**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| WINC, INC., *et al.*,[1] | Case No. 22-11238 (LSS) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
AUTHORIZING (I) THE DEBTORS TO (A) CONTINUE PREPETITION
INSURANCE POLICIES, (B) PAY ALL PREPETITION OBLIGATIONS IN
RESPECT THEREOF; AND (C) CONTINUE THEIR INSURANCE PREMIUM
FINANCING PROGRAM; AND (II) BANKS TO HONOR AND
PROCESS RELATED CHECKS AND TRANSFERS**

The above-captioned affiliated debtors and debtors in possession (collectively, the

"Debtors") hereby file this motion (this "Motion") for the entry of interim and final orders,

substantially in the form attached hereto as **Exhibit A** (the "Interim Order") and **Exhibit B**

(the "Final Order," and together with the Interim Order, the "Proposed Orders"), pursuant to

sections 105(a), 363(b), and 364(c) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532

(the "Bankruptcy Code"), and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), (i) authorizing, but not directing, the Debtors to (a) continue to maintain

and administer prepetition insurance policies and revise, extend, renew, supplement, or change

such policies, as needed, (b) pay or honor obligations outstanding on account of prepetition

insurance policies, and (c) continue their insurance premium financing program and renew or enter

into new premium financing programs, as necessary, under substantially similar terms; and

(ii) authorizing banks and other financial institutions (collectively, the "Banks") to honor and

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Winc, Inc. (8960); BWSC, LLC (0899); and Winc Lost Poet, LLC (N/A).  The Debtors' mailing address for purposes of these chapter 11 cases is 1751 Berkeley Street, Studio 3, Santa Monica, CA 90404.

process all checks and electronic transfer requests related to the foregoing.   In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Carol Brault in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"),[2] filed contemporaneously herewith.   In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.        The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.   This is a core proceeding pursuant to 28 U.S.C. § 157(b), and pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.        The statutory and legal predicates for the relief sought herein are sections 105(a) and 363(b) of the Bankruptcy Code, and Bankruptcy Rules 6003 and 6004.

## BACKGROUND

### A.        General Background

3.        On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").   The Debtors are authorized to operate their businesses and manage their properties as debtors in possession

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed in the Chapter 11 Cases and no request has been made for the appointment of a trustee or an examiner.

4.    Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in the First Day Declaration.

**B.    Insurance Policies[3]**

5.    In the ordinary course of business, the Debtors maintain a comprehensive insurance program (the "Insurance Program").  The Insurance Program includes multiple insurance policies covering, among other things, directors' and officers' ("D&O") liability (including excess layers of D&O liability insurance), fiduciary liability, employment practices liability, general and excess commercial liability, automobile, liquor, property, cargo, foreign liability, umbrella, and premises liability through several different insurance carriers (collectively, the "Insurers") under the insurance contracts listed on **Exhibit C** attached hereto (collectively, the "Insurance Policies").[4] All of the Insurance Policies are essential to the protection and continued operation of the Debtors' businesses.

6.    Under the Insurance Policies, the Debtors are required to pay premiums based on fixed rates set by the Insurers.  The premiums for the Insurance Policies, which total, in the

---

[3]  The descriptions of the Insurance Policies are intended only as a summary, and the actual terms of the Insurance Policies shall govern in the event of any inconsistency with the descriptions set forth herein.

[4]  In addition to the Insurance Policies discussed herein, the Debtors maintain an insurance policy with respect to the Debtors' workers' compensation program (the "Workers' Compensation Program"), which is listed on **Exhibit C**, attached hereto.  This policy is described in further detail in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, and Other Compensation and (B) Continue Employee Benefits Obligations and Pay Related Administrative Obligations; (II) Authorizing the Debtors to Honor Any Workers' Compensation Obligations; (III) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (IV) Granting Related Relief* (the "Employee Wage Motion"), filed concurrently herewith.  Except for the Debtors request to continue to finance the policy premium associated with the Workers' Compensation Program, which is addressed herein, all other relief requested with respect to the Workers' Compensation Program is requested in the Employee Wage Motion.

aggregate, approximately $2.6 million, are generally paid in monthly installment payments of approximately $35,000. However, certain policies require the Debtors to make a substantial up-front payment toward the total annual policy premium. Certain of the premiums are financed through the Debtors' insurance premium finance agreement (defined below) in the total aggregate amount of approximately $190,000. As of the Petition Date, approximately $296,000 remains outstanding on account of premiums under the Insurance Policies.

7.      The Debtors seek authority to continue the Insurance Policies in the ordinary course of business and to pay the outstanding amounts on account thereof on the terms set forth in the Proposed Orders.

## C.    Brokers' Fees

8.      In connection with the Insurance Policies, the Debtors obtain brokerage services from Woodruff-Sawyer & Co. and IMA, Inc. (the "Brokers"). The Brokers assist the Debtors in obtaining comprehensive insurance for the Debtors' operations by, among other things, assisting the Debtors with the procurement and negotiation of the Insurance Policies and enabling the Debtors to obtain those policies on advantageous terms at competitive rates. The Brokers are paid from commissions earned from the Insurers, not directly by the Debtors. Accordingly, while the Debtors do not believe that any amounts are owed to the Brokers as of the Petition Date, the Debtors seek authority, out of an abundance of caution, to satisfy amounts, if any, due to the Brokers and continue to utilize the services of the Brokers during the Chapter 11 Cases.

## D.    The Debtors' Prepetition Insurance Premium Finance Agreement

9.      The Debtors finance certain of their insurance premiums pursuant to an insurance premium finance agreement (the "Finance Agreement"), attached hereto as **Exhibit D**, with FIRST Insurance Funding Corporation (the "PFA Lender"). Under the Finance Agreement with the PFA Lender, the PFA Lender has agreed to pay the insurance premiums due under certain of the

Insurance Policies in exchange for an upfront payment of $33,140.55, followed by ten (10) monthly payments from the Debtors, each in the amount of $19,249.32. The Debtors are current on amounts due under the Finance Agreement, having made a monthly payment on November 30, 2022. The Debtors' obligations under the Finance Agreement are secured by sums due under the Insurance Policies, including any unearned premiums or other sums that may become payable under the Insurance Policies. The Insurance Policies are essential to the Debtors' business during the Chapter 11 Cases.

10. In the Debtors' business judgment, the terms of the Finance Agreement represent fair and reasonable terms for financing the premiums of the Insurance Policies under the circumstances, and the Debtors' estates will benefit by maintaining this low-cost financing from the PFA Lender. Moreover, any interruption of payments might adversely affect the Debtors' ability to obtain financing for future policies on favorable terms, to the extent needed. In some cases, the coverage is required by regulations, laws, or contracts that govern the Debtors' business obligations. Thus, the Debtors request the authority to continue honoring their obligations pursuant to the Finance Agreement and to continue the grant of security interests to the PFA Lender.

## **RELIEF REQUESTED**

11. By this Motion, the Debtors request that the Court enter the Proposed Orders, (i) authorizing, but not directing, the Debtors to continue to maintain and, to the extent necessary, revise, extend, renew, supplement, or change the Insurance Policies, as needed, and to pay any policy premiums and Broker Fees arising thereunder or in connection therewith, including prepetition obligations arising in the ordinary course of business; (ii) continue their insurance premium financing program, honor obligations incurred under the Financing Agreement, and renew or enter into new premium financing programs, as necessary, under substantially similar

terms; and (iii) authorizing the Banks to honor and process check and electronic transfer requests related thereto.

## BASIS FOR RELIEF

**A.      Continuation of the Insurance Program and Payment of Prepetition Obligations in Respect Thereof Are Necessary and Appropriate**

12.      Continuation of the Debtors' Insurance Program is a crucial ordinary-course-of-business transaction.  Authority to pay any prepetition amounts that may be due and owing related to the Insurance Policies—to the extent that the Debtors determine that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment of the coverage, benefits or proceeds provided under the Insurance Policies—is necessary, as the insurance coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' assets and, in many cases, such coverage is required by the various contracts and state, federal, and international laws that govern the Debtors.  *See, e.g.*, 28 U.S.C. § 959(b) (obligating chapter 11 debtors under federal law to operate their business and manage their property according to the laws of the states where such business and property are located).  Further, under the chapter 11 operating guidelines issued by the United States Trustee for Region 3 pursuant to 28 U.S.C. § 586, the Debtors are obligated to maintain certain types of insurance coverage during the Chapter 11 Cases, which is provided by certain of the Insurance Policies.

13.      In addition, the Debtors may need to renew, replace, modify, or extend certain of their Insurance Policies, or obtain additional insurance during the pendency of the Chapter 11 Cases, which will include the need to obtain D&O "tail" coverage shortly after the Petition Date. The nonpayment of any premiums, deductibles, or related fees under the Insurance Program could result in one or more of the Insurers increasing future insurance premiums, declining to renew the Insurance Policies, or refusing to enter into new insurance agreements with the Debtors.  If the

Insurance Policies lapse without renewal, the Debtors may be exposed to substantial liability for first-party property claims and third-party liability claims, to the detriment of all parties in interest.

14.     Similarly, the services provided by the Brokers are critical to ensuring that the Debtors obtain the necessary insurance coverage on advantageous terms at competitive rates, and the Brokers have significant institutional knowledge regarding the Debtors' insurance needs.  If the Debtors were forced to replace the Brokers, the Debtors would necessarily be required to spend time, energy, and resources getting a new insurance broker up to speed on the Debtors' insurance needs.

15.     Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  A bankruptcy court may use its equitable powers under section 105 of the Bankruptcy Code to permit a debtor in possession to pay prepetition claims when payment is necessary to effectuate a debtor's bankruptcy goals and essential to the continued operation of the business.  *See Miltenberger v. Logansport. C. & S.W.R. Co.*, 106 U.S. 286 (1882); *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981); *In re Just for Feet, Inc.*, 242 B.R. 821, 825 (D. Del. 1999) (under necessity of payment doctrine prepetition claims may be paid if essential to the continued operation of the business during reorganization); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 192 (Bankr. D. Del. 1994) (recognizing that necessity of payment doctrine authorizes payment of prepetition claims when "such payment is essential to the continued operation of the business").

16.     The Court may authorize the Debtors to pay premiums to maintain existing insurance coverage, or obtain additional coverage, under section 363(b) of the Bankruptcy Code. In particular, section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Thus, under this section, a court may authorize a debtor to pay certain prepetition claims. *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–77 (S.D.N.Y. 1989) (affirming lower court order authorizing payment of prepetition wages pursuant to section 363(b) of the Bankruptcy Code).

17.    In addition, sections 1107(a) and 1108 of the Bankruptcy Code authorize a debtor in possession to continue to operate its business. 11 U.S.C. §§ 1107(a), 1108. Indeed, a debtor in possession operating a business under section 1108 of the Bankruptcy Code has a duty to protect and preserve the value of its business, and prepetition claims may be paid if necessary to perform the debtor's duty. *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) ("There are occasions when this duty can only be fulfilled by the preplan satisfaction of a prepetition claim."). The *CoServ* court specifically noted that the pre-plan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.*

18.    The relief sought by this Motion is appropriate under each of the foregoing standards. In light of the importance of maintaining insurance coverage with respect to their business activities, the Debtors believe that it is in the best interest of their estates to maintain and continue the Insurance Program and to pay any prepetition premiums necessary to do so, as well as to revise, extend, supplement, or change insurance coverage, as necessary, pursuant to section 363(b)(1) of the Bankruptcy Code. If the Policies lapse, or if certain of the Insurers cancel the Insurance Policies or otherwise refuse to continue doing business with the Debtors, on account of unpaid premiums, before the Debtors are able to find replacement coverage, the Debtors' estates could be exposed to significant liabilities. The loss of any insurance coverage could impose

considerable administrative and financial burden on the Debtors, requiring the Debtors'
management to expend significant attention and resources to secure replacement coverage at a
critical juncture in the Chapter 11 Cases and, possibly, rendering the Debtors non-compliant with
the U.S. Trustee's requirement that debtors maintain insurance coverage during the Chapter 11
Cases.

**B.      The Court Should Authorize, but Not Direct, the Debtors, in Their Discretion, to
         Make Any Necessary Payments Under the Finance Agreement and Renew the
         Finance Agreement and/or Enter into New Finance Agreements in the Ordinary
         Course of Business.**

19.      The Debtors request authority, but not direction, to pay amounts outstanding in
connection with the Finance Agreement.  If the Debtors are unable to make any payments that
arise under the Finance Agreement, the PFA Lender may be permitted to terminate the Insurance
Policies.  The Debtors would then be required to obtain replacement insurance on an expedited
basis and likely at a significantly increased cost.  If the Debtors are required to obtain replacement
insurance, the premium may be the same or greater than what the Debtors are currently obligated
to pay.  The Debtors may be required to pay the premium for such new policy in a lump sum, and
losing the benefit of financing under the Finance Agreement will further strain the Debtors' limited
liquidity.  Thus, in view of the importance of maintaining the related insurance coverage and
preserving their cash flow by financing their insurance premiums, the Debtors believe that it is in
the best interest of their estates and creditors for the Court to authorize the Debtors to honor their
obligations under the Finance Agreement.  Any other alternative would likely require considerable
cash expenditures and would be detrimental to the Debtors' chapter 11 efforts.

20.      The Finance Agreement grants the PFA Lender a security interest in the respective
Insurance Policies, including any unearned premiums or other sums that may become payable
under the Insurance Policies.  Security interests created by premium finance arrangements are

generally recognized as secured claims in bankruptcy to the extent of the amount of unearned premiums financed pursuant to such agreements. *See TIFCO, Inc. v. U.S. Repeating Arms Co. (In re U.S. Repeating Arms Co.)*, 67 B.R. 990, 994–95 (Bankr. D. Conn. 1986); *Drabkin v. A.I. Credit Corp. (In re Auto-Train Corp.)*, 9 B.R. 159, 164–66 (Bankr. D.D.C. 1981). Moreover, section 361 of the Bankruptcy Code specifically contemplates providing adequate protection to the extent of the diminution in value of a secured creditor's collateral, and security interests such as those under the Finance Agreement warrant adequate protection in the form of periodic payments pursuant to the Finance Agreement's terms. *See, e.g.*, *In re Waverly Textile Processing, Inc.*, 214 B.R. 476, 480 (Bankr. E.D. Va. 1997); *TIFCO, Inc. v. U.S. Repeating Arms Co.*, 67 B.R. 990, 1000 (Bankr. D. Conn. 1986).

21. Therefore, if the Debtors are unable to continue making payments under the Finance Agreement, the PFA Lender could seek relief from the automatic stay to cancel applicable Insurance Policies in accordance with the terms of the Finance Agreement or to seek adequate protection of its respective investment. *See Universal Motor Express*, 72 B.R. 208, 211 (Bankr. W.D.N.C. 1987) (recognizing that a default under the financing arrangement and the resulting decline in value of the unearned premiums justified relief from the automatic stay). The Debtors then would be required to obtain replacement insurance on an expedited basis and at significant cost to the estates. If the Debtors are required to obtain replacement insurance and to pay a lump-sum premium for such insurance in advance, this payment may be the same or greater than what the Debtors currently pay to the PFA Lender under the Finance Agreement. Even if the PFA Lender is not permitted to terminate the Insurance Policies, any interruption of payments would severely and adversely affect the Debtors' ability to finance premiums for future policies, as needed. Accordingly, the Debtors submit that the practical solution is to continue making the

premium financing payments.

22.     In addition, the Debtors submit that the Court should also authorize the Debtors to renew or enter into new premium finance agreements postpetition in the ordinary course of business and consistent with the Debtors' past practice.

23.     Section 363(c)(1) of the Bankruptcy Code provides that "the trustee [or a debtor in possession] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).  Section 363(b)(1) of the Bankruptcy Code provides that, "[t]he trustee [or debtor in possession], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).

24.     The Debtors submit that the renewal of the Finance Agreement and/or the execution of new premium finance agreements constitute transactions in the ordinary course of business, within the meaning of section 363(c)(1) of the Bankruptcy Code, that do not require prior bankruptcy court approval.

25.     Neither the Bankruptcy Code nor its legislative history provides a framework for analyzing whether a transaction is in the ordinary course of business.  The Third Circuit, however, has developed a two-part inquiry, including a "horizontal dimension" test and a "vertical dimension" test, for determining whether a transaction is in the ordinary course of business under section 363(c)(1).  *See In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992); *see, e.g.*, *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 791 (Bankr. D. Del. May 24, 2007); *Braunstein v. McCabe*, 571 F. 3d 108, 124–25 (1st Cir. 2009).  The horizontal dimension test focuses on whether, from an industry wide perspective, the transaction is "of the sort commonly undertaken by

companies in that industry." *In re Roth Am., Inc.*, 975 F.2d 202 at 953.  The vertical dimension test (or creditor's expectation test) focuses on the vantage point of a hypothetical creditor and inquires whether the transaction subjects the creditor to economic risks of a nature different from those the creditor accepted when it decided to extend credit to the debtor.  *Id.*

26.     The Debtors believe that the renewal of the Finance Agreement and/or the execution of new premium finance agreements satisfies the "horizontal dimension" test because maintaining insurance coverage and entering into related premium financing agreements is a common industry practice.  *Drabkin*, 800 F.2d at 1154 (finding such a premium financing agreement to be a "common commercial arrangement.").  The "vertical dimension" test is also satisfied because the Debtors' maintenance of insurance under premium finance agreements does not subject the Debtors' creditors to any economic risk, but rather, serves to protect the Debtors' creditors from economic risk.  Accordingly, the renewal of the Finance Agreement and/or the execution of new premium finance agreements constitute "ordinary course" uses of estate property under section 363(c)(1) of the Bankruptcy Code.  *See In re Roth American*, 975 F.2d at 952 n.4 (citing *U.S. v. Estate of Deutscher*, 115 B.R. 592, 598-99 (M.D. Tenn. 1990), for the proposition that "trustee's use of fund to . . . reinstate insurance was in ordinary course of business").

27.     Indeed, the Debtors submit that it may be outside the ordinary course of business for them to fail to renew the Finance Agreement.  *See In re Lavigne*, 114 F.3d 379, 383-84 (2d Cir. 1994) (cancellation of insurance policy was not in the ordinary course of business).  Nevertheless, out of an abundance of caution, the Debtors have filed this Motion seeking entry of the Proposed Orders approving, under section 363 of the Bankruptcy Code, the Debtors' postpetition renewal of the Finance Agreement and/or the execution of new premium finance agreements.

28.     The Debtors also request authority to enter into new premium finance agreements

pursuant to section 364(c)(2) of the Bankruptcy Code, consistent with their ordinary course practices.  Section 364(c)(2) authorizes, after notice and a hearing, a debtor in possession to obtain debt secured by a lien on property of the estate.  11 U.S.C. § 364(c)(2).  Under any new premium finance agreement, the counterparty would likely require that the Debtors grant a security interest in the unearned premiums under the financed policies.  *See generally In re Schwinn Bicycle Co.*, 200 B.R. 980, 982 (Bankr. N.D. Ill. 1996) (describing insurance premium financing agreements).

29.     Section 364(c) authorizes a debtor, in the exercise of its business judgment, to incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estates.  *See, e.g.*, *In re General Growth Props., Inc.*, 412 B.R. 122, 125-26 (Bankr. S.D.N.Y. May 14, 2009) (granting motion for postpetition financing upon finding that (a) "no comparable credit [was] available on more favorable terms"; (b) the debtors needed postpetition financing to "to preserve [their] assets and continue their operations"; and (c) the terms and conditions of the DIP Documents had been negotiated in good faith); *In re Budget Grp., Inc.*, Case No. 02-12152, 2002 Bankr. LEXIS 1050 (Bankr. D. Del. Aug, 1, 2002) (authorizing funding of acquisition of property on a secured basis where acquired property was necessary to maintain operations and debtor could not obtain such funding on an unsecured basis); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties").  Because a borrowing to maintain essential insurance coverage is in the best interests of the Debtors' estates, the Debtors submit that the Court should authorize them to renew the Finance Agreement and/or execute new premium finance agreements postpetition, as appropriate.

**C.    The Court Should Authorize the Banks to Honor and Process the Debtors' Payments Related to the Insurance Programs and the Broker Fees**

30.    The Debtors also request that the Court authorize the Banks, when requested by the Debtors, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition obligations as described herein, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments. The Debtors further request that all Banks be authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to this Motion.

## SATISFACTION OF BANKRUPTCY RULE 6003

31.    Pursuant to Bankruptcy Rule 6003(b), any motion seeking to use property of the estate pursuant to section 363 of the Bankruptcy Code or to satisfy prepetition claims within twenty-one days of the Petition Date requires the Debtors to demonstrate that such relief "is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(b). As set forth throughout this Motion, any disruption of the Insurance Policies, and the related services received by the Debtors would substantially diminish or impair the Debtors' efforts in the Chapter 11 Cases to preserve and maximize the value of their estates and directly undermine the Debtors' ability to operate their business.

32.    For this reason and those set forth above, the Debtors respectfully submit that Bankruptcy Rule 6003(b) has been satisfied and that the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

## REQUEST FOR WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

33.    Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the

order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As set forth throughout this Motion, any disruption in, among other things, the Debtors' insurance coverage would be detrimental to the Debtors, their creditors, and their estates, and would impair their ability to optimize their business performance at this critical time as they begin the chapter 11 process.  For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable to the Proposed Orders.

34.    To implement the foregoing immediately, the Debtors also respectfully request a waiver of the notice requirements of Bankruptcy Rule 6004(a) to the extent they are deemed applicable to the Proposed Orders.

## RESERVATION OF RIGHTS

35.    Nothing in the Proposed Orders or this Motion (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors and their estates; (ii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority, or amount of any claim against the Debtors and their estates; (iii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to any and all claims or causes of action against any of the Insurers; or (iv) shall be construed as a promise to pay a claim.

## NOTICE

36.    Notice of this Motion has been or will be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the holders of the thirty (30) largest unsecured claims on a consolidated basis against the Debtors; (iii) counsel to the Debtors' prepetition secured lender; (iv) counsel to the DIP Lender; (v) the Internal Revenue Service; (vi) the U.S. Securities

29867880.11

and Exchange Commission; (vii) the Banks; and (viii) the Insurers.  Notice of this Motion and any

order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the

nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## **CONCLUSION**

WHEREFORE, the Debtors request that the Court enter the Proposed Orders, granting the

relief requested herein and such other and further relief as the Court may deem just and proper.

Dated:    December 2, 2022
       Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Shella Borovinskaya*
Michael R. Nestor (No. 3526)
Matthew B. Lunn (No. 4119)
Allison S. Mielke (No. 5934)
Joshua B. Brooks (No. 6765)
Shella Borovinskaya (No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile:  (302) 571-1253
Email:  mnestor@ycst.com
      mlunn@ycst.com
      amielke@ycst.com
      jbrooks@ycst.com
      sborovinskaya@ycst.com

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

# **EXHIBIT A**

## **Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| WINC, INC., *et al.*,[1] | Case No. 22-11238 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. _____** |

**INTERIM ORDER AUTHORIZING (I) THE DEBTORS TO
(A) CONTINUE PREPETITION INSURANCE POLICIES, AND (B) PAY ALL
PREPETITION OBLIGATIONS IN RESPECT THEREOF; (II) AUTHORIZING THE
DEBTORS TO CONTINUE THEIR INSURANCE PREMIUM FINANCING PROGRAM;
AND (III) AUTHORIZING BANKS TO HONOR AND PROCESS
RELATED CHECKS AND TRANSFERS**

Upon consideration of the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of interim and final orders, pursuant to sections 105(a), 363(b), and 364(c) of the Bankruptcy Code, (i) authorizing, but not directing, the Debtors to (a) continue to maintain and administer prepetition insurance policies and revise, extend, renew, supplement, or change such policies, or enter into new policies, including procuring directors' and officers' liability tail coverage, as needed, and (b) pay or honor obligations outstanding on account of prepetition insurance policies; (ii) authorizing, but not directing, the Debtors to continue their insurance premium financing program and renew or enter into new premium financing programs, as necessary, under substantially similar terms; and (iii) authorizing the Banks to honor and process all checks and electronic transfer requests related to the foregoing; and upon consideration of the Motion and all pleadings related thereto, including

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Winc, Inc. (8960); BWSC, LLC (0899); and Winc Lost Poet, LLC (N/A). The Debtors' mailing address for purposes of these chapter 11 cases is 1751 Berkeley Street, Studio 3, Santa Monica, CA 90404.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

the First Day Declaration; and due and proper notice of the Motion having been given; and it appearing that no other or further notice of the Motion is required; and it appearing that this Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that the relief requested in the Motion and provided for herein is in the best interest of the Debtors, their estates, and creditors; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED on an interim basis as set forth herein.

2.      A final hearing on the relief sought in the Motion shall be conducted on _____, 2022 at _____ (ET) (the "<u>Final Hearing</u>").  Any party-in-interest objecting to the relief sought at the Final Hearing or the Final Order shall file and serve a written objection, which objection shall be served upon (i) proposed counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Wilmington, DE 19801, Attn: Matthew B. Lunn, Esq. (mlunn@ycst.com) and Allison S. Mielke, Esq. (amielke@ycst.com); (ii) the Office of the United States Trustee, 844 King Street, Room 2207, Wilmington, DE 19801, Attn: Jane Leamy, Esq. (jane.m.leamy@usdoj.gov); (iii) counsel to the DIP Lender, Cooley LLP, 110 N. Wacker Drive, Suite 4200, Chicago, IL 60606, Attn: Eric E. Walker, Esq. (ewalker@cooley.com) and Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, 16th Floor, P.O. Box 1347, Wilmington, DE 19899-1347, Attn:  Derek Abbott, Esq. (dabbott@morrisnichols.com) and Curtis Miller, Esq. (cmiller@morrisnichols.com); and (iv) counsel to any statutory committee appointed in the

Chapter 11 Cases, in each case so as to be received no later than _____, 2022 at 4:00 p.m. (ET).  If no objections to the entry of the Final Order are timely filed, this Court may enter the Final Order without further notice or a hearing.

3.       Subject to Paragraph 4, the Debtors are authorized to maintain the Insurance Policies without interruption and to renew, supplement, modify, extend, or change the Insurance Policies, or enter into new insurance policies, and to incur and pay premiums, claims, deductibles, retentions, retrospective adjustments, administrative fees, broker fees (including, without limitation, the Broker Fees), and any other obligations arising thereunder or in connection therewith, in accordance with the same practices and procedures as were in effect prior to the Petition Date.

4.       The Debtors are authorized, but not directed, in their discretion to pay, honor, or otherwise satisfy premiums, claims, deductibles, retentions, retrospective adjustments, administrative fees, broker fees (including, without limitation, the Broker Fees), and any other obligations that (a) were either due and payable on or related to the period prior to the Petition Date on account of the Insurance Policies and the Finance Agreement, in an amount not to exceed $65,000 pending entry of the Final Order, and (b) are, or become, due and payable or related to the period after the commencement of the Chapter 11 Cases.

5.       The Banks are authorized, when requested by the Debtors, in the Debtors' discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition obligations authorized to be paid hereunder, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments.  The Banks may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued

by the Debtors prior to the Petition Date should be honored pursuant to this Interim Order, and any such Bank shall not have any liability to any party for relying on such representations by the Debtors, as provided for in this Interim Order.

6.      Nothing in this Interim Order (i) is intended or shall be deemed to constitute the Debtors' assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors and their estates; (ii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates to contest the validity, priority, or amount of any claim against the Debtors and their estates; (iii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates with respect to any and all claims or causes of action against any third party; or (iv) shall be construed as the Debtors' promise to pay a claim or continue any applicable programs postpetition, which decision shall be in the sole discretion of the Debtors.  Any payment made pursuant to an order of the Court granting the relief requested herein is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

7.      The Debtors are authorized to take any and all actions necessary to effectuate the relief granted herein.

8.      The requirements of Bankruptcy Rule 6003(b) are satisfied.

9.      Notwithstanding the applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be effective and enforceable immediately upon its entry.

10.     Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

29867880.11

11.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Interim Order.

29867880.11

## **EXHIBIT B**

**Final Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| WINC, INC., *et al.*,[7] | Case No. 22-11238 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. ___ & ___** |

**FINAL ORDER AUTHORIZING (I) THE DEBTORS TO (A) CONTINUE
PREPETITION INSURANCE POLICIES, AND (B) PAY ALL PREPETITION
OBLIGATIONS IN RESPECT THEREOF; (II) AUTHORIZING THE DEBTORS TO
CONTINUE THEIR INSURANCE PREMIUM FINANCING PROGRAM; AND
(III) AUTHORIZING BANKS TO HONOR AND PROCESS
RELATED CHECKS AND TRANSFERS**

Upon consideration of the motion (the "Motion")[8] of the above-captioned debtors and

debtors in possession (collectively, the "Debtors") for the entry of interim and final orders,

pursuant to sections 105(a), 363(b), 364(c) of the Bankruptcy Code, (i) authorizing, but not

directing, the Debtors to (a) continue to maintain and administer prepetition insurance policies and

revise, extend, renew, supplement, or change such policies, or enter into new policies, as needed,

and (b) pay or honor obligations outstanding on account of prepetition insurance policies;

(ii) authorizing, but not directing, the Debtors to continue their insurance premium financing

program and renew or enter into new premium financing programs, as necessary, under

substantially similar terms; and (iii) authorizing the Banks to honor and process all checks and

electronic transfer requests related to the foregoing; and upon consideration of the Motion and all

pleadings related thereto, including the First Day Declaration; and due and proper notice of the

---

[7] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Winc, Inc. (8960); BWSC, LLC (0899); and Winc Lost Poet, LLC (N/A).  The Debtors' mailing address for purposes of these chapter 11 cases is 1751 Berkeley Street, Studio 3, Santa Monica, CA 90404.

[8] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Motion having been given; and it appearing that no other or further notice of the Motion is required; and it appearing that this Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that the relief requested in the Motion and provided for herein is in the best interest of the Debtors, their estates, and creditors; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED on a final basis as set forth herein.

2.      Subject to Paragraph 3, the Debtors are authorized to maintain the Insurance Policies without interruption and to renew, supplement, modify, extend, or change the Insurance Policies, or enter into new insurance policies, and to incur and pay premiums, claims, deductibles, retentions, retrospective adjustments, administrative fees, broker fees (including, without limitation, the Broker Fees), and any other obligations arising thereunder or in connection therewith, in accordance with the same practices and procedures as were in effect prior to the Petition Date.

3.      The Debtors are authorized, but not directed, in their discretion to pay, honor, or otherwise satisfy premiums, claims, deductibles, retentions, retrospective adjustments, administrative fees, broker fees (including, without limitation, the Broker Fees), and any other obligations that (i) were either due and payable on or related to the period prior to the Petition Date on account of the Insurance Policies and the Finance Agreement, in an amount not to exceed

29867880.11

8

$65,000, and (ii) are, or become, due and payable or related to the period after the commencement of the Chapter 11 Cases.

4.      The Banks are authorized, when requested by the Debtors, in the Debtors' discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition obligations authorized to be paid hereunder, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments.  The Banks may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Final Order, and any such Bank shall not have any liability to any party for relying on such representations by the Debtors, as provided for in this Final Order.

5.      Nothing in this Interim Order (i) is intended or shall be deemed to constitute the Debtors' assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors and their estates; (ii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates to contest the validity, priority, or amount of any claim against the Debtors and their estates; (iii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates with respect to any and all claims or causes of action against any third party; or (iv) shall be construed as the Debtors' promise to pay a claim or continue any applicable programs postpetition, which decision shall be in the sole discretion of the Debtors.  Any payment made pursuant to an order of the Court granting the relief requested herein is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

29867880.11

6.      The Debtors are authorized to take any and all actions necessary to effectuate the relief granted herein.

7.      Notwithstanding the applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Final Order shall be effective and enforceable immediately upon its entry.

8.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Final Order.

**EXHIBIT C**

**List of Insurance Policies**

| INSURANCE CARRIER | INSURANCE POLICY | Financed/Not Financed | POLICY NUMBER | EFFECTIVE DATES |
|---|---|---|---|---|
| Transportation Insurance Company | Workers Compensation | Not Financed | 6081401958 | 09/30/22 – 09/30/23 |
| Transportation Insurance Company | Workers Compensation | Not Financed | 6081401961 | 09/30/22 – 09/30/23 |
| The Continental Insurance Company | Automobile | Not Financed | 6080961108 | 09/30/22 – 09/30/23 |
| Valley Forge Insurance Company | Property/General Liability | Not Financed | 6080961111 | 09/30/22 – 09/30/23 |
| The Continental Insurance Company | Umbrella | Not Financed | 6080961092 | 09/30/22 – 09/30/23 |
| The Continental Insurance Company | Liquor Liability | Not Financed | 6080961089 | 09/30/22 – 09/30/23 |
| Lloyds of London | Cargo (War & Marine) | Financed | WC-FAL-90000045/ MC-FAL-90000045 | 09/30/22 – 09/30/23 |
| ACE American Insurance Company | Foreign Liability | Not Financed | PFFFD38423757 006 | 09/30/22 – 09/30/23 |
| Axis Insurance Company | Employment Practices Liability | Financed | P00100069106402 | 09/30/22 – 09/30/23 |
| Travelers Casualty and Surety Company of America | Fiduciary Liability Insurance | Financed | 107546131 | 09/30/22 – 09/30/23 |
| National Union Fire Insurance Company of Pittsburgh, PA | Primary Directors' and Officers' Insurance | Not Financed | 01-811-11-45 | 11/11/22 – 11/11/23 |

| INSURANCE CARRIER | INSURANCE POLICY | Financed/Not Financed | POLICY NUMBER | EFFECTIVE DATES |
|---|---|---|---|---|
| National Union Fire Insurance Company of Pittsburgh, PA | Excess Directors' and Officers' Insurance | Not Financed | 01-811-11-47 | 11/11/22 to 11/11/23 |
| Endurance American Insurance Company | Excess Directors' and Officers' Insurance | Not Financed | DOX3330027679200 | 11/11/22 to 11/11/23 |
| Allied World Insurance Company | Excess Directors' and Officers' Insurance | Not Financed | 0313-6125 | 11/11/22 to 11/11/23 |
| Axis Insurance Company | Excess Directors' and Officers' Insurance | Not Financed | P-001-001045876-01 | 11/11/22 to 11/11/23 |

29867880.11

## EXHIBIT D

**Premium Financing Agreement**

**LENDER:**

450 Skokie Blvd, Ste 1000

## PREMIUM FINANCE AGREEMENT

☐ Personal   ☑ Commercial   ☐ Additional Premium

Northbrook, IL 60062-7917
P:(800) 837-2511 F:(800) 837-3709
www.firstinsurancefunding.com

**FIRST INSURANCE** FUNDING
A WINTRUST COMPANY

**Quote #: 41998725**

| INSURED/BORROWER | Customer ID: N/A | AGENT or BROKER |
|---|---|---|
| (Name and Address as shown on Policy) | | (Name and Business Address) |
| Club W, Inc. (dba Winc Wines) | | WOODRUFF-SAWYER & CO |
| 1751 Berkeley Street | | 50 CALIFORNIA ST FL 12 |
| Studio 3 | | SAN FRANCISCO, CA 94111 |
| Santa Monica, CA 90404 | | |

## LOAN DISCLOSURE

| Total Premiums, Taxes, and Fees | Down Payment | Unpaid Balance | Documentary Stamp Tax (only applicable in Florida) | Amount Financed (amount of credit provided on your behalf) | FINANCE CHARGE (dollar amount the credit will cost you) | Total of Payments (amount paid after making all scheduled payments) | ANNUAL PERCENTAGE RATE (cost of credit as a yearly rate) |
|---|---|---|---|---|---|---|---|
| 220,937.00 | 33,140.55 | 187,796.45 | 0.00 | 187,796.45 | 4,696.75 | 192,493.20 | 5.420 % |

*YOUR PAYMENT SCHEDULE WILL BE:*   *Mail Payments to: FIRST INSURANCE Funding, PO Box 7000, Carol Stream, IL 60197-7000*

| Number of Payments | Amount of Each Payment | First Installment Due | 10/30/2022 |
|---|---|---|---|
| 10 | 19,249.32 | Installment Due Dates | 30th (Monthly) |

**INSURED'S AGREEMENT:**

**1. SECURITY INTEREST.** INSURED/BORROWER ("Insured") grants and assigns FIRST INSURANCE Funding, A Division of Lake Forest Bank & Trust Company, N.A. ("LENDER") a first priority lien on and security interest in the financed policies and any additional premium required under the financed policies listed in the Schedule of Policies, including (a) all returned or unearned premiums, (b) all additional cash contributions or collateral amounts assessed by the insurance companies in relation to the financed policies and financed by LENDER hereunder, (c) any credits generated by the financed policies, (d) dividend payments, and (e) loss payments which reduce unearned premiums (collectively, the "Financed Policies"). If any circumstances exist in which premiums related to any Financed Policy could become fully earned in the event of loss, LENDER shall be named a loss-payee with respect to such policy.

**2. FINANCE CHARGE.** The finance charge begins accruing on the earliest effective date of the Financed Polices. The finance charge is computed using a 365-day calendar year.

**3. LATE PAYMENT.** For commercial loans, a late charge will be assessed on any installment at least 5 days in default, and the late charge will equal 5% of the delinquent installment or the maximum late charge permitted by law, whichever is less. For personal loans, a late charge will be assessed on any installment 10 days in default, and the late charge will be the lesser of $10 or 5% of the delinquent installment.

**4. PREPAYMENT.** If Insured prepays the loan in full, Insured is entitled to a refund of the unearned finance charge computed according to the Rule of 78s.

### SCHEDULE OF POLICIES

| Policy Number | Full Name of Insurance Company and Name of General Agent or Company Office to Which Premium is Paid | Coverage | Policy Term | Effective Date | Premiums, Taxes and Fees |
|---|---|---|---|---|---|
| P00100069106402 | C00198-AXIS INSURANCE COMPANY [CX:0] [PR] | EPLI | 12 | 9/30/2022 ERN TXS/FEES FIN TXS/FEES | 52,007.00 0.00 0.00 |
| 107546131 | C00269-TRAVELERS CAS AND SUR OF AMER [CX:0] [PR] | LIAB FIDUC | 12 | 9/30/2022 ERN TXS/FEES FIN TXS/FEES | 3,930.00 0.00 0.00 |
| (Policies continued on next page.) | | | | TOTAL | 220,937.00 |

Q# 41998725, PRN: 100322, CFG: 0Internal - No Restrictions, RT: GATF-IMM-WOODRUFF, DD: 0, BM: Invoice, Qtd For: A01708 Original, Memo 1

**5. PROMISE TO PAY.** In consideration of the premium payment by LENDER to the insurance companies listed in the Schedule of Policies (or their authorized representative) or the Agent or Broker listed above, Insured unconditionally promises to pay LENDER, the Amount Financed plus interest and other charges permitted under this Agreement, including the Down Payment if owed and payable directly to LENDER, subject to all the provisions of this Agreement.

**6. POWER OF ATTORNEY.** INSURED IRREVOCABLY APPOINTS LENDER AS ITS "ATTORNEY-IN-FACT" with full power of substitution and full authority, in the event of default under this Agreement, to (a) cancel the Financed Policies in accordance with the provisions contained herein, (b) receive all sums assigned to LENDER, and (c) execute and deliver on behalf of Insured all documents relating to the Financed Policies in furtherance of this Agreement. This right to cancel will terminate only after all of Insured's indebtedness under this Agreement is paid in full. Insured is responsible for repayment of the Amount Financed plus interest and other charges permitted under this Agreement, including the Down Payment if owed and payable directly to LENDER, irrespective of whether LENDER exercises this right to cancel the Financed Policies.

**7. SIGNATURE & ACKNOWLEDGEMENT.** Insured has received, reviewed, and signed a copy of this Agreement. By signing below, you certify that you have the requisite authority to (a) enter into this Agreement on behalf of Insured (if applicable, including as agent, trustee, executor, or otherwise in a representative capacity) and any other insureds named on the Financed Policies, and (b) jointly and severally agree on behalf of all insureds named on this Agreement to all provisions set forth in this Agreement. **Insured acknowledges and understands that entry into this financing arrangement is not required as a condition for obtaining insurance coverage.**

**NOTICE TO INSURED: (1) Do not sign this Agreement before you read both pages of it, or if it contains any blank space.  (2) You are entitled to a completely filled-in copy of this Agreement.  (3) You have the right prepay the loan in full and receive a refund of any unearned finance charge. (4) Keep a copy of this Agreement to protect your legal rights. (5) See last page of Agreement for your consent to electronic statement and notice delivery.**

DocuSigned by:
*Carol Brault*
5A8A4FA20EA24AC...

10/5/2022

| Signature of Insured or Authorized Agent | Date | Signature of Agent | Date |
|---|---|---|---|

**FIF0521NBP**

**ADDITIONAL PROVISIONS OF PREMIUM FINANCE AGREEMENT**

**8. APPLICATION OF PAYMENTS.** (a) Payments received by LENDER from Insured shall be applied first to installments, then to any unpaid fees. The payment of installments is prioritized over the payment of fees, which means when LENDER receives partial payments or overpayments of any installment(s), amounts previously applied to fees may be reallocated to enable a full installment(s) to be paid. This payment application method may cause fees to reappear as unpaid and owing after the payment period in which the fees were originally assessed and paid, but does not increase or otherwise change the amount of fees that Insured may be required to pay under this Agreement. (b) Any returned premium received by LENDER from the Financed Policies will be applied to reduce the total unpaid balance under this Agreement, which shall not relieve Insured of its obligation to pay any remaining installments due but may reduce the amount of such installments.

**9. EFFECTIVE DATE.** This Agreement will not become effective until it is accepted in writing by LENDER. LENDER will send a Notice of Acceptance to Insured to confirm this Agreement is effective.

**10. DEFAULT/CANCELLATION.** Insured is in default under this Agreement if (a) the Down Payment, if to be collected by LENDER, or any payment is not received by LENDER when it is due, (b) a proceeding in bankruptcy, receivership, insolvency or similar proceeding is instituted by or against Insured, or (c) Insured fails to comply with any of the terms of this Agreement. If Insured is in default, LENDER has no further obligation under this Agreement to pay premiums on Insured's behalf, and LENDER may pursue any of the remedies provided in this Agreement or by law. If a default by Insured results in a cancellation of the Financed Policies, Insured agrees to pay a cancellation charge for commercial loans, which will be the maximum permitted by law. No cancellation charge shall apply to personal loans. If cancellation or default occurs, Insured agrees to pay interest on the unpaid balance due at the contract rate until the balance is paid in full.

**11. LIMITATION OF LIABILITY.** Insured understands and agrees that LENDER or its assignee is not liable for any losses or damages to Insured or any person or entity upon the exercise of LENDER's right of cancellation, except in the event of willful or intentional misconduct by LENDER.

**12. INSUFFICIENT FUNDS CHARGE.** If Insured's payment is dishonored for any reason and if permitted by law, Insured will pay LENDER an insufficient funds charge equal to the maximum fee permitted by law for commercial loans and $10 for personal loans.

**13. LENDER'S RIGHTS AFTER THE POLICIES ARE CANCELLED.** After any Financed Policy is cancelled by any party or if a credit is otherwise generated, LENDER has the right to receive all unearned premiums and other funds assigned to LENDER as security herein and to apply them to Insured's unpaid balance under this Agreement or any other agreement between Insured and LENDER. Receipt of unearned premiums does not constitute payment of installments to LENDER, in full or in part. Any amounts received by LENDER after cancellation of the Financed Policies will be credited to the balance due with any excess paid to the Insured; the minimum refund is $1.00. Any deficiency shall be immediately paid by Insured to LENDER. Insured agrees that insurance companies may rely exclusively on LENDER's representations about the Financed Policies.

**14. ASSIGNMENT.** Insured may not assign any Financed Policy or this Agreement without LENDER's prior written consent. LENDER may transfer its rights under this Agreement without the consent of Insured.

**15. AGENT OR BROKER.** Insured agrees that the Agent or Broker issuing the Financed Policies or through whom the Financed Policies were issued is not the agent of LENDER, except for any action taken on behalf of LENDER with the express authority of LENDER, and LENDER is not bound by anything the Agent or Broker represents to Insured, orally or in writing, that is not contained in this Agreement. The Agent or Broker will receive from LENDER $1,877.96 for aiding in the administration of this Agreement relating to the Financed Policies. In NY, the Agent or Broker may assess a fee to Insured for obtaining and servicing the Financed Policies pursuant to NY CLS Ins § 2119. Any questions regarding this payment should be directed to the Agent or Broker.

**16. COLLECTION COSTS.** Insured agrees to pay reasonable attorney fees, court costs, and other collection costs to LENDER to the extent permitted by law if this Agreement is referred to an attorney or collection agent who is not a salaried employee of LENDER to collect money that Insured owes.

**17. GOVERNING LAW.** The loan terms subject to this Agreement are governed by applicable federal law and Illinois law (to the extent not preempted by federal law), without regard to principles of conflicts of law or choice of law. If any court finds any term herein to be invalid, such finding will not affect the remaining provisions.

**18. WARRANTY OF ACCURACY.** Insured represents and warrants that to the best of its knowledge: (a) the Financed Policies are in full force and effect and that the Insured has not and will not assign any interest in the Financed Policies except for the interest of mortgagees and loss payees, (b) the Down Payment and any past due payments have been paid in full to the Agent or Broker or Lender in cash or other immediately available funds, (c) all information provided herein or in connection with the Agreement is true, correct, and not misleading, (d) Insured is not insolvent nor presently involved in any insolvency proceeding, (e) Insured has no indebtedness to the insurance companies issuing the Financed Policies, (f) there is no provision in the Financed Policies that would require LENDER to notify or obtain consent from any other party to effect cancellation of the Financed Policies, and (g) Insured has disclosed if he or she is a covered member of the armed forces or a dependent of a covered member as defined in the Military Lending Act.

**19. ADDITIONAL PREMIUMS.** (a) Insured expressly agrees to (i) fully and timely comply with all audits by the insurance companies issuing the Financed Policies, (ii) timely provide complete and accurate payroll information, if applicable, and (iii) pay to the insurance companies any additional amount due in connection with the Financed Policies. The Amount Financed shall be applied to the Financed Policies' premium amounts and Insured shall be responsible for any additional premiums or other sums. (b) Insured, or Agent or Broker, may request that LENDER finance additional policies and/or additional premiums (the "Additional Premiums") for Insured during the term of this Agreement. If LENDER agrees, LENDER will send a Notice of Acceptance to Insured to confirm its approval to finance the Additional Premiums. For commercial loans, this Agreement shall be deemed amended on the date of the Notice of Acceptance to consolidate the Additional Premiums with Financed Policies into a single and indivisible loan transaction subject to this Agreement (with applicable changes to the payment schedule), and the Additional Premiums shall be "Financed Policies" on the date of the Notice of Acceptance. For personal loans, LENDER (or Agent or Broker on LENDER's behalf) will provide a separate Premium Finance Agreement to Insured for any Additional Premiums.

**20. CORRECTIONS.** LENDER may insert the names of insurance companies or policy numbers in the Schedule of Policies, if this information is not known at the time Insured signs this Agreement. LENDER is authorized to correct patent errors or omissions in this Agreement.

**21. NON-WAIVER.** Not Applicable.

---

**AGENT OR BROKER REPRESENTATIONS AND WARRANTIES**

Unless previously disclosed in writing to LENDER or specified in the Schedule of Policies, the Agent or Broker executing this Agreement expressly represents, warrants, and agrees as follows: (1) Insured has received a copy of this Agreement and has authorized this transaction, the signer of this Agreement (whether Insured or its agent) has valid authority to bind Insured and any other insureds named under the Financed Policies to the terms of this Agreement, including the Power of Attorney provision, Insured's signature is genuine, and the Down Payment has been received from Insured (unless the Down Payment was made to Lender), (2) the information contained in the Schedule of Policies including the premium amount is correct and accurately reflects the necessary coverage, (3) the Financed Policies (a) are in full force and effect, (b) are cancellable by Insured or LENDER (or its successors or assigns), (c) will generate unearned premiums which will be computed on the standard short rate or pro rata basis, and (d) do not contain any provisions which affect the standard short rate or pro rata premium computation, including but not limited to direct company bill, audit, reporting form, retrospective rating, or minimum or fully earned premium, (4) the Agent or Broker is either the insurer's authorized policy issuing agent or the broker placing the coverage directly with the insurer, except where the name of the Issuing Agent or General Agent is listed in the Schedule of Policies, (5) to the best of the Agent or Broker's knowledge, there are no bankruptcy, receivership, or insolvency proceedings affecting Insured, (6) Agent or Broker will hold harmless and indemnify LENDER and its successors and assigns against any loss or expense (including attorney's fees, court costs, and other costs) incurred by LENDER and resulting from Agent or Broker's violations of these Representations and Warranties or from Agent or Broker's errors, omissions, or inaccuracies in preparing this Agreement, and will promptly reimburse LENDER for any loss or expense incurred in connection with any incidence of fraud or lack of valid authority on behalf of Insured or any other named insureds with respect to the terms of this transaction, the Agreement, or the Financed Policies, (7) agent or Broker will (a) hold in trust for LENDER any payments made or credited to Insured through or to Agent or Broker by the insurance companies or LENDER, and (b) pay these monies and the unearned commissions to LENDER upon demand to satisfy the outstanding indebtedness under this Agreement, and (8) to fully and timely assist with all payroll audits.

DocuSign Envelope ID: 93040913-847C-4859-A248-F86B6CF277A9

## SCHEDULE OF POLICIES

Insured:  Club W, Inc. (dba Winc Wir

Quote #: 41998725

| Policy Number | Full Name of Insurance Company and Name of General Agent or Company Office to Which Premium is Paid | Coverage | Policy Term | Effective Date | Premiums, Taxes and Fees |
|---|---|---|---|---|---|
| MC-90000045 | C00005-LLOYDS OF LONDON<br>G02620-FALVEY CARGO  UNDERWRITING<br>    [ME:75.000 %, CX:0]          [PR] | CRGO | 12 | 9/30/2022<br>ERN TXS/FEES<br>FIN TXS/FEES | 165,000.00<br>0.00<br>0.00 |

**FIF0214P-SCH**