## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WINC, INC., *et al.*,[1] | Case No. 22-11238 (LSS) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
POSTPETITION FINANCING, (B) GRANT SENIOR SECURED LIENS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, AND (C) UTILIZE CASH
COLLATERAL; (II) DETERMINING THAT THE PREPETITION SECURED
LENDER IS ADEQUATELY PROTECTED; (III) MODIFYING THE
AUTOMATIC STAY; (IV) SCHEDULING FINAL HEARING;
AND (V) GRANTING RELATED RELIEF**

The above-captioned affiliated debtors and debtors in possession (collectively, the "Debtors") hereby submit this motion (this "Motion"),[2] pursuant to sections 105(a), 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an interim order, in substantially the form attached hereto as **Exhibit I** (the "Interim Order"), and a final order (the "Final Order" and, together with the Interim Order, the "Financing Orders")[3] granting the relief requested below. In support of this Motion, the Debtors rely on the *Declaration of Carol Brault in Support of Chapter 11 Petitions and First Day*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Winc, Inc. (8960); BWSC, LLC (0899); and Winc Lost Poet, LLC (N/A). The Debtors' mailing address for purposes of these chapter 11 cases is 1751 Berkeley Street, Studio 3, Santa Monica, CA 90404.

[2] Any capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the DIP Loan Documents or the Interim Order, as applicable.

[3] The Debtors will file the form of Final Order prior to the Final Hearing (as defined below).

*Pleadings* (the "First Day Declaration"), filed concurrently herewith and incorporated herein by reference, and further respectfully represent as follows:

## PRELIMINARY STATEMENT[4]

1. Prior to the filing of the Chapter 11 Cases, the Debtors engaged in extensive good-faith arms'-length negotiations with the DIP Lender over the terms of the DIP Facility, which will permit the Debtors to continue business operations, fund the Chapter 11 Cases and pursue value-maximizing sale process (the "Sale Process") for the benefit of all stakeholders. As discussed more fully below, the DIP Facility provides for a secured, superpriority, priming facility comprising a term loan in the principal amount of $5.0 million, of which $2.0 million will become available upon entry of the Interim Order.

2. The Debtors have minimal cash on hand and require immediate access to additional liquidity to fund business operations, fund the Chapter 11 Cases and complete a value-maximizing Sale Process. It is also critically important that the Debtors communicate to the market that they had sufficient liquidity to continue operations following the commencement of the Chapter 11 Cases to address any concerns that may be raised by customers, employees, and vendors as the Debtors transition into chapter 11. Thus, immediate access to the interim funding provided under the DIP Facility and the continued use of Cash Collateral is necessary to avoid immediate and irreparable harm to the Debtors and critical to the Debtors' efforts to maximize value for their stakeholders through the Chapter 11 Cases and the Sale Process.

3. As set forth more fully in the First Day Declaration, given the realities of the Debtors' prepetition finances and business operations, the Debtors could not have obtained

---

[4] Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings given to such terms below.

financing on more favorable terms than those offered by the DIP Lender. For these reasons and those set forth below, the Debtors submit that the DIP Facility is the best available financing under the circumstances, reasonable and appropriate, and in the best interests their estates and stakeholders. Accordingly, the Debtors respectfully request that the Court grant the relief requested herein.

## JURISDICTION AND VENUE

4. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b), and pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The statutory bases for the relief requested herein are sections 105(a), 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and Local Rule 4001-2.

## BACKGROUND

### A. General Background

6. On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No official committees have been

appointed in the Chapter 11 Cases and no request has been made for the appointment of a trustee or an examiner.

7.     Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in the First Day Declaration.

**B.     Prepetition Indebtedness**

8.     On December 15, 2020, the Debtors entered into that certain *Credit Agreement* (the "Prepetition Credit Agreement") with Bank of California (the "Prepetition Lender" and such facility, the "Prepetition Credit Facility"), as successor by merger to Pacific Mercantile Bank, which provided the Debtors with a revolving line of credit.   Borrowings under the Prepetition Credit Facility bear interest at a variable annual rate equal to 1.25% plus the prime rate.   The Prepetition Credit Facility is secured by a first priority lien in substantially all of the Debtors' assets.   Further, the Prepetition Credit Facility is secured by substantially all of the assets of BWSC.   Borrowings under the Prepetition Credit Facility bear interest at a variable annual rate equal to 1.25% plus the prime rate.   The Debtors' ability to borrow under the Prepetition Credit Facility is subject to a borrowing base determined upon eligible inventory and receivables.   The Debtors used the proceeds of the Prepetition Credit Facility to fund working capital obligations. As of the Petition Date, the Prepetition Credit Facility was fully drawn.

9.     Under the terms of the Credit Agreement, the initial maturity date of the Credit Facility was March 31, 2022.   In February 2022, the Debtors approached the Prepetition Lender about securing additional financing, but the Prepetition Lender informed the Debtors that it was unwilling to extend the Debtors additional credit.   Instead, over the course of several months, the Debtors and the Prepetition Lender entered into three amendments of the Credit Agreement, which (among other things) extended the initial maturity date of the Prepetition Credit Facility to

December 31, 2022, incrementally reduced the Debtors' borrowing capacity each month leading up to the maturity date with a series of pay downs, and modified a liquidity measurement.

10.    As of the Petition Date, the Debtors estimate that approximately $3.4 million in principal is due under the Prepetition Credit Facility, plus fees in the amount of approximately $23,500.[5]

11.    Additionally, as discussed more fully in the First Day Declaration, Debtors estimate that as of the Petition Date they owe approximately (i) $1.4 million on account of outstanding obligations under a revenue sharing agreement; and (ii) $8.0 million in trade payables and other general unsecured obligations.

C.    **The Debtors' Urgent and Immediate Liquidity Needs**

12.    In anticipation of their immediate need for debtor in possession financing and the use of Cash Collateral,[6] the Debtors have, in consultation with their advisors, including their financial advisor, RPA Advisors, LLC ("RPA"), performed a review and analysis of their projected cash needs.  Based upon that review and analysis, the Debtors and RPA have prepared an initial budget outlining the Debtors' postpetition cash needs (as amended, modified or supplemented from time to time with the DIP Lender's written consent, the "Approved Budget"), a copy of which is attached as Exhibit A to the Interim Order.  The Debtors believe that the Approved Budget is an accurate reflection of their funding requirements and will allow them to meet their obligations,

---

[5]  In the ordinary course of business, Bank of California automatically draws interest payments from the Debtors' bank account.  At 12:01 a.m. on December 1, 2022—just moments after filing chapter 11 petitions—cash in the amount of the interest accrued and unpaid as of the Petition Date was automatically deducted from the Debtors' bank account.  Accordingly, as of the filing of this First Day Declaration, there are no accrued and unpaid fees owed to the Prepetition Lender.

[6]  As used herein, "Cash Collateral" shall have the meaning given to such term in section 363(a) of the Bankruptcy Code.

including administrative expenses, in the Chapter 11 Cases.  The Debtors also believe that the Approved Budget is fair, reasonable, and appropriate under the circumstances.

13.     The Debtors are in need of an immediate infusion of liquidity to ensure sufficient working capital to operate their business and administer their estates.  More specifically, the Debtors, in consultation with their advisors, determined that the DIP Facility is necessary to, among other things, ensure (i) payments to employees, certain third-party vendors, utilities, taxing authorities, and insurance companies, among others, who provide essential services needed to operate, maintain, and insure the Debtors' assets; (ii) ensure the timely payment of Chapter 11 administrative expenses; (iii) instill confidence in the Debtors from their customers, employees, and vendors; and (iv) promote a successful Sale Process.

**D.      Negotiation of the DIP Facility**

14.     As discussed more fully herein and in the First Day Declaration, the Debtors, in consultation with their legal and financial advisors, determined, based on the facts and circumstances, that obtaining sufficient third-party DIP financing (whether on a secured or unsecured basis) was critical to implement the Sale Process and, ultimately, the success of the Chapter 11 Cases.  Based on discussions with the Prepetition Lender regarding the Prepetition Credit Facility, including a history of declining to provide any additional financing to the Debtors, and considering the circumstances of the Debtors' operations, the Debtors determined that the Prepetition Lender was not a viable candidate to provide debtor in possession financing for the Chapter 11 Cases.  Specifically, in February 2022, prior to the initial maturity date of the Prepetition Credit Facility, the Debtors approached the Prepetition Lender about securing additional financing, but (as discussed above) the Prepetition Lender informed the Debtors that it was unwilling to extend the Debtors additional credit.

15.    Given that the Prepetition Lender was unwilling to extend additional funding, the Debtors commenced a process to solicit funding from various other lenders. After several lenders declined to provide funding, the Debtors entered into advanced discussions with a private lender that specializes in providing working capital for growing business. The parties executed a term sheet for a working capital loan, and the Debtors were hopeful that the negotiations would yield new financing. However, after performing substantial diligence and obtaining an appraisal of the Debtors' assets, such lender declined to provide funding.

16.    Despite the setback, over a period of months, the Debtors continued to solicit financing proposals and eventually entered into negotiations with a lender regarding the terms of a letter of credit secured by the Debtors' inventory. As discussed above, in October 2022, the Debtors and the Prepetition Lender entered into a further amendment of the Credit Agreement to provide the Debtors with additional time to pursue a financing transaction. The third, and final, amendment to the Credit Agreement delayed the reduction in borrowing capacity scheduled for November 1, 2022 to December 1, 2022, and also deferred measurement of a minimum liquidity covenant to December 31, 2022.

17.    Thereafter, the Debtors and lender continued negotiations and executed a term sheet for a line of credit. Ultimately, after protracted negotiations, the lender's insistence on certain punitive fees, covenants, and other terms rendered the financing transaction unfeasible.

18.    Given the Debtors' liquidity position and inability to secure financing from sources other than the Stalking Horse Bidder, the Debtors focused their efforts on negotiating the best possible DIP financing they could secure from the only party known to the Debtors to be interested in serving as a stalking horse bidder in the Chapter 11 Cases: Project Crush Acquisition Corp LLC (the "DIP Lender"). Accordingly, with the assistance of their legal and financial advisors, the

Debtors engaged in extensive discussions and multiple rounds of good faith and arm's length negotiations with the DIP Lender prior to the Petition Date to achieve that objective. The terms of the DIP Facility represent the best possible financing that the Debtors could secure from any party.

**E.      Material Terms of the DIP Facility[7]**

19.      The following chart contains a summary of (a) the material terms of the DIP Facility; and (b) use of Cash Collateral, each with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B), and Local Rule 4001-2. The justification for inclusion of the provisions set forth in subsections N through X of Local Rule 4001-2(a)(i) are set forth more fully below in the "Basis for Relief Requested" Section of this Motion.

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| **Borrower**<br><br>Bankruptcy Rule 4001(c)(1)(B | Winc, Inc., a Delaware corporation ("Winc"), BWSC, LLC, a California limited liability company ("BWSC"), and Winc Lost Poet LLC, a Delaware limited liability company ("Lost Poet" together with Winc, each a "Borrower" and together the "Borrowers"). | Term Sheet, p. 1. |
| **Guarantors**<br><br>Bankruptcy Rule 4001(c)(1)(B) | N/A | |
| **Administrative Agent**<br><br>Bankruptcy Rule 4001(c)(1)(B) | N/A | |

---

[7] The following summary of the DIP Facility (the "Summary of Material Terms") is qualified in its entirety by reference to the applicable provisions of the relevant DIP Loan Documents or the Interim Order, as applicable. To the extent there are any inconsistencies between the Summary of Material Terms and the provisions of the DIP Loan Documents or the Interim Order, the provisions of the Interim Order or the DIP Loan Documents, as applicable, shall control. The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2 herein.

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| **DIP Lender**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Project Crush Acquisition Corp LLC, either directly or through one or more U.S. affiliates. | Term Sheet, p. 1. |
| **Commitment**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(A) | <u>DIP Facility</u>. A secured, superpriority, priming debtor-in-possession facility comprising a term loan in a principal amount of $5 million (the "<u>DIP Facility</u>"; the DIP Lender's commitments under the DIP Facility, the "<u>DIP Commitments</u>"; the loan under the DIP Facility, the "<u>DIP Loan</u>"; and proceeds received by the Borrowers from the DIP Loan, the "<u>DIP Proceeds</u>"),[8] $2 million of which shall be available upon the entry of the Interim Order. | Term Sheet, p. 1–2.<br><br>Interim DIP Order, pmbl. (a); ¶ 2.1. |
| **Maturity Date**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i) | All DIP Obligations will be due and payable in full in cash unless otherwise agreed to by the DIP Lender in writing on the earliest of (i) January 20, 2023; (ii) if the Final Order has not been entered, twenty-eight (28) calendar days after the Petition Date; (iii) the acceleration of the DIP Facility and the termination of the DIP Commitments upon the occurrence of a termination event; (iv) the effective date of any plan of reorganization; (v) the date the Bankruptcy Court converts any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (vi) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases; (vii) the consummation of the sale of all or substantially all of the Borrowers' assets; and (viii) the date an order is entered in any Bankruptcy Case appointing a Chapter 11 trustee or examiner with enlarged powers (any such date, the "<u>DIP Termination Date</u>"). | Term Sheet, p. 2.<br><br>Interim DIP Order, ¶ 5. |
| **Borrowing Conditions and Restrictions on Use of Proceeds**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i) | The Approved Budget shall consist of a 7-week operating budget setting forth all forecasted receipts and disbursements on a weekly basis for such 7-week period beginning as of the week of the Petition Date, broken down by week, including the anticipated weekly uses of the DIP Proceeds for such period (and draws under the DIP Facility), which forecast shall be in form and substance satisfactory to the DIP Lender.<br><br>The DIP Loan shall be used solely in accordance with the Approved Budget, DIP Loan Documents, and the Financing Orders.<br><br>The Debtors shall maintain all existing deposit accounts (other than excluded accounts to be agreed) and each such | Term Sheet, pp 2–3.<br><br>Interim DIP Order, ¶ 2. |

---

[8] As used in this Motion, the term "<u>DIP Obligations</u>" shall mean the loan made to, or guaranteed by, the Debtors and the other DIP Obligors, and all other "DIP Obligations" (as defined in the DIP Loan Documents), in each case pursuant to the DIP Loan Documents related to the DIP Facility.

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| | deposit account shall remain or become subject to a perfected lien and control pursuant to the terms of the Financing Orders or, as may be requested by the DIP Lender, an enforceable control agreement in favor of the DIP Lender (any such account, a "Controlled Account"). The DIP Credit Agreement (as define din the Term Sheet), and the Financing Orders, shall require the Debtors to maintain the DIP Proceeds in the Controlled Accounts except as permitted to be used in accordance with the Approved Budget and shall prohibit the Debtors from withdrawing funds from the Controlled Accounts after the occurrence and during the continuance of an Event of Default under the DIP Credit Agreement; provided, however, that the Debtors shall be permitted to fund the Carve-Out and pay critical ordinary course administrative claims up to $670,000 in accordance with the terms of the Approved Budget after an Event of Default. | |
| **Interest Rate**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i) | The DIP Loan will bear interest at a fixed rate per annum equal to 14.00%, accruing monthly, payable in arrears and payable in kind.<br><br>Upon the occurrence of and during the continuance of an Event of Default under the DIP Loan Documents, the DIP Loan and all DIP Obligations will automatically bear interest at an additional 2.00% per annum. | Term Sheet, p. 3–4.<br><br>Interim DIP Order, ¶ 2. |
| **Fees and Expenses**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B), 4001-2(a)(i)(K) | A closing fee equal to 2.0% (the "Closing Fee") on the entire DIP Commitments, which shall be earned upon entry of the Interim Order. The Closing Fee shall be payable in kind, including any accrued interest and fees, to the DIP Lender upon the earlier of (i) the DIP Termination Date, or (ii) the closing of a sale following entry of a Sale Order (as defined in the Term Sheet).<br><br>The Borrowers shall jointly and severally pay (i) (x) all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of the DIP Lender (including, but limited in the case of counsel, to all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of the DIP Lender's counsels, and, to the extent necessary, one firm of local counsel engaged by the DIP Lender in connection with the Debtors' Chapter 11 Cases, and any successor counsel to each), in each case in connection with the negotiations, preparation, execution and delivery of the DIP Loan Documents and the funding of all DIP Loan under the DIP Facility, including, without limitation, all | Term Sheet, p. 4.<br><br>Interim DIP Order, ¶¶ H, 2, 6. |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| | due diligence, transportation, computer, duplication, messenger, audit, insurance, appraisal, valuation and consultant costs and expenses, and all search, filing and recording fees, incurred or sustained by the DIP Lender and its counsels and professional advisors in connection with the DIP Facility, the DIP Loan Documents or the transactions contemplated thereby, the administration of the DIP Facility and any amendment or waiver of any provision of the DIP Loan Documents, and (ii) without duplication, all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of the DIP Lender (including, but limited in the case of counsels, to all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of outside counsels to the DIP Lender (and any successor counsel), and, to the extent necessary, one firm of local counsel engaged by the DIP Lender in each relevant jurisdiction, and any successor counsel to such primary counsel and local counsel, in each case in connection with (A) the enforcement of any rights and remedies under the DIP Loan Documents; (B) the Chapter 11 Cases, including attendance at all hearings in respect of the Chapter 11 Cases; and (C) defending and prosecuting any actions or proceedings arising out of or relating to the DIP Obligations, the Liens securing the DIP Obligations, or any transaction related to or arising in connection with the DIP Credit Agreement or the other DIP Loan Documents. | |
| **Provisions Limiting Court's Power or Discretion to Enter Future Orders**<br><br>Local Rule 4001-2(a)(i)(C) | N/A | |
| **Provisions Providing for Funding of Non-Debtor Affiliates**<br><br>Local Rule 4001-2(a)(i)(D) | N/A | |
| **Material Conditions to Closing and Borrowing, Including Budgets**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Credit Agreement will contain conditions precedent to borrowings, including: (i) the Borrowers shall provide notice to the DIP Lender pursuant to the Term Sheet; (ii) no Default of Event of Default shall have occurred and be continuing; (iii) the DIP Loan is authorized pursuant to the Financing Orders; (iv) the Financing Orders are consistent with the terms of the Term | Term Sheet, p. 6. |

29915183.6

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| Local Rule 4001-2(a)(i)(E) | Sheet and otherwise satisfactory to the DIP Lender; (v) there shall not have been any "Material Adverse Change" (as defined in the Term Sheet); and (vi) the Loan Parties shall be in compliance with the Financing Orders and the Approved Budget. | |
| **Carve Out**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii)<br><br>Local Rule 4001-2(a)(i)(F) | "<u>Carve Out</u>" means an amount equal to the sum of the following: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a), plus interest pursuant to 31 U.S.C. § 3717; (ii) Allowed Professional Fees incurred at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice, but only to the extent allowed by the Court at any time and only to the extent of amounts included in the Approved Budget; and (iii) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $100,000 incurred after the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice.<br><br>For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve Out shall be senior to all liens and claims securing the DIP Facility, and all other forms of adequate protection, liens, or claims securing the DIP Obligations. | Interim DIP Order ¶ 11<br><br>Term Sheet, p. 5–6. |
| **Security and Priority Under the DIP Facility**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii)<br><br>Local Rule<br><br>4001-2(a)(i)(G), 4001-2(a)(i)(N), 4001-2(a)(i)(P) | All obligations of the Borrowers to the DIP Lender under the DIP Facility or any exposure of the DIP Lender and its affiliates in respect of cash management incurred on behalf of a Borrower under the DIP Facility (collectively, the "<u>DIP Obligations</u>"), shall be secured by the following liens and security interests (the "<u>DIP Liens</u>"):<br><br>(a)      subject to the Carve Out, pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority perfected senior priming lien on, and security interest in substantially all of the assets of the Borrowers, wherever located, that may be subject to a validly perfected security interest in existence on the Petition Date;<br><br>(b)      subject to the Carve Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority perfected lien on, and security interest in, all present and after acquired property of the Debtors, wherever located, not subject to a lien or security interest on the date of commencement of the Chapter 11 Cases (collectively, the "<u>Unencumbered Property</u>");<br><br>(c)      subject to the Carve Out, pursuant to section 364(c)(3) of the Bankruptcy Code, a junior perfected lien | Interim DIP Order ¶ 8, 9.<br><br>Term Sheet, p. 5. |

29915183.6

on, and security interest in, all present and after-acquired property of the Debtors, wherever located, that is subject to a Permitted Lien on the Petition Date or subject to a Permitted Lien in existence on the Petition Date that is perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code; and

(d)        subject to the Carve Out, a first priority perfected lien on, and security interest in, all funds on deposit in the Controlled Accounts.

The property referred to in the preceding clauses (a), (b), (c) and (d) is collectively referred to as the "DIP Collateral" and shall include, without limitation, all assets (whether tangible, intangible, personal or mixed) of the Borrowers, whether now owned or hereafter acquired and wherever located, before or after the Petition Date, including, without limitation, all accounts, proceeds of leases, inventory, equipment, equity interests or capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, the proceeds of all claims or causes of action (including upon entry of the Final DIP Order, avoidance actions and proceeds of avoidance actions under chapter 5 of the Bankruptcy Code) and all products, offspring, profits and proceeds thereof.

All DIP Claims shall be entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having superpriority over any and all administrative expenses of the kind that are specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code, subject only to the Carve Out.

The DIP Claims will, at all times during the period that the DIP Loan remains outstanding, remain, in right of payment, senior in priority to all other claims or administrative expenses, subject only to the Carve Out.

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| **Milestones**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vi)<br><br>Local Rule 4001-2(a)(i)(H) | The DIP Loan Documents will include milestones related to the Debtors' Chapter 11 Cases (the "<u>Milestones</u>"), including: | Term Sheet, p. 10–11. |
| | | |

| Deadline | Milestone |
|---|---|
| Petition Date + 3 business days | • Entry of Interim Order<br>• Debtors file Bid Procedures Motion |
| Petition Date + 7 calendar days | Debtors file Asset Purchase Agreement |
| Petition Date + 14 calendar days | Entry of the Bid Procedures Order |
| Petition Date + 28 calendar days | Entry of the Final Order |
| Petition Date + 45 calendar days | Entry of the Sale Order |
| January 20, 2023 | Effective Date of Sale |

| | | |
|---|---|---|
| **Prepayment**<br><br>Local Rule 4001-2(a)(i)(I) | Voluntary prepayments of the DIP Loan shall be permitted at any time, without premium or penalty. | Term Sheet, p. 4. |
| **Provisions Governing Joint Liability**<br><br>Local Rule 4001-2(a)(i)(J) | The Debtors are jointly and severally liable under the Term Sheet. | Term Sheet, p. 1. |
| **Provisions Requiring Debtors to Pay Agent or Lender's Expenses and Attorneys' Fees Without Notice or Review**<br><br>Local Rule 4001-2(a)(i)(K) | N/A | |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| **Provisions Prohibiting Use of Estate Funds to Investigate Liens and Claims of Prepetition Lenders**<br><br>Local Rule 4001-2(a)(i)(L) | N/A | |
| **Termination or Events of Default**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(M) | <u>Termination</u>. Upon the occurrence and during the continuance of an Event of Default, the DIP Lender shall, by written notice to Borrowers, its counsel, the U.S. Trustee and counsel for any statutory committee, terminate the DIP Facility, declare the obligations in respect thereof to be immediately due and payable and, subject to the immediately following paragraph, exercise all rights and remedies under the DIP Loan Documents, the Interim Order, and the Final DIP Order.<br><br><u>Event of Default</u>. The DIP Credit Agreement will contain events of default customarily found in loan agreements for similar debtor-in-possession financings and other events of default deemed by the DIP Lender appropriate to the transactions contemplated therein which will be applicable to the Debtors and their subsidiaries (each an "<u>Event of Default</u>"), including, among other things: (i) failure to make payments when due; invalidity of the DIP Loan Documents; (ii) termination of the Asset Purchase Agreement due to a breach by the Debtors; (iii) failure to obtain the DIP Lender's consent for various pleadings; (iv) violation of the Financing Orders; (v) dismissal or conversion of the Chapter 11 Cases; (vi) appointment of a Chapter 11 trustee or examiner; (vii) sale of substantially all of the Debtors assets in contravention of the Bid Procedures; (viii) failure to meet a Milestone (unless extended or waived); (ix) the filing a motion to obtain an order granting a claim or lien that is senior or *pari passu* with the DIP Claims; (x) cessation of the DIP Liens or DIP Claims to be valid, perfected, and enforceable; (xi) failure to comply with the Approved Budget and Permitted Variances; (xii) allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against any DIP Lender; (xiii) an order has been entered by the Bankruptcy Court restricting the DIP Lender's right to credit bid; and (xiv) the payment of any prepetition claim other than (a) as consented to by the DIP Lender, (b) as authorized by the Approved Budget, (c) permitted under the terms of the DIP Credit Agreement, or (d) as authorized by the Bankruptcy Court pursuant to the "first day" or | Term Sheet, pp. 12–13.<br><br>Interim Order ¶ 5. |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| | "second day" orders or the Interim Order or the Final DIP Order and reflected in the Approved Budget. | |
| **Provisions (a) Granting Cross-Collateralization Protection, (b) Elevating Pre-petition Debt to Admin. Expense, or (c) Securing Pre-petition Debt with Liens on Postpetition Assets**<br><br>Local Rule 4001-2(a)(i)(N) | N/A | |
| **"Roll-Up" Provisions**<br><br>Local Rule 4001- 2(a)(i)(O) | N/A | |
| **Priming Provisions**<br><br>Local Rule 4001-2(a)(i)(P) | *See* "Security and Priority Under the DIP Facility", above.<br><br>*See also* "Adequate Protection", below. | Interim Order ¶ 8. |
| **Provisions or Findings of Fact (i) Binding Estate or Parties in Interest w/r/t Validity, Perfection, or Amount of Prepetition Liens or the Waiver of Claims Against the Secured Creditor Without Giving Parties in Interest at Least Seventy-Five (75) Days from the Entry of the Initial Interim Order to Investigate Such Matters** | N/A | |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| Local Rule 4001-2(a)(i)(Q) | | |
| **Provisions Immediately Approving All Terms and Conditions of the DIP Credit Agreement**<br><br>Local Rule 4001-2(a)(i)(R) | N/A | |
| **Waivers/ Modification of Automatic Stay and Provisions Allowing Lenders to Enforce Remedies Without at Least Five (5) Days Written Notice**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv)<br><br>Local Rule 4001-2(a)(i)(S) | N/A | |
| **Provisions Limiting What Parties in Interest (Other Than the Debtors) May Raise**<br><br>Local Rule 4001-2(a)(i)(T) | Neither the Debtors, any statutory committee, nor any other party-in-interest shall have the right to contest the enforcement of the remedies set forth in the Financing Orders and the DIP Loan Documents. | Term Sheet, p. 13. |
| **Liens on Avoidance Actions**<br><br>Bankruptcy Rule 4001(c)(1)(b)<br><br>Local Rule 4001-2(a)(i)(U) | The DIP Collateral that secures the DIP Liens includes, upon entry of the Final Order, avoidance actions and proceeds of avoidance actions under chapter 5 of the Bankruptcy Code) and all products, offspring, profits and proceeds thereof. | Term Sheet, p. 4.<br><br>Interim DIP Order ¶ 8, 9. |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| **Section 506(c), 552(b) "Equities of the Case," and Marshalling Waivers**<br><br>Bankruptcy Rule 4001(c)(1)(B)(x);<br><br>Local Rule 4001-2(a)(i)(V)-(X) | The DIP Lender shall not be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral.<br><br>The Debtors (on behalf of themselves and their estates) shall waive, and shall not assert in the Chapter 11 Cases or any successor cases, (i) any surcharge claim under sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender, upon the DIP Collateral and (ii) the DIP Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender with respect to proceeds, product, offspring or profits of any of the DIP Collateral. | Interim DIP Order ¶¶ K, 18, 19. |
| **Adequate Protection**<br><br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii)<br><br>Local Rule 4001-2(a)(i)(B), 4001-2(a)(i)(K), 4001-2(a)(i)(N), 4001-2(a)(i)(P) | Pursuant to the Financing Orders, the Prepetition Secured Party shall be granted (effective and perfected upon the entry of the Interim Order and without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, and other agreements or instruments) valid, perfected, postpetition security interests and liens (the "Replacement Liens") in and on all of the DIP Collateral, including proceeds of all amounts owed to the Debtors by CMS and, upon entry of a Final Order, proceeds of Avoidance Actions; provided, however, that the Replacement Liens shall only be and remain subject and subordinate to (i) the DIP Liens and/or payment of any DIP Obligations on account thereof, and (ii) prior payment of the Carve Out. The Replacement Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Case, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Case. | Interim DIP Order ¶¶ G, 12. |
| **Loan Covenants**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i) | The DIP Credit Agreement will contain customary affirmative and negative covenants to be consistent with the Documentation Principles, including without limitation, requiring the Debtors (i) to provide certain pleadings and documents to the DIP Lender and its counsel for review prior to filing; (ii) to deliver documents related to the sale or restructuring of the Debtors (provided that the DIP Lender is not an active bidder at the applicable time); (iii) to comply with all laws and payment of taxes, licenses, and regulatory permits, etc.; (iv) to limit certain intercompany transactions; (v) to maintain a cash | Term Sheet, pp. 7–9. |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| | management system; (vi) to deliver, and comply with, the Approved Budget, as required by the Term Sheet; (vii) not to incur or assume additional debt or certain obligations; (viii) not to permit any change in ownership or control of any Debtor or any subsidiary or any change in accounting treatment or reporting practices, except as may be necessary or permitted under the Term Sheet; (ix) not to make or permit any change to the Financing Orders; (x) not to seek authorization for, or permit the existence of, claims, other than those of the DIP Lender, entitled to superpriority under section 364(c)(1) of the Bankruptcy Code that is senior or *pari passu* with the DIP Lender's section 364(c)(1) claim, except for the Carve Out; and (xi) to comply with the Milestones. | |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors shall jointly and severally indemnify and hold harmless each Indemnified Party from, among other things, various claims and causes of action arising out of or relating to the DIP Facility, the DIP Loan Documents or the transactions contemplated thereby, or any use made or proposed to be made with the DIP Proceeds, except any such claims resulting solely from an Indemnified Party's gross negligence or willful misconduct.<br><br>No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated by the Term Sheet, except, with respect to any Indemnified Party, to the extent such liability is found to have resulted solely from such Indemnified Party's gross negligence or willful misconduct or any of such Indemnified Party's affiliates or their respective principals, directors, officers, employees, representatives, agents, attorneys or third party advisors. | Term Sheet, p. 14. |
| **Variance Covenant**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i) | *See* "Loan Covenants", above. | Term Sheet, p. 8.<br><br>Interim DIP Order ¶ 2(i). |
| **Use of Cash Collateral; Entities with Interest in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(l)(B)(i) | The Debtors are seeking the non-consensual use of the Prepetition Lender's Cash Collateral. | Term Sheet, p. 1. |

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY | | |
|---|---|---|
| **Challenge Period**<br><br>Bankruptcy Rule 4001(c)(1)(B), 4001(c)(1)(B)(viii) | The Debtors' Stipulations shall be binding upon each other party in interest, including any Creditors' Committee unless such Creditors' Committee or any other party in interest having standing, including any Chapter 11 trustee (or if the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case(s)): (a) commences a Challenge (as defined below) within seventy-five (75) calendar days following the date of entry of the Interim Order (such time period shall be referred to as the "Challenge Period") and (b) obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action. | Interim DIP Order ¶ 14. |

## RELIEF REQUESTED

20.     The Debtors respectfully request entry of the Financing Orders:

(i)      authorizing Winc, Inc. and BWSC, in their capacities as Borrowers, to obtain postpetition financing, and, on a joint and several basis, incur the Borrowers' obligations in connection with the DIP Facility;

(ii)     authorizing the Borrowers to enter into the Term Sheet, in substantially the form attached to the Interim Order as Exhibit B  (the "Term Sheet") and the DIP Loan Documents (as defined in the Term Sheet), to the extent not inconsistent with the Term Sheet, and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate or desirable in connection with the DIP Loan Documents;

(iii)    authorizing the Debtors to use the proceeds of the DIP Facility and Cash Collateral, in accordance with the terms of the Interim Order and the Approved Budget to (a) pay principal, fees, interest, and other obligations under the DIP Facility, and (b) provide working capital for, and for other general corporate purposes of, the Debtors, including for funding the Carve Out;

(iv)    authorizing the Debtors to use the Prepetition Lender's Cash Collateral on a non-consensual basis;

(v)     determining that the Prepetition Lender is adequately protected for the usage of its Cash Collateral and the incurrence of obligations under the DIP Facility;

(vi)    modifying the automatic stay imposed under section 362 of the Bankruptcy Code, to the extent necessary, to implement and effectuate the terms and provisions of the DIP Loan Documents and the Financing Orders; and

(vii)    granting related relief.

## BASIS FOR RELIEF REQUESTED

**A.    Entry into the DIP Loan Documents Is an Exercise of the Debtors' Sound Business Judgment**

21.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Loan Documents, obtain access to the proceeds of the DIP Facility, and continue using Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant debtors considerable deference in acting in accordance with their business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

22.    Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assoc.'s*, 14 B.R. 506, 513-14 (Bankr. D. Utah. Oct 8, 1981) (noting that courts should not second guess a

debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code"). To determine whether the business judgment test is met, the court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).

23. In determining whether the Debtors have exercised sound business judgment in entering into the DIP Loan Documents, the Court should consider the economic terms of the DIP Facility under the totality of circumstances. *See* Hr'g Tr. at 734–35:24, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. February 27, 2009) (recognizing that "the terms that are now available for DIP financing in the current economic environment aren't as desirable" as they once were previously, referring to the period following the 2008 financial markets collapse); *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *In re Elingsen McLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization). Moreover, the Court may appropriately take into consideration non-economic benefits to the Debtors offered under a proposed postpetition facility. *See In re ION Media Networks, Inc.*, No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (holding that "a business decision to obtain credit from a particular lender is almost never based purely on economic terms. . . . Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. . . .").

24.     The Debtors' decision to enter into the DIP Loan Documents is an exercise of their sound business judgment.  As further discussed in the First Day Declaration, the DIP Facility was a product of good faith arms'-length negotiation among the Debtors and the DIP Lender, which was the best (and only) available source of postpetition financing given the realities of the Debtors' finances and business prospects.  The Debtors ultimately decided that moving forward with the proposed DIP Facility was an appropriate step given that the DIP Facility will allow the Debtors to fund the Chapter 11 Cases and conduct a robust and value-maximizing Sale Process.  Ultimately, the Debtors and their advisors determined that the DIP Facility was appropriate and in the Debtors' best interests under the totality of circumstances.  The incremental liquidity provided under the DIP Facility is needed to ensure adequate working capital and funding for the other administrative expenses associated with the Chapter 11 Cases.   Absent this funding, the Debtors would not be able to sustain operations throughout the Sale Process and would likely be forced to liquidate.  Accordingly, estate value would be significantly impaired absent the funding under the DIP Facility.  In light of the above, the Debtors determined that entry into the DIP Facility was the best path available and they have obtained the best terms currently achievable under the circumstances.

**B.     The Debtors Should be Authorized to Grant Liens and Superpriority Claims**

25.     The Debtors propose to obtain the DIP Facility by providing security interests and liens as set forth in the DIP Loan Documents and described above.    The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to incur secured or superpriority debt under certain circumstances.   Specifically, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, when the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."

11 U.S.C. § 364(d)(1).  Accordingly, the Debtors may incur "priming" liens under the DIP Loan Documents if the Prepetition Lender's interests in collateral are adequately protected.

26.     The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  *See In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).  "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." *Id*. (quoting *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).  A party's interests in collateral may be adequately protected by a sufficient equity cushion.  *See, e.g., In re Phoenix Steel Corp.*, 39 B.R. 218, 224 (D. Del. 1984) ("an equity cushion may be a basis for finding the existence of adequate protection"); *In re Melson*, 44 B.R. 454, 456-57 (Bankr. D. Del. 1984) ("An equity cushion provides adequate protection if the equity is not eroding so rapidly that it is illusory"); *In re Singer*, 368 B.R. 435, 443 (Bankr. E.D. Pa. 2007); *Baybank-Middlesex v. Ralar Distribs., Inc.*, 69 F.3d 1200, 1203 (1st Cir. 1995) ("A sufficient equity cushion is itself a recognized form of adequate protection"); *In re Stanley Hotel, Inc.*, 15 B.R. 660 (D. Colo. 1981); *Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396 (9th Cir. 1984); *Travelers Inc. Co. v. Plaza Family P'ship (In re Plaza Family P'ship)*, 95 B.R. 116 (E.D. Cal. 1989); Hr'g Tr. at 146–13:19, *In re FUHU Holdings, Inc.*, No. 15-12465 (CSS) (Bankr. D. Del. Dec. 21, 2015) (approving use of cash collateral over prepetition lender's objection and finding that the prepetition lender was adequately protected by a stalking horse bidder's asset purchase agreement).

27.     The Debtors have concluded that adequate and acceptable alternative financing on a non-priming basis and on terms more favorable than those being provided by the DIP Lender under the DIP Facility is currently unobtainable.  As discussed above, the Debtors engaged in an extensive prepetition process to obtain financing, and was unsuccessful.  After those efforts failed,

the Debtors only option was to require that any potential bids for the assets include bridge financing, and only the DIP Lender provided an actionable proposal. Accordingly, the DIP Lender is the Debtors' only source of postpetition financing, and the DIP Lender has insisted upon receiving priming liens on the DIP Collateral as a non-negotiable condition to providing the DIP Facility. Therefore, the Debtors submit that they have satisfied the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable.

28.     In addition, the Prepetition Lender's interests in collateral are adequately protected. The Debtors and the DIP Lender entered into a letter of intent for the DIP Lender to serve as a stalking horse bidder in the Chapter 11 Cases for all or substantially all of the Debtors' assets and expect to file an executed or substantially final version of the asset purchase agreement in the next few days. The DIP Lender's baseline bid of no less than $10.0 million in cash consideration, plus the assumption of certain liabilities, provides the Prepetition Lender with an equity cushion, even accounting for the DIP Lender's ability to credit bid the aggregate amount of the DIP Obligations. Given that the DIP Lender has committed to purchase the Debtors' assets for a price that materially exceeds the outstanding obligations owed to the Prepetition Lender under the Prepetition Credit Facility, and the Debtors intention to proceed on an expedited timeline and pay off the Prepetition Lender from the proceeds of the sale of the Debtors' assets, the Debtors have established that the Prepetition Lender's interests in the prepetition collateral is adequate protection from diminution in value, and the Debtors should be authorized to grant priming liens to the DIP Lender in the DIP Collateral that are senior in priority to those secured by the Prepetition Lender. Without the liquidity provided, the Debtors do not have sufficient cash to satisfy the obligations under the Prepetition Credit Facility. Pursuing a sale of the Debtors' business as a going concern as contemplated in the DIP Lender's baseline bid, which is only possible through the liquidity

provided under the DIP Facility, represents the best opportunity for the Prepetition Lender to be paid in full on account of the obligations under the Prepetition Credit Facility.

**C.    The Debtors Should be Authorized to Use Cash Collateral**

29.    Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's Cash Collateral.  Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).

30.    Parties with an interest in cash collateral are entitled to adequate protection under section 363(e) of the Bankruptcy Code.  *See* 11 U.S.C. § 363(e).  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 *Collier on Bankruptcy* ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

31.     While the DIP Lender has expressly consented to the use of any Cash Collateral they advance (satisfying the requirements of section 363(c)(2)(A) of the Bankruptcy Code), the Prepetition Lender has not consented to the use of its Cash Collateral.  However, the Debtors are nonetheless compelled to request approval for the usage of the Prepetition Lender's Cash Collateral to access critical funds to operate the Debtors' business.  As discussed above, the Prepetition Lender's interests in Cash Collateral is adequately protected by an equity cushion, which (i) is fair and reasonable and (ii) adequately protects against the diminution in value of the Prepetition Lender's interest in the Prepetition Collateral.  In light of the foregoing, the Debtors submit that the proposed adequate protection to be provided is appropriate.

**D.      The Rates and Fees of the DIP Facility Are Reasonable**

32.     Under the DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Lender.  Specifically, the Debtors have agreed to an interest rate of 14% per annum, a closing fee in the amount of 2.0% of the DIP Commitments, and payment of the DIP Lender's fees and expenses, all of which shall be payable in kind.

33.     The Debtors and the DIP Lender agree that the collateral terms, covenants, interest rates, and fees were subject to negotiation and are an integral component of the overall terms of the DIP Facility, and were required by the DIP Lender as consideration for the extension of the DIP Facility.  Moreover, the fees are customary and usual and in line with debtor in possession financings of this kind.  The Debtors considered the fees when determining in their sound business judgment whether the DIP Facility constituted the best terms on which the Debtors could obtain sufficient debtor in possession financing.  The Debtors believe paying these fees in order to obtain the DIP Facility is in the best interests of the Debtors' estates.

34.     Under the circumstances, and particularly in light of the fact that the DIP Facility is being provided in connection with the terms of the broader Sale Process, the interest rates and

fees reflected in the DIP Loan Documents are reasonable and substantially in line with other debtor in possession financings generally, including debtor in possession financings recently approved by this court in other comparable chapter 11 cases.

**G.** **The Milestones Imposed by the DIP Facility Are Reasonable**

35.     As set forth in the chart above, the Term Sheet also contemplates, as a condition to providing the DIP Facility, certain (i) conditions precedent; (ii) milestones (the "<u>Milestones</u>") in connection with the Sale Process; and (iii) events of default, all of which are customary for postpetition financing in chapter 11.

36.     The DIP Facility is an important component of the Debtors' chapter 11 efforts because they provide the Debtors the stability and certainty needed to conduct a robust Sale Process in a timely and efficient manner.  The continued operation of the Debtors' business during the Sale Process will not be possible absent access to the DIP Facility.  The DIP Facility will prevent interruptions to the Debtors' operations, preserve the Debtors' ability to maintain ordinary course relationships with vendors, customers and suppliers, and satisfy working capital needs in the ordinary course during the Sale Process.  Moreover, the Milestones are reasonable under the circumstances and are not designed to make the Debtors disproportionately susceptible to a breach of such terms.  Accordingly, the Milestones and other conditions precedent and events of default are reasonable and should be approved.

**H.** **The Carve Out Is Appropriate**

37.     The liens granted pursuant to the Term Sheet, and the superpriority claims of the DIP Lender are subject and subordinate to the Carve Out.  The Carve Out contains similar terms to others that this Court has found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.  Without the Carve Out, the Debtors' estates may be deprived of possible rights and powers if the services for which

professionals may be compensated is restricted. *See In re Ames Dep't Stores*, 115 B.R. at 38

(observing that courts insist on carve outs for professionals representing parties in interest because

"[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely

prejudiced"). Additionally, the Carve Out protects against administrative insolvency during the

course of the Chapter 11 Cases by ensuring that assets remain for the payment of U.S. Trustee fees

and professional fees. Accordingly, the Carve Out is appropriate and should be approved.

## I.     The DIP Lender Should be Deemed a Good Faith Lender

38.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect

on loans extended to a debtor, and its right in any lien securing those loans, even if the authority

of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.

Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this
> section [364 of the Bankruptcy Code] to obtain credit or incur debt,
> or of a grant under this section of a priority or a lien, does not affect
> the validity of any debt so incurred, or any priority or lien so granted,
> to an entity that extended such credit in good faith, whether or not
> such entity knew of the pendency of the appeal, unless such
> authorization and the incurring of such debt, or the granting of such
> priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

39.     Here, the Debtors believe the DIP Facility embodies the most favorable terms on

which the Debtors could obtain postpetition financing. As described in the First Day Declaration,

negotiations of the terms of the DIP Facility with the DIP Lender were conducted in good faith and

at arms'-length. The terms and conditions of the DIP Loan Documents are fair and reasonable,

and the proceeds of the DIP Facility will be used only for purposes that are permissible under the

Bankruptcy Code, and in accordance with the Financing Orders and the DIP Loan Documents,

including, for the avoidance of doubt, the Approved Budget (subject to any Permitted Variances).

Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein, in the DIP Loan Documents, and the First Day Declaration. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

**J.      Modification of the Automatic Stay Is Warranted**

40.      The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to, among other things:  (a) grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (b) upon the occurrence of an Event of Default (as defined in the DIP Loan Documents), subject to any applicable notice periods set forth in the Financing Orders, for the DIP Lender to exercise any remedies available to it; and (c) implement the terms of the proposed Financing Orders, including payment of all amounts referred to in the DIP Loan Documents.

41.      Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of the Chapter 11 Cases.

<u>REQUEST FOR A FINAL HEARING</u>

42.      Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request the Court set a date for the Final Hearing that is as soon as practicable, and in no event later than December 28, 2022, in accordance with the Milestones, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

<u>BANKRUPTCY RULE 6003</u>

43.      The Court may grant the relief requested in this Motion immediately if the "relief is necessary to avoid immediate and irreparable harm."  Bankruptcy Rule 6003; *see also In re First*

*NLC Fin. Servs., LLC*, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008). The Third Circuit Court of Appeals has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions. In that context, the Third Circuit has instructed that irreparable harm is that which "cannot be redressed by a legal or an equitable remedy following a trial." *Instant Air Freight Co. v. C.F. Air Freight, Inc*., 882 F.2d 797, 801 (3d Cir. 1989). As explained above and in the First Day Declaration, access to the DIP Facility and the use of Cash Collateral, in the interim amounts proposed, are essential and the relief requested is narrowly tailored to only the relief that is necessary to prevent immediate and irreparable damage to the Debtors' operations, and therefore, Bankruptcy Rule 6003 is satisfied.

## BANKRUPTCY RULE 6004(a) AND (h) WAIVERS ARE APPROPRIATE

44.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## DEBTORS' STATEMENT PURSUANT TO LOCAL RULE 4001-2(a)(iii)

45.     The Debtors believe that the Approved Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the Approved Budget.

## RESERVATION OF RIGHTS

46.     Except as otherwise provided in the Financing Orders, nothing contained herein is intended or shall be construed as (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under section 365 of the Bankruptcy Code.

## NOTICE

47.     Notice of this Motion has been or will be provided to: (i) the Office of the United States Trustee; (ii) the holders of the thirty (30) largest unsecured claims on a consolidated basis against the Debtors; (iii) counsel for the Prepetition Lender; (iv) counsel for the DIP Lender; (v) the Internal Revenue Service; (vi) the Securities and Exchange Commission; and (vii) Bank of California, N.A.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter the Interim Order, substantially in the form annexed hereto as **Exhibit I**, and the Final Order, granting the relief requested herein and such other and further relief as the Court deems appropriate under the circumstances.

Dated:   December 2, 2022
Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Matthew B. Lunn*
Michael R. Nestor (No. 3526)
Matthew B. Lunn (No. 4119)
Allison S. Mielke (No. 5934)
Joshua B. Brooks (No. 6765)
Shella Borovinskaya (No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email: mnestor@ycst.com
      mlunn@ycst.com
      amielke@ycst.com
      jbrooks@ycst.com
      sborovinskaya@ycst.com

*Proposed Counsel to the Debtors and
Debtors in Possession*

# EXHIBIT I

## Interim Order

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WINC, INC., *et al.*,[1] | Case No. 22-11238 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Docket Ref. No. ___** |

## INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(3), 364(d)(1), AND 364(e) AND (B) USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364, AND (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)

Upon consideration of the motion, dated as of December 2, 2022 (the "Motion")[2] of Winc, Inc. ("Winc") and its affiliated debtors and debtors-in-possession (collectively with Winc, the "Debtors"), pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-2, and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Local Rules"), seeking entry of (i) an interim order (this "Interim Order") and (ii) a final order (the "Final Order"); and the Debtors' having requested on the record at the interim hearing on the Motion (the "Interim Hearing") that the Court enter an Interim Order, *inter alia*,:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Winc, Inc. (8960); BWSC, LLC (0899); and Winc Lost Poet, LLC (N/A). The Debtors' mailing address for purposes of these chapter 11 cases is 1751 Berkeley Street, Studio 3, Santa Monica, CA 90404.

[2] Unless otherwise defined, capitalized terms used herein shall have the meaning ascribed to them in the Term Sheet (as defined below).

(a)     authorizing the Debtors to obtain secured postpetition financing on a superpriority basis (the "DIP Facility") pursuant to the terms and conditions of that certain Superpriority Secured Debtor-in-Possession Credit Facility Term Sheet, dated as of December 2, 2022 (the "Term Sheet"), a copy of which is attached hereto as **Exhibit B**, in the aggregate principal amount of up to $5.0 million;[3]

(b)     authorizing the Debtors to execute any other documents, agreements, and instruments delivered pursuant thereto or executed or filed in connection therewith, all as may be reasonably requested by the DIP Lender (as the same may be amended, restated, supplemented, or otherwise modified from time to time, and collectively with the Term Sheet, the "DIP Loan Documents");

(c)     granting to the DIP Lender first priority security interests in and liens on all of the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Loan Documents, as applicable, this Interim Order and the Final Order, as applicable (collectively, and including all "Obligations" as described in the Term Sheet, the "DIP Obligations"), subject only to prior payment of the Carve Out (as defined below);

(d)     granting allowed superpriority administrative expense claims to the DIP Lender;

(e)     authorizing the Debtors to use Cash Collateral (as defined below);

(f)     authorizing the Debtors to grant adequate protection to the Prepetition Secured Party (as defined below);

---

[3]   The "DIP Lender" shall mean Project Crush Acquisition Corp LLC.

(g)     scheduling a hearing (the "<u>Final Hearing</u>"), pursuant to Bankruptcy Rule 4001(c)(2), to consider entry of the Final Order ((a) through (g) collectively, the "<u>Requested Relief</u>");

and the Interim Hearing having been held on December 5, 2022; and upon all of the pleadings filed with the Court and the evidence proffered or adduced at the Interim Hearing; and the Court having heard and resolved or overruled any and all objections to the Requested Relief; and it appearing that the Requested Relief is in the best interests of the Debtors, their estates, and creditors; and upon the record herein; and after due deliberation thereon, and good and sufficient cause appearing therefor:

## IT IS HEREBY FOUND AND DETERMINED THAT:[4]

A.     <u>Petition Date</u>.  On November 30, 2022 (the "<u>Petition Date</u>"), the Debtors commenced their chapter 11 cases (these "<u>Chapter 11 Cases</u>") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>").  The Debtors are operating their businesses and managing their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner, or official committee of creditors holding unsecured claims (a "<u>Creditors' Committee</u>") has been appointed in any of these Chapter 11 Cases.

B.     <u>Jurisdiction; Venue</u>.  The Court has jurisdiction over these Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the DIP Facility constitutes a core proceeding pursuant to 28 U.S.C.

---

[4]     Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as applicable, pursuant to Bankruptcy Rule 7052.

§ 157(b)(2)(D). The Court is a proper venue of these Chapter 11 Cases and the Requested Relief under 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief sought herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014 and the applicable Bankruptcy Local Rules.

C.    Notice. Good and sufficient notice of the Motion under the circumstances has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules. The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending a Final Hearing.

D.    Prepetition Senior Obligations and Senior Liens.

(i)    For purposes of this Interim Order, (a) the term "Prepetition Senior Obligations" shall mean all of the Obligations (as such term is defined in the Prepetition Senior Loan Documents (as defined below)), as of the Petition Date, owed to the Prepetition Secured Party, and (b) the term "Prepetition Senior Loan Documents" shall mean that certain Credit Agreement, dated as of December 15, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Prepetition First Lien Credit Agreement"), by and among Winc, Inc. and BWSC LLC, as borrowers (the "Borrowers"), and Pacific Mercantile Bank, as Bank (together with its permitted agents, sub-agents, delegates, attorneys-in-fact, successors and assigns, the "Prepetition Secured Party") and together with all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, subordination agreements, instruments, amendments, fee letters and any other agreements delivered pursuant thereto or in connection therewith.

(ii)     To secure the Prepetition Senior Obligations, the Debtors granted to the Prepetition Secured Party first priority liens upon and senior security interest in (the "Prepetition Senior Liens") substantially all of the Debtors' property and assets (collectively, the "Prepetition Senior Collateral") as more particularly set forth in certain security documents and instruments, including but not limited to the Security Agreement, dated as of December 15, 2020, by Winc, Inc. and BWSC LLC as grantors, in favor of the Prepetition Secured Party;

E.     Debtors' Acknowledgements and Stipulations.

The Prepetition Senior Obligations

In exchange for the priming of Prepetition Secured Party's liens and claims in connection with the DIP Facility, the Debtors acknowledge, represent, stipulate, and agree, subject to the terms and provisions of Paragraph 14 below, that:

(i)     as of the Petition Date, (a) the aggregate principal amount of the Prepetition First Lien Obligations of not less than approximately $3,400,000, together with interest (including default interest) thereon, premiums, costs, expenses, fees (including attorneys' fees), indemnities, reimbursement obligations and other charges and Obligations owed by the Debtors are due and payable under the Prepetition First Lien Credit Agreement; (b) all of the Prepetition First Lien Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors and are unconditionally owing by the Debtors to the Prepetition Secured Party, and (c) the Prepetition First Lien Obligations are not subject to any avoidance, reductions, set-off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses or any other challenges

under the Bankruptcy Code or any applicable law or regulation by any person or entity, except as set forth in Paragraph 14 below; and

(ii)　　the Prepetition First Liens constitute valid, binding, enforceable, non-avoidable and perfected liens on all or substantially all of the Debtors' assets with priority over any and all other liens except for the DIP Liens (other than Permitted Liens, as defined in the Prepetition First Lien Loan Documents) and are not subject to any challenge or defense, including, without limitation, respectively, avoidance, reductions, recharacterization, subordination (whether equitable, contractual or otherwise), claims, counterclaims, cross-claims, offsets, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity.

F.　　Cash Collateral.  For purposes of this Interim Order, the term "Cash Collateral" shall mean and include all "cash collateral," as defined in section 363 of the Bankruptcy Code, in or on which the DIP Lender or the Prepetition Secured Party have a lien, security interest, or other interest (including, without limitation, any adequate protection liens or security interests) whether existing on the Petition Date, arising pursuant to this Interim Order, or otherwise and shall include, without limitation:

(i)　　all cash proceeds arising from the collection, sale, lease or other disposition, use or conversion of any real or personal property, including insurance policies (including, without limitation, policies for the benefit of directors and officers of the Debtors), in or on which the DIP Lender or Prepetition Secured Party have a lien or a replacement lien, whether as part of the DIP Collateral, Prepetition Collateral, or pursuant to an order of the Court or applicable law or otherwise, and whether such property has been converted to cash, existed as of the commencement of these Chapter 11 Cases, or arose or was generated thereafter;

(ii)     all of the respective deposits, refund claims, and rights in retainers of the Debtors on which the DIP Lender or Prepetition Secured Party has a lien or replacement lien, whether as part of the DIP Collateral, Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise; and

(iii)     the proceeds of any sale of DIP Collateral or Prepetition Collateral in connection with any sale consummated prior to entry of the Final Order.

G.     <u>Adequate Protection</u>.  The Prepetition Secured Party is entitled, pursuant to sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code, to adequate protection of its respective interests in the Prepetition Collateral, including the Cash Collateral, in exchange for the Debtors' use of such Prepetition Collateral, to the extent of the diminution in value, if any, of the Prepetition Collateral, including, without limitation, any diminution in value resulting from (i) the sale, lease, or use by the Debtors (or other decline in value) of the Cash Collateral and any other Prepetition Collateral, (ii) the priming of the Prepetition Liens on and in the Prepetition Collateral by the DIP Lender, (iii) the subordination of the Prepetition Senior Obligations to the Carve Out, or (iv) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

H.     <u>Purpose and Necessity of Financing</u>.  The Debtors require the financing described in the Requested Relief to (i) permit the continuation of their businesses and preserve their going concern value, (ii) satisfy payroll obligations and other working capital and general corporate purposes of the Debtors consistent with the terms set forth in the DIP Loan Documents and the Approved Budget (as defined below), (iii) pursue an orderly sale process, and (iv) pay fees and expenses related to the DIP Loan Documents and the Chapter 11 Cases.  If the Debtors do not obtain authorization to borrow under the Term Sheet (and, upon entry of a Final Order, the DIP Credit Agreement), they will suffer immediate and irreparable harm.  The Debtors are unable to

obtain adequate unsecured credit allowable as an administrative expense under section 503 of the Bankruptcy Code, or other sufficient financing under sections 364(c) or (d) of the Bankruptcy Code, on more favorable terms than those set forth in the DIP Loan Documents, based on the totality of the circumstances. A loan facility in the amount provided by the DIP Loan Documents is not available to the Debtors without granting the DIP Lender, for the benefit of the DIP Lender, superpriority claims, liens, and security interests, pursuant to section 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, as provided in this Interim Order and the DIP Loan Documents. After considering all alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to them at this time.

    I.  <u>Willingness to Provide Financing</u>. The DIP Lender has indicated a willingness to provide financing to the Debtors subject to the entry of this Interim Order, and conditioned upon the entry of the Final Order, including findings that such financing is essential to the Debtors' estates, the DIP Lender is extending credit to the Debtors as set forth in the DIP Facility in good faith, and that the claims, superpriority claims, security interests, liens, rights, and other protections granted to the DIP Lender will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, or reconsideration of this Interim Order, the Final Order, or any other order.

    J.  <u>Good Cause Shown</u>. Good cause has been shown for entry of this Interim Order. The ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Loan Documents is vital to the Debtors' estates and creditors. The liquidity to be provided under the DIP Loan Documents will enable the Debtors to continue to operate their businesses in the ordinary course, preserve the value of the Debtors' assets and pursue a sale transaction that will maximize

the value of their assets for the benefit of all stakeholders. Among other things, entry of this Interim Order is necessary to maximize the value of the Debtors' assets and to avoid immediate and irreparable harm to the Debtors and their estates, and, accordingly, is in the best interests of, the Debtors, their estates, and their creditors.

K.       Sections 506(c) and 552(b) Waivers. In light of (i) the DIP Lender's agreement to permit their DIP Liens and DIP Superpriority Claim to be subject to prior payment of the Carve Out, and in exchange for and as a material inducement to the DIP Lender to agree to provide the DIP Facility and (ii) the agreement of the Prepetition Secured Party to permit their Prepetition Liens to be subject to prior payment of the Carve Out, the DIP Liens, and the DIP Superpriority Claim and to permit the use of their Cash Collateral for payments made in accordance with the Approved Budget and the terms of this Interim Order, the DIP Lender and the Prepetition Secured Party are each entitled to (a) subject to entry of the Final Order, a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (b) subject to entry of the Final Order, a waiver of the provisions of section 506(c) of the Bankruptcy Code.

L.       Good Faith. The terms of the DIP Facility, including, without limitation, the interest rates and fees applicable, and intangible factors relevant thereto, are reasonable under the circumstances. Based upon the record before the Court, the DIP Loan Documents have been negotiated in good faith and at arm's-length among the Debtors and the DIP Lender, under no duress, and without undue influence, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the DIP Facility, and the use of Cash Collateral, including in respect of the granting of the DIP Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents related to any and all transactions contemplated by the foregoing. Any DIP Obligations

and other financial accommodations made to the Debtors by the DIP Lender pursuant to the DIP Loan Documents and this Interim Order shall be deemed to have been extended by the DIP Lender in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and the DIP Lender shall be entitled to all protections afforded thereby.

M.     <u>Fair Consideration and Reasonably Equivalent Value</u>.  All of the Debtors have received and will receive fair and reasonable consideration in exchange for access to the DIP Facility and all other financial accommodations provided under the DIP Loan Documents and this Interim Order.  The terms of the DIP Loan Documents are fair and reasonable, reflect the Debtors' exercise of prudent judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

N.     <u>Immediate Entry of Interim Order</u>.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Bankruptcy Local Rule 4001-2(b).  The permission granted herein to enter into the DIP Loan Documents and to obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Debtors. This Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for access to the financing necessary for the continued flow of supplies and services to the Debtors necessary to sustain the operation of the Debtors' existing businesses and further enhance the Debtors' prospects for a successful reorganization or sale of substantially all of their assets.

Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.     _Disposition_.  The relief requested by the Debtors on the record at the Interim Hearing is granted on the terms set forth in this Interim Order.  Any objection to the interim relief sought by the Debtors that has not previously been withdrawn or resolved is hereby overruled on its merits.  The term of this Interim Order, the DIP Loan Documents, and the use of Cash Collateral authorized hereunder shall expire, and the DIP Facility made pursuant to this Interim Order and the DIP Loan Documents will mature, and together with all interest thereon and any other obligations accruing under the DIP Loan Documents, will become due and payable (unless such obligations become due and payable earlier pursuant to the terms of the DIP Loan Documents and this Interim Order by way of acceleration or otherwise) on the earlier of (a) twenty-eight (28) days after the Petition Date if a Final DIP Order has not been entered prior to such date, or (b) termination of the DIP Facility by the DIP Lender following the occurrence of an Event of Default in accordance with the terms of this Interim Order.

## AUTHORIZATION FOR DIP FINANCING AND USE OF CASH COLLATERAL

2.     _Authorization for DIP Financing and Use of Cash Collateral_.

(i)     The Debtors are hereby authorized, on an interim basis, to incur DIP Obligations immediately subject to the terms of this Interim Order, the Approved Budget, and the DIP Loan Documents, in the aggregate principal amount of up to $2,000,000.  Available financing under the DIP Loan Documents shall, on an interim basis, be made to fund, strictly in accordance with the Approved Budget, working capital and general corporate requirements of the Debtors, bankruptcy-related costs and expenses (including interest, fees, and expenses in accordance with this Interim Order or the DIP Loan Documents), and any other amounts required or allowed to be paid in accordance with this Interim Order, but only as and to the extent authorized by the

Approved Budget (and permitted variances as set forth in the DIP Loan Documents) and the DIP Loan Documents.

(ii)     The Debtors are authorized to use Cash Collateral subject to and in accordance with the terms, conditions, and limitations set forth in this Interim Order, the Approved Budget (and permitted variances as set forth in the DIP Loan Documents) and the DIP Loan Documents, without further approval by the Court.

(iii)     The Debtors have delivered to the DIP Lender a budget that sets forth projected cash receipts and cash disbursements (by line item) on a weekly basis for the time period from and including the Petition Date through January 20, 2023, a copy of which is attached hereto as **Exhibit A** (the "Approved Budget").  The Approved Budget shall at all times be in form and substance acceptable to the DIP Lender, and approved in writing by the DIP Lender in their sole and absolute discretion.  The Debtors shall provide updates to the Approved Budget and financial reporting with respect to the Debtors in accordance with the terms of the DIP Loan Documents and shall provide copies of updates to the Approved Budget to the U.S. Trustee and counsel for any Creditors' Committee.  Funds borrowed under the DIP Loan Documents and Cash Collateral used under this Interim Order shall be used by the Debtors in accordance with the DIP Loan Documents and this Interim Order.  The consent of the DIP Lender to any Approved Budget shall not be construed as a commitment to provide the DIP Facility or, to the extent permitted by Paragraph 11 below, to permit the use of Cash Collateral after the occurrence of a Termination Event under this Interim Order, regardless of whether the aggregate funds shown on the Approved Budget have been expended.

(iv)     Any amendments, supplements, or modifications to the Approved Budget must be consented to in writing by the DIP Lender in their sole discretion prior to the

implementation thereof and shall not require further notice, hearing, or court order; provided, however that notice of any such amendment, supplement, or modification shall be provided to the U.S. Trustee and counsel to the Creditors' Committee.

(v)     The DIP Lender (i) may assume the Debtors will comply with the Approved Budget, and (ii) shall have no duty to monitor such compliance. All advances and extensions of credit shall be based upon the terms and conditions of the DIP Loan Documents, as the same may be adjusted from time to time. Subject to the terms and conditions of this Interim Order, the DIP Lender shall have the right but not the obligation to extend credit independent of any Approved Budget line item restrictions on loan availability set forth in the DIP Loan Documents, and all such DIP Obligations shall be entitled to the benefits and protections of this Interim Order.

(vi)    To the extent any court order is entered directing disgorgement of any payments made by the Debtors to the Prepetition Secured Party either prior to or after the Petition Date, 100% of the proceeds recovered by the Debtors' estates in connection with such order(s) directing disgorgement shall be applied first to repayment of the DIP Obligations, until the DIP Obligations are indefeasibly paid in full in cash, and then to repayment of claims in accordance with the priority scheme set forth in the Bankruptcy Code.

3.    <u>Authority to Execute and Deliver Necessary Documents.</u>

(i)     Each of the Debtors is authorized to negotiate, prepare enter into, and deliver the DIP Loan Documents, in each case including any amendments thereto and borrow money under the DIP Facility, on an interim basis, in accordance with the terms of this Interim Order and the DIP Loan Documents. Each of the Debtors is further authorized and directed to negotiate, paper, enter into and deliver any UCC financing statements, pledge and security agreements, mortgages or deeds of trust, or similar documents or agreements encumbering all of

the DIP Collateral and securing all of the Debtors' obligations under the DIP Loan Documents, each as may be reasonably requested by the DIP Lender.

(ii)        Each of the Debtors is further authorized and directed to negotiate, prepare, enter into and deliver any UCC financing statements, pledge and security agreements, mortgages or deeds of trust, or similar documents or agreements encumbering all of the Prepetition Collateral with Replacement Liens and securing all of the Debtor's obligations under the Prepetition First Lien Credit Agreement, subject to the modification of such obligations and interests through this Interim Order (provided that, for the avoidance of doubt, such Replacement Liens and any other security interests held by the Prepetition Secured Party shall be primed and henceforth subordinate in all respects to the DIP Liens as set forth through the DIP Credit Documents and authorized through this Interim Order).

(iii)        Each of the Debtors is further authorized to (i) perform all of its obligations under the DIP Loan Documents, and such other agreements as may be required by the DIP Loan Documents to give effect to the terms of the financing provided for therein and in this Interim Order, and (ii) perform all acts required under the DIP Loan Documents and this Interim Order.

4.        <u>Valid and Binding Obligations</u>.  All obligations under the DIP Loan Documents shall constitute valid and binding obligations of each of the Debtors, enforceable against each of them, each of their estates, and each of their successors and assigns, jointly and severally, including, without limitation, any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Case (as defined below), in accordance with their terms and the terms of this Interim Order, and no obligation, payment, transfer, or grant of a lien or security interest under the DIP Loan Documents or this Interim Order shall be restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under

section 502(d) of the Bankruptcy Code) or subject to any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity. The DIP Obligations include all loans and any other indebtedness or obligations, contingent or absolute, now existing or hereafter arising, which may from time to time be or become owing by the Debtors to the DIP Lender under the DIP Loan Documents, including without limitation all principal, interest, costs, fees, expenses and other amounts owed pursuant to the DIP Loan Documents.

5. <u>Termination of DIP Loan Documents</u>. Notwithstanding anything in this Interim Order to the contrary, the term of this Interim Order and the DIP Loan Documents shall expire, and the DIP Facility made pursuant to this Interim Order and the DIP Loan Documents will mature, and together with all interest thereon and any other obligations accruing under the DIP Loan Documents, will become due and payable (unless such obligations become due and payable earlier pursuant to the terms of the DIP Loan Documents and this Interim Order by way of acceleration or otherwise) on the date that is the earliest of: (a) twenty-eight (28) days after the Petition Date if a Final DIP Order has not been entered prior to such date, (b) January 20, 2023, (c) the date of consummation of a sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code, (c) the occurrence of the effective date of any confirmed plan of reorganization in the Chapter 11 Cases, or (d) termination of the DIP Facility by the DIP Lender following the occurrence of an Event of Default; provided, however, the DIP Facility shall not terminate until such time as all accrued fees and expenses due and owed to the DIP Lender as set forth in the DIP Loan Documents have been paid to the DIP Lender.

6.      <u>Authorization for Payment of DIP Financing Fees and Expenses</u>.  All fees paid and payable, and all costs and/or expenses reimbursed or reimbursable (including, without limitation, all fees, costs, and expenses referred to in the DIP Loan Documents) by the Debtors to the DIP Lender are hereby approved.  The Debtors are hereby authorized and directed to pay all such fees, costs, and expenses in accordance with the terms of the DIP Loan Documents and this Interim Order, without any requirement that any party or their counsel file any further application or other pleading, notice, or document with the Court for approval or payment of such fees, costs, or expenses.  Notwithstanding anything to the contrary herein, the fees, costs, and expenses of the DIP Lender, whether incurred prior to or after the Petition Date, including, without limitation, all fees referred to in the DIP Loan Documents and all attorneys' fees and expenses, shall be deemed fully earned and non-refundable as of the date of this Interim Order, except with respect to reimbursement of professional fees and expenses, which shall be subject to the fee review procedures set forth below in Paragraph 6(i) and (ii) below.

(i)      The payment of the fees, expenses and disbursements set forth in this paragraph of this Interim Order shall be made within ten (10) days after the receipt by the Debtors, the Committee, and the U.S. Trustee (the "<u>Review Period</u>") of invoices thereof (the "<u>Invoiced Fees</u>") (subject in all respects to applicable privilege or work product doctrines), including a summary description of the services provided and the expenses incurred by the applicable professional arising before or after the Petition Date, as applicable; <u>provided</u>, <u>however</u>, that any such invoice (i) may be redacted to protect privileged, confidential or proprietary information and (ii) shall not be required to contain individual time detail.

(ii)      The Debtors, the Committee and the U.S. Trustee may preserve their right to dispute the reasonableness of any portion of the Invoiced Fees (the "<u>Disputed Invoiced Fees</u>")

if, within the Review Period, the Debtors, the Committee or the U.S. Trustee files with the Court a motion or other pleading, on at least ten (10) calendar days prior written notice to the DIP Lender of any hearing on such motion or other pleading, which must contain a specific basis for the objection to the Disputed Invoiced Fees and quantification of the disputed amount of the fees and expenses invoiced. The Debtors' payment of the Invoiced Fees (other than any Disputed Invoiced Fees pending resolution of such dispute by the parties or disposition by the Court) shall not be delayed based on any objections thereto, and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final non-appealable order of this Court. None of the Invoiced Fees shall be subject to Court approval or required to be maintained in any specific format, and no recipient of any payment on account thereof shall be required to file with respect thereto any interim or final fee application with the Court.

7. <u>Amendments, Consents, Waivers, and Modifications</u>.  The Debtors may enter into any amendments, consents, waivers, or modifications to the DIP Loan Documents in accordance with the terms of the DIP Loan Documents without need for further notice and hearing or any order of this Court; <u>provided</u>, <u>however</u>, that any material amendment, waiver, or modification shall require Court approval.  Copies of all amendments, waivers, modifications, whether or not material, shall be filed with the Court and provided by the Debtors to counsel to the Creditors' Committee and the U.S. Trustee.

## DIP LIENS AND DIP SUPERPRIORITY CLAIMS

8. <u>DIP Liens & Priority</u>.

(a)    To secure the DIP Obligations and other obligations of the Debtors under the DIP Facility and DIP Loan Documents, the DIP Lender is hereby granted for the benefit of itself, pursuant to and in accordance with sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of

the Bankruptcy Code, subject to the Carve Out at all times, valid, enforceable, and fully perfected (i) first priority liens on all property of the Debtors' estates in these Chapter 11 Cases that is not subject to valid, perfect, and non-avoidable liens as of the Petition Date excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code (collectively, "<u>Avoidance Actions</u>"); provided, however, upon entry of the Final Order, liens in favor of the DIP Agent and DIP Lender shall attach to and be perfected in any proceeds of Avoidance Actions; (ii) junior liens on all property of the Debtors' estates in these Chapter 11 Cases, that is subject to valid, perfected, and non-avoidable liens in existence as of the Petition Date or to valid liens in existence at the time of the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, other than property that is subject to the existing liens that secure obligations under the agreements referred to in subsection (iii) below, which liens shall be primed by the liens to be granted to the DIP Lender as described therein; (iii) first priority, senior priming liens on all of the property (such property, together with the property described in subsections (i) and (ii) above, the "<u>DIP Collateral</u>") of the Debtors' estates in these Chapter 11 Cases (including, without limitation, inventory, accounts receivable, general intangibles, chattel paper, owned real estate, real property leaseholds, fixtures and machinery and equipment fixtures and machinery and equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements, and other intellectual property and capital stock of subsidiaries) that is subject to the existing liens that secure the obligations of any other lenders under or in connection with any existing credit agreement and related documents and agreements and all of which existing liens (the "<u>Primed Liens</u>") shall be primed by and made subject and subordinate to the perfected first priority senior liens to be granted to the DIP Lender, for the benefit of itself, which senior priming liens in favor of the DIP Lender

shall also prime any liens granted after the Petition Date to provide adequate protection in respect of any of the Primed Liens, subject, in each case, only to the Carve Out and, solely with respect to the collateral subject thereto (subsections (i), (ii), and (iii) collectively, the "DIP Liens").

(b)     The DIP Liens shall be effective immediately upon the entry of this Interim Order and shall not at any time be made subject or subordinated to, or made *pari passu* with, any other lien, security interest or claim existing as of the Petition Date, or created under sections 363 or 364(d) of the Bankruptcy Code or otherwise, other than prior payment of the Carve Out.

(c)     The DIP Liens shall be and hereby are deemed fully perfected liens and security interest, effective and perfected upon the date of this Interim Order, without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements, account control agreements, or any other agreements or instruments, such that no additional actions need by taken by the DIP Lender to perfect such interests.  Any provision of any lease, loan document, easement, use agreement, proofer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or approval of one or more landlords, licensors or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person, in order for any of the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the transactions granting the DIP Lender for the benefit of itself, a security interest in such fee, leasehold, or other interest or other collateral or the proceeds of any assignment, sale, or other transfer thereof, by any of the Debtors in favor of the DIP Lender, for the benefit of itself, in accordance with the terms of the DIP Credit Agreement and the other DIP Loan Documents.

9.     DIP Lender's Superpriority Claim.  The DIP Lender is hereby granted an allowed superpriority administrative expense claim (the "DIP Superpriority Claim") pursuant to section 364(c)(1) of the Bankruptcy Code in each of the Chapter 11 Cases and in any successor case(s) under the Bankruptcy Code (including any case or cases under chapter 7 of the Bankruptcy Code, the "Successor Case(s)") for all DIP Obligations, having priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed DIP Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof including, without limitation, any proceeds or property recovered in connection with the pursuit of Avoidance Actions.  The DIP Superpriority Claim granted in this paragraph shall be subject and subordinate in priority of payment only to prior payment of the Carve Out. Except as set forth in this Interim Order, without the written consent of the DIP Lender, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases or in any Successor Case and the DIP Superpriority Claim shall be senior in all respects to any superpriority claims granted in these Chapter 11 Cases including, without limitation, on account of any break-up fee or expense reimbursement that may be granted by the Court in connection with the sale of the Debtors' assets.

10.     Survival of DIP Liens and DIP Superpriority Claim.  The DIP Liens, DIP Superpriority Claim, and other rights and remedies granted under this Interim Order to the DIP

Lender shall continue in this and any Successor Case(s) and shall be valid and enforceable against any trustee appointed in any or all of the Debtors' Chapter 11 Cases and/or upon the dismissal or conversion of any or all of the Debtors' Chapter 11 Cases or any Successor Case(s) and such liens and security interests shall maintain their priority as provided in this Interim Order until all of the DIP Obligations have been indefeasibly paid in full in cash and the DIP Lender's commitments have been terminated in accordance with the DIP Loan Documents.

11. <u>Carve Out</u>. As used in this Interim Order, the "<u>Carve Out</u>" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code, (ii) all unpaid professional fees and disbursements incurred by the Debtors and any statutory committees appointed in these Chapter 11 Cases prior to the occurrence of an Event of Default and notice thereof delivered to the Debtors, but only to the extent allowed by the Court at any time and only to the extent of amounts included in the Approved Budget, and (iii) at any time after the occurrence of an Event of Default and notice thereof delivered to the Borrower, to the extent allowed at any time, whether before or after delivery of such notice, whether by interim order, procedural order or otherwise, the payment of accrued and unpaid professional fees, costs and expenses (collectively, the "<u>Professional Fees</u>") incurred by persons or firms retained by the Debtors and the committee and allowed by the Court, not in excess of $100,000 for the Debtors' professionals and the Creditors' Committee professionals (the "<u>Carve Out Cap</u>"). On a weekly basis, the fees and expenses of the Debtors' and Creditors' Committee's professionals provided in the Budget shall be funded into an escrow account with Young Conaway Stargatt & Taylor, LLP to satisfy the professional fees included within the Carve Out (the "<u>Professional Fee Reserve</u>"). The funds on deposit in the Professional Fee Reserve shall be available to satisfy the obligations

owed to the Debtors' and committee's professionals benefiting from the Carve Out, and the DIP

Lender shall have a security interest upon any residual interest in the Professional Fee Reserve

available following satisfaction in cash in full of all obligations benefiting from the Carve Out;

<u>provided</u>, <u>further</u>, that the Carve Out shall not be available to pay any such Professional Fees

incurred in connection with the initiation or prosecution of any claims, causes of action, adversary

proceedings or other litigation against the DIP Lender or the DIP Lender's professionals and

nothing herein shall impair the right of any party to object to the reasonableness of any such fees

or expenses to be paid by the Debtors' estates.

## **ADEQUATE PROTECTION**

12. <u>Adequate Protection for Prepetition Secured Party</u>. Pursuant to sections 361,

363(e), and 364(d) of the Bankruptcy Code, as adequate protection for any diminution in the value

of the Prepetition Collateral resulting from, among other things: (i) the incurrence of the DIP

Obligations secured by a priming DIP Lien, (ii) the use of Cash Collateral, (iii) the imposition of

the automatic stay, (iv) the subordination their right to receive payment from the proceeds of the

Prepetition Collateral to the prior payment of the Carve Out, or (v) otherwise (collectively, the

"<u>Prepetition Senior Lender Diminution Claim</u>"), the Prepetition Secured Party is hereby granted

(in each case subject to the DIP Liens, the DIP Superpriority Claim, and prior payment of the

Carve Out) the following (collectively, the "<u>Prepetition Senior Lender Adequate Protection</u>

<u>Obligations</u>"):

(a)    Subject to paragraph 15 of this Interim Order, to secure the Prepetition

Senior Lender Diminution Claim, the Prepetition Secured Party is hereby granted (effective and

perfected upon the date of this Interim Order and without the necessity of execution by the Debtors

of mortgages, security agreements, pledge agreements, financing statements, and other agreements

or instruments) valid, perfected, postpetition security interests and liens (the "<u>Replacement Liens</u>") in and on all of the DIP Collateral and, upon entry of a Final DIP Order, proceeds of Avoidance Actions; <u>provided</u>, <u>however</u>, that the Replacement Liens shall only be and remain subject and subordinate to (i) the DIP Liens and/or payment of any DIP Obligations on account thereof, and (ii) prior payment of the Carve Out. The Replacement Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Case, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Case.

## RESTRICTION ON USE OF FUNDS

13.     Notwithstanding anything in this Interim Order or the DIP Loan Documents to the contrary, no proceeds of the DIP Facility, any DIP Collateral or Prepetition Collateral (including, without limitation, Cash Collateral) or any portion of the Carve Out may be used to pay any claims for services rendered by any professionals retained by the Debtors, any creditor or party in interest, a Creditors' Committee, any trustee appointed under these Chapter 11 Cases or any Successor Cases, or any other party to (a) request authorization to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code or otherwise, other than from the DIP Lender, unless the proceeds of such loans or accommodations are or will be sufficient, and will be used, to indefeasibly pay in full in cash all DIP Obligations, the Prepetition Senior Obligations, and Prepetition Senior Lender Adequate Protection Obligations, or (b) investigate (except as set forth in Paragraph 14 below), assert, join, commence, support or prosecute any action or claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief

against, or adverse to the interests of, in any capacity, the DIP Lender or any of their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, or action, including, without limitation, (i) any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code; (ii) any action relating to any act, omission or aspect of the relationship between or among any of the DIP Lender, on the one hand, and the Debtors or any of their affiliates, on the other; (iii) any action with respect to the validity and extent of the DIP Obligations or the validity, extent, and priority of the DIP Liens; (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part the DIP Liens; (v) any action that has the effect of preventing, hindering or delaying (whether directly or indirectly) the DIP Lender in respect of the enforcement of its liens and security interests in the DIP Collateral, or Cash Collateral; (vi) pay any Claim of a Creditor (as such terms are defined in the Bankruptcy Code) inconsistent with the Budget without the prior written consent of the DIP Lender (vii) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral, unless otherwise permitted hereby or by the DIP Loan Documents. Notwithstanding the foregoing, up to $10,000 in the aggregate of the DIP Facility, DIP Collateral, Cash Collateral, Prepetition Collateral and Carve Out may be used by a Creditors' Committee to investigate the Prepetition Senior Obligations, or the Prepetition Senior Liens and/or claims against the Releasees prior to the expiration of the Challenge Period (as each is defined below).

14. <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims</u>.

(a) The Debtors' acknowledgements and stipulations set forth in Paragraph E above (the "<u>Debtors' Stipulations</u>") shall be binding upon the Debtors in all circumstances upon entry of this Interim Order.

(b)     The Debtors' Stipulations shall also be binding upon each other party in interest, including any Creditors' Committee unless such Creditors' Committee or any other party in interest having standing, including any Chapter 11 trustee (or if the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case(s)): (a) commences a Challenge (as defined below) within seventy-five (75) calendar days following the date of entry of the Interim Order (such time period shall be referred to as the "Challenge Period") and (b) obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action. For the avoidance of doubt, any trustee appointed or elected in these Chapter 11 Cases shall, until the expiration of the period provided herein for asserting Challenges, and thereafter for the duration of any adversary proceeding or contested matter commenced pursuant to this paragraph  (whether commenced by such trustee or commenced by any other party in interest on behalf of the Debtors' estates), be deemed to be a party other than the Debtors and shall not, for purposes of such adversary proceeding or contested matter, be bound by the acknowledgments, admissions, confirmations and stipulations of the Debtors in this Interim Order.

(c)     A "Challenge" means with respect to any party that has filed a notice seeking standing to commence and has filed (A) an adversary proceeding challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtors' Stipulations, or (B) an adversary proceeding against any or all of the Prepetition Secured Party in connection with or related to the Prepetition Senior Obligations, or the actions or inactions of any of the Prepetition Secured Party arising out of or related to the Prepetition Senior Obligations or otherwise, including, without limitation, any claim against Prepetition Secured Party in the nature

of a "lender liability" cause of action, setoff, counterclaim, or defense to the Prepetition Senior Obligations (including, but not limited to, those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code ((A) and (B) collectively, the "<u>Challenges</u>" and, each individually, a "<u>Challenge</u>").  Nothing in this Order shall be deemed to provide automatic standing to any party in interest.

(d)     With respect to any party interest that (i) fails to raise a proper Challenge within the Challenge Period or (ii) raises a proper Challenge within the Challenge Period which is fully and finally adjudicated in favor of the Prepetition Secured Party, then for all purposes in these Chapter 11 Cases and any Successor Case(s), (i) all payments made to or for the benefit of the Prepetition Secured Party, pursuant to, or otherwise authorized by, this Interim Order or otherwise (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, or avoidance, (ii) any and all such Challenges by any party in interest (including, without limitation, a Creditors' Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed in the Chapter 11 Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed in any Successor Case) shall be deemed to be forever released, waived, and barred, (iii) the Prepetition Senior Obligations shall be deemed to be a fully allowed and fully secured claim within the meaning of section 506 of the Bankruptcy Code, not subject to counterclaim, setoff, subordination, recharacterization, reduction, defense or avoidance, (iv) any and all pre-petition claims or causes of action against the Prepetition Secured Party, as applicable, relating in any way to the Debtors shall be forever waived and released by the Debtors, the Debtors' estates and all creditors, interest holders, a Creditors' Committee and other parties in interest in the Chapter 11 Cases and any Successor Case and (v) all matters not subject to the Challenge, including, without limitation, all

findings, the Debtors' Stipulations in Paragraph E, all waivers, releases set forth herein, affirmations and other stipulations as to the priority, extent and validity as to the claims, liens and interests of the Prepetition Secured Party shall be of full force and effect upon the Debtors, the Debtors' estates and all creditors, equity interest holders, a Creditors' Committee and other parties in interest in the Chapter 11 Cases and any Successor Case.

15. <u>Prohibition on Granting of Additional Liens and Interests</u>. It shall constitute an event of default, the DIP Lender shall have no further obligation to provide financing under the DIP Loan Documents, and the DIP Lender shall be entitled to enforce its rights and remedies under the DIP Loan Documents and this Interim Order if the Debtors seek, or this Court grants, any liens, claims, interests or priority status, other than the Carve Out, having a lien or administrative priority superior to or pari passu with that of the DIP Liens, the DIP Superpriority Claim, or the Replacement Liens granted by this Interim Order, while any portion of the DIP Obligations or Prepetition Senior Obligations remain outstanding, or any commitment under the DIP Loan Documents or Prepetition First Lien Loan Documents remains in effect, without the prior written consent of the DIP Lender.

16. <u>Release</u>. Subject to entry of the Final Order, the release, discharge, waivers, settlements, compromises, and agreements set forth in this Paragraph 16 shall be deemed effective upon entry of the Interim Order, and subject only to the rights set forth in Paragraph 14 above. The Debtors, on behalf of themselves and their estates (including any successor trustee or other estate representative in these Chapter 11 Cases or any Successor Case) forever and irrevocably (a) release, discharge, and acquit the DIP Lender and its former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest

(collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, including, without limitation, any claims arising from any actions relating to any aspect of the relationship between the DIP Lender, on the one hand, and the Debtors and their affiliates, on the other hand, including any equitable subordination claims or defenses, with respect to or relating to the DIP Facility, the DIP Liens, the DIP Loan Documents, any and all claims and causes of action arising under the Bankruptcy Code; and (b) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and non-avoidability of the Prepetition Senior Obligations and the Prepetition Senior Liens.

## REMEDIES; MODIFICATION OF AUTOMATIC STAY

17. <u>Remedies and Stay Modification</u>.

(a)     The automatic stay provisions of section 362 of the Bankruptcy Code are, to the extent applicable, modified without further application or motion to, or order from, the Court, to the extent necessary so as to permit the following:

i.     Whether or not a Default or an Event of Default under the DIP Loan Documents or a default by any of the Debtors of any of their obligations under this Interim Order has occurred (A) the right to file or record any financing statements, mortgages or other instruments or other documents to evidence the security interests in and liens upon the DIP Collateral, (B) the right to charge and collect any interest, fees, costs and other expenses accruing at any time under the DIP Loan Documents as provided therein, and (C) the right to give the Debtors any notice provided for in any of the DIP Loan Documents or this Interim Order;

ii.      Subject to Paragraph 17(a)(iv) below, the automatic stay provisions of section 362 of the Bankruptcy Code are modified without the need for further Court order to permit the DIP Lender, upon the occurrence and during the continuance of an Event of Default, and without any interference from the Debtors or any other party interest, to (I)(A) cease providing the DIP Facility and/or suspend or terminate the commitments under the DIP Loan Documents, and (B) declare all DIP Obligations immediately due and payable, and (II) subject to five (5) calendar days' prior written notice (which may be delivered by electronic mail) (the "Remedies Notice Period") to the Debtors, their counsel, counsel to any Creditors' Committee and the U.S. Trustee, to exercise all other rights and remedies provided for in the DIP Loan Documents, this Interim Order or under other applicable bankruptcy and non-bankruptcy law including, without limitation, the right to (A) in the case of the DIP Lender, take any actions reasonably calculated to preserve or safeguard the DIP Collateral or to prepare the DIP Collateral for sale; (B) in the case of the DIP Lender, foreclose or otherwise enforce the DIP Liens on any or all of the DIP Collateral; (C) set off any amounts held as Cash Collateral (including, without limitation, in any Cash Collateral account held for the benefit of the DIP Lender); and/or (D) exercise any other default-related rights and remedies under the under the DIP Loan Documents or this Interim Order. The Remedies Notice Period shall run concurrently with any notice period provided for under the DIP Loan Documents;

iii.      Immediately upon the occurrence of an Event of Default under the DIP Loan Documents or any of their obligations under this Interim Order, the DIP Lender may charge interest at the default rate set forth in the DIP Loan Documents without being subject to the Remedies Notice Period;

iv.     The automatic stay of section 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed terminated without the necessity of any further action by the Court in the event that the Debtors, the Creditors' Committee, if any, and/or the U.S. Trustee or any party in interest with requisite standing have not obtained an order from this Court to the contrary prior to the expiration of the Remedies Notice Period. During the Remedies Notice Period, the Debtors shall not be permitted to use any Cash Collateral or any DIP Facility proceeds except to pay expenses reasonably necessary to preserve the Debtors' going concern value, which amount shall not exceed $670,000.  The Debtors, a Creditors' Committee, if any, the U.S. Trustee, and any other party with requisite standing, shall have the burden of proof at any hearing on any request by them to reimpose or continue the automatic stay of Section 362(a) of the Bankruptcy Code or to obtain any other injunctive relief;

v.     If the DIP Lender is entitled, and has elected in accordance with the provisions hereof, to enforce its respective liens or security interests or exercise any other default-related remedies following expiration of the Remedies Notice Period, the Debtors shall cooperate with the DIP Lender in connection with such enforcement by, among other things, (A) providing at all reasonable times access to the Debtors' premises to representatives or agents of the DIP Lender (including any collateral liquidator or consultant), (B) providing the DIP Lender and their representatives or agents, at all reasonable times access to the Debtors' books and records and any information or documents requested by the DIP Lender or its respective representatives, (C) performing all other obligations set forth in the DIP Loan Documents, and (D) taking reasonable steps to safeguard and protect the DIP Collateral, and the Debtors shall not otherwise interfere with or actively encourage others to interfere with the DIP Lender's enforcement of rights;

vi. Upon the occurrence and during the continuance of an Event of Default under the DIP Loan Documents or a violation of the terms of this Interim Order, subject to payment of the Carve Out and payment of the expenses provided in subsection (iv) of this Paragraph, the DIP Lender shall have no further obligation to provide financing under the DIP Loan Documents and the DIP Lender and the Prepetition Secured Party shall have no further obligation to permit the continued use of Cash Collateral;

vii. Upon the occurrence and during the continuance of an Event of Default under the DIP Loan Documents or a violation of the terms of this Interim Order, the DIP Lender may at all times continue to collect and sweep cash as provided herein or as provided in the DIP Loan Documents; and

viii. This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Interim Order and relating to the application, re-imposition or continuance of the automatic stay of Section 362(a) of the Bankruptcy Code or other injunctive relief requested.

**MISCELLANEOUS**

18.     Limitation of Section 506(c) Claims.  Subject to entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any Successor Case at any time shall be surcharged against, and no person may seek to surcharge any costs or expenses of administration against the DIP Lender, or any of their respective claims, the Carve Out, or the DIP Collateral, pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender.  No action, inaction or acquiescence by the DIP Lender shall be deemed to be or shall be considered evidence of any

alleged consent to a surcharge against the DIP Lender, any of its respective claims, the Carve Out, or the DIP Collateral.

19.    No Marshaling.  Subject to entry of a Final Order, the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral. Without limiting the generality of the immediately preceding sentence, no party shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of the DIP Collateral after an Event of Default under the DIP Loan Documents, or termination or breach under the DIP Loan Documents.

20.    Additional Perfection Measures.  The DIP Liens and the Replacement Liens shall be perfected by operation of law immediately upon entry of this Interim Order. None of the Debtors, the DIP Lender, or the Prepetition Secured Party shall be required to enter into or obtain landlord waivers, mortgagee waivers, bailee waivers, warehouseman waivers or other waiver or consent, or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, control agreements, notices of lien or similar instruments in any jurisdiction (including, but not limited to control agreements relating to bank accounts, trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property, or filings with any other federal agencies/authorities), or obtain consents from any licensor or similarly situated party-in-interest, or take any other action in order to validate and to perfect the DIP Liens or the Replacement Liens.

(i)    If the DIP Lender, in its sole discretion, chooses to take any action to obtain consents from any landlord, licensor or other party in interest, to file mortgages, financing statements, notices of lien or similar instruments, or to otherwise record or perfect such security

interests and liens, the DIP Lender is hereby authorized, but not directed to, take such action or to request that Debtors take action reasonably requested on its behalf (and Debtors are hereby authorized to take such action) and:

        (a)      any such documents or instruments shall be deemed to have been recorded and filed as of the time and on the date of entry of this Interim Order; and

        (b)      no defect in any such act shall affect or impair the validity, perfection, and enforceability of the liens granted hereunder.

        (ii)      In lieu of obtaining such consents or filing any such mortgages, financing statements, notices of lien or similar instruments, the DIP Lender may, in its sole discretion, choose to file a true and complete copy of this Interim Order in any place at which any such instruments would or could be filed, together with a description of the DIP Collateral, and such filing by the DIP Lender shall have the same effect as if such mortgages, deeds of trust, financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Interim Order.

        21.      <u>Application of Collateral Proceeds</u>.  To the extent required by this Interim Order and the DIP Loan Documents, after an Event of Default, the Debtors are hereby authorized and directed to remit to the DIP Lender, as the case may be, subject to the payment of the Carve Out, one-hundred percent (100%) of all collections on, and proceeds of, the DIP Collateral, and the automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to permit the DIP Lender to retain and apply all collections, remittances, and proceeds of the DIP Collateral in accordance with the DIP Loan Documents. In furtherance of the foregoing, (a) all cash, securities, investment property and other items of any Debtor deposited with any bank or other financial institution shall be subject to a perfected, first priority security interest in favor of the

DIP Lender (or its designee), (b) upon the expiration of the Remedies Notice Period, each bank or other financial institution with an account of any Debtor is hereby authorized and instructed to comply at all times with any instructions originated by the DIP Lender (or its designee) to such bank or financial institution directing the disposition of cash, securities, investment property and other items from time to time credited to such account, without further consent of any Debtor, including, without limitation, any instruction to send to the DIP Lender (or its designee) by wire transfer (to such account as the DIP Lender (or its designee) shall specify, or in such other manner as the DIP Lender (or its designee) shall direct) all such cash, securities, investment property and other items held by it, and (c) any deposit account control agreement executed and delivered by any bank or other financial institution, any Debtor and the Prepetition Secured Party shall establish co-control in favor of the DIP Lender of any and all accounts subject thereto and any and all cash, securities, investment property and other items of any Debtor deposited therein to secure the DIP Obligations (provided that primary control rights shall vest in the DIP Lender), and all rights thereunder in favor of the Prepetition Secured Party shall inure also to the benefit of, and shall be exercisable exclusively by, the DIP Lender, until all of the DIP Obligations have been indefeasibly paid in full, at which time exclusive control shall automatically revert to the Prepetition Secured Party.

22.     <u>Access to Collateral</u>.  Notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Lender contained in this Interim Order or the DIP Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents, upon three (3) business days' written notice to the landlord, lienholder, licensor or other third party owner of any leased or licensed premises or intellectual property that an Event of Default under the DIP Loan Document or a default by any of the Debtors of any of

29923373.3

34

their obligations under this Interim Order has occurred and is continuing, the DIP Lender (i) may, unless otherwise provided in any separate agreement by and between the applicable landlord or licensor and the DIP Lender (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of any of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and (ii) shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable lease or license and to use any and all trademarks, trade names, copyrights, licenses, patents or any other similar assets of the Debtors, which are owned by or subject to a lien of any third party and which are used by the Debtors in their businesses, in either the case of subparagraph (i) or (ii) of this paragraph, without interference from lienholders, landlords or licensors thereunder, subject to such lienholders, landlords or licensors rights under applicable law. Nothing herein shall require the Debtors or the DIP Lender to assume any lease or license under section 365(a) of the Bankruptcy Code as a precondition to the rights afforded to the DIP Lender in this paragraph, provided, however, that the DIP Lender shall compensate any counterparty to a lease, contract, or license for use of such lease, contract, or license on a per diem basis.

23. <u>Delivery of Documentation</u>.  The Debtors (and/or their legal or financial advisors) shall deliver to the DIP Lender, counsel to the DIP Lender, and any financial advisors to the DIP Lender, all financial reports, Approved Budgets, forecasts, and all other legal or financial documentation, pleadings, and/or filings that are either (i) required to be provided (by the Debtors and/or their legal or financial advisors) to the DIP Lender, and/or the DIP Lender's legal and financial advisors pursuant to the DIP Loan Documents, or (ii) reasonably requested by the DIP Lender (or its legal and financial advisors).

24. <u>Access to Books and Records</u>.  The Debtors (and/or their legal and financial advisors) will (a) keep proper books, records and accounts in accordance with GAAP in which full, true and correct entries shall be made of all dealings and transactions in relation to their business and activities, (b) cooperate, consult with, and provide to the DIP Lender all such information as required or allowed under the DIP Loan Documents, the provisions of this Interim Order or that is afforded to the Creditors' Committee and/or the Creditors' Committee's respective legal or financial advisors, (c) permit, upon two (2) business days' notice and during normal business hours, representatives of the DIP Lender to visit and inspect any of their respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations and accounts with their respective officers, employees and independent public accountants as often as may reasonably be desired, and (d) permit representatives of the DIP Lender to consult with and advise the Debtors' management on matters concerning the general status of the Debtors' business, financial condition and operations.

25. <u>Lenders Not Responsible Persons</u>.  In (a) making the decision to provide the DIP Facility; (b) administering the DIP Facility; (c) extending other financial accommodations to the Debtors under the DIP Loan Documents; and (d) making the decision to collect the indebtedness and obligations of the Debtors, the DIP Lender shall not solely by reason thereof be considered to (x) owe any fiduciary obligation to the Debtors or any other party with respect to their exercise of any consent rights afforded them under the DIP Loan Documents or this Interim Order or (y) be exercising control over any operations of the Debtors or acting in any way as a responsible person,

or as an owner or operator under any applicable law, including without limitation, any environmental law (including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601, *et seq*., the Resource Conservation and Recovery Act, 42 U.S.C. 6901, *et seq.*, as either may be amended from time to time, or any similar federal or state statute).

26. <u>Successors and Assigns</u>. The DIP Loan Documents and the provisions of this Interim Order shall be binding upon the Debtors, DIP Lender, and the Prepetition Secured Party and each of their respective successors and assigns, and shall inure to the benefit of the Debtors, the DIP Lender, and the Prepetition Secured Party, and each of their respective successors and assigns including, without limitation, any trustee, examiner with expanded powers, responsible officer, estate administrator or representative, or similar person appointed in a case for any Debtor under any chapter of the Bankruptcy Code. The terms and provisions of this Interim Order shall also be binding on all of the Debtors' creditors, any Creditors' Committee, equity holders, and all other parties in interest, including, but not limited to a trustee appointed under chapter 7 or chapter 11 of the Bankruptcy Code.

27. <u>Binding Nature of Agreement</u>. Each of the DIP Loan Documents to which any of the Debtors are or will become a party shall constitute legal, valid, and binding obligations of the Debtors party thereto, enforceable in accordance with their terms. The DIP Loan Documents have been or will be properly executed and delivered to the DIP Lender by the Debtors. Unless otherwise consented to in writing, the rights, remedies, powers, privileges, liens, and priorities of the DIP Lender and the Prepetition Secured Party, as applicable, provided for in this Interim Order, the DIP Loan Documents, or otherwise shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation or sale order), by any plan of reorganization or

liquidation in these Chapter 11 Cases, by the dismissal or conversion of these Chapter 11 Cases or in any subsequent case under the Bankruptcy Code unless and until the DIP Obligations have first been indefeasibly paid in full in cash and completely satisfied and the commitments terminated in accordance with the DIP Loan Documents.

28. <u>Subsequent Reversal or Modification</u>. This Interim Order is entered pursuant to section 364 of the Bankruptcy Code, and Bankruptcy Rules 4001(b) and (c), granting the DIP Lender all protections afforded by section 364(e) of the Bankruptcy Code.

29. <u>Collateral Rights</u>. If any party who holds a lien or security interest in DIP Collateral or Prepetition Collateral that is junior and/or subordinate to the DIP Liens, the Replacement Liens or the Prepetition Senior Liens in such DIP Collateral or Prepetition Collateral receives or is paid the proceeds of such DIP Collateral or Prepetition Collateral prior to the indefeasible payment in full in cash and the complete satisfaction of (a) all DIP Obligations under the DIP Loan Documents and termination of the commitment in accordance with the DIP Loan Documents, and (b) the Prepetition Senior Obligations under the Prepetition Senior Loan Documents, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such DIP Collateral or Prepetition Collateral in trust for the DIP Lender and the Prepetition Secured Parties and shall immediately tum over such proceeds for application by the DIP Lender and the Prepetition Secured Party to repay the Prepetition Senior Obligations and the DIP Obligations in accordance with the DIP Loan Documents, the Prepetition First Lien Loan Documents and this Interim Order until indefeasibly paid in full.

30. <u>No Waiver</u>. This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lender or the Prepetition Secured Party may have to bring or be heard on any matter brought before this Court.

31.     <u>Limits on Lenders' Liability</u>.    Nothing in this Interim Order and subject to Paragraph 14 or in any of the DIP Loan Documents, the Prepetition First Lien Loan Documents, or any other documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender or the Prepetition Secured Party of any liability for any claims arising from any and all activities by the Debtors or any of their subsidiaries or affiliates in the operation of their businesses or in connection with their restructuring efforts.

32.     <u>Sale/Conversion/Dismissal</u>.

(a)     Unless otherwise ordered by the Court, absent the consent of the DIP Lender, the Debtors shall not seek or support entry of any order that provides for either the sale of the stock of the Debtors or the sale of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code to any party unless, in connection with such event, the proceeds of such sale are or will be indefeasibly paid to the DIP Lender on account of the DIP Obligations and the commitments under the DIP Loan Documents and this Interim Order are terminated in accordance therewith on the closing date of such sale.

33.     <u>Priority of Terms</u>.  To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Loan Documents, the Motion, the Requested Relief, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" "as set forth in" or "as more fully described in" the DIP Loan Documents (or words of similar import), the terms and provisions of this Interim Order shall govern.

34.     <u>No Third Party Beneficiary</u>. Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

35.     _Survival_.  Except as otherwise provided herein, (a) the protections afforded under this Interim Order, and any actions taken pursuant thereto, shall survive the entry of an order (i) dismissing any of these Chapter 11 Cases or (ii) converting any of these Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code, and (b) the DIP Liens, the Replacement Liens, and the DIP Superpriority Claim shall continue in these Chapter 11 Cases, in any such successor case or after any such dismissal.  The DIP Liens, the Replacement Liens, and the DIP Superpriority Claim shall maintain their priorities as provided in this Interim Order and the DIP Loan Documents, and not be modified, altered or impaired in any way by any other financing, extension of credit, incurrence of indebtedness (except with respect to any additional financing to be provided by the DIP Lender in accordance with the Final Order), or any conversion of any of these Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code or dismissal of any of these Chapter 11 Cases, or by any other act or omission.

36.     _Adequate Notice/Scheduling of Final Hearing_. The notice given by the Debtors of the Interim Hearing was given in accordance with Bankruptcy Rules 2002 and 4001, and Bankruptcy Local Rules 2002-1, 4001-l(a), and 9013-l(m).  Such notice was good and sufficient under the particular circumstances.  The Debtors shall promptly mail copies of this Interim Order and notice of the Final Hearing to any known party affected by the terms of this Interim Order and/or Final Order and any other party requesting notice after the entry of this Interim Order.  Any objection to the relief sought at the Final Hearing shall be made in writing setting forth with particularity the grounds thereof, and filed with the Court and served so as to be actually received no later than seven (7) days prior to the Final Hearing at 4:00 p.m. (prevailing Eastern Time) by the following (with electronic copies of any such objection at the time of service to the email address set forth below): (a) counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000

North King Street, Wilmington DE 19801, Attn: Michael R. Nestor (mnestor@ycst.com),

Matthew B. Lunn (mlunn@ycst.com), and Allison S. Mielke (amielke@ycst.com); (b) counsel to

the DIP Lender, (i) Cooley LLP, 110 N. Wacker Drive, Suite 4200, Chicago, IL 60606, Attn: Eric

Walker, Esq. (ewalker@cooley.com); and (ii) Morris, Nichols, Arsht & Tunnell LLP, 1201 North

Market Street, P.O. Box 1347, Wilmington, DE 19899-1347, Attn: Curtis S. Miller

(cmiller@mnat.com) and Derek C. Abbot (dabbott@mnat.com); and (c) the Office of the United

States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Jane

Leamy (Jane.M.Leamy@usdoj.gov).  The Court shall conduct a Final Hearing on the Requested

Relief commencing on _____, 2022 at _____ (prevailing Eastern Time).

37.     <u>Immediate Binding Effect; Entry of Interim Order</u>.  This Interim Order shall be
valid and fully effective immediately upon entry, notwithstanding the possible application of
Bankruptcy Rules 6004(h), 7062, and 9014, or otherwise, and the Clerk of the Court is hereby
directed to enter this Interim Order on the Court's docket in these Chapter 11 Cases.

38.     <u>Proofs of Claim</u>. Notwithstanding any order of this Court to the contrary, the
Prepetition Secured Party and the DIP Lender hereby are relieved of any obligation or requirement
to file proofs of claim in the Chapter 11 Cases with respect to any Prepetition Senior Obligations,
or DIP Obligations and any other claims or liens granted hereunder or created hereby. Upon
approval of this Interim Order, the Debtors' Stipulations shall be deemed to constitute a timely
filed proof of claim for the Prepetition Secured Party, and Prepetition Secured Party shall be treated
under section 502(a) of the Bankruptcy Code as if they each have filed a proof of claim.
Notwithstanding the foregoing, the Prepetition Secured Party are hereby authorized and entitled,
in their discretion, but not required, to file (and amend and/or supplement, as they see fit) a proof

of claim and/or aggregate proofs of claim in each of these Chapter 11 Cases or Successor Cases for any claim allowed herein.

39. <u>Retention of Jurisdiction</u>. This Court shall retain jurisdiction over all matters pertaining to the implementation, interpretation, and enforcement of this Interim Order.

# Exhibit A

**DIP Budget**

**Winc, Inc.**
*DIP Budget*
*as of 12/2/22*

| ($, 000s) | Week-Ending | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|
| | 12/9 | 12/16 | 12/23 | 12/30 | 1/6 | 1/13 | 1/20 | |
| DTC Receipts | $540 | $620 | $520 | $560 | $560 | $480 | $500 | $3,780 |
| Wholesale Receipts | 320 | 320 | 200 | 320 | 320 | 320 | 320 | 2,120 |
| Bulk Sales & Other | - | 343 | - | 298 | 110 | - | - | 751 |
| Total Receipts | $860 | $1,283 | $720 | $1,178 | $990 | $800 | $820 | $6,651 |
| Inventory Expenses | ($1,359) | ($483) | ($450) | ($182) | ($632) | ($632) | ($632) | ($4,371) |
| Selling Costs | (630) | (150) | (150) | (150) | (530) | (125) | (275) | (2,010) |
| Payroll (incl Temp) | (40) | (303) | (205) | (310) | (45) | (310) | (45) | (1,258) |
| Rent | (235) | - | - | - | (235) | - | - | (470) |
| Insurance | (50) | - | - | (35) | (35) | - | - | (119) |
| G&A & Other | (249) | (478) | (102) | (279) | (208) | (131) | (49) | (1,497) |
| Total Disbursements | ($2,562) | ($1,414) | ($907) | ($956) | ($1,685) | ($1,199) | ($1,001) | ($9,725) |
| **Operating Cash Flow** | **($1,702)** | **($131)** | **($187)** | **$221** | **($695)** | **($399)** | **($181)** | **($3,074)** |
| Debtor Professionals | - | - | - | - | - | - | - | - |
| UCC & US Trustee | - | - | - | - | - | - | - | - |
| 503(b)(9) & Other Misc | (50) | (50) | (50) | (50) | (50) | - | - | (250) |
| Other Restructuring Related | (5) | - | - | - | - | - | - | (5) |
| Total Restructuring Costs | ($55) | ($50) | ($50) | ($50) | ($50) | - | - | ($255) |
| **Net Cash Flow** | **($1,757)** | **($181)** | **($237)** | **$171** | **($745)** | **($399)** | **($181)** | **($3,329)** |
| **Beginning Cash Balance** | **$892** | **$789** | **$271** | **$701** | **$540** | **$856** | **$122** | **$892** |
| Net Cash Flow | (1,757) | (181) | (237) | 171 | (745) | (399) | (181) | (3,329) |
| Professional Fee Escrow | (346) | (337) | (333) | (333) | (439) | (335) | (333) | (2,455) |
| DIP Draws/Repayments | 2,000 | - | 1,000 | - | 1,500 | - | 500 | 5,000 |
| **Ending Cash Balance** | **$789** | **$271** | **$701** | **$540** | **$856** | **$122** | **$108** | **$108** |

**Professional Fee Accruals & US Trustee Fees**

| | 12/9 | 12/16 | 12/23 | 12/30 | 1/6 | 1/13 | 1/20 | Total |
|---|---|---|---|---|---|---|---|---|
| *Debtor Professionals Fees* | *($300)* | *($300)* | *($300)* | *($300)* | *($400)* | *($300)* | *($300)* | *($2,200)* |
| *UCC Fees* | *(25)* | *(25)* | *(25)* | *(25)* | *(25)* | *(25)* | *(25)* | *(175)* |
| *US Trustee Fees* | *(21)* | *(12)* | *(8)* | *(8)* | *(14)* | *(10)* | *(8)* | *(80)* |
| *Total* | *($346)* | *($337)* | *($333)* | *($333)* | *($439)* | *($335)* | *($333)* | *($2,455)* |

## Exhibit B

**DIP Term Sheet**

**WINC, INC.**


**SUPERPRIORITY SECURED
DEBTOR-IN-POSSESSION CREDIT FACILITY TERM SHEET**

**Summary of Proposed Terms and Conditions**

This Summary of Terms and Conditions (this "<u>DIP Term Sheet</u>") outlines certain terms of the DIP Facility (as defined herein) to be provided by the DIP Lender (as defined herein) subject to the conditions herein and as set forth more fully below. The Loan Parties are not authorized to disclose the terms contained herein to any person other than their professional advisors, who shall agree to maintain its confidentiality.

| | |
|---|---|
| **Borrower:** | Winc, Inc., a Delaware corporation ("<u>Winc</u>"), BWSC, LLC, a California limited liability company ("<u>BWSC</u>"), Winc Lost Poet LLC, a Delaware limited liability company ("<u>Lost Poet</u>" and with Winc and BWSC, each a "<u>Borrower</u>" and together the "<u>Borrowers</u>" or "<u>you</u>"), each in their capacity as a debtor and debtor-in-possession (each individually a "<u>Loan Party</u>" and a "<u>Debtor</u>", and collectively, the "<u>Loan Parties</u>" and the "<u>Debtors</u>") in a case (together with the cases of its affiliated debtors and debtors-in-possession, the "<u>Chapter 11 Cases</u>") to be filed under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"). This DIP Term Sheet assumes that the Borrowers will file voluntary proceedings simultaneously under the Bankruptcy Code in the Bankruptcy Court (collectively, the "<u>Bankruptcy Case</u>"). |
| **DIP Lender:** | Project Crush Acquisition Corp LLC, a Delaware limited liability company will, either directly or through one or more US affiliates (collectively, the "<u>DIP Lender</u>"), finance the DIP Facility (as defined below) and provide the DIP Commitments (as defined herein). The DIP Lender will be identified as the "Stalking Horse Bidder" in the proposed order (the "<u>Bid Procedures Order</u>") approving the bidding procedures in connection with the proposed sale of the assets identified as the "Acquired Assets" in that certain non-binding letter of intent from the DIP Lender to you dated November 24, 2022 (the "<u>Acquired Assets</u>"). |
| **Type and Amount of the DIP Facility:** | A secured superpriority priming debtor-in-possession non-amortizing facility comprised of a term loan in a principal amount of $5 million, of which (i) $2 million will be available upon entry of an Interim Order (as defined below) acceptable to the DIP Lender, and (ii) the remaining $3 million will be available upon entry of a Final DIP Order (as defined below) acceptable to the DIP Lender (the "<u>DIP Facility</u>"; the DIP Lender's commitments under the DIP Facility, the "<u>DIP Commitments</u>"; the loan under the DIP Facility, the "<u>DIP Loan</u>"; the DIP Lender's claim under the DIP Facility, a "<u>DIP Claim</u>"; and collectively, the "<u>DIP Claims</u>"; and proceeds received by the Borrowers from the DIP Loan, the "<u>DIP Proceeds</u>"); |

Following the Closing Date (as defined below), the DIP Loan may be incurred in a single or multiple draws upon entry of an interim order of the Bankruptcy Court authorizing and approving the DIP Facility and the use of the Borrowers' cash collateral, as applicable (the "<u>Interim Order</u>"), subject to the other terms and conditions provided herein (the "<u>Extension of Credit</u>"); *provided that* the total amount of all draws incurred before entry of the Final DIP Order shall not exceed the cap of $2 million.

Once repaid, the DIP Loan incurred under the DIP Facility cannot be reborrowed.

**Credit Bidding:**
The Interim Order, the entry of a final order of the Bankruptcy Court authorizing and approving the DIP Facility (including the DIP Loan and all documents and lender fees related thereto) (such order to be acceptable in all respects to the DIP Lender, the "<u>Final DIP Order</u>"), and the DIP Loan Documents shall provide that, in connection with any sale of any of the Debtors' assets under section 363 of the Bankruptcy Code or under a plan of reorganization, the DIP Lender shall have the right to credit bid all amounts outstanding under the DIP Facility (including any accrued interest and fees) in accordance with Section 363(k) of the Bankruptcy Code.

**Closing Date:**
The date of the satisfaction or waiver by the DIP Lender of the relevant "Conditions Precedent to Borrowing DIP Loan" set forth below (the "<u>Closing Date</u>").

**Maturity:**
All DIP Obligations (as defined herein) will be due and payable in full in cash unless otherwise agreed to by the DIP Lender in writing on the earliest of (i) January 20, 2023, (ii) if the Final DIP Order has not been entered, twenty-eight (28) calendar days after the Petition Date, (iii) the acceleration of the DIP Loan and the termination of the DIP Commitments upon the occurrence of an event referred to below under "Termination", (iv) the effective date of any plan of reorganization, (v) the date the Bankruptcy Court converts any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (vi) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases, (vii) the consummation of the sale of all or substantially all of the Borrowers' assets and (viii) the date an order is entered in any Bankruptcy Case appointing a Chapter 11 trustee or examiner with enlarged powers (any such date, the "<u>DIP Termination Date</u>"). Principal of, and accrued interest on, the DIP Loan and all other amounts owing to the DIP Lender under the DIP Facility shall be payable on the DIP Termination Date (the "<u>Repaid Amount</u>").

**Budget:**
The "<u>Budget</u>" shall consist of a 7-week operating budget setting forth all forecasted receipts and disbursements on a weekly basis for such 7-week period beginning as of the week of the Petition Date, broken down by week, including the anticipated weekly uses of the DIP Proceeds for such period (and draws under the DIP Facility), which shall include, among other things, available cash, cash flow, trade payables and ordinary course expenses, total expenses and capital expenditures, fees and expenses relating to the DIP Facility, fees and expenses related to the Chapter 11 Case (including professional fees), and working capital and other general corporate needs,

which forecast shall be in form and substance satisfactory to the DIP Lender (such Budget shall be supplemented in the manner required pursuant to the "Financial Reporting Requirements" section below).

**Use of Proceeds:**   The DIP Loan shall be used solely in accordance with the Budget (including Permitted Variances (as defined below)) and the terms and conditions of the DIP Credit Agreement, the Interim Order, and the Final DIP Order, including (but subject to the Budget) to (i) provide working capital and for other general corporate purposes of the Debtor, (ii) fund the costs of the administration of the Chapter 11 Case (including professional fees and expenses) and the section 363 sale process, and (iii) fund interest, fees, and other payments contemplated in respect of the DIP Facility. For the avoidance of doubt, the Borrowers understand and agree a permitted use shall be to pay the DIP Lender's reasonable costs. fees and expenses relating to the DIP Loan, which shall be paid as set forth in the DIP Credit Documents and pursuant to the Interim Order, Final DIP Order, and any other applicable order, and which costs, fees and expenses shall be accrued and paid upon the earlier of (i) the DIP Termination Date, or (ii) the closing of a sale following entry of a Sale Order (as defined below).

**Documentation:**   At the Borrowers' request and with the consent of the DIP Lender, the DIP Facility initially will be provided pursuant to the terms of this DIP Term Sheet and the Interim Order and Final DIP Order. The DIP Facility otherwise will be evidenced by a credit agreement (the "DIP Credit Agreement") in form and substance satisfactory to the DIP Lender with such modifications as are necessary to reflect the terms set forth in this DIP Term Sheet and the nature of the DIP Facility as a debtor-in-possession facility, including appropriate qualifications to reflect the commencement and continuation of the Chapter 11 Cases, the events leading up to the Chapter 11 Cases, the effect of the bankruptcy, the conditions in the industry in which the Borrowers operate in as existing on the Closing Date and/or the consummation of transactions contemplated by the Debtors' "first day" pleadings, and to reflect operational matters reasonably acceptable to the DIP Lender and the Debtors and other terms as may be reasonably agreed between DIP Lender and the Debtor, (the "Documentation Principles"), security documents and other legal documentation (collectively, together with the DIP Credit Agreement, the "DIP Loan Documents"), which DIP Loan Documents shall be in form and substance consistent with the Documentation Principles, this DIP Term Sheet and otherwise satisfactory to the DIP Lender.

**Controlled Accounts:**   The Debtors shall maintain all existing deposit accounts (other than excluded accounts to be agreed) and each such deposit account shall remain or become subject to a perfected lien and control pursuant to the terms of the Interim Order and the Final DIP Order or, as may be requested by the DIP Lender, an enforceable control agreement in favor of the DIP Lender (any such account, a "Controlled Account"). The DIP Credit Agreement, the Interim Order (as applicable), and the Final DIP Order shall require the Debtors to maintain the DIP Proceeds in the Controlled Accounts except as permitted to be used in accordance with the Budget and shall prohibit the Debtors from withdrawing funds from the Controlled Accounts after the occurrence and during the continuance of an Event of Default under the DIP Credit Agreement;

3

provided, however, that the Debtors shall be permitted to fund the Carve-Out and pay critical ordinary course administrative claims up to $670,000 in accordance with the terms of the Budget after an Event of Default.

**Interest:**

The DIP Loan will bear interest at a fixed rate per annum equal to 14%, accruing monthly, payable in arrears and payable in kind.

Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day year.

**Default Interest:**

Upon the occurrence of and during the continuance of an Event of Default under the DIP Loan Documents, the DIP Loan and all DIP Obligations will automatically bear interest at an additional 2.00% *per annum.*

**Fees:**

A closing fee equal to 2.0% (the "Closing Fee") on the entire DIP Commitments, which shall be earned upon entry of the Interim Order. The Closing Fee shall be payable in kind, including any accrued interest and fees, to the DIP Lender upon the earlier of (i) the DIP Termination Date, or (ii) the closing of a sale following entry of a Sale Order (as defined below).

**Voluntary Prepayments:**

Voluntary prepayments of the DIP Loan shall be permitted at any time, without premium or penalty.

**Priority and Security under DIP Facility:**

All obligations of the Borrowers to the DIP Lender under the DIP Facility, including, without limitation, all principal and accrued interest, premiums (if any), costs, fees and expenses or any other amounts due, or any exposure of each DIP Lender and its affiliates in respect of cash management incurred on behalf of a Borrower under the DIP Facility (collectively, the "DIP Obligations"), shall be secured by the following liens and security interests (the "DIP Liens"):

(a)    subject to the Carve Out, pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority perfected senior priming lien on, and security interest in substantially all of the assets of the Borrowers, wherever located, that may be subject to a validly perfected security interest in existence on the Petition Date;

(b)    subject to the Carve Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority perfected lien on, and security interest in, all present and after acquired property of the Debtors, wherever located, not subject to a lien or security interest on the date of commencement of the Chapter 11 Cases (collectively, the "Unencumbered Property");

(c)    subject to the Carve Out, pursuant to section 364(c)(3) of the Bankruptcy Code, a junior perfected lien on, and security interest in, all present and after-acquired property of the Debtors, wherever located, that is subject to a Permitted Lien on the Petition Date or subject to a Permitted Lien in existence on the Petition Date that is perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code; and

(d)    subject to the Carve Out, a first priority perfected lien on, and security

4

interest in, all funds on deposit in the Controlled Accounts.

The property referred to in the preceding clauses (a), (b), (c) and (d) is collectively referred to as the "DIP Collateral" and shall include, without limitation, all assets (whether tangible, intangible, personal or mixed) of the Borrowers, whether now owned or hereafter acquired and wherever located, before or after the Petition Date, including, without limitation, all accounts, proceeds of leases, inventory, equipment, equity interests or capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, the proceeds of all claims or causes of action (including upon entry of the Final DIP Order, avoidance actions and proceeds of avoidance actions under chapter 5 of the Bankruptcy Code) and all products, offspring, profits and proceeds thereof.

The DIP Liens shall be effective and perfected as of the entry of the Interim Order (subject to the occurrence of the Closing Date) and without necessity of the execution, filing or recording of control agreements, financing statements or other agreements. However, the DIP Lender may, in its discretion, require the execution, filing or recording of any or all of the documents described in the preceding sentence.

Notwithstanding the foregoing, the DIP Collateral shall not include (and the DIP Liens shall not extend to) assets scheduled and held by the Debtors in trust (but only for so long as such assets are held in trust).

**Superpriority DIP Claims:** All DIP Claims shall be entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having superpriority over any and all administrative expenses of the kind that are specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code, subject only to the Carve Out.

The DIP Claims will, at all times during the period that the DIP Loan remains outstanding, remain, in right of payment, senior in priority to all other claims or administrative expenses, subject only to the Carve Out.

**Carve Out:** "Carve Out" means an amount equal to the sum of the following (A) : (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (ii) below); (ii) to the extent allowed by the Bankruptcy Court at any time, whether by interim order, final order, or otherwise, all accrued and unpaid fees, disbursements, costs and expenses incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (the "Debtor Professionals") and all accrued unpaid fees, disbursements, costs and expenses incurred by the Committee (if any) pursuant to section 328 and 1103 of the Bankruptcy Code (the "Committee Professionals," together with the Debtor Professionals, the "Estate Professionals," and such Estate Professional fees in each case in accordance with the Budget, the "Allowed Professional Fees") at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (as

defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (iii) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $100,000 incurred after the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, final order, or otherwise (the amounts set forth in this clause (iii), the "<u>Post-Carve Out Trigger Notice Cap</u>"); provided, however, nothing herein shall be construed to impair the ability of any party to object to any fees, expenses, reimbursement or compensation sought by any such professionals or any other person or entity. For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice (which may be delivered by e-mail (or other electronic means)) by the DIP Lender to the Debtors and their counsel, the United States Trustee, and lead counsel to any Committee appointed in the Chapter 11 Cases, which notice may be delivered following the occurrence of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

On a weekly basis, the fees of the Debtors' and committee's professionals provided in the Budget shall be funded into an escrow account with Young Conaway Stargatt & Taylor, LLP to satisfy the professional fees included within the Carve-Out (the "<u>Professional Fee Reserve</u>"). The funds on deposit in the Professional Fee Reserve shall be available to satisfy the obligations owed to the Debtors' and committee's professionals benefiting from the Carve-Out, and the DIP Lender shall have a security interest upon any residual interest in the Professional Fee Reserve available following satisfaction in cash in full of all obligations benefiting from the Carve-Out.

For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve Out shall be senior to all liens and claims securing the DIP Facility, and all other forms of adequate protection, liens, or claims securing the DIP Obligations.

|  |  |
|---|---|
| **Conditions Precedent to Borrowing DIP Loan:** | The DIP Credit Agreement will contain the following conditions precedent to borrowings on the date of the Extension of Credit, which conditions precedent apply to any funding of the DIP Facility under this DIP Term Sheet: |

- The DIP Lender shall have received a borrowing notice from the Borrowers at least one (1) business day prior to the anticipated date of the Extension of Credit.

- No Default or Event of Default shall have occurred, and shall be continuing, under the DIP Loan Documents immediately prior to the funding of the DIP Loan or would result from such borrowing of the DIP Loan.

- The making of the DIP Loan shall be authorized pursuant to the Interim Order or the Final DIP Order, as applicable.

- The entry of the Interim Order or Final DIP Order, as the case may be, in form and substance consistent with the terms and conditions set forth

herein and otherwise satisfactory to the DIP Lender in its sole discretion, which Interim Order or Final DIP Order, as the case may be, shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Lender.

- Other than the Known Events, since the Petition Date, there shall not have been a Material Adverse Change; provided that Known Events and Material Adverse Change shall be defined in the DIP Credit Agreement.

- The Loan Parties shall be in compliance with (i) the Interim Order or the Final DIP Order, as the case may be, and (ii) the Budget (subject to Permitted Variances).

**Affirmative and Negative Covenants:** The DIP Credit Agreement will contain customary affirmative and negative covenants to be consistent with the Documentation Principles, including without limitation, the following:

- The Debtors shall deliver to the DIP Lender and its counsels for review and comment, as soon as commercially reasonable, and in any event not less than three (3) Business Days prior to filing (or as soon thereafter as is reasonably practicable under the circumstances), all pleadings, motions and other documents material to the DIP Lender (provided that any of the foregoing relating to the DIP Facility shall be deemed material) to be filed on behalf of the Debtors with the Bankruptcy Court.

- The Debtors shall promptly deliver in accordance with the Bid Procedures, to the DIP Lender copies of any term sheets, proposals, presentations, amendments to the Asset Purchase Agreement (as defined below) or other documents, from any party, related to (i) the restructuring of the Debtors, or (ii) the sale of assets of one or more of the Debtors. Notwithstanding the foregoing, the Debtors will not provide copies of any term sheets, proposals, presentations, amendments to the Asset Purchase Agreement, bids or other confidential information to the DIP Lender if the DIP Lender is an active bidder or involved in the bidding process as to the relevant Asset(s) at the applicable time.

- The Debtors shall comply with laws (including without limitation, the Bankruptcy Code, ERISA, environmental laws, OFAC, money laundering laws, PATRIOT Act and other anti-terrorism laws and anti-corruption laws), pay taxes, maintain all necessary licenses and permits and trade names, trademarks, patents, preserve corporate existence, maintain appropriate and adequate insurance coverage and permit inspection of properties, books and records, in each case, subject to materiality qualifiers consistent with the Documentation Principles.

- The Debtors shall limit all transactions with affiliates of the Debtors (other than ordinary course transactions consistent with past practice among or between any Debtors and their respective subsidiaries), including, without limitation, restrictions on payment of any

7

management fees to affiliates.

- The Debtors shall maintain a cash management system as required by the Interim Order and the Final DIP Order.

- The Debtors shall deliver the Budget, updated weekly (and calculated cumulatively for each 1-week Budget period) and adherence to the Budget, subject to Permitted Variances.

- Aggregate disbursements shall not exceed the aggregate amount of disbursements in the Budget for the applicable period by more than the Permitted Variance.

- For purposes hereof, the term "Permitted Variances" will mean, for the first full week period after the Closing Date, to be tested on the third business day of each week following the end of such week period (the "Initial Testing Period") and for the Applicable Rolling Period (as defined below) after the Initial Testing Period (each such period after the Initial Testing Period, together with the Initial Testing Period, the "Testing Periods"): (i) all favorable variances, and (ii) an unfavorable variance of no more than 10% for actual operating disbursements (on an aggregate basis), in each case as compared to the budgeted disbursements, respectively, set forth in the Budget with respect to the applicable Testing Period; notwithstanding the foregoing, the Carve Out shall be excluded from the determination of Permitted Variances. The Permitted Variances with respect to each Testing Period shall be determined and reported to the DIP Lender not later than 5:00 p.m. Central Time on the third business day of each week immediately following the end of each such Testing Period. Additional variances, if any, from the Budget, and any proposed changes to the Budget, shall be subject to the approval of the DIP Lender. Variances will be reported on a cumulative basis matching the relevant Applicable Rolling Period in a format replicating the Budget and will include explanation of variances (including whether they are permanent or temporal in nature). Variances will be carried over across Applicable Rolling Periods solely to the extent they are permanent in nature. "Applicable Rolling Period" means, (i) for the Initial Testing Period, the most recently completed calendar week, (ii) for the second Testing Period after the Closing Date, the most recently completed two calendar weeks, (iii) for the third Testing Period after the Closing Date, the most recently completed three calendar weeks and (iv) for each Testing Period thereafter, the most recently completed four calendar weeks.

- Consistent with the Documentation Principles and subject to the Budget, the Debtors shall not incur or assume any additional debt (including intercompany funding) or contingent obligations in respect of debt, give any guaranties in respect of debt, create any liens, charges or encumbrances or incur additional material lease obligations, in each case, beyond agreed upon limits; not merge or consolidate with any other person, change the nature of business or corporate structure or create or acquire new subsidiaries, in each case, beyond agreed upon limits; not

8

amend its charter or by laws; not sell, lease or otherwise dispose of assets (including, without limitation, in connection with a sale leaseback transaction) outside the ordinary course of business and beyond agreed upon limits; not give a negative pledge on any assets in favor of any person other than the DIP Lender; and not permit to exist any consensual encumbrance on the ability of any subsidiary to pay dividends or other distributions to the Borrowers; in each case, subject to customary exceptions or baskets as may be agreed.

- The Debtors shall not (i) make, commit to make, or permit to be made any bonus payments (including retention and incentive bonuses) to any employees of the Debtors and their subsidiaries in excess of the amounts set forth in the Budget (on an aggregate basis) and (ii) terminate any executive officers or other key employees of the Debtors and their subsidiaries without the DIP Lender's prior written consent, which consent shall not be unreasonably withheld.

- The Debtors shall not permit any change in ownership or control of any Debtor or any subsidiary or any change in accounting treatment or reporting practices, except as required by GAAP or as permitted or contemplated by the DIP Credit Agreement.

- Without the prior written consent of the DIP Lender, the Debtors shall not make or permit to be made any change to the Interim Order or the Final DIP Order with respect to the DIP Facility.

- The Debtors shall not permit the Debtors to seek authorization for, and not permit the existence of, any claims other than that of the DIP Lender entitled to a superpriority under section 364(c)(1) of the Bankruptcy Code that is senior or *pari passu* with the DIP Lender's section 364(c)(1) claim, except for the Carve Out.

- The Debtors shall comply with the Milestones (as defined herein).

**Financial Reporting Requirements:**

The Borrowers shall provide to the DIP Lender (hereinafter the "Financial Reporting Requirements"): (i) following delivery of the Budget on the Closing Date, by not later than 5:00 p.m. Eastern Time on the third business day of the second full week following the Closing Date and by not later than 5:00 p.m. Eastern Time on the third business day of every other week thereafter following the end of each Testing Period, an updated Budget, in each case, in form and substance reasonably satisfactory to the DIP Lender for the subsequent 7 week period consistent with the form of the Budget, and such updated Budget shall become the "Budget" for the purposes of the DIP Facility upon the DIP Lender's acknowledgement that the proposed updated Budget is substantially in the form of the Budget and in substance satisfactory to the DIP Lender (provided, that, until a new Budget has been approved by the DIP Lender, the most recently approved Budget shall govern); and (ii) beginning on the third business day of the first full week following the Closing Date (by not later than 5:00 p.m. Eastern Time), and on the third business day of each week thereafter following the end of each Testing Period

(by not later than 5:00 p.m. Eastern Time), a variance report (the "Variance Report") setting forth actual cash receipts and disbursements and cash flows of the Debtors for the prior Testing Period and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such period as compared to the applicable Budget delivered by the Debtors, in each case, on a weekly and cumulative rolling 4-week basis (and each such Variance Report shall include explanations for all material variances and shall be certified by the Chief Financial Officer of the Debtors). The Borrowers will promptly provide notice to the DIP Lender of any Material Adverse Change.

All deliveries required pursuant to this section shall be subject to the confidentiality provision to be negotiated in the DIP Credit Agreement.

At the election of the DIP Lender, on each Monday (or, in the event that such day is not a Business Day then on the Business Day immediately following) during the Chapter 11 Cases, the Borrowers' senior management and professionals shall host a telephonic meeting for the DIP Lender and their professionals at which the Borrower's senior management and professionals shall provide an update to the DIP Lender (and make themselves available for questions) with respect to the financial and operating performance of the Loan Parties and their estates, including, but not limited to, the Variance Report.

**Other Reporting Requirements:**     The DIP Credit Agreement will contain other customary reporting requirements for similar debtor-in-possession financings and others determined by the DIP Lender in its reasonable discretion to be appropriate to the transactions contemplated herein, including, without limitation, with respect to material adverse events, events and notices under other material debt instruments, litigation, contingent liabilities, ERISA or environmental events and consistent with the Documentation Principles (collectively with the financial reporting information described above, the "Information").

**LOI Milestone:**     By no later than November 30, 2022, you shall deliver to the DIP Lender a binding letter of intent in which DIP Lender is identified as the "Stalking Horse Bidder" in connection with the proposed sale of the assets identified as the "Acquired Assets" in that certain non-binding letter of intent from the DIP Lender to you dated November 26, 2022.

**Chapter 11 Cases Milestones:**     The DIP Credit Agreement will include the following milestones related to the Debtors' Chapter 11 Cases (the "Milestones"):

- No later than three (3) business days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order.

- No later than three (3) business days after the Petition Date, the Debtors shall file with the Bankruptcy Court a motion (the "Bid Procedures Motion") for approval of bid procedures consistent with the Bid Procedures Order (the "Bid Procedures") in form and substance acceptable to the DIP Lender and the Debtors.

- No later than seven (7) calendar days after the Petition Date, the Debtors shall file with the Bankruptcy Court a stalking horse asset

purchase agreement for the Acquired Assets with the DIP Lender as the purchaser consistent with the proposed Bid Procedures (the "Asset Purchase Agreement"), pursuant to which the DIP Lender shall be designated the stalking horse bidder, the proposed bid protections for the DIP Lender as stalking horse bidder are approved and the DIP Lender shall be permitted to credit bid its DIP Loan pursuant to Section 363(k) of the Bankruptcy Code.

- No later than fourteen (14) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Bid Procedures Order designating the DIP Lender as the stalking horse bidder, approve bid protections for the DIP Lender as the stalking horse bidder, and permitting the DIP Lender to credit bid its DIP Loan pursuant to Section 363(k) of the Bankruptcy Code;

- No later than twenty-eight (28) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

- No later than forty-five (45) calendar days after the Petition Date, the Bankruptcy Court shall have entered one or more final, non-appealable sale order(s) (which shall be in form and substance reasonably acceptable to the DIP Lender) approving each of the winning bid(s) resulting from the auction (the "Sale Order"); and

- No later than January 20, 2023, the Asset Sale Effective Date (as defined in the Bid Procedures Order) shall have occurred.

**Events of Default:** The DIP Credit Agreement will contain events of default customarily found in loan agreements for similar debtor-in-possession financings and other events of default deemed by the DIP Lender appropriate to the transactions contemplated therein which will be applicable to the Debtors and their subsidiaries (each an "Event of Default"), including, without limitation:

- failure to make payments when due;

- invalidity of the DIP Loan Documents;

- termination of the Asset Purchase Agreement due to a breach thereunder by the Debtors;

- any of the Debtors shall file a pleading seeking to vacate or modify the Interim Order or the Final DIP Order over the objection of the DIP Lender;

- entry of an order without the prior written consent of the DIP Lender amending, supplementing or otherwise modifying the Interim Order or the Final DIP Order;

- reversal, vacatur or stay of the effectiveness of the Interim Order or the Final DIP Order except to the extent reversed within five (5) Business Days;

- any violation of any material term of the Interim Order or the Final DIP Order by the Debtors;

- dismissal of the Chapter 11 Case of a Debtor with material assets or

conversion of the Chapter 11 Case of a Debtor with material assets to a case under Chapter 7 of the Bankruptcy Code, or any Debtor shall file a motion or other pleading seeking such dismissal or conversion of any Bankruptcy Case;

- appointment of a Chapter 11 trustee or examiner with enlarged powers, or any Debtor shall file a motion or other pleading seeking such appointment;

- any sale of all or substantially all assets of the Debtors pursuant to Section 363 of the Bankruptcy Code, unless such sale is conducted in accordance with the Bid Procedures;

- failure to meet a Milestone, unless extended or waived by the prior written consent of the DIP Lender;

- the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order by the Bankruptcy Court, granting any superpriority claim or lien (except as contemplated herein) which is senior to or *pari passu* with the DIP Claims;

- an order shall be entered in any of the Chapter 11 Cases, without the prior written consent of the DIP Lender: (i) to permit any administrative expense or any claim (now existing or hereafter arising of any kind or nature whatsoever) to have administrative priority equal or superior to the DIP Claims (other than the Carve Out) or (ii) granting or permitted grant of a lien that is equal in priority or senior to the DIP Liens (other than the Carve Out);

- the Debtors' filing of a motion seeking entry of an order approving any key employee incentive plan, employee retention plan, or comparable plan, without the prior written consent of the DIP Lender;

- cessation of the DIP Liens or the DIP Claims to be valid, perfected and enforceable in all respects;

- Permitted Variances under the Budget are exceeded for any period of time without consent of or waiver by the DIP Lender;

- subject to entry of the Final DIP Order, the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against any DIP Lender;

- an order shall have been entered by the Bankruptcy Court prohibiting, limiting or restricting the right of the DIP Lender to credit bid for any or all of the Debtors' assets; and

- the payment of any prepetition claim other than (i) as consented to by the DIP Lender, (ii) as authorized by the Budget, (iii) permitted under the terms of the DIP Credit Agreement or (iv) as authorized by the Bankruptcy Court pursuant to the "first day" or "second day" orders or the Interim Order or the Final DIP Order and reflected in the Budget.

**Termination:**      Upon the occurrence and during the continuance of an Event of Default, the DIP Lender shall, by written notice to Borrowers, its counsel, the U.S. Trustee

and counsel for any statutory committee, terminate the DIP Facility, declare the obligations in respect thereof to be immediately due and payable and, subject to the immediately following paragraph, exercise all rights and remedies under the DIP Loan Documents, the Interim Order, and the Final DIP Order.

**Remedies:** The DIP Lender shall have customary remedies upon the occurrence and during the continuance of an Event of Default, including, without limitation, the following:

Without further order from the Bankruptcy Court, and subject to the terms of the Interim Order and the Final DIP Order (including in respect of any required notices), the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to exercise, upon the occurrence and during the continuance of any Event of Default under their respective DIP Loan Documents, all rights and remedies provided for in the DIP Loan Documents, and to take any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable): (a) immediately terminate the Debtors' limited use of any cash collateral; (b) cease making any DIP Loan under the DIP Facility to the Debtors; (c) declare all DIP Obligations to be immediately due and payable; (d) freeze monies or balances in the Debtors' accounts (and, with respect to the DIP Credit Agreement and the DIP Facility, sweep all funds contained in the Controlled Accounts); (e) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Lender against the DIP Obligations, or otherwise enforce any and all rights against the DIP Collateral in the possession of any of the applicable DIP Lender, including, without limitation, disposition of the DIP Collateral solely for application towards the DIP Obligations; and (f) take any other actions or exercise any other rights or remedies permitted under the Interim Order and the Final DIP Order, the DIP Loan Documents or applicable law to effect the repayment of the DIP Obligations; provided, however, that the DIP Lender must provide the Debtors with five (5) calendar days' written notice (which may be by email) before exercising any enforcement rights or remedies; provided, further, that neither the Debtors, any statutory committee nor any other party-in-interest shall have the right to contest the enforcement of the remedies set forth in the Interim Order and the Final DIP Order and the DIP Loan Documents. The Debtors shall cooperate fully with the DIP Lender in their exercise of rights and remedies, whether against the DIP Collateral or otherwise.

The Debtors shall waive any right, without the prior written consent of the DIP Lender, to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Lender set forth in the Interim Order and the Final DIP Order and in the DIP Loan Documents.

**Marshalling and Waiver of 506(c) and 552(b) Claims:** Effective upon entry of the Final DIP Order, the DIP Lender shall not be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral and all proceeds shall be received and applied pursuant to the Final DIP Order and the DIP Loan Documents

13

notwithstanding any other agreement or provision to the contrary.

Effective upon entry of the Final DIP Order, the Debtors (on behalf of themselves and their estates) shall waive, and shall not assert in the Chapter 11 Cases or any successor cases, (i) any surcharge claim under sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender, upon the DIP Collateral and (ii) the DIP Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender with respect to proceeds, product, offspring or profits of any of the DIP Collateral.

| | |
|---|---|
| **Expenses** | The Borrowers shall jointly and severally pay (i) (x) all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of the DIP Lender (including, but limited in the case of counsel, to all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of the DIP Lender's counsels, and, to the extent necessary, one firm of local counsel engaged by the DIP Lender in connection with the Debtors' Chapter 11 Cases, and any successor counsel to each), in each case in connection with the negotiations, preparation, execution and delivery of the DIP Loan Documents and the funding of all DIP Loan under the DIP Facility, including, without limitation, all due diligence, transportation, computer, duplication, messenger, audit, insurance, appraisal, valuation and consultant costs and expenses, and all search, filing and recording fees, incurred or sustained by the DIP Lender and its counsels and professional advisors in connection with the DIP Facility, the DIP Loan Documents or the transactions contemplated thereby, the administration of the DIP Facility and any amendment or waiver of any provision of the DIP Loan Documents, and (ii) without duplication, all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of the DIP Lender (including, but limited in the case of counsels, to all reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of outside counsels to the DIP Lender (and any successor counsel), and, to the extent necessary, one firm of local counsel engaged by the DIP Lender in each relevant jurisdiction, and any successor counsel to such primary counsel and local counsel, in each case in connection with (A) the enforcement of any rights and remedies under the DIP Loan Documents, (B) the Chapter 11 Cases, including attendance at all hearings in respect of the Chapter 11 Cases; and (C) defending and prosecuting any actions or proceedings arising out of or relating to the DIP Obligations, the Liens securing the DIP Obligations, or any transaction related to or arising in connection with the DIP Credit Agreement or the other DIP Loan Documents. |
| **Indemnification:** | The Debtors shall jointly and severally indemnify and hold harmless the DIP Lender and each of its affiliates and each of their respective officers, directors, employees, controlling persons, agents, advisors, attorneys and representatives of each (each, an "<u>Indemnified Party</u>") from and against any and all claims, damages, losses, liabilities and expenses (including, without |

limitation, fees and disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense with respect thereto, arising out of or in connection with or relating to the DIP Facility, the DIP Loan Documents or the transactions contemplated thereby, or any use made or proposed to be made with the DIP Proceeds, whether or not such investigation, litigation or proceeding is brought by any Debtor or any of its subsidiaries, any shareholders or creditors of the foregoing, or any other third party, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby or under the DIP Loan Documents are consummated, except, with respect to any Indemnified Party, to the extent such claim, damage, loss, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's gross negligence or willful misconduct or any of such Indemnified Party's affiliates or their respective principals, directors, officers, employees, representatives, agents, attorneys or third party advisors. No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except, with respect to any Indemnified Party, to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Party's gross negligence or willful misconduct or any of such Indemnified Party's affiliates or their respective principals, directors, officers, employees, representatives, agents, attorneys or third party advisors. In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages.

| | |
|---|---|
| **Assignments and Participations:** | No consent of the Borrowers shall be required for any assignments to a US subsidiary of the DIP Lender. |
| **Governing Law:** | Except as governed by the Bankruptcy Code, the law of the State of Delaware. |
| **Counsel to the DIP Lender:** | Cooley LLP |
| **Local Counsel to the DIP Lender:** | Morris, Nichols, Arsht & Tunnell LLP |
| **Counsel to the Debtors:** | Young Conaway Stargatt & Taylor, LLP |

278261410 v5