**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| WINC, INC., *et al.*,[1] | Case No. 22-11238 (LSS) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF CAROL BRAULT IN SUPPORT**
**OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Carol Brault, hereby declare under penalty of perjury that the following is true and correct:

1.      I am Chief Financial Officer ("CFO") of Winc, Inc. ("Winc"), which, as discussed below, if the sole member of Debtor BWSC, LLC ("BWSC"), and the managing member of Debtor Winc Lost Poet, LLC ("Winc Lost Poet" and, collectively, the "Debtors" or the "Company"). Before serving as the CFO of Winc, I served as the Company's Vice President of Finance from February 2018 to April 2021. Prior to Winc, I served in various leadership roles at several large consumer products companies, including The Honest Company, Bare Escentuals, and Bath & Body Works. I have a Bachelor of Science in Business Administration/Accounting from Ohio State University, Fisher College of Business. As CFO of Winc, I have extensive insight into the Debtors' business operations and strategy, and I am familiar with the Debtors' operations, day-to-day business affairs, and books and records. I submit this declaration (this "Declaration") to assist the Court and parties-in-interest in gaining an understanding of the circumstances that led to the commencement of these chapter 11 cases (collectively, the "Chapter 11 Cases") and in

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Winc, Inc. (8960); BWSC, LLC (0899); and Winc Lost Poet, LLC (N/A).  The Debtors' mailing address for purposes of these chapter 11 cases is 1751 Berkeley Street, Studio 3, Santa Monica, CA 90404.

support of the Debtors' petitions, motions, and applications requesting various types of "first day" relief (collectively, the "First Day Pleadings").  I am authorized by the Debtors to submit this Declaration.

2.       Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussions with members of the Debtors' management, and information provided to me by the Debtors' professional advisors. If I were called upon to testify, I would testify competently to the facts set forth herein.

3.       On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  The Debtors have filed a motion seeking joint administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

4.       Part I of this Declaration provides an overview of the Debtors' business and capital structure.  Part II provides a discussion of the events leading to the commencement of the Chapter 11 Cases and the Company's prepetition restructuring efforts.  Part III affirms and incorporates the facts that support the relief requested in the First Day Pleadings.

## INTRODUCTION

5.       Winc is an emerging growth company that utilize a data-driven brand development strategy to sell proprietary wine products through a traditional three-tier wine distribution network (distributor – retailer – consumer), referred to as the wholesale channel, and an online direct-to-consumer ("DTC") channel.  The Debtors analyze consumer data and real-time purchasing behaviors from their DTC sales to develop wine brands that align with shifting and emerging

consumer preferences. The Debtors' asset-light production model is designed to reduce time to market for potential breakout brands, as compared to traditional brand development, which reduces risk and cost of product launches, which are a key driver of the Debtors' growth strategy.

6. The Debtors' products are available at premium retailers and restaurants throughout the United States. In addition, the Debtors offer their products for sale on their e-commerce platform, which comprises five (5) websites[2] where products are available to customers (the "<u>DTC Customers</u>") that subscribe to the Debtors' online membership service. DTC Customers generally pay a monthly fee in exchange for redeemable credits that may be used to purchase products on the DTC platform. In addition, DTC Customers receive access to special pricing, offers, and services.

7. As part of their wholesale operations, the Debtors distribute wine in all 50 states through their relationships with various wine distributors. In 2021, the Debtors serviced more than 16,900 retail accounts in twelve countries. The Debtors' primary retail partners in the United States include Whole Foods, H-E-B, Target, and Albertson's.

8. The Debtors' corporate headquarters is located in Santa Monica, California. The Debtors also have distribution facilities located in California and Pennsylvania. The Debtors develop their products in collaboration with winemakers, vineyards, distillers and manufacturers, both domestically and internationally, which are then transported, in bulk, to processing facilities on California's Central Coast, or as finished goods, which are transported to the Debtors' warehouse facilities for distribution. The Debtors' asset-light model leverages a network of co-manufacturers in California to accomplish the Debtors' various production and bottling needs.

---

[2] The websites are: (i) www.winc.com; (ii) www.summerwater.com; (iii) www.lostpoet.winc.com; (iv) www.gift.winc.com; and (v) www.eagles.winc.com.

This strategy reduces the Debtors' up-front capital expenditures, while allowing the Debtors to dictate workflows, and maintain high quality production standards.

9. The Debtors have developed a portfolio of five core brands—Summer Water, Wonders, Lost Poet, Folly of the Beast, and Chop Shop—and various other non-core brands and products. Over the past several years, the Debtors have undertaken strategic initiatives aimed at expanding and optimizing their product and service offerings and scaling high-performing brands to position the Company for growth and profitability.

10. Unfortunately, despite the promise of these initiatives, the Debtors have been unable to generate revenue sufficient to support the Debtors' business, and the Company has been dependent on debt and equity financing to fund its operations.

11. In November 2021, the Company completed its initial public offering ("IPO") through an underwritten sale of 1,692,308 shares of its common stock at a price of $13.00 per share. The aggregate net proceeds from the offering, after deducting underwriting discounts and commissions and other offering expenses, were approximately $17.7 million.

12. Concurrent with the IPO, all then-outstanding shares of the Company's redeemable convertible preferred stock were converted into an aggregate of 8,395,808 issued shares of common stock and reclassified into permanent equity. Following the IPO, there were no shares of redeemable convertible preferred stock outstanding.

13. Through these and other efforts, including a re-configured marketing strategy to reduce digital advertising costs, the Company materially improved its liquidity position and was poised for continued growth and profitability. However, the Company faced tightening liquidity as revenue from DTC sales declined, and, facing a looming maturity date under the Prepetition Credit Facility (as defined below), the Company struggled to secure new third party financing.

14.     After considering all strategic alternatives, the Debtors, in consultation with their legal and financial advisors, determined that the commencement of a comprehensive marketing process provided the best path to preserve and maximize the value of the Debtors' assets.  As discussed in detail below, after an extensive, approximately nine-month long marketing campaign, the Debtors identified a potential purchaser for the Company as a going concern and began negotiating an out-of-court merger transaction that contemplated, among other things, a lengthy approval process by stockholder approval at a duly called meeting of the stockholders of Winc and the purchaser's extension of bridge financing.  After execution of a letter of intent and obtaining a commitment to deliver documentation for the merger transaction and bridge financing prior to the Thanksgiving holiday, the potential purchaser revised the structure of the transaction, proposing instead to consummate the transaction through a chapter 11 sale process, and provided the Debtors with a new letter of intent to act as a stalking horse bidder for substantially all of their assets (the "Assets").  Facing a looming payment default under the Prepetition Credit Facility and given the limited liquidity available to the Debtors, the Debtors and the potential purchaser pivoted to negotiating the terms of a debtor in possession financing ("DIP") facility to fund the Debtors' operations, while, in parallel, working to finalize the terms of a stalking horse agreement.

15.     Given various circumstances, including—most prominently—liquidity constraints, the Debtors determined, in consultation with their legal and financial advisors, to commence the Chapter 11 Cases to implement a sale of the Assets.  The Debtors expect, in the near term, to seek approval of a sale with a stalking horse bidder that is subject to a competitive bidding process and consistent with both the timing of the Chapter 11 Cases and the Debtors' fiduciary duties to maximize value for their estates, stakeholders, and parties in interest.

# PART I

## THE DEBTORS' BUSINESSES

**A.     The Debtors' History**

16.     Winc was incorporated in Delaware in 2011 as Club W, Inc.  In 2021, Club W, Inc. became Winc, Inc.  On February 13, 2012, BWSC was organized under the laws of California.  On April 19, 2021, Winc Lost Poet was organized under the laws of Delaware.

17.     Winc's common stock is publicly traded on the NYSE American LLC exchange under the ticker symbol "WBEV".  Winc is the sole member of BWSC and the managing member of Winc Lost Poet.  Winc and BWSC are each in the business of selling alcoholic beverages, as detailed above.  Winc Lost Poet was formed in connection with the launch of the Company's "Lost Poet" brand, but it has never engaged in any business operations.

**B.     The Acquisition of Certain Supplier Relationships**

18.     As part of their strategic growth initiative, in May 2021, the Company entered into an asset purchase agreement (the "NMI Agreement") pursuant to which it acquired certain assets of a boutique wine importer, Natural Merchants, Inc. ("NMI"), consisting primarily of supplier relationships, for a total purchase price of up to $13.0 million, comprising up to $12.0 million in cash and $1.0 million in shares of the Debtors' then-existing Series F redeemable convertible preferred stock.  Upon closing, the Debtors paid NMI $8.0 million in cash, with the remaining $4.0 million of cash (the "Earnout Payment") contingent upon achieving certain performance targets between May 2022 and May 2023 (up to an additional $2.0 million in consideration each year).

19.     The Debtors determined that an Earnout Payment in the amount of $1.6 million was due to NMI for the period ending May 2022 (the "May 2022 Earnout Payment").  Subsequently, the Debtors entered into an amendment (the "NMI Amendment") of the NMI Agreement to, among other things, allow the Debtors to pay the May 2022 Earnout Payment in nine monthly

installments, beginning September 15, 2022. The NMI Amendment also made the repayment of the May 2022 Earnout Payment subject to a 10% annualized interest rate, accruing monthly from July 1, 2022. Any unpaid amount of the May 2022 Earnout Payment may be accelerated under certain circumstances, including a sale of all of substantially all of the Debtors' assets.

## C. The Company's Organizational Structure

20.     A corporate organizational chart is attached hereto as **Exhibit A**.

21.     Winc, the direct parent of each of the other Debtors, is the 100% owner of BWSC and 90% owner and managing member of Winc Lost Poet.

22.     On February 1, 2019, Winc acquired the rights, title, and interest in certain intellectual property in connection with the launch of a line of wine beverages promoted under the brand name, "Lost Poet" (the "Product"). In connection with the acquisition of such rights, the Debtors established Winc Lost Poet and entered into that certain *Collaboration Agreement* (the "Collaboration Agreement") with Atticus Publishing, LLC ("Atticus"), which owns 10% of the interests in Winc Lost Poet. Under the Collaboration Agreement, the Debtors pay certain royalty fees to Atticus, which are calculated as a percentage of net proceeds from the sale of the Company's Product. Winc Lost Poet owns the intellectual property rights associated with the Product.

## D. The Debtors' Capital Structure

23.     The Debtors' outstanding secured debt consists of a first lien revolving credit facility with an outstanding balance of approximately $3.5 million. In addition, the Debtors entered into a revenue sharing agreement, pursuant to which the Debtors obtained an advance of approximately $2.88 million against approximately $3.26 million of future receivables. The

Debtors also incur trade payables and operating expenses in connection with the ordinary course operations of their business.

24. As of the Petition Date, the Debtors' outstanding obligations in connection with the foregoing are estimated at the following amounts:

| Type | Amount Outstanding |
|------|--------------------|
| Prepetition Credit Facility | $3.5 million |
| Revenue Sharing Agreement | $1.4 million |
| Trade/Other General Unsecured Obligations | $8.0 million |

    *a.*     *The First Lien Revolving Credit Facility*

25. On December 15, 2020, the Debtors entered into that certain *Credit Agreement* (as amended, the "Credit Agreement") with Bank of California (the "Prepetition Lender" and such facility, the "Prepetition Credit Facility"), as successor by merger to Pacific Mercantile Bank, which provides the Debtors with a revolving line of credit. The Prepetition Credit Facility is secured by a first priority lien in substantially all of the Debtors' assets. Further, the Prepetition Credit Facility is secured by substantially all of the assets of BWSC. Borrowings under the Prepetition Credit Facility bear interest at a variable annual rate equal to 1.25% plus the prime rate. The Debtors' ability to borrow under the Prepetition Credit Facility is subject to a borrowing base determined upon eligible inventory and receivables. The Debtors used the proceeds of the Prepetition Credit Facility to fund working capital obligations. As of the Petition Date, the Prepetition Credit Facility was fully drawn.

26. Under the terms of the Credit Agreement, the initial maturity date of the Credit Facility was March 31, 2022. In February 2022, the Debtors approached the Prepetition Lender about securing additional financing, but the Prepetition Lender informed the Debtors that it was unwilling to extend the Debtors additional credit. Instead, over the course of several months, the Debtors and the Prepetition Lender entered into three amendments of the Credit Agreement, which

(among other things) extended the initial maturity date of the Prepetition Credit Facility to December 31, 2022, incrementally reduced the Debtors' borrowing capacity each month leading up to the maturity date with a series of pay downs, and modified a liquidity measurement.

27.     Thereafter, the Debtors solicited funding from various lenders.  After several lenders declined to provide funding, the Debtors entered into advanced discussions with a private lender that specializes in providing working capital for growing business.  The parties executed a term sheet for a working capital loan, and the Debtors were hopeful that the negotiations would yield new financing.  However, after performing substantial diligence and obtaining an appraisal of the Debtors' assets, such lender declined to provide funding.

28.     Despite the setback, the Debtors continued to solicit financing proposals and eventually entered into negotiations with a lender regarding the terms of a letter of credit secured by the Debtors' inventory.  To provide the Debtors with additional time to pursue a financing transaction, in October 2022, the Debtors and the Prepetition Lender entered into a further amendment of the Credit Agreement, as discussed above, which delayed the reduction in borrowing capacity scheduled for November 1, 2022 to December 1, 2022, and also deferred measurement of a minimum liquidity covenant to December 31, 2022.

29.     Thereafter, the Debtors and lender continued negotiations and executed a term sheet for a line of credit.  Ultimately, after protracted negotiations, the lender's insistence on certain punitive fees, covenants, and other terms rendered the financing transaction unfeasible.

30.     Given the Debtors' liquidity position and inability to secure financing from sources other than the Stalking Horse Bidder, as discussed below, the Debtors were unable to make the payment due to the Prepetition Lender on December 1, 2022.  As of the Petition Date, the Debtors

estimate that approximately $3.4 million in principal is due under the Prepetition Credit Facility, plus fees in the amount of approximately $23,500.[3]

### b.    The Revenue Sharing Agreement

31.    On May 30, 2022, Winc entered into that certain *Revenue Share Agreement* with CFT Clear Finance Technology Corp. ("Clearco"), providing for the sale, on a non-recourse basis, of the proceeds, in the amount of approximately $3.26 million, of future sales from the Debtors' DTC operations in exchange for an advance of approximately $2.88 million.  On a daily basis, the Debtors apply 9% of daily DTC receipts towards the balance owed to Clearco.  As of the Petition Date, the Debtors had made payments in the amount of approximately $1.85 million toward the outstanding balance.

### c.    Trade Payables and Other Unsecured Claims

32.    The Debtors also estimate that they have approximately $8.0 million in trade payables and other general unsecured obligations outstanding as of the Petition Date.

## PART II

## EVENTS LEADING TO CHAPTER 11

### A.    Sale and Financing Efforts

33.    In March 2022, after considering the Debtors' outstanding debt under, and the upcoming maturity of, the Prepetition Credit Facility and the ongoing operational and liquidity needs of the Company, the Company determined to explore strategic alternatives.

---

[3]  In the ordinary course of business, Bank of California automatically draws interest payments from the Debtors' bank account.  At 12:01 a.m. on December 1, 2022—just moments after filing chapter 11 petitions—cash in the amount of the interest accrued and unpaid as of the Petition Date was automatically deducted from the Debtors' bank account.  Accordingly, as of the filing of this First Day Declaration, there are no accrued and unpaid fees owed to the Prepetition Lender.

34. Also in March 2022, the Company engaged Canaccord Genuity Group, Inc. ("Canaccord"), as investment banker to explore a potential sale of the Debtors' assets; and in November 2022 the Company engaged RPA Advisors, LLC as their financial and restructuring advisor.

35. As part of the consideration of potential strategic alternatives, Canaccord undertook a prepetition marketing effort, and began soliciting indications of interest for the sale of the Debtors' assets, both on an integrated basis as well as on a piecemeal basis. In particular, Canaccord crafted detailed marketing materials and assembled related diligence information for a confidential electronic data room and a confidential information memorandum with the assistance of the Debtors and their other professional advisors. Canaccord developed an initial list of approximately forty-five (45) strategic and financial prospective purchasers. Canaccord circulated, via email, a detailed "teaser" and description of the opportunity to acquire the Debtors' assets to all of the prospective purchasers. Thereafter, Canaccord worked with approximately twenty (20) interested parties to execute non-disclosure agreements (each, an "NDA"). Parties who executed an NDA were provided with access to the confidential data room, which contained diligence information about the Debtors and their assets, a confidential information memorandum, and a process letter detailing the requirements and timing for delivery of indications of interest. Canaccord responded to various inquiries and two parties expressed interest in the Debtors and their assets. Given the Debtors' lack of financing, Canaccord informed potential purchasers that any actionable bid would need to include financing, which was necessary to ensure that the Debtors could fund their operations through the closing of a sale transaction. Ultimately, only one party— Project Crush Acquisition Corp LLC (the "DIP Lender" or the "Stalking Horse Bidder")— submitted an actionable bid for the Assets.

36.     As discussed above, the Stalking Horse Bidder's initial proposal contemplated an acquisition of the Assets through an out-of-court merger transaction.  The Debtors and the Stalking Horse Bidder agreed on the terms of the merger transaction, subject to documentation, which included, among other things, an all-cash consideration purchase price, as well as bridge financing to ensure that the Debtors could continue to operate in the ordinary course of business through a sale closing date.  However, on the eve of a deadline to finalize transaction documents, the Stalking Horse Bidder pivoted the structure of the transaction to an in-court transaction.  Pursuant to those discussions, and after extensive deliberations with the Stalking Horse Bidder and the Debtors' advisors, the Debtors and the Stalking Horse Bidder agreed to the terms of DIP financing, discussed below, and the material terms of an asset purchase agreement, in the form of a letter of intent, which is attached hereto as **Exhibit B** (the "Stalking Horse Bid"), subject to final documentation.  The total cash consideration for the Stalking Horse Bid is contemplated to be approximately $10.0 million, subject to higher or otherwise better offers.

37.     The Debtors negotiated the terms of the Stalking Horse Bid at arms'-length with the assistance of their professionals, and it will serve as a baseline from which all prospective bidders will negotiate.  The Stalking Horse Bid contemplates a sale of certain unexpired contracts, inventory, and intellectual property.  The Stalking Horse Bidder is responsible for paying any cure costs related to the assumption and assignment of contracts in accordance with the terms and conditions of the Stalking Horse Bid.  In addition, the Stalking Horse Bid includes various customary representations and warranties by and from the Debtor and the Stalking Horse Bidder.

38.     Shortly after filing the Chapter 11 Cases, the Debtors will file a motion seeking approval of the Stalking Horse Bid, as well as certain customary bidding protections in favor of the Stalking Horse Bidder, such as an initial overbid amount, and payment of a break-up fee and

capped expense reimbursement in the event that the Stalking Horse Bidder is ultimately not the successful purchaser of the Assets.

39.     The Debtors, with the assistance of their professionals, are continuing to engage with potential purchasers of the Debtors' Assets to ensure a robust and competitive sale process that maximizes value for the Debtors' stakeholders.

40.     At the outset of these proceedings, the Debtors will seek Court authority to establish an auction and sale timeline for the sale of the Assets that will allow the Debtors to implement certain bidding procedures and maximize value for all interested parties in an efficient and effective manner.

41.     After considering all viable restructuring options and taking the steps identified herein to address operational and liquidity challenges prior to the Petition Date, I believe that the sale process represents the best means through which to maximize value for the estates and all interested parties.

**B.     The Debtors' Postpetition Financing**

42.     The Debtors require additional liquidity to fund their operations and the Chapter 11 Cases and to ensure a thorough and value-maximizing sale process.  The DIP Lender has agreed to provide DIP financing on the terms set forth in the motion to approve such financing (the "DIP Motion" and the associated DIP financing facility, the "DIP Facility"),[4] filed concurrently herewith.  Accordingly, the Debtors, with the advice of their professional advisors, engaged in negotiations with the DIP Lender on the specific terms and amount of the DIP Facility prior to the Petition Date.

---

[4] Capitalized terms used but not defined in this section have the meanings given to them in the DIP Motion.

43. Based on my experience and knowledge of the Debtors' current capital structure, as well as the Debtors' operations, and efforts to obtain financing over the past year, I do not believe that the Debtors could not have obtained financing on more favorable terms from sources other than the DIP Lender, and are similarly unable to obtain adequate unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. As discussed above, in connection with the marketing process and selection of a stalking horse bidder, the Debtors requested that the interested parties provide financing to bridge to a strategic sale transaction. The only party that made such a proposal that was actionable was the DIP Lender. As a result, the Debtors and their advisors focused on negotiating the best possible financing terms with the DIP Lender and commenced the Chapter 11 Cases seeking approval of the DIP Facility described at length in the DIP Motion.

44. The DIP Facility consists of a postpetition senior secured priming credit facility in an aggregate principal amount of up to $5.0 million provided by the DIP Lender, of which $2.0 million shall be available to the Debtors upon the entry of the Interim DIP Order.

45. The DIP Facility will be secured by superpriority liens on all of the Debtors' assets, on the priorities set forth more fully in that certain DIP Term Sheet dated December 1, 2022 (the "DIP Term Sheet") and Interim DIP Order. As detailed above, the DIP Facility provides for $2.0 million on an interim basis; and (ii) subject to entry of the Final Order, $5.0 million.

46. The DIP Term Sheet also establishes the following milestones, which may be waived or extended with the DIP Lender's consent:

| EVENT | DUE DATE |
|---|---|
| Entry of Interim DIP Order | December 5, 2022 |
| Filing of Bidding Procedures Motion | December 5, 2022 |
| File Asset Purchase Agreement | December 7, 2022 |
| Entry of the Bidding Procedures Order | December 7, 2022 |
| Entry Final DIP Order | December 28, 2022 |

| EVENT | DUE DATE |
|-------|----------|
| Entry of Sale Order | January 14, 2023 |
| Sale Closing | January 20, 2023 |

47. The Debtors have an immediate need to obtain the DIP Facility on an interim basis to, among other things, (i) permit the orderly continuation of their business; (ii) maintain business relationships with their vendors, suppliers, customers and other parties; (iii) make payroll; (iv) pay the costs of the administration of the Chapter 11 Cases and the sale process; and (v) satisfy other working capital and general corporate needs. The Debtors require immediate access to sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations to avoid irreparable harm by, among other things, preserving and maintaining the value of the Debtors' assets. The Debtors will not have sufficient sources of working capital and financing to operate their business or maintain their properties in the ordinary course of business throughout the Chapter 11 Cases without the DIP Facility.

48. I believe that the commercial terms of the DIP Facility are reasonable and provide sufficient liquidity to fund the Chapter 11 Cases, conduct the sale process, and, ultimately, wind down the Debtors' affairs. I also believe that approval of the DIP Facility will instill much needed confidence in parties that are critical to the success of the Chapter 11 Cases, including the Debtors' employees, vendors, suppliers, and customers. In addition, I believe the DIP Facility will increase the opportunity for a robust, competitive postpetition sale process by facilitating the Debtors' efforts to preserve operations and their going-concern value during that process. Without access to the DIP Facility, the Debtors would be unable to avoid a value-destructive liquidation—which would result in irreparable harm to the Debtors and their stakeholders.

49. The Debtors, with the assistance of their advisors, including RPA, have determined that the DIP Facility will be sufficient to support the Debtors' operations through the pendency of

the Chapter 11 Cases and adequate, considering all available assets, to pay administrative expenses due or accruing during the period covered by the DIP Budget.

50. I believe the terms of the DIP Facility reflect good faith, arms'-length negotiation among the Debtors and the DIP Lender. Without access to the DIP Facility, the Debtors would suffer immediate and irreparable harm, and the Debtors would likely be forced to liquidate.

51. For all these reasons, I believe the DIP Facility is necessary and appropriate, and essential to the Debtors' ability to conduct the Chapter 11 Cases for the benefit of their stakeholders.

## PART III

## SUPPORT FOR RELIEF REQUESTED IN FIRST DAY MOTIONS

52. Concurrently herewith, the Debtors filed the First Day Pleadings seeking relief related to the administration of the Chapter 11 Cases, the Debtors' operations, and their cash and financing needs, to ensure a smooth entry into chapter 11. I am familiar with the contents of each First Day Pleading (including the exhibits to such pleadings) and believe that the relief sought in each First Day Pleading: (i) will enable the Debtors to operate in chapter 11 with minimal disruptions; (ii) is critical to the Debtors' chapter 11 efforts; and (iii) best serves the interests of the Debtors' estates and creditors. Further, it is my belief that the relief sought in the First Day Pleadings is in each case narrowly tailored and necessary to achieve the goals identified above. A list of the First Day Pleadings is set forth below:

a. *Debtors' Motion for Entry of an Order Authorizing the Joint Administration of the Debtors' Chapter 11 Cases*

b. *Debtors' Application for Entry of Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Effective as of Petition Date*

c. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing and Approving Continued Use of Cash Management System, (II) Authorizing Continued Use of Corporate Credit Cards and Granting Administrative Expense Status to*

*Postpetition Credit Card Obligations, (III) Authorizing Use of Prepetition Bank Accounts and Business Forms, (IV) Waiving the Requirements of Section 345(b) on an Interim Basis, (V) Granting Administrative Expense Status to Postpetition Intercompany Claims, and (VI) Granting Certain Related Relief*

d. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto*

e. *Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (IV) Granting Related Relief, Including Setting a Final Hearing Related Thereto*

f. *Debtors' Motion for Entry of Interim and Final Orders Authorizing (I) the Debtors to (A) Continue Prepetition Insurance Policies, (B) Pay All Prepetition Obligations in Respect Thereof; and (C) Continue Their Insurance Premium Financing Program; and (II) Banks to Honor and Process Related Checks and Transfers*

g. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors and Service Providers, (B) Certain Vendors with Claims Entitled to Administrative Expense Status Under Section 503(b)(9) of the Bankruptcy Code, (C) Foreign Vendors; and (D) Shippers, Warehouseman, and Other Lienholders; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Certain Related Relief*

h. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Honor Customer Obligations and Continue Customer Programs in the Ordinary Course of Business and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto*

i. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Employee Wages, Salaries, and Other Compensation; and (B) Continue Employee Benefits Obligations and Pay Related Administrative Obligations; (II) Authorizing Debtors to Honor any Workers' Compensation Obligations; (III) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (IV) Granting Related Relief*

j. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties;*

*(III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief*

53.     The Debtors have narrowly tailored the First Day Pleadings to meet the goals of: (i) continuing their operations in chapter 11 with as little disruption and loss of productivity as possible; (ii) maintaining the confidence and support of key customers, vendors and suppliers during the Chapter 11 Cases; and (iii) establishing procedures for the efficient administration of the Chapter 11 Cases and a robust marketing and sale process.

54.     I have reviewed and discussed with counsel each of the First Day Pleadings (including the exhibits thereto), and I believe the facts stated therein to be true and correct to the best of my knowledge, with appropriate reliance on corporate officers, business records and advisors.  I incorporate by reference the factual statements set forth in each of the First Day Pleadings as though set forth herein.

55.     It is my belief that the relief sought in each of the First Day Pleadings is necessary to the success of the Debtors' chapter 11 efforts and the maximization of the value of the Debtors' estates.  It is my further belief that, with respect to those First Day Pleadings requesting the authority to pay specific prepetition claims or continue selected prepetition programs, the relief requested is essential to the Debtors' chapter 11 efforts and necessary to avoid immediate and irreparable harm to the Debtors' estates.  The success of the Chapter 11 Cases depends upon the Debtors' ability to maintain operations in the ordinary course postpetition and maximize estate value.  The relief requested in the First Day Pleadings is a critical component of maintaining uninterrupted business operations and the confidence of key constituencies necessary to implement a successful sale.

## **CONCLUSION**

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Executed:  December 2, 2022

/s/ Carol Brault
Carol Brault
Chief Financial Officer

# EXHIBIT A

## Corporate Organizational Chart

```
┌─────────────────────────────┐
│          WINC, Inc.         │
│    Delaware Corporation     │
└─────────────────────────────┘
```

┌──────────────────────────────────┐                    ┌──────────────────────────────────┐
│  100% Ownership/Sole Member      │                    │  90% Ownership/Managing Member   │
└──────────────────────────────────┘                    └──────────────────────────────────┘

```
┌─────────────────────────────┐          ┌─────────────────────────────┐
│          BWSC, LLC          │          │      Winc Lost Poet, LLC    │
│ California Limited Liability │          │  Delaware Limited Liability │
│          Company            │          │          Company            │
└─────────────────────────────┘          └─────────────────────────────┘
```

# **EXHIBIT B**

## **Letter of Intent**

Via E-mail

November 28, 2022

Ladies and Gentlemen:

As a follow up to my conversation with Pat DeLong on November 23, 2022 and as a replacement for our prior Indication of Interest, dated November 17, 2022, which is hereby withdrawn and terminated, we are pleased to present to you with the attached letter that outlines the proposed terms for an alternative transaction between Project Crush Acquisition Corp LLC and Winc, Inc.

We are proposing a purchase price of $10,000,000 for the assets of Winc, which acquisition would be structured as a sale pursuant to section 363 of the Bankruptcy Code in a chapter 11 bankruptcy case administered by the United States Bankruptcy Court for the District of Delaware in which we would agree to serve as the stalking horse bidder. In addition, as we understand that Winc requires Debtor-in-Possession financing in order to consummate a Chapter 11 bankruptcy, we are willing to provide such financing in an amount to be agreed to supply the company with cash necessary to sustain operations through deal close.

We kindly request your acceptance and execution of this letter by 10am Pacific Time on November 29, 2022 because time is of the essence as we need to begin work immediately to get the financing in place.

With warm regards,

Mark Lynn

CEO, Project Crush Acquisition Corp LLC

November [28], 2022

<u>Via E-mail</u>

Winc, Inc.

Re: Proposed Purchase of Certain Assets of Winc, Inc.

Ladies and Gentlemen:

The purpose of this non-binding letter of intent (this "Letter") is to express the intent of Project Crush Acquisition Corp LLC or one of its wholly-owned subsidiaries (collectively, "Purchaser") to purchase (the "Transaction") the Acquired Assets (as defined below) of Winc, Inc. and its subsidiaries (collectively, the "Seller") that own or have interests in the Acquired Assets and to set forth certain conditions to such Transaction. This offer will remain open only until 10:00 a.m. Pacific Time, November [29], 2022 as time is of the essence and documentation of any bridge financing will require time to negotiate and validate Purchaser's senior secured lender status.

1.      **Basic Transaction**. In an acquisition to be structured as a sale pursuant to section 363 of the Bankruptcy Code in a chapter 11 bankruptcy case administered by the United States Bankruptcy Court for the District of Delaware, Purchaser intends to purchase certain "Acquired Assets," identified during the due diligence process and set forth in the definitive agreements but which Purchaser initially anticipates would constitute the operating assets of Seller that are owned, used or are otherwise related to the Seller's business as currently conducted (the "Business"). Such Acquired Assets may include, but are not limited to, accounts receivable, tangible personal property, intellectual property including copyrights, trademarks and patents, marketing and training materials, information technology, "know how" and all related equipment, employees, and any such other assets identified during the due diligence process or otherwise set forth in the Agreement (as defined below). Purchaser would not assume any liabilities of Seller other than customer subscription liabilities related to existing customer agreements and certain other liabilities necessary for a smooth transition of the Business and to be identified in the Agreement (collectively, the "Assumed Liabilities"). Purchaser intends to make an offer of employment to all Seller employees who Purchaser has determined during due diligence are necessary to continue the Business or to ensure a smooth transition of the Business (employees who accept such offers being the "Assumed Employees").

2.      **Consideration**.

The consideration for the Transaction will consist of both cash consideration and the assumption of the Assumed Liabilities as well as the employment of the Assumed Employees. The cash purchase price shall not be less than $10,000,000.00, (the "Purchase Price"), which will be subject to offset against any amounts outstanding under debtor-in-possession loans or other loans made by Purchaser to Seller, including any and all accrued interest thereon.

3.      **Conditions to the Transaction**.

The Transaction will be contingent upon, among other things (as deemed necessary or appropriate by Purchaser in its sole discretion), the following:

(a)      Execution of an acceptable asset purchase agreement (the "Agreement"), consistent with the terms herein and otherwise in a form wholly acceptable to Purchaser;

**(b)**     All Acquired Assets being transferred free and clear of all liens, mortgages, claims, setoffs, recoupment and encumbrances (subject only to usual and customary permitted liens acceptable to Purchaser in its sole discretion);

**(c)**     Compliance with closing conditions set forth in the Agreement deemed necessary or appropriate by Purchaser and delivery of ancillary documents;

**(d)**     The filing by Seller of a Chapter 11 bankruptcy proceeding in the United States Bankruptcy Court for the Delaware ("Bankruptcy Proceeding");

**(e)**     The filing of an acceptable sale motion in the Bankruptcy Proceeding to approve the Transaction, including the designation of Purchaser as the stalking horse bidder, and sale/bid procedures acceptable to Purchaser promptly following the Bankruptcy Proceeding commencement date;

**(f)**     The entry of an order approving bid procedures, breakup fee ("Breakup Fee") and expense reimbursement and schedule for sale process all as reasonably acceptable to Purchaser;

**(g)**     Entry of a final non-appealable order approving the Transaction ("Sale Order"), in a form acceptable to Purchaser, from the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which Sale Order becomes a final and non-appealable order no later than a date to be agreed by Purchaser and Seller;

**(h)**     All parties comprising Seller being debtors in Chapter 11 cases in the Bankruptcy Court and parties to and subject to the Sale Order; and

**(i)**     Approval or consent by all secured creditors having liens on any Acquired Asset of the terms of the Agreement.

The Agreement shall not be subject to a financing contingency.

**4.     Costs**. Other than the Breakup Fee and expense reimbursement, Purchaser and Seller will bear their own costs and expenses (including without limitation, broker's fees, attorney's fees, and accountant's fees) related to the Transaction, except as otherwise provided in the Agreement.

**5.     Closing and Possession**. Purchaser would take possession of the Acquired Assets upon closing of the Transaction (the "Closing").

**6.     Debtor-In-Possession Financing**.  Subject in all respects to the terms and conditions of this Letter, Purchaser is willing to make available to Seller, on customary terms and conditions acceptable to Purchaser as set forth in the definitive debtor-in-possession financing documentation, such debtor-in-possession financing in an amount to be agreed by the parties. This proposal does not create or constitute a commitment by or obligation on the part of Purchaser to provide any financing to Seller, which commitment shall be made pursuant to a separate term sheet.

**7.     Conduct of Business**. During the period from the date hereof until the earlier of (i) the execution of the Agreement (in which case the provisions of the Agreement shall govern) and (ii) the termination of this Letter in accordance with the terms hereof, Seller shall operate its businesses in the ordinary course, subject to limitations imposed as a result of the commencement of the Chapter 11 proceeding and refrain from any extraordinary transactions. The definitive agreements will include an interim operating plan and budget agreeable to the Purchaser and Seller to which the Seller will adhere until the Closing of the Transaction.

**8.**     **[Intentionally Omitted]**

**9.**     **Termination**. This Letter may be terminated (a) by mutual written consent of Purchaser and Seller or (b) upon written notice by either party to the other at any time after 5:00 p.m. Pacific Time on December 15, 2022 if the Agreement has not been executed by such date; provided, that the termination of this Letter will not affect the liability of a party for breach of any of the Binding Provisions or Seller's obligations under the pre-petition or other financing pursuant to Section 6 prior to such termination. Notwithstanding anything to the contrary contained herein, this Letter shall terminate automatically upon execution of the Agreement. Upon termination of this Letter in accordance with the terms hereof, the parties will have no further rights or obligations hereunder, except with respect to those matters that explicitly survive any such termination or are otherwise subject to definitive documents contemplated by this Letter or the Agreement.

**10.**     **Due Diligence**. Until the earlier of (i) the execution of the Agreement (in which case the provisions of the Agreement shall govern) and (ii) the termination of this Letter in accordance with the terms hereof, Seller will (a) cooperate fully with Purchaser and the directors, officers, employees, accountants, lawyers, brokers, financial advisors, and any other agents or representatives of Purchaser or its subsidiaries (if any) (collectively, "Purchaser's Representatives") with respect to Purchaser's due diligence investigation of Seller; (b) cause members, directors, officers, employees, accountants, lawyers, brokers, financial advisors, and any other agents or representatives of Seller and its subsidiaries and affiliates (collectively, "Seller's Representatives") to cooperate fully with Purchaser and Purchaser's Representatives with respect to Purchaser's due diligence investigation of Seller; and (c) permit reasonable access to Seller's Representatives and, subject to consent of Seller, key business relations in connection with Purchaser's due diligence investigation and the transactions contemplated hereby. Without limitation of the foregoing and upon reasonable notice by Purchaser, Seller will provide Purchaser and Purchaser's Representatives with prompt and complete access during normal business hours to Seller's employees, accountants (including outside accountants), facilities, books, records, contracts and all other information and data pertaining to Seller and its subsidiaries and affiliates; provided, that all such access and disclosure will be conducted in such manner so as not to unduly interfere with the normal business operation of Seller.

**11.**     **Public Announcements; Confidentiality**. The parties hereto will not make any press release or public announcement concerning this Letter, the proposed Transaction or the proposed terms thereof, the existence of discussions between the parties, or any memoranda, letters or agreements between the parties relating to the proposed Transaction, except with the prior written consent of the other party or as required under applicable law or regulatory authority after consultation with the other party; provided however, that Seller shall be permitted to disclose the existence of this Letter in connection with the Chapter 11 proceeding. Solely to the extent required by applicable securities laws of the Securities and Exchange Commission, Seller may make such securities filings, subject to Purchaser's review and approval of such communications, which shall not be unreasonably withheld. Each of the parties hereto will observe and perform its obligations under that certain Non-Disclosure Agreement dated as of June 16, 2022 by and between Seller and Purchaser (the "Confidentiality Agreement"). Seller and Seller's Representatives hereby agree that each shall be subject to and bound by the Confidentiality Agreement as if it were an original party thereto together with Purchaser.

**12.**     **Miscellaneous**.

       **(a)**     **Governing Law; Jurisdiction; Waiver of Jury Trial**. The Binding Provisions will be governed by and construed under the laws of the State of Delaware without regard to conflicts of laws principles. The parties hereto specifically waive any right to a jury trial with respect to any matter arising under the Binding Provisions.

**(b)** **Entire Agreement**. The Binding Provisions constitute the entire agreement between the parties and supersede all prior oral or written agreements, understandings, representations and warranties, and dealings between the parties on the subject matter hereof.

**(c)** **Amendment**. This Letter may be amended or modified only by a writing executed by each of the parties.

**(d)** **Counterparts**. This Letter may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Letter and all of which, when taken together, will be deemed to constitute one and the same instrument. The words "execution," "signed," "signature," and words of like import in this Letter shall be deemed to include electronic signatures or electronic records (including facsimile and electronic mail), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature.

**(e)** **Binding Provisions**. This Letter does not contain all the essential terms with respect to the Transaction, and the parties acknowledge that they must complete negotiations on the points set forth in this Letter as well as on points beyond the scope of this Letter before the Transaction can be consummated. The parties recognize that the structure of the Transaction is subject to continuing review and analysis. Except as specified in the next sentence, this Letter is an expression of intent only, does not express an agreement of the parties or an offer to enter into an agreement, and is not intended to and does not create any legal or equitable obligations with respect to the Transaction on the part of any party hereto. The parties do not intend to be bound until they enter into definitive agreements with respect to the Transaction; provided, that the covenants contained in Section 4 and Sections 7 through 12 of this Letter (the "Binding Provisions") shall be binding and enforceable upon Purchaser and Seller whether or not the parties reach a definitive agreement with respect to the Transaction.

[Signature Page Follows.]

Please sign and date this Letter in the space provided below to confirm the mutual agreements set forth in this Letter and return a signed copy to the undersigned no later than 10:00am Pacific Time on November [29], 2022.

Very truly yours,

**Project Crush Acquisition Corp LLC**

By: _____

Name: _____

Title: _____

**AGREED TO AND ACCEPTED BY:**

**Winc, Inc.**

By: _____

Name: _____

Title: _____

Please sign and date this Letter in the space provided below to confirm the mutual agreements set forth in this Letter and return a signed copy to the undersigned no later than 10:00am Pacific Time on November [29], 2022.

Very truly yours,

**Project Crush Acquisition Corp LLC**

By:_____

Name:_____

Title:_____

**AGREED TO AND ACCEPTED BY:**

**Winc, Inc.**

By: *Brian Smith*

 F722549F37B4463...

Name: Brian Smith

Title: Interim CEO