```
                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE


                                   .  Chapter 11
         IN RE:                    .
                                   .  Case No. 22-11238(LSS)
         WINC, INC., et al,        .
                                   .
                                   .  824 Market Street
                                   .  Wilmington, Delaware 19801
                        Debtors.   .
         . . . . . . . . . . . . . .  Tuesday, December 6, 2022
```

               TRANSCRIPT OF HEARING ON FIRST-DAY MOTIONS
            BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
                   UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For the Debtors:              Michael R. Nestor, Esq.
                              Matthew B. Lunn, Esq.
                              Allison S. Mielke, Esq.
                              Joshua B. Brooks, Esq.
                              Shella Borovinskaya, Esq.
                              YOUNG, CONAWAY, STARGATT
                               & TAYLOR, LLP
                              Rodney Square
                              1000 North King Street
                              Wilmington, Delaware 19801


For the U.S. Trustee:         Jane M. Leamy, Esq.
                              OFFICE OF THE U.S. TRUSTEE
                              844 King Street, Suite 2207
                              Wilmington, Delaware 19801




(Appearances Continued)

Audio Operator:               Electronically Recorded
                              by LaCrisha Harden, ECRO

Transcription Company:        Reliable
                              1007 N. Orange Street
                              Wilmington, Delaware 19801
                              (302)654-8080
                              Email:  gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:   (Continued)

For Project Crush
Acquisition Corp, LLC:        Curtis S. Miller, Esq.
                             MORRIS, NICHOLS, ARSHT
                              & TUNNELL, LLP
                             1201 North Market Street
                             16th Floor
                             Wilmington, Delaware 19899

                             Eric E. Walker, Esq.
                             COOLEY, LLP
                             110 North Wacker Drive
                             Chicago, Illinois 60606

                             Joseph W. Brown, Esq.
                             COOLEY, LLP
                             55 Hudson Yards
                             New York, New York 10001
                             COOLEY, LLP
                             55 Hudson Yards
                             New York, New York 10001

For Banc of California,
N.A., as successor-by-merger
to Pacific Mercantile
Bank:                        James O'Neill, Esq.
                             PACHULSKI, STANG, ZIEHL
                              & JONES, LLP
                             919 North Market Street
                             17th Floor
                             Wilmington, Delaware 19899

APPEARANCES VIA ZOOM:

For the Debtors:             Brian Smith, Esq.
                             YOUNG, CONAWAY, STARGATT
                              & TAYLOR, LLP

For Banc of California,
N.A., as successor-by-merger
to Pacific Mercantile
Bank:                        Richard M. Pachulski, Esq.
                             Maxim B. Litvak, Esq.
                             PACHULSKI, STANG, ZIEHL
                              & JONES, LLP

(Appearances Continued)

APPEARANCES VIA ZOOM:   (Continued)

For Rancho Canada de Los
Pinos, LLC:                     Nathan Schultz, Esq.
                                LAW OFFICE OF NATHAN A.
                                 SCHULTZ, P.C.

For the U.S. Securities
and Exchange Commission:        William Uptegrove, Esq.
                                U.S. SECURITIES AND EXCHANGE
                                 COMMISSION

Also Appearing:                 Brian Lennon, Esq.
                                WILLKIE, FARR & GALLAGHER, LLP

                                Noah Weingarten, Esq.
                                LOEB & LOEB, LLP

                                Jason Levin, Esq.
                                Brya Keilson, Esq.
                                MORRIS JAMES, LLP

                                Tyler Stahl
                                WINC, INC.

                                Brian Hunt
                                EPIQ CORPORATE RESTRUCTURING

                                Michael Baranowski
                                Terri Baron
                                BANC OF CALIFORNIA

                                Wayne Weitz
                                Marilee Greene
                                B. RILEY ADVISORY SERVICES

                                Werner Michlits
                                Niklas Peltzer
                                MICHLITS WERNER GMBH

                                Joseph Welch
                                IN GOOD TASTE
                                Frederic Chaudiere
                                FAMILLE CHAUDIERE (SARL)

                                Eric Reubel
                                DUNDON ADVISERS

(Appearances Continued)

APPEARANCES VIA ZOOM:  (Continued)

Also Appearing:              Douglas Circle
                             RANCHO CANADA LOS PINOS

                             John Policano
                             RPA ADVISORS

                             Max St. Aubin
                             CREDITOR

                             Gus Kallergis, *Pro Se*

                             Kareem Jeudy, *Pro Se*

                             Judah Hertzberg, *Pro Se*

                             Michelle Kainen, *Pro Se*

                             Michael Whalen, *Pro Se*

                             Jeff Kaplan
                             "BCAS"

                             David Wender
                             "RNDC"

                             Uday Gorrepati
                             "ABI PROJECT"

INDEX

|  | Page |
|---|---|
| JOINT ADMINISTRATION | 16 |
| RETENTION OF EPIQ AS CLAIMS AND NOTICING AGENT | 17 |
| UTILITIES | 18 |
| TAXES | 20 |
| CASH MANAGEMENT | 22 |
| CRITICAL VENDORS | 24 |
| INSURANCE | 27 |
| CUSTOMER PROGRAMS | 29 |
| WAGES AND BENEFITS | 32 |
| DIP FINANCING/ADEQUATE PROTECTION/CASH COLLATERAL | 34 |

| EXHIBIT | EVID. |
|---|---|
| Brault Declaration | 17 |

1          (Proceedings commence at 3:03 p.m.)

2          (Call to order of the Court)

3               THE COURT:  Please be seated.

4               Good afternoon --

5               MR. LUNN:  Good afternoon --

6               THE COURT:  -- Mr. Lunn.

7               MR. LUNN:  -- Your Honor.  May it please the Court,

8     Matthew Lunn from Young Conaway on behalf of the debtors,

9     Your Honor.

10               First, thank you for setting today and this time

11    for our first-day hearing with respect to the Winc, Inc.

12    Chapter 11 cases.  We filed three cases, Your Honor, Winc,

13    Inc. and two of its subsidiaries, on November 30th of this

14    year.  And the lead case, Your Honor, just for the record

15    purposes, is 22-11238.

16               Before I begin, Your Honor, as is customary, I'd

17    like to make a few introductions to the Court.

18               THE COURT:  That's fine.

19               MR. LUNN:  With us today from Winc is the debtors'

20    CFO Carol Brault.  She is also the first-day declarant.

21               THE COURT:  Yes.  Welcome.

22               MR. LUNN:  Debtors' proposed financial advisor is

23    RPA, and with us today is Kevin Pleines.

24               Debtors' proposed investment banker is Canaccord,

25    and Brian Bacal is with us today, Your Honor.

1          THE COURT:  Yes.

2          MR. LUNN:  And then I have a few of my colleagues

3    from Young Conaway.  Obviously, Mr. Nestor is sitting in the

4    gallery back there.  But we also have who will handle the

5    first-day hearing and pleadings, Your Honor:  Allison Mielke,

6    Shella Borovinskaya, and Josh Brooks, Your Honor.

7          THE COURT:  Yes.

8          MR. LUNN:  Also, as is customary, but we really do

9    mean it, we'd like to thank the Office of the United States

10   Trustee, Jane Leamy, who we got the first-day papers to her,

11   and as always, she was expeditious in getting us comments.

12          We've incorporated her comments with respect to the

13   -- what I would call the "routine" first-days.  I think there

14   may be one or two issues left on the DIP order, but I'll

15   leave that to the end.  But I think we're pretty much

16   resolved across the board there, Your Honor.

17          With respect to the game plan, what I would propose

18   to do is set the stage for Your Honor, tell us -- you know,

19   tell Your Honor where we are, what we have been doing, what

20   we hope to do, and give Your Honor a brief overview of the

21   debtors.  But I'll keep it brief, understanding we're at, you

22   know, midway through the afternoon and there's a lot to get

23   through with respect to the agenda, Your Honor.  And then I'd

24   turn, obviously, the podium over to my colleagues to present

25   the first-days, if that's acceptable.

1          THE COURT:  That's fine.

2          MR. LUNN:  Thank you.

3          So what is Winc, Your Honor?  Winc is a direct-to-

4    consumer retail and wholesale seller of wine, headquartered

5    in Santa Monica, California.  The business operations are

6    through Winc, Inc. and BWSC, LLC.

7          Winc actually doesn't grow its own grapes, it

8    doesn't own a vineyard, it doesn't have a bottling facility.

9    Instead, what it does is it purchases grapes, it purchases

10   also unfinished product after crush, so the juice, and it

11   also finish -- purchases finished product.  The sourcing of

12   products, Your Honor, is done domestically in California, and

13   also -- done also internationally.

14         In connection with the production of its wine, the

15   company has two winemakers, but it also collaborates with

16   other winemakers in the industry, vineyards and other

17   manufacturers, then uses their collective knowledge to

18   develop the underlying products that are then put onto the

19   various -- excuse me, Your Honor -- the various labels.

20         Unfinished product, Your Honor, is shipped and

21   transported to its processing facility in California.

22   Finished products are shipped to either warehouse facilities

23   in California or one that's literally over the border in

24   Delaware County, right in Bethel Township, Garnet Valley

25   area.

1          With respect to the direct-to-consumer online

2     retail channel, Winc offers a subscription service.  And Your

3     Honor, we will hear more of that, I think from Mr. Brooks, in

4     connection with the customer programs motion.  But in really

5     broad brushes, in exchange for being a member and paying a

6     monthly fee of approximately $60, members are provided with a

7     redeemable credit that they then use to purchase the wine.

8     And they are also provided various incentives, special

9     pricing offers, and other services as being a member.

10          Primary retail partners for Winc, Your Honor, are

11     Whole Foods, Target, and Albertsons.  And there are five core

12     brands:  Summer Water, Wonders, Lost Poet, Folly of the

13     Beast, and Chop Shop.

14          The debt, Your Honor, not overly complicated.

15     Sometimes we're used to seeing various tranches of debt.

16     Here, we have one pre-petition secured credit facility with

17     Banc of California.  The principal amount is approximately --

18     approx -- excuse me -- approximately three and a half million

19     dollars.  The lien is substantially all of the debtors'

20     assets.

21          THE COURT:  Uh-huh.

22          MR. LUNN:  Trade credit or unsecured credit is

23     about $8 million, Your Honor.

24          THE COURT:  Uh-huh.

25          MR. LUNN:  The how and the why with respect to the

1    chapter --

2            THE COURT:  Before you go on, since it wasn't clear

3    to me from the declaration what the debtors' assets actually

4    were, am I -- did I hear you correctly that they have a

5    processing facility --

6            MR. LUNN:  There is --

7            THE COURT:  -- that's theirs?

8            MR. LUNN:  There is a processing facility.

9            THE COURT:  Okay.  For the unfinished product.

10           MR. LUNN:  Correct.

11           THE COURT:  Okay.  And so do they process all their

12   product or do they also buy finished product and put a label

13   on it?

14           MR. LUNN:  Buy finished product and put a label on

15   it, Your Honor.

16           THE COURT:  Okay.  Okay.  And that goes to their

17   two distribution facilities.

18           MR. LUNN:  Correct.  The finished product goes --

19   and then I would assume, once a product is finished, it goes

20   to the distribution facilities or it's sold directly to

21   customers through the online portals.

22           THE COURT:  Okay.  So that -- and that wine is sold

23   either direct to consumer or to one of the --

24           MR. LUNN:  Wholesalers.

25           THE COURT:  -- wholesalers.

1          MR. LUNN:  Correct --

2          THE COURT:  Okay.

3          MR. LUNN:  -- Your Honor.

4          THE COURT:  Okay.

5          MR. LUNN:  Again, the how and the why of the

6  Chapter 11, Your Honor:

7          Over the last year, the company began to face

8  significant liquidity pressures as a result of revenue

9  dropping from the direct-to-consumer sales.  There is a

10  looming maturity date under the --

11          THE COURT:  Uh-huh.

12          MR. LUNN:  -- Banc of California facility of

13  December 31st.

14          And during the time over the last year or so, the

15  company has attempted to source new third-party financing or

16  refinance Banc of California.  Ultimately, those efforts in

17  obtaining the third-party financing outside of a Chapter 11

18  process proved unsuccessful.

19          But during the same time line, the company engaged

20  Canaccord.  Canaccord was engaged in March of 2022 to explore

21  various strategic alternatives.  And during the last 8 to 9

22  months, Canaccord has contacted or had contact with nearly 50

23  parties; 20 of those parties are under NDAs.  And as I said,

24  while this marketing was being done, the company was

25  attempting to refinance the facility.

1          Fast-forward a little bit, Your Honor, to mid

2    November.  And the company was pursuing an out-of-court

3    merger transaction, entered into exclusivity with the party

4    that is the proposed stalking horse bidder.  During that

5    time, the company made it clear that there needed to be some

6    sort of bridge financing to get from merger documentation

7    through a merger completion date.

8          The day before Thanksgiving, we thought we had an

9    out-of-court deal.  It ended up being an in-court deal.

10          THE COURT:  Uh-huh.

11          MR. LUNN:  And a week later, Your Honor, we filed

12    Chapter 11 with funding being provided on an in-court basis

13    from the stalking horse bidder to fund that process and so

14    that the company could capitalize on that actual sale process

15    with the stalking horse.

16          Your Honor, we did attach a copy of the LOI to the

17    first-day declaration.  And over the course of the past week,

18    we've been involved in, I would call it "good faith and

19    extensive negotiations" with the stalking horse purchaser to

20    finalize an APA.  We will finalize an APA tomorrow, Your

21    Honor.  And the goal was to file that APA tomorrow and then,

22    obviously, ask for a shortened hearing with respect to bid

23    procedures in accordance with the milestones of the DIP.

24          The headline number of that offer, Your Honor, is

25    put in the LOI, it was $10 million --

1          THE COURT:  Uh-huh.

2          MR. LUNN:  -- for the sale of the assets, plus

3   assumed liabilities, which also includes cure amounts with

4   respect to the debtors' contracts.

5          Outside sale closing date, Your Honor, of January

6   20th, 2023.

7          As I mentioned, Your Honor, Canaccord has been

8   involved for quite some time.  And since we've flipped from

9   an -- outside of the exclusivity period now into an in-court,

10  Canaccord has re-instituted its reach-out and has made

11  contact with 50 parties or so.  And I would say this, Your

12  Honor:  It's that the debtors are very encouraged with the

13  level of interest that has been received and has been

14  conveyed to Canaccord.

15         So we're hoping for a competitive and open process,

16  even though I know, Your Honor, it's somewhat shortened.  But

17  we think, given where the company has been, the liquidity

18  situation and everything else, that it all will work, Your

19  Honor.  But we'll leave that for -- that's not before Your

20  Honor today.

21         THE COURT:  Uh-huh.

22         MR. LUNN:  I understand that.  But at the same

23  time, you know, any debtor that files a case is trying to

24  implement a restructuring strategy, Your Honor.  And here,

25  the debtors' restructuring strategy, to maximize value, is to

1    execute on an APA that's being backed by the stalking horse

2    bidder, who's putting money right up front for us to execute

3    on a sale process.

4              THE COURT:  And who is the stalking horse bidder?

5              MR. LUNN:  It's -- yeah.  May I introduce Your

6    Honor to counsel --

7              THE COURT:  Mr. Miller.

8              MR. LUNN:  -- for the stalking horse bidder?

9              THE COURT:  Mr. Miller.

10             MR. MILLER:  Good afternoon, Your Honor.  For the

11   record, Curtis Miller of Morris, Nichols, Arsht & Tunnell on

12   behalf of Project Crush Acquisition Corp., LLC.  I'm here

13   with my co-counsel in the case, Eric Walker and Joe Brown

14   from Cooley, and my colleague who I don't think you've met

15   yet Evie Walker from Morris Nichols.

16             Nice to see you again in person --

17             THE COURT:  Nice to see you.

18             MR. MILLER:  -- after so long.

19             So Project Crush Acquisition Corp is an affiliate

20   of AMASS Brands, Inc.  You know, they are in the beverage

21   industry, as well.

22             THE COURT:  Okay.

23             MR. MILLER:  Just so you know -- and I was going to

24   raise this in connection when we were talking about the DIP -

25   - the CEO of AMASS Brands, Mark Lynn, he was a cofounder of

1    what is now Winc.  He has no affiliation with the entity at

2    this point.  He was affiliated with them between August of

3    2011 and December of 2013 and he sold his last of, I think

4    there were some convertible notes, in 2015.  So there's no

5    contractual or equity or other arrangement with him.

6          Obviously, he thinks highly of the business and

7    wants to make a bid for the assets and came into this case

8    because no one else was willing to provide the funding and we

9    needed to get to a sale, Your Honor.

10          THE COURT:  Okay.

11          MR. MILLER:  So that's why we're here.

12          THE COURT:  Thank you.

13          MR. MILLER:  Does that answer your question?

14          THE COURT:  Yes, it does.  Thank you.

15          MR. LUNN:  Your Honor, those are all the remarks I

16    had planned.  Unless Your Honor has any questions, what I

17    would do is cede the podium to Mr. Brooks to walk Your Honor

18    through at least half of the agenda.

19          THE COURT:  Okay.  That's fine.

20          MR. LUNN:  Thank you.

21          THE COURT:  Mr. Brooks.

22          MR. BROOKS:  May it please the Court.  Good

23    afternoon, Your Honor.  Again, Joshua Brooks from Young

24    Conaway on behalf of the debtors.

25          I'll be presenting Items 2 through 8 on today's

1    agenda.  I also note that we do have blacklines of the DIP

2    order and the termsheet, if you'd like me to hand those up at

3    this time.

4              THE COURT:  I have those.

5              MR. BROOKS:  Okay.

6              THE COURT:  Thank you.

7              MR. BROOKS:  Wonderful.  Thank you.

8              At Item Number 2, we have the first-day

9    declaration, a declaration of, again, Carol Brault, who is

10   the CFO of the debtors.  And we rely on this declaration for

11   the relief that we seek today.  So, obviously, she's here,

12   available to testify should there be any questions.

13             Next on the agenda we have Item Number 3, the

14   debtors' motion for joint administration.

15             We have three debtors here who are "affiliates"

16   within the meaning of Section 101(2) of the Bankruptcy Code.

17   Accordingly, Bankruptcy Rule 1015 and Local Rule 1015-1

18   provide that consolidation, for procedural purposes, is

19   warranted, given that the motions, orders, and hearings will

20   affect all of these debtors jointly and provide a single

21   docket for interested parties to see new items on the agenda

22   -- I'm sorry -- on the docket.

23             Unless Your Honor has any questions, we ask that

24   the Court enter the order at this time.

25             THE COURT:  Thank you.  I do not have any

1    questions.

2         Does anyone wish to be heard with respect to the

3    joint admin motion?

4         (No verbal response)

5         THE COURT:  I hear no one.

6         I've reviewed it.  It's appropriate and I will sign

7    it.

8         MR. BROOKS:  Great.  Thank you, Your Honor.

9         Before I proceed further, I would like to move the

10   declaration of Carol Brault into evidence.

11        THE COURT:  Does anyone object?

12        (No verbal response)

13        THE COURT:  I hear no objections.  It's admitted

14   without objection.

15        (Brault Declaration received in evidence)

16        MR. BROOKS:  Great.  Thank you.

17        Item Number 4 on the agenda, we have the debtors'

18   application to appoint Epiq Corporate Restructuring, LLC as

19   its claims and noticing agent.

20        In this case, we have more than 200 creditors; and,

21   therefore, Local Rule 2002-1(f) requires the appointment of a

22   claims agent.

23        The debtors have complied with the claims agent

24   retention protocol and solicited three proposals and selected

25   Epiq based on its competitive pricing structure, as well as

1        its expertise.

2              In support of the application, we have submitted

3        the declaration of Brian Hunt, who is a consulting director

4        with Epiq, as Exhibit B.

5              And unless you have any questions, Your Honor, we

6        ask that the Court enter -- approve the application.

7              THE COURT:  I do not have any questions.

8              Does anyone wish to be heard with respect to the

9        retention of Epiq as claims agent?

10         (No verbal response)

11             THE COURT:  I hear no one.

12             I have reviewed the application and I note that the

13       debtor has complied with the custom here and I will approve

14       it.

15             MR. BROOKS:  Great.  Thank you, Your Honor.

16             Next on the agenda, we have Item Number 5, the

17       utilities motion and adequate assurances motion.  Sorry.

18             By this motion, the debtors seek entry of an order

19       prohibiting utility providers from terminating service, as

20       well as approval of certain procedures for adequate assurance

21       of future payment.

22             The debtors, in their ordinary course of business,

23       use telecommunications, internet connectivity, and waste

24       disposal services, and propose to deposit $2,175 into a

25       segregated account.  That's approximately half of the

1  debtors' monthly spend.

2       We believe that the procedures proposed here are

3  consistent with Section 366 of the Bankruptcy Code and also

4  consistent with other procedures routinely approved in this

5  district.  And also, we believe that, absent the relief

6  sought here, the debtors will suffer immediate and

7  irreparable harm.

8       Unless Your Honor has any questions, we request

9  that the Court enter the interim order at this time.  Sorry.

10  There is no interim order.

11       THE COURT:  No, this should be an interim.

12     (Participants confer)

13       MR. BROOKS:  Oh, apologies.

14       THE COURT:  Okay.

15       MR. BROOKS:  There is an interim order.

16       THE COURT:  Yes.

17       MR. BROOKS:  Thank you, Your Honor.

18       THE COURT:  Does anyone wish to be heard with

19  respect to the utilities motion?

20     (No verbal response)

21       THE COURT:  I hear no one.

22       I've reviewed it.  I agree that it is in line with

23  these types of orders and it is necessary to avoid immediate

24  and irreparable harm and required by the Code in order to

25  provide adequate assurance to utilities.

1          So the only thing I think we need is a final

2     hearing date --

3          MR. BROOKS:  If I may --

4          THE COURT:  -- with respect --

5          MR. BROOKS:  -- Your Honor?

6          THE COURT:  -- to the order.  Have we settled on

7     that?

8          MR. BROOKS:  Yes, Your Honor, we have.  January 6th

9     at 2 p.m.  And I understand that the revised orders have

10    incorporated that final hearing date, as well as the

11    referenced docket numbers, and those have been uploaded.

12         THE COURT:  Okay.  I see that on the calendar, so

13    Ms. Johnson has you in there.  Okay.

14         MR. BROOKS:  Great.  Thank you, Your Honor.

15         The next item we have, Number 6, the taxes motion.

16         The debtors operate in several jurisdictions and

17    pay sales and excise taxes, in addition to regulatory taxes

18    and fees, as well as foreign taxes and fees.  They typically

19    make these payments monthly or on a quarterly basis in the

20    ordinary course.  And as of the petition date, the debtors

21    estimate that they owe $450,000 in un-remitted taxes and fees

22    that are not catch-up payments.  Therefore, the debtors are

23    seeking authority to pay $350,000 pursuant to the interim

24    order.

25         And we believe that the relief warranted -- I'm

1    sorry -- the relief here is warranted under the doctrine of

2    necessity, so that it may preserve and maximize the estate's

3    value and present -- prevent -- excuse me -- unnecessary

4    exposure to adverse consequences against the debtors or their

5    management.  Therefore, the debtors believe that the

6    immediate and irreparable harm standard has been satisfied

7    and request that the interim order be entered at this time.

8         THE COURT:  Does anyone wish to be heard with

9    respect to the taxes motion?

10        (No verbal response)

11        THE COURT:  I hear no one.

12        The only question I have is whether -- not whether,

13   I guess -- but where the taxes are reflected in the budget,

14   in terms of an ability to pay.  We're starting to get into

15   some big numbers here, and I know liquidity is tight.  I just

16   didn't see it in here.

17        MS. MIELKE:  Good afternoon, Your Honor.

18        THE COURT:  Good afternoon.

19        MS. MIELKE:  Allison Mielke with Young Conaway on

20   behalf of the debtors.

21        As far as I'm aware, these tax payments are in the

22   line item for selling costs.

23        THE COURT:  Okay.

24        MS. MIELKE:  You'll see in the initial 12/9 -- week

25   ending 12/9, there's six hundred and thirty there.

1          THE COURT:  Okay.

2          MS. MIELKE:  Thank you.

3          THE COURT:  Thank you.

4          Okay.  I have reviewed the motion and the form of

5    order (indiscernible) no.  And with respect to the taxes, if

6    my recollection is correct, most of them appear to be sales

7    taxes, which are collected and owed to the respective

8    authorities; and, therefore, I think it is appropriate, to

9    the extent that those taxes are even the debtors' property,

10   for them to flow through to the appropriate authorities and

11   to ensure that there is no personal liability for management

12   for those taxes collected.

13         The remainder of the taxes, for similar reasons, I

14   will approve.

15         So, there being no objection -- again, this is on

16   an interim basis.  And what is being paid should be what

17   comes due, what falls due during this period.  And I will

18   approve it as necessary to avoid immediate and irreparable

19   harm.

20         MR. BROOKS:  Great.  Thank you, Your Honor.

21         The next item we have is Item Number 7 on today's

22   agenda, the debtors' cash management motion.

23         The debtors use a fully integrated cash management

24   system, including the use of a corporate credit card.  The

25   debtors also maintain two bank accounts at Banc of

1    California, which is a party to the Uniform Depository

2    Agreement with the United States Trustee's Office, and it's

3    also FDIC insured.  By this motion, the debtors seek

4    authority to continue use of their cash management system, as

5    well as to continue ordinary course intercompany transactions

6    among the debtor affiliates.

7           The relief here is vital to afford the debtors a

8    seamless transition into these Chapter 11 cases, and it's

9    also necessary to prevent immediate and irreparable harm.

10   Therefore, the debtors request that the Court enter the

11   interim order for a cap of $800,000.

12           Unless Your Honor has any questions ...

13           THE COURT:  The only question I had was the same,

14   with respect to the budget.  I assume it's in here?

15       (Participants confer)

16           MS. MIELKE:  It is, Your Honor.  There's a -- it's

17   kind of broken throughout, so it's part of inventory

18   expenses, it's part of G&A and other.  And there might be a

19   little bit in inventory expense, but it's kind of throughout,

20   sprinkled throughout.  And that 800,000 is coming due in the

21   interim period.

22           THE COURT:  Okay.  Thank you.

23           Does anyone wish to be heard with respect to the

24   debtors' cash management motion?

25       (No verbal response)

1          THE COURT:  I hear no one.

2          I have reviewed it.  As counsel noted, it's not a

3    complicated cash management system.  I thought it might be

4    complicated when we didn't have the bank on board, but the

5    bank appears to be on board, and they aren't objecting, so

6    it's appropriate.  I will grant the motion.

7          And I have no objections from the Office of the

8    United States Trustee, which I know scrutinizes these motions

9    in particular.  So it will be granted.

10         MR. BROOKS:  Great.  Thank you, Your Honor.

11         The last item I'm presenting today is Item Number

12   8, the debtors' vendors motion.

13         The motion sets out the debtors' distribution

14   network, which relies very heavily upon the cooperation and

15   assistance of key contributors to the production, storage,

16   labeling, marketing, and distribution of the debtors' wine

17   products, as well as to the administration of their

18   operations.

19         Essentially, the debtors employ winemakers and

20   vineyards to produce their wine, and then bottlers and

21   laborers -- I'm sorry -- labelers, who package them before

22   they are stored or shipped at their warehouses across the two

23   states you heard earlier, Santa Monica, California and Garnet

24   Valley, Pennsylvania.

25         I assure you that none of the vendors who would be

1    paid pursuant to these orders are -- would otherwise be

2    retained as an ordinary course professional or under 327,

3    Section 327 of the Bankruptcy Code.  And absent the relief,

4    operations of the debtors' businesses would surely halt and

5    render all of these Chapter 11 efforts null; therefore, the

6    debtors submit that the immediate and irreparable harm

7    standard has been satisfied and requests entry of the interim

8    order at this time, unless, of course, Your Honor has

9    questions.

10          THE COURT:  Does anyone wish to be heard with

11   respect to the critical vendor motion?

12       (No verbal response)

13          THE COURT:  I hear no one.

14          This is a large number, a three-million-dollar

15   number, in connection with this case.  As I understand it,

16   the trade is 8 million, so it's not insignificant.  Is all of

17   this coming due during the interim period?

18          MR. BROOKS:  Yes, Your Honor.

19       (Pause in proceedings)

20          MR. BROOKS:  Your Honor, if I may.

21          THE COURT:  Uh-huh.

22          MR. BROOKS:  Most of it is on account of inventory,

23   which is very important to the debtors' success in these

24   Chapter 11 cases.  Obviously, without it, we wouldn't have a

25   product to sell.

1    THE COURT:  Well, is it inventory -- if it's

2    inventory, it's what the debtor already has, right?  Or is in

3    the process or what is it?

4         (Participants confer)

5         MR. BROOKS:  It's a bit of both, as I understand.

6         THE COURT:  And does this (indiscernible) how much

7    of this is sitting in a warehouse that -- where someone has a

8    lien on it?

9         MR. BROOKS:  The debtors estimate that

10   approximately 1.82 million are on account of lien claims,

11   potential lien claims.

12        THE COURT:  Okay.  Well, I'm not hearing any

13   objection.  And while it's a large amount, it is supported by

14   Ms. Brault's declaration.  And I take it that -- again, that

15   somewhere in the budget we have that $3 million.  One nine --

16   one eight or one nine is potential liens (indiscernible) so I

17   will permit it.  I believe the declaration indicates that the

18   debtors scrubbed their books to determine what was necessary

19   to pay, in terms of critical vendor.

20        And I will approve it on an interim basis, subject,

21   of course, to review on a final basis, as necessary to avoid

22   immediate and irreparable harm and to ensure that the debtor

23   continues to have inventory to be able to sell to its

24   customers or to provide to its customers who have already,

25   either purchased it, or are turning in their credits for

1    wine.

2            MR. BROOKS:  Great.  Thank you, Your Honor.

3            Those are all of the motions I'm presenting today.

4    And at this time, I'll cede the podium to Ms. Shella

5    Borovinskaya.

6            THE COURT:  Thank you.

7            MR. BROOKS:  Thank you.

8            MS. BOROVINSKAYA:  Good afternoon, Your Honor.  May

9    it please the Court, Shella Borovinskaya from Young Conaway,

10   proposed counsel to the debtors.

11           Your Honor, it's great to be back in your courtroom

12   today, albeit in a different role this time around.  I will

13   be presenting Items 9 through 11 on the agenda for Your

14   Honor's consideration.

15           Item 9 is the debtors' insurance motion.  Through

16   this motion, we ask for the authority to continue our

17   insurance programs and to pay any premiums on account

18   thereof.

19           Your Honor, in connection with the debtors'

20   business, they maintain a host of insurance policies which

21   you can find attached to our motion at Exhibit C.  Three of

22   these policies are financed with First Insurance Funding, and

23   the PFA is attached to the motion at Exhibit D.

24           As Your Honor is aware, the United States Trustee

25   guidelines for Region 3 require the debtors to maintain

1    insurance, which certain of these policies provide.  In

2    addition, under Section 1102(b)(4)(C), the failure to

3    maintain insurance is cause for conversion to a Chapter 7.

4         Your Honor, at this time, the debtors believe that

5    insurance coverage is essential for preserving the value of

6    their assets, and we believe that the inability to continue

7    our insurance program and to pay amounts on account thereof

8    would provide the debtors with immediate and irreparable

9    harm.

10        Unless Your Honor has any questions about the

11   debtors' insurance policies and their program in general, we

12   ask that the Court enter the order approving the motion.

13        THE COURT:  Thank you.  I don't have any questions.

14        Does anyone wish to be heard with respect to the

15   insurance motion?

16        (No verbal response)

17        THE COURT:  I hear no one.

18        I have reviewed it.  I note the amount that the

19   debtors are seeking authority for on an interim basis is

20   $65,000.  Counsel is correct that the debtors need to remain

21   insured in order to, not only protect their assets, but to

22   comply with the Code and the requisite rules.  And I will

23   approve this as necessary to avoid immediate and irreparable

24   harm.

25        MS. BOROVINSKAYA:  Thank you, Your Honor.

1          The next item on today's agenda is the debtors'

2    customer programs motion.

3          Your Honor, the debtors' customer programs are

4    intended to enhance customer loyalty, drive sales, and

5    improve customer relations.  Your Honor can view the debtors'

6    customer programs as two fold:

7          On one side, the DTC side, the debtors, as you've

8    heard before, have their membership subscription programs.

9    Their insider membership works where their customers pay a

10   fee, approximately $60, and they -- the debtors receive in

11   cash, and the customers receive a dollar-for-dollar credit in

12   their account that they can then later redeem for the

13   debtors' wine.  There is also a legacy membership, where

14   customers pay a monthly fee and are shipped wine on an

15   automatic monthly basis.

16         On the other side, we have our wholesaler

17   distributor incentives.  The debtors provide their

18   distributors with samples of wine that those distributors

19   then use to sell the debtors' products.  In addition, the

20   debtors honor their distributors' profit margins when selling

21   to national accounts, such as Targets or Walmarts.

22         In addition to these core customer programs, the

23   debtors also offer their customers and non-customers the

24   ability to purchase gift cards, which they can then redeem

25   for the debtors' products at their websites.

1          And in addition, the debtors also provide routine

2     customer programs, such as refunds and exchanges for their

3     DTC customers.  Wholesalers are not able to return or

4     exchange the products.

5          Your Honor, by this motion, we also seek to serve

6     the DTC customers electronically via email.  When these

7     customers sign up for the debtors' membership programs, they

8     provide the debtors with their email, which the debtors then

9     keep on record and use as their exclusive method of

10     communication with these customers.  We believe that their

11     customers expect to receive notice via email and we believe

12     that the relief is warranted at this time.

13          We believe that Section 105(a) and Rule 2002(m)

14     authorize Your Honor to grant the relief requested, given the

15     large customer base, coupled with the fact that the debtors

16     are facing a severe liquidity crisis and also have accurate

17     and reliable emails on record for all of their customers.

18          Your Honor, at this time, we are seeking to pay

19     $191,000 on account of customer programs, and this is on

20     account of returns and chargebacks.

21          At this time, we respectfully request the Court to

22     enter the order approving the motion, unless Your Honor has

23     any questions.

24          THE COURT:  Okay.  Well, one of my questions was

25     what you anticipate during the interim period, which I do see

1   in the form of order.  And maybe that's all I need to know

2   right now.  We'll deal with the rest of it at the -- at

3   final.

4           Does anyone wish to be heard with respect to the

5   customer program motion or the request for notice, in

6   particular?

7       (No verbal response)

8           THE COURT:  Okay.  I hear no one.

9           It's apparent that the debtors need to ensure that

10  their customer base remains intact, and to do that, it needs

11  to provide -- continue to provide the benefit it provides to

12  its customers through the various programs.

13          And during -- it's not an insignificant sum overall

14  on these -- on the programs overall, but in the interim, it's

15  $191,000.  It's certainly necessary to keep the customers in

16  place.

17          As far as the electronic notice, I'm going to

18  permit it.  I've only permitted it on occasion.  But given

19  the nature of the relationship, as explained by the debtors,

20  that that's the way that there's normal communication with

21  these particular customers, I'm going to permit it.  If there

22  is a customer who would prefer regular mail or other type of

23  notice, then they can contact the debtors, and I assume that

24  notice will be changed to the way that the customers prefer

25  it.

1          But I do think -- I'm going to look at the rules.

2     But even with that, I do think I have the ability, where this

3     is the primary method of communication and the expected

4     method, to approve that notice, and I will certainly do it on

5     this interim basis.  And if anybody has a problem with it,

6     I'll revisit it, but I think it's appropriate.

7          MS. BOROVINSKAYA:  Thank you, Your Honor.

8          The last item that I'll be presenting for Your

9     Honor's consideration is the debtors' employee and wages

10    motion.

11         Your Honor, the debtors' employees are critical to

12    the success of the debtors' business.  Currently, the debtors

13    employ approximately 77 individuals, 53 of whom are salaried,

14    full-time employees, and 22 of which are hourly full-time

15    employees.  The debtors made payroll on November 28th and

16    November 25th, and their next payroll for their biweekly

17    hourly employees is due this Friday

18         Your Honor, in addition to our 77 employees, we

19    also have 89 supplemental workers that provide services to

20    the debtors.  Some of the services that they provide are

21    supplemental work in their warehouses, as well as finance and

22    customer service.

23         Your Honor, in connection with the debtors' role as

24    an employer, the debtors provide their eligible employees a

25    host of employee benefits that are described in detail in our

1    motion.  Some of these benefits include health benefits,

2    reimbursable employee expenses, flexible spending accounts,

3    and the like.  Through this motion, we are seeking the

4    authority to continue to administer those benefit programs

5    and to pay amounts on account thereof, such as wage

6    deductions, payroll taxes, and other taxes that are due to

7    governmental entities.

8           Unless Your Honor has any questions about the

9    debtors' employees and their wages, we respectfully request

10   that the Court enter the order approving the motion.

11          THE COURT:  The motion mentions staffing agencies,

12   so I take it that's where the 89 supplemental workers come

13   from.

14          MS. BOROVINSKAYA:  Correct, Your Honor.

15          THE COURT:  Okay.  And it is not clear to me

16   whether any amount in this on an interim basis is for

17   staffing companies.

18          MS. BOROVINSKAYA:  Your Honor, $40,000 of the

19   465,000 that we're seeking is on account of the payroll

20   that's due this Friday and 425,000 is on account of the

21   staffing agencies.

22          THE COURT:  Does anyone wish to be heard with

23   respect to the employee wages motion?

24       (No verbal response)

25          THE COURT:  I take it the debtors are going to

1    continue to need the 89 employees that are provided by the

2    staffing agency?

3            MS. BOROVINSKAYA:  Yes, Your Honor.

4            THE COURT:  Okay.  I will -- those are the

5    questions that I had.  As you can see, I reviewed the motion

6    and, clearly, it's necessary for the debtors to retain their

7    employee base, and that employee base is -- includes more

8    than half is staffing -- is provided by staffing agencies.

9    So, under those circumstances, even though I think that's a

10   significant number going to the staffing agency, which has a

11   different relationship with a debtor than employees do,

12   direct employees do, I will approve on an interim basis the -

13   - as requested and with the cap set forth in the order, the

14   amounts requested to avoid immediate and irreparable harm.

15           MS. BOROVINSKAYA:  Thank you, Your Honor.

16           And with that, I will cede the podium to my

17   colleague Ms. Mielke.

18           MS. MIELKE:  Good afternoon again, Your Honor.

19   Allison Mielke with Young Conaway on behalf of the debtors.

20           We'll turn now to the last item on the agenda,

21   Number 12, the hearing to consider approval of the debtors'

22   motion for use of cash collateral and granting adequate

23   protection to the pre-petition secured lender and interim

24   approval of debtor-in-possession financing.

25           As we've mentioned before, this motion is supported

1   by the declaration of Carol Brault, who is present in the

2   courtroom today.

3            I think, at the outset, we're all very pleased to

4   announce that we do have an agreement on the consensual use

5   of cash collateral, so that should make today's hearing much

6   easier.  As a result of that, there were substantial changes

7   to the order that we filed.  And in addition, we did have an

8   informal comment this morning from a vendor.

9            The motion -- or excuse me.  The blackline that we

10  filed this morning did incorporate all of the comments until

11  about eleven o'clock --

12            THE COURT:  Okay.

13            MS. MIELKE:  -- and then we did make one additional

14  comment.  So, if I may approach, we do have an updated

15  cumulative blackline.

16            THE COURT:  You may.  Thank you.

17            MS. MIELKE:  May I proceed?

18            THE COURT:  You may.

19            MS. MIELKE:  Thank you.

20            The headline, Your Honor, is that the DIP lender

21  will be providing financing *pari passu* to the pre-petition

22  lender.  The debtors will provide both of these parties with

23  certain liens, claims, and expense reimbursements.  Those

24  expense reimbursements are primarily for professional fees,

25  and there is a provision in the order that provides for

1    notice of those fees.

2            Additionally, both of those lender parties will

3    consent -- or will have certain consent rights.

4            If it pleases the Court, I'd like to briefly set

5    the table and just provide a little bit of background,

6    hopefully that's not duplicative of what Mr. Lunn has already

7    said, to explain the debtors' need for financing and how the

8    stalking horse bidder came to be.

9            As stated in Ms. Brault's declaration in

10   conjunction with the DIP budget, the DIP budget and the

11   declaration itself establishes unequivocally the need for

12   financing here.  And as Your Honor has already indicated,

13   there are substantial payments that are coming due on an

14   interim basis.  I'll just run through, quickly, a couple of

15   those:

16            As you mentioned, $445,000 in wages and benefits;

17            Tax payments, several hundred thousand dollars;

18            Significant obligations on account of inventory;

19            Rent, which actually came down -- due on the 1st;

20            And substantial shipping costs.

21            So a lot of the critical vendor relief is a mix of

22   three things, but it's inventory, it's shipping costs to

23   actually ship goods to customers, and also that's sort of

24   tied up with lienholder claims, as well.

25            As Mr. Lunn mentioned, the debtors have been

1  seeking a third-party source of financing since March.  Ms.

2  Brault has led the charge on behalf of the debtors to see a

3  third-party source after they approached Banc of California

4  and were denied additional funding.

5      The debtors were turned down on several occasions.

6  They entered into two termsheets, one in July, I think,

7  somewhere in the middle of the summer, and then most recently

8  in the fall.  And both of those termsheets fell through,

9  ultimately, the second as a result of just really predatory

10  type terms, and the first just as a result of the lack of

11  interest for the lender.

12      The pre-petition lender in these cases worked with

13  the debtors over the last approximately ten months to

14  gradually step down the repayment -- to step repayment over

15  the course of ten months.  The debtors have faithfully been

16  making those payments, but as we all know, ran out of cash

17  and were unable to make the payment that was due on December

18  1st.

19      The debtors also require financing to support a

20  sale process in these cases.  As Mr. Lunn indicated in his

21  presentation, the debtors are -- have determined that the

22  best way to proceed and to maximize value of these assets is

23  to engage with the stalking horse bidder to have the

24  financing to support the sale process and run a public

25  auction process, so that we can engage additional interested

1    parties in a distressed situation.

2         While these assets have been on the market for now

3    for about nine months, we are hopeful that there will be

4    additional interest going forward.  And that has borne

5    already.  Our -- we are told from Canaccord, the debtors'

6    investment banker, that there has been substantial interest

7    and we, as well have been getting significant inbounds.

8         That said, as you'll note and have noted already,

9    there are substantial costs in these cases.  There's not a

10   lot of runway here.  And we believe that the time line, which

11   I will get into shortly, is appropriate for a couple of

12   reasons:

13        The first is to allow these assets to be marketed

14   in a sort of post-petition, free, you know, auction type of

15   scenario.

16        But that said, given the amount of time that these

17   mark -- these assets have been marketed, it really should be

18   a short period of time because there isn't a lot of time to

19   waste and there's no money to waste.

20        The debtors' investment banker -- and I'll just

21   turn back.  At the time of the petition date, kind of leading

22   up to the petition date, Mr. Lunn noted that we were working

23   with the stalking horse bidder on an out-of-court merger

24   agreement.

25        THE COURT:  Uh-huh.

1          MS. MIELKE:  That ultimately pivoted to an in-court

2     transaction.  But even at that time, the stalking horse

3     bidder was the only horse around to -- or any game in town,

4     really, to provide financing and bridge financing.  So they

5     really -- the debtors really were kind of out of options at

6     that point.

7          Your Honor, I'll turn to the terms of the facility.

8     I'll just provide a brief overview because I know how

9     carefully you look at these, and I'm sure you understand all

10    of the terms --

11         THE COURT:  Uh-huh.

12         MS. MIELKE:  -- at this point.  But I'll go over it

13    a little bit.  And then, if Your Honor -- we can go through

14    the blackline, if that makes sense.

15         THE COURT:  Uh-huh.

16         MS. MIELKE:  The debtors are proposing to enter

17    into a superpriority senior secured multi-draw term loan.

18    The full amount of the loan is $5 million with a 2 million

19    draw on an interim basis.

20         THE COURT:  Hasn't --

21         MS. MIELKE:  It's con --

22         THE COURT:  Hasn't that changed to a *pari passu*

23    loan?

24         MS. MIELKE:  Did I -- yes, Your Honor --

25         THE COURT:  Okay.

1          MS. MIELKE:  -- it has.  Apologies.

2          The DIP facility is contemplated to terminate on

3     January 20th.  It could, obviously, terminate earlier for a

4     handful of reasons, including events of default and failure

5     to meet milestones, but that is the date that everybody has

6     circled for a closing.

7          The milestones include entry of -- a deadline of

8     tomorrow for entry of an interim order for the DIP financing,

9     and then also to file a bid procedures motion.

10         There is a deadline on Wednesday to file an

11    executed asset purchase agreement, which we believe we are

12    capable of meeting.

13         There is customary milestones for entry of a final

14    order, that's on 28 days; and then the sale order, which is

15    45 days, which is quick.  But as we have noted, we think

16    there are exigent circumstances here that necessitate that

17    time line.

18         Note there's also a deadline, which we have already

19    discussed, about entry of the bid procedures order, and

20    that's 22 days from the petition date.  While that is on

21    shortened notice -- and certainly, Your Honor, we will be

22    filing a motion to shorten and can raise this issue, if and

23    when needed, we believe that filing the LOI with the first-

24    day dec. on the first day really put it out in the market.

25    And certainly, the information that we've put in the first-

1    day dec. about where this is going, in terms of the sale

2    process and the shortened sale process, that parties are on

3    notice of that this is going to be a sale and that we want to

4    do it quickly.

5         In these -- in this instance in particular, the

6    parties that are interested in this asset, this sort of wine

7    program, it's a small community.  And we think that the

8    people have been sort of circling these assets for the last

9    few months are likely to be the parties that will be

10   interested in an asset sale -- or excuse me -- in a going

11   concern sale.  So we think it's contemplated and reasonable

12   that these parties could get bids in by -- excuse me -- that

13   the bid procedures could be approved at that time, and that

14   is an appropriate time line for those people.

15        I think what isn't apparent in the pleadings, we

16   actually anticipated that that time line would be shortened,

17   but we did speak with the United States Trustee in advance of

18   this hearing for some concerns about when a committee might

19   be appointed.

20             THE COURT:  Uh-huh.

21             MS. MIELKE:  And so we pushed that a week later.

22   So we think that we've attempted to address that concern.

23   Obviously, we can address other concerns if they arise.

24             THE COURT:  Let me ask, since you talked about a

25   committee.  What kind of notice is being given to the

1    shareholders here?  How are they being advised of what's

2    going on?

3         MS. MIELKE:  Well, there has been press releases.

4    We have put together a communications package to, you know,

5    inform people that are asking.  There will be a notice of

6    commencement that goes out to every committee -- or excuse me

7    -- every equity holders, so they have notice of the cases.

8         (Participants confer)

9         MS. MIELKE:  Oh, yeah.  Excuse me.  Mr. Lunn is

10   indicating that there's been some SEC filings done as a

11   result of the Chapter 11 cases, so -- and consistent with

12   those reporting obligations, given that this is a public

13   company, there will be periodic reports that are filed with

14   any material updates in the case.

15        And I would say that's topically how the equity

16   holders, given that this is such a widely held company,

17   typically communicates and learns of updates about the

18   company.  There's been a lot of inbound traffic from equity

19   holders at this point.  So, you know, I don't -- I can't say

20   that my opinion matters for anything, but I will tell you I

21   can confirm that there's been a lot of traffic and interest

22   about it.  And it seems pretty clear to me, anyway, that that

23   communication is -- has been successful.

24        THE COURT:  I ask because of the short time line

25   that the debtor is requesting here.

1          MS. MIELKE:  Yeah.

2          THE COURT:  I don't know when the notice of

3    commencement of case goes out normally, but it's not like

4    today, so that's why I ask.  And it's something for the

5    debtors to think about, in terms of ensuring that there is

6    some method by which the shareholders know what's going on.

7          MS. MIELKE:  Yeah, understood.  I think there's

8    nothing else really to say there, Your Honor.  But we will --

9    we understand the concern and we'll address it.

10          Your Honor, there's -- just turning back to the

11    highlight of some of the terms.  There's fees and expenses

12    included and contemplated.  The DIP lender is charging

13    customary fees of about two percent, and there's expense

14    reimbursements, as I've mentioned before.  Those are all

15    going to be PIK'ed and paid from the sale proceeds.

16          The DIP loan accrues interest at 14 percent.

17          Of course, there's also customary  liens and claims

18    that are being granted to the DIP parties -- or to the DIP

19    lender and the pre-petition lender.

20          There is a carveout for professional fees and

21    disbursements, as is customary, and the U.S. Trustee fees are

22    included in that.

23          And then both lenders are reserving their right to

24    credit bid.

25          Your Honor, I'm happy to answer any questions you

1   have.  I'm happy to go through the blackline from top to

2   bottom, if that's helpful; or, if you have direct questions

3   that you'd rather us just answer, we can do that, as well.

4           THE COURT:  I have questions.  We can take a turn

5   through the revised order.  But can you tell me -- and the

6   one I've looked at is what Ms. Johnson gave me after my

7   morning hearing.

8           So can you tell me what's new in what you just

9   handed up?

10          MS. MIELKE:  I can.  I, of course, will not be able

11  to find that easily.  Here we go.  Page -- I think it's Page

12  20 and 21.

13      (Participants confer)

14          MS. MIELKE:  As far as I'm aware, the change was to

15  paragraph -- on the top of 21.  Are you at 21?  And then I'll

16  describe further.  So, at the end of DIP liens, there was a

17  proviso there that addressed PACA claims.  And the party that

18  was it was actually included for didn't particularly care for

19  that language, and so we took it out.

20          THE COURT:  That was one of my questions, actually,

21  is whether there are any PACA/PASA claims.  I don't know

22  anything about wine, the wine industry and PACA claims, so

23  ...

24      (Participants confer)

25          MR. MILLER:  Good afternoon, Your Honor.  For the

1    record, Curtis Miller of Morris Nichols.

2          So the language, what's intended there, is we don't

3    know.  But we did get an inbound that said there are these

4    PACA claims, PACA trust claims that may exist.

5          THE COURT:  Uh-huh.

6          MR. MILLER:  We don't know anything about them.

7    But the idea here was just to not prime them today, have

8    language that says we're reserving your right to make the

9    argument, if you're valid, you have a trust claim, then we'll

10    deal with it at that point in time, but we're not seeking to

11    do anything to you on an interim basis.

12          THE COURT:  Okay.  And is there language that says

13    that, or is that -- because that seems like the appropriate

14    way to handle this today, that we're not priming it.

15       (Participants confer)

16          THE COURT:  In fact, I think, among the --

17          MR. MILLER:  There is, Your Honor.  It's in the --

18    it's in the order.

19       (Participants confer)

20          MR. MILLER:  Paragraph 8 is the DIP liens and

21    priority.

22       (Participants confer)

23          MR. MILLER:  And they are -- they're effectively a

24    permitted lien.  And this was the language that was signed

25    off on by their counsel.

1          MS. MIELKE:  Subsection 8.2, Your Honor, talks

2    about junior liens.  And then the Subsection 3 talks about

3    first priority liens on DIP collateral, and it only extends

4    to the loans held by the pre-petition secured party, so that

5    the DIP liens aren't priming any valid lien or any valid lien

6    existing as of the petition date.

7          THE COURT:  Okay.  So it's implicit.

8          MS. MIELKE:  It doesn't have to spell out PACA, no.

9          THE COURT:  Okay.

10         MS. MIELKE:  But it does talk about those types of

11   liens explicitly in that paragraph.

12         THE COURT:  Okay.  That's fine.

13         I do think that somewhere else -- and I hopefully

14   marked it -- well, I guess not PACA claims, maybe reclamation

15   claims were not excluded from priming, so we'll get to that.

16         Let me ask.  Does -- before we start going through

17   the order, does anyone wish to be heard?  Ms. Leamy.

18         MS. LEAMY:  Good afternoon, Your Honor.  Jane Leamy

19   for the U.S. Trustee.

20         There's a couple open points we think, and I think

21   -- so Paragraph 14, the challenge period, has been reduced to

22   40 days from the customary 75 following the date of interim

23   order, so we have a concern with that.

24         THE COURT:  Uh-huh.

25         MS. LEAMY:  And then Subparagraph (c) states that a

1    "challenge" means with respect to any party that has obtained

2    standing to commence.  And I think before it had said "filed

3    a notice seeking standing."  So we'd prefer the original

4    language.

5           And then the -- just overall, Your Honor, I do

6    appreciate the parties making an adjustment to the date that

7    the bidding procedure be entered.  Hopefully -- you know,

8    we've had some responses to the committee solicitation so

9    far, so I'm hopeful we'll be able to form a committee.  And

10   hopefully, that will be by early next week.

11          But -- so they moved the bidding procedures out,

12   but not the sale order deadline, which is 45 days after the

13   petition date, which I think brings us to around the end of

14   the second week of January.  And I -- you know, I'm sure

15   that's not the shortest the Court has ever seen, but given

16   that it's over a holiday period -- I do recognize that

17   there's been a long marketing here, but it's -- it just seems

18   really short, so ...

19          THE COURT:  Okay.

20          MS. LEAMY:  Thank you.

21          THE COURT:  Thank you.

22          MR. MILLER:  Good afternoon again, Your Honor.

23   Curtis Miller for the record.

24          I just wanted to point out a couple of things, so

25   that you had the full sort of view of how we got here, where

1    we are at currently, and where we're trying to go.

2           So, first, our DIP is an all new money DIP.  We

3    were not a pre-petition lender.

4           THE COURT:  Right.

5           MR. MILLER:  We're not seeking to roll anything up,

6    we're not trying to cross-collateralize anything.  And when

7    we bid at the auction, it's going to be new money and a

8    credit bid of our DIP, which was also new money.  So, when we

9    talk about the sale happening on January -- and we'll get to

10   this in connection with the bid procedures hearing -- we are

11   talking about a new money purchase of the assets, so we have

12   that in place.

13          Obviously, we're very happy to have gotten here

14   with Banc of California, you know, filed on the first day as

15   a priming DIP.  No one really wants to have a priming fight

16   on day one.  We didn't want to have one, although we thought

17   we had some good arguments.  They would have some arguments,

18   as well.  And we worked really hard over the weekend and we

19   appreciate their assistance in getting to where we're at

20   today, and also with Ms. Leamy.

21          In the order I hope that you saw, it actually came

22   in clean, we tried to take your various comments over the

23   years and bake those into the order.  I'm sure you still have

24   some questions, but we did try to address the points that you

25   have had over the years and put those in the order, so that

1    they weren't concerns of yours.

2           I think that's really the comments I wanted to

3    make.  And we're happy to, you know, answer some of the

4    questions that you have, if you have some.  But also,

5    obviously, some of the questions, particularly the ones that

6    Ms. Leamy had, are not with respect to us because we were not

7    a pre-petition lender --

8           THE COURT:  Right.

9           MR. MILLER:  -- in this case.

10          THE COURT:  Right.

11          I will hear from anybody who wants to justify the

12   shortened challenge period, in terms of -- and the issue of

13   standing.

14          In terms of the sale date itself, I'm going to

15   wait.  We'll address that at the bid procedures, when,

16   hopefully, we will have a committee in place.  I'm pleased to

17   hear that the solicitation has already occurred, and

18   hopefully, we'll have them on board soon.

19          Mr. O'Neill.

20          MR. O'NEILL:  Yes, Your Honor.  Good afternoon.

21   James O'Neill, Pachulski, Stang, Ziehl & Jones on behalf of

22   Banc of California, appearing today, the pre-petition secured

23   lender.

24          THE COURT:  Yes.

25          MR. O'NEILL:  And also with me, by Zoom, are my

1  partners Max Litvak and Richard Pachulski.

2          Mr. Litvak is going to address the Court with

3  respect to the challenge period and related issues.

4          THE COURT:  Okay.  Thank you.

5          MR. LITVAK:  Good afternoon, Your Honor.  Max

6  Litvak, Pachulski, Stang, Ziehl & Jones, on behalf of the

7  bank, Banc of California.  Good to see you again, Your Honor.

8          I just wanted to set the stage briefly.  And just

9  to clarify, our -- my client, our client is not a bidder

10  here.  We actually didn't reserve rights to credit bid.

11  That's not something that we're interested in.

12          The only thing we were interested in is we added a

13  proviso that, if the DIP lender credit bids, which is fine,

14  and they put in their $5 million of new money and they credit

15  bid, that they also put in enough cash to pay us off.  That's

16  really, at the end of the day, the only thing that the bank

17  is looking for is full and final payment.

18          And it's not a huge amount of money, relatively

19  speaking, three and a half million dollars or so of

20  principal, plus the various fees and costs and so forth that

21  will be added on to that.

22          But it's a pretty think case when you think about

23  it, Your Honor.  The five-million-dollar DIP, three and a

24  half million dollars, roughly, of Banc of California pre-

25  petition debt, you're at eight and a half million.  And you -

1    - if you layer on the various fees, the closing fee under the

2    DIP facility, the interest at fourteen percent, the legal

3    fees on both sides, you know, call it another million

4    dollars, you're at nine and a half out of the ten, so it's a

5    -- so it's a very thin case.

6              THE COURT:  Uh-huh.

7              MR. LITVAK:  So, from our perspective -- you know,

8    and when we first saw this and we saw that the DIP lender was

9    coming in and attempting to prime us, you know, we could have

10   been more adversarial about it.  Actually, my partner Mr.

11   Pachulski, who's also on the line, came up with the idea of,

12   hey, let's let -- let's not just fight this and get in the

13   way and potentially cause a Chapter 7 filing or something bad

14   to happen here, let's see if we can do a Chapter 11 sale,

15   let's see if we can preserve the business, maximize the value

16   of the assets for the benefit of all the parties, including

17   Banc of California.  And thankfully, the DIP lender was

18   agreeable to that, to do it on a *pari passu* basis, and we

19   came up with that and they agreed, and that's what's

20   incorporated here, which we think is fair under the

21   circumstances.

22             And like I said, it's not without risk on all sides

23   because it is kind of a close call.  And hopefully, it will

24   be a successful bidding process and there is overbidding and

25   we don't have worry any -- about any of it.  But that's where

1   we were, that's where we're coming from, Your Honor, is we

2   just want to get paid off as soon as possible on the full

3   amount of our debt.

4          But pending that, we've agreed on a set of adequate

5   protection, which includes the *pari passu* liens that were

6   mentioned.  And in addition to that, we're going to get our

7   fees and we're going to accrue default rate interest.  So

8   long as we're over-secured, we're going to be entitled to the

9   default rate interest.  And so I think it behooves everyone

10   and it's in the interest of the estate to pay us off as

11   quickly as possible.

12          So, with respect to the challenge period -- and we

13   heard just before the hearing that the U.S. Trustee has an

14   issue with that, not entirely surprising.  Yes, we shortened

15   it up.  I know it's different from what's contemplated under

16   the local rules.  But Your Honor, we only did it because we

17   want to know, when this sale closes, that we get paid off.

18          The DIP lender is going to credit bid, they're

19   going to put in their cash.  So the cash is going to be

20   there, it's going to be in the estate.  And we'd like it

21   distributed, to the extent of our claims, to pay us off.  We

22   don't want to have to wait until the sixty-fifth or seventy-

23   fifth day after the petition date if the outside closing date

24   is going to be January 20th.  The sale closes, we want to be

25   paid off, and we just want to be out of it.

1          And by the way, Your Honor, we're just a commercial

2    bank here.  Frankly, our client is a successor-by-merger to

3    the original bank that entered into the transaction.  But

4    this is not a super complicated loan transaction.  It's a

5    standard loan agreement, security agreement, trademark

6    security agreement.  The UCCs are on file, everything is

7    valid.  We don't see that there is any basis to challenge.

8          Obviously, a committee will be appointed, they will

9    have a chance to take a look at it.  If they want to come to

10   talk -- come and talk to us prior to the final hearing and

11   explain to us why they need more time, we're willing to

12   listen.

13         But in the meantime, I think, under the

14   circumstances, if Your Honor does agree to a sale hearing

15   towards the end -- or middle or towards the end of January,

16   we'd just like to tie the challenge period for purposes of

17   this interim order so that it's a few days prior, so that we

18   know if there is a problem.  If there is some issue, someone

19   raises an issue, we want to know going into the sale hearing

20   that there is -- that there is the issue.

21         And the issue on standing, I mean, I think it's

22   very standard.  Actually, I do a lot of DIP financings in

23   Delaware.  It's very standard at the interim order to simply

24   say that no one has standing and you have to get standing in

25   order to assert a claim that you otherwise don't have

1    standing for.  So now the committee may come back and say,

2    well, you know, we want to be able to simply file a motion

3    for standing by the challenge deadline, and that will be good

4    enough for some period of time until the Court resolves that

5    motion.

6            And we might agree to that, Your Honor; we might

7    now.  It depends on where we are in the sale process and

8    whether or not the committee actually raises something that's

9    challengeable, that has any merit whatsoever.  We don't

10   really see it right now because it's simply a commercial

11   banking transaction, not a lot of money, three and a half

12   million dollars and that's it.

13           So that's our perspective, is we would like Your

14   Honor to tie in the challenge period to the sale, whatever

15   you ultimately set, and people have to have standing by then

16   in order to assert a proper challenge, or we can address it

17   at the final hearing.  But for purposes of the interim order,

18   we'd just like to enter it like it's usually entered,

19   frankly, an interim DIP order.

20           So that's our perspective, Your Honor.  I just

21   wanted to throw that out there.  If you have any questions

22   about any of the specific provisions in the order, I'm here

23   to answer them as best I can.

24           THE COURT:  Thank you.

25           Well, on that particular issue, I am going to enter

1  the interim order the way I usually enter it, which is in

2  accordance with the rules, and I'm not going to shorten the

3  period.  I don't think I've done that yet.  If I have, it's

4  been a one-off.

5       But I actually don't see the need to do it here at

6  all because I recognized and actually somewhat assessed the

7  situation the same way you did, Mr. Litvak.  And the bank had

8  its alternatives, and this is the best alternatives it's

9  decided for itself, in terms of the use of cash collateral

10  and the *pari passu* liens.

11       But in terms of shortening the period, I don't see

12  the need to.  If this -- even if this sale is only on the,

13  I'll say expedited schedule that's being requested, those

14  funds, when they come into this estate, they will be held.

15  The bank will have its lien on it and they will be held and

16  not disbursed until the lien issue is resolved.

17       And from what you're saying, it's not surprising.

18  You're saying this is a commercial loan that was in place

19  several years before the petition date, it's been fully

20  documented.  I think the committee can assess it.  And if

21  what you're saying is true, it -- then it behooves the

22  committee, in fact, to move quickly and to look at the loan,

23  so that interest can stop accruing and it can be paid and

24  there is more left over for whomever it's going to be in this

25  very case so far who's going to be entitled to funding.

1          So I don't see a reason here.  The bank is not

2    credit bidding; again, not surprising, given that it's a

3    commercial bank and it's a commercial loan.  And those funds

4    will be held, they will not be disbursed until it's

5    determined who is owed the funds.

6          And so I'm going to keep the period at this time at

7    the -- as it's set out in the rules.  And I would encourage

8    you to speak with committee counsel, if we have a committee,

9    to explain to them exactly why it is that they should take a

10   look at this and get the matter behind them, so that interest

11   and fees stop accruing.  So that's how I'm going to handle

12   that issue.

13         As far as the "obtain standing" language, it's --

14   you know, we see different versions of this.  And it can stay

15   in there.  I will say that it can tend to slow things down

16   because, if the committee has filed a motion for standing and

17   I haven't decided it, I'm going to extend the time period

18   until I have time to decide it.  So it sometimes slows things

19   down, but I will also say that these things usually get

20   resoled.  So I'll let that play out however that's going to

21   play out, but I don't have a particular concern about the

22   "obtain" language, so that can stay.

23         Let me see where I do have questions then.

24         MR. MILLER:  Your Honor?

25         THE COURT:  Yes.

1          MR. MILLER:  I have to admit there is an error that

2     you picked up on before in the order.  Paragraph 8(a) should

3     have specific language with respect to PACA.  We can add that

4     back in, in an interim -- I mean in an amended form of this

5     order --

6          THE COURT:  Okay.

7          MR. MILLER:  -- if Your Honor is willing to approve

8     it at some point.

9          THE COURT:  Okay.

10          MR. MILLER:  There was also like some minor edits,

11     but they are all fairly minor.

12          THE COURT:  Okay.

13          MR. MILLER:  They're sort of scriveners errors.

14          MR. LITVAK:  Yeah, on that one -- on that issue,

15     Your Honor -- and I don't have the latest redline that was

16     presented to you, but I have the language that was supposed

17     to go in there because I was the one that actually proposed

18     it to the attorney for the vendor that was asserting a PACA

19     claim.

20          And basically, what we did there is, in 8(a)(ii),

21     where it refers to "junior liens," and it basically says that

22     the DIP liens are not priming -- they're coming in junior,

23     that the DIP liens are going to be junior liens *pari passu*

24     with the Banc of California, we're both going to be junior as

25     to all property of the debtors' estates that's subject to

1    valid, perfected, and non-avoidable liens in existence as of

2    the petition date, other than the Banc of California liens.

3              And then where we -- we were going to add there:

4              "-- including, without limitation, any valid,

5              perfected, and enforceable statutory liens or

6              related claims under the Perishable Agricultural

7              Commodities Act or applicable state law."

8              To make it clear that the DIP liens and the

9    adequate protection is going to be junior to any of those

10   preexisting liens, to the extent that they're valid.

11             And I see Mr. Schultz, who's the other attorney who

12   we negotiated this, has just put his camera on.

13             THE COURT:  Mr. Schultz.

14             MR. SCHULTZ:  Good afternoon, Your Honor.  Nathan

15   Schultz on behalf of -- I'll find the name of the creditor in

16   just a second -- I filed a notice of appearance

17   (indiscernible) but I did fully negotiate this language with

18   counsel (indiscernible) was what we landed here

19   (indiscernible) what Your Honor heard before.  So just to say

20   that, yes (indiscernible)

21             THE COURT:  Okay.  So I take it we have agreement,

22   it's just a matter of getting the language into the order,

23   and then those claims will be sorted out if they need to be

24   at the appropriate time.  Okay.  Thank you.  Okay.

25             MS. MIELKE:  What is helpful, Your Honor?  Do you

1   want to ask specific questions or should we go through?

2           THE COURT:  I'm going to ask specific questions.

3   I'm going -- I'm looking at what was I guess sent over this

4   morning.  It looks like it's Version 3.  I don't know what

5   version you all are on.  But I want many changes made to

6   this, and that's where I have my -- well, I'm looking at two

7   versions, actually, of comments.

8           Well, let me ask to confirm.  The pre-petition

9   loan, Winc, Inc. is one of the borrowers, right?

10          MS. MIELKE:  Yes.

11          THE COURT:  Okay.

12          MR. LITVAK:  My understanding, Your Honor, just to

13  clarify, that two out of the three debtors are borrowers on

14  that pre-petition loan:  Winc, Inc. and BWSC, LLC.

15          THE COURT:  Okay.  I ask because I want to make

16  sure we don't have an LLC issue with respect to DIP financing

17  and the ability to challenge.  And as long as I've got one

18  incorporated entity, then I'm comfortable that I don't have

19  an LLC issue.

20          MR. LITVAK:  Okay.  Thank you, Your Honor.

21          THE COURT:  Okay.  The idea, obviously, is that the

22  challenge period is not illusory.

23          General question.  Does the DIP collateral include

24  anything that the pre-petition lender did not have a lien on

25  pre-petition, other than, obviously, avoidance actions, which

1    are being requested?

2              UNIDENTIFIED:  I'm sorry.  Can you ask that

3    question again, Your Honor?

4              THE COURT:  Yeah.  Is there anything -- and it

5    maybe actually goes more to the pre-petition adequate

6    protection.  But is there anything that is part of the DIP

7    collateral that was not liened up pre-bankruptcy?  A better

8    way to put it.

9         (Participants confer)

10             MR. LITVAK:  Your Honor, maybe I should address

11   this on behalf of the pre-petition lender.

12             THE COURT:  Uh-huh.

13             MR. LITVAK:  Your Honor, we have a blanket lien.

14   Could the committee -- because you know, we're on the

15   committee's side a lot -- come up with something like

16   commercial tort claims, for instance?  Yes.  And would those

17   be picked up now?  Yes.  In the DIP collateral, we're picking

18   up everything in the DIP collateral.  The only thing that's

19   carved out is stuff that's already subject to senior -- or

20   valid liens, which we talked about, like the PACA liens, we

21   come in junior to those, and then proceeds of avoidance

22   actions, which are subject to entry of final order.

23             THE COURT:  Okay.

24             MS. MIELKE:  The only reason I pause, Your Honor,

25   is there is some IP in -- up in one of the Lost Poet

1    entities, but it is under the original credit agreement, it

2    is collateral -- or it is an asset of Lost Poet.  But I don't

3    think there was ever an agreement filed to make that

4    particular subsidiary a guarantor under the agreement.  But

5    the agreement does require that and there are all sorts of

6    obligations, so I think it probably is included.

7              MR. LITVAK:  Well, we have a lien, in any case,

8    Your Honor, on the equity in that entity.

9              MS. MIELKE:  That's right.

10             MR. LITVAK:  I don't know if there are any claims

11   there.  But if there's IP there, it would flow up.  I'm not

12   aware of any significant creditor claims there, but debtors'

13   counsel can correct me.

14             MS. MIELKE:  That's correct.  There are no -- I'm

15   not aware of any claims at that entity.

16             THE COURT:  Okay.

17       (Pause in proceedings)

18             THE COURT:  Okay.  The first comment that I have

19   that wasn't addressed is Paragraph 3 on Page 15, "Authority

20   to Execute and Deliver Necessary Documents."  And I guess

21   this may be the first time this appears, it's the first time

22   I marked it.  It talks about the DIP loan documents.

23             The only thing I have is a termsheet and that's the

24   only thing that anybody has.  I don't know at this point if

25   you're contemplating still an agreement, but I'm not going to

1    bless some agreement that I haven't seen and that, actually,

2    more importantly, hasn't been filed so others can see it.

3          MS. MIELKE:  We were -- I -- we tried to be very

4    careful with this language, Your Honor.  I believe that there

5    is some language in the beginning that references the DIP

6    loan documents.  I think we've asked for authority to enter

7    into the DIP loan documents.  But I don't think that you are

8    blessing a credit agreement that hasn't -- that does not

9    exist.

10          And those documents, it's Page 2, in Paragraph (b):

11          "-- authorizing the debtors to execute any other

12          documents, agreements, and instruments delivered

13          pursuant thereto or executed or filed in connection

14          therewith, all as may be reasonably requested" --

15          Blah, blah, blah, "DIP loan documents."

16          So, as far as I'm aware, that is what we have asked

17    for.  I don't think we've -- I don't think there's a

18    paragraph, unless someone else would like to correct me, that

19    expressly approves a credit agreement.

20      (Participants confer)

21          THE COURT:  No.  But it does use that -- it does

22    then use that term consistently throughout the next -- this

23    Paragraph 3 and then in Paragraph 4, about being, you know,

24    binding obligations under DIP loan documents.

25          MR. MILLER:  Your Honor, Curtis Miller for the

1    record.

2                I think it must have come out inadvertently in some

3    of the versions that went past.  But there was intended to be

4    -- no one is seeking to have you pre-approve DIP -- full DIP

5    credit agreements today.  We're lending on a termsheet;

6    you're approving a termsheet.

7                THE COURT:  Uh-huh.

8                MR. MILLER:  We'll put in some language at the end

9    of Paragraph 3 which makes clear that you are not approving a

10   credit agreement that is not before you.

11               THE COURT:  Okay.

12               MS. MIELKE:  I do --

13               THE COURT:  And as long as everyone has that

14   understanding here --

15               MS. MIELKE:  I do think --

16               THE COURT:  -- and I --

17               MS. MIELKE:  -- we were asking for authority to

18   enter into that agreement, Your Honor, to the extent it's

19   consistent.  But we, I think, can work on the language there.

20               THE COURT:  Okay.

21         (Pause in proceedings)

22               THE COURT:  Okay.  Paragraph 6, which deals with

23   the fees of the DIP lender and pre-petition.  This has me

24   approving fees, both those that were paid pre-petition and

25   those that are yet to be paid.  Why should I be approving

1    what was done pre-bankruptcy.

2            MR. MILLER:  Your Honor, so this is split -- there

3    -- we do have the fee procedures, obviously; I believe it's

4    Paragraph 9.

5            THE COURT:  Uh-huh.

6            MR. MILLER:  So, obviously, there are fees that are

7    incurred in connection with getting to this point on behalf

8    of the DIP letter, putting it in the termsheet, putting it

9    into the DIP order.

10           This is fairly customary in my experience, where we

11   have, as of today, you are approving the fees that we have

12   accrued up to this date.  As part of the interim DIP closing,

13   we will get paid those fees and expenses.  And then, from

14   here on out, from the interim order forward, we will be

15   sending out the notices, as you typically see -- you know, I

16   believe it's a ten-day notice period where we send it to Ms.

17   Leamy and to the other notice parties.  And then, if no one

18   objections, those get paid; and, if there is an objection, we

19   come back before you, Your Honor.

20           THE COURT:  I don't know that I've actually

21   approved them.  But it actually -- the question may also go

22   more to the pre-petition secured lender than the DIP lender

23   on this.  Again, I guess how are these getting paid.  I don't

24   know what that amount is.  But are they in the budget?

25           MR. MILLER:  Well, the pre-petition lender's non-

1    professional fees, those are -- they're not getting paid out

2    during the case, so they are accruing, but they're not being

3    paid.  And then Mr. Litvak's fees will get paid pursuant to

4    the notice procedures in the case.

5              MS. MIELKE:  And in terms of -- to answer your

6    question, Your Honor, on the budget, we are actually in the

7    process of working through a revised budget, we just couldn't

8    get to it today in time.  So we anticipate working through

9    some of those issues and filing a revised budget probably

10   later this week.

11             MR. LITVAK:  Your Honor, if I may.  With respect to

12   the pre-petition secured lender, our client actually prepared

13   an accounting of their claim as of the petition date, which

14   included the fees.  We were not involved pre-petition; they

15   just brought us in after the bankruptcy.  And it was a very

16   small number, as I recall, in the accounting with respect to

17   pre-petition legal fees.  So that was -- it was not a huge

18   number, Your Honor.

19             THE COURT:  Well --

20             MR. LITVAK:  We just didn't -- we didn't want to go

21   through the reporting procedures with respect to those pre-

22   petition fees, whoever that was, some prior firm, probably

23   not a bankruptcy firm, to get all that together.  So we just

24   wanted those -- you know, in my experience, it's not unusual

25   to have the pre-petition fees of the lenders simply paid out

1    because that's what's accrued, that's what -- as of the

2    petition date, as part of our claim.

3            THE COURT:  Okay.  Well, this provision says that

4    they're authorized and directed to be paid in accordance with

5    the documents, which I suspect doesn't wait until the end of

6    the case and doesn't wait until your claim is resolved and

7    makes them fully earned and non-refundable as of the date of

8    this order, prior to a challenge period.

9            So I don't have a problem with the concept that the

10   fees that are owed under the pre-petition credit agreement, I

11   think as you said earlier, to the extent you're over-secured,

12   are paid.  They may be part of the claim.  Interest is

13   entitled to be paid.  But we're in the middle of a challenge

14   period, and I'm not going to enter an order that approves

15   them and makes them payable and non-refundable.  But they can

16   be part of the claim and I have no problem with that.

17           I don't know that I have to approve them today,

18   either.  I don't see a basis or a reason to really do that.

19   And I wouldn't do it, I don't think I've done it for pre-

20   petition fees when we're in the middle of a challenge period.

21   It's certainly not something --

22           MR. LITVAK:  I think that's fine.  That's fine,

23   Your Honor.  I'm sorry to -- if I interrupted.

24           THE COURT:  That's okay.

25           MR. LITVAK:  That's fine.  I think you'll see as

1    you get to the adequate protection provisions, that there are

2    provisions in there for our post-petition fees to be paid on

3    a monthly basis as we go forward, subject to a notice period.

4    I would like to keep that provision in there if acceptable to

5    Your Honor, but I think everyone understands we don't -- we

6    can take out the final and indefeasible part about that, you

7    know, it's subject to challenge.  That's fine.

8                THE COURT:  Okay.

9                MR. MILLER:  Your Honor, on that same provision,

10   speaking with my co-counsel, we can also just accrue our pre-

11   petition fees and expenses because we're really just paying

12   ourselves.  You know, my firm will always want me to get paid

13   before the end of the year, but we can wait on that minimal

14   period.

15               THE COURT:  There's some partners who are going to

16   be disappointed, yeah.

17               MR. MILLER:  That's right.

18               THE COURT:  Okay.  Thank you.

19         (Pause in proceedings)

20               THE COURT:  Quick question.  In Paragraph 8(c),

21   it's on Page 21 of the blackline that I'm looking at.  And

22   it's the second -- yeah, second sentence:

23               "Any provision of any lease, loan document,

24               easement, use agreement, et cetera, that requires

25               the consent or approval of a landlord or a payment

1          of fees to a governmental entity or a non-

2          governmental entity or any other purpose" --

3          People want me to find that that has no force and

4     effect.  And how can I do that and how can I do that on an

5     interim basis?

6          (Pause in proceedings)

7          MS. MIELKE:  Certainly, Your Honor, we could make

8     it subject to final ...

9          (Pause in proceedings)

10         MS. MIELKE:  I -- go ahead.

11         MR. MILLER:  Your Honor, on that one, with respect

12    to leases and, you know, contracts and things like that, the

13    way we've dealt with it before is change it to the proceeds

14    of them, rather than putting it on the actual agreement

15    themselves.

16         THE COURT:  Uh-huh.

17         MR. MILLER:  So we'd suggest changing it to that.

18         THE COURT:  Okay.

19         MR. MILLER:  And then, with respect to the others,

20    we could make it subject to the final.

21         THE COURT:  I think it needs to be.  I'm not sure

22    if I have authority to do some of what's in here or not, but

23    I certainly don't think I can do it on an interim basis.  So

24    notice it out and see what we get.

25         MR. MILLER:  So we'll split it up with that --

1           THE COURT:  That's fine.

2           MR. MILLER:  Thank you, Your Honor.

3       (Pause in proceedings)

4           THE COURT:  In Paragraph 9, where we have the list

5   of code sections that are being primed, I see that 506(c) is

6   subject to entry of a final, but maybe five -- consistent

7   with the PACA/PASA thing, what about 546(c) and 546(d) --

8           MS. MIELKE:  Okay.

9           THE COURT:  -- and whether they should be subject -

10  -

11          MS. MIELKE:  I think the --

12          THE COURT:  -- at least to a final order for

13  parties who may have reclamation rights?  Which I don't know,

14  again, this industry and how it works.  And I'm not even sure

15  if 546(d) would even apply to this industry, but you've got

16  it in here, so ...

17          MR. MILLER:  Your Honor, 546(c) and (d) being

18  subject to the final are okay on behalf of the DIP lender.  I

19  think Mr. Litvak has to say if that's okay with him from a

20  pre-petition lender perspective.

21          MR. LITVAK:  That's fine, Your Honor.

22          THE COURT:  Okay.  Thank you.

23      (Pause in proceedings)

24          THE COURT:  I notice that there is a definition of

25  "diminution claim."  I generally don't like that.  It is what

1    it is.  But this didn't seem that it's necessarily going

2    outside the bounds.  I'll deal with it if I ever have to deal

3    with what a diminution claim is, which, in eight years, I

4    haven't yet had to deal with.

5         Okay.  And then on the adequate protection

6    superpriority claim in the new Paragraph, I guess 12(a), for

7    546(c) and (d), then I would like the same qualification

8    there.

9         MS. MIELKE:  Yes, Your Honor.

10        THE COURT:  Okay.  And I see the paragraph, I guess

11    it's 12(c), that Mr. Litvak was referring to, in terms of the

12    professional fees on a go forward basis subject to a process,

13    and I'm okay with that.  And we'll deal with it -- I don't

14    think this says that it's indefeasible.  So, to the extent

15    that there is some successful challenge, we'll deal with it.

16    Okay.

17        (Pause in proceedings)

18        THE COURT:  In terms of the restriction on use of

19    funds in Paragraph 13, I think some of these are broader than

20    they should be.

21        (a) is a request to obtain post-petition loans or

22    other financial accommodations.  I recognize that may be a

23    default under the DIP credit agreement.  But why isn't --

24    just, if it's a default, it's a default, and it can be

25    called.  Why isn't that sufficient?

1          MR. MILLER:  Your Honor, we added in -- because we

2    were aware of this issue with respect to, you know, certain

3    other provisions that, you know, you'd see in other DIP

4    orders that would limit the debtor's ability to take action.

5          THE COURT:  Uh-huh.

6          MR. MILLER:  In this one, however, we're talking

7    about the use of our money, so we don't think we should have

8    to fund or, you know, give our money to allow someone to sue

9    us effectively.

10          THE COURT:  Well, that I agree with.  I agree that

11    you should -- nobody should be able to sue you, except for

12    the limited -- and it probably doesn't even apply to you all

13    necessarily -- investigation period.

14          MR. MILLER:  Right.

15          THE COURT:  And --

16          MR. MILLER:  But if they're seeking to get other

17    loans or financial accommodations that either prime us or are

18    *pari passu* with us, we don't think they should be able to use

19    our funds to do that, either.

20          Now there is a proviso at the end that says, if

21    it's going to pay us off in full, have at it.

22          THE COURT:  Right.

23          MR. MILLER:  And we're here because the debtors had

24    no other option.  So then it's not.  But otherwise, we don't

25    think they should be able to use our funds in that scenario.

1        Like I said, we did -- we're aware of Your Honor's

2   authority on that and precedent on that and we built that

3   into other provisions in the order, but we did not put it

4   here for that reason.

5        THE COURT:  Okay.  I'll leave it in on an interim

6   basis.

7        MR. MILLER:  Thank you, Your Honor.

8        (Pause in proceedings)

9        MR. LITVAK:  Your Honor, I apologize.  If I may

10   interrupt for a moment.

11        THE COURT:  Mr. Litvak.

12        MR. LITVAK:  As we're getting to Paragraph 14,

13   which deals with the challenge period -- and I know -- I

14   understand the Court's ruling with respect to changing that

15   back to 65 days.  I guess it would be 65 days after formation

16   of the committee.  I would just ask that, in case the

17   committee is not formed or if there is any delay in forming

18   the committee, that there is some outside date there, maybe

19   75 days from the petition date is pretty standard, for other

20   parties-in-interest to assert a challenge.

21        THE COURT:  What's the rule?

22        MS. MIELKE:  Seven --

23        THE COURT:  I'm forgetting.

24        MS. MIELKE:  It's --

25        THE COURT:  But it's not --

1          MS. MIELKE:  It's seven --

2          THE COURT:  It's not that sixty-five-day thing.

3          MS. MIELKE:  It's 75 days from entry of the interim

4     order.

5          THE COURT:  Seventy-five days from entry of the

6     interim order for all other parties, other than the

7     committee?

8          MS. MIELKE:  It's for --

9          THE COURT:  And what's --

10         MS. MIELKE:  -- everybody.

11         THE COURT:  Is it for everybody --

12         MS. MIELKE:  It was --

13         THE COURT:  -- now?

14         MS. MIELKE:  Yeah.  The local rule was changed

15    about 2 years ago, Your Honor, to make it just a blanket 75

16    days of the interim order.

17         THE COURT:  Okay.  So that will be put in there,

18    whatever the rule is.

19         MS. MIELKE:  Which is actually how it was, so we'll

20    just revert it back, Your Honor.

21         THE COURT:  Okay.

22         MR. LITVAK:  And the other question that I have,

23    Your Honor  -- and I know you mentioned that you would like,

24    if the closing occurs prior to the running of that challenge

25    deadline, you would like the money to be held in reserve.

1    The question that I have, Your Honor, is:  Could we provide

2    for that money to be distributed to Banc of California,

3    subject to the challenge rights?

4            And I ask that because it is such a small cushion,

5    as I mentioned before.  If it's just a ten-million-dollar

6    bid, we're worried, if the money stays in the debtors'

7    estates, the interest will continue to accrue and our fees

8    will continue to accrue, so we'll be eating into that

9    cushion, and it might be a very small cushion.  I just want

10   to make sure that there is enough money to cover that.

11           And one way to do that would be to distribute the

12   money right away to the client, be subject to disgorgement.

13   We're -- you know, we're a regulated bank, obviously.  So, if

14   there is a successful challenge and we have to give some of

15   that back or all of it back, they could do that.

16           So that's why I ask:  Is there -- or can we reserve

17   on this issue until we get closer to the sale hearing and

18   then deal with it, in terms of disposition of proceeds?

19           THE COURT:  Yes.  And I -- again, I think it's not

20   an unreasonable -- it's not unreasonable to think about these

21   issues and the best way to approach them.  And I would think

22   a committee would be amenable to that discussion.

23           So I don't think it belongs in the interim

24   financing order, but I think it's an appropriate discussion

25   to be had as we get closer to either the sale or to have a

1    discussion with the committee when they have -- when they're

2    formed, if they're formed, but I don't think it belongs here.

3    But I'm not precluding that, I'm not precluding that at all.

4            MR. LITVAK:  Thank you, Your Honor.

5        (Pause in proceedings)

6            THE COURT:  Okay.  I see the release provision in

7    Paragraph 16, and it is subject to the entry of the final

8    order, so I'm fine with that, it being in here and being

9    requested at the final time.

10            One thing I would emphasize here is to make sure

11   that, if there is a release in the final order, it is not

12   prospective, it can only account for what has happened to

13   that date.

14       (Pause in proceedings)

15            THE COURT:  Okay.  I'm sorry for the delay.  Some

16   of my comments that I had written went before there was an

17   agreement, so I'm trying to exclude those.

18       (Pause in proceedings)

19            THE COURT:  Okay.  I think, in the remedies

20   paragraph, 17, little -- 17(ii).

21       (Pause in proceedings)

22            THE COURT:  The second -- it's (2)(c), maybe?  It's

23   got a lot of the same -- (2)(c), which is what can happen --

24   it looks to me, in (2)(c), like there's a setoff prior to the

25   end of the remedies notice period and everything should be

1   held in abeyance pending the remedies notice period and

2   everything should be held in abeyance, pending the remedies

3   notice period.

4           MS. MIELKE:  Your Honor, if --

5           THE COURT:  Except you can stop use of cash

6   collateral, that can happen.  You can terminate use of cash

7   collateral.  You don't have to lend anymore.  But in terms of

8   remedies, that shouldn't happen until the remedies notice

9   period is over.  And I'm not sure it reads that way.  It

10  might, but I'm not sure it does.

11          MS. MIELKE:  I think it says subject to five days

12  prior written notice.  So I would -- the way I read it, Your

13  Honor, but I'm -- there's many opinions here today.  I think

14  that notice would have to expire before the DIP lender could

15  foreclose.

16          THE COURT:  It's really going to be the pre-

17  petition lender at this point who's going to set off, right?

18          MS. MIELKE:  That -- right.

19          MR. MILLER:  It's actually both because we both

20  have rights in that -- those cash collateral accounts, those

21  --

22          THE COURT:  Yeah, but --

23          MR. MILLER:  -- controls accounts.

24          THE COURT:  -- they've got the account in their

25  bank.

1          MR. MILLER:  They actually do have possession of

2     it.

3          THE COURT:  So ...

4          MR. MILLER:  But we have Your Honor's order, so ...

5          (Laughter)

6          (Participants confer)

7          MR. MILLER:  But I believe the way you're --

8          THE COURT:  Is it --

9          MR. MILLER:  I believe the way it was just read to

10    you is correct.  It's subject to that five-day remedies

11    period.

12         THE COURT:  Okay.  As long as we're clear on that.

13    And if you all can take a look at it and make sure it reads

14    that way.  I'm not concerned about it between now and the

15    final, but let's just make sure it reads that way.

16         MR. MILLER:  Mr. Litvak, do you agree with my

17    reading?

18         MR. LITVAK:  I do, yes, Your Honor.  I was going to

19    say that's --

20         THE COURT:  How you read it.

21         MR. LITVAK:  We're not going to be --

22         THE COURT:  Okay.

23         MR. LITVAK:  -- setting off or effectuating any

24    kind of a transfer of any of the money or anything like that,

25    certainly not prior to the expiration of the remedies notice

1    period following an event of default.

2           THE COURT:  Okay.  Now here's an interesting

3    provision that I haven't had before in my orders that -- at

4    least that I've noticed.  On para -- Page 34, it's in (iv)

5    now, same paragraph, last sentence, which talks about the

6    burden of proof at a hearing during the remedies notice

7    period.  And I'll confess, I haven't thought about it before.

8    And again, I don't think it's been in one of my orders

9    before.  And it talks about:

10              "The debtor, the creditors' committee, or the UST

11              has the burden at any hearing on any request by

12              them to reimpose" --

13              It wouldn't be reimpose.

14              "-- or continue the automatic stay" --

15              It might be continue.

16              "-- or to obtain any other injunctive relief."

17          I don't know who ought to have the burden of proof

18    on that hearing and I'll say I haven't had one in eight

19    years, so I've just given no thought to this at all.

20        (Participants confer)

21          MR. MILLER:  I mean, I think Ms. Mielke was just

22    going to say exactly what I was.  The movant, who will have

23    to -- because this order is going to provide there's a

24    termination or a default date, right?  We'll provide the

25    five-day notice.

1              THE COURT:  Uh-huh.

2              MR. MILLER:  If someone -- if that five -- period

3    passes and no one stops it by applying for relief from Your

4    Honor, we'll have stay relief, we'll be able to take

5    remedies.

6              THE COURT:  Correct.

7              MR. MILLER:  So that the movant will have the

8    burden.  What we're just trying to do is avoid a separate

9    sideshow fight on that because we did not put in the language

10   that says you can only raise this specific issue because we

11   know you hate that.

12             THE COURT:  Yes.  Thank you.

13             MR. MILLER:  But what we did leave in was this

14   language to avoid that alternate issue.

15             THE COURT:  Okay.  Well, it's interesting.  I

16   haven't seen it before.  No one is objecting to it here.

17   We'll see if anybody objects to it at final, but I'll keep it

18   in for now.

19             MR. MILLER:  Thank you, Your Honor.

20        (Pause in proceedings)

21             THE COURT:  Okay.  Paragraph 21, application of the

22   collateral proceeds.  How does that paragraph, and in

23   particular the first sentence, how does that mesh with the

24   remedies notice period?

25             MS. MIELKE:  It is ...

1     (Pause in proceedings)

2          MS. MIELKE:  It is -- it does say to the -- it's

3     qualified to the extent required by this interim order and

4     the DIP loan documents, Your Honor.  I mean, I suppose that

5     language could be tweaked a little bit.  But I think, as it

6     is, it doesn't do violence to the remedies period.

7          I guess you could say "to the extent consistent

8     with," instead of "required by," but I defer to the lenders

9     there.

10         MR. MILLER:  Your Honor, I don't think that

11    language changes anything.  And you know, if you want to say

12    "to the extent consistent with this interim order," I think

13    that's fine because I -- at least as I understood, your

14    question was we need to have the five-day remedies period

15    built into here.  And we can -- and we can just make that

16    express, if that's Your Honor's concern, but that doesn't

17    concern me.  I mean, we're not trying to jump the -- that

18    period --

19         THE COURT:  Yeah, I'm --

20         MR. MILLER:  -- through this --

21         THE COURT:  -- just trying --

22         MR. MILLER:  -- language.

23         THE COURT:  -- to figure out how it works.

24         MR. MILLER:  And we can make that, you know, that

25    it is subject to the five-day notice period, remedies period,

1    whatever it is.

2         (Participants confer)

3            THE COURT:  Okay.

4         (Pause in proceedings)

5            THE COURT:  Okay.  Paragraph 22, access to

6    collateral.  I don't know what rights the pre-petition lender

7    currently has under any of the debtors' documents.  I'm not

8    sure what authority I have to let somebody else, for example,

9    use the debtors' license privileges or be on the landlord's

10   premises without permission.  There probably -- there could

11   be some rights, state law rights.  But I don't know what

12   authority I have to vary whatever the contractual and state

13   law rights are with respect to access to collateral.

14           MS. MIELKE:  I believe that there's a proviso that

15   says that, subject to lienholders, landholder -- landlords,

16   or licensors' rights under applicable law.  Does that address

17   your concern, Your Honor?

18           THE COURT:  And where does it say that?

19           MS. MIELKE:  It's the middle of the first paragraph

20   on Page 40?

21        (Pause in proceedings)

22           THE COURT:  Okay.  I think that language is doing a

23   lot of work, but it can stay in and we'll see if there is an

24   issue on final.  Make sure the appropriate people get notice

25   of it, though.

1          MS. MIELKE:  Yes, Your Honor.

2          (Pause in proceedings)

3          THE COURT:  Okay.  Paragraph, I guess it's 27 now,

4    new 27, successors and assigneds.  It has that language in

5    it, "The DIP loan documents shall be binding on the debtors."

6    And there, I think, again, we don't have those documents.

7          MS. MIELKE:  Thank you, Your Honor.  We'll plan to

8    change that with a proviso to the "DIP loan documents"

9    definition.  But if that doesn't work, then we'll make a --

10          THE COURT:  You --

11          MS. MIELKE:  -- revision here, as well.

12          THE COURT:  You can make it work.  And I would just

13    look throughout because I'm sure I missed some.

14          MS. MIELKE:  Yeah.  I think that's why maybe making

15    it in the defined term might be the better way to go.

16          THE COURT:  Okay.

17          (Pause in proceedings)

18          THE COURT:  Okay.  Those were my comments and

19    questions.

20          I do appreciate and I did notice that some of the -

21    - well, first of all, I noticed the relatively short --

22    relatively fewer page numbers, pages.  I appreciate that.

23    And I did notice that some of the things that I do not like

24    to see in interim DIP orders were not in here, so I do

25    appreciate that.

1           MR. LITVAK:  Your Honor, if I may?

2           THE COURT:  Yes.

3           MR. LITVAK:  Will the final hearing on the DIP also

4     be January 6th at 2 p.m. eastern time?

5           MS. MIELKE:  No.

6           THE COURT:  So I don't know.  I think we got

7     requests for -- different requests for different times.

8           MS. MIELKE:  Right.  Your Honor, you beat me to it.

9     So the next thing on the list is scheduling.  Our interim

10    period is slated through the week of the 19th, so I think

11    that is when we need some additional relief.

12          You know, to the extent that are parties later on

13    down the line that take issue with that being final at that

14    time.  I mean, I guess we could address that, but I think we

15    do need to be in front of Your Honor that week for additional

16    relief.

17          We have already indicated that we'll plan to file a

18    bid procedures motion, hopefully tomorrow, and we will try to

19    shorten notice on that.  That is the date that we are -- the

20    22nd is the date that we are hoping to circle for both the

21    final DIP hearing, as well as the bid procedures hearing,

22    understanding we still need to file a motion to shorten, we

23    get it.

24          THE COURT:  Is that the -- is that regular notice

25    on the final DIP?

84

1          MS. MIELKE:  It's --

2          THE COURT:  It is?

3          MS. MIELKE:  -- ten day, I think.

4          UNIDENTIFIED:  Fourteen days.

5          MS. MIELKE:  Is it 14?

6     (Participants confer)

7          MS. MIELKE:  I don't know what today is, but ...

8     (Participants confer)

9          THE COURT:  Okay.  So that would be regular notice

10    on a final DIP, but we would need to shorten the period on

11    the bid procedures?

12         MS. MIELKE:  That's right.

13         THE COURT:  Okay.  Well, I'll give you time on the

14    22nd.  If parties really have an issue, I'll hear about it at

15    -- then.  But let's make it the morning, make it 10 on the

16    22nd, for the final DIP and bid procedures.  And that -- bid

17    procedures really does mean that you get your motion filed.

18         MS. MIELKE:  Yes, Your Honor.

19         THE COURT:  And I know that you'll work with the

20    committee --

21         MS. MIELKE:  We will, of course.

22         THE COURT:  -- if they need additional time to

23    object to anything.

24         MS. MIELKE:  Your Honor, I didn't get a chance to

25    do the usual adulations when I was starting, but I would be

1   remiss if I didn't say that the parties worked very well in

2   the last few days together and have been very commercial to

3   get this over the finish line, so our thanks from the debtors

4   to get it done.

5           THE COURT:  Okay.  Well, I appreciate it, as well,

6   and am pleased that you were able to get Banc of California

7   into the loop, which made this a much easier hearing than it

8   would otherwise have been.  And I do recognize the economics

9   of this case, which is what it is.  And we hope, of course,

10  that any auction will be robust and can bring more money, but

11  we'll see what happens.

12          I will approve the interim DIP financing requested,

13  both the DIP financing and the use of cash collateral on an

14  interim basis on the terms that we have discussed, as revised

15  through the colloquy we've had.  It's clear that the debtor

16  needs money to meet, not only its restructuring expenses, but

17  its operational expenses and the ability to keep its

18  workforce intact and keep its customers in inventory.  And

19  the -- I reviewed the budget coming in and I have the

20  declaration of Ms. Brault in support.  And based on that, I

21  will find that this interim financing is necessary.

22          In terms of adequate protection, the bank has now

23  consented to use of cash collateral and to *pari passu*

24  priority, in terms of financing, so it is consensual and,

25  again, necessary.  So I think I have the record to be able to

1    approve the financing on an interim basis.

2              Is there anything else we need to do today?

3              MS. MIELKE:  Thank you for your time, Your Honor.

4    I don't think so.

5              MR. MILLER:  Thank you, Your Honor.

6              THE COURT:  Thank you.  We'll look forward to --

7              MR. LITVAK:  Thank you, Your Honor.

8              THE COURT:  -- revised orders.  Please let Ms.

9    Johnson know when you have them filed.

10             MS. MIELKE:  Yes, Your Honor, we will.

11             THE COURT:  Okay.  Thank you.

12             UNIDENTIFIED:  Thank you, Your Honor.

13             THE COURT:  We're adjourned.

14          (Proceedings concluded at 5:00 p.m.)

15                              *****

1                              CERTIFICATION

2              I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9

10   _____        December 8, 2022

11   Coleen Rand, AAERT Cert. No. 341

12   Certified Court Transcriptionist

13   For Reliable