## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WINC, INC., *et al.*,[1] | Case No. 22-11238 (LSS) |
| Debtors. | (Jointly Administered) |
| | **L.R. 2016-2(d) Waiver Requested** |
| | **Hearing Date:**<br>**January 6, 2023 at 2:00 p.m. (ET)** |
| | **Objection Deadline:**<br>**December 30, 2022 at 4:00 p.m. (ET)** |

## DEBTORS' APPLICATION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE EMPLOYMENT AND RETENTION OF CANACCORD GENUITY LLC AS INVESTMENT BANKER FOR THE DEBTORS, EFFECTIVE AS OF THE PETITION DATE; AND (II) WAIVING THE INFORMATION REQUIREMENTS OF LOCAL RULE 2016-2(d)

The above-captioned affiliated debtors and debtors in possession (collectively, the "Debtors") in these chapter 11 cases (the "Chapter 11 Cases") respectfully submit this application (the "Application") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), pursuant to sections 327(a) and 328(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2014-1 and 2016-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), authorizing the Debtors to retain and employ Canaccord Genuity LLC ("CG") as their investment banker, effective as of the Petition Date (as defined

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Winc, Inc. (8960); BWSC, LLC (0899); and Winc Lost Poet, LLC (N/A). The Debtors' mailing address for purposes of these chapter 11 cases is 1751 Berkeley Street, Studio 3, Santa Monica, CA 90404.

below) in accordance with the terms and conditions set forth in that certain engagement letter (the "Engagement Letter"), dated as of March 16, 2022 (as amended by written agreement dated November 25, 2022 (the "Amendment", and together with the Engagement Agreement, the "Retention Agreement"),[2] a copy of which is attached hereto as **Exhibit C**.  In support of this Application, the Debtors submit the declaration of Brian Bacal (the "Bacal Declaration"), attached hereto as **Exhibit B**.  In further support of this Application, the Debtors respectfully state as follows:

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the A*mended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Debtors consent, pursuant to Local Rule 9013-1(f), to the entry of a final order by the Court in connection with this Application to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue of these proceedings and the Application in this Court is proper under 28 U.S.C. § 1408 and § 1409.

2.      The statutory and legal predicates for the relief requested herein are sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rules 2014 and 2016, and Local Rules 2014-1 and 2016-2.

---

[2] Capitalized terms used, but not otherwise defined herein, shall have the meaning given to them in the Retention Agreement.

29935340.5

## BACKGROUND

3.      On November 30, 2022 (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On December 12, 2022, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of general unsecured creditors (the "Committee").  *See* Docket No. 54.  No request has been made for the appointment of a trustee or examiner.

4.      Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in the *Declaration of Carol Brault in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 15] (the "First Day Declaration").

5.      Prior to the Petition Date, the Debtors faced a number of issues, including a December 31, 2022 maturity date on its senior secured debt and severe liquidity constraints.  The Debtors began the process of addressing these issues several months ago.  To assist in these efforts, the Debtors hired CG on March 16, 2022 to conduct a comprehensive marketing process for the Debtors' business (the "Assets"), both on an integrated basis as well as on a piecemeal basis.  As part of this effort, CG undertook a lengthy prepetition marketing effort and began soliciting indications of interest for the sale of the Assets, both on an integrated basis as well as on a piecemeal basis.  CG crafted detailed marketing materials and assembled related diligence information for a confidential electronic data room and a confidential information presentation with the assistance of the Debtors and their other professional advisors.  CG developed an initial list of approximately forty (40) strategic and financial prospective purchasers.  CG also circulated

a detailed "teaser" and description of the opportunity to acquire the Debtors' Assets to all of the prospective purchasers. Eventually, nineteen (19) interested parties executed non-disclosure agreements with whom CG then engaged in extensive communications, and assisted the Debtors' management team through numerous good-faith, arm's-length negotiations.

6.      In mid-November 2022, the proposed purchaser's (the "Stalking Horse Bidder") proposal provided for an all-cash purchase price and extension of credit to fund the Debtors' operations until an out-of-court merger transaction could be consummated. After the Stalking Horse Bidder provided an updated proposal, the parties executed an exclusivity agreement to provide a period of exclusive negotiations for eight days and the Stalking Horse Bidder committed to deliver documentation for the merger transaction and bridge financing. However, on the day before Thanksgiving (two days prior to the end of the exclusivity period), the Stalking Horse Bidder revised the structure of the proposed transaction, and instead proposed to consummate the transaction through a sale process under 11 U.S.C. § 363. In addition, the Stalking Horse Bidder submitted an updated letter of intent offering to purchase the Assets for $8 million in cash consideration. Upon receipt of these new proposed terms and process, the Debtors, with the assistance of CG and the Debtors' other professional advisors, reached out to a select number of previously interested parties to solicit better offers (on an in-court and out-of-court basis) in a timely manner. After it was determined that the Stalking Horse Bidder offered the best and most executable offer in the time the Debtors had available to them, the Debtors executed a letter of intent and engaged in extensive arm's-length negotiations, after which the Debtors and the Stalking Horse Bidder agreed on the terms of a stalking horse bid, including an increase in the amount of cash consideration to $10 million. After further negotiations, the Debtors ultimately executed an asset purchase agreement.

7.       Since the Petition Date, CG has contacted over fifty (50) potentially interested parties, including various parties that had been contacted prior to the Petition Date, regarding the Assets and the Sale.  To date, CG continues its efforts to market the Assets and ensure that the Debtors are able to obtain the highest and best value for the Assets.  Thus far, over forty (40) potentially interested parties have received an updated process letter outlining the proposed bidding procedures and the associated timelines, and there are over twenty-five (25) parties who have access to the data room.  Upon the Court's approval of the Bidding Procedures, CG, with the assistance of the Debtors' professionals, will continue to market the Assets and ensure a robust and competitive sale process that maximizes value for the Debtors' stakeholders.

8.       At the same time, CG has continued negotiating with the Stalking Horse Bidder in an effort to increase the proposed stalking horse bid amount.  On the Petition Date, the Stalking Horse Bidder's proposed purchase price was $10.0 million in cash consideration for certain of the Debtors' assets.  CG has already enjoyed success in these endeavors as the proposed stalking horse bidder recently agreed to purchase the equity interests in BWSC, LLC and thereby assume liabilities, therefore materially increasing the value and consideration of their bid.  CG remains hopeful that further increases in value will be attained through the auction process.

**RELIEF REQUESTED**

9.       By this Application, the Debtors request entry of the Proposed Order (i) authorizing them to retain and employ CG as investment banker to the Debtors, effective as of the Petition Date, and (ii) waiving the information requirements of Local Rule 2016-2(d).

29935340.5

## SERVICES TO BE PROVIDED

10.    CG serves as the Debtors' investment banker in connection with the Debtors' chapter 11 sales efforts and, in general, pursuit and review of strategic and financial alternatives, the entry of which constitutes a "Transaction" (as defined in the Retention Agreement).

11.    As outlined in the Retention Agreement, the Debtors propose to continue to retain CG to render, among other things, the following investment banking services:

a.    manage the sale and marketing process in connection with the potential sale of substantially all of the Debtors' Assets;

b.    assist the Debtors in evaluating any proposed Transaction, and alternatives and strategies thereto;

c.    assist the Debtors in identifying and screening potential Strategic Partners, and preparing descriptive materials for distribution and presentation to potential Strategic Partners;

d.    assist the Debtors in coordinating potential Strategic Partners' due diligence investigations;

e.    assist the Debtors in structuring and negotiating the financial aspects of any Transaction;

f.    meet, at the Debtors' reasonable request, with their Board of Directors to discuss any proposed Transaction and its financial implications; and

g.    participate in hearings before the Court and provide relevant testimony with respect to the matters described herein and arising in connection with any Transaction.

## CG'S QUALIFICATIONS

12.    CG is an independent and full-service global investment banking firm offering investment banking, equity research, wealth management, institutional and private brokerage, and private capital solutions to individual and institutional clients.  CG employs over 2,000 individuals and has several locations in 10 countries, including in cities such as New York, Boston, San Francisco, London, Toronto, Vancouver, Paris, Sydney, Hong Kong, and Singapore.  In fiscal year 2022, CG participated in 149 transactions, raising approximately $44.6 billion.  In the first quarter of 2022, CG advised on 80 financing transactions and raised $6.1 billion for global growth

companies.  Globally, CG has a leading M&A advisory practice, with over 1,100 M&A transactions since 2010 and over 130 transactions in the last twelve months representing aggregate disclosed transaction value greater than $28 billion.

13.    The Debtors selected CG because CG's professionals have considerable expertise and experience in providing investment banking services to financially-distressed companies and to creditors, purchasers, bondholders, and other constituencies in chapter 11 as well as in out-of-court proceedings.  Representative engagements that investment bankers at CG have led in prior chapter 11 cases and restructurings include AbitibiBowater; American Eagle Energy Corporation; American IronHorse Motorcycles, Inc.; BI-LO, LLC; Buccaneer Energy; Calpine Energy; Catalyst Paper;  Compton Petroleum Corporation;  Dakota Plains Holdings, Inc.;  Diamond Glass Companies, Inc.; Gateway Ethanol, LLC; Giordano's Enterprises, Inc.; Gulf Fleet Holdings, Inc.; Hipcricket, Inc.; HMX Acquisition Corp.; International Garden Products, Inc.; Jaguar Mining; KeyLime Cove Waterpark, Inc.; Loehmann's, Inc.; Max & Erma's, Inc.; National Envelope Corporation; OptiCanada, Inc.; Renew Energy, Inc.; Response Genetics, Inc.; Robbins Bros. Corporation; Santa Fe Gold Corporation; SynCardia Systems, Inc.; TimberWest; Waterworks, Inc.; and Yellow Media, Inc.

14.    CG was engaged prior to the Petition Date to provide the above-mentioned investment banking services to the Debtors, initially pursuant to the Engagement Letter.  Once it became apparent that it may be necessary for the Debtors to commence the Chapter 11 Cases, the Debtors executed the Amendment to govern CG's provision of services in connection with the Chapter 11 Cases.  As a result of rendering prepetition services to the Debtors, CG is intimately familiar with the Debtors' corporate and capital structure, management, operations, and various other aspects of their business.  CG has a well-developed knowledge of the Debtors' financial

history and business operations and is well-suited to provide the Debtors with the investment banking services contemplated by the Retention Agreement.

## NO DUPLICATION OF SERVICES

15.     The Debtors believe that the services provided by CG will not be duplicative of the services rendered by other professionals to the Debtors during the pendency of the Chapter 11 Cases.  Specifically, CG will carry out unique functions directly related to a potential Transaction and will use reasonable efforts to coordinate with the Debtors and their professionals retained in the Chapter 11 Cases to avoid the unnecessary duplication of services.

## PROFESSIONAL COMPENSATION

16.     CG will seek the Court's approval of its compensation for professional services rendered and reimbursement of expenses incurred in connection with the Chapter 11 Cases in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the guidelines established by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee Guidelines"), and any other applicable procedures and orders of the Court, and consistent with the proposed compensation set forth in the Retention Agreement.

17.     Investment bankers such as CG do not charge for their services on an hourly basis. Instead, they customarily charge fees that are contingent upon the occurrence of a specified type of transaction.  The Retention Agreement sets forth the transaction-based fees that are to be payable to CG.

18.     As set forth more fully in the Retention Agreement,[3] and subject thereto, CG will be compensated as follows (the "Fee Structure"):

---

[3] The Engagement Letter provides for the Debtors to pay CG other prepetition fees for CG's provision of investment banking services prior to and in connection with the Debtors' determination to initiate the Chapter 11 Cases, namely (i) a Signing Fee of $50,000, which was payable upon the signing of the Engagement Letter (and creditable against the Transaction Fee) and (ii) two quarterly Work Fees of $25,000, which was payable on each of June 1, 2022 and

29935340.5

a.  Monthly Fees.  The Debtors shall pay a monthly cash fee in the amount of $100,000 in advance of each month (the "Monthly Fee").  After three full Monthly Fees have been paid, 100% of any subsequent Monthly Fees actually paid and retained shall be credited once (without duplication) against any payable Transaction Fee.

b.  Retainer.  Upon execution of the Amendment, the Debtors provided CG with a $75,000 advance retainer to cover CG's out of pocket expenses.  CG agrees to provide the Debtors with reasonable support for its expenses at the Debtors' request or at the Court's direction.

c.  Transaction Fee.  Upon the closing of a Transaction, a fee equal to the greater of (i) 2.0% of the Aggregate Consideration or (ii) $2,000,000.

19.  Further, subject to the Retention Agreement, the Debtors shall reimburse CG, upon its request from time to time, for all reasonable and documented expenses arising out of the Retention Agreement, including travel and related expenses, the costs of document preparation, production and distribution (such as printing and binding, and photocopies), and third party research and database services, and the reasonable fees and disbursements of independent counsel retained by CG); provided such expenses shall not exceed $75,000 without the Debtors' prior written consent (not to be unreasonably withheld).

20.  CG's industry and restructuring experience, its capital markets knowledge, financing skills, and mergers and acquisitions capabilities, some or all of which may be required by the Debtors during the term of CG's engagement, were important factors in determining the Fee Structure.  The ultimate benefit to the Debtors of CG's services could not be measured merely by reference to the number of hours to be expended by CG's professionals in the performance of such services.  Moreover, the Fee Structure takes into consideration CG's anticipation that it will need to provide a substantial commitment of professional time and effort in order to perform its duties under the Engagement Letter and in light of the fact that such commitment may foreclose

---

August 30, 2022.  As reflected in the table of payments to CG attached to the Bacal Declaration as **Exhibit 1**, the Debtors compensated CG prior to the execution of the Amendment and CG's provision of services in connection with the Chapter 11 Cases.

29935340.5

other opportunities for CG.  Further, the actual time and commitment required of CG and its professionals to render services to the Debtors may vary substantially from week to week or month to month, creating "peak load" issues for the firm.

21.    Thus, because of CG's expertise, commitment of resources to this engagement to the exclusion of other possible employment, and the time that CG has devoted and will continue to devote to this engagement, the Debtors request that the Court approve the Fee Structure pursuant to section 328(a) of the Bankruptcy Code and that the Court evaluate CG's final compensation and reimbursement of expenses in the Chapter 11 Cases under the standards of section 328(a) of the Bankruptcy Code rather than under those of section 330 of the Bankruptcy Code, subject to CG filing a final fee application seeking approval of the payment of its fees and expenses.

## CG'S DISINTERESTEDNESS

22.    To the best of the Debtors' knowledge, information, and belief, and except to the extent disclosed herein and in the Bacal Declaration, CG:  (a) is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code; (b) does not hold or represent an interest materially adverse to the Debtors, their creditors, and shareholders for the matters for which CG is to be employed; and (c) has no connection to the Debtors, their creditors, shareholders, or related parties herein except as disclosed in the Bacal Declaration.

23.    As of the Petition Date, CG does not hold a prepetition claim against the Debtors for services rendered.

24.    To the extent that any new relevant facts or relationships bearing on the matters described herein during the period of CG's retention are discovered or arise, CG will use

reasonable efforts to promptly file a supplemental declaration, as required by Bankruptcy Rule 2014(a).

## RECORDKEEPING

25.     It is not the general practice of investment banking firms, including CG, to keep detailed time records similar to those customarily kept by attorneys.  Because CG does not maintain contemporaneous time records in one-tenth hour increments or provide or conform to a schedule of hourly rates for its professionals, CG respectfully requests, pursuant to Local Rule 2016-2(h), that it be excused from compliance with such requirements.  Instead, CG requests that it be required only to maintain time records in one hour (1.0) increments setting forth, in a summary format, a description of the services rendered by each professional and the amount of time spent on each date by each such individual in rendering services on behalf of the Debtors.

26.     CG will also maintain detailed records of any actual and necessary costs and expenses incurred in connection with the aforementioned services.  CG's application for compensation and expenses will be paid by the Debtors pursuant to the terms of the Engagement Letter, in accordance with Local Rule 2016-2(e) and any procedures established by the Court.

## INDEMNIFICATION AND CONTRIBUTION PROVISIONS

27.     The Debtors have agreed, among other things, to indemnify, and provide contribution and reimbursement to, CG and certain related parties in accordance with the indemnification provisions attached as **Annex A** to the Engagement Letter (the "Indemnification Provisions").

28.     The Debtors believe such provisions are customary and reasonable for CG's engagement.  Unlike the market for other professionals that the Debtors may retain, such provisions are standard terms of the market for investment bankers.  CG and the Debtors believe

that such provisions are comparable to those generally obtained by investment banking and financial advisory firms of similar stature to CG and for comparable engagements, both in and out of court.

29.    Accordingly, as part of this Application, the Debtors request that the Court approve the Indemnification Provisions subject to the modifications set forth in the Proposed Order.

## **BASIS FOR RELIEF**

30.    Section 327(a) of the Bankruptcy Code provides that a debtor is authorized to employ professional persons "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtors] in carrying out their duties under this title." 11 U.S.C. § 327(a).  Additionally, section 328(a) of the Bankruptcy Code provides, in relevant part, that the Debtors "with the court's approval, may employ or authorize the employment of a professional person under section 327 . . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis . . . ." 11 U.S.C. § 328(a).  Accordingly, section 328(a) of the Bankruptcy Code permits the compensation of investment bankers on more flexible terms that reflect the nature of their services and market conditions.

31.    The Debtors submit that approval of the Debtors' retention of CG in accordance with the terms and conditions of the Retention Agreement is warranted.  First, the requirements of section 327 of the Bankruptcy Code are satisfied.  CG is needed post-petition to assist with negotiations, as necessary, to provide expert advice and testimony regarding the Debtors' chapter 11 sale process and related to transactions to enable the Debtors to discharge their duties as debtors and debtors in possession.  CG has extensive experience and an excellent reputation in providing

high-quality investment banking and financial advisory services.  The Debtors submit that CG is well qualified to provide its services to the Debtors in an efficient and timely manner.

32.    Second, the Debtors believe that, based on the extensive work performed by CG over the course of the engagement, the Fee Structure is market-based, fair, and reasonable under the standards set forth in section 328(a) of the Bankruptcy Code.  The Fee Structure reflects CG's commitment to the variable level of time and effort necessary to perform the services to be provided, its particular expertise, and the market prices for its services for engagements of this nature both out of court and in the chapter 11 context.

33.    Courts in this and other jurisdictions have approved similar arrangements to the Fee Structure under section 328 of the Bankruptcy Code.  *See, e.g., In re Hipcricket, Inc.*, Case No. 15-10104 (LSS) (Bankr. D. Del. Feb. 11, 2015) (approving a flexible fee structure and engagement letter under section 328 on the grounds that both were reasonable); *In re Vertis Holdings, Inc.,* Case No. 12-12821 (CSS) (Bankr. D. Del. Nov. 20, 2012) (same); *In re Neb. Book Co.*, Case No. 11-12005 (PJW); (Bankr. D. Del. Aug. 10, 2011) (same).

34.    Third, the Indemnification Provisions are reasonable under the circumstances and reflect market conditions, and accordingly should be approved under section 328 of the Bankruptcy Code.  *See, e.g., In re United Artists Theatre Co. v. Walton*, No. 01-1351, 315 F.3d 217 (3rd Cir. 2003) (approving indemnification for investment banker and financial advisor where the indemnity clause, including a carve out for gross negligence, was "reasonable" and therefore, permissible under the Bankruptcy Code).  Courts in this jurisdiction have approved similar provisions to the Indemnification Provisions in other chapter 11 cases.  *See, e.g., In re Hipcricket, Inc.*, Case No. 15-10104 (LSS) (Bankr. D. Del. Feb. 11, 2015) (approving an indemnification provision the court deemed reasonable and reflective of market conditions); *In re Vertis Holdings,*

*Inc.*, No. 12-12821 (CSS) (Bankr. D. Del. Nov. 20, 2012) (same); *In re Neb. Book Co.*, No. 11-12005 (PJW); (Bankr. D. Del. Aug. 10, 2011) (same).

## NOTICE

35.     Notice of this Application has been provided to:  (i) the U.S. Trustee; (ii) proposed counsel for the Committee; (iii) counsel to the Debtors' prepetition secured lender; (iv) counsel to the DIP Lender; and (v) all parties who, as of the filing of this Application, have requested notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors request entry of the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other relief as is just and proper.


Dated: December 16, 2022

By: */s/ Brian Smith*
         Name: Brian Smith
         Title: Interim Chief Executive Officer