## EXHIBIT B

## Bacal Declaration

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WINC, INC., *et al.*,[1] | Case No. 22-11238 (LSS) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF BRIAN BACAL IN SUPPORT OF THE DEBTORS' APPLICATION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE EMPLOYMENT AND RETENTION OF CANACCORD GENUITY LLC AS INVESTMENT BANKER FOR THE DEBTORS, EFFECTIVE AS OF THE PETITION DATE; AND (II) WAIVING THE INFORMATION REQUIREMENTS OF LOCAL RULE 2016-2(d)**

I, Brian Bacal being duly sworn, state the following under penalty of perjury.

1.  I am a Managing Director at Canaccord Genuity Corp. an affiliate of Canaccord Genuity LLC ("CG") and am duly authorized to make this declaration (the "Declaration") on behalf of CG. I submit this declaration in support of the *Debtors' Application for Entry an Order (I) Authorizing the Employment and Retention of Canaccord Genuity LLC as Investment Banker for the Debtors, Effective as of the Petition Date; and (II) Waiving the Information Requirements of Local Rule 2016-2(d)* (the "Application").[2]

2.  I submit this Declaration in accordance with sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014, and Local Rule 2014-1 in connection with the Application. Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein and, if called as a witness, I would testify thereto. To the extent that any information disclosed herein requires subsequent amendment or modification upon CG's

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Winc, Inc. (8960); BWSC, LLC (0899); and Winc Lost Poet, LLC (N/A). The Debtors' mailing address for purposes of these chapter 11 cases is 1751 Berkeley Street, Studio 3, Santa Monica, CA 90404.

[2] Capitalized terms used, but not otherwise defined, herein have the meanings given to them in the Application.

29935340.5

completion of further analysis or as additional creditor information becomes available to it, one or more supplemental declarations will be submitted to the court reflecting the same.

## SERVICES TO BE PROVIDED

3. CG serves as the Debtors' investment banker in connection with the Debtors' chapter 11 sales efforts and, in general, pursuit and review of strategic and financial alternatives, the entry of which constitutes a "Transaction" (as defined in the Retention Agreement).

4. As outlined in the Retention Agreement, the Debtors propose to continue to retain CG to render, among other things, the following investment banking services:

   a. manage the sale and marketing process in connection with the potential sale of substantially all of the Debtors' Assets;

   b. assist the Debtors in evaluating any proposed Transaction, and alternatives and strategies thereto;

   c. assist the Debtors in identifying and screening potential Strategic Partners, and preparing descriptive materials for distribution and presentation to potential Strategic Partners;

   d. assist the Debtors in coordinating potential Strategic Partners' due diligence investigations;

   e. assist the Debtors in structuring and negotiating the financial aspects of any Transaction;

   f. meet, at the Debtors' reasonable request, with its Board of Directors to discuss any proposed Transaction and its financial implications; and

   g. participate in hearings before the Court and provide relevant testimony with respect to the matters described herein and arising in connection with any Transaction.

## CG'S QUALIFICATIONS

5. CG is an independent and full-service global investment banking firm offering investment banking, equity research, wealth management, institutional and private brokerage, and private capital solutions to individual and institutional clients. CG employs over 2,000 individuals and has several locations in 10 countries, including in cities such as New York, Boston, San Francisco, London, Toronto, Vancouver, Paris, Sydney, Hong Kong, and Singapore. In fiscal year

29935340.5

2022, CG participated in 149 transactions, raising approximately $44.6 billion. In the first quarter of 2022, CG advised on 80 financing transactions and raised $6.1 billion for global growth companies. Globally, CG has a leading M&A advisory practice, with over 1,100 M&A transactions since 2010 and over 130 transactions in the last twelve months representing aggregate disclosed transaction value greater than $28 billion.

6. The Debtors selected CG because CG's professionals have considerable expertise and experience in providing investment banking services to financially-distressed companies and to creditors, purchasers, bondholders, and other constituencies in chapter 11 as well as in out-of-court proceedings. Representative engagements that investment bankers at CG have led in prior chapter 11 cases and restructurings include AbitibiBowater; American Eagle Energy Corporation; American IronHorse Motorcycles, Inc.; BI-LO, LLC; Buccaneer Energy; Calpine Energy; Catalyst Paper; Compton Petroleum Corporation; Dakota Plains Holdings, Inc.; Diamond Glass Companies, Inc.; Gateway Ethanol, LLC; Giordano's Enterprises, Inc.; Gulf Fleet Holdings, Inc.; Hipcricket, Inc.; HMX Acquisition Corp.; International Garden Products, Inc.; Jaguar Mining; KeyLime Cove Waterpark, Inc.; Loehmann's, Inc.; Max & Erma's, Inc.; National Envelope Corporation; OptiCanada, Inc.; Renew Energy, Inc.; Response Genetics, Inc.; Robbins Bros. Corporation; Santa Fe Gold Corporation; SynCardia Systems, Inc.; TimberWest; Waterworks, Inc.; and Yellow Media, Inc.

7. CG was engaged prior to the Petition Date to provide the above-mentioned investment banking services to the Debtors, initially pursuant to the Engagement Letter. Once it became apparent that it may be necessary for the Debtors to commence the Chapter 11 Cases, the Debtors executed the Amendment to govern CG's provision of services in connection with the Chapter 11 Cases. As a result of rendering prepetition services to the Debtors, CG is intimately

29935340.5

3

familiar with the Debtors' corporate and capital structure, management, operations, and various other aspects of their business. CG has a well-developed knowledge of the Debtors' financial history and business operations and is well-suited to provide the Debtors with the investment banking services contemplated by the Retention Agreement.

**NO DUPLICATION OF SERVICES**

8. CG will carry out unique functions directly related to a potential Transaction and will use reasonable efforts to coordinate with the Debtors and their professionals retained in the Chapter 11 Cases to avoid the unnecessary duplication of services.

**PROFESSIONAL COMPENSATION**

9. CG will seek the Court's approval of its compensation for professional services rendered and reimbursement of expenses incurred in connection with the Chapter 11 Cases in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the U.S. Trustee Guidelines, and any other applicable procedures and orders of the Court, and consistent with the proposed compensation set forth in the Retention Agreement.

10. Investment bankers such as CG do not charge for their services on an hourly basis. Instead, they customarily charge fees that are contingent upon the occurrence of a specified type of transaction. The Engagement Letter sets forth the transaction-based fees that are to be payable to CG.

11. As set forth more fully in the Retention Agreement,[3] and subject thereto, CG will be compensated pursuant to the following Fee Structure:

---

[3] The Engagement Letter provides for the Debtors to pay CG other prepetition fees for CG's provision of investment banking services prior to and in connection with the Debtors' determination to initiate the Chapter 11 Cases, namely (i) a Signing Fee of $50,000, which was payable upon the signing of the Engagement Letter and (ii) two quarterly Work Fees of $25,000, which was payable on each of June 1, 2022 and August 30, 2022. As reflected in the table of payments to CG attached hereto as Exhibit 1, the Debtors compensated CG prior to the execution of the Amendment

29935340.5

4

    a.    <u>Monthly Retainer Fees</u>.  The Debtors shall pay a monthly cash fee in the amount of $100,000 in advance of each month (the "Monthly Fee").  After three full Monthly Fees have been paid, 100% of any subsequent Monthly Fees actually paid and retained shall be credited once (without duplication) against any payable Transaction Fee.

    b.    <u>Retainer</u>.  Upon execution of the Amendment, the Debtors provided CG with a $75,000 advance retainer to cover CG's out of pocket expenses.  CG agrees to provide the Debtors with reasonable support for its expenses at the Debtors' request or at the Court's direction.

    c.    <u>Transaction Fee</u>.  Upon the closing of a Transaction, a fee equal to the greater of (i) 2.0% of the Aggregate Consideration or (ii) $2,000,000.

    d.    <u>Termination Fee</u>.  If, in connection with a Transaction that is not completed, the Debtors receive a break-up fee, topping fee, liquidated damages, expense reimbursement or other termination fee or payment (including, without limitation, any judgement for damages or amount in settlement of any dispute as a result of the failure of such Transaction or any stock or other securities or payment in lieu thereof received from a potential Strategic Partner or its affiliates pursuant to a stock option agreement or otherwise), the Debtors will pay CG a fee equal to 15% of such Termination Fee at the time such Termination Fee is received by the Debtors.

12.    Further, subject to the Retention Agreement, the Debtors shall reimburse CG, upon its request from time to time, for all reasonable and documented expenses arising out of the Retention Agreement, including travel and related expenses, the costs of document preparation, production and distribution (such as printing and binding, and photocopies), and third party research and database services, and the reasonable fees and disbursements of independent counsel retained by CG); provided such expenses shall not exceed $75,000 without the Debtors' prior written consent (not to be unreasonably withheld).

13.    Indeed, CG's industry and restructuring experience, its capital markets knowledge, financing skills, and mergers and acquisitions capabilities, some or all of which may be required by the Debtors during the term of CG's engagement, were important factors in determining the Fee Structure.  The ultimate benefit to the Debtors of CG's services could not be measured merely

---

and CG's provision of services in connection with the Chapter 11 Cases.  The Signing Fee and the Work Fees shall be credited against the related Transaction Fee.

29935340.5

5

by reference to the number of hours to be expended by CG's professionals in the performance of such services. Moreover, the Fee Structure takes into consideration the extensive work performed by CG over the course of the engagement and CG's anticipation that it will need to provide a substantial commitment of professional time and effort in order to perform its duties under the Retention Agreement, and in light of the fact that such commitment may foreclose other opportunities for CG. Further, the actual time and commitment required of CG and its professionals to render services to the Debtors may vary substantially from week to week or month to month, creating "peak load" issues for the firm.

## RECORDKEEPING

14. It is not the general practice of investment banking firms, including CG, to keep detailed time records similar to those customarily kept by attorneys. Because CG does not maintain contemporaneous time records in one-tenth hour increments or provide or conform to a schedule of hourly rates for its professionals, CG respectfully requests, pursuant to Local Rule 2016-2(h), that it be excused from compliance with such requirements. Instead, CG requests that it be required only to maintain time records in one hour (1.0) increments setting forth, in a summary format, a description of the services rendered by each professional and the amount of time spent on each date by each such individual in rendering services on behalf of the Debtors.

15. CG will also maintain detailed records of any actual and necessary costs and expenses incurred in connection with the aforementioned services. CG's application for compensation and expenses will be paid by the Debtors pursuant to the terms of the Retention Agreement, in accordance with Local Rule 2016-2(e) and any procedures established by the Court.

29935340.5

**INDEMNIFICATION AND CONTRIBUTION PROVISIONS**

16. The Debtors have agreed, among other things, to indemnify and provide contribution and reimbursement to CG and certain related parties in accordance with the Indemnification Provisions attached as **Annex A** to the Engagement Letter and within the Amendment.

17. I believe the Indemnification Provisions reflected in the Retention Agreement are customary and reasonable terms of consideration for investment banking firms such as CG for engagements both out of court and in chapter 11. The terms of the Retention Agreement were fully negotiated between the Debtors and CG at arm's length.

**CG'S DISINTERESTEDNESS**

18. In connection with the preparation of this Declaration and its retention by the Debtors, CG conducted a review of its conflicts check systems of the list of potential parties in interest that CG received from the Debtors' list of interested parties ("Conflicts Search").

19. CG reviewed the relationships between CG and the list of individuals and entities that CG has been informed may have an interest in this case (collectively, the "Parties in Interest"). The Parties in Interest are set forth on **Exhibit D** attached hereto and incorporated herein by reference. Based on the results of the Conflicts Search conducted to date, to the best of my knowledge, neither myself, CG, nor any of its principals, partners, members, or professionals (collectively, the "Professionals"), insofar as I have been able to ascertain based on the Conflicts Search (a) has any connection with the Debtors, any of the Parties in Interest, the U.S. Trustee, or any person employed in the Office of the U.S. Trustee or (b) represents an interest that is materially adverse to the interest of the Debtors' estates or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with or interest in, the Debtors or for

any other reason of which I know or about which I have been informed, with respect to the services to be performed pursuant to the Retention Agreement, except as disclosed or otherwise described herein.

20.     CG (and its financial advisory affiliates) has been engaged within the last three years or is currently engaged by the following potential Parties in Interest (or one or more of their affiliates, as the case may be) in matters unrelated to these Chapter 11 Cases: Avalara, Inc. and Power Digital Marketing, Inc.

21.     Some of the Professionals, in connection with their employment before joining CG, may have appeared or were engaged in cases, proceedings, or transactions involving attorneys, accountants, investment bankers, and financial consultants, some of whom may represent claimants and Parties in Interest.

22.     As part of CG's diverse business, CG appears or may appear as a financial advisor or an investment banker in cases, proceedings, or transactions involving attorneys, accountants, investment bankers, and financial consultants, some of whom may represent claimants and Parties in Interest.  Further, CG (including its Professionals through their prior employment) has in the past, and may in the future, be represented by several attorneys and law firms in the legal community, some of whom may be involved in the Chapter 11 Cases.  In addition, CG (including its Professionals through their prior employment) has in the past and will likely in the future be working with or against other professionals involved in the Chapter 11 Cases in matters unrelated to the Chapter 11 Cases.  To the best of my knowledge, none of these business relations constitute interests materially adverse to the Debtors in matters upon which CG is to be engaged in the Chapter 11 Cases.

23. CG (including its Professionals through their prior employment) may have in the past represented, may currently represent, and likely in the future will represent, Parties in Interest of the Debtors in connection with matters unrelated to the Debtors and the Chapter 11 Cases (except as described below). CG regularly calls on private and public companies in the sector related to M&A and capital raising opportunities. This leads our team to have regular contact with various sources of potential new business in the sector, including investors (whether financial and strategic) who are active with private companies in the sector.

24. Except as disclosed herein, CG has not been retained to assist any entity or person other than the Debtors on matters relating to, or in connection with, the Chapter 11 Cases. If the Court approves the proposed employment of CG by the Debtors, CG will not accept any engagement or perform any services in relation to the Chapter 11 Cases for any entity or person other than the Debtors. CG will, however, continue to provide professional services to entities or persons that may be creditors of the Debtors or Parties in Interest in the Chapter 11 Cases; provided, however, that such services do not directly relate to, or have any direct connection with, the Chapter 11 Cases.

25. To the best of my knowledge, information, and belief after reasonable inquiry, other than as disclosed in this Declaration, neither I, CG, nor any of our professionals or employees participating in or connected with CG's engagement with the Debtors: (i) is related to the Debtors or any other party in interest herein, the United States Trustee for the District of Delaware, or anyone employed in the Office of the United States Trustee for the District of Delaware; (ii) has any connection with or holds or represents any interest adverse to the Debtors, their estate, their creditors, or any other Party in interest or their respective attorneys in the matters on which CG is proposed to be retained; or (iii) has advised any Party in Interest in connection with the Chapter

11 Cases. Additionally, CG does not believe that any relationship that CG or any of our professionals or employees participating in or connected with CG's engagement with the Debtors may have with any Party in Interest in connection with any unrelated matter will interfere with or impair CG's representation of the Debtors in the Chapter 11 Cases.

26. In light of the number of the Debtors' creditors, Parties in Interest, and potential additional parties in interest, neither I nor CG are able conclusively to identify all potential relationships at this time, and we reserve the right to supplement this disclosure as additional relationships come to our attention. In particular, among other things, CG may have relationships with persons who are beneficial owners of Parties in Interest and persons whose beneficial owners include Parties in Interest or persons who otherwise have relationships with Parties in Interest. Moreover, CG employees may have relationships with Parties in Interest, persons that may become parties in interest in this case, and/or persons that have business relationships with the Debtors or are competitors of the Debtors. If any new relevant facts or relationships are discovered or arise, CG will use reasonable efforts to identify such further developments and will file promptly a supplemental declaration, as required by Bankruptcy Rule 2014(a).

## AFFIRMATIVE STATEMENT OF DISINTERESTEDNESS

27. Based on the Conflicts Search conducted to date and described herein, to the best of my knowledge and insofar as I have been able to ascertain, (a) CG is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, in that, except as otherwise set forth herein, its Professionals:

   a. are not creditors, equity security holders, or insiders of the Debtors;
   b. are not and were not, within two years before the date of the filing of the Debtors' chapter 11 petitions, a director, officer, or employee of the Debtors; and
   c. do not have an interest materially adverse to the interest of the estates or of any class of creditors or equity security holders, by reason of any direct or

29935340.5

indirect relationship to, connection with, or interest in the Debtors, or for any other reason, and does not hold or represent an interest adverse to the Debtors' estate and (b) CG has no connection to the Debtors, their creditors, or their related parties, except as is disclosed herein.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 16, 2022

*/s/ Brian Bacal*
Brian Bacal
Managing Director

29935340.5

11

# EXHIBIT 1

## Debtors' Payments to Canaccord Genuity LLC

| Payment Date | Invoice Number | Amount | Payment Type | Description of Payment |
|---|---|---|---|---|
| **Debtors Engage CG Pursuant to Engagement Letter** | | | | |
| 3/16/22 | 13168 | $50,000 | Wire | Signing Fee |
| 6/1/22 | 13223 | $25,000 | Wire | Work Fee |
| 8/30/22 | 13294 | $25,000 | Wire | Work Fee |
| **Debtors Engage CG Pursuant to Amendment in Connection with Chapter 11 Cases** | | | | |
| 11/25/22 | 13348 | $75,000 | Wire | Advance Retainer |
| 11/25/22 | 11348 | $100,000 | Wire | Monthly Fee |