# EXHIBIT C

## Retention Agreement



Canaccord Genuity LLC
99 High Street
Suite 1200
Boston, MA
USA 02110

T1: 1.617.371.3900
T2: 1.800.225.6201
cgf.com

November 25, 2022

**STRICTLY PRIVATE AND CONFIDENTIAL**

Winc, Inc.
1751 Berkeley St. Studio 3
Santa Monica, CA 90404

**Attn:** **Brian Smith**
**President, Interim Chief Executive Officer, Founder and Chairperson of the Board of Directors**

<u>**RE:**</u>   <u>**AMENDMENT OF CANACCORD GENUITY LLC ENGAGEMENT LETTER**</u>

Ladies & Gentlemen:

Reference is made to that certain letter agreement dated March 16, 2022 (the "Agreement") between Canaccord Genuity LLC (together with its affiliates, control persons, directors, officers, employees, and agents, "CG") and Winc, Inc. (together with its subsidiaries and affiliates, the "Company") pursuant to which the Company engaged CG as its exclusive financial advisor in connection with the Company's review of its strategic and financial alternatives. Capitalized terms used in this Amendment to the Agreement (this "Amendment") and not defined in this Amendment shall have the meanings ascribed to them in the Agreement.

The Company and CG hereby acknowledge that the Agreement is hereby amended by this Amendment as follows.

1. <u>Definition of Transaction</u>. The term "Transaction" as it is defined in the Agreement shall be replaced by the following definition: "any transaction or series of transactions, whether accomplished pursuant to a plan of reorganization or liquidation (a "Plan") confirmed in connection with a case (a "Bankruptcy Case") commenced by or against the Company or any of its subsidiaries or affiliates under title 11 of the United States Code (the "Bankruptcy Code"), or otherwise, involving (a) an acquisition, merger, consolidation or other transaction with another party through which assets of the Company are, directly or indirectly, combined with or transferred to another party outside of the ordinary course of business; (b) the acquisition, directly or indirectly, by a buyer or buyers of equity interests or options, or any combination thereof constituting a majority or controlling portion of the stock of the Company or possessing

*CONFIDENTIAL*

a majority or controlling portion of the voting power of the Company; (c) any other purchase or acquisition, directly or indirectly, by a buyer or buyers of a majority or controlling portion of the securities or other interests (through tender offer, merger, sale, exchange or otherwise) or any portion of the assets of the Company outside of the ordinary course of business; (d) the formation of a joint venture or partnership with the Company or direct investment in the Company for the purposes of affecting a transfer of a majority or controlling interest in the Company to a third party; (e) the conversion to common or other equity, or any other security or instrument, of any portion of the Company's indebtedness; or (f) any combination of the foregoing.

2. <u>Services to Be Rendered</u>. In addition to the services to be rendered under the Agreement, CG will perform the following additional service if requested and if appropriate:

    i. In the event the Company determines to commence one or more cases under the Bankruptcy Code in order to pursue a Transaction or otherwise, and if requested by the Company, participate in hearings before the Bankruptcy Court in which such cases are commenced (the "Bankruptcy Court") and provide relevant testimony with respect to the matters described herein and arising in connection with any Transaction or any proposed Plan.

    ii. Section 1 (i) of the Agreement shall be deleted.

    iii. The following language in Section 1 of the Agreement shall be deleted: "If CG is requested to render an Opinion, the nature and scope of its analysis and investigation it undertakes in order to render such Opinion and the scope, form and substance of the Opinion will be such as CG considers appropriate and will not address the underlying business decision to effect a Transaction. The Opinion will contain any customary qualifications, assumptions, and limitations as CG considers appropriate in its sole discretion and CG may qualify the Opinion in any customary manner that it believes appropriate. Any such Opinion will expressly exclude consideration of any compensation or compensation arrangements arising from the Transaction which benefit any officer, director or employee of the Company, or any class of such persons. The Opinion may be included in any disclosure document required to be filed by the Company with the Securities and Exchange Commission with respect to a proposed Transaction, provided that it is reproduced in full, and that any description of or reference to CG, the Opinion or the analyses performed by CG in connection with the rendering of the Opinion shall be in form and substance acceptable to CG. It is understood and agreed that the Opinion will be addressed to, and be prepared solely for the use and benefit of the Board of Directors of the Company, or a committee thereof, if applicable, and may not be disclosed to any third party or circulated or referred to publicly (except as otherwise provided in this paragraph) without the prior written consent of CG."

3. <u>Fees</u>.

    i. In addition to the fees set forth in the Agreement, during the term of this agreement,

*CONFIDENTIAL*

        a cash fee of $100,000 per month (the "Monthly Fee"), payable in advance of each month. The Company will pay the first Monthly Fee immediately upon the execution of this Amendment, and all subsequent Monthly Fees prior to each monthly anniversary of the date of this agreement. Whether or not a Transaction occurs, CG shall earn and be paid the Monthly Fee every month during the term of this agreement. After three full Monthly Fees have been paid to CG, 100% of any subsequent Monthly Fees actually paid to and retained by CG shall be credited once (without duplication) against any Transaction Fee subsequently payable to CG.

        ii.    Section 2(c) of the Agreement shall be deleted.

4.    <u>Expenses</u>. Upon execution of this Amendment, The Company will provide CG with a $75,000 advance retainer to cover CG's out of pocket expenses. CG agrees to provide the Company with reasonable support for its expenses at the Company's request or at the Bankruptcy Court's direction.

5.    <u>Application for Retention of CG</u>. In the event the Company determines to commence chapter 11 proceedings in order to pursue a Transaction or otherwise, the Company shall apply promptly to the Bankruptcy Court pursuant to sections 327(a) and 328(a) of the Bankruptcy Code for approval of (a) this Agreement and (b) CG's retention by the Company under the terms of this Agreement, nunc pro tunc to the date the Company commences its chapter 11 case, and shall use its best efforts to obtain Bankruptcy Court authorization thereof. The Company shall use its best efforts to obtain such Bankruptcy Court approval and authorization subject only to the subsequent review by the Bankruptcy Court under the standard of review provided in section 328(a) of the Bankruptcy Code, and not subject to the standard of review set forth in section 330 of the Bankruptcy Code. The Company shall supply CG and its counsel with a draft of such application and any proposed order authorizing CG's retention sufficiently in advance of the filing of such application and proposed order to enable CG and its counsel to review and comment thereon. CG shall have no obligation to provide any services under this Agreement unless and until CG's retention under the terms of this Agreement is approved under section 328(a) of the Bankruptcy Code by a final non-appealable order of the Bankruptcy Court in form and substance acceptable to CG. If neither the Company nor CG obtain such an order within a 60-day period, or such order is later reversed, vacated, stayed or set aside for any reason, CG may terminate this agreement, and the Company shall reimburse CG for all fees owing and expenses incurred prior to the date of termination, subject to the requirements of the Bankruptcy Rules, and CG shall be entitled to a contingent claim with respect to any fees that become payable under Section 5 of the Agreement. Subject to being so retained, CG agrees that during the pendency of any such proceedings, it shall continue its obligations under this Agreement pursuant to the provisions of this Agreement so long as the Company is using its best efforts to seek CG's retention under section 328(a) of the Bankruptcy Code.

        CG acknowledges that in the event that the Bankruptcy Court approves its retention by the Company pursuant to the application process described in this Section, payment of CG's fees and expenses shall be subject to (i) the jurisdiction and approval of the Bankruptcy Court under section 328(a) of the Bankruptcy Code and any order approving CG's retention, (ii) any applicable

*CONFIDENTIAL*

fee and expense guidelines and/or orders, and (iii) any requirements governing interim and final fee applications; provided, however, that CG shall not be required to maintain time records.

With respect to CG's retention under section 328(a) of the Bankruptcy Code, the Company acknowledges and agrees that CG's industry and restructuring expertise as well as its capital markets knowledge, financing skills and mergers and acquisitions capabilities, some or all of which may be required by the Company during the term of CG's engagement hereunder, were important factors in determining the amount of the various fees set forth herein, and that the ultimate benefit to the Company of CG's services hereunder could not be measured merely by reference to the number of hours to be expended by CG's professionals in the performance of such services. The Company also acknowledges and agrees that the various fees set forth herein have been agreed upon by the parties hereto in anticipation that a substantial commitment of professional time and effort will be required of CG and its professionals hereunder over the life of the engagement, and in light of the fact that such commitment may foreclose other opportunities for CG and that the actual time and commitment required of CG and its professionals to perform its services hereunder may vary substantially from week to week or month to month, creating "peak load" issues for the firm. In addition, the Company believes that given the numerous issues which CG may be required to address in the performance of its services hereunder, CG's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for CG's services for engagements of this nature in an out-of-court context, the Company agrees that the fee arrangements hereunder are reasonable under the standards set forth in section 328(a) of the Bankruptcy Code.In the event that CG's engagement hereunder is approved by the Bankruptcy Court, the Company shall pay all fees and expenses of CG hereunder as promptly as practicable in accordance with the terms hereof and the orders governing CG's interim and final fee applications, and after obtaining all necessary further approvals from the Bankruptcy Court, if any.

Following entry of an order authorizing our retention, the Company will assist CG in preparing, filing and serving fee statements, interim fee applications, and a final fee application. The Company will support CG's fee applications that are consistent with this agreement in papers filed with the Bankruptcy Court and during any Bankruptcy Court hearing.

CG's post-petition compensation, reasonable and documented out-of-pocket expense reimbursements and payment received pursuant to the provisions of Annex A shall be entitled to priority as expenses of administration under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code and shall be entitled to the benefits of any "carve-outs" for professional fees and expenses in effect pursuant to one or more financing orders entered by the Bankruptcy Court.

*CONFIDENTIAL*

The Company will use its reasonable best efforts to ensure that, to the fullest extent permitted by law, any confirmed plan of reorganization or liquidation in the Bankruptcy Case contains typical and customary releases (both from the Company and from third parties) and exculpation provisions releasing, waiving, and forever discharging CG, its divisions, affiliates, any person controlling CG or its affiliates, and their respective current and former directors, officers, partners, managers, members, agents, representatives and employees from any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities related to the Company or the engagement described in this agreement.

The terms of this Section are solely for the benefit of CG, and may be waived, in whole or in part, only by CG.

**[THIS SPACE LEFT INTENTIONALLY BLANK]**

*CONFIDENTIAL*

The Agreement, except as amended by this Amendment, shall continue in full force and effect in accordance with its terms.  If the foregoing is in accordance with your understanding, please indicate your agreement to the above terms and conditions by signing the enclosed copies of this letter and returning the executed copies to us.

Yours truly,

**CANACCORD GENUITY LLC**

Per: _____

David Istock
Managing Director

ACCEPTED AND AGREED

**WINC, INC.**

Per: _____

Brian Smith
President, Interim Chief Executive Officer, Founder and Chairperson of the Board of Directors