**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| WINC, INC., *et al.*, | Case No.: 22-11238 (LSS) |
| | (Jointly Administered) |
| Debtors. [1] | Re DI Nos.: 14, 47 |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OMNIBUS**
**(I) PRELIMINARY OBJECTION TO DEBTORS' (A) MOTION FOR ENTRY OF**
**ORDER AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING,**
**(B) MOTION FOR APPROVAL OF BID PROCEDURES, AND**
**(C) TO CERTAIN OTHER RELIEF; AND (II) REQUEST FOR ADJOURNMENT**

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of Winc, Inc., BWSC, LLC, and Winc Lost Poet, LLC (collectively, the "<u>Debtors</u>") appointed pursuant to section 1102 of title 11 of the United States Code §§ 101 *et seq.* ("<u>Bankruptcy Code</u>") in the above-captioned chapter 11 cases ("<u>Chapter 11 Cases</u>"), by and through its undersigned proposed counsel, files this Omnibus (I) Preliminary Objection to Debtors' (A) Motion for Entry of Order Authorizing Debtors to Obtain Postpetition Financing; (B) Motion for Approval of Bid Procedures, (C) to Certain Other Relief; and (II) Request for Adjournment (the "<u>Preliminary Objection</u>"), and in support thereof states as follows:

**PRELIMINARY STATEMENT**

1.     The Committee was formed on December 12, retained proposed counsel on December 15 and a proposed financial advisor on December 20.  Although the Committee and its professionals are receiving and reviewing initial diligence materials, the Committee has developed serious concerns about administrative solvency and speed of this case.  This is highlighted by how the DIP Budget, critical vendor payments and sale cadence have been designed to tilt the playing

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Winc, Inc. (8960); BWSC, LLC (0899); and Winc Lost Poet, LLC (N/A).  The Debtors' mailing address for purposes of these chapter 11 cases is 1751 Berkeley Street, Studio 3, Santa Monica, CA 90404.

field in favor of the Stalking Horse at the expense of administrative solvency.  Although the Committee hopes that productive settlement discussions continue up to the hearing, so far proposed solutions have not received the necessary level of engagement, and it now appears this hearing is the best opportunity to correct the course of this case.

2.      Rather than tailoring a DIP Budget for the immediate needs of the estate, this DIP Budget is funding the Stalking Horse Bidder's business plan while radically underfunding the estate's cost of restructuring.  The Debtors' proposed DIP financing seeks to pay prepetition claims—exchanging unsecured debt for superpriority administrative expense claims—without any protections for the Committee to scrutinize specific payments, payees, circumstances or need. Although the final hearing on the Critical Vendor program is scheduled for January 6, millions of dollars of critical vendor payments will be potentially spent under the DIP Budget before then.  A pause of critical vendor payments is critical to permit the Committee an opportunity to scrutinize the need, and return to Court on January 6 should the parties be unable to agree.  The same is true for the exceedingly high inventory build-up costs that are being frontloaded onto the estate for the benefit of the Stalking Horse.  There should be a pause of the nearly $4,300,000 of inventory purchases until the Committee can vet the necessity of those purchases – and if the parties are unable to agree on those expenditures, the issues can be presented to the Court on January 6.  This is a fast-moving case, but a short pause to enable the Committee to vet post-petition payments that could have an irreparable impact on the case outcome is needed.

3.      The Committee has other concerns with the DIP Financing Motion, including the loss of core estate protections, encumbrances on litigation recoveries (including those against board members who voted to absolve themselves and other insiders of $3.5 million in loan obligations), and a severely imbalanced professional fee budget that allots the Debtors' professionals more than 12 times the resources of the Committee's professionals (*before* taking

into consideration the investment banker's transaction fee, which will increase the differential to approximately 25x).

4.      Coupled with the DIP, the Stalking Horse proposal and attenuated sale process is also very concerning.  Debtors are a public company that recently reported assets in excess of $50 million, including *finished and salable* inventory in excess of $18 million. Nonetheless, the structure of the transaction practically ensures administrative insolvency by virtue of a rushed sale over the Christmas and New Year holidays to the Debtors' founder:

### Projected Sale Waterfall

| Sources | Amount |
|---|---|
| Estate Cash | $108,000 |
| Sale Proceeds | $10,000,000 |
| **Available Cash** | **$10,108,000** |
| | |
| Uses | |
| DIP Lender Principal | $5,000,000 |
| DIP Lender Closing Fee | $100,000 |
| DIP Lender Interest (appox.) | $100,000 |
| Prepetition Secured Lender (approx.) | $3,500,000 |
| Investment Banker Transaction Fee | $1,900,000 |
| Employee Administrative Claims | Unknown |
| Wind-Down Expenses | Unknown |
| Other Administrative Claims | Unknown |
| **Closing Payments** | **$10,600,000** |
| | |
| **Winc, Inc. Estate Post-Closing** | **$(492,000)[2]** |

5.      Late yesterday afternoon, the Committee was informed that the Stalking Horse Bidder/DIP Lender had changed its Stalking Horse offer from a purchase of equity that is set forth in the Stalking Horse Purchase Agreement, to an asset purchase transaction.  This change is fundamental, and it is hard to fathom how the Committee (let alone other interested parties) could

---

[2] This number does not include other unknown administrative expenses, which could drive the estate further into insolvency.

AFDOCS:26707791.1

digest and respond to this change to the Bidding Procedures or the Court could reasonably approve them with less than 48 hours' worth of review.

6.      In the less than one week since it has been retained, the Committee's proposed counsel has repeatedly expressed a willingness to work within the confines of the structure proposed by the Stalking Horse and DIP Lender.  The Committee requested various pieces of information from the Debtors' counsel that are absolutely indispensable to having any sense of what the true impact of this proposed sale would be on the Debtors' estate, including an amended and accurate budget, information concerning the true extent of administrative claims and the threshold amounts to avoid administratively insolvency, and the extent of the liabilities that would be assumed by the Stalking Horse Bidder and what obligations would be left in the Debtors' estates.  Very little of this information has been provided to the Committee and where provided on a confidential basis, it has underscored the Committee's concerns or led to proposed solutions that have not been addressed.  If the Debtors do not have or cannot provide clarity on these figures (presumably because the DIP Lender/Stalking Horse Bidder continues to change the fundamental deal structure and insist on a breakneck sale and DIP timeline with no compromise to funnel this case into a predetermined outcome), it is not appropriate to expect or require stakeholders to blindly go along with the rushed process presented to the Court.

7.      Further, the Cash Management Motion goes well beyond the norms of forgoing certain formalities to achieve administrative efficiencies, it (x) allows the Debtors to pay prepetition credit card claims of $800,000; (y) grants the credit card companies automatic administrative expense status for future charges without any further review under section 503 of the Bankruptcy Code (and it is unclear how these administrative claims would even be paid); and (z) grants administrative expense status for all postpetition intercompany transactions, without any information or analysis of which Debtor will be incurring such expenses (which may be significant

4

given that one Debtor is being sold). The Brault Declaration provides no answers or clarity on these points, but rather states in conclusory fashion that the relief requested in these motions is necessary. That is patently insufficient to justify the extraordinary relief being requested or to assuage the Committee's concerns about the potentially disastrous impact that relief may have on the Debtors' estates.

8.      The Committee stresses that its concerns and objections to the process are preliminary and could be alleviated by further and clearer information. However, no such clarity appears to forthcoming and its request for a short adjournment ignored. As a result, the Committee files this Preliminary Objection and requests that the Court adjourn the Final DIP Hearing and Bid Procedures Motion to no earlier than the hearing presently scheduled for January 6, 2023. In addition, to prevent harm and to maintain the status quo, the Debtors' Second Interim DIP Order needs to adjust expenditures projected for the weeks up to and including January 6, 2023 by permitting the Committee's financial advisor to review and reach agreement on budget items. If agreement, cannot be reached, then the parties will return next week to confer with the Court on outstanding disagreement.

## I.      RELEVANT BACKGROUND

9.      The Debtors filed these Chapter 11 Cases on November 30, 2022 (the "Petition Date"). On December 2, 2022, the Debtors filed their *Motion for Entry of Interim and Final Orders (I) Authorizing and Approving Continued Use of Cash Management System, (II) Authorizing Continued Use of Corporate Credit Cards and Granting Administrative Expense Status to Postpetition Credit Card Obligations, (III) Authorizing Use of Prepetition Bank Accounts and Business Forms, (IV) Waiving the Requirements of Section 345(b) on an Interim Basis, (V) Granting Administrative Expense Status to Postpetition Intercompany Claims, and (VI) Granting Relating Relief* [ECF No. 9] (the "Cash Management Motion").

10.     That same day, the Debtors also filed their *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors and Service Providers, (B) Certain Vendors with Claims Entitled to Administrative Expense Status Under Section 503(b)(9) of the Bankruptcy Code, (C) Foreign Vendors; and (D) Shippers, Warehouseman, and Other Lienholders; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief* [ECF No. 10] (the "Critical Vendor Motion").

11.     The Debtors also filed their *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Liens and Superpriority Claims, and (C) Utilize Cash Collateral; (II) Determining that the Prepetition Secured Lender is Adequately Protected; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* [ECF No. 14] (the "DIP Motion").

12.     The Court held a hearing on interim approval of, *inter alia*, the Cash Management Motion and the Critical Vendor Motion on December 6, 2022.  The Court subsequently issued orders dated December 6, 2022 approving the Cash Management Motion [ECF No. 37] (the "Interim Cash Management Order") and the Critical Vendor Motion [ECF No. 41] (the "Interim Critical Vendor Order") on an interim basis.  The Debtors filed an *Omnibus Notice of First Day Pleadings and Final Hearing Thereon* [ECF No. 46] on December 7, 2022 which set a hearing date to consider final approval of, *inter alia*, the Cash Management Motion and the Critical Vendor Motion on January 6, 2023 at 2:00 p.m., and an objection deadline of December 30, 2022.

13.     Also on December 7, 2022, the Court entered an Order [ECF No. 44] (the "Interim DIP Order") granting the DIP Motion on an interim basis, and the Debtors filed a *Notice of Entry of Interim Order and Final Hearing* [ECF No. 45] which set a hearing date of December 22, 2022 at 10:00 a.m. for final approval of the DIP Motion.

14.     The Debtors filed their *Motion for Entry of (A) an Order (I) Approving Bidding Procedures In Connection with the Sale of the Debtors' Assets and Related Bid Protections, (II) Approving Form and Manner of Notice, (III) Scheduling Auction and Sale Hearing, (IV) Authorizing Procedures Governing Assumption and Assignment of Certain Contracts and Unexpired Leases, and (V) Granting Related Relief; and (II) Authorizing a Sale Free and Clear of all Liens, Claims, Encumbrances, and Other Interests* [ECF No. 47] (the "Bid Procedures Motion") on December 7, 2022, which is also set for hearing on December 22, 2022 at 10:00 a.m.

15.     On December 16, 2022, the Debtors filed their *Application for Entry of an Order (I) Authorizing the Employment and Retention of Canaccord Genuity LLC as Investment Banker for the Debtors, Effective as of the Petition Date; and (ii) Waiving the Information Requirements of Local 2016-2(d)* [ECF No. 67], wherein the Debtors request, *inter alia*, approval of a transaction fee for Canaccord of no less than $2,000,000 (less $100,000 in prepetition credits).

16.     The Committee was appointed on December 12, 2022 as set forth in the *Notice of Appointment of Committee of Unsecured Creditors* [ECF No. 54] filed in the Chapter 11 Cases by the United States Trustee.  Proposed counsel for the Debtors subsequently confirmed with the Committee's proposed counsel that the Committee's objection deadline to both final approval of the DIP Motion and the Bid Procedures Motion would be extended through noon on December 21, 2022, as reflected in the Notice of Agenda of Matters Scheduled for Hearing on December 22, 2022 at 10:00 A.M. [Docket No. 74] filed by the Debtors on December 20, 2022.  The Committee files this protective and preliminary objection based on the limited information received to date, and reserves all rights.

## II.   **PRELIMINARY OBJECTION**

17.     Without waiving any rights that it may have with respect to the DIP Motion, Bid Procedures Motion, Cash Management Motion, or Critical Vendor Motion, including the right to file any further objections thereto, all of which rights are hereby expressly reserved, the Committee has identified the following preliminary objections and points of concern with the DIP Motion, Bid Procedures Motion, Cash Management Motion, and Critical Vendor Motion:

### A.  **The DIP Credit Facility and Budget Should Be Revised to Protect the Estates and Unsecured Creditors.**[3]

18.     There is no evidence the terms of the DIP Facility were market-tested.  Rather, the Debtors appear to have negotiated solely with the Stalking Horse  Bidder regarding DIP financing. This context raises serious concerns about the leverage being asserted by the DIP Lender/Stalking Horse Bidder to require the Debtor to use the DIP Facility to pay prepetition claims that the DIP Lender/Stalking Horse Bidder would be responsible for paying in the context of executory contract assumption.

19.     The Debtors appear to be spending estate funds at an extraordinary rate to, in large part, pay certain prepetition unsecured claims and, by the plain numbers presented by the Debtors themselves, leaving behind an administratively insolvent estate.  The Committee has asked for a basic waterfall analysis near daily since December 15, 2022.  It has not received any such waterfall analysis.  The DIP Lender/Stalking Horse Bidder is funding these payments through the DIP Credit Facility, which will then be used to credit bid towards its purchase of substantially all the Debtors' assets as a going concern.

20.     There are likely various other (potentially substantial) items that the Budget does not factor in, such as accruals, wind-down costs, administrative claims of employees, etc., but the

---

[3]   Capitalized terms used but not capitalized herein shall have the meanings ascribed to them in the DIP Motion.

Debtors have failed to provide the Committee with answers to various of its requests for information detailing (i) the back-up for the Budget, (ii) the magnitude of claims estimated to remain following a sale to the Stalking Horse Bidder; and (iii) the projected cash, if any, that would remain to pay such claims (which appears to be a negative number based on disclosed sources and uses to date).

21.     The Committee highlights the following additional provisions of the DIP Facility and Interim DIP Order that are objectionable and should be eliminated or at least substantially modified:

a)     **Extent of DIP Collateral is Overbroad**. The DIP and Adequate Protection Liens and Superpriority Claims should not be payable from or have recourse to claims or causes of actions, claims under the Debtors' insurance policies, avoidance actions, commercial tort claims, and/or any proceeds of the foregoing (the "Excluded Assets") (Interim DIP Order, ¶¶ 8, 9, 12).  The Excluded Assets must be unencumbered entirely and remain with the Debtors and their estates, especially in light of the paucity of other value left here.

b)     **Fees and Expenses of DIP Lender and Prepetition Secured Creditor Must Be Reasonable**. All fees, costs, and expenses must be qualified for reasonableness.  As to the DIP Lender, amounts must only be reimbursable if they are incurred in its capacity as DIP Lender.  Monthly fee payments made to the Prepetition Secured Lender must be made contingent on the Prepetition Secured Lender demonstrating a need for adequate protection, with such payments otherwise being subject to disgorgement (Interim DIP Order, ¶¶ 6, 12).

c)     **No Releases Against Public Policy**. The release in the Interim DIP Order should be clarified such that it does not release intentional misconduct, fraud, or gross negligence, and also clarify that the Committee is not a releasing party (Interim DIP Order, ¶ 16). *See United Artists Theatre Co. v. Walton*, 315 F.3d 217 (3d Cir. 2003) (releases and indemnity of gross

negligence and willful misconduct were impermissible as against public policy); *In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004) (same).

        d)        **DIP Restrictions Are Overbroad**.  The Restrictions on the use of DIP Facility proceeds and Cash Collateral are too broad, including to the extent that they impair the Committee's ability to object to any sale, any restrictions on the use of Cash Collateral, or to investigate or assert Challenges against the Prepetition Secured Lender.  Furthermore, the budget for investigations is currently too restrictive and should be increased to no less than $25,000.00 (Interim DIP Order, ¶ 13).  Furthermore, any provision in the Interim DIP Order or any Final DIP Order that would impair or otherwise interfere with the Committee's ability to allege equitable subordination, recharacterization, or any similar claim must be stricken, in light of the extraordinary nature of the DIP Lender / Stalking Horse Bidder's terms and the fact that it is operated by a previous insider of the Debtors.

        e)        **Professionals Budgets Should Be Equitably Adjusted**.  The Committee's budget of $175,000 for retention of professionals is insufficient for the Committee to fulfill its statutory role and duties.  The Debtors' professionals have access to more than 12 times the resources for ongoing expenses ($2,200,000), and the Debtors' investment banker is proposed to receive an additional $2,000,000.  The budgets should be re-balanced so that the Committee may fund professional fees and expenses up to $800,000.00 from the DIP Budget or 36% of the Debtors' professional fees (Interim DIP Order, Exhibit A).  If the parties are unable to agree, the Committee request that the Court order a pro rata sharing between the Committee and the Debtors of the total DIP Budget for professional fees.  Further, the Committee Carve Out Cap for post-default payment of fees should be increased to at least $100,000.00, and the Carve Out restrictions are too broad, including to the extent that they impair the Committee's ability to object to any sale (Interim DIP Order, ¶11).

f)      **Marshaling, 506(c), and 552(b) Waivers Should Be Stricken**.  There is no reason, requirement, or need to waive the estate's ability to marshal assets.  The Debtors' asset and liability picture remains unclear and there has been no identification of which assets and liabilities rest at each Debtor as of the Petition Date.  The ability to marshal assets may be critical to preserving estate value in this case, given the magnitude of the proposed sale consideration in contrast to the Debtors' assets disclosed in public filings, and the fact that one of the Debtors will be cleaved off through the sale.  *See, e.g., In re Advanced Marketing Servs., Inc.*, 360 B.R. 421, 427 n.8 (Bankr. D. Del. 2007) (explaining doctrine of marshaling); *Meyer v. United States*, 375 U.S. 233, 236 (1963) (noting that marshaling "prevent[s] the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security.").

Further, the waiver of the estate's ability to surcharge collateral or make equities of the case arguments are particularly important where, as here, there is substantial risk of administrative insolvency.  Neither the Debtors nor the secured lenders have provided any compelling justification for why marshaling, surcharge, and equities of the case waivers are necessary to provide adequate protection in this case.  *See, e.g., In re Lockwood Corp.*, 223 B.R. 170 (8th Cir. B.A.P. 1998) (holding 506(c) waiver unenforceable because it would result in windfall to secured creditor); *In re Muma Servs.*, 322 B.R. 541, 558–59 (Bankr. D. Del. 2005) (noting that the purpose of 552(b) is to "prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustee's/debtor-in-possession's use of assets in the estate (which would normally go to general creditors) to cause the appreciated value."); *In re Metaldyne Corp.*, No. 09-13412 MG, 2009 WL 2883045 (Bankr. S.D.N.Y. June 23, 2009) (refusing to enter 552(b) waiver in postpetition financing because it would be "waiv[ing] prospectively an argument that other parties in interest may make"); *Sprint Nextel Corp. v. U.S. Bank Nat'l Ass'n (In re*

*TerreStar Networks, Inc.*), 457 B.R. 254, 272-73 (Bankr. S.D.N.Y. 2011) (request for section 552(b) waiver was premature and thus inappropriate).

## B. The Bid Procedures, Stalking Horse Bid, and Investment Banker Terms Should be Clarified and Modified.[4]

22.    The Committee does not object in principle to the Stalking Horse Bid or the objective of pursuing an expedited sale process.  However, the true consideration to be provided by the Stalking Horse Bid remains unclear and may create confusion among potentially-interested parties.  The Committee's concern, as highlighted herein, is that the Stalking Horse Bid – if accepted – will result in an administratively insolvent estate and a worse result than a liquidation.  Moreover, the Stalking Horse Bidder has fundamentally changed its offer and the market for these assets will need additional time to adjust to an asset purchase from the stock purchase proposal that was made public.

23.    The Debtors' most recent public filings with the Securities and Exchange Commission indicate that they had more than $50 million in assets as of the September 30, 2022, including approximately $26 million in inventory (of which $18 million was finished), $3.3 million in receivables, and more than $2.8 million in prepaid expenses, as well as the value of their relationships and intellectual property portfolio.

24.    Moreover, there is no indication that the marketing process leading up to this sale has been robust or thorough.  The proposed Bid Procedures include an outside closing date of January 20, 2023 despite seeking entry on December 22, 2022 (with 3 business days to provide notice and then an LOI deadline of December 30) – meaning that the *entirety* of the process will take place in the heart of the holiday season.  Aside from the fact that this is likely to turn off

---

[4]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bid Procedures Motion.

AFDOCS:26707791.1

potential buyers in and of itself *(who will likely have only 3 days between Christmas and New Years to evaluate the revised Stalking Horse transaction and decide whether to submit an LOI)*, the limited marketing window and the extremely condensed timeline all but assures that no other bidder will emerge at any auction as currently planned.  If the Brault Declaration is accurate, there were at least 20 parties that had expressed enough interest in the Debtors' assets to execute an NDA. Postponing the auction to a more reasonable date would entice at least some of those parties back to the table, while providing additional time to identify new potential purchasers and attempt to reconnect with previous parties.  It appears that the Bid Procedures benefit one party and one party only: the DIP Lender / Stalking Horse Bidder.

25.     In contrast to these asset valuations provided by the Debtors, the Stalking Horse Bidder proposes to pay $10 million plus the assumption of certain liabilities.  But there is no indication yet what the extent of those liabilities are, which may chill potential bids that produce a superior net result for the estates.  In light of the prevailing information vacuum and other concerns, the Committee makes the following preliminary objections to the proposed Bid Procedures:

a)     **Duplicative and Unwarranted Bid Protections**.  The  $300,000.00 Breakup Fee and $200,000 Expense Reimbursement are too high in light of the fees and reimbursement in the DIP Motion and are not justified under the circumstances.  *See, e.g., In re Energy Future Holdings Corp.*, 575 B.R. 616, 634 (Bankr. D. Del. 2017) (noting that breakup fees are payable "only in narrow circumstances" and must satisfy the "heavy burden" of demonstrating that the breakup fee is "one of the necessary costs or expenses of the estate").  The DIP Lender/Stalking Horse itself has now departed from its own executed Stalking Horse Purchase Agreement and fundamentally changed the deal terms with no material notice to the estate and key stakeholders.  It should receive no break-up fee, but to the extent the Court is inclined to award anything, it should be reduced by the amount of the DIP Closing Fee.  Further, the Expense

Reimbursement should be reduced to $75,000 and must not be duplicative of expenses paid under the DIP Facility. The estate should not be forced to bear all the costs of the DIP Lender/Stalking Horse's vacillations around a deal that it is has been negotiating and fundamentally changing since well before the Petition Date (Bid Procedures Motion Ex. A, ¶¶ 22-23).

      b)    **The Timeline Must Be Pushed Out**. The Committee's proposed counsel has been in contact with Debtors' counsel every day since its appointment. During most of that time, the Committee repeatedly expressed that it was lacking critical information necessary to make an informed decision on the DIP Facility and the Bid Procedures, but was confident that Debtors' counsel could and would provide that information and the parties would be able to reach some level of comfort and therefore agreement with respect to these matters. That changed on the night of December 20, 2022, when the Committee was informed that the Stalking Horse Bidder had unilaterally flipped the deal terms from an equity acquisition to an asset purchase while still intending to move forward with approval of the Bid Procedures on the previous timeline. Neither the Committee nor any potentially interested purchaser could be expected to conduct adequate (if any) diligence on these terms and on this timeline. There is simply no alternative at this point other than extending the timeline proposed in the Bid Procedures in order to allow all parties and potential parties in interest an opportunity to gain clarity on the *fundamental aspects* of the Stalking Horse Bid and the Debtors' assets and liabilities. To that end, the Committee proposes the below extended timeline (with the understanding that the proposed new deadlines represent the *absolute minimum* that the Committee believes could be acceptable as a reasonable amount of time:

| Milestone | Previous Deadline | **Proposed New Deadline** |
|---|---|---|
| Hearing to Consider Approval of Bid Procedures | December 22, 2022 at 10:00 a.m. | **January 6, 2023** |
| Service of Sale Notice | Three (3) business days after entry of Bidding Procedures Order | **One (1) business day after entry of Bidding Procedures Order** |
| Sale Objection Deadline | December 30, 2022 at 4:00 p.m. | **January 13, 2023** |
| LOI Deadline | December 30, 2022 at 4:00 p.m. | **January 13, 2023** |
| Bid Deadline | January 9, 2023 at 12:00 p.m. | **January 27, 2023** |
| Auction | January 11, 2023 at 10:00 a.m. | **January 31, 2023** |
| Sale Hearing | January 16, 2023 | **February 7, 2023** |
| Sale Closing | No later than January 20, 2023 | **No later than February 28, 2023** |

c)     **Committee's Right to Object Must Be Preserved**.  The Committee must have the right to object to the Sale, including to the Stalking Horse transaction and any credit bid of the Bid Protections (Bid Procedures Motion Ex. A, ¶¶ 22-23).

d)     **The Competitive Bidding Process Should Be Clearer**.  The Bid Requirements contemplate a sale of individual assets or assets by lot.  However, the Minimum Bid is only listed for "the Assets" as $10,600,000.00."  It must be clarified that the Minimum Bid only applies to a Bid for all of the Assets and that Qualified Bidders may make Bids for less than all of the Assets for less than $10,600,000.00.  Similarly, the Bid Requirements must clearly set forth the procedures for making a Bid on less than all of the Assets (Bid Procedures Motion Ex. A, Annex 1 ¶ 6).  The Minimum Overbid of $100,000.00 should likewise be clarified to only apply to Bids on all Assets and not individual Assets and/or lots, which must have separate overbid terms spelled out.  (Bid Procedures Motion Ex. A, Annex 1 ¶ 7).  Further the Bid Procedures should be

15

clarified such that the Stalking Horse Bid is still irrevocable by the Stalking Horse Bidder if selected as Back-Up Bid (Bid Procedures Motion Ex. A, Annex 1 ¶ 7).

e)     **Assumption of Contracts Should Be Fixed By Bid Deadline**.  Given the importance of contract assumption to the sale consideration, and the importance of setting clear expectations among bidders during an expedited process, the Stalking Horse Bidder should be required to provide notice of removal of a contract from the Assumed Contract list one day prior to the Auction, rather than two days prior to the Sale Hearing (Bid Procedures Motion Ex. B ¶ 1.2).

f)     **The Debtors and Stalking Horse Bidder Must Provide Clarity on What Liabilities are Being Purchased and Assumed**.  As mentioned above, the Stalking Horse Bidder previously intended to purchase the equity in BWSC, LLC, which would have allegedly also included the assumption of its liabilities (Bid Procedures Motion Ex. B ¶ 1.1).  For example, the Stalking Horse APA currently provides that Debtors are responsible for all "Pre-Closing Compensation and Benefits Liabilities" for employees hired by Buyer after closing.   (Bid Procedures Motion Ex. B ¶ 8.7). However, the Stalking Horse Bidder has now shifted to an asset purchase agreement on the eve of the hearing on the Bid Procedures.  The Debtors have provided a preliminary disclosure schedule, but are still in the midst of negotiations with the Stalking Horse Bidder and the Committee has little if any certainty on what will be left behind.  What assets— and more importantly, what liabilities—will remain in the estate post-sale is critical to determining the extent of the claims pool and whether there is even a sliver of hope that this case will not be rendered administratively insolvent by the DIP Loan and the Stalking Horse Agreement.  The Committee desperately needs clarity on these points.

g)     **Causes of Action Must Remain with the Debtors**.  Causes of action and claims on D&O Policies and proceeds therefrom, Chapter 5 Claims and proceeds thereof, and

AFDOCS:26707791.1

commercial tort claims and proceeds therefrom relating to any of the Debtors must be Excluded Assets to be retained by the Debtors and their respective successors and assigns (Bid Procedures Motion Ex. B ¶ 1.1).

h) **Good Faith Protections Are Premature**. The Debtors have failed to establish an evidentiary record that the DIP Lender/Stalking Horse Bidder has conducted itself in good faith. Although the Committee is unaware of countervailing facts at this early juncture, further information and an evidentiary record is required to grant relief under Section 363(m). *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147–48 (3d Cir. 1986) (finding of good faith required under § 363 is a factual one that must be made from the record).

### C. Cash Management Motion[5]

26.     The Committee is generally supportive of the Debtors' efforts to streamline and preserve prepetition efficiencies. The Cash Management Motion goes beyond streamlining and raises the following concerns:

a) **Payment of Prepetition Credit Cards**. By using superpriorty DIP funds to pay $800,000 in unsecured credit card obligations (in order to facilitate further unrestricted borrowing on an administrative basis), the Debtors are increasing the administrative burden on the estate and the risk of administrative insolvency. (Cash Management Interim Order, ¶ 5). The Committee objects to treating these prepetition amounts as anything other than general unsecured claims. *See, e.g., In re M Group, Inc.*, 268 B.R. 896 (Bankr. D. Del. 2001) (rejecting administrative expense priority for prepetition unsecured claims because it did not arise from postpetition conduct and did not meet the standards of § 503(b)).

---

[5] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Cash Management Motion.

AFDOCS:26707791.1

b) **Automatic Administrative Claims for Credit Card Companies**. The allowance of all postpetition charges on the Corporate Credit Cards as automatic administrative expenses is not merited (and, further, it is unclear how these claims would even be paid given the estate's fraught financial picture). Such expenditures must be vetted on an individual basis and afforded treatment according to the terms of the Bankruptcy Code (Cash Management Interim Order, ¶ 5). *M Group,* 268 B.R. 896.

c) **Automatic Administrative Claims for Intercompany Transactions**. There is insufficient information about the Debtors' Intercompany Transactions to grant automatic allowance of such transactions as administrative expenses (which, again, the Winc estate will have no clear way to pay). *M Group,* 268 B.R. 896. This provision is objectionable and should be stricken.

### D. Critical Vendor Motion[6]

27. As with other relief sought by the Debtors, the Committee does not object in principle to the creation of a critical vendor program to the extent necessary to preserve value. Here, however, the magnitude of the program raises several core concerns, as the Debtors propose to use the approximately $3 million borrowed on a superpriority basis from the Stalking Horse Bidder to pay the general unsecured claims of creditors—many of whom have contracts or other liabilities that the Stalking Horse Bidder (if successful) will likely be assuming and would otherwise be required to cure under the terms of the sale. The Stalking Horse Bidder will undoubtedly attempt to recoup those payments from the sale price through a credit bid of the outstanding DIP Facility.

---

[6] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Critical Vendor Motion.

AFDOCS:26707791.1

28.     To be clear, the concept of the Stalking Horse Bidder lending funds to ensure that relationships are preserved is valid—but this should be a last resort, justified by an evidentiary record, and should not prejudice the estates.  The Brault Declaration is exceedingly thin in its explanation and attempt to justify the Critical Vendor Motion, stating only that Ms. Brault had read the Motion and believed that the relief requested therein was justified.

29.     The *Declaration of Carol Brault in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 15] (the "Brault Declaration") does not substantiate or provide an evidentiary basis for the general statements in the Critical Vendor Motion that (a) foreign creditors as a whole should be automatically entitled to priority based on speculation that they will ignore U.S. bankruptcy law (and apparently should be rewarded for doing so); and (b) the existence of "potential liens" in favor of certain creditors requires paying them to protect inventory, notwithstanding the Debtors' large inventory stores, the expedited timeframe for a sale, and the absence of any evidence that "potentially" liened-up inventory is at risk.

30.     Neither the Critical Vendor Motion nor the Brault Declaration provide any detail regarding the extent to which the proposed payments were on account of executory contracts requiring continued performance and cure by the buyer.  In other words, the Debtors have not established cause to circumvent the priorities of the Bankruptcy Code to make all these payments.

31.     In light of the expedited timeline proposed by the Debtors, and lack of pertinent information necessary to evaluate the requested extraordinary relief, adequate safeguards should be put into place that prevent the critical vendor program from being abused and pushing the estates into administrative insolvency, which it appears they are already teetering on the brink of.  *See, e.g., In re Kmart Corp.*, 359 F.3d 866 (7th Cir. 2004) (denying critical vendor motion because debtors failed to allege sufficient facts to show that prepetition claimants were actually critical vendors); *In re Pioneer Health Services, Inc.*, 570 B.R. 228 (Bankr. S.D. Miss. 2017) (same).

AFDOCS:26707791.1

32.     The Debtors should implement protocols to ensure that any prepetition payments using the DIP Facility are truly necessary, including providing information to the Committee and obtaining the Committee's consent (not to be unreasonably withheld) prior to making such a payment.

## REQUEST FOR ADJOURNMENT

33.     The Committee also requests an adjournment of the Final DIP Hearing and Bid Procedures Hearing.  The Committee is amenable to a further interim draw under the DIP Facility, so long as adequate safeguards are put into place to address the concerns raised herein and adjusted DIP milestones and budget if the Court accepts the Committee's proposals with respect to the Bid Procedures schedule.

## PROPOSED SOLUTIONS

34.     The Committee needs time to evaluate the changed transaction, DIP Budget and likely outcomes of a sale by an estate that is inadequately funded for cost of restructuring while heavily funded for an aggressive critical vendor program and inventory purchases that solely support the Stalking Horse's business plan.  The goals of this transaction require a careful evaluation by the Committee and this Court along with the consideration of other alternatives so that administrative insolvency is not a fait accompli.  The Committee wants to work collaboratively with the Debtor and the Stalking Horse/DIP Lender.   But more time is needed, therefore the Committee proposes the following solutions:

A.   Adjournment of Bid Procedures hearing to January 6.  Alternatively, adjustment of the Bid Procedures Timeline to the dates set forth in Exhibit B hereto and as reflected in the Committee's mark-up at Exhibit C.

B.   Second Interim DIP Order to be revised as reflected in Exhibit A but not entered pending agreement with the Committee on a revised DIP Budget.

AFDOCS:26707791.1

C.  The Debtors' DIP Budget to be negotiated with the Committee and if agreement can be reached by December 23, the parties will submit the Second Interim DIP Order on consent.  If unable to agree, the parties will return to Court the week of December 26.

D.  The parties will agree on an acceptable professionals budget for the Committee by December 23.  If unable to agree, the parties will return to Court the week of December 26.

## <u>CONCLUSION</u>

Wherefore, the Committee respectfully requests that this Court enter an order (i) adjourning the current hearing scheduled on the DIP Motion and the Bid Procedures Motion on December 22, 2022 to January 6, 2023, (ii) modifying the terms of the Interim DIP Order, Bid Procedures Order, Cash Management Interim Order, and Critical Vendor Interim Order as set forth above, and (iii) granting such other relief as the Court deems proper.

Dated:  December 21, 2022
   Wilmington, Delaware

*/s/ Mark T. Hurford*
Anthony M. Saccullo (DE No. 4141)
Mark T. Hurford (DE No. 3299)
**A.M. SACCULLO LEGAL, LLC**
27 Crimson King Drive
Bear, DE 19701
Telephone: (302) 836-8877
Facsimile: (302) 836-8787
Email: Ams@Saccullolegal.com
   Mark@saccullolegal.com

George P. Angelich (*Pro hac vice*)
ARENTFOX SCHIFF LLP
1301 Avenue of the Americas, 42nd Floor
New York, NY 10019
Telephone : (212) 457-5423
Email : George.Angelich@afslaw.com

And

Justin A. Kesselman (*Pro hac vice*)
James E. Britton (*Pro hac vice*)
ARENTFOX SCHIFF LLP
800 Boylston Street, 32nd Floor
Boston, MA 02199
Telephone: (617) 973-6102
Email: Justin.Kesselman@afslaw.com
            James.Britton@afslaw.com

*Proposed Counsel to the Official Committee of*
*Unsecured Creditors*

AFDOCS:26707791.1