**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>WINC, INC., *et al.*,[1]<br><br>　　　　　　Debtors. | Chapter 11<br><br>Case No. 22-11238 (LSS)<br><br>(Jointly Administered)<br><br>**Ref. Docket No. 47** |

**DECLARATION OF MORGAN LEY IN SUPPORT OF DEBTORS' MOTION
FOR ENTRY OF (A) AN ORDER (I) APPROVING BIDDING PROCEDURES IN
CONNECTION WITH THE SALE OF THE DEBTORS' ASSETS AND RELATED
BIDDING PROCEDURES, (II) APPROVING FORM AND MANNER OF NOTICE,
(III) SCHEDULING AN AUCTION AND SALE HEARING, (IV) AUTHORIZING
PROCEDURES GOVERNING ASSUMPTION AND ASSIGNMENT OF CERTAIN
CONTRACTS AND UNEXPIRED LEASES, AND (V) GRANTING RELATED
RELIEF; AND (B) AN ORDER (I) APPROVING PURCHASE AGREEMENTS,
AND (II) AUTHORIZING A SALE FREE AND CLEAR OF ALL LIENS,
CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS**

I, Morgan Ley, make this declaration (this "Declaration") under 28 U.S.C. § 1746 and state as follows:

1.　　I am a Managing Director in the Consumer Investment Banking group at Canaccord Genuity LLC ("Canaccord"), a financial advisory and investment banking firm, which has its principal office at 535 Madison Avenue, New York, New York 10022.  Canaccord has filed an application with the Court under 11 U.S.C. §§ 327(a) and 328(a)[2] to be retained as the investment banker to Winc, Inc. and its debtor affiliates (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Winc, Inc. (8960); BWSC, LLC (0899); and Winc Lost Poet, LLC (N/A).  The Debtors' mailing address for purposes of these chapter 11 cases is 1751 Berkeley Street, Studio 3, Santa Monica, CA 90404.

[2] *See Debtors' Application for Entry of an Order (I) Authorizing the Employment and Retention of Canaccord Genuity LLC as Investment Banker for the Debtors, Effective as of the Petition Date; and (II) Waiving the Information Requirements of Local Rule 2016-2(d)* [Docket No. 67].

2. I have been a Managing Director at Canaccord since January 2017. Prior to joining Canaccord, I was Managing Director in the Consumer Investment Banking group at Raymond James Financial. I have over 25 years of experience in the field of financial advisory and corporate finance related services. During the course of my career, I have considerable experience advising consumer product companies. Representative engagements include the sale of Rebbl Beverages to SYSTM Foods; the sale of Northern Quinoa Corp. to Above Food Corp.; the sale of Vertical Supply Group to Gridiron Capital; the sale of Deutsche Beverage Technology to The Middleby Corporation; the sale of Design Public Group to HNI Corporation; the sale of Sherrill Tree Corp. to Platte River Equity; the sale of iParty Corp. to Party City Holdings Inc.; the sale of VetCor Professional Practices to Cressey & Company; the sale of Topp Portable Air to Sunbelt Rentals; and the sale of City Sports to Highland Consumer Fund. I received my A.B. from Harvard College.

3. I submit this Declaration in support of the relief requested in the motion [Docket No. 47] (the "Bidding Procedures Motion")³ filed by the Debtors seeking, among other things, entry of an order approving (i) certain bidding procedures (the "Bidding Procedures") and assumption and assignment procedures; (ii) entry into an asset purchase agreement with the stalking horse bidder, subject to higher and better bids; and (iii) certain bidding protections (the "Bidding Protections").

4. Except as otherwise indicated, all statements in this Declaration are based upon my review of relevant documents, my discussions with the Debtors and their professionals, my

---

³ Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Bidding Procedures Motion.

29951671.6

discussions with other members of the Canaccord team working on this engagement, and my personal knowledge and experience. If I were called upon to testify, I could and would testify to each of the facts set forth below.

**A.    Qualifications**

5.    Canaccord is an independent and full-service global investment banking firm offering investment banking, equity research, wealth management, institutional and private brokerage, and private capital solutions to individual and institutional clients. Globally, Canaccord has a leading merger and acquisition ("M&A") advisory practice, with over 1,100 M&A transactions since 2010 with over 130 transactions in the last twelve months representing aggregate disclosed transaction value greater than $28 billion. Canaccord's professionals have considerable experience in providing investment banking services to financially-distressed companies and to creditors, purchasers, bondholders, and other constituencies in chapter 11 as well as in out-of-court proceedings. Representative engagements that investment bankers at Canaccord have led in prior chapter 11 cases and restructurings include AbitibiBowater, Inc.; American Eagle Energy Corp.; American IronHorse Motorcycles, Inc.; BI-LO, LLC; Buccaneer Energy LLC; Calpine Corp.; Catalyst Paper Corp.; Comptom Petroleum Corp.; Dakota Plains Holdings, Inc.; Diamond Glass Companies, Inc.; Gateway Ethanol, LLC; Giordano's Enterprises, Inc.; Gulf Fleet Holdings, Inc.; Hipcricket, Inc.; HMX Acquisition Corp.; International Garden Products, Inc.; Jaguar Mining, Inc.; KeyLime Cove Waterpark, Inc.; Loehmann's, Inc.; Max & Erma's, Inc.; National Envelope Corp.; OptiCanada, Inc.; Renew Energy, Inc.; Response Genetics, Inc.; Robbins Bros. Corp.; Santa Fe Gold Corp.; SynCardia Systems, Inc.; TimberWest Forest Corp.; Waterworks, Inc.; and Yellow Media, Inc.

**B.    Canaccord's Engagement and Prepetition Involvement with the Debtors**

6.    On March 16, 2022, the Debtors retained Canaccord to assist with assessing strategic alternatives, including a potential sale of all or substantially all of the Debtors' assets (the "Assets").  As result of its over nine month engagement by the Debtors, Canaccord has acquired significant knowledge of the Debtors' business, including their debt and capital structure, business operations, key stakeholders, financing documents, and related matters.  Given the extensive involvement with the marketing and sale of the Assets to date, Canaccord is uniquely situated to address the current and potential interest for the Assets, as well as how and why the value of the Assets would be maximized through an efficient sale process, and the need to provide the Debtors' proposed stalking horse bidder with Bidding Protections.

7.    Canaccord undertook a lengthy prepetition marketing effort and began soliciting indications of interest (each, an "IOI") for the sale of the Assets, both on an integrated basis as well as on a piecemeal basis.  As part of these efforts, Canaccord crafted detailed marketing materials and assembled related diligence information for a confidential electronic data room (the "Data Room") and a confidential information presentation with the assistance of the Debtors and their other professional advisors.  Canaccord developed an initial list of approximately forty (40) strategic and financial prospective purchasers.  Canaccord also circulated, via email, a detailed "teaser" and description of the opportunity to acquire the Debtors' Assets to all of the prospective purchasers.

8.    Eventually, nineteen (19) interested parties executed non-disclosure agreements (each, an "NDA") and were provided with the confidential information presentation, access to meet management and ask questions via a Zoom call (a "Fireside Chat") and then received a process letter detailing the requirements and timing for delivery of IOIs.  Ultimately, of the ten

(10) interested parties that held a Fireside Chat with members of the Debtors' management team to ask questions about the Assets and the Debtors' operations; three (3) submitted initial indications of interest. These three (3) parties were then provided with access to the Data Room which contained diligence information about the Debtors and their assets and were asked to submit final proposals.

9. Canaccord responded to various inquiries, and, at the end of September, two (2) parties submitted updated proposals. During October, the Debtors then conducted good-faith, arms'-length negotiations with these prospective buyers simultaneously, and these prospective buyers then conducted deeper diligence into the Debtors' businesses. The Debtors also received an unsolicited inbound IOI in mid-October for certain assets of the Debtors. In connection with this process and given the Debtors' liquidity issues and inability to secure third party financing, in early November 2022, Canaccord requested potential prospective buyers provide proposals on an all-cash basis and include bridge financing to support the Debtors' operations through a closing of any sale. Ultimately, only one (1) prospective buyer—Project Crush Acquisition Corp LLC (the "Stalking Horse Bidder")—submitted an actionable bid for the Assets (the "Stalking Horse Bid").

C. **Negotiations with the Stalking Horse Bidder**

10. During initial negotiations with the Stalking Horse Bidder in mid-November 2022, the Stalking Horse Bidder's proposal provided for an all-cash purchase price and extension of credit to fund the Debtors' operations until an out-of-court merger transaction could be consummated. After the Stalking Horse Bidder provided an updated proposal, the parties executed an exclusivity agreement to provide a period of exclusive negotiations for eight days and the Stalking Horse Bidder committed to deliver documentation for the merger transaction and bridge financing. However, on the day before Thanksgiving (two days prior to the end of the exclusivity

period), the Stalking Horse Bidder revised the structure of the proposed transaction, and instead proposed to consummate the transaction through a sale process (the "Sale") under 11 U.S.C. § 363. In addition, the Stalking Horse Bidder submitted an updated letter of intent ("LOI") offering to purchase the Assets for $8 million in cash consideration. Upon receipt of these new proposed terms and process, the Debtors, with the assistance of Canaccord and the Debtors' other professional advisors, reached out to a select number of previously interested parties to solicit better offers (on an in-court and out-of-court basis) in a timely manner. After it was determined that the Stalking Horse Bidder offered the best and most executable offer in the time the Debtors had available to them, the Debtors executed an LOI and engaged in extensive arms'-length negotiations, after which the Debtors and the Stalking Horse Bidder agreed on the terms of a stalking horse bid, including an increase in the amount of cash consideration to $10 million. After further negotiations, on December 7, 2022, the Debtors ultimately executed an asset purchase agreement (the "Original APA").

11. On December 20, 2022, the Debtors received an amended and restated purchase agreement from the Stalking Horse Bidder that modified the structure of the transaction such that the Stalking Horse Bidder was no longer purchasing the equity interests of BWSC, LLC, but proposed to purchase BWSC, LLC's assets. As explained by the Stalking Horse Bidder, the modification to the Original APA was necessitated because of a significant liability of BWSC, LLC that was mistakenly booked at Winc, Inc. related to a legacy earn out obligation. As a result of the changed structure, the cash purchase price has been increased by $1,000,000 to $11,000,000, while continuing to assume specified liabilities related to the business. On December 21, 2022, the Debtors and the Stalking Horse Bidder executed the amended and restated asset purchase agreement, dated as of December 21, 2022 (the "Stalking Horse Agreement").

### D. The Stalking Horse Agreement

12. The Debtors determined, after considering all circumstances and in consultation with their professional advisors, that the Sale of the Assets through the Chapter 11 Cases would provide the best opportunity to maximize the value of the Assets. After extensive arms'-length negotiations, the Debtors and Stalking Horse Bidder entered into the Stalking Horse Agreement, which provides a baseline bid for the Sale. The purchase price contemplated by the Stalking Horse Agreement is $11.0 million in cash consideration, plus assumed liabilities. The Stalking Horse Agreement contemplates that the cash consideration paid to the Debtors by the Stalking Horse Bidder will be reduced by the aggregate amount of any unpaid and outstanding obligations under the DIP Facility by virtue of a credit bid.

13. The Stalking Horse Agreement provides the best option to maximize value for stakeholders. The Debtors, with the assistance of Canaccord and the Debtors' other professional advisors, engaged in good-faith, arms'-length negotiations with the Stalking Horse Bidder regarding the Stalking Horse Agreement and the terms of the postpetition financing. The Debtors' entry into the Stalking Horse Agreement, together with the committed postpetition financing from the Stalking Horse Bidder, permits the Debtors to conduct a value-maximizing sale process that is backstopped by the proposed Stalking Horse Bid. The Debtors' consummation of sale pursuant to the terms of the Stalking Horse Agreement is subject to higher or otherwise better offers (in whole or through a combination of bids) that the Debtors may receive for the Assets pursuant to the Bidding Procedures. Accordingly, there is a strong business justification for the Debtors' entry into the Stalking Horse Agreement.

14. Further, the Stalking Horse Bid benefits the Debtors by serving as a floor for an overbid process to ensure that the Debtors receive the highest or otherwise best offer for the Assets.

29951671.6

Accordingly, if the Debtors were to continue to market the Assets without the benefit of a Stalking Horse Bid serving as the floor, the Debtors might encounter greater challenges in their pursuit of the highest or otherwise best offer for the Assets.

E.    **The Postpetition Marketing Process**

15.    Since November 30, 2022 (the "Petition Date"), Canaccord has contacted over fifty-five (55) potentially interested parties, including various parties that had been contacted prior to the Petition Date, regarding the Assets and the Sale. To date, Canaccord continues its efforts to market the Assets and ensure that the Debtors are able to obtain the highest and best value for the Assets. Thus far, over fifty (50) potentially interested parties have received an updated process letter outlining the proposed bidding procedures and the associated timelines, and there are over twenty-five (25) parties who have access to the Data Room. Upon the Court's approval of the Bidding Procedures, Canaccord, with the assistance of the Debtors' professionals, will continue to market the Assets and ensure a robust and competitive sale process that maximizes value for the Debtors' stakeholders.

F.    **The Bidding Procedures and Sale Timeline**

16.    I have reviewed and am familiar with the Bidding Procedures Motion and the related Bidding Procedures. It is my opinion that the Bidding Procedures and the Debtors' proposed sale timeline (the "Sale Timeline") will allow the Debtors to obtain the highest or otherwise best value for the Assets under the circumstances of the Chapter 11 Cases. The Debtors, with Canaccord's assistance, extensively marketed the Assets prior to filing the Chapter 11 Cases, and continued marketing the Assets post-filing, therefore, the Sale Timeline provides sufficient time for potentially interested parties to formulate bids. The proposed postpetition sale process contemplated by the Debtors is a continuation of a lengthy and comprehensive prepetition

29951671.6

initiative. The Debtors have already made contact with over fifty-five (55) potentially interested parties, set up a Data Room with diligence documents, provided a confidential informational presentation, and, since filing the Chapter 11 Cases, have subsequently reengaged with formerly interested parties, as well as fielding inquiries from new sources.

17. The Bidding Procedures are designed to provide the Debtors with flexibility to solicit proposals, negotiate transactions, hold an auction, and consummate a transaction for the highest or best value. The Bidding Procedures are intended to strike an appropriate balance between ensuring that there is a full and fair opportunity for the Debtors and their stakeholders to review and consider proposed transactions, managing the Debtors' operational and liquidity needs, and maintaining ongoing customer engagement. The Debtors simply do not have sufficient liquidity to engage in a prolonged postpetition sale and marketing process, and such a process is unnecessary under the circumstances given the Debtors' prepetition sale efforts.

18. The Sale Timeline is also necessary to maintain brand value, which is of primary concern to the Stalking Horse Bidder—the only bidder that has provided the Debtors with an executable going concern proposal. If the Sale Timeline was extended, given the Debtors' liquidity position, the Debtors would likely be forced to, among other things, immediately liquidate certain inventory and implement further cost savings measures that will risk the deterioration of brand value, and potentially jeopardize the Sale. In addition, due to the Debtors' liquidity position, the Debtors have halted marketing expenditures that serve as a key driver in revenue growth in the business. If the Sale Timeline is extended and marketing expenditures are not reinstated, the Debtors anticipate that their future revenue levels will be meaningfully eroded.

### G. The Bidding Protections

19. As a key inducement to the execution of the Stalking Horse Bid, the Debtors have agreed, subject to Court approval, to provide the Stalking Horse Bidder with certain Bidding Protections, should the Debtors consummate an alternative transaction for the Assets with another bidder, including: (i) an initial overbid amount; (ii) payment of a break-up fee in the amount of $330,000 (i.e., less than 3% of the implied purchase price of $11.0 million plus assumed liabilities); and (iii) reimbursement of up to $200,000 in out-of-pocket expenses, each subject to the terms of the Stalking Horse Bid. The Bidding Protections were the subject of good faith negotiations. Without the Bidding Protections, the Stalking Horse Bidder would not have agreed to serve as a stalking horse at the values reflected in the Stalking Horse Bid, which may have degraded the value of the Assets and imperiled a postpetition sale process.

20. Based on my substantial experience and personal knowledge of the Debtors' sale and marketing efforts, I believe the proposed Bidding Protections are (a) fair and reasonable; (b) designed to encourage bidding and obtain the best price for the Assets; and (c) in the best interests of the Debtors, their creditors and their estates.

### H. The Debtors' Sale Process Is Intended to Maximize Value and Should be Approved

21. In conclusion, for the reasons discussed above, I believe that approval of the proposed Bidding Procedures, Sale Timeline, and Bidding Protections will enable the Debtors to obtain the highest or otherwise best offer for the Assets under the circumstances and will thereby maximize value for the benefit of all stakeholders in the Chapter 11 Cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  December 22, 2022

*/s/ Morgan Ley*
Morgan Ley
Managing Director
Canaccord Genuity LLC