**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| WINC, INC., *et al.*,[1] | Case No. 22-11238 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. 67** |

## NOTICE OF FILING OF EXHIBIT

**PLEASE TAKE NOTICE** that, on December 16, 2022, the above-captioned debtors and debtors in possession filed the *Debtors' Application for Entry of an Order (I) Authorizing the Employment and Retention of Canaccord Genuity LLC as Investment Banker for the Debtors, Effective as of the Petition Date; and (II) Waiving the Information Requirements of Local Rule 2016-2(d)* [Docket No. 67].

**PLEASE TAKE FURTHER NOTICE** that the engagement agreement between the Debtors and Canaccord Genuity LLC dated March 16, 2022 is attached hereto as **Exhibit A**.

*[Signature page follows]*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Winc, Inc. (8960); BWSC, LLC (0899); and Winc Lost Poet, LLC (N/A). The Debtors' mailing address for purposes of these chapter 11 cases is 12405 Venice Boulevard, Box #1, Los Angeles, CA 90066.

29986455.1

| | | |
|---|---|---|
| Dated: | December 28, 2022<br>Wilmington, Delaware | YOUNG CONAWAY STARGATT & TAYLOR, LLP |

*/s/ Joshua B. Brooks*
Michael R. Nestor (No. 3526)
Matthew B. Lunn (No. 4119)
Allison S. Mielke (No. 5934)
Joshua B. Brooks (No. 6765)
Shella Borovinskaya (No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:  mnestor@ycst.com
          mlunn@ycst.com
          amielke@ycst.com
          jbrooks@ycst.com
          sborovinskaya@ycst.com

*Proposed Counsel to the Debtors and Debtors in Possession*

# **EXHIBIT A**

**Engagement Agreement**



Canaccord Genuity LLC
99 High Street
Suite 1200
Boston, MA
USA 02110

T1: 1.617.371.3900
T2: 1.800.225.6201
cgf.com

**CONFIDENTIAL**

March 16, 2022

Winc, Inc.
1751 Berkeley St.  Studio 3
Santa Monica, CA 90404

Attention:   Geoffrey McFarlane
             Chief Executive Officer

Ladies & Gentlemen:

This letter agreement (the "Agreement") will confirm our understanding of the terms and conditions under which Canaccord Genuity LLC (together with its affiliates, control persons, directors, officers, employees, and agents, "CG") is engaged by Winc, Inc. (together with its subsidiaries and affiliates, the "Company") as its exclusive financial advisor in connection with the Company's review of its strategic and financial alternatives, including one or several possible business combinations, whether in one or more transactions, through the sale of an organization's equity securities or assets, or by means of a merger, consolidation, reorganization, recapitalization, spin-off, joint venture, partnership, tender offer, exchange offer, purchase, lease, divestiture, licensing arrangement, strategic alliance, or any other transaction of a like nature, regardless of form (a "Transaction") with any other person (individually, and together with each such person's respective subsidiaries and affiliates, the "Strategic Partner").

1. <u>Services</u>.  As financial advisor, CG will if appropriate and if requested:

    (a)   assist the Company in analyzing and evaluating its business, operations and financial position and its strategic alternatives;

    (b)   assist the Company in preparing descriptive materials for distribution and presentation to potential Strategic Partners;

    (c)   assist the Company in the preparation and implementation of a plan to have discussions with prospective Strategic Partners;

    (d)   assist the Company in identifying and screening interested prospective Strategic Partners;

    (e)   assist the Company in coordinating potential Strategic Partners' due diligence investigations;

    (f)   assist the Company in evaluating proposals received from potential Strategic Partners from a financial point of view;

*CONFIDENTIAL*

Winc, Inc.
March 16, 2022
Page 2 of 11

  (g)  assist the Company in structuring and negotiating the financial aspects of any Transaction;

  (h)  meet, at the Company's reasonable request, with its Board of Directors to discuss any proposed Transaction and its financial implications; and

  (i)  render an opinion addressed to the Board of Directors of the Company or a committee thereof, in its capacity as such, as to the fairness, from a financial point of view, to the Company or its stockholders, as appropriate, of the consideration to be received by the Company or its stockholders, as the case may be, in a Transaction (or, in the case of a Transaction that involves an exchange of securities of the Company or its subsidiaries, the exchange ratio) (the "Opinion").

If CG is requested to render an Opinion, the nature and scope of its analysis and investigation it undertakes in order to render such Opinion and the scope, form and substance of the Opinion will be such as CG considers appropriate and will not address the underlying business decision to effect a Transaction. The Opinion will contain any customary qualifications, assumptions, and limitations as CG considers appropriate in its sole discretion and CG may qualify the Opinion in any customary manner that it believes appropriate. Any such Opinion will expressly exclude consideration of any compensation or compensation arrangements arising from the Transaction which benefit any officer, director or employee of the Company, or any class of such persons. The Opinion may be included in any disclosure document required to be filed by the Company with the Securities and Exchange Commission with respect to a proposed Transaction, provided that it is reproduced in full, and that any description of or reference to CG, the Opinion or the analyses performed by CG in connection with the rendering of the Opinion shall be in form and substance acceptable to CG. It is understood and agreed that the Opinion will be addressed to, and be prepared solely for the use and benefit of the Board of Directors of the Company, or a committee thereof, if applicable, and may not be disclosed to any third party or circulated or referred to publicly (except as otherwise provided in this paragraph) without the prior written consent of CG.

The Company will furnish and will request potential Strategic Partners to furnish CG such information as CG requests in connection with the performance of its services hereunder (all such information so furnished is referred to herein as the "Information"), and the Company will provide reasonable access to its executive officers, directors, accountants, counsel and other representatives in connection therewith. The Company agrees that CG, in performing its services hereunder, will use and rely upon the Information without assuming any responsibility for independent investigation or verification thereof. Accordingly, CG shall be entitled to assume and rely upon the accuracy and completeness of all such Information. CG will assume that any forecasts and projections approved by the Company for CG's use have been reasonably prepared and reflect the best currently available estimates and judgments of the management of the Company or the potential Strategic Partner, as the case may be, as to the matters covered thereby. The Company will advise CG of any material event or change in the business, affairs, condition (financial or otherwise) or prospects of the Company or, to the Company's knowledge, the Strategic Partner, in each case, that is reasonably relevant to the engagement. The Company will be solely responsible for the Information and any marketing or diligence materials provided by or

*CONFIDENTIAL*

Winc, Inc.
March 16, 2022
Page 3 of 11

on behalf of the Company to potential Strategic Partners in any Transaction contemplated by this engagement. CG will not independently evaluate or appraise any assets or liabilities that may be acquired or assumed in a Transaction, or advise or opine on any related solvency issues.

Except to the extent expressly permitted herein, any advice or opinions CG provides, and any fee arrangements for this assignment may not be disclosed or referred to publicly or to any third party without the prior written consent of CG; provided, that the Company may disclose (a) any such information to its outside legal, accounting and other advisors who are advising the Company in connection with the transactions contemplated by this Agreement (on a confidential and non-reliance basis), and (b) any such information as required by subpoena, court order, regulatory process, legal process (including as reasonably necessary or appropriate in response to a request of any governmental or regulatory authority or court of competent jurisdiction) or disclosure document required to be filed by the Company with the Securities and Exchange Commission. In the event disclosure is required pursuant to clause (b) of the proviso of the immediately preceding sentence, the Company will provide CG with reasonable advance notice (to the extent allowable by law) and permit it to comment on the form and content of the disclosure which comments the Company will consider in good faith, and the Company will reasonably cooperate with CG in obtaining confidential treatment for any such disclosures.

CG agrees that any non-public information relating to the Company or any potential Strategic Partner received by CG from or at the direction or request of the Company will be used by CG and its representatives solely for the purpose of performing its services hereunder and that CG will maintain the confidentiality thereof except to the extent (a) such information is or becomes otherwise publicly available without breach of this Agreement; (b) disclosure thereof is required by subpoena, court order, regulatory process or legal process (including as reasonably necessary or appropriate in response to a request of any governmental or regulatory authority or court of competent jurisdiction); (c) CG discloses such information to a party that is bound by a confidentiality agreement reasonably acceptable to the Company; or (d) the Company consents to the transmission of such information. The Company agrees that it shall have the sole responsibility for any non-disclosure agreement entered into by CG on behalf of the Company in connection with a Transaction.

2. <u>Fees</u>. In consideration for its services hereunder, the Company shall pay CG, by wire transfer of immediately available funds at the time due, the following nonrefundable fees:

   (a) $50,000, for services provided in connection with the commencement of the engagement, payable upon signing of this Agreement (the "Signing Fee");

   (b) A quarterly work-fee of $25,000 payable on each of June 1, 2022 and August 30, 2022) (the "Work Fee");

   (c) $500,000, payable upon delivery to the Board of Directors of the Opinion, regardless of the conclusions reached therein (the "Opinion Fee"); and

*CONFIDENTIAL*

Winc, Inc.
March 16, 2022
Page 4 of 11

    (d) Upon the closing of a Transaction, a "Transaction Fee" equal to the greater of (i) 2.0% of Aggregate Consideration or (ii) $2,000,000 (as defined below);

provided, further, that the Signing Fee and the Opinion Fee paid pursuant to subsection 2(a) and 2(c) shall be credited against the related Transaction Fee paid by the Company to CG.

For purposes of this Agreement, "Aggregate Consideration" shall mean the cumulative value of the Transaction, implied by the sum of all cash and dividends (other than the ordinary course recurring dividends) paid or payable and the fair market value of all property, rights (contractual or otherwise), or securities transferred or transferable directly or indirectly in connection with a Transaction, including (i) cash amounts paid or securities issued (or otherwise exchanged or transferred) to holders of shares of capital stock (or similar equity or ownership interests) or of any warrants, options or stock appreciation rights, whether or not vested, or other securities convertible or exchangeable for any shares of capital stock (or similar equity or ownership interests); (ii) the total amount of indebtedness for borrowed money or similar non-trade liabilities or obligations (including pension liabilities, guarantees, capitalized leases, deferred compensation and the like) repaid, retired, extinguished or assumed in connection with a Transaction; (iii) the value of any performance payments, equity incentives, cash bonus plans or other similar arrangements established in connection with a Transaction (other than ordinary course base salary and bonuses consistent with past practice); (iv) the value of any dividends or other distributions to stockholders or affiliates, declared or paid after the date of this Agreement, other than normal recurring cash dividends in amounts not materially greater than currently paid; and (v) amounts paid by the Company to repurchase any of its securities outstanding on the date hereof. Aggregate Consideration shall include, in the case of a joint venture or similar collaborative undertaking, the total amount of Company cash and fair market value (on the date of closing) of all property contributed by the Company to the joint venture.

For purposes of calculating Aggregate Consideration: (i) in a Transaction involving the sale or transfer, directly or indirectly, of 50% or more of the outstanding common stock or other equity interest in, or assets of, the Company, Aggregate Consideration shall be calculated as if 100% of the outstanding common stock or other equity interest in, or assets of, the Company were sold or transferred for the same amount paid (and otherwise on the same terms) in such Transaction; (ii) the value of any security (as that term is defined in the Securities Act of 1933, as amended) in connection with a Transaction will be determined, if a publicly-traded security, on the basis of the average of the closing prices for the 20 trading days ending 5 trading days prior to the closing, or, if the security is not freely tradable (or having no established public market) on the basis of the fair market value of such security at closing as agreed in good faith by CG and the Company; and (iii) the value of any property transferred in connection with a Transaction will be determined on the basis of the fair market value of such property at closing as agreed in good faith by CG and the Company.

Amounts paid into escrow, installment payments and contingent payments in connection with a Transaction shall be included as part of Aggregate Consideration. Fees on amounts paid into escrow will be payable upon payout of such escrow or installment payment. In the event the consideration to be paid in a Transaction may be increased by payments related to future events

*CONFIDENTIAL*

Winc, Inc.
March 16, 2022
Page 5 of 11

(including, for this purpose earnout payments, and performance payments, equity incentives, cash bonus plans or other similar arrangements established in connection with a Transaction as described in clause (iii) under the definition of Aggregate Consideration), the portion of the Success Fee relating to such contingent payments will be calculated and paid if and when such contingent payments are made.

If, in connection with a Transaction that is not completed, the Company receives a break-up fee, topping fee, liquidated damages, expense reimbursement or other termination fee or payment (including, without limitation, any judgment for damages or amount in settlement of any dispute as a result of the failure of such Transaction or any stock or other securities or payment in lieu thereof received from a potential Strategic Partner or its affiliates pursuant to a stock option agreement or otherwise) (collectively, a "Termination Fee"), the Company will pay CG a fee equal to 15% of such Termination Fee at the time such Termination Fee is received by the Company.

All amounts in this Agreement (including for purposes of expenses) are stated in U.S. dollars and all payments under this Agreement will be paid in immediately available funds in U.S. dollars, free and clear of any value added or similar tax, assessment or other governmental charge. If the Aggregate Consideration to be paid is computed in any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted in U.S. dollars at the prevailing exchange rate on the date the Aggregate Consideration is paid. The Company agrees to make available to CG all its documents and other information reasonably necessary for CG to calculate the Aggregate Consideration of a Transaction.

3. <u>Expenses</u>.  In addition to any fees that may be payable to CG hereunder and regardless of whether any Transaction is proposed or closed, the Company hereby agrees, from time to time upon request, to reimburse CG for all of its reasonable and documented expenses arising out of the engagement hereunder (including travel and related expenses, the costs of document preparation, production and distribution (such as printing and binding, and photocopies), and third party research and database services, and the reasonable fees and disbursements of independent counsel retained by CG); provided such expenses shall not exceed $75,000 without the Company's prior written consent (not to be unreasonably withheld).  CG expects to bill such expenses periodically with payment due within 30 days after a statement therefor. Nothing herein will be deemed to limit in any manner the indemnification, expense reimbursement, and other obligations of the Company pursuant to the provisions set forth in Annex A, which is incorporated by reference into this Agreement.

4. <u>Indemnification</u>.  In consideration of and as a condition precedent to CG undertaking the engagement contemplated by this Agreement, the Company agrees to the indemnification provisions and other matters set forth in Annex A, which is incorporated by reference into this Agreement.

5. <u>Termination of Engagement</u>.  The engagement of CG hereunder shall continue until the date that is 12 months from the date of this Agreement or until terminated under this Section 5.  CG engagement hereunder may be terminated by either party at any time for any reason, upon 10 days' prior written notice to the other party.  Upon any termination or expiration of the engagement, CG

*CONFIDENTIAL*

Winc, Inc.
March 16, 2022
Page 6 of 11

    (i) will be entitled to its full fee under Section 2 hereof in the event that (A) at any time prior to the expiration of 12 months after such termination or expiration a Transaction is consummated; or (B) the Company enters into an agreement during the term of this Agreement or during such subsequent 12 month period contemplating a Transaction and such Transaction is ultimately consummated, and (ii) will continue to be entitled to any accrued and unpaid expenses described in Sections 3 above. In addition, the non-disclosure provisions in Section 1, as well as Sections 3, 4, 5, 6, 7, 10 and Annex A shall remain operative and in full force and effect regardless of any termination or expiration of this engagement.

6. <u>Reliance on Others</u>. CG does not provide accounting, tax or legal advice. The Company confirms that it will rely on its own independent counsel and independent accountants for such advice.

7. <u>No Rights in Stockholders, etc</u>. CG has been engaged only by the Company, and this engagement of CG is not intended to confer rights upon any stockholder, partner, member, creditor, employee or other owner of the Company or any other person not a party hereto. Unless otherwise expressly agreed, no one other than the Company and the Company's Board of Directors is authorized to rely on any statements, advice, opinions or conduct by CG. Any opinions or advice rendered by CG to the Company's Board of Directors or management in the course of this engagement are solely for the purpose of assisting the Company's Board of Directors or management, as the case may be, in evaluating a Transaction and such opinions or advice may not be relied upon by any other person and do not constitute a recommendation to any stockholder of the Company concerning action that such stockholder might or should take in connection with a Transaction. CG role herein is that of an independent contractor and nothing contained herein is intended to create or shall be construed as creating a fiduciary, agency or other relationship between CG and the Company or its security holders, employees or creditors. The Company agrees that it shall not make, and hereby waives (to the extent allowable by applicable law), any claim based on an assertion of such a fiduciary duty, agency or other relationship.

8. <u>Other Activities</u>. CG is a full-service securities firm engaged, either directly or through its affiliates, in various activities, including securities trading, investment management, financing and brokerage activities. As such, the Company should be aware that CG and/or its affiliates may be providing or may in the future provide financial or other services to other parties with conflicting interests. In the ordinary course of its business, CG and its affiliates may actively trade the securities (or related derivative securities) of the Company and other companies which may be the subject of the engagement contemplated by this letter for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities. In addition, CG has adopted policies and procedures designed to preserve the independence of its research analysts, whose views may differ from those of CG investment banking department. Consistent with CG policy to hold in confidence the affairs of its clients, CG will not use on the Company's behalf or have any obligation to disclose to the Company or otherwise have any liability to the Company with respect to any confidential information obtained from any other person. CG confirms that, as of the date of this Agreement, it is not engaged to act as a financial advisor or as a provider or arranger of financing to any other party in connection with a Transaction, nor will it accept any such engagement during the term of this engagement without the Company's prior written consent. CG has not within the past year engaged in any substantive discussions with any

*CONFIDENTIAL*

Winc, Inc.
March 16, 2022
Page 7 of 11

> third party concerning the possibility of effecting, causing, or participating in a Transaction with the Company. In connection with the identification of potential Strategic Partners for a Transaction or if the Board of Directors elects to engage in formal discussions with one or more parties regarding a Transaction, CG will, upon the request of the Board of Directors, disclose to the Board of Directors, its investment banking, capital markets or lending engagements with respect to such parties and the total fees derived from such engagements. CG has previously disclosed to the Board of Directors, and hereby represents, that CG and its affiliates do not beneficially own any interests in the Company or any Strategic Partner identified as of the date of this Agreement.

9. <u>Compliance with Laws</u>.  The Company represents that neither it nor any of its affiliates under common control, nor, to the knowledge of the Company, and of their respective directors or officers, is an individual or entity ("Person") that is, or is owned or controlled by a Person that is: (i) a Person with whom dealings are prohibited or restricted under U.S. economic sanctions (including those administered or enforced by the U.S. Department of Treasury's Office of Foreign Assets Control and the U.S. Department of State) or under sanctions imposed by the United Nations Security Council, Canada, the European Union or any member countries thereof; (ii) a Person subject to anti-money laundering prohibitions, restrictions or sanctions imposed by the United States, Canada, the European Union or any member countries thereof, or any other applicable jurisdiction; or (iii) to the knowledge of the Company, not in compliance in all material respects with all applicable anti-money laundering laws and sanction laws.

10. <u>Miscellaneous</u>.  Nothing in this Agreement is intended to obligate or commit CG to provide any services other than as set forth above.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but which together shall be considered a single instrument.  This Agreement (including Annex A) constitutes the entire agreement between the parties hereto, and supersedes all prior agreements and understandings (both written and oral) of the parties hereto with respect to the subject matter hereof, and cannot be amended or otherwise modified except in writing executed by the parties hereto.  The provisions hereof shall inure to the benefit of and be binding upon the successors and assigns of the Company and CG. In  connection with this Agreement and in the event that a Transaction involves the sale of securities or other transaction under which registration as a broker dealer is required under applicable law (including, without limitation, that certain SEC No Action Letter regarding M&A Brokers dated January 31, 2014, and revised February 4, 2014), Canaccord Genuity LLC, an affiliate of CG, may perform a portion or all of the services to be provided hereunder and, in such event and to the extent requested by CG, the Company will pay a portion or all of the fees payable to CG hereunder to Canaccord Genuity LLC. CG may refer to the Transaction, after it is public knowledge, in traditional "tombstone" announcements or any of its other professional promotional materials.  In connection therewith CG may use the Company's corporate logo in such advertising or promotional materials (including electronic versions thereof).  If requested by CG, the Company shall include a mutually acceptable reference to CG in any press release or other public announcement made by the Company regarding the Transaction.

If you are in agreement with the foregoing, please sign where indicated below and return to the undersigned, whereupon the Agreement shall become effective as of the date hereof.

***CONFIDENTIAL***

Winc, Inc.
March 16, 2022
Page 8 of 11

Sincerely,

CANACCORD GENUITY LLC

By: _____
    Morgan Ley
    Managing Director


ACCEPTED AND AGREED:

WINC, INC.

By: _____
    Geoff MacFarlane
    Chief Executive Officer

*CONFIDENTIAL*

Winc, Inc.
March 16, 2022
Page 9 of 11

## *ANNEX A*

In the event that Canaccord Genuity LLC or any of its affiliates ("CG"), the respective stockholders, partners, members, directors, officers, agents or employees of CG, or any other person controlling CG (collectively, together with CG, "Indemnified Persons") becomes involved in any capacity in any action, claim, suit, investigation or proceeding, actual or threatened, brought by or against any person, including stockholders of Winc, Inc. (together with its affiliates, the "Company"), in connection with or as a result of the engagement contemplated by the letter agreement to which this Annex A is attached (the "engagement"), the Company will reimburse such Indemnified Person for its legal and other expenses (including, without limitation, reasonable and documented attorneys' fees, amounts paid in settlement, and the costs and expenses incurred in connection with investigating, preparing for and responding to third party subpoenas or enforcing the engagement) incurred in connection therewith as such expenses are incurred; *provided, however,* that if it is determined by a final, non-appealable order of a court or arbitral tribunal of competent jurisdiction in any such action, claim, suit, investigation or proceeding that any loss, claim damage or liability of CG or any other Indemnified Person has resulted from the fraud, bad faith, gross negligence or willful misconduct of CG in performing the services that are the subject of the engagement, then CG will repay such portion of reimbursed amounts that is attributable to expenses incurred in relation to the act or omission of CG which is the subject of such determination. The Company will also indemnify and hold harmless each Indemnified Person from and against any losses, claims, damages or liabilities (including actions, claims, suits, investigations or proceedings in respect thereof) (collectively, "Losses") related to or arising out of the engagement, except to the extent any such Losses are determined by a final, non-appealable order of a court or arbitral tribunal of competent jurisdiction to have resulted from the fraud, bad faith, willful misconduct or gross negligence of CG in performing the services that are the subject of the engagement.

If such indemnification is for any reason not available or insufficient to hold an Indemnified Person harmless (except by reason of the fraud, bad faith, gross negligence or willful misconduct of CG), the Company and CG shall contribute to the Losses involved in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by the Company, on the one hand, and by CG, on the other hand, with respect to the engagement or, if such allocation is determined by a final, non-appealable of a court or arbitral tribunal of competent jurisdiction to be unavailable, in such proportion as is appropriate to reflect other equitable considerations such as the relative fault of the Company, its directors and officers, on the one hand, and of CG on the other hand; *provided, however,* that in no event shall the amounts to be contributed by CG exceed the fees actually received by CG in the engagement. The relative benefits to the Company, on the one hand, and CG, on the other hand, shall be deemed to be in the same proportion as (i) the total value paid or proposed to be paid or received or proposed to be received by the Company or its security holders, as the case may be, pursuant to the transaction(s), whether or not consummated, contemplated by the engagement, bears to (ii) all fees actually received by CG in the engagement.

The Company also agrees that neither CG nor any other Indemnified Person shall have any liability to the Company or any other person in connection with or as a result of the engagement or any matter referred to in the engagement, except to the extent that any Losses incurred by the Company are determined by a final, non-appealable order of a court or arbitral tribunal of competent jurisdiction to have resulted from the fraud, bad faith, willful misconduct or gross negligence of CG in performing

*CONFIDENTIAL*

Winc, Inc.
March 16, 2022
Page 10 of 11

the services that are the subject of the engagement. In no event shall CG or any other Indemnified Person be responsible for any indirect, punitive, special or consequential damages, even if advised of the possibility thereof.

In the event that an Indemnified Person is requested or required to appear as a witness in any action brought by or on behalf of or against the Company relating to the engagement in which such Indemnified Person is not named as a defendant, the Company agrees to promptly reimburse CG on a monthly basis for all expenses incurred by it in connection with such Indemnified Person's appearing and preparing to appear as such a witness, including, without limitation, the reasonable fees and disbursements of its legal counsel.

Prior to entering into any agreement or arrangement with respect to, or effecting, any merger, statutory exchange or other business combination or proposed sale or exchange, dividend or other distribution or liquidation of all or a significant portion of its assets in one or a series of transactions or any significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth herein, the Company will notify CG in writing thereof (if not previously so notified) and, if requested by CG, will arrange in connection therewith alternative means of providing for the obligations of the Company set forth herein upon terms and conditions satisfactory to CG.

The Company's obligations hereunder shall be in addition to any rights that any Indemnified Person may have at common law or otherwise. The letter to which this Annex A is attached, including this Annex A, and any other agreements relating to the engagement shall be governed by and construed in accordance with the laws of the State of New York, applicable to contracts made and to be performed therein and, in connection therewith, the parties hereto consent to the exclusive jurisdiction of the state and federal courts of the State of New York, located in Manhattan. No action, claim, counterclaim, proceeding or dispute may be commenced, prosecuted or continued in any court other than the state and federal courts of the State of New York, located in Manhattan. Notwithstanding the foregoing, solely for purposes of enforcing the Company's obligations hereunder, the Company consents to personal jurisdiction, service of process and venue in any court proceeding in which any claim subject to this Annex A and the letter to which this Annex A is attached is brought by or against any Indemnified Person. CG HEREBY AGREES, AND THE COMPANY HEREBY AGREES ON ITS OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF ITS SECURITY HOLDERS, DIRECTORS AND OFFICERS TO WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM, COUNTER-CLAIM OR ACTION ARISING OUT OF THE ENGAGEMENT OR CG'S PERFORMANCE OF SERVICES THAT ARE THE SUBJECT THEREOF.

The provisions of this Annex A shall apply to the engagement (including related activities prior to the date hereof) and any modification thereof and shall remain in full force and effect regardless of the completion or termination of the engagement. If any term, provision, covenant or restriction herein is held by a court of competent jurisdiction to be invalid, void or unenforceable or against public policy, the remainder of the terms, provisions and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

*CONFIDENTIAL*

Winc, Inc.
March 16, 2022
Page 11 of 11



Canaccord Genuity LLC
99 High Street
Suite 1200
Boston, MA
USA 02110

T1: 1.617.371.3900
T2: 1.800.225.6201
cgf.com

November 25, 2022

**STRICTLY PRIVATE AND CONFIDENTIAL**

Winc, Inc.
1751 Berkeley St. Studio 3
Santa Monica, CA 90404

**Attn:**  **Brian Smith**
**President, Interim Chief Executive Officer, Founder and Chairperson of the Board of Directors**

**RE:**  **AMENDMENT OF CANACCORD GENUITY LLC ENGAGEMENT LETTER**

Ladies & Gentlemen:

Reference is made to that certain letter agreement dated March 16, 2022 (the "Agreement") between Canaccord Genuity LLC (together with its affiliates, control persons, directors, officers, employees, and agents, "CG") and Winc, Inc. (together with its subsidiaries and affiliates, the "Company") pursuant to which the Company engaged CG as its exclusive financial advisor in connection with the Company's review of its strategic and financial alternatives. Capitalized terms used in this Amendment to the Agreement (this "Amendment") and not defined in this Amendment shall have the meanings ascribed to them in the Agreement.

The Company and CG hereby acknowledge that the Agreement is hereby amended by this Amendment as follows.

1. <u>Definition of Transaction</u>. The term "Transaction" as it is defined in the Agreement shall be replaced by the following definition: "any transaction or series of transactions, whether accomplished pursuant to a plan of reorganization or liquidation (a "Plan") confirmed in connection with a case (a "Bankruptcy Case") commenced by or against the Company or any of its subsidiaries or affiliates under title 11 of the United States Code (the "Bankruptcy Code"), or otherwise, involving (a) an acquisition, merger, consolidation or other transaction with another party through which assets of the Company are, directly or indirectly, combined with or transferred to another party outside of the ordinary course of business; (b) the acquisition, directly or indirectly, by a buyer or buyers of equity interests or options, or any combination thereof constituting a majority or controlling portion of the stock of the Company or possessing

*CONFIDENTIAL*

    a majority or controlling portion of the voting power of the Company; (c) any other purchase or acquisition, directly or indirectly, by a buyer or buyers of a majority or controlling portion of the securities or other interests (through tender offer, merger, sale, exchange or otherwise) or any portion of the assets of the Company outside of the ordinary course of business; (d) the formation of a joint venture or partnership with the Company or direct investment in the Company for the purposes of affecting a transfer of a majority or controlling interest in the Company to a third party; (e) the conversion to common or other equity, or any other security or instrument, of any portion of the Company's indebtedness; or (f) any combination of the foregoing.

2. <u>Services to Be Rendered</u>. In addition to the services to be rendered under the Agreement, CG will perform the following additional service if requested and if appropriate:

    i. In the event the Company determines to commence one or more cases under the Bankruptcy Code in order to pursue a Transaction or otherwise, and if requested by the Company, participate in hearings before the Bankruptcy Court in which such cases are commenced (the "Bankruptcy Court") and provide relevant testimony with respect to the matters described herein and arising in connection with any Transaction or any proposed Plan.

    ii. Section 1 (i) of the Agreement shall be deleted.

    iii. The following language in Section 1 of the Agreement shall be deleted: "If CG is requested to render an Opinion, the nature and scope of its analysis and investigation it undertakes in order to render such Opinion and the scope, form and substance of the Opinion will be such as CG considers appropriate and will not address the underlying business decision to effect a Transaction. The Opinion will contain any customary qualifications, assumptions, and limitations as CG considers appropriate in its sole discretion and CG may qualify the Opinion in any customary manner that it believes appropriate. Any such Opinion will expressly exclude consideration of any compensation or compensation arrangements arising from the Transaction which benefit any officer, director or employee of the Company, or any class of such persons. The Opinion may be included in any disclosure document required to be filed by the Company with the Securities and Exchange Commission with respect to a proposed Transaction, provided that it is reproduced in full, and that any description of or reference to CG, the Opinion or the analyses performed by CG in connection with the rendering of the Opinion shall be in form and substance acceptable to CG. It is understood and agreed that the Opinion will be addressed to, and be prepared solely for the use and benefit of the Board of Directors of the Company, or a committee thereof, if applicable, and may not be disclosed to any third party or circulated or referred to publicly (except as otherwise provided in this paragraph) without the prior written consent of CG."

3. <u>Fees</u>.

    i. In addition to the fees set forth in the Agreement, during the term of this agreement,

*CONFIDENTIAL*

       a cash fee of $100,000 per month (the "Monthly Fee"), payable in advance of each month. The Company will pay the first Monthly Fee immediately upon the execution of this Amendment, and all subsequent Monthly Fees prior to each monthly anniversary of the date of this agreement. Whether or not a Transaction occurs, CG shall earn and be paid the Monthly Fee every month during the term of this agreement. After three full Monthly Fees have been paid to CG, 100% of any subsequent Monthly Fees actually paid to and retained by CG shall be credited once (without duplication) against any Transaction Fee subsequently payable to CG.

       ii.    Section 2(c) of the Agreement shall be deleted.

4.    <u>Expenses</u>. Upon execution of this Amendment, The Company will provide CG with a $75,000 advance retainer to cover CG's out of pocket expenses. CG agrees to provide the Company with reasonable support for its expenses at the Company's request or at the Bankruptcy Court's direction.

5.    <u>Application for Retention of CG</u>. In the event the Company determines to commence chapter 11 proceedings in order to pursue a Transaction or otherwise, the Company shall apply promptly to the Bankruptcy Court pursuant to sections 327(a) and 328(a) of the Bankruptcy Code for approval of (a) this Agreement and (b) CG's retention by the Company under the terms of this Agreement, nunc pro tunc to the date the Company commences its chapter 11 case, and shall use its best efforts to obtain Bankruptcy Court authorization thereof. The Company shall use its best efforts to obtain such Bankruptcy Court approval and authorization subject only to the subsequent review by the Bankruptcy Court under the standard of review provided in section 328(a) of the Bankruptcy Code, and not subject to the standard of review set forth in section 330 of the Bankruptcy Code. The Company shall supply CG and its counsel with a draft of such application and any proposed order authorizing CG's retention sufficiently in advance of the filing of such application and proposed order to enable CG and its counsel to review and comment thereon. CG shall have no obligation to provide any services under this Agreement unless and until CG's retention under the terms of this Agreement is approved under section 328(a) of the Bankruptcy Code by a final non-appealable order of the Bankruptcy Court in form and substance acceptable to CG. If neither the Company nor CG obtain such an order within a 60-day period, or such order is later reversed, vacated, stayed or set aside for any reason, CG may terminate this agreement, and the Company shall reimburse CG for all fees owing and expenses incurred prior to the date of termination, subject to the requirements of the Bankruptcy Rules, and CG shall be entitled to a contingent claim with respect to any fees that become payable under Section 5 of the Agreement. Subject to being so retained, CG agrees that during the pendency of any such proceedings, it shall continue its obligations under this Agreement pursuant to the provisions of this Agreement so long as the Company is using its best efforts to seek CG's retention under section 328(a) of the Bankruptcy Code.

       CG acknowledges that in the event that the Bankruptcy Court approves its retention by the Company pursuant to the application process described in this Section, payment of CG's fees and expenses shall be subject to (i) the jurisdiction and approval of the Bankruptcy Court under section 328(a) of the Bankruptcy Code and any order approving CG's retention, (ii) any applicable

fee and expense guidelines and/or orders, and (iii) any requirements governing interim and final fee applications; provided, however, that CG shall not be required to maintain time records.

With respect to CG's retention under section 328(a) of the Bankruptcy Code, the Company acknowledges and agrees that CG's industry and restructuring expertise as well as its capital markets knowledge, financing skills and mergers and acquisitions capabilities, some or all of which may be required by the Company during the term of CG's engagement hereunder, were important factors in determining the amount of the various fees set forth herein, and that the ultimate benefit to the Company of CG's services hereunder could not be measured merely by reference to the number of hours to be expended by CG's professionals in the performance of such services. The Company also acknowledges and agrees that the various fees set forth herein have been agreed upon by the parties hereto in anticipation that a substantial commitment of professional time and effort will be required of CG and its professionals hereunder over the life of the engagement, and in light of the fact that such commitment may foreclose other opportunities for CG and that the actual time and commitment required of CG and its professionals to perform its services hereunder may vary substantially from week to week or month to month, creating "peak load" issues for the firm. In addition, the Company believes that given the numerous issues which CG may be required to address in the performance of its services hereunder, CG's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for CG's services for engagements of this nature in an out-of-court context, the Company agrees that the fee arrangements hereunder are reasonable under the standards set forth in section 328(a) of the Bankruptcy Code.In the event that CG's engagement hereunder is approved by the Bankruptcy Court, the Company shall pay all fees and expenses of CG hereunder as promptly as practicable in accordance with the terms hereof and the orders governing CG's interim and final fee applications, and after obtaining all necessary further approvals from the Bankruptcy Court, if any.

Following entry of an order authorizing our retention, the Company will assist CG in preparing, filing and serving fee statements, interim fee applications, and a final fee application. The Company will support CG's fee applications that are consistent with this agreement in papers filed with the Bankruptcy Court and during any Bankruptcy Court hearing.

CG's post-petition compensation, reasonable and documented out-of-pocket expense reimbursements and payment received pursuant to the provisions of Annex A shall be entitled to priority as expenses of administration under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code and shall be entitled to the benefits of any "carve-outs" for professional fees and expenses in effect pursuant to one or more financing orders entered by the Bankruptcy Court.

*CONFIDENTIAL*

The Company will use its reasonable best efforts to ensure that, to the fullest extent permitted by law, any confirmed plan of reorganization or liquidation in the Bankruptcy Case contains typical and customary releases (both from the Company and from third parties) and exculpation provisions releasing, waiving, and forever discharging CG, its divisions, affiliates, any person controlling CG or its affiliates, and their respective current and former directors, officers, partners, managers, members, agents, representatives and employees from any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities related to the Company or the engagement described in this agreement.

The terms of this Section are solely for the benefit of CG, and may be waived, in whole or in part, only by CG.

**[THIS SPACE LEFT INTENTIONALLY BLANK]**

*CONFIDENTIAL*

The Agreement, except as amended by this Amendment, shall continue in full force and effect in accordance with its terms. If the foregoing is in accordance with your understanding, please indicate your agreement to the above terms and conditions by signing the enclosed copies of this letter and returning the executed copies to us.

Yours truly,

**CANACCORD GENUITY LLC**

Per: _____

David Istock
Managing Director

ACCEPTED AND AGREED

**WINC, INC.**

Per: _____

Brian Smith
President, Interim Chief Executive Officer, Founder and Chairperson of the Board of Directors