**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| WINC, INC., *et al.*,[1] | Case No. 22-11238 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Docket Ref. Nos. 14, 44, 75, 82 & 100** |

**DEBTORS' REPLY TO OFFICIAL COMMITTEE OF UNSECURED
CREDITORS' (A) OBJECTION TO DEBTORS' MOTION FOR ENTRY OF FINAL
ORDER AUTHORIZING DEBTORS TO OBTAIN POSTPETITION
FINANCING AND (B) REQUEST FOR ADJOURNMENT**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors")
hereby file this reply (this "Reply") in support of the *Debtors' Motion for Entry of Interim and
Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior
Secured Liens and Superpriority Administrative Expense Claims, and (C) Utilize Cash Collateral;
(II) Determining that the Prepetition Secured Lender Is Adequately Protected; (III) Modifying the
Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No.
14] (the "Motion") and in response to the objection [Docket No. 100] (the "Objection") to the
Motion filed by the Official Committee of Unsecured Creditors (the "Committee"), and
respectfully state as follows:[2]

## REPLY

1.     Since the outset of the Chapter 11 Cases, the Prepetition Lender and DIP Lender
(together, the "Lenders") have worked commercially with the Debtors toward achieving an

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Winc, Inc. (8960); BWSC, LLC (0899); and Winc Lost Poet, LLC (N/A).  The Debtors' mailing address for purposes of these chapter 11 cases is 12405 Venice Boulevard, Box #1, Los Angeles, CA 90066.

[2]  Capitalized terms used but not defined herein shall have meanings ascribed to such terms in the Motion.

efficient and value-maximizing sale process.  Despite having no advance notice of the commencement of the Chapter 11 Cases and not having initially consented to the priming of its liens or use of its Cash Collateral, the Prepetition Lender recognized early on that a contested priming and cash collateral fight would be value destructive.  *See Tr. of First Day Hr'g*, at 51:7-17, *In re Winc, Inc.*, No. 22-11238 (LSS) (Bankr. D. Del. Dec. 6, 2022) (stating that that the Prepetition Lender could have been more adversarial but chose to participate commercially to "preserve the business, maximize the value of the assets for the benefit of all parties. . . .").  To promote a more efficient and value-maximizing process, and after significant arms'-length negotiations, the Prepetition Lender instead consented to postpetition financing on a *pari passu* basis, use of Cash Collateral, and to subordinate its liens to the Carve-Out (as defined in the Final DIP Order), *provided* (and consistent with established law) that certain protections were in place to mitigate the risk associated with the diminution in value of its collateral, including certain adequate protection liens.

2.      For its part, the DIP Lender has agreed to provide postpetition financing, comprising entirely of new money, to fund the Debtors' business operations and the postpetition marketing and public auction process designed to maximize value through a competitive and open court-approved bidding process.  As of the Petition Date, the Debtors had less than $800,000 in cash, which was entirely encumbered by liens held by the Prepetition Lender, and faced a December 1, 2022 deadline to repay $1 million to the Prepetition Lender under the Prepetition Credit Agreement.  As stated in the First Day Declaration, the DIP Lender was the only party that provided an actionable proposal for the Debtors' assets that would allow the Debtors to preserve going concern value.  Absent the postpetition funding from the DIP Lender, the Debtors' only option would have been a value-destructive fire sale of their assets in a liquidation proceeding.

29999465.3

Since the Petition Date, no other party has offered to provide financing on better terms, despite several inbound inquiries.  Accordingly, the funds under the DIP Facility are critical to ensure that the Debtors can preserve going concern value.

3.      Collectively, the Lenders' agreements with the Debtors have allowed, and will allow, the Debtors to access sufficient liquidity to continue operations through a sale process, preserve key commercial relationships, and run a sale process with a baseline committed stalking horse bid, all of which provide the Debtors with the best opportunity to maximize value for the benefit of creditors.

4.      In exchange, the Lenders bargained for customary protections afforded under sections 361 and 364 of the Bankruptcy Code and routinely granted by this Court.  Those protections are an integral component of the agreement reached among the Debtors and the Lenders and were a material inducement for the DIP Facility, the agreement that the liens under the DIP Facility be *pari passu* with the liens held by the Prepetition Lender, and the consensual use of Cash Collateral.

5.      Through its Objection, the Committee uses the Debtors' request for final approval of the DIP Facility to garner leverage for a global settlement of issues—including issues not currently before the Court.  *See* Objection at ¶¶ 1–2 (referencing a settlement of issues related to financing, retention of the Debtors' investment banker, provisions of the stalking horse asset purchase agreement, and distributions for creditors under a chapter 11 plan).  The Committee cannot—and does not—dispute that the Debtors require postpetition financing.  *See* Objection at ¶ 7 (noting that the Debtors require postpetition financing).  The terms of the DIP Facility have been subject to arms'-length and good faith negotiations, represent the best available terms that the Debtors have been able to secure, and include standard, reasonable, and appropriate protections

for the Lenders in exchange for access to critical liquidity. While the Committee has raised a host of issues, there are two primary unresolved issues: (1) the grant of liens on avoidance actions; and (2) the waiver of marshaling and rights under sections 506(c) and 552(b) of the Bankruptcy Code. As described below, these issues have either been addressed through the Final DIP Order or should be overruled.

6. Though the Debtors believe that many of the Committee's concerns are misplaced, in an attempt to facilitate consensus and obviate the need for further litigation, the Debtors, in consultation with the Lenders, agreed to a number of concessions (and clarified a number of points for the avoidance of doubt) as reflected in an updated form of final order (the "Final DIP Order") filed with the Court concurrently with this Reply, which provides the following:

(a)    in order to eliminate any ambiguity, the Debtors revised the Final DIP Order to clarify that (i) the DIP Lender's fees and expenses are payable and reimbursable under the Final DIP Order only to the extent incurred in the DIP Lender's capacity as DIP Lender (and not incurred, for example, in the capacity of Stalking Horse Bidder); and (ii) in paragraph 11 of the Final DIP Order, the prohibition against utilizing the Carve Out to pay for the initiation or prosecution of claims, causes of action, or other litigation is subject to the Committee's investigation rights, as set forth in the Final DIP Order;

(b)    the release provision in paragraph 16 of the Final DIP Order has been revised to include a carve out for claims and causes of action arising from an act or omission that is determined to have constituted willful misconduct, gross negligence, or actual fraud;

(c)    contemporaneous with any notice to the Debtors, the Lenders shall provide the Committee with notice of (i) any Event of Default under the DIP Loan Documents; and (ii) either Lender's intent to visit and inspect any of the Debtors' properties, examine books and

4

records, audit collateral, and tour the Debtors' business premises; and

(d)    the Lenders have agreed that, following an Event of Default (if any), the Lenders will voluntarily use commercially reasonable efforts to marshal away from the proceeds of Avoidance Actions, exercising rights and remedies first over all other DIP Collateral to the extent commercially reasonable.

7.    The Debtors respectfully submit that the terms of the DIP Facility, coupled with the foregoing incremental changes, more than satisfy the requirements of the Bankruptcy Code and applicable law for the approval of the DIP Facility on a final basis.  Ultimately, as set forth in more detail below, the Committee cannot replace the Debtors' business judgment for its own, nor can the Committee ask the Court to selectively re-write the terms of the DIP Facility that the Committee views as unfavorable.  Each of the waivers and protections reflected in the DIP Facility were heavily negotiated at arms' length and in good faith and are material components to the overall agreement of the Debtors and the Lenders to provide financing and consent to the use of Cash Collateral, as applicable.

8.    The Committee's remaining concerns are without merit or not presently before the Court and should be overruled or disregarded.[3]

## A.    The DIP Liens and Adequate Protection Liens in the Proceeds of Avoidance Actions Are Appropriate

9.    Section 550 of the Bankruptcy Code provides that the debtor-in-possession may recover property in connection with avoided transfers "for the benefit of the estate."  11 U.S.C. §550; *Mellon Bank, N.A. v. Dick Corp.*, 351 F.3d 290, 293 (7th Cir. 2003) ("Lest this way of

---

[3] As indicated in the Objection (Objection at ¶ 1), the parties have agreed to adjourn the *Debtors' Application for Entry of an Order (I) Authorizing the Employment and Retention of Canaccord Genuity LLC as Investment Banker for the Debtors, Effective as of the Petition Date; and (II) Waiving the Information Requirements of Local Rules 2016-2(d)* [Docket No. 67] to provide additional time to address the terms of Canaccord Genuity LLC's proposed retention and any compensation to be earned thereunder.

resolving the issue be taken to assume that § 550(a) requires that some benefit flow to unsecured creditors, we add that the statute does not say this.  Section 550(a) speaks of benefit to *the estate*—which in bankruptcy parlance denotes the set of all potentially interested parties—rather than to any particular class of creditors."); *see also Calpine Corp. v. Rosetta Res. Inc.* (*In re Calpine Corp.*), 377 B.R. 808, 813 (Bankr. S.D.N.Y. 2007) (citing *Mellon Bank* with approval).  Section 364 of the Bankruptcy Code, in turn, allows a debtor in possession to encumber "property of the estate" in order to obtain postpetition financing that meets the requirements set forth therein.  *See* 11 U.S.C. §§ 364(c)(2), (3), and (d)(1).  In the case of adequate protection liens, section 361(2) of the Bankruptcy Code expressly contemplates the imposition of "additional liens" as a form of adequate protection to the extent of any diminution in value.  11 U.S.C. § 361(2).  Thus, on its face, the Bankruptcy Code empowers a chapter 11 debtor to encumber estate property in the form of the proceeds of avoidance actions in connection with court-approved postpetition financings.

10.     Sections 363(c)(2) and 363(e) of the Bankruptcy Code are clear that secured claimants with an interest in cash collateral are entitled to adequate protection against such projected diminution in value.  Moreover, the grant of a replacement lien is an appropriate means of providing such adequate protection.  *See* 11 U.S.C. §§ 361–363.  The Debtors commenced the Chapter 11 Cases with a tight budget and a timeline that accounted for the liquidity pressures facing the Debtors and the extensive prepetition marketing.  While the Debtors are hopeful that they will receive competing bids such that they can hold a competitive auction that will result in an increased purchase price and other value to the Debtors' estates, the Debtors' cash balance is projected to decrease over the course of the Chapter 11 Cases, and they have incurred DIP Obligations that are *pari passu* with the Prepetition Lender's claims, secured by substantially the same assets and property, all of which provides the potential for diminution in the value of the

Prepetition Lender's collateral, in particular as cash is used to fund the Chapter 11 Cases. Moreover, the Prepetition Lender already has a lien on substantially all of the Debtors' assets, and the proceeds of Avoidance Actions are one of only two categories of assets (the other being commercial tort claims) upon which the Debtors could grant a replacement lien that is not already encumbered to secure the Prepetition Secured Lender's diminution claim, if any.  *See In re Swedeland Development Grp., Inc.*, 16 F.3d 552, 565-67 (3d Cir. 1994) (holding that the adequate protection was insufficient where a debtor provided a secured creditor with nothing more than it was entitled to receive).

11.    Here, the encumbrance of the proceeds from avoidance actions was negotiated at arm's length among the Debtors and the Lenders as a necessary inducement to provide the DIP Facility and consent to the use of Cash Collateral, as applicable. The Court should give effect to the negotiated agreement struck by the Debtors in their business judgment with the Lenders and overrule the Committee's objection.[4]

12.    Notwithstanding the above, the Debtors and the Lenders have agreed to revise the Final DIP Order to provide for a voluntary marshaling away from avoidance action proceeds, pursuant to which the Lenders would agree to seek to satisfy any DIP Obligations (as defined in the Final DIP Order) first from DIP Collateral other than proceeds of Avoidance Actions (as defined in the Final DIP Order), thereby substantially addressing the Committee's concerns that the lenders would "look first to previously unencumbered assets to satisfy a diminution claim for interests in entirely unrelated property secured prepetition, when in fact they should be looking first to other assets."  Objection at ¶ 10.    Accordingly, for the additional reason that the

---

[4]  In addition, as (a) the DIP Lender was not a prepetition lender to the Debtors; and (b) the DIP Loan consists entirely of new money, the Committee's argument that the DIP liens should be limited to the liens of the Prepetition Lender are misplaced.

Committee's concerns have been substantially addressed by revisions incorporated into the Final DIP Order, the Committee's objection to the grant of adequate protection liens should be overruled.

**B.  Waivers of Marshaling, Section 506(c) and Section 552(b) Are Routinely Granted and Appropriate**

13.  The Committee's argument against the Debtors' waiver of the equitable doctrine of marshaling, Section 506(c), and Section 552(b)'s "equities of the case exception" of the Bankruptcy Code should be rejected.

14.  As a threshold matter, marshaling is a remedy available only to certain secured creditors and is not available to general unsecured creditors. *In re Advanced Mktg. Servs., Inc.*, 360 B.R. 421, 427 (Bankr. D. Del. 2007). Courts have routinely approved a debtor's waiver of marshaling. *See e.g., In re Ector Cnty. Energy Ctr. LLC*, Case No. 22-10320 (JTD) (Bankr. D. Del. June 3, 2022) [Docket No.  195]; *In re Quorum Health Corp.*, Case No. 20-10766 (KBO) (Bankr. D. Del. May 6, 2020) [Docket No. 286]; *In re KiOR, Inc.*, Case No. 14-12514 (CSS) (Bankr. D. Del. Jan. 16, 2015) [Docket No. 275]; *In re Verso Corp.*, Case No. 16-10163 (KG) (Bankr. D. Del. Mar. 1, 2016) [Docket No. 372]; *In re Quiksilver, Inc.*, Case No. 15-11880 (BLS) (Bankr. D. Del. Oct. 15, 2015) [Docket No. 382].

15.  The Committee's objections to the Section 506(c) and 552(b) waivers should also be overruled. Such waivers are routinely granted as a *quid pro quo* where, as here, the Prepetition Lender with blanket liens on substantially all of the Debtors' assets has (a) consented to the use of collateral in order to fund administration of the Chapter 11 Cases through an approved budget (which budget was amended to provide for an increased fee for the Committee's professionals in connection with the Second Interim Order (as defined in the Final DIP Order); (b) agreed to *pari passu* liens and obligations under the DIP Facility; and (c) agreed to subordinate their liens and

claims to the Carve Out.  *See e.g., In re VJGJ, Inc.*, Case No. 21-11332 (BLS) (Bankr. D. Del. 2021 Nov. 15, 2021) [Docket No. 174]; *In re Quorum Health Corp.*, Case No. 20-10766 (KBO) (Bankr. D. Del. May 6, 2020) [Docket No. 286]; *In re True Religion Apparel, Inc.*, Case No. 20-1510941 (CSS) (Bankr. D. Del. May 29, 2020) [Docket No. 278]; *In re HDR Holdings, Inc*., Case No. 19-11396 (MFW) (Bankr. D. Del. Aug. 7, 2019) [Docket No. 164].

16.    Debtors alone have the authority to waive their rights under section 506(c) of the Bankruptcy Code. *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000); 11 U.S.C. § 506(c) ("the trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property, to the extent of any benefit to the holder of such claim.") (emphasis added).  The Supreme Court in *Hartford Underwriters* expressly held "[t]he question thus becomes whether it is a proper inference that the trustee is the only party empowered to invoke the provision [section 506(c)]. We have little difficulty answering yes."  *Hartford Underwriters*, 530 U.S. at 6; *see also In re Smart World Techs., LLC*, 423 F.3d 166, 181-82 (2d Cir. 2005) ("Section 506(c) . . . allows only the 'trustee,' or debtor-in-possession, to take advantage of this exception . . . . We read *Hartford Underwriters* to stand for the proposition that § 1109(b) does not entitle parties in interest, such as . . . creditors, to usurp the debtor-in-possession's role as legal representative of the estate."). *Hartford Underwriters* supports the Debtors' view that the Section 506(c) waiver is an appropriate exercise of the Debtors' business judgment, especially given the substantial benefits the Debtors will receive under the Final DIP Order, together with the protections guaranteed by the Carve-Out to the Debtor's general unsecured creditors and other stakeholders.

17.    The Committee's conclusory allegations are wholly insufficient to deny the Lenders certain and customary protections under the Final DIP Order, which comprise material

components of an integrated agreement to obtain DIP financing and the consensual use of Cash Collateral. Accordingly, the Court should approve the Debtors' decision to provide such protections to the Lenders in exchange for a critical financing lifeline to support the Chapter 11 Cases.

### C.  *Debtor Releases Are Appropriate*

18.     The Committee asserts that the Debtors' proposed release of the Lenders is overbroad and against public policy. *See* Objection at ¶ 6(ii). The releases at issue were negotiated among the Debtors and the Lenders, represent a proper exercise of the Debtors' business judgment, and no party has alleged any wrongdoing that would call into question the Debtors' decision to grant a release. Further, the Debtors' release of the Lenders was a prerequisite for the Lenders' agreement to provide financing and consent to the use of Cash Collateral, as applicable, as is customary with other similar financings. Moreover, the Debtors' releases of the Lenders are expressly made subject to Challenge (*see* Final DIP Order at ¶ 16).

19.     In an effort to reach consensus with the Committee, the Debtors, in consultation with the Lenders, have agreed to include a carve out for any claims or causes of action arising from an act or omission that is deemed to have constituted willful misconduct, gross negligence, or actual fraud, which renders moot the Committee's objection to the breadth of the releases, and any remaining objection on this point should be overruled.

### D.     *The Final Hearing Should Not be Adjourned*

20.     The Final DIP Order should be approved at the hearing scheduled on January 6, 2023, as currently contemplated. The DIP Lender would suffer significant prejudice if the Court were to continue the hearing on final approval of the Final DIP Order, as all DIP funds are scheduled to be advanced during/before the week ending January 13, 2023. Continuing to advance all of the funds contemplated to be provided under the DIP Facility without the Court's final

approval of the underlying terms of the parties' financing inappropriately subjects the DIP Lender

to significant risk.  Moreover, the DIP Lender requires a final order prior to the auction scheduled

on January 11, 2023 to eliminate any uncertainty regarding the DIP Lender's right to credit bid the

amount of the DIP Obligations (as defined in the Final DIP Order).  Finally, the Debtors and the

Lenders have negotiated various case milestones, which are of material importance, that require

the Debtors to obtain entry of a final DIP order on/before January 9, 2023, which milestone was

originally December 28, 2022.

  21. The Committee's request for an adjournment places the Debtors in jeopardy of

defaulting under the terms of the DIP Facility—all so the Committee can garner negotiating

leverage for a proposed global settlement of issues and despite the Debtors' clear and undisputed

need for the financing provided under the DIP Facility.  The Committee's demand to adjourn the

final hearing because, among other things, there are no assurances that sale proceeds will fund a

plan and distributions to general unsecured creditors is not only speculative and premature, but

also is not a sufficient basis to adjourn final approval of the DIP Facility.  First, the Committee

will have ample opportunity to object to the sale of the Debtors' assets, if it determines that such

a sale is inappropriate.  Second, the Debtors' budget, which is attached to the Final DIP Order filed

contemporaneously herewith, contemplates the payment of all administrative claims through the

closing of a sale, inclusive of claims to be assumed through the sale.  Following a sale, the Debtors

will no longer have the overhead expenses associated with maintaining operations and preserving

going concern value.  In addition, to the extent that the DIP Lender is the successful bidder, any

administrative expenses to be incurred post-closing during any of the pending Chapter 11 Cases

are contemplated to be paid by the DIP Lender (in its capacity as the purchaser) as part of a

transition services agreement.  Third, even if the Committee's sale-related issues were relevant to

final approval of the DIP Facility—which they are not—the Debtors need not establish, as the Committee suggests, that a proposed sale must result in a plan and/or distribution to general unsecured creditors. *See*, *e.g.*, *In re Boston Generating, LLC*, 440 B.R. 302, 322-29 (Bankr. S.D.N.Y. 2010) (considering non-exhaustive list of factors and finding that the debtors articulated a sound business justification and good business reason to approve a sale under section 363 when the debtors did not have sufficient liquidity to continue operating without additional DIP financing, assets would continue to deteriorate in value if sold under duress arising from continuing liquidity issues, and there was no evidence that the sale transaction would remain available at a time in the future when a plan would be confirmed, if ever).    Accordingly, the Committee's post-sale administrative solvency concerns should be and can be addressed when those issues are ripe for consideration—following a bid deadline and at the hearing to consider the sale of the Debtors' assets.

22.    Accordingly, the Committee's request to adjourn the hearing to consider the Final DIP Order should not be approved when weighed against the prejudice to the DIP Lender, the premature nature of the Committee's underlying concerns, the Debtors' need for the financing and the Debtors' interest in avoiding a default under the terms of the DIP Facility.

*[Remainder of page intentionally left blank]*

29999465.3

## <u>CONCLUSION</u>

For the foregoing reasons, the Debtors respectfully request that that this Court overrule the Objection, grant the DIP Motion upon the terms set forth in the Final DIP Order, and grant such other and further relief as this Court deems just and proper.

Dated:  January 3, 2023
      Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Allison S. Mielke*
Michael R. Nestor (No. 3526)
Matthew B. Lunn (No. 4119)
Allison S. Mielke (No. 5934)
Joshua B. Brooks (No. 6765)
Shella Borovinskaya (No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile:  (302) 571-1253
Email: mnestor@ycst.com
    mlunn@ycst.com
    amielke@ycst.com
    jbrooks@ycst.com
    sborovinskaya@ycst.com

*Proposed Counsel to the Debtors and Debtors in Possession*