```
 1                    UNITED STATES BANKRUPTCY COURT
                           DISTRICT OF DELAWARE
 2

 3   IN RE:                      .  Chapter 11
                                 .
 4   WINC, INC., et al.,         .  Case No. 22-11238(LSS)
                                 .
 5                               .  (Jointly Administered)
                                 .
 6                               .  824 Market Street
                Debtors.         .  Wilmington, Delaware 19801
 7                               .
                                 .  Thursday, December 22, 2022
 8   . . . . . . . . . . . . . .  10:01 a.m.

 9                       TRANSCRIPT OF HEARING
           BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10              CHIEF UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:           Allison S. Mielke, Esquire
                                YOUNG CONAWAY STARGATT & TAYLOR, LLP
13                              Rodney Square
                                100 North King Street
14                              Wilmington, Delaware 19801

15   For Banc of California:    Maxim B. Litvak, Esquire
                                PACHULSKI STANG ZIEHL & JONES LLP
16                              One Sansome Street, Suite 3430
                                San Francisco, California 94104
17
     For DIP Lender:            Curtis S. Miller, Esquire
18                              MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                                1201 North Market Street, 16th Floor
19                              P.O. Box 1347
                                Wilmington, Delaware 19899-1347
20   (APPEARANCES CONTINUED)

21   Electronically
     Recorded By:               Nolley Rainey, ECRO
22
     Transcription Service:     Reliable
23                              1007 N. Orange Street
                                Wilmington, Delaware 19801
24                              Telephone: (302) 654-8080
                                E-Mail:  gmatthews@reliable-co.com
25
     Proceedings recorded by electronic sound recording:
     transcript produced by transcription service.
```

APPEARANCES: (Continued)

For the Official
Committee of Unsecured
Creditors:                      Justin A. Kesselman, Esquire
                                ARENTFOX SCHIFF LLP
                                800 Boylston Street, 32nd Floor
                                Boston, Massachusetts 02199

                                - and -

                                Anthony M. Saccullo, Esquire
                                A.M. SACCULLO LEGAL, LLC
                                27 Crimson King Drive
                                Bear, Delaware 19701

1                                   INDEX

2    <u>MOTIONS:</u>                                                   <u>PAGE</u>

3    <u>MATTERS GOING FORWARD:</u>

4    Agenda
     Item 1:    Debtors' Motion for Entry of Interim and        4
5               Final Orders (I) Authorizing the Debtors to
                (A) Obtain Postpetition Financing, (B) Grant
6               Senior Secured Liens and Superpriority
                Administrative Expense Claims, and (C) Utilize
7               Cash Collateral; (II) Determining that the
                Prepetition Secured Lender is Adequately
8               Protected; (III) Modifying the Automatic Stay;
                (IV) Scheduling Final Hearing; and (V)
9               Granting Related Relief [D.I. 14; 12/2/22]

10   Court's Ruling                                             7

11   Agenda
     Item 2:    Debtors' Motion for Entry of (A) an Order       7
12              (I) Approving Bidding Procedures in
                Connection with the Sale of the Debtors'
13              Assets and Related Bid Protections, (II)
                Approving Form and Manner of Notice, (III)
14              Scheduling Auction and Sale Hearing, (IV)
                Authorizing Procedures Governing Assumption
15              and Assignment of Certain Contracts and
                Unexpired Leases, and (V) Granting Related
16              Relief; and (B) an Order (I)
                Approving Purchase Agreements, and (II)
17              Authorizing a Sale Free and Clear of All
                Liens, Claims, Encumbrances, and Other
18              Interests [D.I. 47; 12/7/22]

19   Court's Ruling                                             28

20                                  EXHIBITS

21   <u>DECLARATIONS</u>                                              <u>PAGE</u>

22   1) Declaration of Morgan Ley                              9

23

24   Transcriptionist's Certificate                            31

25

1          (Proceedings commenced at 10:01 a.m.)

2                THE COURT:  Please be seated.

3                MS. MIELKE:  Your Honor, good morning.

4                THE COURT:  Good morning.

5                MS. MIELKE:  Allison Mielke with Young Conaway on

6   behalf of the debtors.  First, I apologize, I have a cold,

7   I'm not feeling great.  So I will probably have some cough

8   drops while I speak, if that's okay.

9                THE COURT:  Uh-huh.

10               MS. MIELKE:  Further apologies, I know we filed a

11  lot on the docket this morning very close to the hearing.

12  I've got some blacklines of the bid procedures pleadings, if

13  that would be helpful, but, if not, I'm happy to just get

14  going.

15               THE COURT:  I have everything that was filed this

16  morning.

17               MS. MIELKE:  Great.  Thank you.

18               THE COURT:  Thank you.

19               MS. MIELKE:  All right.  First, Your Honor, thanks

20  for the time today.

21               I'm happy to report that we are here before you on

22  a fully consensual basis this morning, although it did take a

23  Herculean effort to get us here.  We've been working around

24  the clock about the last 24 hours to resolve some issues that

25  the committee had and to make sure that everybody was rowing

1  in the same direction.  So I think that what we're presenting

2  to you today you'll find is fully consensual at this time.

3         We will be -- not to bury the lead, but we'll be

4  adjourning this hearing with respect to the DIP on a final

5  basis to the hearing on January 6th, and we have submitted a

6  form interim order under certification of counsel this

7  morning.  Did Your Honor have questions about that order?

8         THE COURT:  Let me take a look at that one.  I

9  didn't focus on that one.

10      (Pause)

11         THE COURT:  I don't have any questions on that.

12  This is consensual?

13         MS. MIELKE:  It is, Your Honor.  It just extends

14  the period -- or the milestone to enter a final DIP order and

15  it increases the DIP draw by one and a half million so that

16  we can get through the interim period.

17         THE COURT:  Okay, very good.

18         Does anyone wish to be heard on that?

19      (No verbal response)

20         THE COURT:  Okay, we will --

21         MR. LITVAK:  Your Honor --

22         THE COURT:  Oh --

23         MR. LITVAK:  -- it's Max Litvak for --

24         THE COURT:  -- Mr. Litvak.

25         MR. LITVAK:  -- Banc of California, if I may be

1  heard for a moment?

2          THE COURT:  Yes.

3          MR. LITVAK:  Good morning, Your Honor, Max Litvak,

4  Pachulski Stang Ziehl & Jones on behalf of Banc of

5  California.  I just wanted to say, Your Honor, that we're

6  supportive of the continuance of the final DIP hearing, and

7  we've also reviewed the budget.  There's an updated budget

8  that was filed as part of that notice and the bank is okay

9  with that as well.  It stays at the $5 million ultimate

10 maximum DIP loan amount, so we're comfortable with it.  I

11 just want to make that clear on the record.

12          Thank you, Your Honor.

13          THE COURT:  Thank you.

14          Anyone else?  Come to the podium, please.

15          MR. KESSELMAN:  Good morning, Your Honor, Justin

16 Kesselman of ArentFox Schiff on behalf of the committee.

17          THE COURT:  Mr. Kesselman.

18          MR. KESSELMAN:  With respect to the interim DIP

19 order and the adjournment of the final DIP to January 6th,

20 the committee is obviously supportive of entering the order

21 and gratified to reach an interim solution that does, at

22 least until January 6th, resolve some of the committee's

23 issues that were put into its objection, including some

24 increased oversight over the outflow of cash on account of

25 prepetition claims.  That is a concern for the committee to

1  make sure that this is an administratively-solvent estate, as

2  we highlighted in our objection.  That is still, obviously, a

3  concern and will continue to be a concern.  The committee

4  will be monitoring that and is going to be in continued

5  discussions with the professionals of the debtor, but

6  appreciates everyone's efforts, including the professionals

7  of the debtor and the lenders to reach an interim solution

8  for today through January 6th.

9         THE COURT:  Okay.  Thank you.

10        MR. KESSELMAN:  Thank you, Your Honor.

11        THE COURT:  And I did read the committee's

12  objection.  I understand the concerns and which ones have

13  been resolved and which ones are still outstanding from this

14  interim resolution.

15        MR. KESSELMAN:  Thank you, Your Honor.

16        THE COURT:  Thank you.

17        Anyone else?

18     (No verbal response)

19        THE COURT:  Okay.  Well, I will sign this order;

20  we'll get it on the docket today.

21        MS. MIELKE:  Thank you, Your Honor.  We have

22  uploaded it, so it is available --

23        THE COURT:  Thank you.

24        MS. MIELKE:  -- for your convenience.

25        So I'll dive into kind of the main event for

1  today, Your Honor.  First off, just if it's all right, I'll

2  just kind of give a brief overview of events that have

3  transpired since we last met, and then kind of go over our

4  order of operations.

5          First, if I may, I'll introduce some people that

6  are in the courtroom with us.  Debtors' CFO Carol Brault --

7          THE COURT:  Yes.

8          MS. MIELKE:  -- is with us in the courtroom, Kevin

9  Pleines from RPA Advisors next to her with -- that's the

10  debtors' financial adviser.  Morgan Ley Canaccord Genuity and

11  Brian Hurley with Canaccord Genuity, the debtors' investment

12  banker, is also here as well.

13          As I mentioned, we've been in the trenches in the

14  last 24 hours to help, you know, the committee with some of

15  its information issues and some other issues that it has

16  raised.  We believe that the resolutions that we've entered

17  today -- or that we've, you know, agreed on today will

18  provide the committee with additional time to get up to speed

19  and to understand -- lift up the hood, as you will.

20          The parties have agreed on a revised form of bid

21  procedures and order, which we filed this morning.  We also

22  filed a revised APA this morning, as well as the declaration

23  of Morgan Ley in support of those bid procedures.

24          We submit this declaration -- Your Honor, as I

25  mentioned, Mr. Ley is in the courtroom today -- we submit

1  this declaration for the Court's consideration and ask that

2  it be moved into evidence to support the Court's approval of

3  the bid procedures and the procedures order.

4          THE COURT:  Does anyone object?

5      (No verbal response)

6          THE COURT:  I hear no objections.  It's admitted

7  and I did read it this morning.

8      (Ley declaration received in evidence)

9          MS. MIELKE:  Thank you.

10         As you'll recall, we filed the bid procedures

11 motions in this case shortly after the first day hearing, at

12 which we recounted the debtors' significant prepetition

13 marketing efforts, which I'll briefly address again in a

14 moment.

15         Those -- upon filing of the Chapter 11 cases, the

16 parties were -- by the parties, I mean the stalking horse

17 bidder and the debtors -- were engaged in active negotiations

18 on a stalking horse APA.  In parallel, they were negotiating

19 the DIP financing in order to get through a sale process, as

20 well as the terms of the APA.  That was executed the day

21 after the first day hearing, it was filed on the docket, and

22 then this -- the hearing was scheduled approximately 14 days

23 later.

24         During the period between filing the APA and

25 today, there were two primary work streams that the debtors

1  have been engaging.  The first is that, on a post-petition

2  basis, Canaccord immediately reinitiated its marketing

3  efforts.  I think you probably recall that we mentioned the

4  prepetition marketing efforts in this case began

5  approximately nine months ago with the retention of Canaccord

6  in March.  They started that prepetition process, reached out

7  to approximately 50 parties prepetition, and engaged in a

8  fulsome process.  It eventually led to a couple of interested

9  parties, only one was able to provide financing, which was a

10  requirement for the debtors to move forward, and that's how

11  we landed with the stalking horse bidder.

12        Once the cases were filed, Canaccord went back out

13  to the market.  They sent out additional information to some

14  50 parties, I think, a lot of some of the similar parties

15  that were engaged prepetition.  We did make contact with

16  numerous individuals who have had opportunities to interact

17  with management, have interviews with management.  There are

18  25 parties that are under NDA that have been doing diligence

19  and -- on the debtors and that have access to a confidential

20  data room.

21        So far, we can report that no party has asked for

22  additional time or has noted that additional time is needed

23  in order to get bids in on time.

24        The second piece of the work stream has been the

25  disclosure schedules with the asset purchase agreement.  So,

1  as part of the APA that was executed on the 7th, the parties

2  had a structure where they would -- given the timing, they

3  would do some diligence, the debtors in particular would do

4  diligence, populate schedules, get it over to the stalking

5  horse bidder.  There would be agreement on the schedules, and

6  then those would be agreed upon and be binding as part of the

7  asset purchase agreement.

8          So, initially, when the APA -- and I'll just back

9  up briefly, just for some context -- initially, when the

10  parties were negotiating the APA, the deal was structured as

11  a pure asset sale, but it became very clear that there was

12  going to be some licensing issues in terms of how quickly the

13  debtor could be able to transition the business and be able

14  to have the licenses it needed to operate on day one.

15          And so the parties pivoted to a hybrid equity

16  assert transaction where the stalking horse bidder agreed to

17  purchase the equity in BWSC, which is the entity that holds

18  the licenses for the debtors' operations, the wine licenses,

19  and then would purchase certain assets from Winc,

20  Incorporated and Winc Lost Poet, Incorporated, which are the

21  other two debtors in this case.

22          All of the sales and a substantial amount of the

23  obligations of the debtors run through BWSC and part of that

24  -- it's predominantly because the BWSC, I think, has the

25  licenses and so all sales have to be done at that entity.

1          While going through the disclosure schedules and
2     doing that diligence exercise, it became clear -- there was a
3     particular obligation that was substantial and it was
4     originally booked, and had historically been booked on the
5     books and records of Winc, Inc.  And so it was not -- while
6     it was made, you know, available, that information, it wasn't
7     clear that that was a liability of BWSC kind of at the
8     outset.

9          When it became very clear that -- and that was an
10    issue that needed to be addressed, the stalking horse bidder
11    did attempt to negotiate that agreement with the
12    counterparty, but were unable to resolve an economic solution
13    that was feasible for the transaction.  And so they came to
14    us and we pivoted to -- back to the asset purchase structure
15    that we had originally negotiated.

16         So what that means is that we've executed an
17    amended APA, we filed that this morning.  The disclosure
18    schedules that we are finalizing as well, those were done
19    this morning as well.

20         And, functionally, what it means is that the
21    assets of both -- or all three of the debtors will be
22    purchased in the sale and substantial liabilities will be
23    assumed as well.

24         The stalking horse bidder is contemplating
25    assuming, you know, a lot -- substantial amounts of the

1  operational liabilities, including a lot of the sort of

2  operational software licensing-type agreements, subject to

3  the consent of those counterparties, as well as sort of major

4  contracts, and will likely take almost all, if not all, of

5  the debtors' employees as well.

6        So we believe that this structure continues to

7  provide substantial value for the debtors' estates and

8  continues to be the best way to maximize value of the estates

9  and to move forward.

10       The other component of that, Your Honor, is that

11 we're cognizant that this is a type of case the budget is

12 tight.  The stalking horse bidder is aware kind of its

13 obligations to pay the freight of the case, and so we have

14 also negotiated a further increase of the purchase price of a

15 million dollars to help satisfy those liabilities and in --

16 you know, as consideration for sort of the revised asset

17 purchase agreement structure.

18       Turning to the sale timeline, Your Honor, as we've

19 -- as I mentioned and we've kind of hit on this substantially

20 in the first day hearing as well, the prepetition marketing

21 process in this case was substantial and we think that the

22 sale timeline as contemplated hits the right balance between

23 providing a comprehensive and competitive auction process

24 that hopefully maximizes value, but doesn't prolong the

25 process such that it would, you know, unnecessarily create

1  substantial administrative costs that the company can't

2  afford and that would not be value-maximizing.

3         The -- I don't need to read it for Your Honor, but

4  we're contemplating just some -- you know, high-level dates.

5  The bid deadline of January 9th, with an auction on the 11th

6  and a sale hearing on the 17th.

7         The bid procedures contemplates break-up fee and

8  expense reimbursement in sort of customary amounts that are

9  market and in line with amounts that this Court has

10 previously approved.  As discussed in the Ley declaration,

11 the stalking horse bidder required those two protections in

12 order to act as a stalking horse and to submit its bid to be

13 shopped in the public market.

14         The DIP lender will be credit bidding the amount

15 of the DIP facility.  The prepetition lender has confirmed

16 that it is not pursuing a credit bid in these cases, so we've

17 adjusted the documents to reflect that.

18         We did make some conforming non-material changes

19 to the sale notice, just to conform to the documents that we

20 have presented today.

21         And I think that that covers kind of the sort of

22 high-level -- although I'm getting a note -- oh, thank you --

23 so one of the deadlines that we have kind of done away with

24 at this point is the letter of intent deadline.  As I'm sure

25 you recall, maybe it's not a traditional structure that we

1  originally proposed, was to include an LOI deadline, you

2  know, test kind of where we were, whether we were getting a

3  lot of interest or not, and then be able to make the call as

4  to whether or not a further auction process would be

5  warranted.  You know, in discussions with all the various

6  interested parties here and just given the timing, it just

7  doesn't continue to make sense.  So we've removed that from

8  the timeline.

9           So, you know, I don't want to -- I'll turn quickly

10  just to the committee's objection to address it.  I don't

11  want to harp on it or, you know, pause too long on their

12  objections.  I mean, I think --

13           THE COURT:  Is there anything left or is this now

14  consensual?

15           MS. MIELKE:  It is consensual, it is consensual.

16           THE COURT:  Okay.

17           MS. MIELKE:  We strongly disagree with much of

18  what was in that objection and I think I'll leave it at that.

19  The debtors are reserving our rights to address anything that

20  was put in that objection and to, you know, respond to any of

21  the statements that were made in that prior to a final

22  hearing, if needed.

23           We have found a way to move forward in a

24  consensual way.  Given the circumstances of this case, given

25  the budget, given, you know, the time frame, we believe

1  strongly that it does not make sense to have contentious

2  battles over, you know, standard case issues that we can come

3  together commercially to resolve.  So we're hopeful that that

4  is the way that this case moves forward, I anticipate that it

5  is.  We've, over the last 24 hours or so, have worked very

6  commercially with all of the interested parties in this case

7  and were able to ultimately achieve a consensual resolution.

8         So I'll just leave it at that and just note that,

9  you know, the concessions that we've made in order to get to

10  a consensual hearing today are for an interim period only and

11  to provide the committee with transparency and kind of a

12  good-faith effort of, you know, moving along in the same sort

13  of direction.

14        So, Your Honor, I think that's kind of the

15  highlights.  I'm happy to get into details, I'm happy to walk

16  through the redline, if that's helpful, but just in terms of

17  kind of highlights -- I know that Your Honor pays very close

18  attention to these documents, so I have no intention of

19  boring you on a holiday week if that's not necessary.

20        THE COURT:  I would like to hear from others.  The

21  only question that I had -- well, two questions, but on the

22  timeline, I think it was appropriate to do away with the

23  letter of intent deadline, which essentially shortened the

24  bid deadline, but the sale objection deadline is still at

25  December 30th, and I'd like to understand why it's necessary

1  for that deadline to remain at the 30th given that there has

2  been a change to the APA, which does impact creditors of the

3  BWSC, who before when the stock was being taken didn't have

4  to worry about their claims, now that it's not being taken,

5  it impacts them, at the very least, and it's a tight -- as we

6  recognize, it's a tight timeline.

7          So why the necessity for a sale objection deadline

8  that is, what, eight days from now when people aren't going

9  to get the definitive notice that in fact that deadline is

10  real?  So far, it's just a proposed deadline.

11          MS. MIELKE:  Yeah, you know, I'll just take it as

12  a practical matter, Your Honor.  I mean, we've been in

13  contact with all parties that have been interested in these

14  assets, you know, close contact, and so I think the documents

15  have been sent to those parties, they're available in the

16  data room --

17          THE COURT:  I'm not concerned about the parties,

18  the bidders; I'm concerned about the creditors --

19          MS. MIELKE:  Oh, yeah, I understand.

20          THE COURT:  -- the creditors who have to object to

21  a sale.

22          MS. MIELKE:  I suppose, Your Honor -- I mean, the

23  reason that we did that deadline on that day is for the LOI.

24  So, you know, if -- it seems like Your Honor is uncomfortable

25  with it, we could push it to the 6th, which would be the last

1  business day before bid deadlines and would give parties

2  another week.

3          THE COURT:  And what's the significance of having

4  it before the bid deadline?

5          MS. MIELKE:  Well, I think -- I think we'd like to

6  know if there are objections to the sale leading up to the

7  auction.

8          THE COURT:  Well, I'm going to -- we're going to

9  make it the 9th.  We're in a tight schedule already, it's a

10 holiday season, people are in and out, and I think, if all

11 the bidders know before the actual auction, then they have

12 the lay of the land, and they can take a look and people can

13 adjust whatever needs to be adjusted, but I don't -- I mean,

14 the way this timeline was set up before, people were having

15 to -- bidders, prospective bidders were having to put in a

16 binding letter of intent without knowing sale objections.

17         So I think the 9th is where we're going to land.

18         MS. MIELKE:  Yes, Your Honor.  We'll make that

19 change and upload a revised order.

20         Did you have any other questions?

21         THE COURT:  Well, I do want to hear from others,

22 but the only other question I had in revised paragraph 24 --

23     (Pause)

24         THE COURT:  Okay, where it provides that the

25 debtors' obligations under the order, the provisions of this

1  order and the portions of the stalking horse agreement

2  pertaining to bid procedures, including expense

3  reimbursements and break-up fees, shall survive.  What other

4  provisions besides the expense reimbursement and break-up fee

5  are contemplated to survive because I am not generally,

6  obviously, approving the asset purchase agreement or any

7  provisions.

8          What I will do, based on consensus and unless I

9  hear anything different, is approve the break-up fee and

10 expense reimbursement as revised, but I'm not generally

11 approving the entry.

12         So what else, what other provisions?

13         MS. MIELKE:  With that, Your Honor -- I mean, I

14 haven't given any consideration to specific provisions of

15 this order.  If there are other, you know, parties that are

16 concerned about something specific, I'm happy to hear it, but

17 I'm sure that the break-up fee and the expense reimbursement

18 are the primary issues here.

19         THE COURT:  Mr. Miller, I think it's your issue.

20         MR. MILLER:  Good morning, Your Honor.

21         THE COURT:  Good morning.

22         MR. MILLER:  For the record, Curtis Miller of

23 Morris Nichols.

24         Your Honor, if it's limited to -- if we limit the

25 paragraph to the expense reimbursement and break-up fee,

1  that's fine.

2            THE COURT:  Okay --

3            MR. MILLER:  Thank you.

4            THE COURT:  -- then let's do that.  Thank you.

5            Okay, let me hear from others, in support of or

6  anyone who has a concern with respect to the revision.

7            MR. KESSELMAN:  Good morning, Your Honor --

8            THE COURT:  Mr. Kesselman.

9            MR. KESSELMAN:  -- Justin Kesselman of ArentFox on

10  behalf of the committee.

11            Although the committee was pleased to reach this

12  interim step, as with the DIP, we continue to have, you know,

13  concerns over the sale generally, including ensuring that the

14  process is adequate to make sure that interested parties

15  understand what the deal is and the timeline and what they're

16  able to accomplish over that timeline, which is why it was

17  important to remove that LOI deadline, also to -- even by one

18  business day, to get the sale notice out and -- but other

19  aspects of this, you know, other parties and interested

20  bidders need to understand what the economic terms of this

21  transaction are as soon as possible.

22            And so the committee was -- is concerned that the

23  transaction has changed multiple times, including, you know,

24  an asset purchase agreement that was signed last night.  And

25  there's reference by the debtors and, you know, by the

1  stalking horse that substantial liabilities will be assumed

2  and we have no reason to doubt that, but we really do need to

3  understand the magnitude of the liabilities that will be

4  assumed and potential bidders need to understand the

5  magnitude of liabilities that will be assumed because they

6  need that information to understand whether -- you know, what

7  the magnitude of bid is required to make a qualified bid and

8  top the stalking horse.  If that's a substantial number that

9  they need to meet through some combination of cash or

10  additional assumed liabilities, bidders need to know that.

11          And so, you know, we were contacted by an

12  interested party who lost interest in the process earlier,

13  contacted last night, who read our objection and is

14  interested to see the revised bid procedures to get reengaged

15  in the process.  And whether we're able to do that and move

16  quickly and get bidders engaged to have a robust auction is

17  yet to be seen, but we're going to work very hard with all

18  the interested parties to try to make that happen.  But if we

19  find that potential bidders are disenfranchised or have

20  impediments to the process based on the structure that's

21  imposed, we of course reserve our rights to try to seek more

22  time, if it's prudent in the case, and object to the sale if

23  we don't think it's in the best interests of the estate,

24  including if the sale leaves administrative liabilities at

25  the estate that would leave the estate insolvent, which is,

1    you know, a driving force behind our objection.

2              THE COURT:  Okay.  Thank you.

3              MR. KESSELMAN:  Thank you, Your Honor.

4              THE COURT:  Anyone else?  Let me get the people in

5    the courtroom first.

6              Mr. Miller.

7              MR. MILLER:  Good morning again, Your Honor,

8    Curtis Miller of Morris, Nichols on behalf of the stalking

9    horse bidder and DIP lender.

10             In hearing the comments of committee counsel, the

11   one thing I just do want to remark is today is the day to be

12   raising objections to the bid procedures.  So we are

13   resolving that, we've resolved that, so that has passed.  If

14   we get to the sale and they have sale objections, that's

15   fine, but we are where we are today, we've agreed to resolve

16   it.  We made concessions -- it makes the case more expensive

17   -- we've made concessions, but today is the day for bid

18   procedures objections.

19             So, when we get to the sale hearing, we understand

20   that if they think there's other mischief that's happened,

21   those issues can be raised.  You know, there's revised

22   procedures in place to make it a level playing field, you

23   know, give them what they want to be able to talk to

24   creditors, talk to other debtors, that's fine, but today is

25   the day for process objections.

1         So I just wanted to note that for the record.

2   We're not anticipating coming back at the sale hearing and

3   saying the bid procedures were inappropriate, that's being

4   resolved today.

5         Thank you, Your Honor.

6         THE COURT:   Thank you.

7         Let me ask, I think I heard Ms. Mielke say that

8   the disclosure -- Mr. Miller --

9         MR. MILLER:   I'm sorry --

10        THE COURT:   -- I'm sorry --

11        MR. MILLER:   -- I didn't know you were talking to

12  me.

13        THE COURT:   Yes.   I think I heard Ms. Mielke say

14  that the disclosure schedules to the APA were another focus

15  of what has been worked on and --

16        MR. MILLER:   Those --

17        THE COURT:   -- are those complete, substantially

18  complete?   Where are those?

19        MR. MILLER:   Let me ask my co-counsel, Your Honor.

20        THE COURT:   Thank you.

21        MS. MIELKE:   They are complete, Your Honor.   I saw

22  an email this morning go back and forth and we anticipate

23  putting those in the data room as soon as they're ready.

24        THE COURT:   Thank you.

25        MR. MILLER:   Also, my co-counsel reminds me that

1  one of the things that was negotiated and was revised in the

2  bid procedures is there is a minimum bid, like, amount set

3  forth in the bid procedures.

4          THE COURT:  Yes.

5          MR. MILLER:  So that -- you know, I think that

6  resolves the clarity point of what do I actually need to bid,

7  that tells people what they need to bid to come in.  So I

8  think that resolves that issue, Your Honor.

9          THE COURT:  Yes, but that doesn't -- it does, but

10 it doesn't tell us what the assumed liability piece is going

11 to be.

12         MR. MILLER:  Agreed.  That's where the disclosure

13 schedules come in, as you remarked, Your Honor.

14         THE COURT:  Okay.  Thank you.

15         MS. MIELKE:  The only piece I'll add to that, Your

16 Honor, though, is that they do have to bid against the APA

17 and the schedules will be identified in the data room, and so

18 they will know what contracts are being assumed as part of

19 those schedules.  So while they -- sort of the amounts may

20 not be identified, you know, in those schedules, they will

21 have to -- they will know what's included in the APA.

22         THE COURT:  Well, that's why I asked if --

23         MS. MIELKE:  Yeah, that's right.

24         THE COURT:  -- the disclosures were finalized.

25         MS. MIELKE:  Yes, Your Honor.

1          THE COURT:  And I will note, though everyone, I

2    guess, has to bid against the asset purchase agreement, if

3    somebody else comes in with a totally different structure, a

4    plan, anything else, the debtors, of course, will, consistent

5    with their fiduciary obligations, consider that.

6          Yes?

7          MR. SACCULLO:  Your Honor, Anthony Saccullo on

8    behalf of the committee.  Very briefly, just to respond to

9    Mr. Miller.

10          First of all, I think we made clear, the structure

11    of this changed last night -- or the day before right from a

12    stock purchase agreement to an asset purchase agreement.

13    We've already heard from one potential bidder who

14    specifically pulled themselves out because it was a stock

15    purchase agreement, who now is saying they will come back in

16    under this form and they may be interested under what all of

17    us are used to seeing, which is a standard asset purchase

18    agreement.

19          So when we say all of the process and procedure is

20    all done, if we, the committee, find out that there are more

21    players who might have been involved in this who were out

22    because this was a stock purchase agreement, we certainly

23    would bring that to the debtors first and we would hope that

24    the debtors would be behind us and say, hey, wait a minute,

25    let's make sure that this is a level playing field and, if

1   not, we may have to come back to this Court and make sure

2   that interested parties have a level playing field here given

3   that structural change.

4           THE COURT:  So I have two reactions to that.  My

5   first reaction is that, of course, if we find out that

6   there's some changed circumstance or perhaps some

7   misunderstandings -- I'll hear what anybody has to say, but

8   this is the bid procedures and -- but the Court, of course,

9   is free to listen to whatever the circumstances are.

10          Second, what I just said, it surprises me to hear

11  that somebody, a sophisticated purchaser, wouldn't have said

12  I don't care if it's a stock purchase agreement, I'm coming

13  in with an asset purchase agreement because the Bankruptcy

14  Court is going to entertain whatever type of offer in

15  whatever structure it's presented.

16          So I'm a little surprised by that, but we'll deal

17  with that when and if it's an issue.  In the meantime, that

18  party has now engaged in some fashion and they will know by

19  the end of today what the result is.  And I'm sure Canaccord

20  will be reaching out to them and the committee is already in

21  communication.  So I think they'll be brought up to speed

22  pretty quickly.

23          MR. SACCULLO:  Your Honor, I completely agree and,

24  actually, you may have said my point better.  I'm not

25  standing up to object to the bid procedures, I just want to

1   make sure that everyone is aware there could be a possibility

2   that there are people out there who were sort of turned off

3   by the fact that this is a stock purchase agreement and I

4   think we all have sort of a shared idea that we should be

5   moving forward and making sure everybody has an equal

6   opportunity.

7           THE COURT:  Everybody has an equal opportunity.

8           MR. SACCULLO:  Thank you, Your Honor.

9           THE COURT:  Anyone else in the courtroom?

10          Mr. Litvak.

11          MR. LITVAK:  Good morning, Your Honor, Max Litvak

12  on behalf of Banc of California.  Your Honor, the bank is

13  also supportive of the revised bid procedures.  I just wanted

14  to highlight a couple of things, which is I was very pleased

15  to hear that the purchase price is being increased from $10

16  million to $11 million because, as we discussed at the first

17  day hearing, there's a pretty thin equity in this case when

18  you take into account the $5 million DIP, plus interest, plus

19  fees; you have my client's claim of three and a half million

20  dollars, plus interest, plus fees; you're quickly getting

21  into that $9 million range, and to have that little cushion

22  to $11 million is certainly very beneficial and I think will

23  be beneficial in terms of ensuring that administrative claims

24  are paid as well, consistent with the budget.

25          And then the second thing, Your Honor, is we're

1  happy to hear that the ultimate outside date is being held,

2  which is something on the order of January 20th for closing

3  the sale, primarily because, as you can see from the updated

4  budget, the debtors are down to about $100,000 at that point.

5  So it's very important to, from our perspective, have an open

6  and transparent sale process.  Hopefully, there will be

7  overbidding.  Certainly, we would like to see overbidding

8  because then that increases that cushion even more and

9  provides potential benefits not only for the secured

10  creditors, but also the unsecured creditors, but that's --

11  you know, that's something that ultimately we're going to

12  have to live with that deadline because, you know, that's --

13  in terms of the financial wherewithal of the estate, that's

14  pretty much it.

15         So we're supportive of the modifications today,

16  Your Honor, and we're looking forward to a robust conclusion

17  to this sale process.

18         Thank you.

19         THE COURT:  Thank you.  Okay.

20         Well, I'm going to approve the bid procedures and

21  the timeline as modified by the change in the sale objection

22  deadline based on two things:  one, the declaration of Mr.

23  Ley, which supports the request for what is, admittedly, an

24  expedited sale process in terms of the post-petition aspect

25  of it, but as was made clear in the declaration, this

1  process, a sale process, started pre-bankruptcy in March of

2  this year.

3            So I think the timeline, as it stands today, is

4  appropriate.  And with the concessions that have been made in

5  response to the objection filed by the committee, which

6  expressed concerns that I think were appropriately dealt

7  with, I will approve the bid procedures, as modified.

8            I recognize there's been a change in the structure

9  of the sale, which is one of the reasons that the sale

10 objection deadline has been changed, but I think

11 sophisticated parties can adjust appropriately.  There is a

12 reason -- and I was looking for the reason for the change --

13 and there was a reason given for the need to change the

14 structure and that was the earn-out obligation, which

15 apparently was booked at Winc when it should have been booked

16 at BWSC -- or maybe it should have been booked at both, I

17 don't know, but it wasn't booked at BWSC.  And so there is a

18 reason for the change.

19           I noted the consideration went up a million

20 dollars, I noted the break-up fee went up proportionately.  I

21 don't have an objection to that anymore.  Again, I have a

22 basis for the break-up fee in the declaration of Mr. Ley.

23 The stalking horse bidder is the only one that came forward

24 after a long process and made a commitment.  The stalking

25 horse bidder's bid is subject to others coming in and topping

 1  it.  So I think, under the circumstances of this case, it's

 2  appropriate and the fees are within the range that this Court

 3  approves.

 4          Clearly, the process here strikes a balance

 5  between necessary marketing and reality of cash balances and

 6  position of where the debtor is.  So I think it's

 7  appropriate.  And somebody, probably Ms. Mielke, talked about

 8  commercial resolutions and the one that was reached today, I

 9  will just add that commercial resolutions are always

10  preferable to judge decision.  So I would encourage you to

11  continue to act in that regard.

12          We will look for the updated form of order with

13  the two changes that were discussed and we'll get that signed

14  today.  And good luck with the marketing.

15          Anything further?

16      (No verbal response)

17          THE COURT:  Thank you.  We're adjourned.  Happy

18  holidays.

19          COUNSEL:  Thank you, Your Honor.

20      (Proceedings concluded at 10:42 a.m.)

21

22

23

24

25

1                               CERTIFICATION

2              I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9    /s/ Tracey J. Williams                    January 1, 2023

10   Tracey J. Williams, CET-914

11   Certified Court Transcriptionist

12   For Reliable