IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br><br> WINC, INC., *et al.*, <br><br> Debtors.¹ | Chapter 11 <br><br> Case No.: 22-11238 (LSS) <br> (Jointly Administered) <br><br> Related Docket Nos.: 47, 67 & 122 |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OMNIBUS OBJECTION TO (A) DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING STALKING HORSE PURCHASE AGREEMENT AND (II) AUTHORIZING A SALE FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (B) APPLICATION TO RETAIN CANACCORD GENUITY, LLC AS INVESTMENT BANKER; AND (C) CERTAIN INVENTORY PAYMENTS**

The Official Committee of Unsecured Creditors (the "Committee") of Winc, Inc., BWSC, LLC, and Winc Lost Poet, LLC (collectively, the "Debtors") appointed pursuant to section 1102 of title 11 of the United States Code §§ 101 *et seq.* ("Bankruptcy Code") in the above-captioned chapter 11 cases ("Chapter 11 Cases"), by and through its undersigned proposed counsel, files this Objection to (A) Debtors' Motion for Entry of An Order (I) Approving Stalking Horse Purchase Agreement and (II) Authorizing a Sale Free and Clear of All Liens, Claims, Encumbrances and Other Interests; (B) Application to Retain Canaccord Genuity, LLC as Investment Banker; and (C) Certain Inventory Payments (the "Objection"), and in support thereof relies on the *Declaration of Jeffrey R. Manning Sr* attached hereto as **Exhibit 1** (the "Manning Declaration"), and states as follows:

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Winc, Inc. (8960); BWSC, LLC (0899); and Winc Lost Poet, LLC (N/A). The Debtors' mailing address for purposes of these chapter 11 cases is 1751 Berkeley Street, Studio 3, Santa Monica, CA 90404.

1

## PRELIMINARY STATEMENT

1.	In the 27 days since retaining counsel, the Committee has sought solutions and compromises with the goal of achieving commercially reasonable outcomes tailored for this case. The Committee files this objection because the record demonstrates that the proposed Sale and retention of Canaccord is neither reasonable nor in the best interests of creditors. The following core areas of discussion and objection remain open:[2]

   a.	<u>Retention of Canaccord</u>: The Committee opposes the retention of Canaccord absent material changes to the proposed compensation structure. An 18% transaction fee and $100,000 monthly fee are neither market nor otherwise appropriate for these cases or the proposed transactions. If approved in their current form, Canaccord's fees will render the estate administratively insolvent.

   b.	<u>Problematic and Unclear APA Terms</u>: The Committee has raised concerns with the Debtors and Stalking Horse regarding the APA, including (a) clarifications to ensure the estate is not left with open purchase orders or other administrative costs associated with inventory that the Stalking Horse is acquiring, (b) the estate must retain certain key assets to fund unsecured creditor recoveries, including D&O actions and prepayments unrelated to purchased assets, (c) lack of insight into the transition service agreement for which the Debtors seek approval but have not disclosed, and (d) other issues that the Committee is prepared to discuss with the Debtors and Stalking Horse.

   c.	<u>Non-Critical Payments for Benefit of Stalking Horse:</u> The Committee objects to payments on account of prepetition liabilities or postpetition inventory build-up that is not critical. The Stalking Horse should not be permitted to shift its acquisition costs onto the estate, particularly in light of the estate's precarious financial condition.

   d.	<u>Post-Sale Administrative Solvency</u>: The Debtors and Stalking Horse have not provided sufficient assurances regarding the remaining assets and liabilities following closing, including whether there will be sufficient resources to confirm a plan, pay post-closing professional fees and other administrative claims, and ensure a source of value available for unsecured creditors whose contracts will not be assumed and assigned in the sale.

---

[2] As of the filing of this Objection, the Committee is awaiting financial information from the Debtors that will hopefully provide the necessary tools for parties to have a meaningful global settlement discussion. Most of the information sought was originally requested on December 15 or shortly thereafter.

AFDOCS:26785159.5

2. The Debtors entered Chapter 11 publicly reporting assets in excess of $50 million, including:

    a. more than $16 million in finished inventory, as well as rights to valuable wine brands and other intellectual property;

    b. prepayments and deposits of more than $3 million;

    c. accounts receivable of more than $3 million; and

    d. these estates appear to have significant causes of action against insiders who forgave approximately $3.5 million in loans to themselves for no consideration.

3. These assets alone amount to realizable value in excess of $25 million. The Debtors propose to transfer these assets to the DIP Lender/Stalking Horse for only $11 million, through a transaction that does not support itself and is somehow poised to leave no recoveries for general unsecured creditors despite the Debtors entering Chapter 11 less than two months ago with only $3.4 million in secured debt.

4. The restructuring cost of this Chapter 11 process has been extraordinary in comparison to the proposed sale price. Estate and lender professionals are currently budgeted or proposed to receive payments of no less $2,740,000 (not including the proposed fees of Canaccord and the DIP Lender) through January 20, 2023. The Debtors seek to approve an above-market $2 million Transaction Fee (on top of $100,000 monthly fees) for its investment banker in connection with an $11 million Sale that was locked in prior to the commencement of these Chapter 11 Cases. Canaccord post-petition services failed to produce an auction and consisted largely of re-soliciting the same 45 or so parties it solicited prepetition. It is unreasonable for Canaccord to be paid a Transaction Fee of $2 million or monthly fees of $100,000.

5. The Sale proceeds will be swallowed by the claims of the DIP Lender/Stalking Horse, Prepetition Secured Lender, and Canaccord, which purportedly total in excess of $11

million in the aggregate. These estates – already depleted by the payment of excessive professional, lender, cure, and inventory costs – are unlikely to cover these and other administrative shortfalls that the Stalking Horse APA fails to adequately address, including open purchase orders and the full scope of costs associated with the post-Sale transition period.

6. The Debtors should not be permitted to close on the Stalking Horse APA absent substantial revisions, clarifications, and an evidentiary record establishing the administrative solvency of these estates following the Sale and the ability to confirm a plan. Based on the information disclosed to date regarding the Debtors' assets and projected liabilities, the proposed Sale comes at too high a cost and is a dead end for unsecured creditors, who will have a superior prospect of recovery by immediately shifting to an organized liquidation and litigation path. Accordingly, the Committee respectfully requests that the Court deny the Debtors' application to retain Canaccord and motion to approve the Sale to the DIP Lender/Stalking Horse.

## RELEVANT BACKGROUND[3]

7. The Debtors initiated these Chapter 11 Cases on November 30, 2022 (the "Petition Date") by filing their *Voluntary Petition* [ECF No. 1].

8. On December 7, 2022, the Debtors filed their *Motion for Entry of (A) an Order (I) Approving Bidding Procedures In Connection with the Sale of the Debtors' Assets and Related Bid Protections, (II) Approving Form and Manner of Notice, (III) Scheduling Auction and Sale Hearing, (IV) Authorizing Procedures Governing Assumption and Assignment of Certain Contracts and Unexpired Leases, and (V) Granting Related Relief; and (II) Authorizing a Sale*

---

[3] The Committee incorporates by reference its (i) December 30, 2022 *Official Committee of Unsecured Creditors' (A) Objection to Debtors' Motion for Entry of Final Order Authorizing Debtors to Obtain Postpetition Financing and (B) Request for Adjournment* [ECF No. 100] and (ii) December 21, 2022 *Official Committee of Unsecured Creditors' Omnibus (I) Preliminary Objection to Debtors' (A) Motion for Entry of Order Authorizing Debtors to Obtain Postpetition Financing, (B) Motion for Approval of Bid Procedures, and (C) to Certain Other Relief; and (II) Request for Adjournment* [ECF No. 75] as if fully set forth herein.

*Free and Clear of all Liens, Claims, Encumbrances, and Other Interests* [ECF No. 47] (the "Sale Motion").[4]

9.  As part of the Sale Motion, the Debtors seek approval of a stalking horse purchase agreement (as amended, restated, amended and restated, or otherwise modified, the "Stalking Horse APA") to sell substantially all of the Debtors' assets to Project Crush Acquisition Corp. LLC (the "DIP Lender/Stalking Horse").

10. On December 12, 2022, the Office of the United States Trustee for Region 3 appointed the Committee [ECF No. 54].

11. On December 16, 2022, the Debtors filed their *Application for Entry of an Order (I) Authorizing the Employment and Retention of Canaccord Genuity LLC as Investment Banker for the Debtors, Effective as of the Petition Date; and (II) Waiving the Information Requirements of Local Rule 2016-2(d)* [ECF No. 67] (the "Canaccord Application"), which sought permission to retain Canaccord Genuity LLC ("Canaccord") as investment banker. The Debtors and Canaccord agreed to extend the Committee's objection deadline to the Canaccord Application through January 11, 2023.

12. On December 22, 2022, Court entered its *Order* [ECF No. 85] approving the Debtors' proposed bid procedures. A Sale Hearing is scheduled to consider approval of any Sale, including a Sale based on the Stalking Horse APA, on January 17, 2023. The Committee's deadline to object to the Sale is January 11, 2023.

---

[4] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion.

AFDOCS:26785159.5

**OBJECTION**

**A. The Stalking Horse APA Is Inferior to the Liquidation and Litigation Path**

13.   Approval of the Stalking Horse APA in its current form should be denied. The Debtors cannot sell substantially all of their assets on an expedited basis and outside the ordinary course of their businesses under Section 363(b) of the Bankruptcy Code absent "some articulated business justification, other than appeasement of major creditors." *Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (emphasis added); *see also In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (Farnan, C.J.) (following Lionel and stating that a "debtor must show that a sound business purpose justifies such actions"); *In re Delaware & Hudson R. Co.*, 124 B.R. 169, 176 (Bankr. D. Del. 1991) (Longobardi, J.) (same); *In re United Healthcare Sys.*, 1997 WL 176574 at *5-6 (D.N.J. Mar. 26, 1997) (Politan, J.) (same). The "sound business purpose" test articulated in Lionel has become the accepted standard by numerous other courts. *See, e.g., Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997); *Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 184 B.R. 648, 653 (S.D.N.Y. 1995); *In re Delaware & Hudson Ry. Co., supra,* 124 B.R. at 176.

14.   A higher degree of scrutiny is required, where, as here, the Debtors seek to sell substantially all of their assets (to the company's founder) and no going concern reorganization is contemplated, coupled with the fact that the sale terms and cadence is dictated by the DIP Lender/Stalking Horse and the Debtors' prepetition lender. It is a well-established principle that where there is a proposed sale in the context of a Chapter 11 proceeding of substantially all of a debtor's property without the creditor protections of the disclosure statement and plan process, as here, the transaction must be closely scrutinized and the proponent bears a heightened burden of proving the elements necessary for authorization. *See In re Channel One Communications, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (*citing In re Industrial Valley Refrigeration & Air Conditioning*

*Supplies, Inc.*, 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987)); *see also In re CGE Shattuck, LLC*, 254 B.R. 5, 12 (Bankr. D.N.H. 2000); ("[t]he closer a proposed transaction gets to the heart of the reorganization process, the greater scrutiny the Court must give to the matter"); *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991). As set forth below, the Debtors cannot satisfy these heavy burdens.

15. The Stalking Horse Bid will leave these estates administratively insolvent. This is an unacceptable result in a case in which the Debtors entered Chapter 11 claiming to hold assets valued tens of millions of dollars in excess of secured debt. *See, e.g., In re Flour City Bagels, LLC*, 557 B.R. 53 (Bankr. W.D.N.Y. 2016) (denying motion to sell substantially all assets under § 363 because consideration was likely to render estate administratively insolvent and thus sale did not have a reasonable business justification); *In re Encore Healthcare Assocs.,* 312 B.R. 52 (Bankr. E.D. Pa. 2004) (same); *In re Fremont Battery Co.,* 73 B.R. 277 (Bankr. N.D. Ohio 1987) (denying § 363 because "the likelihood of reorganization would dissipate as there would remain no assets from which a plan could be proposed. Additionally, the proceeds from the proposed sale would, at most, benefit one creditor only. The sale would not create proceeds that would inure to the benefit of the unsecured creditors."); *In re Gulf Coast Oil Corp.,* 404 B.R. 407, 427 (Bankr. S.D. Tex. 2009) (denying § 363 sale because "if the proposed transaction will not even pay all of the expenses of the bankruptcy proceeding, it would be especially difficult to understand why the purchaser should get the benefit of extraordinary bankruptcy powers and remedies for which it did not pay."). Shortly after its formation, the Committee requested standard diligence information regarding the value of the Debtors' asset, liabilities, and the projected effect of the Sale on the estates. The Committee has still not received reliable information to support a solvent estate post-closing, nor has the Committee received responsive documents to support Canaccord's compensation structure. With respect to the value of the Debtors' assets, the Debtors directed the

Committee to their public filings, including their Form 10-Q as of September 30, 2022, which reported assets in excess of $50 million.[5]

16. The fact that the Stalking Horse/DIP Lender is the only bidder for the totality of these assets is unremarkable given that the Debtors contacted only 46 parties prepetition and only 5 new parties postpetition. For reasons that have not been explained, although Canaccord initially identified more than 160 targets for marketing the Debtors' assets, they steadfastly cabined the process to a subset of approximately 50 potential buyers (*i.e.*, less than one-third of the initial list). Manning Declaration, ¶ 24. Regardless of whether and why the process was faulty, the estates have been left in the unusual position where the sum of the Debtors' assets as a going concern ($11 million) is worth less than their parts ($25+ million). Manning Declaration, ¶ 20. Accordingly, the Sale should not be approved as proposed. *See In re Exaeris*, 380 B.R. 741, 744 (Bankr. D. Del. 2008) (sale motion denied where there was no evidence of marketing or the value of assets).

17. Approval of the Sale to the DIP Lender/Stalking Horse will strip these estates of this significant value and ensuring zero recovery for any general unsecured creditor whose contract is not assumed as part of the Sale. The $11 million to be "paid" by the DIP Lender/Stalking Horse will be consumed entirely by its own credit bid of the DIP Facility and related fees, along with the claims of the Prepetition Secured Lender and Canaccord. Although the Debtors declared the DIP Lender/Stalking Horse the "successful bidder", the amount of its credit bid remains unclear because the DIP Lender/Stalking Horse has not disclosed the amount or basis for its fees.

18. The Committee understands that the Prepetition Secured Lender has quantified its secured claim at approximately $3.7 million, which is <u>in addition</u> to its budgeted professional fees of $100,000 under the DIP Facility. In other words, the Prepetition Secured Lender's claim has

---

[5] https://ir.winc.com/sec-filings/all-sec-filings/content/0000950170-22-025015/0000950170-22-025015.pdf

increased from $3.4 million to $3.7 million over the seven-week lifespan of these cases, and includes unliquidated and unmatured components such as an undrawn letter of credit that should not be allowed.[6]

19. These estates simply cannot afford to proceed with the transaction as structured. The Debtors and DIP Lender/Stalking Horse must agree to carve out certain assets (such as causes of action) out of the sale and provide additional clarification and protections surrounding the assumption of open purchase orders and the costs of transitioning the business as a going concern. The DIP Lender/Stalking Horse is responsible for creating these uncertainties by virtue of its decision to re-trade its acquisition of BWSC from an equity to an asset purchase, and as a result, it should be required to backstop the estate for the consequences of that decision.

20. As it stands, the Debtors have been unable to provide the Committee with a clear picture of administrative and priority claims following the Sale—let alone continue to operate while the DIP Lender/Stalking Horse attempts to secure licenses and execute on a transition plan. Although the Stalking Horse APA references a transition service agreement to cover certain costs, the Committee has not seen such an agreement nor has been apprised of the salient terms less than 10 days prior to the projected closing.

21. The DIP Lender/Stalking Horse positioned itself as the only financing source to fund a 363 sale process that it demanded for its own benefit at the 11th hour. The DIP Lender/Stalking Horse then changed the terms of the transaction during the Chapter 11 Cases and, in so doing, left these estates exposed to substantial liabilities that the Debtors' own professionals are seemingly unable to quantify. The proposed Sale transaction must be modified to ensure these

---

[6] The Committee received a copy of a payoff letter for the Prepetition Secured Debt on January 10, 2023 which indicates the $3.7 million claim but according to the Debtors it could be higher by approximately an additional $100,000 by the time of the closing.

estates are left administratively solvent with sufficient assets to fund a meaningful recovery for unsecured creditors. Absent such concessions, clarifications and revisions, the Sale should be denied and the Debtors should shift to an alternative strategy to maximize value for creditors.

### B. The Canaccord Retention Application Should Be Denied.

22. Canaccord's Transaction Fee of $2,000,000 is unreasonable in light of the circumstances of these cases and the $11,000,000 sale price.[7] In any other context, no debtor would propose to assume a pre-petition agreement in chapter 11 that will assuredly result in administrative insolvency.

23. The Debtors propose to pay Canaccord a transaction fee in this case of 18.2%. The appropriate Transaction Fee for this case is 2% of sale consideration, which is already reflected as a toggle in Canaccord's Engagement Letter and is generally consistent with other cases in which Canaccord has served as investment banker. *See, e.g., In re Hipcricket Inc.*, Case No. 15-10104 (Bankr. D. Del. 2015) at Docket No. 112 (authorizing retention of Canaccord on $35,000 monthly fee and transaction fee of the greater of (i) $500,000 and (ii) (a) 5% on first $15,000,000, (b) $4% on amounts between $15,000,000 and $20,000,000, and (c) 3% on amounts above $20,000,000); *In re Response Genetics, Inc.*, Case No. 15-11663 (Bankr. D. Del. 2015) at Docket No. 155 (authorizing retention of Canaccord on $50,000 monthly fee and transaction fee greater of (i) 4% and (ii) $450,000); *In re RCCI Wind Down Company, Inc.*, 20-71970 (Bankr. E.D.N.Y. 2020) at Docket No. 74 (authorizing retention of investment banker on $25,000 monthly fee and transaction fee that is greater of (i) $600,000 and (ii) 1.75% of total consideration).

24. Neither the record nor the circumstances of this case justify departing from these norms with a minimum fee structure of the magnitude proposed by the Debtors and Canaccord.

---

[7] Originally a $10,000,000 sale price was secured by Canaccord's negotiations with the Stalking Horse. The purchase price was increased in response to the Committee's objections to the DIP Motion.

Canaccord did not market the Debtors' post-petition financing opportunity or otherwise attempt to find a lender to fund the Chapter 11 Cases. Rather, Canaccord has worked exclusively on the sale, but its postpetition marketing process has been limited to the solicitation of approximately 50 potential buyers and related follow-up, which is considerably thinner than a typical sale process. *See, e.g.*, *In re Greensill Capital, Inc.*, Case No. 21-10561 (Bankr. S.D.N.Y. 2021) at Docket Nos. 212, 236 (investment banker contacted approximately 200 potentially interested parties and resulted in materially higher consideration from stalking horse bid including $4,000,000 increase in cash consideration). That is not sufficient to merit an award of 18% of the sale proceeds (before considering Canaccord's additional compensation of $100,000 per month),[8] which will leave the estate administratively insolvent and unable to fund any recoveries for general unsecured creditors. Investment banker fees are earned based on results, not efforts. Canaccord's efforts have simply not realized significant enough value to the Debtors' estates in order to justify a $2,000,000 transaction fee. *See* Manning Declaration, ¶¶ 21, 27-29.

25. In light of the circumstances of these Chapter 11 Cases, and the inability to reach a commercially reasonable resolution with Canaccord to date regarding the terms of compensation, the Canaccord Application should be denied. Canaccord's efforts in this matter were predominantly prepetition, which should give rise to a prepetition claim. To the extent Canaccord performed additional service postpetition, it may submit a claim in quantum meruit, subject to quantification and qualification as reasonable and otherwise allowable as an administrative expense under section 503 of the Bankruptcy Code.

---

[8] The Canaccord Retention does not include assumed trade liabilities within the definition of Aggregate Consideration. Any argument to the contrary would be further evidence that Canaccord is seeking non-market compensation in these Chapter 11 Cases. *See* Manning Declaration, ¶ 28.

### C. All Disputed Vendor Payments Should Be Denied.

26. The Critical Vendor Order [ECF No. 122] authorized the Committee to review and object to certain proposed payments by the Debtors on account of (a) prepetition vendor claims; and (b) postpetition inventory payments. In the event an objection is unresolved, the Committee is entitled to file a formal objection to the proposed payment for adjudication by this Court. Critical Vendor Order, ¶ 3.

27. The Committee opposed the Debtors' attempts to pay-down pre-sale cure costs and funding of an inventory build-up that was designed exclusively for the benefit of the DIP Lender/Stalking Horse through bloated critical vendor and cash management programs, which included well over $1.5 million in payments that the Committee determined were not, in fact, critical to ensuring a smooth-hand off to the buyer. The Committee opposes attempts by the DIP Lender/Stalking Horse to shift its acquisition costs onto these estates in yet another move that would leave these estates administratively insolvent.

28. First, the Committee objected to a proposed payment to Vendor X,[9] triggering the procedures under the Critical Vendor Order. Despite the objection, the Debtors *erroneously* made the payment to Vendor X. The Committee hereby reiterates that no further prepetition payments should be made to Vendor X absent Committee consent.

29. Second, the Committee objected to a proposed payment to Vendor Y to fund inventory build-up under a prepetition contract, which will benefit the DIP Lender/Stalking Horse as buyer. According to the Debtors, the payment came due on January 1, 2023 under the parties' amended payment schedule. However, the Debtors and their estates will not receive any tangible

---

[9] The Committee uses pseudonyms herein to refer to vendor names that have been designated as confidential by the Debtors.

benefit from such payment and failing to make such payment will not prejudice the Debtors because Vendor Y's contract has a 45-day holding period before it can exercise remedies to dispose of product.  Rather, by deferring payment, the DIP Lender/Stalking Horse will be required to cure the existing arrearage under the Stalking Horse APA if it wishes to assume Vendor Y's contract. *In re ANC Rental Corp., Inc.*, 277 B.R. 226 (Bankr. D. Del. 2002) (assumption and assignment of contract requires cure of pre- and post-petition defaults); *In re Competrol Acquisition Partnership, L.P.*, 274 B.R. 362 (Bankr. D. Del. 2000) (same).  If the DIP Lender/Stalking Horse does not assume Vendor Y's contract, it might likely be rejected, and potentially give rise to an unsecured claim for rejection damages treated *pari passu* with other general unsecured creditors.  11 US.C. § 365(g)(1).  The Committee's objection to a payment at this time should be sustained because there is no material risk to these estates in deferring payment, contrasted against a significant cost savings from such deferral.

30. The Committee reserves all rights to supplement this Objection with additional vendor and inventory payments as they are disclosed in due course.

## EXPEDITED DISCOVERY

31. Contemporaneous with the filing of this Objection, the Committee is serving expedited discovery on the Debtors, Canaccord, and Stalking Horse and proposes to take depositions on January 13 and 14.

## RESERVATION OF RIGHTS AND CONCLUSION

Wherefore, the Committee reserves all of its rights with respect to the Sale Motion, Canaccord Application, and Critical Vendor Order, including, but not limited to, the right to file any further or supplemental objections to the same at any time, and make additional arguments at any hearing, and nothing herein shall be construed as a waiver of any such rights or any arguments or objections that the Committee may raise therein or in the future.

Wherefore, the Committee respectfully requests that this Court enter an order (i) denying the sale to the DIP Lender/Stalking Horse, (ii) denying the Canaccord Application, (iii) sustaining the objections to vendor payments, and (iv) granting such other relief as the Court deems proper.

Dated: January 11, 2023
Wilmington, Delaware

**A.M. SACCULLO LEGAL, LLC**

*/s/ Mark T. Hurford*
Mark T. Hurford (DE No. 3299)
27 Crimson King Drive
Bear, DE 19701
Telephone: (302) 836-8877
Facsimile: (302) 836-8787
Email: Mark@saccullolegal.com

George P. Angelich (*Pro hac vice*)
ARENTFOX SCHIFF LLP
1301 Avenue of the Americas, 42nd Floor
New York, NY 10019
Telephone : (212) 457-5423
Email : George.Angelich@afslaw.com

Justin A. Kesselman (*Pro hac vice*)
James E. Britton (*Pro hac vice*)
ARENTFOX SCHIFF LLP
800 Boylston Street, 32nd Floor
Boston, MA 02199
Telephone: (617) 973-6102
Email: Justin.Kesselman@afslaw.com
           James.Britton@afslaw.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*

AFDOCS:26785159.5