# EXHIBIT 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WINC, INC., *et al.*, | Case No.: 22-11238 (LSS) |
| Debtors. [1] | (Jointly Administered) |

**DECLARATION OF JEFFREY R. MANNING, SR.
IN SUPPORT OF OFFICIAL COMMITTEE OF
UNSECURED CREDITORS' OBJECTION TO (A) DEBTORS'
MOTION FOR ENTRY OF AN ORDER (I) APPROVING STALKING
HORSE PURCHASE AGREEMENT AND (II) AUTHORIZING A SALE
FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES
AND OTHER INTERESTS AND (B) APPLICATION
TO RETAIN CANACCORD GENUITY, LLC AS INVESTMENT BANKER**

I, Jeffrey R. Manning, Sr., pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.  I am a Managing Director with CohnReznick Capital Markets Securities, LLC ("CRC"), the affiliated Financial Industry Regulatory Authority, Inc. ("FINRA") licensed investment bank of CohnReznick, LLP.  CRC and CohnReznick, LLP are the proposed financial advisers for the Official Committee of Unsecured Creditors (the "Committee") of Winc, Inc. and its debtor affiliates (the "Debtors") in the above-captioned Chapter 11 cases (the "Chapter 11 Cases").  Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein.  The statements made herein are true and correct to the best of my knowledge and belief.

2.  I submit this Declaration in support of the Committee's Objection to (A) Debtors' Motion for Entry of an Order (I) Approving Stalking Horse Purchase Agreement and (II)

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Winc, Inc. (8960); BWSC, LLC (0899); and Winc Lost Poet, LLC (N/A).  The Debtors' mailing address for purposes of these chapter 11 cases is 1751 Berkeley Street, Studio 3, Santa Monica, CA 90404.

Authorizing a Sale Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and (B) Application to Retain Canaccord Genuity, LLC as Investment Banker (the "Objection").[2]

### I.  Background and Qualifications

3. I have worked in the corporate recovery field for 40 years, developing substantial experience and expertise in the areas of investment banking, operating restructuring, value investing, loan workouts, and loan trading. My CV is attached hereto as **Exhibit A**.

4. I hold an undergraduate degree in economics and political science from Yale University and a Master of Business Administration degree from Columbia University School of Business.

5. After college in August of 1981, I joined Manufacturers Hanover Trust Co. ("MHT") in the credit training program and took a position in the Corporate Banking Division. In the spring of 1983, I was one of twelve young bankers selected for a prestigious program to earn my MBA at Columbia University's School of Business attending summers on a full scholarship from MHT. Returning that fall I moved into the Special Loan Department at MHT, where I was part of a team of 25 that managed the nonperforming and underperforming portfolio of the bank, usually working with other lenders and lawyers to negotiation a plan of reorganization. During that time I unwound the first derivative interest rate swap in a chapter 11 bankruptcy. Since that time, I have been employed by top-tier financial advisory firms in a number of roles, ranging from analyst to executive.

6. Following my time at MHT I was employed as an EVP Analyst by Dun & Bradstreet Corporation ("D&B"). While D&B is best known for its credit information and solutions for companies, it was also a conglomerate with 36 operating divisions. When D&B sold

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Objection.

the Official Airlines Guide for a gain of $750+ million, my main focus was on designing and implementing "offset" programs to reinvest that gain into the operating businesses. Duties included downsizing headcount, disposing redundant real estate, implementing retraining programs, and closing nonperforming product lines. Over my time at D&B I implemented a total of $392 million of restructuring actions.

7.   From 1992 to 1996 I was a Bank Debt Trader with three successive FINRA firms – SN Phelps & Co, BDS Securities, and Schroder Wertheim & Co. My duties at the time consisted of speaking with various workout officers about non-performing loans, analyzing the intrinsic value of those assets, and finding buyers for those loans in the secondary market. The industry was in a nascent stage then, but it has grown substantially.

8.   From 1996 through 1999, I served as a Managing Director of Rodman & Renshaw ("R&R"). I also served as a member of the R&R executive committee. At the time, R&R was an investment bank and broker-dealer focusing on emergent and high-growth industries, with a line of business in special situations. In these capacities, my primary responsibilities were to work with R&R's parent, Abaco Casa de Bolsa on a good bank/bad bank strategy for Confia SA de CV ("Confia"), with $3.6 billion on nonperforming loans that were eventually transferred to Fobaproa. Confia was acquired by Citibank in 1998.

9.   From 1999 to 2003, I worked as Managing Director and Head of the Special Situations Group at Legg Mason Wood Walker Incorporated. At the time, Legg Mason Wood Walker Incorporated was an investment bank and asset management firm. While there, in addition to executing several private placement with healthy companies, I worked with multiple companies operating at, near, in, or emerging from bankruptcy.

3

10. From 2003 to 2007, I served as the Chief Executive Officer and Senior Managing Director at FTI Capital Advisors, LLC. FTI Capital Advisors, LLC is the wholly-owned investment bank subsidiary of FTI Consulting, Inc., one of the world's largest and most respected financial and restructuring consulting firms. As CEO and Senior Managing Director, I was responsible for supporting and working in tandem with the consulting team of FTI Consulting, Inc., advising companies at, near, in, or emerging from bankruptcy. From 2007 to 2014, I worked as a Managing Director and Special Situations Group Head at BDO Capital Advisors, LLC, an investment bank affiliate of BDO Group ("BDO"), another of the world's largest financial advisory firms. In this capacity, I was supporting and working in tandem with the consulting team of BDO advising companies at, near, in, or emerging from bankruptcy.

11. In 2014, I became a Managing Director at CRC. In my current role, I support and work in tandem with the consulting team of CohnReznick advising companies, stakeholders and official committees of unsecured creditors in both in-court and out-of-court restructurings and related transactions.

12. I hold the designation of Certified Turnaround Professional from the Turnaround Management Association, which has appointed me a Subject Matter Expert in two corporate recovery areas: (i) valuation in bankruptcy, and (ii) sales under § 363 of the Bankruptcy Code. I am also a Board member of the Chesapeake Chapter of the Turnaround Management Association, Inc.

13. I hold the following FINRA licenses required of investment banking professionals: (i) Series 7 – General Securities Representative; (ii) Series 63 – Uniform Securities Agent State Law; (iii) Series 24 – General Securities Principal; and (iv) Series 79 – Investment Banking

Representative.[3] To the best of my knowledge, fewer than 20 professionals in the United States have both a Certified Turnaround Professional designation and a FINRA Series 24 license.

14. Over the course of my career, I have completed more than 150 professional engagements, executing over 25 sales under §363 for debtors, advising dozens of official committees of unsecured creditors and other stakeholders, and providing expert testimony on matters such as evaluating an appropriate sales process and investment banking fees in chapter 11. Some of these cases include: *Revlon, Inc.*, in the Southern District of New York (No. 22-10760 (DSJ)); *Mallinckrodt plc, et al.*, in the District of Delaware (Case No. 20-12522 (JTD)); *CPES, Inc. & Novelles Development Services, Inc*; in the Central District of California – Northern Division (Lead Case No. 9:20-bk-10554-DS; and *Garces Restaurant Group*, in the District of New Jersey (Camden) ((Case No.: 18-19054 (JNP). In general, over the course of these professional engagements, I primarily provide advice in situations operating at, near, or in Chapter 11 bankruptcy. I have provided expert testimony in United States Bankruptcy Court cases in over sixteen judicial districts, as shown on **Exhibit B** attached hereto.

15. I frequently speak at industry and university events, including lecturing at Columbia University School of Business, the Wharton School of the University of Pennsylvania, the University of Virginia Darden School of Business, and other institutions. The subject matter of these lectures is typically the role of the investment banker in special situations, the full list of my industry speaking engagements is voluminous and available upon request. A list of articles that I have authored or co-authored is attached hereto as **Exhibit D**.

---

[3] Because of my years of experience, I was "grandfathered in" to the Series 79 license.

## II. Sources Reviewed

16. In preparing this Declaration, I reviewed transactional documents, financial information, pleadings filed in the Chapter 11 Cases and other information concerning the business operations, performance, and financial condition of the Debtors provided to me in connection with CRC's engagement in the Chapter 11 Cases, as well as Canaccord's retention terms in other chapter 11 cases. Certain of the documents were accessed via a data room provided by the Debtors' proposed investment banker, Canaccord Genuity, LLC ("Canaccord"), a data room provided by the Debtors' counsel, Young Conaway Stargatt & Taylor, LLP ("YCST"), or from the Debtors' financial advisors, RPA Asset Management Services, LLC ("RPM"). I reviewed and relied upon several documents in preparing this Declaration that can be found on **Exhibit C**.

17. I reserve the right to amend this Declaration based on additional materials that I might review, including materials that have not yet been made available for review.

## III. Description of Sale Process

18. According to the Declaration of Carol Brault in Support of Chapter 11 Petitions and First Day Pleadings [ECF No. 15] (the "Brault Declaration"), the Debtors first retained Canaccord in March 2022 to "explore a potential sale of the Debtors' assets" and Canaccord developed "an initial list of approximately forty-five (45) strategic and financial prospective purchasers" and circulated a "teaser" to this list.[4] Twenty (20) of these parties executed non-disclosure agreements. Canaccord received at least four written indications of interest but ultimately decided to focus on the offer from Project Crush Acquisition Corp LLC (the "Stalking Horse Bidder"). It is my

---

[4] Canaccord initially produced a target list substantially larger than 45 names, but for reasons undeterminable did not reach out to the larger universe of approximately 84 strategic and alcohol beverage buyers and approximately 80 potentially interested financial sponsors.

understanding that the Stalking Horse Bidder is organized and controlled by one of the Debtors' founders and former insiders.

### IV. Concerns about the Sale Process and Alternative Sources of Value

19. The Debtors' prepetition marketing process, considered together with publicly available information regarding the Debtors' assets, raised serious concerns that the proposed sale to the Stalking Horse Bidder is not returning fair market value to the estates. When the process commenced in the spring of 2022, the Debtors had a public market cap in excess of $50.0 million. Their 10-Q for the third quarter, filed in November 2022 shortly before the Petition Date, reported assets in excess of $50 million, including more than $16 million in finished inventory, as well as rights to valuable wine brands and other intellectual property. The Debtors also had prepayments and deposits of more than $3 million, accounts receivable of more than $3 million, as well as potential litigation claims. According to the Brault Declaration, when the Debtors entered Chapter 11 less than two months ago, they had approximately $3.4 million in secured debt.

20. Despite these favorable optics, the Debtors propose to sell substantially all of their assets for only $11,000,000, seeking approval of transactions that appear to leave the estates administratively insolvent and unable to fund a process to plan confirmation. Based on the Debtors' disclosed assets, pre- and post-petition interest in those assets by multiple parties, and other information disclosed to the Committee, CohnReznick's preliminary analysis is that a liquidation would result in a superior outcome than the $11.0 million ($11,000,000), even before potential litigation claims.

21. The depressed sale price appears to have been driven in significant part by a flawed marketing process in which potentially interested parties were either not contacted or were not given sufficient time to evaluate a 363 sale in the Chapter 11 Cases. For starters, the proposed

investment banking engagement did not provide normal market incentives for maximizing value, as Canaccord would have needed to find a buyer willing to pay more than 10 times the offer of the Stalking Horse Bidder to trigger an increase in compensation.

22. Further, the Stalking Horse Bidder initially proposed an out-of-court stock purchase agreement. However, the day before Thanksgiving, the Stalking Horse Bidder informed the Debtors that it intended to consummate the transaction through an in-court process under Section 363 of the Bankruptcy Code. The Debtors filed for protection under Chapter 11 of the Bankruptcy Code on November 30, 2022. As part of the Chapter 11 Cases, the Stalking Horse Bidder also made a debtor-in-possession secured loan to the Debtors, putting it *pari passu* with the Debtors' prepetition lender Banc of California as first among the Debtors' secured creditors and ahead of unsecured creditors.

23. On December 7, 2022, the Debtors filed their Motion for Entry of (A) An Order (I) Approving Bidding Procedures in Connection with the Sale of the Debtors' Assets and Related Bid Protections, (II) Approving Form and Manner of Notice, (III) Scheduling Auction and Sale Hearing, (IV) Authorizing Procedures Governing Assumption and Assignment of Certain Contracts and Unexpired Leases, and (V) Granting Related Relief; and (B) An Order (I) Approving Purchase Agreements, and (II) Authorizing a Sale Free and Clear of All Liens, Claims, Encumbrances, and Other Interests (the "Sale Motion") [ECF No. 47]. The Sale Motion initially contemplated a hybrid asset and stock purchase structure, in which the Stalking Horse Bidder would acquire the equity of Debtor BWSC and the assets Debtors Winc and Lost Poet. The Debtors then informed the Committee and the Court that rather than a stock purchase agreement, the Stalking Horse Bidder had revised the terms of the sale to be solely an asset purchase according to the Stalking Horse APA. Following the Committee's filing of an objection to the proposed bid

procedures and other relief, the Stalking Horse Bid increased the consideration to $11.0 million ($11,000,000) for the Debtors' estates, while making other adjustments to the proposed Asset Purchase Agreement.

24. The court approved the bid procedures with certain adjustments on December 22, 2022. The timeline provided for in the Sale Motion meant that the Debtors had less than three weeks from the date that the bid procedures were approved to uncover competing bids. This uncommonly short marketing period coincided with the holiday season, a reality that likely chilled potential bidding. It appears that Canaccord's post-petition marketing process consisted predominantly of re-engaging with entities that it previously reached out to prior to filing the Chapter 11 Cases, and it appears that Canaccord only reached out to five new parties. This approach was entirely inconsistent with best practices marketing assets under a 363 sale process and is difficult to reconcile with the fact that Canaccord initially identified over 160 potentially interested parties at the outset of its prepetition engagement. Canaccord failed to reach out to over 120 of these parties at any point, whether pre- or post-petition, despite the clear goal of any investment banker designated by the court to run a §363 to broadly market the assets to other potential bidders.

25. On December 16, 2022, the Debtors filed the Canaccord Application. The Canaccord Application seeks to retain Canaccord as investment banker pursuant to the following compensation terms: (i) monthly fees of $100,000 each month, with any monthly fees after the third month being credited against any Transaction Fee, and (ii) "Transaction Fee" equal to the greater of (a) $2.0 million ($2,000,000) or (b) 2.0% of total consideration upon any sale.

26. On the morning of January 9, 2023, the Committee's professionals were notified that the Debtors were engaged with several active participants over the weekend who were still

9

considering making competing bids against the Stalking Horse Bid. However, shortly after 5:00 p.m. on the same day, the Committee was informed that no Qualified Bids were received and the Auction had been canceled, meaning that the Sale Motion would be seeking approval of the Stalking Horse Bid.

### V.     Analysis of Stalking Horse Bid and Canaccord Application

27. Based on the consideration to be provided by the Stalking Horse Bid, an analysis of the Debtors' liabilities and the budgets attached to their DIP Financing Orders, approving the Canaccord Application as currently drafted will result in administrative insolvency for the Chapter 11 Cases unless the consideration of the Stalking Horse Bid is materially increased and/or the Canaccord fee is materially reduced. Based on the information provided to date, the Debtors' estates will not have funds to pay Canaccord's $2.0 million ($2,000,000) minimum Transaction Fee and also ensure an administratively solvent estate that is capable of proposing a plan. It remains to be seen whether the Debtors will even be able to pay the entirety of their professional fees (let alone other administrative expenses), which is substantial given the size of this case, with the Stalking Horse Bid and the Canaccord Application as it is currently drafted.

28. Furthermore, Canaccord's 18.2% of consideration of the proposed Transaction Fee is far above market. For a deal of this size, the investment banking market-rate transaction fee would normally be 2.0-3.0% of total consideration. This percentage is consistent with Canaccord's own transaction fees listed in its retention application and agreed to in several prior cases. Of the District of Delaware cases that I reviewed where Canaccord was retained, Canaccord never requested an award for a transaction fee higher than 7.0% of total consideration, which was in fact not awarded, and most of transaction fees were 5.0% or below of total consideration before crediting monthly transaction fees. The requested amount of the Transaction Fee is astonishingly

10

high in light of the fact that Canaccord's $100,000 monthly fees are also far above their monthly rates in their other previous Delaware cases, which typically ranged from $35,000 to $50,000 per month. In most previous Canaccord engagements that I reviewed, Canaccord also credited 50% of its monthly fees towards any payable transaction fee. All of this data points to the conclusion that the requested Transaction Fee, while potentially available from a transaction outside of bankruptcy court with materially higher consideration than the $11.0 million ($11,000,000) Stalking Horse, the terms of the Canaccord Application in the Chapter 11 Cases are far from industry standard and also inconsistent with Canaccord's previous retention terms in Bankruptcy Court engagements in the District of Delaware. Based on my reading of Canaccord's Engagement Letter, the term "Aggregate Consideration," which is used to measure the percentage of Canaccord's Transaction Fee, does not include trade liabilities. The inclusion of assumption of trade liabilities in a transaction fee calculation would be not market and outside of industry norms.

29. Based upon over 30 years as a FINRA licensed investment banker with a significant focus and experience in Federal Bankruptcy Court, Canaccord's transaction fee should not be construed to be based on the effort that Canaccord expended, pre or post-petition, or the amount of hours that it put into any engagement.[5] Investment bankers should be compensated based upon the value created during the transaction, i.e., a higher price equates to a higher fee. This principle is reflected by the very toggle built into Canaccord's proposed Transaction Fee: the greater of $2.0 million ($2,000,000), or 2.0% of total consideration. Total consideration would need to be over $100.0 million ($100,000,000) in order for the 2.0% transaction fee to exceed the $2.0 million ($2,000,000) minimum floor. Clearly, the Stalking Horse Bid's $11.0 million ($11,000,000) does

---

[5] Canaccord collected $250,000 in fees for its pre-petition efforts, see further Canaccord Retention Application Exhibit 1, p.13 (Doc 67)

not represent the kind of value creation that would justify a $2.0 million ($2,000,000) transaction fee in any scenario, in or out-of-court.

30. The Debtors should withdraw the Canaccord Application leaving Canaccord with a general unsecured claim for any potential Transaction Fee. Such a result is consistent with the practical reality that the Debtor is seeking to compensate Canaccord for prepetition work that led to the Debtors' selection of the former founder and insider the Stalking Horse Bidder as the buyer in connection with a prepetition out-of-court sale process.

*/s/ Jeffrey R. Manning, Sr.*
Jeffrey R. Manning, Sr.

## Exhibit A – Manning CV Highlights

**CohnReznick Capital Market Securities, LLC** <span style="float:right">Baltimore, MD</span>
*Managing Director,* 2015 to present. Head of special situations practice at CohnReznick Capital, the affiliated investment bank of CohnReznick, LLP. This FINRA member firm has a premier practice and focus on renewable energy. CohnReznick has a material restructuring practice as well. The special situations practice focuses on out-of-favor or storied companies, often operating at, near, or in bankruptcy. Emphasis on §363 sales, valuation of bankrupt companies, and private placements.

**BDO Capital Advisors, LLC** <span style="float:right">Costa Mesa, CA and New York, NY</span>
*Managing Director,* 2007 to 2015. Head of special situations practice at BDO Capital (f/k/a Trenwith Group), the wholly-owned investment bank of BDO USA LLP. Emphasis on §363 sales, valuation of bankrupt companies, and private placements. Member of Investment Banking Executive and Engagement Committee.

**FTI Capital Advisors, LLC** <span style="float:right">Washington, DC</span>
*Chief Executive Officer,* 2003 to 2007. Chief Executive Officer, Supervisory Principal, and Senior Managing Director of the wholly-owned investment bank of FTI Consulting, Inc. While based in DC, recruited eight senior bankers in New York, DC, Dallas, San Francisco, and Los Angeles. FTICA positioned itself as a boutique investment bank with capabilities in private placements, M&A Advisory, and strategic alternatives for healthy companies and special situations.

**Legg Mason Wood Walker, Incorporated** <span style="float:right">Baltimore, MD</span>
*Managing Director,* 1999 to 2003. Head of special situation practice and executed private placements for Legg Mason, a NYSE financial institution with middle market focus. Member of the Fairness Opinion Committee.

**Rodman & Renshaw, Inc.** <span style="float:right">New York, NY</span>
*Managing Director,* 1996 to 1999. Focus on distressed debt, Mexican cross-border, and private placements. Primary duties included structuring and marketing private placements, developing Mexican "Good Bank/Bad Bank" strategy for Confia, S.A., and marketing and trading fixed income, distressed securities, and special situation private paper. Member of Executive, Commitment, and Investment Committees.

**Schroder Wertheim & Co., Incorporated** <span style="float:right">New York, NY</span>
*Senior Vice President, Global Bank Debt*, 1994 to 1995. Started distressed debt-trading operation for Schroder Wertheim, a subsidiary of Schroder Plc. Duties included creating trading protocol, recruiting team, and sourcing product in the United Kingdom and mainland Europe. Started trading bank debt at S.N. Phelps & Co. in 1992.

**The Dun & Bradstreet Corporation** <span style="float:right">New York, NY</span>
*Assistant Vice President*, and various assignments from 1987 to 1992. Duties included designing and implementing over $392 million in operating restructuring actions; and providing finance support for strategic alliance negotiations with key European and US partners associated with mergers, acquisitions, and divestitures.

**Manufacturer Hanover Trust Company** <span style="float:right">New York, NY</span>
*Assistant Vice President*, and various assignments from 1981 to 1987. After completing the MHT Credit Training program, primary duties included loan workout and calling officer for large corporate accounts.

**Exhibit B Expert Witness & Testimony Experience**

In re: **CPES, Inc. & Novelles Development Services, Inc.:** Prepared Expert Report on sales process, valuation, overcoming sales and fee objections before the Hon. Deborah J. Saltzman in the Central District of California – Northern Division, Lead Case No. 9:20-bk-10554-DS.

2019 In re: **MBF Inspection Services, Inc**.: Prepared Expert Report on Flash Valuation for the U.S. Bankruptcy Court, District of New Mexico, before the Hon. David T. Thuma, Case No. 18-11579.

2018 **Garces Restaurant Group, et.al.:** Extensive direct testimony and cross examination on four occasions regarding pre-petition marketing efforts, impact of potential motion to dismiss, post-petition sales process, and investment banking fees between §328 and §330 professionals in the US Bankruptcy Court, District of New Jersey (Canton) before the Hon. Jerrold N. Poslusny, Jr.

2017 **Folts Home and Folts Adult Home, Inc.:** Testimony on investment banking sales process in the US Bankruptcy Court, Northern District of New York before the Hon. Diane Davis.

2017 **Hi-Temp Specialty Metals, Inc.:** Deposition as fact witness in adversarial proceeding relating to chapter 11 filing in the US Bankruptcy Court, Eastern District of New York before the Hon. Louis A. Scarcella.

2016 **Jamieson Ranch Vineyards:** Deposition as fact witness in adversarial proceeding relating to a Cayman Island court directed liquidation of a Napa Valley vineyard.

2015 **SkyMall, et. al.:** Testimony on investment banking sales process in the US Bankruptcy Court, District of Arizona before the Hon. Brenda K. Martin.

2013 **Greek Peak Mountain Resort, Inc.:** Testimony on investment banking sales process in the US Bankruptcy Court, Northern District of New York before the Hon. Margaret Cangilos-Ruiz.

2012 **Reddy Ice Holdings, Inc.:** Expert testimony on solvency, valuation, and motion for an equity committee in the US Bankruptcy Court, Northern District of Texas before the Hon. Stacey Jernigan, including a Declaration and Flash Valuation, Dallas, TX.

2012 **Beyond Oblivion, Inc.:** Testimony on investment banking sales process in the US Bankruptcy Court, Southern District of Manhattan before the Hon. Allen L. Gropper.

2011 **Nutrition 21, Inc. et.al.:** Testimony on sales process and valuation in the US Bankruptcy Court, Southern District of Manhattan (White Plains) before the Hon. Robert D. Drain.

2011 **Polarome International, LLC:** Expert witness deposition on sales process and valuation in the US Bankruptcy Court, Chapter 7, District of New Jersey before the Hon. Rosemary Gambardella.

Case 22-11238-LSS    Doc 159-1    Filed 01/11/23    Page 16 of 20

2011 **WUWUL, LLC (d/b/a WordWorld):** Testimony on sales process and valuation in the US Bankruptcy Court, Southern District of Manhattan before the Hon. Sean H. Lane.

2011 **Greektown Holdings, LLC:** Prepared expert report on Investment Banking Fees on this case filed in the Eastern District of Michigan, Southern Division. Settled in 2013.

2010 **Erickson Retirement Communities, LLC:** Prepared expert report on valuation methodologies used on this case in the Northern District of Texas. Matter settled.

2010 **Questex Media Group:** Testimony on Investment Banking fees the US Bankruptcy Court before the Hon. Kevin J. Carey, US Chief Bankruptcy Judge in Delaware.

2009 **Cardiac Management Systems:** Testimony on Investment Banking fees, sales process, and carve-outs in the US Bankruptcy Court, Southern District of Florida, before the Hon. Laurel M. Isicoff, Miami, FL.

2009 **Lang Holdings, Inc. et.al.:** Direct testimony on Investment Banking fees at Omnibus Hearing before the Hon. Kevin J. Carey, US Chief Bankruptcy Judge in Delaware -- Appeared as expert witness for the Official Committee of Unsecured Creditors in adversarial proceeding regarding investment banking fees.

2009 **Dial-A-Mattress Operating Corp., et.al.:** Extensive direct testimony on auction process and criteria to determine "highest and best" in the US Bankruptcy Court, plus testimony on investment banking fees, Eastern District of New York, before the Hon. Denis E. Milton, Brooklyn, NY.

2008 **Cardiac Management Systems:** Testimony on process, valuation, and collection of fees in the US Bankruptcy Court, Southern District of Florida, before the Hon. Laurel M. Isicoff, Miami, FL.

2006 **Life Partners Holding, Inc:** Testimony on process, valuation, and collection of fees in American Arbitration Association on Mammoth Life, LLC matter, Dallas, TX.

2005 **Environmental Elements Corporation:** Expert testimony on process, valuation, and break fees in the US Bankruptcy Court, District of Maryland, before the Hon. Duncan W. Keir, Chief Judge, Baltimore, MD.

2004 **Corban Communications, Inc., et.al.:** Expert testimony on process, valuation, and long-term contracts in the US Bankruptcy Court, Northern District of Texas, before the Hon. Chief Judge Steven A. Felsenthal, Dallas, TX.

2004 **Duty Free Americas, Inc. v. Legg Mason, Inc**.: Deposed as witness relating to $115 million bond default. Matter settled.

2004 **Mosaic Inforce CP Holdco, Inc. et.al. v Information Resources, Inc**.: Provided expert testimony and report pursuant to the review of certain expert reports examining four issues: 1)

15

AFDOCS:26811530.1

impact of a sale of assets under §363 on a right of first refusal ("ROFR"); 2) issues surrounding a ROFR and the alleged right to acquire only 2%; 3) adequacy of due diligence by JLL Partners, LP ("JLL"); and 4) valuation within the context of a competitive process.

2003 **Seitel, Inc.:** Deposition and expert testimony on valuation in the US Bankruptcy Court, District of Delaware, before the Hon. Peter J. Walsh, Wilmington, DL.

2003 **Genaissance Pharmaceuticals, Inc.:** Proffered testimony in the US Bankruptcy Court, District of Northern California before the Hon. Randall J. Newsome, Oakland, CA.

2003 **Cannondale Corporation:** Extensive direct testimony, adversary cross-examination, offer of proof, and proffered testimony in the US Bankruptcy Court, District of Connecticut, Bridgeport Division, before the Hon. Alan H.W. Shiff, Bridgeport, CT.

2002-2003 **Devon Mobile Communications, LP:** Direct testimony and proffered testimony in the US Bankruptcy Court, District of Delaware, before the Hon. Peter J. Walsh, Wilmington, DL.

2002-2003 **Standard Automotive Corporation, Inc.:** Extensive direct testimony, adversary cross-examination, offer of proof, and proffered testimony in the US Bankruptcy Court, Southern District of New York, before the Hon. Cornelius Blackshear, New York, NY.

2002-2003 **Beverage Canners International Corporation:** Extensive direct testimony, adversary cross-examination, and proffered testimony in the US Bankruptcy Court, Southern District of Florida, before the Hon. Chief Judge Robert A. Mark, Miami, FL.

1996-1997 **Confia SA de CV:** Direct testimony at Banco de México before the Dra. Patricia Armendariz de Iniestrosa, Vice-presidente of Comision Nacional Bancaria y de Valorz, México D.F., Estado de México.

AFDOCS:26811530.1

## EXHIBIT C – Resource Documents

**Includes but not limited to:**

Application for Retention of Canaccord Genuity LLC as Investment Banker (Doc 67)

Filing of Exhibit A (Doc 90)

Project CRUSH Discussion Materials dated May 10, 2022 (YCST Data Room)

Project CRUSH Process Tracker dated November 23, 2022 (YCST Data Room)

Winc 363 Process Tracker dated December 17, 2022 (YCST Data Room)

Winc 363 Process Tracker dated December 30, 2022 (YCST Data Room)

# EXHIBIT D -- Published By-Line Articles

*"Will PG&E be forced to turn to PPAs to get a bankruptcy exit plan confirmed?,"* with collaboration from Steven Wilamowksy, Partner, Schiff Hardin, **Utility Dive**, March 31, 2020, Washington, DC.

*"How renewable energy providers can prepare for PG&E's bankruptcy,"* **Utility Dive**, February 15, 2019, Washington, DC.

*"Snapshots -- A Good Sport: feature interview with Jeffrey R. Manning, CTP,"* The Journal of Corporate Renewal, September 2017, Chicago, IL.  https://turnaround.org/jcr/2017/09/jeffrey-r-manning-ctp-good-sport

*"What to Do When Your Bank Says No—Financing Alternatives for the Middle Market,"* Chief Executive Networks, Mid-Market CEO Briefing, © 2015, ChiefExecutive.net, Chief Executive Magazine, May 27, 2015, Greenwich, CT.

*"Riding the Healthcare Wave,"* guest editor, The Journal of Corporate Renewal, Turnaround Management Association, Chicago, IL, vo. 32, no. 6, © Jul/Aug 2014.

*"Reengineering the Healthcare Turnaround Process,"* guest editor, The Journal of Corporate Renewal, Turnaround Management Association, Chicago, IL, vo. 26, no. 6, © Jul/Aug 2013.

*"Restructuring Soft Asset Companies,"* guest editor, The Journal of Corporate Renewal, Turnaround Management Association, Chicago, IL, vo. 25, no. 9, © Nov/Dec 2012.

*"Government Cuts Could Hurt SNFs,"* article co-authored with Gerald Shapiro, BDO Corporate Advisors, published in PE Hub, Thomas Reuters, New York, NY, © March 27, 2012.

*"Skilled Nursing Facilities Bracing for Another Tough Year,"* article co-authored with Gerald Shapiro, BDO Corporate Advisors, published in The ABI Journal, Xander Media Group, Inc., Wayne, PA, © January/February 2012.

*"Viewpoint: Beware of Consultants Bearing Unlicensed Bankers,"* column co-authored with Jeffrey T. Varsalone, JD published in the Daily Bankruptcy Review, Dow Jones & Company, Inc., Princeton, NJ, © July 13, 2011.

*"Miles to Go"* commentary for The Deal Pipeline, published by The Deal, LLC, New York, NY, © April 2011.

*"Middle Market Enters the Realm of the Recovery Profession"* Viewpoint, Daily Bankruptcy Review, published by Dow Jones & Company, Princeton, NJ, © March 23, 2011.

"*2011 Middle Market Forecast*" <u>M&A Chicago: Journal for Middle Market M&A Professionals</u>, published by Bauer Rock Media Group, Chicago, IL, © February 22, 2011.

"*Saving the Brand, How Retailers Avoid Liquidation*" article co-authored with Jay Indyke, Esq. Partner, Cooley Godward Kronish, <u>The ABI Journal</u>, published by Xander Media Group, Inc., Wayne, PA, © November 2010.

"*A Fresh Look into the Zone of Insolvency,*" article co-authored with Gerard S. Catalanello, Partner Duane Morris LLP in <u>The Journal of Corporate Renewal</u>, published by Turnaround Management Association, Chicago, IL, © September/October 2009.

"*The Changing Landscape of the Restructuring Industry,*" <u>The Secured Lender Journal</u>, published by Turnaround Management Association, Chicago, IL, © November/December 2008.

"*Saving Technology & Service Companies from Chapter 11,*" chapter in <u>Inside the Minds: The Industries Most at Risk in Bankruptcy</u>, published by Aspatore Books, a Thomson Business Publisher of C-Level Business & Legal Intelligence, Boston, MA, © 2008.

"*Private Matters,*" column on the current status of going private initiative, <u>The Deal</u>, published by The Deal LLC, New York, NY, © February 25, 2008.

"*The Perils of the One-Stop Financing Shop*," <u>High Yield Report</u>, SourceMedia, Inc., New York, NY, © September 10, 2007.

"*The Allure of a Going-Private Transaction*," co-author Eric J. Gier of Trenwith Group, <u>Washington CEO Magazine</u>, Seattle, WA, © May 2007.

"*The Current State of the Fairness Opinion*," <u>American Bankruptcy Institute Journal</u>, vol. XXIV, No. 7, Alexandria, VA, © September 2005.

"*Sarbanes-Oxley Prompts More Firms to Go Private*," co-authored with Fred S. Stoval, Esq. of Patton Boggs, <u>The National Law Journal</u>, New York, NY, © May 24, 2005.

"*Viewpoint: Long Live the New King,*" column on the development of private capital funds published in the <u>Daily Bankruptcy Review Small Cap</u>, Dow Jones & Company, Inc., Princeton, NJ, © January 12, 2005.

"*The Appeal of the Deal*," co-authored with Howard J. Loewenberg, <u>Chief Executive Officer</u>, SPG Media Ltd, London, United Kingdom, © September 2004.

"*A Tricky Balancing Act: Valuation and the Zone of Insolvency*," co-authored with James Berman, Esq. of Zeisler & Zeisler, PC, <u>The National Law Journal</u>, New York, NY, © February 16, 2004.

2

AFDOCS:26811530.1