# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>WINC, INC., *et al.*,[1]<br><br>　　　　　　Debtors. | Chapter 11<br><br>Case No. 22-11238 (LSS)<br><br>(Jointly Administered)<br><br>**Ref. Docket Nos. 47, 79, 80, & 85** |

## DECLARATION OF MORGAN LEY IN SUPPORT OF SALE TO THE STALKING HORSE BIDDER

I, Morgan Ley, hereby declare pursuant to 28 U.S.C. § 1746, under penalty of perjury, to the best of my knowledge and belief, that:

1. I am a Managing Director in the Consumer Investment Banking at Canaccord Genuity LLC ("Canaccord"), the proposed investment banker to the above-captioned debtors and debtors in possession (collectively, the "Debtors"). I submit this declaration (this "Declaration") in support of the Debtors' request, as set forth in the *Debtors' Motion for Entry of (A) an Order (I) Approving Bidding Procedures in Connection with the Sale of the Debtors' Assets and Related Bid Protections, (II) Approving Form and Manner of Notice, (III) Scheduling Auction and Sale Hearing, (IV) Authorizing Procedures Governing Assumption and Assignment of Certain Contracts and Unexpired Leases, and (V) Granting Related Relief; and (B) an Order (I) Approving Purchase Agreements, and (II) Authorizing Sale Free and Clear of All Liens, Claims, Encumbrances, and Other Interests* [Docket No. 47] (the "Motion"),[2] that the Court enter the Sale Order approving the Sale of the Assets to the Stalking Horse Bidder. This Declaration incorporates the statements and testimony set forth in the *Declaration of Morgan Ley in Support*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Winc, Inc. (8960); BWSC, LLC (0899); and Winc Lost Poet, LLC (N/A). The Debtors' mailing address for purposes of these chapter 11 cases is 12405 Venice Boulevard, Box #1, Los Angeles, CA 90066.

[2] Capitalized terms used but not defined herein shall have the meaning given to such terms in the Motion.

30028271.8

*of Debtors' Motion for Entry of (A) An Order (I) Approving Bidding Procedures in Connection with the Sale of the Debtors' Assets and Related Bidding Procedures, (II) Approving Form and Manner of Notice, (III) Scheduling an Auction and Sale Hearing, (IV) Authorizing Procedures Governing Assumption and Assignment of Certain Contracts and Unexpired Leases, and (V) Granting Related Relief; and (B) an Order (I) Approving Purchase Agreements and (II) Authorizing a Sale Free and Clear of All Liens, Claims, Encumbrances, and Other Interests* [Docket No. 79] (the "Bidding Procedures Declaration").

2. I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors.

3. Except as otherwise set forth herein, all statements in this Declaration are based upon my review of relevant documents, my discussions with the Debtors and their professionals, my discussions with other members of the Canaccord team working on this engagement, and my personal knowledge and experience. If I were called upon to testify, I could and would testify to each of the facts set forth below.

## BACKGROUND AND QUALIFICATIONS

4. I have been a Managing Director at Canaccord since January 2017. Prior to joining Canaccord, I was Managing Director in the Consumer Investment Banking group at Raymond James Financial. I have over 25 years of experience in the field of financial advisory and corporate finance related services. During the course of my career, I have gained considerable experience advising consumer product companies.

5. Canaccord is an independent and full-service global investment banking firm offering investment banking, equity research, wealth management, institutional and private brokerage, and private capital solutions to individual and institutional clients. Globally, Canaccord

has a leading merger and acquisition ("M&A") advisory practice, with over 1,100 M&A transactions since 2010 with over 130 transactions in the last twelve months representing aggregate disclosed transaction value greater than $28 billion. Canaccord's professionals have considerable experience in providing investment banking services to financially-distressed companies and to creditors, purchasers, bondholders, and other constituencies in chapter 11 as well as in out-of-court proceedings.

6. Representative engagements that investment bankers at Canaccord have led in prior chapter 11 cases and restructurings include AbitibiBowater, Inc.; American Eagle Energy Corp.; American IronHorse Motorcycles, Inc.; BI-LO, LLC; Buccaneer Energy LLC; Calpine Corp.; Catalyst Paper Corp.; Comptom Petroleum Corp.; Dakota Plains Holdings, Inc.; Diamond Glass Companies, Inc.; Gateway Ethanol, LLC; Giordano's Enterprises, Inc.; Gulf Fleet Holdings, Inc.; Hipcricket, Inc.; HMX Acquisition Corp.; International Garden Products, Inc.; Jaguar Mining, Inc.; KeyLime Cove Waterpark, Inc.; Loehmann's, Inc.; Max & Erma's, Inc.; National Envelope Corp.; OptiCanada, Inc.; Renew Energy, Inc.; Response Genetics, Inc.; Robbins Bros. Corp.; Santa Fe Gold Corp.; SynCardia Systems, Inc.; TimberWest Forest Corp.; Waterworks, Inc.; and Yellow Media, Inc.

**A.     The Prepetition Sale Process**

7. On March 16, 2022, the Debtors retained Canaccord to assist with assessing strategic alternatives, including a potential sale of all or substantially all of the Debtors' assets (the "Assets"). As result of its over ten-month engagement by the Debtors, Canaccord has acquired significant knowledge of the Debtors' business, including their debt and capital structure, business operations, financing documents, and related matters.

8. Canaccord undertook a lengthy prepetition marketing effort and began soliciting indications of interest (each, an "IOI") for the sale of the Assets, both on an integrated basis as well as on a piecemeal basis. As part of these efforts, Canaccord crafted detailed marketing materials and assembled related diligence information for a confidential electronic data room (the "Data Room") and a confidential information presentation with the assistance of the Debtors and their other professional advisors. Canaccord and the Debtors, including the Debtors' management and board of directors (the "Board of Directors"), reviewed a broad preliminary list of various potential parties in interest consisting of both strategic and financial buyers. After a review of the preliminary list and discussions with the Debtors and Board of Directors, Canaccord received approval to approach forty-four (44) potential buyers that the Debtors and Canaccord believed could have an interest in acquiring a company, or certain assets, in the alcohol sector with the Debtors' financial profile and business model, among other factors. Of the potential buyers, twenty-one (21) were strategic operators and twenty-three (23) were financial buyers. Canaccord circulated, via email, a description of the opportunity to acquire the Assets to the prospective purchasers followed by a "teaser" to interested parties.

9. Eventually, nineteen (19) interested parties executed non-disclosure agreements (each, an "NDA") and were provided with the confidential information presentation, access to meet management and ask questions via a Zoom call (a "Fireside Chat") and then received a process letter detailing the requirements and timing for delivery of IOIs. Ultimately, of the ten (10) interested parties that held a Fireside Chat with members of the Debtors' management team to ask questions about the Assets and the Debtors' operations; three (3) submitted initial indications of interest. These three (3) parties were then provided with access to the Data Room

which contained diligence information about the Debtors and their assets and were asked to submit final proposals.

10. Canaccord responded to various inquiries, and, at the end of September, two (2) parties submitted updated proposals. During October, the Debtors then conducted good-faith, arms'-length negotiations with these prospective buyers simultaneously, and these prospective buyers then conducted deeper diligence into the Debtors' businesses. The Debtors also received an unsolicited inbound IOI in mid-October for certain assets of the Debtors. In connection with this process and given the Debtors' liquidity issues and inability to secure third party financing, in early November 2022, Canaccord requested potential prospective buyers provide proposals on an all-cash basis and include bridge financing to support the Debtors' operations through a closing of any sale. Ultimately, only one (1) prospective buyer—Project Crush Acquisition Corp LLC (the "Stalking Horse Bidder")—submitted an actionable bid for the Assets (the "Stalking Horse Bid").

**B.    Negotiations with the Stalking Horse Bidder**

11. During initial negotiations with the Stalking Horse Bidder in mid-November 2022, the Stalking Horse Bidder's proposal provided for an all-cash purchase price and extension of credit to fund the Debtors' operations until an out-of-court merger transaction could be consummated. After the Stalking Horse Bidder provided an updated proposal, the parties executed an exclusivity agreement to provide a period of exclusive negotiations for eight days and the Stalking Horse Bidder committed to deliver documentation for the merger transaction and bridge financing. However, on the day before Thanksgiving (two days prior to the end of the exclusivity period and one week before a deadline to make a $1 million loan payment (the "Loan Payment"), the Stalking Horse Bidder revised the structure of the proposed transaction, and instead proposed to consummate the transaction through a sale process (the "Sale") under 11 U.S.C. § 363. In

addition, the Stalking Horse Bidder submitted an updated letter of intent ("LOI") offering to purchase the Assets for $8 million in cash consideration. Upon receipt of these new proposed terms and process, the Debtors, with the assistance of Canaccord and the Debtors' other professional advisors, reached out to a select number of previously interested parties to solicit better offers (on an in-court and out-of-court basis) in a timely manner before the Loan Payment became due. After it was determined that the Stalking Horse Bidder offered the best and most executable offer in the time the Debtors had available to them, the Debtors executed an LOI and engaged in extensive arms'-length negotiations, after which the Debtors and the Stalking Horse Bidder agreed on the terms of a stalking horse bid, including an increase in the amount of cash consideration to $10 million. After further negotiations, the Debtors ultimately executed an asset purchase agreement (the "Stalking Horse Agreement").[3] The Debtors and the Stalking Horse Bidder are currently negotiating additional amendments to the Stalking Horse Agreement in response to issues raised by the Committee.

**C.      The Stalking Horse Agreement**

12.    The Debtors determined, after considering all circumstances and in consultation with their professional advisors, that the Sale of the Assets through the Chapter 11 Cases would provide the best opportunity to maximize the value of the Assets. After extensive arms'-length negotiations, the Debtors and Stalking Horse Bidder entered into the Stalking Horse Agreement. At the time of the Petition Date, the Stalking Horse Bidder's purchase price was $8 million in cash consideration for the Assets. However, following the commencement of the Chapter 11 Cases and after engaging in further negotiations with the Debtors and their professionals, the Stalking Horse Bidder agreed to assume a material portion of the liabilities of BWSC, LLC, thereby substantially

---

[3] The Stalking Horse Agreement is attached as Exhibit 1 to the *Notice of Filing Revised Asset Purchase Agreement* [Docket No. 80].

30028271.8

6

increasing the overall value of the Stalking Horse Bid. The purchase price originally contemplated by the Stalking Horse Agreement was $10 million in cash consideration, plus assumed liabilities. However, after additional negotiations by the Debtors, their advisors, and the Stalking Horse Bidder, the Stalking Horse Bidder agreed to provide additional consideration in the amount of $1 million, bringing the total cash consideration to $11 million while continuing to assume material specified liabilities related to the business. The Stalking Horse Agreement contemplates that the cash consideration paid to the Debtors by the Stalking Horse Bidder will be reduced by the aggregate amount of any unpaid and outstanding obligations under the DIP Facility by virtue of a credit bid.

13. The Debtors, with the assistance of Canaccord and the Debtors' other professional advisors, engaged in good-faith, arms'-length negotiations with the Stalking Horse Bidder regarding the Stalking Horse Agreement and the terms of the postpetition financing. The Debtors' entry into the Stalking Horse Agreement, together with the committed postpetition financing from the Stalking Horse Bidder, has allowed the Debtors to conduct a value-maximizing Sale process. Accordingly, there is a strong business justification for the Debtors' entry into the Stalking Horse Agreement and request for approval of the Sale.

**D.   The Postpetition Sale Process**

14. Understanding that time was of the essence, upon the Petition Date, Canaccord commenced the postpetition marketing process for the Assets by engaging or reengaging with fifty-nine (59) prospective buyers (comprising thirty (30) prospective strategic buyers and twenty-nine (29) prospective financial buyers), including various parties that had been contacted prior to the Petition Date, regarding the Assets and the Sale. Canaccord prepared and circulated marketing materials, which included a confidential information presentation detailing the Assets and the Sale

process, as well as, among other things, process letters, communications and information about these cases and an NDA. For those thirty (33) parties that executed an NDA, Canaccord provided them with the confidential information presentation for the Assets, provided access to the Data Room and provided the opportunity for all potential parties in interest access to the management team, if desired.

15. Throughout the Sale process, Canaccord supplemented its outreach efforts by sending periodic emails and/or calls to all interested parties with updates on the process, additions to the Data Room, and other supplemental information as the Chapter 11 Cases progressed (including re-engaging with all potential parties in interest after the bid procedures hearing and sending an updated process letter reflecting the additional time available to submit binding bids, among other things).

16. My colleagues or I followed up with the prospective purchasers who expressed interest in the Assets on multiple occasions, and continued to facilitate buyer due diligence and due diligence meetings leading up to the Bid Deadline of January 9, 2023.

17. As the foregoing demonstrates, Canaccord spent considerable time, energy and resources engaging with potential bidders and other parties. Throughout the Sale process, I and other members of the Canaccord team provided updates to the Debtors' bankruptcy counsel and senior management, and sought their direction where appropriate.

18. Notwithstanding the foregoing marketing efforts, the Debtors received only one bid for a subset of the Assets. The Debtors did not receive any bids, other than the Stalking Horse Agreement, for substantially all of the Assets. After reviewing the bid for a subset of the Debtors' Assets, the Debtors determined, in their business judgment, that such bid was not higher or better on terms or price than the Stalking Horse Agreement (the "Non-Qualified Bid").

19.     Canaccord reengaged with the bidder that submitted the Non-Qualified Bid to inquire as to whether such bidder was willing to increase its offer on terms that would exceed the Stalking Horse Bid, but the bidder declined.  The Debtors also engaged with the Stalking Horse Bidder to determine if the assets subject to the offer from the Non-Qualified Bidder could be sold on an exclusive or non-exclusive basis to additional parties, but the Stalking Horse Bidder declined.  Accordingly, the Debtors, after consultation with their advisors and in their business judgment, determined that the Stalking Horse Agreement was the highest and best bid for the Assets.

E.    **The Stalking Horse Agreement Represents the Highest and Best Value**

20.     Based on the extensive marketing efforts described above and in the Bidding Procedures Declaration, along with my experience, I believe that the Stalking Horse Agreement represents the highest and best value for the Assets.  A market test, such as the extensive one conducted by Canaccord, is the best means to identify the value of the Assets.  Here, several potentially interested bidders declined to submit bids for the Assets after conducting diligence and determining that the Stalking Horse Bid, including all of the estimated assumed liabilities, represented full value for the Assets.  Accordingly, the market for the Assets reflects that the Stalking Horse Agreement represents the highest and best value for the Assets.  Based on the cash purchase price, plus the assumed liabilities, the value of sale transaction represented in the Stalking Horse Agreement to the Debtors' estates is between approximately $29 million to $39 million.[4]  The $10 million range in value reflects the Debtors' top-end estimate of potential breakage for the prepaid credits and gift cards liability.

---

[4] This includes (i) the $11 million of cash, (ii) approximately $4 million in assumed liabilities; (iii) approximately $4 million of assumed gift card liabilities, and (iv) approximately $19.7 million from over 160,000 assumed customer credit liabilities (of which over 50,000 customers have over $100 worth of credits outstanding, representing approximately $17.7 million).

30028271.8

21. Absent approval of the Stalking Horse Bid, the total estimated assumed liabilities of approximately $18 million to $28 million would materially dilute any claims pool distribution, to the extent there are proceeds available for distribution.

22. I believe that the Debtors: (a) conducted a comprehensive marketing process for the Assets; (b) conducted the sale process in compliance with the Bidding Procedures Order and the Bidding Procedures; and (c) afforded all potential purchasers an appropriate opportunity to participate in the sale process and submit a bid for the Assets.

23. Based on my professional experience and knowledge of the Chapter 11 Cases, I believe that: (a) the Sale process was robust, fair, and conducted in accordance with the Bidding Procedures Order; (b) the Stalking Horse Bidder and its respective professional advisors and representatives, acted in compliance with the Bidding Procedures Order and the Bidding Procedures, and conducted themselves in a non-collusive, fair and good-faith manner in connection with the Sale process; and (c) the Stalking Horse Agreement represents fair and reasonable terms for the purchase of the Assets, based on the extensive marketing process described herein.

24. Except as otherwise provided for in the proposed order approving the Sale to the Stalking Horse Bidder, the Debtors are seeking to sell the Assets free and clear of all liens, claims, encumbrances, and other interests. I believe the Stalking Horse Bidder would not have submitted the Stalking Horse Agreement, and would not consummate the Sale, if the Sale was not free and clear of the foregoing. Moreover, I believe that not selling the Assets in this manner would result in significantly reduced consideration for the Assets, which would adversely impact the Debtors' efforts to preserve and maximize the value of the Assets.

25. I am not aware of any facts indicating that the Debtors and the Stalking Horse Bidder entered into the Stalking Horse Agreement for the purpose of hindering, delaying or defrauding creditors. I believe that under the circumstances, including the extensive marketing process conducted by the Debtors, the consideration provided by the Stalking Horse Bidder is fair and reasonable, and the highest and best value for the Assets to be sold.

**F.      Conclusion**

26. For all these reasons, given the comprehensive marketing process that the Debtors and their professional advisors undertook, as described herein, I believe that the sale of the Assets to the Stalking Horse Bidder represents the highest and best value for the Assets, and that entry of an order approving the Sale is appropriate.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my information, knowledge, and belief.

Dated:  January 16, 2023

*/s/ Morgan Ley*
Morgan Ley
Managing Director
Canaccord Genuity LLC