# **EXHIBIT 3**

**TSA**

## TRANSITION SERVICES AGREEMENT

**THIS TRANSITION SERVICES AGREEMENT** ("TSA") is effective the day of _____, 2023, ("Effective Date") by and among, on the one hand, [Project Crush Acquisition Corp LLC] ("Buyer") and [●] ("DTC Sub", and together with Buyer, the "Buyer Parties"), and on the other hand, BWSC, LLC ("Seller") and, solely for purposes of Section 4, Winc, Inc. ("Winc"). Buyer, DTC Sub, and Seller may each be referred to individually as a "Party" and together as the "Parties."

**WHEREAS**, Seller and its debtor affiliates, Winc, Inc., and Winc Lost Poet, LLC, are engaged, among other things, in the business of producing, marketing and selling alcoholic and non-alcoholic beverage products and related merchandise available for purchase through wholesale and direct-to-consumer channels, including through subscription agreements with consumers (the "Business");

**WHEREAS**, the Buyer, Seller and the other parties thereto have entered into an Asset Purchase Agreement dated as of December 7, 2022, as amended by that certain Amended and Restated Asset Purchase Agreement, dated as of December 21, 2022 (as amended, the "APA"), under which, in accordance with Sections 363, 365 and the other applicable provisions of the United States Bankruptcy Code, Buyer and its designated Affiliates purchased all of the Transferred Assets (as defined in the APA), free and clear of all Liens, together with the Assumed Liabilities of Seller and its debtor affiliates, upon the terms and conditions set forth therein (the "Transactions");

**WHEREAS**, in connection with the Transactions contemplated by the APA, the Parties acknowledge that the alcohol beverage industry is subject to unique and extensive licensing, regulatory, and tax obligations under multiple federal, state, and local laws, including but not limited to the Federal Alcohol Administration Act, the Internal Revenue Code, the Food, Drug and Cosmetic Act, Titles 21, 24, and 27 of the Code of Federal Regulations, the California Business and Professions Code, and the alcohol beverage and tax laws ("Alcohol Beverage Laws") of each state and each other jurisdiction of the United States ("U.S. Jurisdictions");

**WHEREAS**, as an integral part of the Transactions, the Buyer Parties further desire that Seller maintains its independence, certain operations, and compliance obligations until such time as the Buyer Parties can transfer or obtain new licenses or permits as required by the federal government and all applicable U.S. Jurisdictions; and

**WHEREAS**, in connection with the Transactions and pursuant to the APA, Seller desires to provide certain transition services to the Buyer Parties, and the Buyer Parties desire to receive such transition services in exchange for payment, on the terms and conditions set forth in this TSA.

**NOW, THEREFORE**, in consideration of the mutual agreements, representations, and warranties hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**SECTION 1**.  Defined Terms.  Capitalized terms used but not otherwise defined in this TSA will have the meaning given to them in the APA.

**SECTION 2**.  Term and Termination.

a.  Commencing on the Closing Date and continuing until the earlier of (i) such time that the applicable Buyer Parties obtain all licenses and permits required by Alcohol Beverage Laws to allow Buyer Parties to conduct the Business and (ii) January 31, 2024 (the "Term").

b.  The Buyer Parties may terminate this TSA for convenience, either as to the entire TSA or only with respect to a particular Transition Service, upon written notice to the Seller, and in such case, the applicable Transition Service shall terminate on the termination date specified in such written notice and Schedule A shall be deemed amended to delete such Transition Service as of the termination date, and this TSA shall be of no further force and effect for such Transition Service. For the avoidance of doubt, this TSA shall be deemed terminated in its entirely upon the termination of all of the Transition Services hereunder. In addition, the Buyer Parties may terminate this Agreement immediately upon written notice to Seller in the case of a material breach of this Agreement by Seller if Seller has not cured such material breach within 10 days after receipt of written notice thereof sent by the Buyer Parties.

c.  Seller shall provide the Buyer Parties with prompt written notice if Seller reasonably believes that Buyer Parties' actions or nonperformance under this TSA have caused Seller to be administratively insolvent. In such event, Buyer Parties shall have 10 days after receipt of such written notice to cure any defaults under this TSA (the "Cure Period").  If such defaults are not cured within the Cure Period, Seller shall have the ability to seek relief from the Bankruptcy Court and, in such event, shall provide Buyer Parties, subject to applicable laws, an opportunity to object and be heard.  Seller shall notify the Buyer Parties of their intent to seek relief from the Bankruptcy Court and provide the Buyer Parties with a copy of any notices, documents, or filings with respect hereto.

d.  Upon the expiration or termination of this TSA in accordance with its terms or the termination of the provisions of any Transition Services hereunder, in addition to any other rights or remedies of the Parties under this TSA or Law: (1) the Seller shall promptly cease the performance of such Transition Services pursuant to this Agreement, unless a Buyer Party instructs the Seller by written notice to complete work-in-process pursuant to the same terms and conditions as set forth herein, (2) the Buyer Parties shall pay all Fees owed to the Seller for the terminated Transition Services prior to termination pursuant to the terms set forth herein, and (3) the Seller shall convey, by bill of sale, assignment, or other necessary conveyance documents or instruments (i) any raw materials, finished goods, work-in-process of any type, consigned goods, and merchandise acquired by the Sellers after the Closing that would have constituted Inventory if acquired by the Sellers prior to the Closing ("Interim Inventory") and (ii) any Transferred Assets relating to or used by the Seller to provide such Transition Services that were not previously transferred to the applicable Buyer Party at the Closing ("Delayed Transferred Assets").  Buyer Parties shall

bear all costs and expenses associated with the transfer, packaging, shipment, and delivery of any Interim Inventory or such Transferred Assets, to the extent necessary or applicable. For the avoidance of doubt, except in the ordinary course of business, no Interim Inventory or Delayed Transferred Assets shall be transferred, leased, mortgaged, encumbered or assigned to any Person other than to the Buyer Parties either during or at the expiration of the Term.

**SECTION 3.** Compliance with Laws and Regulations. During the Term, to the extent funds are available, or made available, to Seller to do so, including, without limitation, any amounts required to acquire or secure any bond (solely to the extent approved in advance by the Buyer Parties; provided, that, to the extent such bond is necessary under applicable Law in order for Seller to perform any Transition Service and such bond is not approved or otherwise obtained by the Buyer Parties, Seller shall not be required to perform such Transition Service until such time as such bond is approved or obtained), Seller agrees to (i) maintain all licenses, permits, and bonds necessary to fulfill its obligations under this TSA in full force and effect as and to the extent required by applicable Alcohol Beverage Laws of the U.S. Jurisdictions; (ii) fulfill in all material respects the obligations to pay excise taxes; (iii) maintain operational, procedural, and reporting obligations, in all material respects, as and to the extent required by federal law and the law of all applicable U.S. Jurisdictions; and (iv) maintain accurate records and documentation regarding the operations of the Business consistent with Seller's current recordkeeping system or such other recordkeeping system that the Parties implement during the Term, in each case, at the sole cost and expense of the Buyer Parties. In the event the Buyer Parties implement new recordkeeping systems during the Term, Seller will use commercially reasonable efforts to cooperate with the Buyer Parties, at the Buyer Parties' sole cost and expense, to facilitate the transfer of such records and documentation in such format and manner as reasonably requested by the Buyer Parties.

**SECTION 4.** Seller's Obligations.

a. During the Term, to the extent funds are available, or made available, to Seller to do so, Seller shall provide (a) the services outlined in Schedule A, (the "Transition Services") and (b) any service, system, function, or responsibility not specifically described in Schedule A, but that is inherently required for the proper performance and delivery of a service, system, function or responsibility of the Business, as requested by the Buyer Parties. Notwithstanding any provisions of this TSA to the contrary, Seller shall have no obligation to perform any Transition Services or any other obligations under this TSA, and shall not be in breach of this TSA, at any time when there are not sufficient funds available from Transition Proceeds (as hereinafter defined) or from other funds made available by Buyer Parties to permit Seller to perform such Transition Services or any other such obligations.

b. As promptly as practicable after the Effective Date, Buyer Parties on behalf of Seller shall obtain commercial insurance policies necessary for Seller to operate the Business and provide the Transition Services pursuant to this TSA. All costs and expenses of Seller associated with obtaining such insurance policies shall be payable by Buyer Parties as Fees and Buyer Parties shall provide all necessary assistance to Seller in connection with obtaining such insurance policies. Seller, as the insured party, shall provide any necessary cooperation to Buyer Parties in connection with obtaining such insurance policies. Until the earlier of (x) such time as such necessary insurance policies are obtained for Seller and

-3-

(y) sixty (60) days after the Effective Date, Winc shall (i) maintain and not terminate its existing commercial insurance policies with respect to the Business (the "Winc Insurance Policies") for the benefit of Seller (which shall not include, for the avoidance of doubt, any directors and officers indemnification policies); provided, that, under no circumstance shall Winc be obligated to obtain or renew any Winc Insurance Policies or incur any costs or expenses associated with the coverage under such Winc Insurance Policies during the sixty-day period beginning after the Effective Date and (ii) not be wound up, liquidated or dissolved or close or dismiss its Voluntary Bankruptcy Case or convert to a case under Chapter 7 of the Bankruptcy Code; provided, however, that with respect to the foregoing clause (ii), Winc shall have the same rights and be subject to the same notice provisions as Seller under Section 2(c) of this TSA.  Premiums paid in respect of the Winc Insurance Policies that are allocable to Seller during the Term shall be payable as Fees without regard to when such premiums are paid. Seller acknowledges and agrees that the Buyer Parties shall have all rights to claims, and proceeds thereof, under the Winc Insurance Policies solely to the extent arising during the Term and relating to the Business (including all credits, proceeds, causes of actions or rights thereunder) and, for the avoidance of doubt, all such proceeds received shall constitute Transition Proceeds and shall be subject to this TSA.

**SECTION 5.**  Funds Collected from Distribution Pursuant to Agreement.

a. All sales made by Seller in the operation of the Business during the Term shall be made in the ordinary course of business, consistent in all manners with the customs and practices used by Seller prior to the Effective Date.  To the extent that an employee, officer, director or consultant of Seller (other than any employee of any Buyer Party) desires to enter into an agreement or contract in respect of the operation of the Business and the provision of the Transition Services that would result in Fees (as defined below) to be paid by any Buyer Party, the Buyer Parties' prior written approval shall be required before such Fees are funded pursuant to this Section 5(a). All monies collected by Seller from sales of products during the Term shall be used (i) to fund any out-of-pocket fees, expenses, or costs of Seller, including, without limitation any Excess Administration Expenses (as hereinafter defined), that Seller has actually incurred solely in connection with the provision of the Transition Services during the Term (the "Fees"), (ii) to pay for the Buyer Parties' provision of certain services to Seller during the Term pursuant to that certain Master Services Agreement, and (iii) to the extent there are any amounts remaining after payment of Fees and amounts payable pursuant to clauses (i) and (ii) above, such amounts shall be held in a separate account for the benefit of the Buyer Parties (the "Fund Account") until the expiration of the Term or such earlier time as Buyer Parties indicate that the Buyer Parties have obtained Licenses that will permit Buyer Parties to receive such amounts and directs Sellers to disburse such amounts to Buyer Parties, at which point Seller shall immediately transfer, without any consideration therefore, such amounts.  For the avoidance of doubt, except as provided in this TSA, in no event shall Seller, any other Seller Party pursuant to the APA, nor any third party (including creditors or their successors or assigns) have any right to or interest in any monies collected by or on behalf of Seller in respect of the operation of the Business and provision of the Transition Services from and after the Closing Date (all such monies, the "Transition Proceeds").

b. During the Term, Seller shall be responsible for and pay out of Seller's or its Affiliates' own funds and in no event shall any Transition Proceeds (as hereinafter defined) be used to pay any, (i) fees, expenses, or costs (including all legal, accounting, financial advisory, valuation, investment banking and other third party advisory or consulting fees and expenses) incurred by or on behalf of Seller or its Affiliates in connection with any Voluntary Bankruptcy Case and unrelated to the provision of Transition Services and (ii) fees, expenses, or costs incurred in connection with the wind down of Seller pursuant to the Voluntary Bankruptcy Cases ((i) and (ii), collectively, the "Post-Closing Administration Expenses") in an aggregate amount of up to $[●] (the "Post-Closing Administration Expense Cap"). Post-Closing Administration Expenses in excess of the Post-Closing Administration Cap ("Excess Administration Expenses") shall be payable by Buyer Parties as Fees in accordance a detailed monthly invoice setting forth the amount of Post-Closing Administration Expenses incurred for the preceding calendar month, the amount of the Post-Administration Expense Cap, if any, used to pay such Post-Closing Administration Expenses, and the amount of Excess Administration Expenses incurred by Seller for such calendar month (each a "Monthly Invoice") that is submitted by Seller to Buyer for such purpose pursuant to Section 5(c). For the avoidance of doubt, the additional amount of statutory fees due and payable pursuant to section 1930 of title 28 of the United States Code and costs of preparing any monthly operating reports incurred by Seller as a result of providing the Transition Services shall be deemed to be Excess Administration Expenses for all purposes of this Agreement. For informational purposes, within fifteen (15) days after the Effective Date, Seller shall deliver to Buyer a budget for the 13-week period following Closing (the "Initial Budget") setting forth the anticipated Post-Closing Administration Expenses and shall provide an updated 13-week budget with each Monthly Invoice (together with the Initial Budget, the "Budget") Notwithstanding anything to the contrary in this Agreement, in no event shall the Buyer Parties be responsible for, or pay, and no Transition Proceeds shall be used to pay or fund, any: (a) legal fees in connection with any Legal Proceeding of Seller that is not directly related to the provision of Transition Services or (b) accounting, legal, financial advisory, valuation, investment banking, or other third party advisory or consulting fees and expenses of Seller that are not directly related to the Transition Services (and otherwise would not have been incurred in the absence of this TSA and the provision of the Transition Services) or (c) except as provided in this Section 5(b), statutory fees due and payable pursuant to section 1930 of title 28 of the United States Code, costs of preparing any monthly operating reports, and any costs related to closing the Voluntary Bankruptcy Cases;

c. Subject to Section 5(a), Seller shall provide or cause to be provided to the Buyer Parties, within 10 days after the end of each calendar month, a monthly report that shall include (i) the total revenue received from sales of products during such month, (ii) a detailed accounting of Fees paid by or on behalf of Seller during such month, (iii) a detailed accounting of amounts paid pursuant to the Master Services Agreement during such month, (iv) the amount, if any, deposited into, or disbursed from, the Fund Account during such month, (v) the amount and cost of any Interim Inventory acquired by Seller during such month, and (vi) a Monthly Invoice, updated Budget, and report of all variances from the then-current Budget .

280294552 v11

d. During the 15 day period following delivery of a Monthly Invoice, Buyer shall have the right to review such Monthly Invoice and object to any items included in such Monthly Invoice that it, in its reasonable and good faith discretion, disagrees with or disputes. In the event of such dispute, including, without limitation, with regards to any Excess Administration Expenses reflected in any Monthly Invoice or any Budget submitted by Seller to the Buyer Parties, the Buyer Parties shall promptly deliver a written statement (email being sufficient) to Seller, and in no event later than 10 days after the receipt of such Monthly Invoice from Seller, listing all disputed items and providing a reasonably detailed description of each disputed item.  Seller and the Buyer Parties shall seek to resolve all such disputes expeditiously and in good faith; provided, however, that Seller shall continue performing the Transition Services in accordance with this TSA pending resolution of any dispute.  If the Parties are unable to resolve any dispute, then such dispute shall be submitted to the Bankruptcy Court for determination and the determination of the Bankruptcy Court shall be binding on the Parties.  In the event such resolution results in the Fees that were funded, paid or reimbursed exceeding the actual and determined amount of Fees, such excess amount shall be promptly remitted to the Fund Account.

**SECTION 6**.  Other Actions and Presentation of Documentation. The Parties may take such other actions or present such other documents to federal, state, and local alcohol beverage licensing authorities as necessary to effectuate the intent of this TSA.

**SECTION 7.**  Personnel.  Seller will make arrangements to provide sufficient number of experienced personnel as independent contractors, to perform the Transition Services and all costs and expenses associated with the retention of such personnel shall be payable by Buyer Parties as Fees.

**SECTION 8.**  Representations and Warranties.

a. The Buyer Parties represent and warrant that each shall diligently devote its best efforts to obtain the requisite license and permits on or before the end of the Term; provided, that nothing in this Section 8(b) shall be construed to alter the Term or scope of Transition Services.

b. The Buyer Parties and Seller each represent and warrant (i) it has all requisite corporate power and authority to execute and deliver this TSA and to perform its obligations hereunder, (ii) all acts or proceedings required to be taken by it to authorize the execution and delivery of this TSA and the performance of its obligations hereunder has been properly taken, and (iii) this TSA has been duly authorized, executed, and delivered by it and constitutes the legal, valid, and binding obligation of it, enforceable against it in accordance with the TSA's terms.

c. Each Party will keep, or cause to be kept, and maintain all records customarily required by governmental authorities through the end of the Term.  Each Party will send copies of such records to the other Party upon the other Party's request on or prior to the expiration of the Term; provided, that, Seller shall make electronic copies of all such material records available to the Buyer Parties prior to the expiration of the Term.

-6-

-7-

**SECTION 9.**  Restrictions on Dissolutions.  Subject to Section 2(c) hereto, prior to the termination or expiration of this TSA, Seller agrees not to (i) be wound up, liquidated or dissolved and (ii) close or dismiss its Voluntary Bankruptcy Case or convert to a case under Chapter 7 of the Bankruptcy Code.

**SECTION 10**.  General Terms.

    a.    Amendment and Waiver.  This TSA may be amended only by a writing executed by each of the Parties.  No waiver of compliance with any provision or condition hereof, and no consent provided for herein, will be effective unless evidenced by an instrument in writing duly executed by the Party sought to be charged therewith.  No failure on the part of any Party to exercise, and no delay in exercising, any of its rights hereunder will operate as a waiver thereof, nor will any single or partial exercise by any Party of any right preclude any other or future exercise thereof or the exercise of any other right.

    b.    Notice.  Each notice, report, demand, waiver, consent, and other communication required or permitted to be given hereunder will be in writing and will be sent (and deemed given upon receipt) (i) by registered or certified first-class mail, postage prepaid and return receipt requested, (ii) by Federal Express or comparable overnight courier, or (iii) by email, followed by the original via certified first-class mail, addressed as follows:

    If to a Buyer Party:

Project Crush Acquisition Corp LLC
927 Santa Fe Avenue,
Los Angeles, CA 90021
Attn: Mark T. Lynn, Chief Executive Officer
Email: mark@amass.com

with a copy to (which shall not constitute notice):

Cooley LLP
1333 2nd Street
Suite 400
Santa Monica, CA 90401
Attention: Matt Hallinan; Erin Kirchner; Matt Silverman; Eric Walker
Email: mhallinan@cooley.com; ekirchner@cooley.com; msilverman@cooley.com; ewalker@cooley.com

If to Seller:

Winc, Inc.
1751 Berkeley Street, Studio 3
Santa Monica, CA 90404
Attn: Mr. Brian Smith
Email: Brian@winc.com

>with a copy to (which shall not constitute notice):
>Young Conaway Stargatt & Taylor, LLP
>1000 North King Street
>Wilmington, DE 19801
>Attention: Craig Grear; Matthew Lunn
>Email: cgrear@ycst.com; mlunn@ycst.com

c.      Binding Effect; No Assignment.  This TSA will be binding upon and will inure to the benefit of the Parties and their respective successors and assigns and, except as aforementioned, this TSA creates no rights of any nature in any person not a Party hereto.  Neither Party shall assign any of its rights or delegate any of its responsibilities, liabilities, or obligations under this TSA.

d.      Indemnification.  Buyer Parties shall indemnify and hold Seller and Seller's members, officers, directors, agents and employees (each an "Indemnified Party") harmless from and against any claim, damage, loss, expense (including reasonable and out-of-pocket attorneys' fees), penalty, fine, or liability of any kind whatsoever (each, a "Loss"), or any action therefore, by or on behalf of any third party that arise from or are in connection with (i) any claims relating to Seller's provision of Transition Services hereunder, (ii) the Buyer Parties' failure to pay over to the appropriate taxing authority any taxes relating to the operation of the Business for any taxable period beginning after the Effective Date and ending at the expiration or termination of the Term, (iii) any warranty, recalls, or products liability claims relating to the Inventory, solely to the extent such Inventory was sold during the Term pursuant to this TSA, (iv) any claims relating to hazardous or toxic component materials, solely to the extent such claims arise or related to the operation of the Business during the Term, (v) any claims relating to improper or incomplete labeling or warnings, solely to the extent such claims arise or are in connection with the sale of any Inventory during the Term pursuant to this TSA, (vi) the Buyer Parties' material breach of or failure to comply with any of the Buyer Parties' agreements or covenants contained in this Agreement, (vii) the fraud, negligence (including omissions), or willful misconduct of the Buyer Parties, their officers, directors, employees, agents, or representatives; and (viii) any liability or other claims asserted by customers of the Business against an Indemnified Party, solely to the extent such liability or other claims arise or are in connection with the sale of any Inventory during the Term pursuant to this TSA; provided, however, that the Buyer Parties shall not indemnify any Indemnified Party for any such matters resulting from the fraud, gross negligence or willful misconduct of such Indemnified Party.

e.      Governing Law.  THE PARTIES AGREE THAT, SO LONG AS IT ACCEPTS JURISDICTION, THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "BANKRUPTCY COURT") SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO THE INTERPRETATION, IMPLEMENTATION, AND ENFORCEMENT OF THIS TSA AND ANY DOCUMENT EXECUTED PURSUANT HERETO (COLLECTIVELY, THE "DISPUTED MATTERS"), AND THE PARTIES HEREBY EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST IN ANY WAY SUCH JURISDICTION. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PRECEDING SENTENCE, IN THE EVENT THAT THE BANKRUPTCY COURT CANNOT OR DOES NOT ACCEPT JURISDICTION OVER ANY DISPUTED MATTER, THE PARTIES HEREBY AGREE THAT THE COURTS OF THE COUNTY OF NEW CASTLE, STATE OF DELAWARE AND OF THE UNITED STATES

280294552 v11

LOCATED IN THE DISTRICT OF DELAWARE SHALL HAVE EXCLUSIVE JURISDICTION OVER SUCH DISPUTED MATTER, AND THE PARTIES HEREBY EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST IN ANY WAY SUCH JURISDICTION. FOR THE PURPOSE OF ANY LITIGATION RELATING TO THE DISPUTED MATTERS, THE PARTIES WAIVE ANY OBJECTION THAT THEY AT ANY TIME MAY HAVE TO THE LAYING OF VENUE IN ANY SUCH COURT AND TO ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. THE PARTIES HEREBY WAIVE PERSONAL SERVICE OF ANY PROCESS IN CONNECTION WITH ANY SUCH ACTION OR PROCEEDING AND AGREE THAT THE SERVICE THEREOF MAY BE MADE BY CERTIFIED OR REGISTERED MAIL ADDRESSED TO OR BY PERSONAL DELIVERY TO ANY OTHER PARTY AT SUCH OTHER PARTY'S ADDRESS SET FORTH ON THE SIGNATURE PAGE HERETO. IN THE ALTERNATIVE, IN ITS DISCRETION, ANY OF THE PARTIES MAY EFFECT SERVICE UPON ANY OTHER PARTY IN ANY OTHER FORM OR MANNER PERMITTED BY APPLICABLE LAW.

    f.    <u>Waiver of Jury Trial.</u>  THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS TSA OR ANY OF THE CONTEMPLATED TRANSACTIONS OR RELATIONSHIPS CREATED UNDER OR BY THIS TSA, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.  THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS SECTION OF THE AGREEMENT WITH ANY COURT OR OTHER TRIBUNAL AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE TRIAL BY JURY.

    g.    <u>Representation of Counsel; Mutual Negotiation</u>.  Each Party has had the opportunity to be represented by counsel of its choice in negotiating this TSA.  This TSA will therefore be deemed to have been negotiated and prepared at the joint request and direction of the Parties, at arm's length, with the advice and participation of counsel.

    h.    <u>Headings.</u>  The headings herein are included for ease of reference only and shall not control or affect the meaning or construction of the provisions of this TSA.

    i.    <u>Entire Agreement</u>.  This TSA all documents to be delivered by the Parties pursuant hereto collectively represent the entire understanding and agreement between the parties with respect to the subject matter hereof.  This TSA cannot be amended, supplemented or modified except by an agreement in writing which makes specific reference to this TSA, or an agreement delivered pursuant hereto, as the case may be, and which is signed by all Parties.

    j.    <u>Severability</u>.  The Parties intend that the provisions of this TSA be enforced to the fullest extent permissible under applicable law and public policies applied in each jurisdiction in which enforcement is sought.  Accordingly, if any particular provision of this TSA shall be adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party, such provision, as to such jurisdiction,

shall be ineffective, without invalidating the remaining provisions of this TSA or affecting the validity or enforceability of this TSA or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this TSA or affecting the validity or enforceability of such provision in any other jurisdiction.

      k.    <u>Relationship of the Parties</u>. Each Party agrees that such Party shall perform its obligations set forth herein as an independent contractor. Nothing contained in this TSA will be construed as creating a partnership, joint venture, franchise, agency, trust, fiduciary relationship, or other association of any kind between the Parties. Except as otherwise specifically provided in this TSA, each Party shall be responsible for compliance with all applicable laws and orders of governmental entities and for obtaining required licenses and permits.

      l.    <u>Separate Counterparts</u>. This TSA may be executed simultaneously in two counterparts, each of which together shall constitute one and the same agreement.

*[Remainder of this page intentionally left blank – signature page follows]*

**IN WITNESS WHEREOF,** the Parties hereto have entered into and signed this TSA as of the date first set forth above.

| **BUYER PARTIES:** | **SELLER:** |
|---|---|
| **Project Crush Acquisition Corp LLC** | **BWSC, LLC** |
| By: _____ <br> Name: _____ <br> Title: _____ | By: _____ <br> Name: _____ <br> Title: |
| **[●]** | **Solely for purposes of Section 4** <br> **WINC, INC.** |
| By: _____ <br> Name: _____ <br> Title: _____ | By: _____ <br> Name: _____ <br> Title: |

# SCHEDULE A

Transition Services

1. Licensing and Brand Registration Support.  In coordination with and in support of, the Buyer Parties' personnel, Seller will assist Buyer Parties regarding:
    a. Maintenance and transitioning of licensing, brand registration and price posting.
    b. Support for transition to new distributors in select markets where a Buyer Party already has operations.

2. Winery Operations
    a. Produce, blend, store, filter, finish and bottle, or cause to be produced, blended, stored, filtered, finished and bottled, wine as necessary to preserve continuity for the Business.
    b. File, or cause to be filed, federal reports of operations, excise tax returns, and any other documentation required or requested by the Alcohol and Tobacco Tax and Trade Bureau.
    c. File, or cause to be filed, all applicate state reports and excise returns.
    d. Store, or cause to be stored, finished goods with respect to the Business.
    e. To the extent permissible by state law, solicit and accept orders for sales of the Seller's product in the ordinary course of business, consistent in all manner with the customs and practices used by Seller prior to the Effective Date.

3. Relationship Management and Ongoing Reporting.  In coordination with and in support of the Buyer personnel, Seller will assist, or cause to assist, the Buyer Parties with the following tasks:

    a. Active discount and advertising agreements, as well as any other contractual arrangements related to the products sold or for sale / distribution.

    b.  Statutory Reporting filings.

    c. Managing invoice payment resolution with customers.

    d. Reconciling invoice discrepancies.