1

```
 1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

 3   IN RE:                        .  Chapter 11
                                   .  Case No. 22-11238 (LSS)
 4   WINC, INC., et al.,           .
                                   .  (Jointly Administered)
 5                                 .
                                   .  Courtroom No. 2
 6                                 .  824 Market Street
                  Debtors.         .  Wilmington, Delaware 19801
 7                                 .
                                   .  Tuesday, January 17, 2023
 8   . . . . . . . . . . . . . . .   3:30 p.m.

 9

10                          TRANSCRIPT OF HEARING
             BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
11                CHIEF UNITED STATES BANKRUPTCY JUDGE

12   APPEARANCES:

13   For the Debtors:          Matthew Lunn, Esquire
                               Allison Mielke, Esquire
14                             YOUNG CONAWAY STARGATT & TAYLOR LLP
                               Rodney Square
15                             1000 North King Street
                               Wilmington, Delaware 19801
16


17

18   (APPEARANCES CONTINUED)

19   Audio Operator:          LaChrisha Harden

20   Transcription Company:   Reliable
                              The Nemours Building
21                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
22                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
23

     Proceedings recorded by electronic sound recording,
24   transcript produced by transcription service.

25
```

```
 1   APPEARANCES (CONTINUED):

 2   For Individual
     Grape Growers:              Rachel Mersky, Esquire
 3                               MONZACK MERSKY BROWDER &
                                   HOCHMAN, P.A.
 4                               1201 N. Orange Street, Suite 400
                                 Wilmington, Delaware 19801
 5
     For the Committee:          Justin Kesselman, Esquire
 6                               ARENTFOX SCHIFF LLP
                                 The Prudential Tower
 7                               800 Boylston Street, 32nd Floor
                                 Boston, MA 02199
 8
     For the U.S. Trustee:       Jane Leamy, Esquire
 9                               OFFICE OF THE UNITED STATES TRUSTEE
                                 844 King Street, Suite 2207
10                               Lockbox 35
                                 Wilmington, Delaware 19801
11
     For VV1515 LLC:             Michael Yurkewicz, Esquire
12                               KLEHR HARRISON HARVEY BRANZBURG LLP
                                 919 North Market Street, Suite 1000
13                               Wilmington, Delaware 19801

14   For Banc of California:     Maxim Litvak, Esquire
                                 PACHULSKI STANG ZIEHL & JONES LLP
15                               One Sansome Street
                                 34th Floor, Suite 3430
16                               San Francisco, California 94104

17   For Project Crush
     Acquisition:                Eric Walker, Esquire
18                               COOLEY LLP
                                 110 N. Wacker Drive, Suite 4200
19                               Chicago, Illinois 60606

20   For Atticus
     Publishing, Inc.:           Connor Bifferato, Esquire
21                               THE BIFFERATO FIRM, P.A.
                                 800 North King Street
22                               Wilmington, Delaware 19801

23

24

25
```

1                              INDEX

2    MOTIONS:                                                    PAGE

3    Agenda
4    Item 1:  Debtor's Motion for Entry of (A) an Order (I)        4
                 Approving Bidding Procedures in Connection
5                With the Sale of the Debtor's Assets and
                 Related Bid Protections, (II) Approving Form
6                And Manner of Notice (III) Scheduling Auction
                 And Sale Hearing (IV) Authorizing Procedures
7                Governing Assumption and Assignment of Certain
                 Contracts and Unexpired Leases, and (V)
8                Granting Related Relief; and (B) an Order (I)
                 Approving Purchase Agreements, and (II)
9                Authorizing a Sale Free and Clear of all Liens,
                 Claims, Encumbrances, and Other Interests
10               [D.I. 47; Filed 12/7/22]

11               Court's Ruling:                                 42

12   Agenda
13   Item 2:  Debtor's Application for Entry of an Order (I)      37
                 Authorizing the Employment and Retention of
14               Canaccord Genuity LLC as Investment Banker for
                 The Debtors, Effective as of the Petition Date;
15               And (II) Waiving the Information Requirements
                 Of Local Rule 2016-2(d)
16               [D.I. 67; Filed 12/16/22]

17               Court's Ruling:                                 41

18

19

20   DECLARATIONS:                                               PAGE

21   Carol Brault                                                5

22   Morgan Ley                                                  5

23

24

25

1        (Proceedings commence at 3:35 p.m.)

2              MS. MIELKE:  May I begin, Your Honor?

3              THE COURT:  Yes.

4              MS. MIELKE:  First on the agenda is the debtor's

5    motion to approve the sale of substantially all of their

6    assets to Project Crush Acquisition Company LLC or Co., LLC,

7    excuse me.  At the outset I will note that after significant

8    protracted negotiations we're pleased to report that the

9    debtors are proceeding on what we thought was an consensual

10   basis.  There may be one outstanding issue, but we are

11   working on some language right now to try to address it.  So

12   hopefully by the end of the hearing we will have a fully

13   consensual hearing for you today.

14             We did resolve the committee's objection through a

15   settlement of issues.  Those were negotiated by the stalking

16   horse bidder, the debtors and the committee together over the

17   last several days.  We also received informal comments from

18   various parties regarding mostly cure and assumption

19   objections.  Those have been resolved by filing supplemental

20   cure notices and incorporating language into the sale order.

21             In support of the motion the debtors filed the

22   declaration of Carol Brault who is the debtor's chief

23   financial officer and the declaration of Morgan Ley who is

24   with Canaccord Genuity, LCC, the debtor's investment banker.

25   Both witnesses are here in the Courtroom and available for

1  cross-examination.  I think at this point, Your Honor, we

2  would ask that those be admitted into evidence.

3          THE COURT:  Is there any objection of the entry

4  into evidence of the declaration of Morgan Ley or the

5  declaration of Carol Brault?

6       (No verbal response)

7          THE COURT:  I hear none.  They are both admitted.

8       (Declarations admitted into evidence)

9          MS. MIELKE:  Thank you.

10         Your Honor, just a brief recap of the debtors.

11 The debtors operate a direct to consumer and wholesale

12 channel wine business.  The business is based out of Los

13 Angeles historically and it has distribution centers in

14 California and in Pennsylvania.  The debtors do not own any

15 real property.  So the assets that are sought to be

16 transferred consist of personal property contracts, personal

17 property leases, and certain intangibles.

18         For almost 10 months now the debtors have been

19 pursuing a strategic alternative -- excuse me, a strategic

20 transaction.  After that extensive process we are asking the

21 Court today to approve a transaction to the stalking horse

22 bidder which the debtors believe, as reflected in the

23 declarations that we filed, is the best possible avenue to

24 preserve and maximize value in these cases.

25         As you will recall, the debtors limped into

1  bankruptcy a couple of months ago with $800,000 in cash and

2  facing a looming loan payment deadline.  The parties worked

3  together to avoid a contested cash collateral fight at the

4  beginning and they agreed on terms to obtain debtor-in-

5  possession financing.  That financing was used to pay

6  administrative claims to support the sale process.  The

7  debtors and Canaccord immediately commenced a post-petition

8  marketing process as soon as the cases were filed.

9          The Court approved bid procedures on December 22nd

10 and approved Project Crush Acquisition as the stalking horse

11 bidder.  Bids were due on January 9th.  No qualified bids

12 were received despite the debtors best efforts and the

13 debtors canceled the auction and proceeding today with

14 approval of the stalking horse bid.

15         We did receive substantial feedback, which we have

16 indicated in the declaration of Morgan Ley, from several

17 bidders that indicated that they believed that the

18 consideration that we were receiving in the stalking horse

19 bid was full value for the assets.  So we did have some

20 interest, but no bidder was willing to exceed the value that

21 we were already getting from the stalking horse bid.

22         I will briefly go over some of the terms of the

23 APA.  As I mentioned, the sale is for a sale of substantially

24 all of the debtor's assets.  That includes inventory,

25 accounts receivable, assumption and assignment of certain

1  contracts, etc.  The transferred assets also include the

2  transfer of specified causes of action.  Those include some

3  avoidance actions against certain vendors and a specified

4  officer who is accepting employment with the buyer.

5           The consideration for this sale is $11 million in

6  cash and that, in addition to assumption of certain

7  liabilities, the debtors have estimated in the amount of

8  approximately $18 to $28 million.  Those liabilities consist

9  of cure costs for assumed contracts, some trade payables and

10  then predominately the gift card and customer obligations.

11           Of that purchase consideration the stalking horse

12  bidder is going to credit bid approximately $4.1 million and

13  that will consist of the DIP draw plus interest and fees.

14  Then there is a very small amount of that credit bid that

15  will be on account of a settlement that the committee and the

16  debtors have reached which I will go over shortly.

17           I think I mentioned it, but in some the value that

18  the debtors have estimated the sale to bring in is between

19  $29 and $30 million.  The range reflects some value

20  associated on the debtor's books and records with breakage

21  for gift cards and prepaid credits.

22           Due to the necessity for the buyer to obtain

23  liquor licenses going forward the debtors and the stalking

24  horse bidder have entered into a transition services

25  agreement where essentially BWSC will continue to operate the

1   business and the purchaser will be responsible for the costs

2   associated with the operation of the business.  The buyer

3   will be taking on certain or most of, I will say certain of

4   the debtor's employees and will be providing the staffing

5   necessary to perform those duties.

6           The costs will be funded from transition proceeds

7   through a fee invoicing process.  And the fees of the Chapter

8   11 case are contemplated to be paid by the purchaser to the

9   extent that they are attributable to the TSA.  So there are

10  some costs that the Chapter 11 cases will bear for costs that

11  are a straight-forward Chapter 11 what you would have to pay

12  anyway.  But to the extent there is a hook to the TSA then

13  the purchaser will satisfy those.

14          As I indicated, there is a settlement with the

15  committee in this case. It was protracted and hard fought.

16  The terms of the settlement are attached to the sale order as

17  a term sheet which I have provided to you.

18          Just a brief overview, the committee is in support

19  of the sale.  The debtors and the committee are going to be

20  working together to file a plan.  Going forward we have set

21  forth some milestones which we hope we can achieve to get a

22  plan on file.  There is also an agreement to resolve the

23  committee's critical vendor objection.  That has been

24  resolved.

25          The debtors will be making one of those payments

1   and then there is a mechanism where the debtors and the buyer

2   have agreed, and the committee have agreed, not to make the

3   remaining of those payments.  And then they are going to

4   split the remaining cash proceeds left at the estates after

5   the sale proceeds waterfall, 50/50; so cash on hand at the

6   end of the sale proceeds waterfall.

7           So --

8           THE COURT:  With who?

9           MS. MIELKE:  The buyer.  So it will be like a

10  payment kind of in lieu of the, sort of, application of

11  critical vendor payments from the DIP.  So that payment will

12  go back to the buyer which the buyer will be credit bidding.

13          There are some additional -- in order to resolve

14  an objection filed by several lien claimants the parties have

15  agreed that the purchaser will be assuming responsibility to

16  pay those claims going forward.  Those are listed with

17  specificity in the term sheet.

18          Those are the highlights from the term sheet, Your

19  Honor.  As I mentioned, we have resolved the committee's

20  objection with respect to critical vendor issues.

21          I think that that leaves the, what I will call,

22  objection of the ad hoc grape growers.  I am hopeful that we

23  are going to be able to come to some language that will

24  provide those grape growers comfort.

25          As we -- we can go through the blackline of the

1  sale order if Your Honor would like, but we have made it

2  clear in the sale order that -- or we have and we will if we

3  need to revise that language that the liens of those

4  claimants will be riding through.  So the sale will not be

5  free and clear of those liens.

6          Then I think, I don't know, if I could just take a

7  moment to check to see if the language that we have discussed

8  with that particular set of lien claimants, if we have been

9  able to arrive at a resolution on that.

10     (Pause)

11        MS. MIELKE:  So my understanding is that there is

12  some language that is still being proposed and agreed on.  So

13  perhaps we can get agreement on that by the time the hearing

14  is over and if not we can address where we need to move with

15  that.

16          Your Honor, that is it for the highlights.  I'm

17  happy to walk through the blackline of the sale order with

18  you.  I know you haven't had any really time to see the

19  revisions.  So I don't know what would be helpful for you, if

20  you would like us to just go through it or if you need a

21  moment.

22        THE COURT:  I am still trying to figure out what

23  the 50/50 split is.  Can you take baby steps on that?

24        MS. MIELKE:  Sure.  So the debtors will calculate

25  a waterfall at closing.  It's identified here under the sale

1  proceeds utilization on page 2 of the term sheet.  We have

2  agreed to what the amount of the DIP claim will be, that will

3  be credit bid.  Then the other sale proceeds from that

4  waterfall will be the payment of the Bank of California

5  secured claim which I think at this point we have stipulated

6  to.

7          THE COURT:  Okay.

8          MS. MIELKE:  Administrative claims of the case

9  including professional fees.  That will result in a net sale

10 of proceeds.  Then the debtors and the buyer have agreed that

11 those net sale proceeds will be split 50/50.  It is -- I

12 don't know what the call it, it was an arrangement as a way

13 to allocate proceeds, DIP funds, that kind of thing to sort

14 of arrange payment of -- to satisfy the payment of those

15 potential claims that would have been made as a result of

16 critical vendor payments.  Then we have agreed that the buyer

17 will be credit bidding that amount.

18          THE COURT:  Is that because the -- okay, so

19 certainly critical vendor payments are not being made that I

20 approved or permitted.  So I guess I am not clear why any net

21 sale proceeds are being split and why the estate isn't

22 receiving 100 percent of the net sale proceeds after payment

23 of the DIP, and the secured claim, and any other claims.

24          MS. MIELKE:  Well the thought is, Your Honor, that

25 DIP proceeds would have been used to have paid those real

1  dollars.  So that would have -- essentially it's just an -- I

2  mean it would have been paid anyway from the debtor estates,

3  but we have agreed not to pay it from a debtor estate and

4  instead split the proceeds 50/50.

5          So I think it actually potentially provides some

6  upside to the estate to the extent that, you know, claims are

7  satisfied, come in lower or there is some upside there.

8          THE COURT:  So are those critical vendor claims

9  being picked up by way of cure claims or are they being left

10 as general unsecured claims?

11         MS. MIELKE:  They are what they are, those claims.

12 So assuming that they were -- so to be clear, those vendor

13 claims were both prepetition and just inventory payments like

14 regular inventory payments.  I think those payments will be

15 satisfied. If the buyer decides going forward that they are

16 going to be doing business with those vendors then they can

17 pay them if they would like, but right now they're just

18 general unsecured claims in the case.

19         THE COURT:  I'm still not sure I understand this,

20 but if that is the deal the committee struck it's the deal

21 they struck.  I'm not sure I understand it.

22         MR. KESSELMAN:  Your Honor, Justin Kesselman for

23 the official committee of unsecured creditors.

24         I can walk through some of what the committee's

25 viewpoint is on the settlement.  The committee viewed, first

1  and foremost, that saving $996,000 in estate funds for being

2  used to pay largely what we view is unsecured claims and

3  keeping an amount in the estate, you know, to pay either

4  administrative claims or to be more, you know, equitably

5  distributed among unsecured creditors generally made more

6  sense for the estate

7        So preserving close to a million dollars in

8  payments from going out of the estate we had to make some

9  deal with the buyer and with the debtors in order to ensure

10 that that million dollars did not go out of the estate

11 because in our view, by sending out the million dollars out

12 of the estate, the buyer was shifting a cure cost onto the

13 estate.  And if the buyer wanted to assume those contracts

14 then our view is that the buyer should pay the cure and take

15 that on.

16        So through a resolution through this, not only the

17 cure cost, but the buyer picking up the liens.  I think it's

18 approximately $2 million in liens.  What we were trying to do

19 is ensure, through this arrangement, that there actually were

20 net sale proceeds for the estate at the end of the sale

21 because when you add it all up without the deal and what the

22 estate was headed for in the view of the committee you had

23 $11 million in sale proceeds, potentially $5 million on the

24 DIP, more than $3 and a half million on the Banc of

25 California's claim, $2 million to Canaccord, and $2 million

1  in lien claims that were potentially payable from the

2  proceeds, all of which is substantially in excess of $11

3  million.  So all of that together would have more than

4  swallowed up all of the proceeds. It would have left the

5  estate unable to fund the full scope of administrative costs

6  and certain with no distribution to unsecured creditors.

7          Instead, under this arrangement the lien claims

8  are paid for, the estate cash is preserved and not sent out

9  on the kind of contracts that would be potentially assumed by

10 the buyer and there will be net sale proceeds based on the

11 projections that we received from the debtor's financial

12 advisor in order to fund the estate through, to confirm a

13 plan, and provide for an opportunity for unsecured creditors

14 to be paid.

15          That is our view of how the deal accomplishes

16 that.

17          THE COURT:  Okay.  Thank you.

18          MR. KESSELMAN:  Thank you, Your Honor.

19          MS. MIELKE:  Your Honor, there is one

20 clarification.  We stipulated to the amount of the DIP lender

21 credit bid on the sale closing row of the chart, on page 1 of

22 the settlement termsheet, but it did not make its way all the

23 way down to the sale proceeds utilization sale.  So that just

24 needs to be updated to reflect the number $4,165,963.49.

25          THE COURT:  Okay.

1    MS. MIELKE:  Your Honor, I don't want to drone on

2  and on if it's unhelpful.  Should we go through the order or

3  do you need some time to review it?  How can we help you?

4    THE COURT:  You can go through the order.

5    MS. MIELKE:  Your Honor --

6    MR. LITVAK:  Your Honor, I apologize.  At the

7  appropriate time I have some comments to the termsheet so I

8  just wanted to put a pin in that whenever Your Honor is

9  ready.

10    THE COURT:  Why don't you go ahead, Mr. Litvak.

11    MR. LITVAK:  Thank you, Your Honor.  Thank you for

12  allowing me to appear via zoom.  Mat Litvak, Pachulski Stang

13  Ziehl & Jones, on behalf of the Banc of California.

14    Your Honor, I expressed these comments to debtor's

15  counsel in emails, but the issue that we have is there is a

16  specific cap on the amount.  You can see that on page 1 of

17  the termsheet in that third box.  There is a specific cap of

18  $3,558,646 and that the payment to the bank shall not exceed

19  that, plus reasonable attorney fees, and interest accruing

20  for the period beginning January 4th through the closing

21  date.

22    Your Honor, that number nets out two things that I

23  wanted to clarify on the record.  First, there is a letter of

24  credit that is outstanding of $100,000. I know the debtors

25  are trying to cancel it, but we have not received, from the

1  bank's perspective, confirmation from the beneficiary that

2  that LC has, in fact, been canceled.  So we would insist upon

3  a reserve for that letter of credit of $103,000, $3,000 being

4  for a little cushion in case there are any fees.

5          We don't need to be paid that amount, Your Honor.

6  I am just saying that that amount needs to be reserved by the

7  estate because it would be payable to the bank if the letter

8  of credit is ever called upon and that is not included in the

9  $3.558 million.  So that is our first issue.

10         THE COURT:  Okay.

11         MR. LITVAK:  Would you like me to go through all

12  of the issues, Your Honor?

13         THE COURT:  Yes.

14         MR. LITVAK:  The second issue, Your Honor, is that

15  this number $3.558 million deducts default rate interests

16  that the bank had been charging the debtor from the petition

17  date through January 4th, it's about $16,000.  The bank is

18  agreeable to waiving all the default rate interest, but that

19  is subject to the committee agreeing that its challenge

20  rights are also waived.

21         Under the final DIP order the challenge deadline

22  is February 20th and in my discussions with the committee I

23  believe that they are willing to do that. So if they are then

24  this proviso that says subject to the committee's challenge

25  period deadline of February 20th would need to come out and

1   the committee -- in pro rata the language should say that the

2   committee waives its challenge.  If they are not willing to

3   do that and this remains subject to the committee's challenge

4   period then the claim amount needs to be increased.  So that

5   is the second point that I have.

6          The third point, Your Honor, is that this number

7   of $3.558 million does not include my firm's fees either

8   before or after January 4th.  We would estimate that those

9   fees will not exceed $175,000.  They may be only around $150,

10  but I don't know yet because we have to get to closing first.

11  But that is another item that needs to be addressed or the

12  language needs to be revised to reflect that.

13         Then lastly, Your Honor, at the end of that box,

14  but at the top of page 2 it says that at sale closing all

15  liens of BOC, Banc of California, on excluded assets shall be

16  deemed released and discharged.  That would be fine, but it

17  has to be subject to us actually getting the money, getting

18  full payment.

19         Those are my four comments, Your Honor, to the

20  termsheet.

21         THE COURT:  Thank you.

22         MR. LITVAK:  Thank you.

23         THE COURT:  Let me hear a response.

24         MR. KESSELMAN:  Your Honor, from the committee's

25  perspective Mr. Litvak is correct.  That was a discussion

1  held right before the hearing.  So the committee is waiving

2  its challenge deadline.

3              THE COURT:  Okay.

4              MR. KESSELMAN:  That language will be stricken.

5              THE COURT:  Okay.

6              MR. KESSELMAN:  As to the letter of credit my

7  understanding is it's been canceled, but debtor's counsel can

8  confirm what the status of that is.

9              The issue about the secured lenders fees I believe

10 those have been reserved in escrow. I don't know the exact

11 amount that is in the escrow, but, you know, our intention is

12 to ensure that their reasonable fees are paid.  So if there

13 has to be an amendment to the language to provide for that we

14 can make sure that happens, but that's all I have.

15             THE COURT:  Okay.  Does the debtor disagree with

16 that?

17             MS. MIELKE:  Your Honor, we might just need one

18 moment.  Some of this is new to me, at least.

19             MR. KESSELMAN:  Yeah, we have no verification of

20 the number.  That is the first time, I think, I've heard it.

21             MR. WALKER:  Good afternoon, Your Honor.  Eric

22 Walker of Cooley on behalf of the successful bidder and the

23 DIP lender.

24             One point of clarification on the $103,000 reserve

25 that is outstanding line of credit.  We understand it's been

1 canceled or it's in the process of being canceled. We

2 understand Banc of California's position; they want to

3 reserve in the event that something happens between now and

4 when it actually gets canceled.

5        As Your Honor knows and as Ms. Mielke described

6 for the Court, there is a process to calculate net sale

7 proceeds that will then augment our credit bid as part of the

8 sale and we just want to make clear on the record that if

9 that $103,000 reserve is not drawn upon for the letter of

10 credit that that is not included in the calculation of net

11 sale proceeds.

12        THE COURT:  Okay. So the purchaser doesn't get a

13 50 percent credit on the $103,000?

14        MR. WALKER:  We would be because the $103,000

15 would not be used.  The reserve would be released, right,

16 and, therefore, it wouldn't be deducted as part of the

17 equation to determine what the net sale proceeds is.  Does

18 that make sense?

19        THE COURT:  Okay.

20        MR. WALKER:  I see shaking heads from the debtors

21 and the committee.

22        THE COURT:  So there's two different points.  The

23 Banc of California wants to ensure that the $103,000 is there

24 in case the letter of credit is drawn. If you all want to

25 make sure that if, in fact, it's been canceled without being

1  drawn that the purchaser --

2          MR. WALKER:  The reserve goes away.

3          THE COURT:  Okay.  Right.  So the purchaser gets

4  its share of that.

5          MR. WALKER:  50 percent.

6          THE COURT:  Okay.

7          MR. WALKER:  Thank you, Your Honor.

8          MS. MIELKE:  I think the only outstanding point on

9  that, I think, after conference with the committee is that --

10 I don't think I have the number in front of me anymore, but

11 there is a $103,000 escrow for prepetition lender fees.  I

12 think that the committee -- I don't think anybody is

13 stipulating to what the prepetition fees are and it's subject

14 to reasonableness, but there is -- you know, its escrowed

15 currently for $100,000.

16         Then I think -- is there one other issue?  That

17 might have been it.

18         THE COURT:  I don't know if that effects whatever

19 calculation that's going on, but Mr. Litvak says it's at $175

20 or it could be at $175.

21         MR. LITVAK:  Yes, Your Honor.  It's not just

22 prepetition legal fees.  There was a separate component in

23 our pay-off statement which is already included in the $3.558

24 million which was about $15,000 for prepetition legal fees.

25 That was a different law firm.  And then our fees were

1  budgeted at $100,000 for purposes of the final DIP order, but

2  I think we're going to come in over that. As I mentioned, I

3  think it's going to be no more than $175, probably closer to

4  $150.

5          So we just need to tinker with the language in the

6  termsheet to make it clear that it's not just post-January

7  4th fees, but it's all of our post-petition legal fees.

8          Then the last issue was just clarifying that

9  language about waiver of the bank's liens in the excluded

10  assets that that is subject to full and final payment of the

11  bank.  Once that is done, and, yes, it should occur

12  concurrent with closing, then we're good and, obviously, will

13  release the liens.

14          THE COURT:  Right.  I assume that is one issue.

15          MS. MIELKE:  I think we just have some revisions

16  to the termsheet, Your Honor.

17          THE COURT:  So there will be changes made in --

18          MR. LITVAK:  Thank you.

19          THE COURT:  -- working with Mr. Litvak.

20          Anyone else have any questions, comments, concerns

21  about the termsheet in its current iteration?

22      (No verbal response)

23          THE COURT:  Okay.  Let me hear from anyone who

24  filed an objection that would like to speak.  Ms. Mersky.

25          THE COURT:  Okay.  Let me hear from anyone who

1  filed an objection that would like to speak.

2         Ms. Mersky?

3         MS. MERSKY:  Good afternoon, Your Honor.  Rachel

4  Mersky.  It's nice to see you in person again.

5         THE COURT:  It's good to see you.

6         MS. MERSKY:  On behalf of eight individual grape

7  growers, which are identified by entries of appearance, we've

8  been working very, very hard with the debtors since

9  January 6th to try and resolve all the issues and the debtors

10 have been extremely responsive and it's a difficult moving

11 target, as documents change.  I believe we are primarily

12 there.  The big issue on behalf of the grape growers was that

13 the -- there would be no attempt to have a sale, free and

14 clear, of the California Food and Agriculture Code producer's

15 lien, which is a lien similar to PACA, but packs a lot more

16 strength, including criminal liability if grapes are sold

17 without being paid for and processing.

18         We have -- additional language has been added to

19 the order and right now, we're working with the buyers on one

20 additional term, as it relates.  I think it'll be part of the

21 transition services agreement or the order.

22         I'd also like to point out at paragraph 8 of the

23 proposed order, language was added and on the redline, which

24 took out the language -- it was liabilities and permitted

25 encumbrances and it had the language "comma if any."  "If

1    any" has been struck.

2            We would like to have added, and I haven't

3    specifically discussed this, but we have discussed this,

4    "including, but not limited to the California Food and

5    Agriculture Code producer's lien."

6            I don't think we talked about using state law as a

7    language, but I think that that's more specific and it'll

8    clarify that it's clear that that is one of the permitted

9    liens that is covered.  We're still working with the lender

10   on one additional term, which I hope we'll have shortly.

11           But the -- we've worked and we've agreed on all

12   the amounts of the liens.  It is with the term sheet,

13   disputed payment, and lien claim settlement.  There was

14   language added that addressed each of the eight grape growers

15   that we represent and, as I said, there's just one additional

16   term, which we're hoping to clarify.  But I think with that,

17   assuming we get that final term, that we worked diligently

18   and we do appreciate the efforts of the debtors and now of

19   the purchasers, to try and work through this.

20           THE COURT:  Okay.

21           MS. MERSKY:  It's a very, very big issue in

22   California and the California Agricultural Act, which

23   protects edible flowers, which I learned in the FTD case, as

24   well as most agriculture, and very, very heavily protects

25   grape growers, is an Act which, when we have grape cases, is

1  a little more difficult and different.

2          Thank you very much, Your Honor.

3          THE COURT:  It sounds like the Oklahoma oil and

4  gas that follows you to the pump and, you know, can probably

5  get to the consumer, who's pumped it.

6          MS. MERSKY:  But in Oklahoma, Texas, and one other

7  state, you can't have criminal liability for those acts.

8  There's actual criminal liability in California.

9          Thank you, Your Honor.

10          THE COURT:  Thank you.

11          MR. KESSELMAN:  Your Honor, Justin Kesselman from

12  the Committee.  Just -- we haven't seen the language that's

13  being proposed yet, so, of course, our interest is in

14  preserving the terms of our term sheet, but we will consult

15  with the debtors and the other parties to look at the

16  proposed language.

17          THE COURT:  Okay.

18          MR. KESSELMAN:  Thank you.

19          THE COURT:  Mr. Yurkewicz?

20          MR. YURKEWICZ:  Good afternoon, Your Honor.

21  Michael Yurkewicz, Klehr Harrison Harvey Branzburg, on behalf

22  of VV1515, LLC.  We are the landlord at one of the

23  distribution centers.  We filed an objection to the

24  assumption of the contract.

25          We were able to enter into a lease amendment with

1  the purchaser that resolves our objection.  With that, I

2  thank the purchaser for working with us and we no longer have

3  any objection to the sale.

4            THE COURT:  Thank you.

5            MR. YURKEWICZ:  Thank you.

6            THE COURT:  Any other objectors?

7            MR. BIFFERATO:  Your Honor, Connor Bifferato, on

8  behalf of Atticus Publishing, LLC.  I apologize for my

9  appearance.  I was only retained by audio only, but I was

10 only retained within the last hour.  My co-counsel Laura

11 Taveras is with me here, as well, and we have moved for

12 admission.

13            It's a very minor issue.  The latest iteration of

14 the APA references cure amounts to include both, pre-petition

15 and post-petition amounts.  As I understand it, the last

16 iteration only referenced pre-petition cure and because the

17 amounts listed for our client Atticus Publishing, LLC, are

18 not correct with respect to post-petition amounts, we

19 obviously just wanted to make sure that cure rights are

20 preserved, with regard to any assumption and assignment.

21            THE COURT:  Okay.  So talk to me about cure

22 amounts.

23            MS. MIELKE:  With respect to Atticus, Your Honor,

24 or generally?

25            THE COURT:  Generally and then Atticus.

1          MS. MIELKE:  We've filed a cure notice.  We've put

2     cures out.  We've worked with lots of people in the last two

3     weeks.  An objection deadline has come and gone.  This is the

4     only one that I've heard about so far.

5          So, I think the debtors' position would be we've

6     given the world notice.  Everybody's had an opportunity to

7     object.

8          With respect to, I think -- I can't remember

9     exactly -- I think it's Atticus Publishing, LLC, I've been in

10    contact with them since day one of the case, so I'm a little

11    surprised to hear about this now.  But I don't -- I think

12    with respect to Atticus, I don't think there's any issue, you

13    know, reserving rights on the post-petition amount that may

14    have accrued since we filed the cure notice.

15         MR. BIFFERATO:  That would take care of our issue,

16    Your Honor.

17         MS. MIELKE:  And then, just to clarify, it sounds

18    like the APA, the definition of cure costs includes post-

19    petition accruals under those contracts.

20         THE COURT:  Okay.  And I'm not making that

21    determination today.

22         MS. MIELKE:  Correct.

23         THE COURT:  Okay.  Mr. Bifferato, does that

24    satisfy your concern?

25         MR. BIFFERATO:  It does, Your Honor.  Thank you.

1        THE COURT:  Okay.  Anyone else?

2      (No verbal response)

3        THE COURT:  Okay.  Let's flip through the order as

4   it stands now.  I understand there's going to have to be some

5   changes, but let's flip through it as it stands now and let's

6   walk me through any major change.

7        MS. MIELKE:  There aren't too many major changes,

8   Your Honor, but I'll note some substantive changes.

9        THE COURT:  Uh-huh.

10        MS. MIELKE:  I'll just note on page 6, the end of

11   paragraph (h), that the stalking horse bid and sort of the

12   documents referenced there are modified by the terms of the

13   settlement term sheet.  We've included the TSA, as well as

14   the accompanying MSA, as documents -- exhibits to the order,

15   as well as the settlement term sheet itself, and that gets us

16   through paragraph (j).  There's been a defined term change,

17   so that's a lot of this markup.  Paragraph (d)(d) just

18   clarifies that the stalking horse bidder has agreed to assume

19   the cure costs related to the assumed lien contracts.

20        THE COURT:  Where is that?

21        MS. MIELKE:  It's on page 13, it's

22   paragraph (d)(d).  "D," as in dog.

23        Again, just a couple of provisions that modify.

24   To the extent the term sheet is applicable, it just

25   references to the extent modified by the settlement term

1  sheet.

2          Page 19 just clarifies that the purchasers shall

3  pay the associated cure costs, associated with the assumed

4  lien contracts.

5          And then we'll obviously revise, as has already

6  been indicated, paragraph 8 to include a reference to liens

7  from California's state producers law.  We'll have to run

8  through that language amongst the parties, but we'll agree on

9  something and include that under certification of counsel.

10          The (indiscernible) paragraph to the bottom of 8

11  is to address just a transfer issue.  So, under the TSA and

12  the order, the assets are being transferred, but are going to

13  be held in trust, for the benefit of purchaser, for purposes

14  of the licensing.  To this paragraph is to address that

15  arrangement and make it clear.

16          THE COURT:  What paragraph is that?

17          MS. MIELKE:  It's paragraph 8; it's the end of 8

18  on page 20.

19          THE COURT:  Okay.  As I recall, there is something

20  in the -- well, there's a fair amount in the sale order about

21  license agreements, but ultimately, there's a recognition

22  that nothing is impairing any government's ability to take a

23  look at the licensing agreements.

24          MS. MIELKE:  I think that's correct.

25          THE COURT:  Okay.

1          MS. MIELKE:  Paragraph 24 references

2    Section 1.2(a) of the purchaser agreement, which provides for

3    the assumption of contracts.  There's a timing component in

4    that as a result of the licensing.  So contracts associated

5    with licenses will be assumed at the time that the license is

6    obtained and transferred and the assets are transferred -- or

7    excuse me -- the legal title to the assets are transferred.

8          28 just makes clear that the proceeds are going to

9    pay off the pre-petition secured party.

10          MR. LUNN:  Your Honor, I have a comment on that

11    one.

12          THE COURT:  Okay.  What's your comment?

13          MR. LUNN:  That is to the length of reference of

14    the challenge rights, consistent with what we discussed in

15    the term sheet.

16          THE COURT:  That makes sense to me.

17          MS. MIELKE:  I think that's consistent with what

18    Committee represented, but I think, yes, Your Honor, the

19    Committee is shaking their head.  We'll do that.

20          MR. LUNN:  Thank you.

21          MS. MIELKE:  So, we'll start that paragraph with

22    capital A, At.

23          Paragraph 29 is language to address an objection

24    received or an informal response received from Natural

25    Merchants.  There was a pre-petition acquisition that the

1  debtor -- an APA that the debtors entered into with Natural

2  Merchants and there is some earnout liability associated with

3  that and some continuing -- some obligations under that

4  contract.

5          So, this paragraph is a resolution of the parties'

6  rights, with respect to an escrow amount that is being held

7  and clarifies that the debtors will be rejecting certain of

8  the agreements related to that agreement.

9          Paragraph -- do you have questions on that, Your

10 Honor?

11         THE COURT:  No.

12         MS. MIELKE:  Okay.  Paragraph 30 just addresses

13 Oracle.  This is pretty standard language that I think Oracle

14 often includes in an order that just says that any contracts

15 of it -- that its contracts will not be assumed and assigned

16 without its consent.

17         THE COURT:  Uh-huh.

18         MS. MIELKE:  They also often have an issue about

19 the transfer of licenses to third parties.  It's just to

20 address that, as well.

21         Moving on to 31, this language is included to

22 address an objection received by Summerland.  Summerland has

23 a lien claim in certain wine.  The debtors' contract at the

24 time that the cure notice was filed, the debtors had a

25 contract with Summerland, but it expired on its own terms at

1 the end of last year.  So, this makes clear that the debtor

2 will be making payment on account of that claim through --

3 and there's a specified amount -- and then makes clear that

4 that agreement is not subject to assumption and assignment.

5          And I think those are the highlights, Your Honor.

6 If there's anything else, I'm happy to answer questions.

7        (Pause)

8          THE COURT:  Is there a transition services

9 agreement that's attached to this?

10          MS. MIELKE:  There is.  We filed it earlier today

11 and I have copies here if you need it.

12        (Pause)

13          MS. MIELKE:  May I approach, Your Honor?

14          THE COURT:  You may.  Thank you.

15          Is there an outside time period for the transition

16 services agreement?

17          MS. MIELKE:  Yes, Your Honor.  I think it is

18 January 31st, 2024.

19          THE COURT:  Okay.  That's a fairly long period.

20          MS. MIELKE:  It is an outside date, Your Honor.  I

21 don't believe it's the intent of the parties for it to take

22 that long and, frankly, the buyer should be incentivized for

23 it not to take that long, because they are covering the costs

24 of the Chapter 11 case, as well --

25          THE COURT:  They're picking up all the costs.

1          MS. MIELKE:  -- so, I mean, all costs associated

2  with the TSA.  So, there are going to be a couple of very

3  core bankruptcy costs that they're not picking up, but it's

4  expensive, so I can't imagine they're going to want to do it

5  for too long.

6          THE COURT:  Okay.

7          MR. WALKER:  Your Honor, Eric Walker, again, on

8  behalf of the purchaser.

9          We agree with the sentiment that we're going to

10  get this transition completed as quickly as possible.  It's

11  really with the State regulators, who we're in the process of

12  getting our license for.  We expect it will take a couple of

13  months.  We put that outside date in there just as kind of an

14  outside end date, but we certainly hope to accomplish it

15  within a handful of months.

16          And with respect to the transition costs, we've

17  made it very clear in the TSA and in the settlement agreement

18  with all the parties that we understand, as the purchaser, we

19  will be paying any administrative costs with respect to the

20  operations of the company during the interim period, and

21  there's a detailed mechanism for us to pay for that, and then

22  any additional administrative costs for the bankruptcy case

23  that would not have been incurred, but for the TSA.  And so,

24  that's going to govern the relationship of the parties moving

25  forward.  I just wanted to make that clear for the record.

1            THE COURT:  Thank you.

2            MR. WALKER:  Thank you.

3            THE COURT:  Anyone else who wishes to be heard?

4            MS. MERSKY:  Your Honor, Rachel Mersky, again, on

5  behalf of the eight grape growers.

6            I don't know if this language -- we're working on

7  language, which would -- we hope to have in.  And I don't

8  know if it belongs in the TSA or in the settlement agreement.

9  I think it depends upon the buyers in this part, but the

10  rather simple language we've proposed that no product of any

11  assumed lien contract, which is a defined term, will be sold

12  under the TSA without first assuming, assigning, and cure by

13  the buyer; once again, following the fact that the lien

14  attaches and that the product cannot be sold without cure,

15  and we're trying to get an agreement as to that language, but

16  I just wanted to raise that issue now.

17            THE COURT:  Thank you.

18            MS. MERSKY:  Thank you, Your Honor.

19            THE COURT:  It sounds like there's agreement in

20  principle and we're just working on the language.

21            MS. MERSKY:  Your Honor, I don't -- that's

22  language that we're working on.  I don't have the authority

23  to represent the buyers or the debtors on that language

24  issue.  I think they're still talking to our client.

25            THE COURT:  Do we have a -- we're not in agreement

1  in principle?

2           MR. LUNN:  Look, I have a suggestion, Your Honor.

3           THE COURT:  Yeah, I just want to make sure we're

4  not leaving today with an open issue that's going to create a

5  problem.

6           MR. LUNN:  A hundred percent agree, and for the

7  record, Matthew Lunn from Young Conaway, on behalf of the

8  debtor.  Maybe we do this, we allow them to go to the back of

9  the courtroom for five or so minutes.

10          We take Canaccord --

11          THE COURT:  You can take Canaccord, that's fine.

12          MR. LUNN:  -- and then we just try to be as

13  efficient as possible, given the late hour.

14          THE COURT:  Yes, you can, certainly.

15          MR. LUNN:  Okay.

16          THE COURT:  And if you need to contact your

17  clients, go ahead.  But let's do Canaccord and then we'll see

18  where we are.

19          MR. LUNN:  Right.  Your Honor, may I approach with

20  a redline of the form of order for -- with respect to

21  Canaccord?

22          THE COURT:  Right.  And, actually, I just want to

23  make sure, is there anything else, in terms of presentation

24  to the Court on the sale motion that you'd like to put on the

25  record before we switch to Canaccord?

1          MR. LUNN:  Do you want to put anything on the

2  record?

3          MR. KESSELMAN:  Your Honor, Justin Kesselman from

4  the Committee.

5          Other than the comments that, you know, I made

6  previously, I would just like to commend the efforts of the

7  debtor, the buyer, Canaccord, Banc of California, all the

8  parties that negotiated very hard over the past month since

9  the Committee was appointed.  The Committee's concerns were

10  real.  I outlined those earlier.  We were very concerned

11  about the administratively insolvent estate with no

12  recoveries for general unsecured creditors.  We were very

13  concerned about certain aspects of the sale and certain

14  causes of action going out of the estate, and we were able to

15  resolve those concerns by finding a commercial solution, as

16  we talked about at the bid procedures hearing and as Your

17  Honor suggested.

18          So, we appreciate the Court's guidance throughout

19  this short case so far, chambers, and all the professionals

20  that have been involved to reach a result that the Committee

21  believes is commercially reasonable, but a good exercise of

22  the debtors' business judgment, and creates an opportunity

23  for unsecured creditors to achieve a recovery.

24          THE COURT:  Mr. Walker?

25          MR. WALKER:  Possibly.

1          MS. MIELKE:  I don't think so, Your Honor.  I

2    think it's, you know, we've set forth the terms.  We believe

3    it's in the debtors -- in the best interests of the estates

4    for the sale to be approved and we think this is the sale

5    that we can get under the circumstances and that we've run a

6    thorough process, so we'd ask that Your Honor approve it.

7          THE COURT:  Thank you.

8          Okay.  Now we'll turn to Canaccord.  Mr. Lunn?

9          MR. LUNN:  Thank you, Your Honor.  Matthew Lunn

10   from Young Conaway, again, for the record.

11         So, to say that the discussions, with respect to

12   the Canaccord fee, you know, is -- was long and protracted,

13   it was.  And if I may approach, Your Honor, there's been a

14   settlement, with respect to the underlying transaction fee

15   and the compensation.

16         THE COURT:  Okay.

17         MR. LUNN:  Your Honor, I don't believe that any of

18   the objections really went to the expertise or the

19   qualifications, the disinterestedness of Canaccord at all.  I

20   think what Your Honor has heard through the testimony from

21   Mr. Ley, as well as from others, that Canaccord has run a

22   process that yielded value to the debtors' estates, the

23   value-maximizing transaction that was able to ultimately get

24   the business sold as a going-concern.

25         So, the question ultimately came down to, what was

1   the reasonableness of their fee?  And with that, Your Honor,

2   multiple discussions.  There were multiple objections that

3   were filed -- I think Your Honor saw that -- by the U.S.

4   Trustee, by the buyer as a DIP lender, by the Committee, as

5   well as by Banc of California.

6          What I handed to Your Honor is a settlement that

7   effectively sets forth what the proposed fee will be for

8   Canaccord, and I'll direct Your Honor's attention to

9   paragraph 2 of the order.

10          THE COURT:  Uh-huh.

11          MR. LUNN:  It results -- the agreed-upon

12  resolution -- actually, I'll also say that the comments in

13  this order also reflect comments received from Ms. Leamy,

14  generally speaking.  So, the order, as I understand it, has

15  been agreed to by all the parties.

16          In essence, the economic resolution of the fee,

17  Your Honor, is the payment of $975,000 upon closing of the

18  sale to Project Crush Acquisition, which is the

19  (indiscernible) before Your Honor, obviously.  There's one

20  additional monthly fee of a hundred thousand dollars and

21  that's the amount that was included in the engagement letter.

22  Eighty percent of that is credited against the $975,000 to

23  pay a closing.  And then there's an additional expense

24  reimbursement of $499,000.99.

25          Canaccord is still required to file final fee

1 applications, interim and final, I assume would be one and

2 final and done.

3                THE COURT:  Uh-huh.

4                MR. LUNN:  And with that, Your Honor, that does

5 set forth, otherwise, the resolution.

6                Counsel for Canaccord is here, Mr. Brian Lennon,

7 from Willkie Farr & Gallagher, and Your Honor obviously know

8 that Mr. Ley, as well as his colleagues, Ms. Brault and Mr.

9 Hurley, are also in the courtroom.

10               Does Your Honor have any questions, with respect

11 to the settlement or disinterested or the declarations or

12 anything of the like?

13               THE COURT:  No, I don't.

14               Let me hear from anyone else who would like to be

15 heard.

16               MR. KESSELMAN:  Thank you, Your Honor.  Justin

17 Kesselman for the Committee.

18               I just wanted to, again, put on the record, our

19 appreciation of everyone's hard work to reach a resolution.

20 The Committee does withdraw its objection and the resolution

21 that's reflected in the revised terms of engagement reflects

22 the Committee's settlement.  The Committee will not object to

23 a final fee application by Canaccord, so long as it's in

24 accordance with the settlement reflected in the revised

25 retention.  And the Committee supports payment to Canaccord,

 1  consistent with the terms of the settlement and revised

 2  retention agreement.

 3          THE COURT:  Thank you.

 4          MR. KESSELMAN:  Thank you, Your Honor.

 5          THE COURT:  Ms. Leamy?

 6          MS. LEAMY:  Good afternoon.  Jane Leamy for the

 7  U.S. Trustee.  I just want to confirm that the revised order

 8  resolves the U.S. Trustee's objection, as well.

 9          THE COURT:  Thank you.

10          MS. LEAMY:  Thank you.

11          MR. LITVAK:  Your Honor, if I may, on behalf of

12  the bank?

13          THE COURT:  Mr. Litvak?

14          MR. LITVAK:  Your Honor, the revisions to the

15  order resolve the bank's objection, as well.  Thank you very

16  much.  And also the fact that we expect to be paid in full, I

17  think, resolves it, as well.

18      (Laughter)

19          THE COURT:  You suspect so.  Thank you.

20          And Mr. Lunn, remind me, the monthly fee of

21  100,000, the first three months were not credited.  It was

22  only after that, right?  So, this 80 percent of this hundred

23  thousand is a concession, correct?

24          MR. LUNN:  It is a concession; yes, Your Honor.

25          THE COURT:  Okay.  Anyone else?

1       (No verbal response)

2              THE COURT:  I read the application.  I read the

3   objections.  I do not have any concern about

4   disinterestedness and I think the resolution is an

5   appropriate one under the circumstances, and I appreciate

6   that that was able to be worked out with Canaccord,

7   recognizing the ultimate results and taking a look at an

8   appropriate, a more appropriate fee.  So, I will approve

9   this.

10             MR. LUNN:  Thank you, Your Honor.

11             I don't believe the order has been uploaded, but

12  we will upload it as soon as we get back to the office.

13             THE COURT:  Okay.

14             MR. LUNN:  I believe we're still missing some

15  people, so --

16             THE COURT:  So, let's take 10 minutes and let's

17  see if that can get resolved and you'll let me know.

18             MR. LUNN:  Will do.  Thank you, Your Honor.

19             THE COURT:  Okay.  We're in recess.

20         (Recess taken at 4:33 p.m.)

21         (Proceedings resumed at 4:50 p.m.)

22             THE COURT:  Mr. Lunn?

23             MR. LUNN:  Thank you, Your Honor.

24             I'm pleased to report that language has been

25  agreed to.  This language is going to find its way into the

1   TSA, which we will work on revising.  I think we'll be

2   submitting all of this under COC at some point, after

3   everyone's had a chance to look at it.  Given the hour,

4   probably first thing in the morning.

5           But the agreed-upon language that's going to be

6   added into the TSA is that "no product of any assumed lien

7   contracts," and that's a defined term in the settlement

8   agreement, "will be sold by the debtors or the purchasers,

9   without first complying with the California Food and

10  Agriculture Code producer lien with respect to such product."

11          THE COURT:  Okay.

12          MR. LUNN:  And with that, I believe we are

13  resolved.  I see them shaking their heads, so --

14          THE COURT:  Okay.  With that resolution, then, I

15  am prepared to approve the sale, which at this point, is --

16  there are no objections to the sale that remain unresolved.

17          The declarations that were put in evidence, the

18  declaration of Ms. Brault, the declaration of Mr. Ley are

19  sufficient to satisfy the evidentiary support for the sale of

20  this debtor, as related.  And in the declarations, the debtor

21  started this process pre-petition and continuing the process

22  post-petition, and the only prospective purchaser that came

23  forward and entered into an agreement is the stalking horse

24  bidder.  The stalking horse bidder, though, he was a founder

25  of the company many years ago, is not an insider and there is

1  no evidence of any collusion or any other inappropriate

2  behavior that would taint the process here.

3        These assets were marketed and while they did not

4  draw another prospective purchaser, a process was followed in

5  order to obtain a highest-and-best offer.

6        The need for the sale to go forward outside of a

7  plan of reorganization is apparent from the debtors'

8  liquidity position coming into the bankruptcy and with a pre-

9  petition loan that was due, and as I recall, it had been

10  extended prior to bankruptcy, at least once.

11        So, the process is fair.  The sale price is the

12  highest and best.  All of the objections have been resolved

13  and I will also make a good faith finding for the purchaser.

14        And I think that should be sufficient on this

15  uncontested record to approve the sale.  I will look forward

16  to receiving a revised form of order that's been circulated

17  and approved by all parties with a redline that shows me the

18  changes.  I didn't have an opportunity to review the

19  transition services agreement, but it has been represented to

20  the Court by both, the debtors and the purchaser, that the

21  purchaser is picking up the cost of the TSA itself and is

22  picking up the costs of the bankruptcy, to the extent that

23  the TSA is the cause of any additional administrative costs

24  of the bankruptcy case.

25        So, I believe that should be sufficient.  Are

1  there any questions?

2       (No verbal response)

3            THE COURT:  Okay.  Thank you very much, counsel.

4            COUNSEL:  Thank you, Your Honor.

5            THE COURT:  We're adjourned.

6       (Proceedings concluded at 4:55 p.m.)

7

8

9

10

11                        CERTIFICATION

12       We certify that the foregoing is a correct

13  transcript from the electronic sound recording of the

14  proceedings in the above-entitled matter to the best of our

15  knowledge and ability.

16

17  /s/ William J. Garling              January 18, 2023

18  William J. Garling, CET-543

19  Certified Court Transcriptionist

20  For Reliable

21

22  /s/ Mary Zajaczkowski               January 18, 2023

23  Mary Zajaczkowski, CET-531

24  Certified Court Transcriptionist

25  For Reliable