

**The New York Times Company**

620 8th Avenue
New York, NY 10018
nytimes.com

Sworn to me this 9th day of March, 2023

_____
Notary Public

Ellen Herb
Notary Public, State of New York
No. 01HE6163785
Qualified in New York County
Commission Expires April 2, 2023

# PROOF OF PUBLICATION

March 9, 2023

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

3/9/2023, NYT & NATL, pg B3

*Larnyce Tabron*

# U.S. and Europe Seek New Trade Deal to Resolve Climate Dispute

**By ANA SWANSON and ALAN RAPPEPORT**

WASHINGTON — American and European officials meeting here this week are trying to agree on the outlines of a limited trade deal that would allow European companies to qualify for some of the benefits of the Biden administration's new climate legislation, in a bid to assuage a major source of tension between the allies.

The governments hope to announce their intention to begin negotiations over such an agreement as soon as Friday, when President Biden is set to meet with Ursula von der Leyen, the president of the European Commission, at the White House.

American officials have also been carrying out similar conversations with the governments of Japan and the United Kingdom, to see if some type of limited new agreement could be struck that would also offer Japanese and British companies certain benefits under the law.

At the center of the debate is the Inflation Reduction Act, a $370 billion bill that President Biden signed last year to try to mitigate climate change by transforming U.S. power generation and the car industry. The bill offers generous tax credits to American consumers to purchase new and used electric vehicles, but it imposes tough restrictions on the types of vehicles that can benefit from these rules, in ways that disadvantage foreign carmakers.

The law specifies that, to receive a tax credit, cars must be assembled in North America and source the material for their batteries from North America, or from countries with which the United States has a free-trade agreement. Despite close ties, the United States does not have a free-trade agreement with the European Union, Japan or the United Kingdom.

The passage of the law has prompted harsh criticism from allies, who say companies in their countries will be penalized. European officials have been particularly outspoken, arguing that the bill comes at a delicate time for a European economy that is already contending with disruptions from the war in Ukraine and skyrocketing energy prices.

The dispute has raised the prospect of a subsidy war between the United States and the European Union, and threatened to strain relations at a time when both sides are trying to maintain a united front against Russia.

"I don't think U.S. government officials anticipated this level of pushback and this level of disdain against this massive climate bill," said Olga Khakova, the deputy director for European energy security at the Atlantic Council's Global Energy Center. But she said emotions had now subsided a bit. "We are in this mode right now where we want to find a solution."

The rift has set off a scramble within the U.S. government to try to scrape together some type of new trade deal that could be signed with allied governments to allow their companies to benefit from some of the law's tax credits. With such an agreement, for example, a company based in the European Union could help to supply lithium, nickel or other battery materials for electric vehicles made in North America.

The Treasury Department, in a white paper published in December, said that the Inflation Reduction Act did not define the term "free trade agreement," and that the Treasury secretary could identify additional free-trade agreements for the purposes of the critical-minerals requirement going forward.

Treasury Secretary Janet L. Yellen said last month that the Biden administration was considering limited trade deals focused on critical minerals as a solution, and she suggested that these could be done without the approval of Congress. She emphasized that the intent of the law was not for the United States to steal jobs from Europe and that the law was meant to be aligned with the administration's "friend-shoring" agenda.

"I think the word 'free trade' was meant to mean reliable friends and partners with whom we can feel we have secure supply chains," Ms. Yellen said on the sidelines of the Group of 20 finance ministers meetings in India last month. "We've been very clear with Europe that this is not a subsidy war."

With input from the Office of the United States Trade Representative, officials from the Treasury Department have prepared a document spelling out what kind of deal would constitute a "free-trade agreement" for the purposes of the legislation, according to people familiar with the plans.

It is not clear how quickly the solution could be finalized, however, as the white paper said the Treasury Department and the Internal Revenue Service would seek public comment on "what criteria should be used to identify free-trade agreements for the purposes of the critical-minerals requirement."



President Biden is set to meet on Friday with Ursula von der Leyen, the president of the European Commission. SAMUEL CORUM FOR THE NEW YORK TIMES

*Foreign carmakers say that the inflation bill has put them at a disadvantage.*

In a briefing last Friday, a European official said Europe and the United States could announce by the end of this week a commitment to forge a new limited trade deal, most likely focused on supply chains for critical minerals. Unlike a traditional free-trade agreement, which entails reducing barriers to trade between partners, this agreement would not involve lowering tariffs on either side, and the parties would aim to flesh out the agreement in days or weeks, rather than months, the European official said.

The official added that the agreement would need to be legally binding, and would still involve seeking some type of approval from European Union member states. In the United States, the agreement could come in the form of an executive order from the Biden administration, and without requiring the approval of Congress, the official suggested.

One irony is that neither the European Union nor the United States is a major source of the critical minerals needed for electric vehicle batteries. But some officials have suggested that the partnership would form a foundation for a group that could be expanded over time to include countries with larger supplies of lithium, cobalt, nickel and other minerals.

While analysts said a new deal with Europe could in practice satisfy the requirements of the law, it would not really resemble a free-trade agreement, as such agreements have come to be understood.

Free-trade deals are legal agreements that the World Trade Organization defines as covering "substantially all trade" between countries, including a broad range of goods and, typically, services. They usually take years to negotiate and, in the United States, require the approval of Congress.

Scott Lincicome, the director of general economics at the Cato Institute, said that the Biden administration's authority to strike such trade pacts was questionable but that it was unlikely that anyone would try to mount a legal challenge to them.

"Everyone in the room knows that this is not kosher, but there's not really anything anybody can do about it," Mr. Lincicome said.

Political appetite for striking new free-trade deals has diminished in the United States in recent years, in part because of a perception that such pacts have helped multinational corporations move factories and jobs offshore.

Efforts to strike expansive trade deals with Europe and a group of Asian countries during the Obama administration fizzled, in part because of that political opposition. During the Trump administration, the United States signed a series of limited trade deals with South Korea, Japan and China that were carried out through executive orders, not by congressional approval.

Edward Alden, a senior fellow at the Council on Foreign Relations, said that the limited deal would mollify the Europeans, and that U.S.-E.U. economic relations were too important "to not allow the Europeans under the tent in some way or another." But it could escalate complaints from other trading partners, like South Korea, that don't feel as though their concerns have been taken care of, he said.

South Korea already has a comprehensive free-trade agreement with the United States, but it has other criticisms of the climate law, centering on how the current terms exclude electric vehicles made by Hyundai from receiving tax credits. "Once you make accommodations for one, the pressure grows to make accommodations for others," he said.

It remains unclear how Congress will respond. Lawmakers have expressed concerns that the administration is not adhering to the law's original intent of promoting U.S. manufacturing. Many also disapprove of efforts by the executive branch to bypass congressional authority in approving trade deals.

But Democrats may also be sympathetic to the effort to smooth over relations with Europeans, and reluctant to reopen debate over their signature climate legislation. And at least one key lawmaker, Senator Joe Manchin III, Democrat of West Virginia, has said he didn't realize that the European Union lacked a free-trade agreement with the United States in the first place.

Still, the dispute has elicited some criticism that American officials are going to great lengths to mollify Europeans, especially given that the European Union imposes some trade barriers on the United States, like a relatively high tariff on imported U.S. cars.

John G. Murphy, the senior vice president for international policy at the U.S. Chamber of Commerce, said it was his group's view that the Biden administration should fight against various E.U. policies that discriminate against American companies "with the same doggedness European officials have brought to their complaints about the I.R.A."

---

# Swiss Bankers Are Charged With Aiding Putin Ally

**By NICK CUMMING-BRUCE**

Four bankers went on trial in Zurich on Wednesday, charged with helping to cover up the movement of tens of millions of Swiss francs through accounts opened in the name of a Russian musician with close links to President Vladimir V. Putin of Russia.

The case focuses on two bank accounts in the name of Sergei P. Roldugin, a concert cellist and director of a Moscow musical academy who is known as an old friend of Mr. Putin's and as a godfather to the president's eldest daughter. The accounts were opened in the Swiss unit of Gazprombank, a prominent lender in Russia.

The trial raises wider questions about the role of Swiss banks as the destination of choice for billions of dollars of deposits linked to Russian officials, oligarchs and ultimately to Mr. Putin, especially in the wake of Russia's invasion of Ukraine last year.

Swiss prosecutors say the defendants — Gazprombank's chief executive and three other employees at the bank — were criminally negligent in failing to perform robust due diligence to determine the real beneficiary of the assets flowing through the accounts. The bankers, three Russians and a Swiss, deny the charge.

The prosecutors contend the bankers should have suspected Mr. Roldugin was not the beneficial owner of those assets but only, as the indictment suggests, a "straw man" or "wallet" for Mr. Putin.

"It is well known," the indictment said, "that Russian President Putin officially only has an income of 100,000 Swiss francs, and is not wealthy, but in fact has enormous assets which are managed by persons close to him."

Prosecutors also drew attention to companies set up in Mr. Roldugin's name by Bank Rossiya, an institution whose chairman, the billionaire financier Yuri Kovalchuk, they said, "is considered Mr. Putin's treasurer."

Mr. Roldugin has acknowledged that he is not a businessman. He said in a 2014 interview that "I don't have millions," yet the accounts opened with Gazprombank credited him with holding assets of over $50 million and receiving over $8 million a year, the indictment said.



The trial of four bankers in Zurich raises questions about the role of Swiss banks as the destination of choice for billions linked to wealthy Russians. ENNIO LEANZA/KEYSTONE, VIA ASSOCIATED PRESS

In an interview on Russian television in 2016, Mr. Roldugin said his so-called wealth consisted mainly of donations from rich businessmen to finance the purchase of expensive musical instruments for Russian musicians.

Gazprombank opened the accounts in 2014, after Russia had annexed Crimea, and managed them until 2016. Their existence came to light in 2016 in the Panama Papers leak, which released more than 11 million documents with financial details of over 214,000 offshore business entities.

Switzerland's financial market regulator, FINMA, started an investigation soon after the leak, leading eventually to the criminal charges filed by prosecutors against Gazprombank.

Switzerland has taken steps to clean up its reputation as a haven for dirty money, and Wednesday's one-day trial attracted interest as evidence of Swiss authorities holding bankers to account. It has also drawn criticism, however, for the leniency of the penalties sought by prosecutors. They asked for a suspended sentence of seven months, with two years of probation, for each defendant.

"That's absurd if you want to change the environment for bankers laundering money for Russian officials," William F. Browder, the British-based financier and campaigner against corruption in Russia, said in a phone interview. "They should face custodial sentences, not a slap on the wrist."

The proceedings provide another example of how "Switzerland wants to be seen to be doing something but doesn't want to be tough," said Mr. Browder, once a major investor in Russia who started a campaign for sanctions against corrupt Russian officials after his tax adviser, Sergei Magnitsky, was detained, severely beaten and left to die in prison.

In 2021, the Swiss authorities closed a decade-long investigation into a money-laundering scandal involving funds siphoned off by Russian officials into Swiss bank accounts, without pressing charges. In January, the authorities decided to return to Russia more than $14 million of the funds frozen in that investigation and held in accounts in Credit Suisse and UBS.

---

# California Cuts Off Walgreens Over Stance on Abortion Pill

**By KATIE ROBERTSON**

The governor of California said on Wednesday that he would not renew a multimillion-dollar contract with Walgreens, after the pharmacy chain announced that it would stop selling an abortion pill in 21 states that had threatened legal action.

The governor, Gavin Newsom, a Democrat, said he had directed the California Department of General Services to notify Walgreens that it would withdraw a planned renewal of the contract that was supposed to take effect on May 1. He said the state had paid Walgreens $54 million over the life of the contract, which allowed it to get specialty prescription drugs that were mostly used by the Department of Corrections and Rehabilitation.

"California will not stand by as corporations cave to extremists and cut off critical access to reproductive care and freedom," Mr. Newsom said in a statement.

Walgreens has found itself in the middle of the intense political and legal debate over abortion rights since the Supreme Court last year overturned Roe v. Wade, the 1973 decision that established a federal constitutional right to abortion. After Republican attorneys general in 21 states threatened legal action against pharmacy chains that sold the abortion pill mifepristone, Walgreens said it would no longer distribute the drug in those states.

The pharmacy chain's decision was met with instant backlash from some customers and politicians in Democratic-led states. Mr. Newsom said on Monday that California would stop doing business with Walgreens and that he had ordered a review of all of the state's contracts with the company.

Fraser Engerman, a spokesman for Walgreens, said in an email on Wednesday that the company was "deeply disappointed" by California's decision "not to renew our longstanding contract due to false and misleading information."

"Walgreens is facing the same circumstances as all retail pharmacies, and no other retail pharmacies have said that they would approach this situation differently, so it's unclear where this contract would now be moved," he said.

Mr. Engerman said the company's position had always been to sell the abortion pill where it was legally allowed to do so.

"We will dispense this medication consistent with federal and state laws," he added.

---

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

In re: WINC, INC., et al.,[1] Debtors.

Chapter 11
Case No. 22-11238 (LSS)
(Jointly Administered)
Ref. Docket No. 277

**NOTICE OF (I) DEADLINE FOR FILING OF PROOFS OF CLAIM BY CREDITORS ON OR BEFORE APRIL 5, 2023 AT 5:00 P.M. AND (II) DEADLINE REQUIRING FILING OF PROOFS OF CLAIM BY GOVERNMENTAL UNITS ON OR BEFORE MAY 30, 2023 AT 5:00 P.M.**

The United States Bankruptcy Court for the District of Delaware (the "Court"), having jurisdiction over the chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), has entered an order [Docket No. 277] (the "Bar Date Order") establishing (i) April 5, 2023 at 5:00 p.m. (prevailing Eastern Time) as the deadline by which each person or entity (including, without limitation, individuals, partnerships, corporations, joint ventures, and trusts), other than governmental units, must file a proof of claim (each, a "Proof of Claim") based on any asserted claims against the Debtors that arose prior to the Petition Date (as defined below), *including requests for allowance and payment of claims under section 503(b)(9) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532* (the "Bankruptcy Code") *for goods delivered and received by the Debtors in the 20 days prior to the Petition Date* (the "General Bar Date") (ii) May 30, 2023 at 5:00 p.m. (prevailing Eastern Time) as the deadline by which any governmental unit (as such term is defined in section 101(27) of the Bankruptcy Code) must file Proofs of Claim against the Debtors (the "Government Bar Date"), and (iii) April 5, 2023 at 5:00 p.m. (prevailing Eastern Time) as the deadline by which any holder of a claim allowable under section 503(b) or 507(a)(2) of the Bankruptcy Code as an expense of administration of the Debtors' estates that arose during the period from the Petition Date (as defined below) through and including January 31, 2023 must file Proofs of Claim against the Debtors (the "Administrative Claims Bar Date" and together with the General Bar Date, the Government Bar Date, the Rejection Bar Date, and the Supplemental Schedules Bar Date (as defined below), and the Supplemental Bar Date (as defined below) the "Bar Dates"). The Bar Date Order, the Bar Dates, as applicable, and the procedures set forth below for the filing of Proofs of Claim apply to all claims against the Debtors that arose prior to November 30, 2022 (the "Petition Date"), on which day each of the Debtors commenced chapter 11 cases under the Bankruptcy Code (the "Chapter 11 Cases").

**1. WHO MUST FILE A PROOF OF CLAIM**
You MUST file a Proof of Claim to vote on any chapter 11 plan filed by the Debtors or to share in distributions from the Debtors' bankruptcy estates if you have a claim (as defined in section 101(5) of the Bankruptcy Code) that arose prior to the Petition Date and it is not one of the other types of claims described in Section 2 below. Acts or omissions of the Debtors that arose before the Petition Date may give rise to claims against the Debtors that must be filed by the applicable Bar Date, notwithstanding that such claims may not have matured or become fixed or liquidated prior to the Petition Date.
Under section 101(5) of the Bankruptcy Code and as used herein, the word "claim" means (i) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

**2. PARTIES WHO NEED NOT FILE A PROOF OF CLAIM**
The following persons or entities *are not required* to file a Proof of Claim on or before the applicable Bar Date:
(a) any person or entity whose claim is listed on the Debtors' *Schedules of Asset and Liabilities* [Docket Nos. 93, 95, and 97] (the "Schedules") and (i) whose claim is not described therein as "disputed," "contingent," or "unliquidated," (ii) who does not dispute the amount, priority, or nature of the claim as set forth in the Schedules, and (iii) who does not dispute that the claim as listed in the Schedules is an obligation of the specific Debtor against which the claim is listed;
(b) any person or entity whose claim has been paid in full;
(c) any person or entity that holds a direct or indirect interest in any of the Debtors, which interest is based exclusively upon the ownership of membership interests, or rights to purchase, sell, or subscribe to such an interest; *provided, however*, that interest holders who wish to assert claims (as opposed to ownership interests) against any of the Debtors, including, without limitation, claims that arise out of or relate to the ownership or purchase of an interest, or the sale, issuance, or distribution of the interest, must file Proofs of Claim on or before the applicable Bar Date unless another exception identified herein applies;
(d) any person or entity that holds a claim that has been allowed by a final order of this Court entered on or before the applicable Bar Date;
(e) any holder of a claim for which a separate deadline is fixed by this Court;
(f) any holder of a claim against the Debtors that has previously been properly filed with the Clerk of the Court or with the Claims Agent (utilizing a claim form that substantially conforms to the Proof of Claim Form);
(g) any current officer or director of any of the Debtors;
(h) any Debtor holding a claim against another Debtor;
(i) any person or entity holding a claim payable to the Court or the United States Trustee Program pursuant to 28 U.S.C. § 1930; and
(j) any other person or entity asserting a prepetition claim which by order of the Court is not required to file a proof of claim.
This Notice is being sent to many persons and entities that have had some relationship with or have done business with the Debtors, but may not have a claim against the Debtors. The fact that you have received this Notice does not mean that you have a claim against the Debtors or that the Debtors or the Court believe that you have such a claim.
**YOU SHOULD NOT FILE A PROOF OF CLAIM IF YOU DO NOT HAVE A CLAIM AGAINST ANY OF THE DEBTORS.**
If the Debtors amend or supplement their Schedules subsequent to the mailing of this Bar Date Notice to reduce the undisputed, noncontingent, and liquidated amount of a claim, to change the nature, priority, or classification of a claim, or to add a new claim, they will provide notice of any amendment or supplement of their Schedules to the holders of the claims affected thereby within five (5) business days of filing any such amendment or supplement. Holders of the claims affected thereby must file Proofs of Claim with respect to such claims by the later of (i) the applicable Bar Date and (ii) 5:00 p.m. (prevailing Eastern Time) on the date that is twenty-one (21) days from the date on which notice is served (the "Supplemental Schedules Bar Date"); *provided, however*, that any affected party who filed a Proof of Claim prior to the date on which the Debtors file an amendment or supplement to their Schedules shall not be required to file another Proof of Claim if the claim set forth in such Proof of Claim is not affected by the amendment or supplementation.

**3. EXECUTORY CONTRACTS AND UNEXPIRED LEASES**
If you hold a claim arising from the rejection of an executory contract or unexpired lease, then you must file a Proof of Claim based on such rejection on or before the later of (i) 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days after the date of entry of an order approving the rejection of the executory contract or unexpired lease or (ii) the General Bar Date (the "Rejection Bar Date"). Notwithstanding the foregoing, if you are a party to an executory contract or unexpired lease and you assert a claim (other than a rejection damages claim) on account of unpaid amounts accrued and outstanding as of the Petition Date pursuant to such executory contract or unexpired lease, you must file a Proof of Claim for such amounts on or before the General Bar Date or Government Bar Date, as applicable, unless you are expressly excluded from filing a Proof of Claim by the Bar Date Order.

**4. WHEN AND WHERE TO FILE**
All original Proofs of Claim must be filed so as to be received on or before the applicable Bar Date at 5:00 p.m. (prevailing Eastern Time) either (i) electronically through the Claims Agent's website at https://dm.epiq11.com/Winc or (ii) by first-class mail overnight delivery service, or hand delivery at the following address: If by First-Class Mail: Winc, Inc. Claims Processing Center, c/o Epiq Corporate Restructuring, LLC, P.O. Box 4419, Beaverton, OR 97076-4419. If by Hand Delivery or Overnight Mail: Winc, Inc. Claims Processing Center, c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Blvd., Beaverton, OR 97005.
**PROOFS OF CLAIM WILL BE DEEMED TIMELY FILED ONLY IF ACTUALLY RECEIVED BY THE CLAIMS AGENT ON OR BEFORE THE APPLICABLE BAR DATE AT 5:00 P.M. (PREVAILING EASTERN TIME). PROOFS OF CLAIM MAY NOT BE DELIVERED BY FACSIMILE, TELECOPY, OR EMAIL.**

**5. WHAT TO FILE**
The Debtors may provide you with a proof of claim form (the "Proof of Claim Form") for use in the Chapter 11 Cases. If your claim is scheduled by the Debtors (and not scheduled as disputed, contingent, or unliquidated), the form also may set forth the amount of your claim as scheduled by the Debtors and the specific Debtor against which the claim is scheduled. You will receive a different Proof of Claim Form for each claim scheduled in your name by the Debtors. You may use the proof of claim form(s) provided by the Debtors to file your claim.
IF YOU FILE A PROOF OF CLAIM, YOUR FILED PROOF OF CLAIM MUST (I) BE WRITTEN IN THE ENGLISH LANGUAGE; (II) DENOMINATE THE CLAIM IN LAWFUL CURRENCY OF THE UNITED STATES AS OF THE PETITION DATE; (III) CONFORM SUBSTANTIALLY WITH THE PROOF OF CLAIM FORM; (IV) BE SIGNED BY THE CLAIMANT OR BY AN AUTHORIZED AGENT OF THE CLAIMANT; (V) INDICATE THE PARTICULAR DEBTOR AGAINST WHICH THE CLAIM IS ASSERTED; (VI) SET FORTH THE LEGAL AND FACTUAL BASIS FOR THE ALLEGED CLAIM; AND (VII) INCLUDE SUPPORTING DOCUMENTATION (OR, IF SUCH DOCUMENTATION IS VOLUMINOUS, INCLUDE A SUMMARY OF SUCH DOCUMENTATION) AND AN EXPLANATION AS TO WHY SUCH DOCUMENTATION IS NOT AVAILABLE; *PROVIDED, HOWEVER,* THAT A PROOF OF CLAIM MAY BE FILED WITHOUT SUPPORTING DOCUMENTATION UPON THE PRIOR WRITTEN CONSENT OF THE DEBTORS.
Vendors of goods may be entitled to assert claims arising prior to the Petition Date under section 503(b)(9) of the Bankruptcy Code to the extent that they delivered goods to the Debtors within the 20-day period prior to the Petition Date. The Court has deemed the filing of a proof of claim as satisfying the procedural requirements for asserting such a claim arising under the Bankruptcy Code. In addition to meeting all the other requirements of the immediately preceding paragraph above, any Proof of Claim asserting a section 503(b)(9) claim must (i) include the value of the goods delivered to and received by the Debtors in the 20 days prior to the Petition Date, (ii) attach any documentation identifying which of the Debtors the goods were shipped to and the date such goods were received by such Debtors, (iii) state whether the amount asserted in the Proof of Claim represents a combination of goods and services and, if applicable, the portion of the claim that relates solely to the value of goods, and (iv) attach any documentation identifying the particular invoices for which the section 503(b)(9) claim is being asserted.
Holders of all claims must file Proofs of Claim Forms may be obtained from the Claims Agent website: https://dm.epiq11.com/Winc. Proof of Claim Forms may also be obtained from the Court's website: www.deb.uscourts.gov.

**6. CONSEQUENCES OF FAILURE TO FILE A PROOF OF CLAIM BY THE APPLICABLE BAR DATE**
EXCEPT WITH RESPECT TO CLAIMS OF THE TYPE SET FORTH IN SECTION 2 ABOVE, OR UNLESS OTHERWISE ORDERED BY THE COURT, ANY HOLDER OF A CLAIM AGAINST ANY OF THE DEBTORS WHO IS REQUIRED, BUT FAILS, TO FILE A PROOF OF SUCH CLAIM IN ACCORDANCE WITH THE BAR DATE ORDER ON OR BEFORE THE APPLICABLE BAR DATE SHALL NOT BE TREATED AS A CREDITOR WITH RESPECT TO SUCH CLAIM FOR THE PURPOSES OF VOTING AND DISTRIBUTION IN THE CHAPTER 11 CASES.

**7. THE DEBTORS' SCHEDULES AND ACCESS THERETO**
You may be listed as the holder of a claim against the Debtors in the Schedules. Copies of the Schedules and the Bar Date Order may be examined by interested parties on the Court's electronic docket for the Chapter 11 Cases, which is available at http://www.deb.uscourts.gov (a PACER login and password are required and can be obtained through the PACER Service Center at http://www.pacer.psc.uscourts.gov). Additionally, electronic copies of the Schedules and the Bar Date Order may be viewed free of charge at the Debtors' Claims Agent's website at https://dm.epiq11.com/Winc. Copies of the Schedules may also be examined by interested parties between the hours of 8:00 a.m. and 4:00 p.m. (prevailing Eastern Time) at the office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801.

**8. ADDITIONAL INFORMATION**
If you require additional information regarding the contents hereof, you may contact the Claims Agent's restructuring center for the Debtors by phone at (855) 608-2412 (U.S. and Canada) or +1 (503) 461-3028 (Outside the U.S.) or by email at Wincinfo@epiqglobal.com. Please be advised that the Claims Agent is not permitted to provide legal advice.
Dated: March 6, 2023, Wilmington, Delaware YOUNG CONAWAY STARGATT & TAYLOR, LLP /s/ Joshua B. Brooks, Michael R. Nestor (No. 3526) Matthew B. Lunn (No. 4119) Allison S. Mielke (No. 5934) Joshua B. Brooks (No. 6765) Shella Borovinskaya (No. 6758) Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Telephone: (302) 571-6600, Facsimile: (302) 571-1253, Email: mnestor@ycst.com, mlunn@ycst.com, amielke@ycst.com, jbrooks@ycst.com, sborovinskaya@ycst.com, *Counsel to the Debtors and Debtors in Possession*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Winc, Inc. (8960); BWSC, LLC (0899); and Winc Lost Poet, LLC (N/A). The Debtors' mailing address for purposes of these chapter 11 cases is 12405 Venice Boulevard, Box #1, Los Angeles, CA 90066.
[2] The Debtors reserve all rights with respect to such claims, including, without limitation, to assert that such claims are subject to subordination pursuant to section 510(b) of the Bankruptcy Code.