**<u>EXHIBIT A</u>**

**Revised Proposed Confirmation Order**

30628628.1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| WINC, INC., *et al.*,[1] | Case No. 22-11238 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Ref.  Docket Nos. 403 & 444** |

**ORDER APPROVING AND CONFIRMING THE COMBINED DISCLOSURE
STATEMENT AND JOINT CHAPTER 11 PLAN OF WINC, INC.
AND ITS AFFILIATED DEBTORS**

Upon consideration of the (i) *Combined Disclosure Statement and Joint Chapter 11 Plan of Winc, Inc. and Its Affiliated Debtors* [Docket No. 444] (as amended, modified or supplemented, the "Combined Disclosure Statement and Plan"),[2] attached hereto as **Exhibit A**; and (ii) *Debtors' and Official Committee of Unsecured Creditors' Joint Motion for Entry of an Order (I) Approving the Combined Disclosure Statement and Joint Chapter 11 Plan on an Interim Basis; (II) Establishing Solicitation and Tabulation Procedures; (III) Approving the Form of Ballot and Solicitation Materials; (IV) Establishing the Voting Record Date; (V) Fixing the Date, Time, and Place for the Confirmation Hearing and the Deadline for Filing Objections Thereto; and (VI) Granting Related Relief* [D.I. 376] (the "Solicitation Procedures Motion") filed by the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") and the Official Committee of Unsecured Creditors appointed in the Debtors' Chapter 11 Cases (the "Committee," and together with the Debtors, the "Plan Proponents"); and this Court, by order dated June 27, 2023 [D.I. 402] (the "Solicitation Procedures Order"), having conditionally

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Winc, Inc. (8960); BWSC, LLC (0899); and Winc Lost Poet, LLC (N/A).  The Debtors' mailing address for purposes of these chapter 11 cases is 12405 Venice Boulevard, Box #1, Los Angeles, CA 90066.

[2]  Capitalized terms used not defined herein shall have the meanings given to them in the Combined Disclosure Statement and Plan or in the Solicitation Procedures Order, as applicable.

approved the Combined Disclosure Statement and Plan for solicitation purposes and authorizing

the Debtors to solicit approvals for the Combined Disclosure Statement and Plan; and the Debtors

having filed the documents comprising the Plan Supplement on July 20, 2023 [D.I. 429] and July

28, 2023 [D.I. 440]; and having considered the *Declaration of Carol Brault in Support of*

*Confirmation of the Combined Disclosure Statement and Joint Chapter 11 Plan of Winc, Inc. and*

*Its Affiliated Debtors* [D.I. 446]; and having considered the creditor support for the Combined

Disclosure Statement and Plan as evidenced on the record and in the *Declaration of Emily Young*

*of Epiq Corporate Restructuring, LLC Regarding the Solicitation and Tabulation of Ballots Cast*

*on Combined Disclosure Statement and Joint Chapter 11 Plan of Winc, Inc. and Its Affiliated*

*Debtors* [D.I. 445] (the "Voting Declaration"); and there being filed no objections or reservations

of rights pertaining to final approval and confirmation of the Combined Disclosure Statement and

Plan; and a hearing having been held on August 3, 2023 regarding final approval and confirmation

of the Combined Disclosure Statement and Plan (the "Hearing"); and upon the evidence adduced

and proffered and the arguments of counsel made at the Hearing; and this Court having reviewed

all documents in connection with confirmation and having heard all parties desiring to be heard;

and upon the record in the Chapter 11 Cases; and after due deliberation and consideration of all of

the foregoing; and sufficient cause appearing therefor; this Court hereby makes the following:

**FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

        A.     The findings and conclusions set forth herein and on the record of the

Hearing constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the

Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.

To the extent any of the following findings of fact constitute conclusions of law, they are adopted

as such.  To the extent any of the following conclusions of law constitute findings of fact, they are

adopted as such.

30563047.8

B.      This Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 1334(a) and 157(1) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  Venue of these proceedings and the Chapter 11 Cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2) and this Court may enter a final order hereon under Article III of the U.S. Constitution.

C.      On June 5, 2023, the Debtors filed the initial version of the Combined Disclosure Statement and Plan [D.I. 375], which was later revised on June 27, 2023 [D.I. 403] and August 1, 2023 [D.I. 444].  The filing of the Combined Disclosure Statement and Plan satisfies the requirements of Bankruptcy Rule 3016 and Local Rule 3017-2.

D.      As evidenced by the affidavits of service filed on July 7, 2023 [D.I. 413] and July 12, 2023 [D.I. 415] (together, the "Affidavits of Service"), and the Voting Declaration, the Debtors caused the Ballots to be distributed as required by sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, the Local Rules, all other applicable provisions of the Bankruptcy Code, the Solicitation Procedures Order, and all other rules, laws and regulations applicable to such solicitation.  The solicitation materials were transmitted in accordance with the Solicitation Procedures Order.  Sufficient time in accordance with the applicable Bankruptcy Rules and Local Rules was provided for the Voting Class to accept, reject or object to confirmation of the Combined Disclosure Statement and Plan.  Such transmittal and service was adequate and sufficient under the circumstances and no other or further notice is or shall be required.

E.      As evidenced by the Affidavits of Service, the Debtors have provided proper, adequate, and sufficient notice of the Combined Disclosure Statement and Plan and

Confirmation Hearing, as required by Bankruptcy Rule 3017(d), to all Holders of Claims and Interests and all other parties in interest, and no other or further notice is or shall be required.

F.     The solicitation of acceptance or rejection of the Combined Disclosure Statement and Plan has been fair, properly conducted, in good faith, and in compliance with applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Local Rules, the Solicitation Procedures Order, and all other rules, laws and regulations applicable to such solicitation.

G.     The Combined Disclosure Statement and Plan complies with all of the applicable provisions of the Bankruptcy Code including, but not limited to those regarding the (i) proper classification of Claims and Interests (sections 1122, 1123(a)(i) of the Bankruptcy Code); (ii) specification of Unimpaired Classes (section 1123(d)(2) of the Bankruptcy Code); (iii) specification of treatment of Impaired Classes (section 1123(a)(3) of the Bankruptcy Code); (iv) provision for the equal treatment of each Claim or Interest within a particular class (section 1123(a)(4) of the Bankruptcy Code); (v) provision for adequate and proper means of implementation (section 1123(a)(5) of the Bankruptcy Code); (vi) prohibition against the issuance of non-voting equity securities (section 1123(a)(6) of the Bankruptcy Code); (vii) manner of selection of the Creditor Trustee and the Post- Effective Date Debtor Representative (section 1123(a)(7) of the Bankruptcy Code); and (viii) inclusion of additional Plan provisions permitted to effectuate and implement the transactions contemplated by the Combined Disclosure Statement and Plan (section 1123(b) of the Bankruptcy Code); and, thus, the Combined Disclosure Statement and Plan satisfies section 1129(a)(1) of the Bankruptcy Code.

H.     As required by section 1129(a)(2) of the Bankruptcy Code, the Plan Proponents have complied with the Bankruptcy Code, Bankruptcy Rules, Local Rules, Solicitation

Procedures Order, all other rules, laws and regulations applicable to such solicitation, and other orders of this Court.

I.     The Combined Disclosure Statement and Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code and not by any means forbidden by law, thus satisfying section 1129(a)(3) of the Bankruptcy Code.

J.     Any payments made or promised by the Debtors for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Combined Disclosure Statement and Plan and incident to the Chapter 11 Cases, have been approved by, or are subject to approval of this Court as reasonable, thus satisfying section 1129(a)(4) of the Bankruptcy Code.

K.     The identity of, and the terms of the proposed compensation to be paid to, the Creditor Trustee and the Post-Effective Date Debtor Representative is consistent with the interests of the Debtors' creditors and Holders of Interests and with public policy and thus, the Combined Disclosure Statement and Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

L.     The provisions of section 1129(a)(6)of the Bankruptcy Code are inapplicable to the Chapter 11 Cases.

M.     As evidenced by the Combined Disclosure Statement and Plan and at the Hearing, each Holder of a Claim or Interest in each Impaired Class has either accepted the Combined Disclosure Statement and Plan or will receive or retain under the Combined Disclosure Statement and Plan property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors liquidated under chapter 7 on such date. Thus, the Combined Disclosure Statement and Plan satisfies section 1129(a)(7) of the Bankruptcy Code.

N.      Class 3 voted to accept the Combined Disclosure Statement and Plan.  The Claims in Classes 1 and 2 are not Impaired under the Combined Disclosure Statement and Plan and the Holders of such Claims are, therefore, deemed to have accepted the Combined Disclosure Statement and Plan under section 1126(f) of the Bankruptcy Code, thus satisfying section 1129(a)(8) of the Bankruptcy Code.  The remaining Classes of Claims and Interests are Impaired by the Combined Disclosure Statement and Plan and are not entitled to receive or retain any property under the Combined Disclosure Statement and Plan and, therefore, are deemed to have rejected the Combined Disclosure Statement and Plan pursuant to section 1126(g) of the Bankruptcy Code.  As found and determined below, pursuant to section 1129(b)(1) of the Bankruptcy Code, the Combined Disclosure Statement and Plan may be confirmed notwithstanding the fact that such Classes are Impaired and are deemed to have rejected the Combined Disclosure Statement and Plan.

O.      Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the treatment of Claims under the Combined Disclosure Statement and Plan of the type specified in sections 507(a)(1) and 507(a)(3)–(a)(8) of the Bankruptcy Code, if any, complies with the provisions of section 1129(a)(9) of the Bankruptcy Code.

P.      At least one Impaired Class of Claims has accepted the Combined Disclosure Statement and Plan, determined without including any acceptances of the Combined Disclosure Statement and Plan by any insider.  Thus, the Combined Disclosure Statement and Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

Q.      The Combined Disclosure Statement and Plan provides for adequate means for its implementation, is feasible and, thus, satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

R.      No Debtor offered "retiree benefits," as that term is used in the Bankruptcy Code, was required to pay a domestic support obligation, or is an individual.  Accordingly, sections 1129(a)(13)–(15) of the Bankruptcy Code are inapplicable.

S.      The Debtors are moneyed, business, or commercial corporations. Accordingly, section 1129(a)(16) of the Bankruptcy Code is inapplicable.

T.      The primary purpose of the Combined Disclosure Statement and Plan is not the avoidance of taxes or the requirements of Section 5 of the Securities Act of 1933.

U.      The Plan Proponents have acted in good faith with respect to the formulation, solicitation and confirmation of the Combined Disclosure Statement and Plan pursuant to section 1125(e) of the Bankruptcy Code.

V.      Holders of Claims and Interests in Classes 4, 5(a), 5(b), and 5(c) are deemed to have rejected the Combined Disclosure Statement and Plan.  Based upon the evidence proffered, adduced, and presented by the Debtors at the Confirmation Hearing, the Combined Disclosure Statement and Plan does not discriminate unfairly and is fair and equitable with respect to the aforementioned Classes, as required by sections 1129(b)(1) and (b)(2) of the Bankruptcy Code. Thus, the Combined Disclosure Statement and Plan may be confirmed notwithstanding the deemed rejection of the Combined Disclosure Statement and Plan by the Holders of Claims and Interests in Classes 4, 5(a), 5(b), and 5(c).

W.      The transactions contemplated pursuant to the Combined Disclosure Statement and Plan are essential elements of the Combined Disclosure Statement and Plan,

proposed in good faith, critical to the Combined Disclosure Statement and Plan, and in the best interests of the Debtors, their Estates, all Holders of Claims, all Holders of Interests, and all other parties in interest.  All of the documents to be executed and delivered in connection with such transactions were negotiated and proposed, and will be or have been entered into, in good faith, without collusion, and from arm's-length bargaining positions.  All of such documents are, or will be, valid, binding, and enforceable agreements.

X.      Section 9.2 of the Combined Disclosure Statement and Plan provides for the substantive consolidation of the Debtors for all purposes related to the Combined Disclosure Statement and Plan, as set forth threin, including, without limitation, voting, confirmation, and Distributions thereunder.  Based on the record of the Chapter 11 Cases, the acceptance of the Combined Disclosure Statement and Plan by the Voting Classes, and in the absence of any objections by parties impacted by the consolidation to such request, this Court finds that such substantive consolidation of the Debtors and their Estates is justified and appropriate in the Chapter 11 Cases for purposes of the Combined Disclosure Statement and Plan and the Distributions thereunder.

Y.      As a result of the foregoing, the Combined Disclosure Statement and Plan satisfies all applicable confirmation requirements.

Z.      This Court may retain jurisdiction over the matters set forth in Article XV of the Combined Disclosure Statement and Plan.

**ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:**

1.      The Combined Disclosure Statement and Plan is approved and confirmed pursuant to section 1129 of the Bankruptcy Code.  All ancillary Combined Disclosure Statement

and Plan documents necessary for implementing the Combined Disclosure Statement and Plan, including those in the Plan Supplement, are approved.

2.     The Combined Disclosure Statement and Plan is approved on a final basis as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

3.     Any objections to the adequacy of the information contained in the Combined Disclosure Statement and Plan or confirmation of the Combined Disclosure Statement and Plan not otherwise withdrawn, resolved or otherwise disposed of are overruled and denied.

4.     Subject to the provisions of the Combined Disclosure Statement and Plan, in accordance with section 1141(a) of the Bankruptcy Code, and notwithstanding any otherwise applicable law, upon the occurrence of the Effective Date, the terms of the Combined Disclosure Statement and Plan and this Confirmation Order shall be binding upon, and inure to the benefit of (i) the Debtors and the Post-Effective Date Debtors; (ii) the Creditor Trust; (iii) any and all Holders of Claims or Interests (irrespective of whether any of such Claims or Interests are Impaired under the Combined Disclosure Statement and Plan or whether the Holders of such Claims or Interests accepted, rejected or are deemed to have accepted or rejected the Combined Disclosure Statement and Plan, or whether such Holders filed a proof of claim or interest); (iv) any other Entity giving, acquiring or receiving property under the Combined Disclosure Statement and Plan; (v) any and all non-Debtor parties to any Executory Contract; (vi) the Creditor Trustee, in his capacity as such; (vii) the Post-Effective Date Debtor Representative, in his capacity as such; and (viii) the respective Affiliates, officers, directors, agents, representatives, attorneys, successors or assigns, if any, of any of the foregoing.

5.     The Debtors shall remain debtors-in-possession under the Bankruptcy Code until the Effective Date.  As of the Effective Date, the Post-Effective Date Debtors, Post-Effective

Date Debtor Representative, and/or the Creditor Trustee, as applicable, are hereby authorized to wind up the Debtors' affairs and may make distributions after the Effective Date in accordance with this Confirmation Order and the Combined Disclosure Statement and Plan.  The terms of the Combined Disclosure Statement and Plan shall govern the classification of Claims and Interests for purpose of Distributions to be made thereunder.

6.      The appointment of Brian K. Ryniker as the Creditor Trustee and Brian Ayers as the Post-Effective Date Debtor Representative and the terms of the proposed compensation thereof are hereby approved.  The Creditor Trustee and the Post-Effective Date Debtor Representative shall have such rights, powers, and duties and shall receive such compensation as is provided for in the Combined Disclosure Statement and Plan, this Confirmation Order, and the Creditor Trust Agreement.

7.      Except as otherwise expressly provided under the Combined Disclosure Statement and Plan or herein, any and all Executory Contracts that have not been assumed or assumed and assigned by the Debtors as of the Effective Date shall be deemed rejected effective as of the Effective Date.  For the avoidance of doubt, to the extent executory, the APA, TSA, MSA, and/or other ancillary documents that are related to the 363 Sale, shall be assumed by the Debtors or the Post-Effective Date Debtors, as applicable.

8.      On the Effective Date, the Committee shall be dissolved as provided by Section 16.7 of the Combined Disclosure Statement and Plan and the members of the Committee and the Professionals retained by the Committee shall be deemed released from their respective fiduciary obligations, duties, and responsibilities, subject to the rights set forth therein. Notwithstanding the foregoing, Professionals retained by the Committee shall be entitled to prosecute their respective Professional Fee Claims.

30563047.8

9.      On the Effective Date, the engagement of each Professional retained by the Debtors shall be terminated without further order of the Bankruptcy Court; *provided*, *however*, such Professional shall be entitled to prosecute their respective Professional Fee Claims.

10.     As of the Effective Date, each member of the existing board of directors or managers, as applicable, and other governing bodies of each of the Debtors shall be deemed to have been removed, in each case without any further action required on the part of the Debtors or the Debtors' directors, officers, managers, shareholders, or members, and without further notice to or order of this Court, act or action under applicable law, regulation, order, rule or the vote, consent, authorization or approval of any person or Entity.

11.     Unless required to be filed by an earlier date by another order of this Court, any Holder of an Administrative Claim, other than a Professional Fee Claim or a claim for U.S. Trustee Fees, must (a) file with this Court a request for payment of such Administrative Claim (an "Administrative Claim Request") so as to be received by the Administrative Claim Bar Date, which shall be 5:00 p.m. (prevailing Eastern Time) on the date that is forty-five (45) days after the Effective Date Notice is filed and served and (b) serve such Administrative Claims Request on (i) the Creditor Trust, (ii) the U.S. Trustee, and (iii) all parties requesting notice pursuant to Bankruptcy Rule 2002.  Such request must include at a minimum:  (a) the name of the Debtor(s) that are purported to be liable for the Administrative Claim; (b) the name of the Holder of the Administrative Claim; (c) the amount of the Administrative Claim; (d) the basis of the Administrative Claim; and (e) all supporting documentation for the Administrative Claim.  Any Administrative Claim that is not timely filed as set forth above will be forever barred, and Holders of such Administrative Claims will not be able to assert such Claims in any manner against the Creditor Trust, Creditor Trustee, the Post-Effective Date Debtors, the Post-Effective Date Debtor

Representative, the Debtors, or their Estates, or their respective successors or assigns or their respective property.

12.     Unless required to be filed by an earlier date by another order of this Court, all Professional Fee Claims must be (a) filed on or before 5:00 p.m. (prevailing Eastern Time) on the date that is forty-five (45) days after the Effective Date Notice is filed with this Court; and (b) served on (i) the Creditor Trust (to the extent filed after the Effective Date), (ii) the U.S. Trustee, (iii) counsel to the Debtors, and (iv) counsel to the Committee.  Parties will have twenty-one (21) days to object to the Professional Fee Claims.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of this Court in the Chapter 11 Cases, this Court shall determine the Allowed amounts of such Professional Fee Claims.  Any request for payment of a Professional Fee Claim that is not timely filed as set forth above will be forever barred, and holders of such Professional Fee Claims will not be able to assert such Claims in any manner against the Creditor Trust, the Creditor Trustee, the Post-Effective Date Debtor Representative, the Debtors, or their Estates, or their respective successors or assigns or their respective property.

13.     The substantive consolidation of the Debtors, as set forth in Section 9.2 of the Combined Disclosure Statement and Plan, for purposes of confirming and consummating the Plan, is approved pursuant to sections 105(a), 541, 1123 and 1129 of the Bankruptcy Code.

14.     This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules or regulations of any State or any other governmental authority with respect to the implementation or consummation of the Combined Disclosure Statement and Plan.  To the fullest extent permitted by applicable law, each federal, state, commonwealth, local, or other governmental agency is hereby authorized to accept any and all documents and

30563047.8

12

instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Combined Disclosure Statement and Plan and this Confirmation Order, and the Post-Effective Date Debtors, Creditor Trustee, or Trust, as applicable, shall not be required to pay any fee or assessment with respect thereto.

15.     To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of security, or the making or delivery of an instrument of transfer under the Combined Disclosure Statement and Plan may not be taxed under any law imposing a stamp tax or similar tax.

16.     The Debtors are hereby authorized to execute, deliver, file or record such documents, contracts, instruments, releases, and other agreements, and to take such other actions, as may be necessary or appropriate to effectuate, implement, or further evidence the terms and conditions of the Combined Disclosure Statement and Plan.  On and after the Effective Date, the Creditor Trustee and the Post-Effective Date Debtor Representative, as applicable, are authorized and empowered to issue, execute, file, and deliver or record such documents, contracts, instruments, releases, and other agreements in the name of and on behalf of the Debtors.

17.     Each term and provision of the Combined Disclosure Statement and Plan, as it may have been altered or interpreted by the terms of this Confirmation Order, is:  (i) valid and enforceable pursuant to its terms; (ii) integral to the Combined Disclosure Statement and Plan; and (iii) non-severable and mutually dependent.

18.     This Court hereby retains jurisdiction of the Chapter 11 Cases and all matters arising under, arising out of, or related to, the Chapter 11 Cases and the Combined Disclosure Statement and Plan (i) as provided for in Article XV of the Combined Disclosure

Statement and Plan, (ii) as provided for in this Confirmation Order, and (iii) for the purposes set forth in sections 1127 and 1142 of the Bankruptcy Code.

19.     The exculpation, injunction, and indemnification provisions contained in the Combined Disclosure Statement and Plan are expressly incorporated into this Confirmation Order as if set forth in full and are hereby authorized and approved and shall be effective and binding on all persons or entities, to the extent provided therein.

20.     Notwithstanding any provision to the contrary in the Plan, the Plan Supplement, this Order or any implementing Plan documents (collectively, "Documents"):  As to the United States and the Commonwealth of Pennsylvania, Department of Revenue (together, the "Authorities"), nothing in the Documents shall: (1) discharge, release, enjoin, impair or otherwise preclude (a) any liability to the Authorities that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code ("claim"), (b) any claim of the Authorities arising after the Effective Date, or (c) any liability of any entity or person under police or  regulatory statutes or regulations to any Governmental Unit (as defined by section 101(27) of the Bankruptcy Code) as the owner, lessor, lessee or operator of property or rights to property that such entity owns, operates or leases after the Confirmation Date; (2) release, nullify, preclude or enjoin the enforcement of any police or regulatory power; (3) release, enjoin, impair or discharge any non-Debtor from any claim, liability, suit, right or Cause of Action of the Authorities, or enjoin or impair the prosecution, enforcement or collection of any such claim, liability, suit, right, or Cause of Action against any non-Debtor; (4) affect any setoff or recoupment rights of the Authorities and such rights are preserved; (5) require the Authorities to file an administrative claim in order to receive payment for any liability described in section 503(b)(1)(B) and (C) pursuant to section 503(b)(1)(D) of the Bankruptcy Code; (6) constitute an approval or consent by the Authorities without compliance

30563047.8

with all applicable legal requirements and approvals under non-bankruptcy law; (7) be construed as a compromise or settlement of any liability, claim, Cause of Action or interest of the Authorities; (8) confer exclusive jurisdiction to the Bankruptcy Court with respect to any federal rights, suits, interests, claims, liabilities and Causes of Action, except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code); or (9) modify the scope of sections 502 or 505 of the Bankruptcy Code with respect to the claims of the Authorities.

21. Administrative expense claims of the Authorities allowed pursuant to the Plan or the Bankruptcy Code shall be paid on the Effective Date, or as soon as practicable after the Effective Date, and shall accrue interest and penalties in accordance with the Bankruptcy Code and non-bankruptcy law until paid in full. Priority Tax Claims of the Authorities allowed pursuant to the Plan or the Bankruptcy Code will be paid in accordance with section 1129(a)(9)(C) of the Bankruptcy Code. To the extent such allowed Priority Tax Claims (including any penalties, interest or additions to tax entitled to priority under the Bankruptcy Code) are not paid in full in cash on the Effective Date, then such Priority Tax Claims shall accrue interest commencing on the Effective Date at the rate set forth in section 511 of the Bankruptcy Code. Moreover, nothing shall affect a release, injunction or otherwise preclude any claim whatsoever against any Debtor or any of the Debtors' estates by or on behalf of the Authorities for any liability arising (a) out of prepetition or postpetition tax periods for which a return has not been filed or (b) as a result of a pending audit or audit that may be performed with respect to any prepetition or postpetition tax period. Further, nothing shall enjoin the Authorities from amending any claim against any Debtor or any of the Debtors' estates with respect to any tax liability (a) arising out of prepetition or postpetition tax periods for which a tax return has not been filed or (b) from a pending audit or audit that may be performed with respect to any prepetition or postpetition tax period. Any liability

arising (a) out of prepetition or postpetition tax periods for which a return has not been filed or (b) as a result of a pending audit or audit which may be performed with respect to any prepetition or postpetition tax period shall be paid in accordance with section 1129(a)(9)(A) and (C) of the Bankruptcy Code.  Without limiting the foregoing but for the avoidance of doubt, the Debtors and the Creditor Trustee shall comply with federal law and nothing contained in the Documents shall be deemed to bind the Authorities to any characterization of any transaction for tax purposes or to determine the tax liability or withholding obligations of any person or entity, including, but not limited to, the Debtors and the Debtors' estates, nor shall the Documents be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of this Plan, nor shall anything in the Documents be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under section 505 of the Bankruptcy Code.

22.     Nothing contained in the preceding paragraphs shall be construed as a waiver of any rights of the Debtors, the Estates, or the Creditor Trust to object to any claims of the Authorities, seek to reclassify all or any portion of any such claim, or act as a waiver of any right to seek expedited consideration under section 505 of the Bankruptcy Code.

23.     The failure to reference or discuss any particular provision of the Combined Disclosure Statement and Plan in this Confirmation Order shall have no effect on the validity, binding effect and enforceability or such provision and such provision shall have the same validity, binding effect and enforceability as every other provision of the Combined Disclosure Statement and Plan.

24.     The provisions of Federal Rule of Civil Procedure 62, as applicable pursuant to Bankruptcy Rule 7062, and Bankruptcy Rule 3020(e) shall not apply to this

Confirmation Order.  The period in which an appeal with respect to this Confirmation Order must be filed shall commence immediately upon the entry of this Confirmation Order.

25.    Pursuant to Bankruptcy Rule 2002(f)(7) and 3020(c), the Creditor Trust shall serve the Effective Date Notice, in accordance with Section 13.2 of the Combined Disclosure Statement and Plan.

26.    In the event any provision of the Combined Disclosure Statement and Plan is inconsistent with any document or agreement to be executed pursuant to the Combined Disclosure Statement and Plan, the provisions of the Combined Disclosure Statement and Plan shall control; *provided however*, that this Confirmation Order shall control in the event of any inconsistency between this Confirmation Order and any provision of the Combined Disclosure Statement and Plan.

27.    This Confirmation Order shall be deemed to be a separate confirmation order with respect to each Debtor and it shall be sufficient for the purposes thereof that the Clerk of this Court enters this Confirmation Order in the docket of the above-captioned jointly administered case.

28.    Subject to the occurrence of the Effective Date, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, 8001 or otherwise, immediately upon the entry of this Confirmation Order, the terms of the Combined Disclosure Statement and Plan and this Confirmation Order shall be, and hereby are, immediately effective and enforceable.

29.     The Debtors are authorized to consummate the Combined Disclosure Statement and Plan at any time after the entry of the Confirmation Order, subject to satisfaction or waiver of the conditions precedent to the occurrence of the Effective Date as set forth in Article XIII of the Combined Disclosure Statement and Plan.

**<u>EXHIBIT A</u>**

**Combined Disclosure Statement and Plan**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WINC, INC., *et al.*,[1] | Case No. 22-11238 (LSS) |
| Debtors. | (Jointly Administered) |

## COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN OF WINC, INC. AND ITS AFFILIATED DEBTORS

Dated: August 1, 2023

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Michael R. Nestor (No. 3526)
Matthew B. Lunn (No. 4119)
Allison S. Mielke (No. 5934)
Joshua B. Brooks (No. 6765)
Shella Borovinskaya (No. 6758)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone:  (302) 571-6600
Emails:  mnestor@ycst.com
       mlunn@ycst.com
       amielke@ycst.com
       jbrooks@ycst.com
       sborovinskaya@ycst.com

**COUNSEL FOR THE DEBTORS AND DEBTORS IN POSSESSION**

**A.M. SACCULLO LEGAL, LLC**
Mark T. Hurford (No. 3299)
27 Crimson King Drive
Bear, DE 19701
Telephone:  (302) 836-8877
Email:  Mark@saccullolegal.com

**ARENTFOX SCHIFF LLP**
George P. Angelich (admitted *pro hac vice*)
1301 Avenue of the Americas, 42nd Floor
New York, NY 10019
Telephone:  (212) 457-5423
Email:  George.Angelich@afslaw.com

Justin A. Kesselman (admitted *pro hac vice*)
James E. Britton (admitted *pro hac vice*)
800 Boylston Street, 32nd Floor
Boston, MA 02199
Telephone:  (617) 973-6102
Email:  Justin.Kesselman@afslaw.com
      James.Britton@afslaw.com

**COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Winc, Inc. (8960); BWSC, LLC (0899); and Winc Lost Poet, LLC (N/A).  The Debtors' go-forward mailing address for purposes of these chapter 11 cases is 12405 Venice Boulevard, Box #1, Los Angeles, CA 90066.

30605632.1
-i-

# TABLE OF CONTENTS

ARTICLE I DEFINED TERMS AND RULES OF INTERPRETATION .......................6

ARTICLE II CLASSIFICATION OF CLAIMS AND INTERESTS AND
ESTIMATED RECOVERIES ...................................................................................19

    2.1     Classification..................................................................................19

ARTICLE III BACKGROUND AND DISCLOSURES ...................................................21

    3.1     General Background. ...............................................................21
    3.2     Events Leading to the Chapter 11 Cases..................................23
    3.3     The Chapter 11 Cases. ............................................................24

ARTICLE IV CONFIRMATION AND VOTING PROCEDURES................................29

    4.1     Confirmation Procedure..........................................................29
    4.2     Procedure for Objections. .......................................................29
    4.3     Requirements for Confirmation. ..............................................30
    4.4     Classification of Claims and Interests.....................................30
    4.5     Impaired Claims or Interests. ..................................................31
    4.6     Feasibility................................................................................32
    4.7     Best Interests Test and Liquidation Analysis...........................32
    4.8     Acceptance of the Plan............................................................33

ARTICLE V CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO
VOTING ......................................................................................................................34

    5.1     The Plan May Not Be Accepted. .............................................34
    5.2     The Plan May Not Be Confirmed. ...........................................34
    5.3     Distributions to Holders of Allowed Claims under the Plan May Be
            Inconsistent with Projections....................................................35
    5.4     Objections to Classification of Claims. ...................................35
    5.5     Failure to Consummate the Plan. .............................................36
    5.6     Reductions to Estimated Creditor Recoveries. ........................36
    5.7     Certain Tax Considerations......................................................36

ARTICLE VI TREATMENT OF UNCLASSIFIED CLAIMS........................................43

    6.1     Administrative Claims. ............................................................43
    6.2     Priority Tax Claims..................................................................44

ARTICLE VII TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ............45

    7.1     Class 1:  Priority Non-Tax Claims..........................................45
    7.2     Class 2:  Secured Claims.........................................................45
    7.3     Class 3:  General Unsecured Claims.......................................45

7.4     Class 4:  Intercompany Claims. ................................................45
7.5     Classes 5(a), 5(b) and 5(c): Interests. ....................................45
7.6     Reservation of Rights Regarding Claims and Interests. ............46

ARTICLE VIII ACCEPTANCE OR REJECTION OF THE PLAN ...............................46

8.1     Class Entitled to Vote. ..............................................................46
8.2     Acceptance by Impaired Classes of Claims. ............................46
8.3     Presumed Acceptance by Unimpaired Classes. ......................46
8.4     Presumed Rejections by Impaired Classes. .............................46
8.5     Controversy Concerning Impairment. ......................................46
8.6     Elimination of Vacant Classes. .................................................47
8.7     Elimination of Intercompany Claims. .......................................47

ARTICLE IX IMPLEMENTATION OF THE PLAN AND ESTABLISHMENT
OF THE CREDITOR TRUST .............................................................................47

9.1     Implementation of the Plan. .....................................................47
9.2     Substantive Consolidation. ......................................................47
9.3     Debtors' Members, Managers, Directors, and Officers. ...........48
9.4     Appointment of Creditor Trustee and Wind-Down of the Post-
       Effective Date Debtors. ............................................................48
9.5     Appointment of Post-Effective Date Debtor Representative to
       Oversee the Reorganization and Eventual Wind-Down and
       Dissolution of the Post-Effective Date Debtors, as Applicable. ...............49
9.6     Creation and Governance of the Creditor Trust. ......................50
9.7     Purpose of the Creditor Trust. ..................................................51
9.8     The Creditor Trust Agreement. .................................................51
9.9     Compensation and Duties of Creditor Trustee. ........................53
9.10    U.S. Federal Income Tax Treatment of the Creditor Trust. ......54
9.11    Abandonment, Disposal, and Destruction of Records. .............57
9.12    Distributions by Creditor Trustee. ............................................57
9.13    Dissolution of the Creditor Trust. .............................................58
9.14    Control Provisions. ...................................................................58
9.15    Limitation of Liability; Indemnification. .....................................59
9.16    Company Action. ......................................................................59
9.17    Standing to Pursue Debtors' Rights, Including Retained Causes of
       Action. .......................................................................................59

ARTICLE X PROVISIONS GOVERNING DISTRIBUTIONS ......................................59

10.1    Distributions for Allowed Claims. .............................................59
10.2    Interest of Claims. ....................................................................60
10.3    Distributions by Creditor Trustee as Disbursing Agent. ...........60
10.4    Means of Cash Payment. .........................................................60
10.5    Fractional Distributions. ...........................................................61
10.6    De Minimis Distributions. .........................................................61

| 10.7 | Delivery of Distributions; Unclaimed Distributions. | 61 |
| 10.8 | Application of Distribution Record Date. | 62 |
| 10.9 | Withholding, Payment and Reporting Requirements With Respect to Distributions | 62 |
| 10.10 | Setoffs. | 63 |
| 10.11 | No Distribution in Excess of Allowed Amounts. | 63 |
| 10.12 | Allocation of Distributions. | 63 |
| 10.13 | Forfeiture of Distributions. | 63 |

ARTICLE XI PROVISIONS FOR CLAIMS OBJECTIONS AND ESTIMATION OF CLAIMS ......64

| 11.1 | Claims Administration Responsibility. | 64 |
| 11.2 | Claims Objections. | 64 |
| 11.3 | Estimation of Contingent or Unliquidated Claims | 64 |
| 11.4 | Distributions on Account of Disputed Claims. | 64 |
| 11.5 | Amendments to Claims. | 65 |
| 11.6 | Claims Paid and Payable by Third Parties. | 65 |
| 11.7 | Adjustment to Claims Without Objection. | 65 |
| 11.8 | No Recourse | 65 |

ARTICLE XII EXECUTORY CONTRACTS ......66

| 12.1 | Executory Contracts Deemed Rejected. | 66 |
| 12.2 | Asset Purchase Agreements and Related Agreements | 66 |
| 12.3 | Insurance Contracts. | 66 |

ARTICLE XIII CONFIRMATION AND CONSUMMATION OF THE PLAN ......68

| 13.1 | Conditions Precedent to the Effective Date. | 68 |
| 13.2 | Notice of Effective Date. | 69 |
| 13.3 | Waiver of Conditions Precedent to the Effective Date. | 69 |
| 13.4 | Effect of Non-Occurrence of Effective Date. | 69 |

ARTICLE XIV EFFECTS OF CONFIRMATION ......69

| 14.1 | Exculpation and Injunctions. | 69 |
| 14.2 | Term of Bankruptcy Injunction or Stays. | 71 |
| 14.3 | Allocation Between Principal and Interest. | 71 |

ARTICLE XV RETENTION OF JURISDICTION ......72

| 15.1 | Exclusive Jurisdiction of Bankruptcy Court. | 72 |

ARTICLE XVI MISCELLANEOUS PROVISIONS ......74

| 16.1 | Modification of the Plan. | 74 |
| 16.2 | Revocation, Withdrawal, or Non-Confirmation of the Plan. | 74 |

16.3    Binding Effect. ................................................................................74
16.4    Subordination Rights. .......................................................................74
16.5    Severability of Plan Provisions. ........................................................75
16.6    Payment of Statutory Fees; Filing of Quarterly Reports. ..................75
16.7    Dissolution of the Committee. ...........................................................75
16.8    Securities Registration Exemption.....................................................76
16.9    Exemption from Section 1146. ..........................................................76
16.10   Closing of Chapter 11 Cases; Caption Change.................................76
16.11   Filing of Additional Documents. .......................................................77
16.12   Cancellation of Existing Securities and Agreements..........................77
16.13   Successors and Assigns......................................................................77
16.14   Governing Law. .................................................................................77
16.15   Exhibits and Schedules. .....................................................................77
16.16   Computation of Time..........................................................................78
16.17   Reservation of Rights.........................................................................78

EXHIBITS:

Exhibit A:  Delayed Assumption Contracts
Exhibit B:  Liquidation Analysis

## DISCLAIMER

THE COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION, AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE (I) DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, (II) ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR (III) DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THE COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN THAT WHICH IS CONTAINED IN THE COMBINED DISCLOSURE STATEMENT AND PLAN. NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THE COMBINED DISCLOSURE STATEMENT AND PLAN. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST. THE COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016(b) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS.

SEE ARTICLE V HEREIN, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE COMBINED DISCLOSURE STATEMENT AND PLAN.

THE INFORMATION CONTAINED IN THE COMBINED DISCLOSURE STATEMENT AND PLAN, INCLUDING THE INFORMATION REGARDING THE DEBTORS' HISTORY, BUSINESS, AND OPERATIONS, IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN. AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, LITIGATIONS, AND APPEALS INCLUDING FOR AVOIDANCE OF DEBT AND LITIGATION CLAIMS THAT MAY BE PENDING AS OF THE FILING OF THE DEBTORS' CHAPTER 11 CASES OR COMMENCED AFTER THE FILING OF THE DEBTORS' CHAPTER 11 CASES, THE COMBINED DISCLOSURE STATEMENT AND PLAN IS NOT TO BE CONSTRUED AS AN ADMISSION OR A STIPULATION BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THE DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN (A) CONSTITUTES AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, (B) SHALL BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR (C) SHALL BE DEEMED A REPRESENTATION OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.

CERTAIN OF THE STATEMENTS CONTAINED IN THE COMBINED DISCLOSURE STATEMENT AND PLAN, BY THEIR NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," OR "CONTINUE," OR THE NEGATIVE THEREOF, OTHER VARIATIONS THEREON, OR COMPARABLE TERMINOLOGY AND INCLUDE THE LIQUIDATION ANALYSIS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHER, THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THAT THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE PRESENTED IN SUCH FORWARD-LOOKING STATEMENTS. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT. THE LIQUIDATION ANALYSIS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE VALUE OF THE PROPERTY

DISTRIBUTED TO HOLDERS OF ALLOWED CLAIMS OR EQUITY INTERESTS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  THEREFORE, ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.  THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, EXCEPT AS REQUIRED BY APPLICABLE LAW.  **ALL HOLDERS OF IMPAIRED CLAIMS SHOULD CAREFULLY READ AND CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY, INCLUDING ARTICLE V: "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING."**

NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE DOCUMENTS ATTACHED TO THE COMBINED DISCLOSURE STATEMENT AND PLAN. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN WHICH ARE OTHER THAN AS SET FORTH HEREIN, OR INCONSISTENT WITH THE INFORMATION CONTAINED IN THE COMBINED DISCLOSURE STATEMENT AND PLAN, THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT, AND THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST.

THE COMBINED DISCLOSURE STATEMENT AND PLAN CONTAINS, AMONG OTHER THINGS, A SUMMARY OF THE PLAN, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY, TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS, BY REFERENCE TO SUCH DOCUMENT OR STATUTORY PROVISIONS.  IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES.

EXCEPT AS OTHERWISE SPECIFICALLY AND EXPRESSLY STATED HEREIN, THE COMBINED DISCLOSURE STATEMENT AND PLAN DOES NOT REFLECT ANY EVENTS THAT MAY OCCUR SUBSEQUENT TO THE DATE HEREOF AND THAT MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.  ACCORDINGLY, THE DELIVERY OF THE DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCE, IMPLY THAT THE INFORMATION HEREIN IS CORRECT OR COMPLETE AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

IN PREPARING THE COMBINED DISCLOSURE STATEMENT AND PLAN, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS'

BUSINESS. THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THE COMBINED DISCLOSURE STATEMENT AND PLAN. ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THE COMBINED DISCLOSURE STATEMENT AND PLAN, THE COMBINED DISCLOSURE STATEMENT AND PLAN HAS NOT BEEN AUDITED (UNLESS OTHERWISE EXPRESSLY PROVIDED HEREIN) AND NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND ITS FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

NEITHER THE COMBINED DISCLOSURE STATEMENT AND PLAN NOR THE CONFIRMATION ORDER WAIVE ANY RIGHTS OF THE DEBTORS WITH RESPECT TO THE HOLDERS OF CLAIMS OR INTERESTS PRIOR TO THE EFFECTIVE DATE. RATHER, THE COMBINED DISCLOSURE STATEMENT AND PLAN SHALL CONSTITUTE A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO POTENTIAL CONTESTED MATTERS, POTENTIAL ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR CLAIM OR OBJECTION TO A PARTICULAR CLAIM IS OR IS NOT IDENTIFIED IN THE COMBINED DISCLOSURE STATEMENT AND PLAN. EXCEPT AS PROVIDED UNDER THE PLAN, THE DEBTORS MAY OBJECT TO CLAIMS AFTER CONFIRMATION OR THE EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS ON THE TERMS SPECIFIED IN THE PLAN.

THE DEBTORS ARE GENERALLY MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THE COMBINED DISCLOSURE STATEMENT AND PLAN AS OF THE DATE HEREOF WHERE FEASIBLE, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THE DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THE COMBINED DISCLOSURE STATEMENT AND PLAN SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS SENT. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THE COMBINED DISCLOSURE STATEMENT AND PLAN. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE

30605632.1

4

VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THE COMBINED
DISCLOSURE STATEMENT AND PLAN.

**HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN
MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN
ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO
ACCEPT OR REJECT THE PLAN.   IMPORTANTLY, PRIOR TO DECIDING
WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A
VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER
CAREFULLY ALL OF THE INFORMATION IN THE COMBINED DISCLOSURE
STATEMENT AND PLAN AND ANY APPENDICES HERETO.**

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE
EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST AND
INTERESTS IN THE DEBTORS (INCLUDING THOSE HOLDERS WHO DO NOT
SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT
THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE
BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS
CONTEMPLATED THEREBY.**

## INTRODUCTION[2]

The Debtors and the Committee (together, the "Plan Proponents") hereby jointly propose the
following Plan for the distribution of the Debtors' remaining assets to the Holders of Allowed
Claims against the Debtors as set forth herein.  Each of the Debtors and the Committee is a
proponent of the Plan within the meaning of Bankruptcy Code section 1129.  **The Plan
Proponents believe that the Plan is in the best interests of creditors and strongly recommend
that creditors vote to accept the Plan.**

The combined Disclosure Statement and Plan contains, among other things, a discussion of the
Debtors' history, business, properties, operations, the Chapter 11 Cases, risk factors, summary and
analysis of the Plan, and certain other related matters.

**ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE ENCOURAGED TO
READ THE COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY,
AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR
REJECT THE PLAN.   SUBJECT TO CERTAIN RESTRICTIONS AND
REQUIREMENTS SET FORTH IN BANKRUPTCY CODE SECTION 1127,
BANKRUPTCY RULE 3019, AND IN THE PLAN, THE PLAN PROPONENTS RESERVE
THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN,
OR ANY PART THEREOF, PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

---

[2] Capitalized terms not defined in this Introduction shall have the meanings ascribed below.

30605632.1

5

# ARTICLE I
## DEFINED TERMS AND RULES OF INTERPRETATION

**Defined Terms**.

**1.1**    "<u>363 Sale</u>" shall mean the sale of substantially all of the Debtors' assets pursuant to the Sale Documents and as approved by the Sale Order.

**1.2**    "<u>363 Sale Proceeds</u>" shall mean the Cash proceeds received by the Debtors pursuant to the 363 Sale.

**1.3**    "<u>503(b)(9) Claims</u>" shall mean Claims arising under Bankruptcy Code section 503(b)(9).

**1.4**    "<u>Administrative Claim</u>" shall mean a Claim for costs and expenses of administration of the Chapter 11 Cases allowed under Bankruptcy Code sections 503(b), 507(b) or, if applicable, 1114(e)(2), including but not limited to: (a) any actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (including, but not limited to, wages, salaries, commissions for services and payments for inventory and premises) and Claims by Governmental Units for taxes (including Claims related to taxes which accrued after the Petition Date, but excluding Claims related to taxes which accrued on or before the Petition Date); (b) compensation for legal, financial, advisory, accounting and other services and reimbursement of expenses allowed by the Bankruptcy Court under Bankruptcy Code sections 328, 330, 331, 363 or 503(b) to the extent incurred on or prior to the Effective Date; (c) all fees and charges assessed against the Estates under United States Code title 28 section 1930; (d) any 503(b)(9) Claims; and (e) any Claims that have been designated "Administrative Claims" by Final Order of this Court.

**1.5**    "<u>Affiliate</u>" shall mean "affiliate" as defined in Bankruptcy Code section 101(2).

**1.6**    "<u>Allowed</u>" shall mean all or a portion of a Claim against the Debtors or an Interest in the Debtors (a) that has been listed by the Debtors in the Schedules as liquidated in amount and not as "disputed" or "contingent," and with respect to which no contrary Claim has been filed, (b) as to which no Objection or request for estimation has been Filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Bankruptcy Court, (c) as to which any Objection has been settled, waived, withdrawn or denied by a Final Order, or (d) that is allowed (i) by a Final Order, (ii) pursuant to the terms of the Plan, or (iii) by a stipulation entered into between the Holder of such Claim and the Creditor Trustee, on or after the Effective Date.  For purposes of computing Distributions under the Plan, a Claim that has been deemed "Allowed" shall not include interest, costs, fees or charges on such Claim from and after the Petition Date, except as expressly set forth in the Plan.

**1.7**    "<u>APA</u>" shall mean that certain *Second Amended Asset Purchase Agreement* (as may be amended, modified, and/or supplemented) by and between Project Crush Acquisition Corp LLC and the Debtors, dated as of January 17, 2023.

**1.8** "Avoidance Actions" shall mean any and all avoidance, equitable subordination or other recovery actions, including any Claim or Causes of Action of the Debtors or the Estates to recover or avoid transfers or to avoid liens under chapter 5 of the Bankruptcy Code or applicable state law or otherwise, including, but not limited to, causes of action arising under Bankruptcy Code sections 105(a), 502, 506, 510, 522, 541, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, or 553, or any similar actions under federal, state, or common law; provided, however, that any and all actions that were sold to Project Crush pursuant to the Sale Order and APA shall not constitute Avoidance Actions for the purposes hereof.

**1.9** "Ballot" shall mean the ballot form distributed to each Holder of a Claim entitled to vote to accept or reject the Plan.

**1.10** "Bankruptcy Code" shall mean title 11 of the United States Code, 11 U.S.C. §§ 101–1532, and as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

**1.11** "Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Delaware.

**1.12** "Bankruptcy Exception" shall have the meaning set forth in Section 5.7(a)(iii) of this Disclosure Statement and Plan.

**1.13** "Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms, or the Local Rules, and as each has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

**1.14** "Bar Date" shall mean, with respect to any particular Claim, the specific date set by the Bankruptcy Court as the last day for Filing Proofs of Claim, motions for allowance of Administrative Claims, or proofs of Interest against the Debtors in the Chapter 11 Cases for that specific Claim or Interest.

**1.15** "Bar Date Order" shall mean the *Order (I) Establishing Deadlines for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [D.I. 277].

**1.16** "Beneficiary" shall mean a holder of a Creditor Trust Interest, whether individually or as agent on behalf of one or more other Entities. To the extent Holders of Allowed Claims are entitled to a Distribution from the Creditor Trust pursuant to the terms of the Plan, such Holders are each a Beneficiary.

**1.17** "Bidding Procedures Order" shall mean that certain *Order (I) Approving Bidding Procedures in Connection with Sale of the Debtors' Assets and Related Bid Protections; (II) Approving Form and Manner of Notice; (III) Scheduling Auction and Sale Hearing; (IV) Authorizing Procedures Governing Assumption and Assignment of Certain Contracts and Unexpired Leases; and (V) Granting Related Relief* [D.I. 85].

**1.18** "Business Day" shall mean any day, other than a Saturday, Sunday or a legal holiday (as that term is defined in Bankruptcy Rule 9006(a)).

30605632.1

**1.19** "BWSC" shall mean BWSC, LLC.

**1.20** "BWSC Assets" shall mean (a) BWSC's interest in certain Transferred Assets for which BWSC holds legal title for the benefit of Project Crush, and (b) any other Transferred Assets that are held by BWSC for the benefit of Project Crush during the pendency of the TSA, as set forth in the Sale Documents. For the avoidance of doubt, BWSC Assets are not Creditor Trust Assets or property of the Estates within the meaning of Bankruptcy Code section 541, and Creditor Trust Assets are not BWSC Assets.

**1.21** "Canaccord" shall mean Canaccord Genuity Group, LLC.

**1.22** "Cash" shall mean money that is legal tender of the United States of America.

**1.23** "Causes of Action" shall mean all Claims, actions, causes of action, choses in action, suits, debts, dues, damages, defenses, judgments, set-off claims, third-party claims, counterclaims, and cross claims that are or may be pending or existing on the Effective Date against any Entity, based in law or equity, including, but not limited to, under the Bankruptcy Code and including, but not limited to, Avoidance Actions, in each case whether direct, indirect, known or unknown, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order, and including any unknown Causes of Action that have not been released by the Plan or any order of the Bankruptcy Court.

**1.24** "Chapter 11 Cases" shall mean the chapter 11 cases commenced by the Debtors and jointly administered under case number 22-11238 (LSS) in the Bankruptcy Court.

**1.25** "Claim" shall mean a claim against any Debtor, as such term is defined in Bankruptcy Code section 101(5).

**1.26** "Claims Agent" shall mean the Debtors' claims agent in the Chapter 11 Cases, Epiq Corporate Restructuring, LLC.

**1.27** "Claims Objection Deadline" shall mean the date that is one hundred eighty (180) days after the Effective Date, or such later date as may be ordered by the Bankruptcy Court; *provided however*, that the Post-Effective Date Debtors or Creditor Trustee, as applicable, may seek one or more extensions of this date from the Bankruptcy Court.

**1.28** "Class" shall mean each category or group of Holders of Claims or Interests that has been designated as a class in Article II of the Disclosure Statement and Plan.

**1.29** "Clearco Agreement" shall mean that certain *Revenue Share Agreement*, dated May 30, 2022 between CFT Clear Finance Technology Corp. and Winc.

**1.30** "Closing Date" shall mean January 23, 2023.

**1.31** "COD" shall have the meaning set forth in Section 5.8(a)(iii) of this Disclosure Statement and Plan, specifically cancellation of debt.

**1.32**     "Committee" shall mean the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases.

**1.33**     "Confirmation" shall mean entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

**1.34**     "Confirmation Date" shall mean the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

**1.35**     "Confirmation Hearing" shall mean the hearing held by the Bankruptcy Court to consider confirmation of the Plan and final approval of the Disclosure Statement, as such hearing may be adjourned or continued from time to time.

**1.36**     "Confirmation Notice" shall mean the notice of Confirmation Hearing to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f).

**1.37**     "Confirmation Order" shall mean the order entered by the Bankruptcy Court confirming the Plan pursuant to, among others, Bankruptcy Code section 1129.

**1.38**     "Consummation" shall mean the occurrence of the Effective Date.

**1.39**     "Contingent" shall mean, with reference to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which, or the obligation to make payment on which, is dependent upon a future event that may or may not occur.

**1.40**     "Corporate Organizational Documents" shall mean all limited liability company agreements, articles of incorporation, bylaws, and other organic documents of the Debtors.

**1.41**     "Creditor" shall have the meaning ascribed to such term in Bankruptcy Code section 101(10).

**1.42**     "Creditor Trust" shall mean the trust formed pursuant to the Plan and the Creditor Trust Agreement to hold the legal and equitable title to the Creditor Trust Assets.

**1.43**     "Creditor Trustee" shall mean the entity designated by the Committee, in consultation with the Debtors, identified in the Plan Supplement, and appointed as the trustee of the Creditor Trust, as of the Effective Date, as the fiduciary responsible for administering the Creditor Trust for the benefit of the Beneficiaries, and any successor subsequently appointed pursuant to the Creditor Trust Agreement.

**1.44**     "Creditor Trust Agreement" shall mean the trust agreement that establishes the Creditor Trust and governs the powers, duties, and responsibilities of the Creditor Trustee of the Creditor Trust.  The Creditor Trust Agreement shall be filed as part of the Plan Supplement.

**1.45**     "Creditor Trust Assets" comprise (i) the Debtors' Cash as of the Effective Date; (ii) all prepayments, deposits, refunds and other rights arising under or related to Excluded Assets; (iii) all rights of the Debtors to tax refunds and credits; (iv) all rights and interests in

any of the Debtors' D&O Liability Insurance Policies and other insurance policies (including any proceeds and refunds with respect to such policies), other than insurance policies transferred to Project Crush under the APA, if any; (v) all Retained Causes of Action and any proceeds resulting therefrom; (vi) the Debtors' books and records, other than those transferred to Project Crush under the APA, and any and all rights to access and copy all legacy data (including without limitation emails) transferred to Project Crush under the APA; (vii) the New Common Stock; (viii) all of the Debtors' rights to privilege and privileged communications with any party as of the Effective Date; and (ix) any other Excluded Assets under the APA.  For the avoidance of doubt, Creditor Trust Assets shall not include funds in the Professional Fee Escrow Account, any Transferred Assets, or BWSC Assets.

1.46      "Creditor Trust Expenses" shall mean all reasonable legal and other fees and expenses incurred by the Creditor Trust and the Creditor Trustee on account of, among other things, administration of the Creditor Trust, winding down the Estates, dissolving the Debtors, and closing of the Chapter 11 Cases, including, without limitation, reasonable fees and expenses of professionals retained by the Creditor Trustee, if any, insurance costs, taxes, escrow expenses and all other costs of administering the Creditor Trust and the Estates in accordance with the Plan and the Creditor Trust Agreement, as applicable.

1.47      "Creditor Trust Interests" shall mean the interests in the Creditor Trust held by the Beneficiaries pursuant to the Plan and Creditor Trust Agreement.

1.48      "D&O Liability Insurance Policies" shall mean that certain *Directors and Officers Liability Insurance Policy* issued by National Union Fire Insurance Company of Pittsburgh, PA (Policy No. 01-811-11-45), *Directors' and Officers' Insurance Policy* issued by National Union Fire Insurance Company of Pittsburgh, PA (Policy No. 01-811-11-47), *Directors' and Officers' Insurance Policy* issued by Endurance American Insurance Company (Policy No. DOX3330027679200), *Directors' and Officers' Insurance Policy* issued by Allied World Insurance Company (Policy No. 0313-6125), and *Directors' and Officers' Insurance Policy* issued by Axis Insurance Company (Policy No. P-001-001045876-01), as the same may have been endorsed, amended, or otherwise modified from time to time, and to the extent that such policies are in effect as of the Effective Date.

1.49      "Debtors" shall mean, collectively, Winc, BWSC, and Winc Lost Poet.

1.50      "Debtors' Cash" shall mean Cash held by the Debtors or their Estates as of the Effective Date of the Plan, which shall not include the Professional Fee Escrow Account.

1.51      "Delayed Assumption Contract Counterparties" shall mean the non-Debtor counterparties to the Delayed Assumption Contracts.

1.52      "Delayed Assumption Contracts" shall have the meaning given to such term in the APA.  A schedule of the Delayed Assumption Contracts is attached hereto as **Exhibit A**.

1.53      "Delayed Assumption Date" shall mean the Termination Date or such earlier date as determined by Project Crush, in either case pursuant to the terms of and consistent with the Sale Documents.

**1.54** "Delayed Assumption Objection Deadline" shall mean the date that is fourteen (14) days after service of the Notice of Delayed Assumption.

**1.55** "DIP Lender" shall mean Project Crush Acquisition Corp LLC, solely in its capacity as lender under the DIP Term Sheet and the DIP Order.

**1.56** "DIP Term Sheet" shall mean that certain *Superpriority Secured Debtor-in-Possession Credit Facility Term Sheet*, dated December 6, 2022, which was attached as Exhibit B to the DIP Order.

**1.57** "DIP Obligations" shall mean all amounts owed by the Debtors to the DIP Lender under the DIP Term Sheet and DIP Order.

**1.58** "DIP Order" shall mean the *Final Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(3), 364(d)(1), and 364(e) and (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* [D.I. 134].

**1.59** "Disallowed" shall mean, with respect to any Claim or portion thereof, any Claim against a Debtor which: (i) has been disallowed, in whole or part, by a Final Order; (ii) has been withdrawn, in whole or in part, by the Holder thereof; (iii) is listed in the Schedules as zero or as Disputed, Contingent or unliquidated and in respect of which a proof of Claim has not been timely Filed or deemed timely Filed pursuant to the Plan, the Bankruptcy Code or any Final Order or other applicable law; (iv) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the Filed amount of any proof of Claim; (v) was required to be Filed by order of the Bankruptcy Court but as to which such proof of Claim or proof of Interest was not timely or properly Filed; or (vi) the Holder of a Claim is an Entity from which property is recoverable under Bankruptcy Code sections 542, 543, 550, or 553 or that is a transferee of a transfer avoidable under Bankruptcy Code sections 522(f), 522(h), 544, 545, 548, 549, or 724(a), unless such Entity or transferee has paid the amount, or turned over any such property, for which such Entity or transferee is liable under Bankruptcy Code section 522(i), 542, 543, 550, or 553, and if required by the Bankruptcy Code, an Objection or adversary proceeding has been Filed.  In each case, a Disallowed Claim is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination, or estimation.

**1.60** "Disbursing Agent" shall mean the Creditor Trustee; *provided, however*, that the Creditor Trustee may, in its sole discretion, retain a third party to act as Disbursing Agent.

**1.61** "Disclosure Statement" shall mean the disclosure statement, as amended, supplemented, or modified from time to time, that is embodied within the combined Disclosure Statement and Plan and distributed in accordance with, among others, Bankruptcy Code sections 1125, 1126(b), and 1145, Bankruptcy Rule 3018 and other applicable law.

**1.62** "Disputed" shall mean any Claim or Interest that has not been Allowed or Disallowed in accordance with the terms of the Plan.

**1.63**     "Distribution" shall mean a delivery of Cash by the Disbursing Agent to the Holders of Allowed Claims pursuant to the Plan.

**1.64**     "Distribution Date" shall mean the date on which a Distribution is made pursuant to the Plan.

**1.65**     "Distribution Record Date" shall mean the date established for determining the Holders of Claims entitled to Distributions pursuant to the Plan, which shall be the Effective Date or such other date established pursuant to Section 10.8 of the Plan.

**1.66**     "Effective Date" shall mean the first Business Day after the later of the date on which (a) all conditions in Article XIII of the Plan have been satisfied or waived in accordance with that Article and (b) no stay of the Confirmation Order is in effect.

**1.67**     "Effective Date Notice" shall mean the notice of the Effective Date.

**1.68**     "Entity" shall have the meaning ascribed to such term in Bankruptcy Code section 101(15).

**1.69**     "Estate" shall mean each of the Debtors' estates created by Bankruptcy Code section 541 upon the commencement of the Chapter 11 Cases on the Petition Date.

**1.70**     "Estates" shall mean, collectively, the Debtors' Estates.

**1.71**     "Excluded Assets" shall have the meaning set forth in the APA.

**1.72**     "Exculpated Parties" shall mean, in each of their capacities as such, (a) the Debtors, (b) current and former managers, directors and officers of the Debtors, (c) current and former members of the Committee, (d) Professionals retained by the Debtors pursuant to an Order of the Bankruptcy Court, and (e) Professionals retained by the Committee pursuant to an Order of the Bankruptcy Court.

**1.73**     "Executory Contract" shall mean a contract or unexpired lease to which a Debtor is a party that is subject to assumption or rejection under Bankruptcy Code section 365.

**1.74**     "File," "Filed," or "Filing" shall mean, respectively, file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

**1.75**     "Final Distribution" shall mean the final Distributions to Holders of Allowed Claims.

**1.76**     "Final Order" shall mean an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, that is not subject to stay or appeal, and for which the applicable time within which to take such action has expired, or for which such actions has been adjudicated by the highest court with jurisdiction over the matter.

**1.77**     "Initial Administrative Claim Bar Date" shall mean April 5, 2023 at 5:00 p.m. (ET), which is the deadline established by the Bar Date Order for filing proofs of claim for

Administrative Claims that arose during the period between the Petition Date and January 31, 2023.

**1.78** "First Day Declaration" shall mean the *Declaration of Carol Brault in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [D.I. 15].

**1.79** "First Tier Claims" shall mean all Administrative Claims (including Professional Fee Claims), Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims.

**1.80** "General Bar Date" shall mean March 30, 2023 at 5:00 p.m. (ET), which is the deadline established by the Bar Date Order for filing certain non-governmental proofs of claim, including 503(b)(9) Claims.

**1.81** "General Unsecured Claim" shall mean a Claim against a Debtor, but excluding any Administrative Claims (including Professional Fee Claims), Priority Tax Claims, Priority Non-Tax Claims, Intercompany Claims, and Interests.

**1.82** "Governmental Unit" shall have the meaning ascribed to such term in Bankruptcy Code section 101(27).

**1.83** "GUC Cash Distribution Amount" shall mean the amount equal to the liquidated Creditor Trust Assets, subsequent to the reduction for amounts necessary to satisfy (i) Distributions on account of Allowed First Tier Claims (including, for the avoidance of doubt, Professional Fee Claims), and (ii) Creditor Trust Expenses.

**1.84** "Holder" shall mean any Entity holding a Claim or Interest.

**1.85** "Impaired" shall mean, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of Bankruptcy Code section 1124.

**1.86** "Impaired Class" shall mean a Class of Claims or Interests that is Impaired.

**1.87** "Insurance Contract" shall mean all insurance policies that have been issued at any time to or provide coverage to any of the Debtors and all agreements, documents or instruments relating thereto.

**1.88** "Insurer" means any company or other entity that issued an Insurance Contract, any third party administrator, and any respective predecessors and/or Affiliates thereof.

**1.89** "Intercompany Claim" shall mean a Claim by a Debtor against another Debtor.

**1.90** "Interests" shall mean the legal interests, equitable interests, contractual interests, equity interests or ownership interests, or other rights of any Entity in the Debtors including all capital stock, stock certificates, common stock, preferred stock, partnership interests, limited liability company or membership interests, rights, treasury stock, options, warrants, contingent warrants, convertible or exchangeable securities, investment securities, subscriptions or other agreements and contractual rights to acquire or obtain such an interest or share in the Debtors, partnership interests in the Debtors' stock appreciation rights,

conversion rights, repurchase rights, redemption rights, dividend rights, preemptive rights, subscription rights and liquidation preferences, puts, calls, awards or commitments of any character whatsoever relating to any such equity, common stock, preferred stock, ownership interests or other shares of capital stock of the Debtors or obligating the Debtors to issue, transfer or sell any shares of capital stock whether or not certificated, transferable, voting or denominated "stock" or a similar security.

**1.91** "Internal Revenue Code" shall mean the United States Internal Revenue Code 1986, as amended.

**1.92** "IRS" shall mean the Internal Revenue Service.

**1.93** "Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

**1.94** "Liquidating Trustee" shall mean a "Liquidating trustee", as such term is defined in section 18-101(11) of the LLC Act.

**1.95** "LLC Act" shall mean the Delaware Limited Liability Company Act.

**1.96** "Local Rules" shall mean the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

**1.97** "MSA" shall mean that certain *Master Services Agreement* by and among Project Crush, Project Crush Wholesale Sub, LLC, Project Crush DTC Sub, LLC and BWSC, effective as of January 23, 2023.

**1.98** "New Common Stock" means the one (1) authorized share of common stock, par value $.01 per share, of Reorganized Winc, to be issued as of the Effective Date and held by the Creditor Trustee on behalf of the beneficiaries of the Creditor Trust. The share of New Common Stock issued pursuant to the Plan will be deemed upon such issuance, validly issued, fully paid and non-assessable, and shall be uncertificated and non-transferable, except by operation of law.

**1.99** "NOLs" shall have the meaning set forth in Section 5.7(a) of this Disclosure Statement and Plan.

**1.100** "Notice of Delayed Assumption" shall mean the notice filed by the Debtors and served on the Delayed Assumption Contract Counterparties informing such counterparties of the deadline to object to the assumption of the Delayed Assumption Contracts as of the Delayed Assumption Date.

**1.101** "OCP Order" shall mean the *Order (I) Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business and (II) Waiving Certain Information Requirements of Local Rule 2016-2* [D.I. 127].

**1.102** "Objection*"* shall mean any objection, application, motion, complaint or any other legal proceeding (including, but not limited to, an adversary proceeding) seeking, in whole or

in part, to disallow, determine, liquidate, classify, reclassify, or establish the priority, expunge, subordinate or estimate any Claim (or the basis thereof).

**1.103**     "Paid in Full," "Payment in Full," or "Pay in Full" shall mean, with respect to an Allowed Claim, payment in Cash or other consideration in an aggregate amount equal to the Allowed amount thereof.

**1.104**     "Petition Date" shall mean November 30, 2022, the date on which the Debtors commenced the Chapter 11 Cases in the Bankruptcy Court.

**1.105**     "Plan" shall mean this combined Disclosure Statement and plan under chapter 11 of the Bankruptcy Code, as it may be altered, amended, modified or supplemented from time to time, including, the Plan Supplement and all exhibits, attachments, and ancillary documents.

**1.106**     "Plan Proponents" shall have the meaning set forth in the Introduction section of this Disclosure Statement and Plan.

**1.107**     "Plan Supplement" shall mean the ancillary documents necessary to the implementation and effectuation of the Plan, including the Creditor Trust Agreement, and shall identify the Creditor Trustee and the Post-Effective Date Debtor Representative. The Plan Supplement shall be Filed on or before the date that is seven (7) days prior to the Voting Deadline.

**1.108**     "Post-Effective Date Debtor Representative" shall mean such person(s) (and any successor(s) subsequently appointed pursuant to each Post-Effective Date Debtor's applicable Corporate Organizational Documents, as amended by the Plan) appointed and authorized to, upon and after the Effective Date, oversee, wind down and liquidate the Post-Effective Date Debtors. The Post-Effective Date Debtor Representative shall:  (a) serve as the sole officer and director of Reorganized Winc, (b) serve as the Liquidating Trustee to wind up the affairs of Post-Effective Date Winc Lost Poet, and (c) serve as the sole officer to manage and oversee the business operations and affairs of BWSC. The Post-Effective Date Debtor Representative shall be designated by the Committee, in consultation with the Debtors, and identified in the Plan Supplement. The Post-Effective Date Debtor Representative shall be deemed appointed as of the Effective Date.

**1.109**     "Post-Effective Date Debtors" shall mean the Debtors on or after the Effective Date.

**1.110**     "Post-Effective Date Winc Lost Poet" shall mean Winc Lost Poet on or after the Effective Date.

**1.111**     "Prepetition Credit Facility" shall mean the Debtors' revolving line of credit with Banc of California, N.A., as successor-by-merger to Pacific Mercantile Bank, pursuant to the Prepetition Credit Agreement.

**1.112** "Prepetition Secured Party" shall mean Banc of California, N.A., as successor-by-merger to Pacific Mercantile Bank, solely in its capacity as the lender under the Prepetition Credit Agreement.

**1.113** "Prepetition Credit Agreement" shall mean that certain *Credit Agreement*, dated as of December 15, 2020 (as has been amended, supplemented or otherwise modified from time to time), by and among the Debtors and the Prepetition Secured Party.

**1.114** "Priority Non-Tax Claim" shall mean any and all Claims accorded priority in right of payment under Bankruptcy Code section 507(a), other than Priority Tax Claims and Administrative Claims.

**1.115** "Priority Tax Claim" shall mean a Claim or a portion of a Claim for which priority is asserted under Bankruptcy Code section 507(a)(8).

**1.116** "Professional" shall mean an Entity employed pursuant to a Final Order in accordance with Bankruptcy Code sections 327, 328, 333, 363, 1103 and to be compensated for services rendered during the Chapter 11 Cases, pursuant to Bankruptcy Code sections 327, 328, 329, 330, and 331, or for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Bankruptcy Code section 503(b)(4).

**1.117** "Professional Fee Claims" shall mean all fees and expenses for services rendered by Professionals (other than Professionals retained pursuant to the OCP Order) in connection with the Chapter 11 Cases from the Petition Date through and including the Effective Date.

**1.118** "Professional Fee Claims Bar Date" shall mean the deadline for Filing all applications for Professional Fee Claims, which shall be forty-five (45) days after Filing and service of the Effective Date Notice.

**1.119** "Professional Fee Escrow Account" means an account held by Young Conaway Stargatt & Taylor, LLP and funded by the Debtors in Cash on the Effective Date pursuant to Section 6.1(e) of the Plan, in an amount equal to the Professional Fee Reserve Amount.

**1.120** "Professional Fee Reserve Amount" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors or the Committee prior to the Effective Date, which estimates Professionals shall deliver to the Debtors and the Committee as set forth in Section 6.1(e) of the Plan.

**1.121** "Project Crush" shall mean Project Crush Acquisition Corp LLC.

**1.122** "Reorganized BWSC" shall mean BWSC on and after the Effective Date.

**1.123** "Reorganized Winc" shall mean Winc on and after the Effective Date.

**1.124** "Retained Causes of Action" shall mean all Causes of Action that are not Transferred Assets, as defined in the APA, including, but not limited to, (a) all Avoidance Actions and all Claims under chapter 5 of the Bankruptcy Code, other than the Transferred

Chapter 5 Claims (as defined in the APA); (b) direct or derivative Claims or Causes of Action against any and all current and/or former officers, directors, stockholders, members, managers, employees, Affiliates, or insiders of the Debtors, including but not limited to for breach of fiduciary duty or aiding and abetting breach of fiduciary duty, or under and pursuant to any D&O Liability Insurance Policy or fiduciary insurance policy (including for bad faith) maintained by the Debtors; and (c) the right to seek a determination by the Bankruptcy Court of any tax, fine, or penalty relating to a tax, or any addition to a tax, under section 505 of the Bankruptcy Code.

**1.125** "Revenue Procedure" shall mean an official statement of a procedure published by the IRS in the Internal Revenue Bulletin.

**1.126** "Sale Documents" shall mean, collectively, the Sale Order, APA, TSA, and MSA.

**1.127** "Sale Order" shall mean that certain *Order Authorizing (I) the Sale of the Debtors' Assets Free and Clear of all Liens, Claims, Encumbrances, and Other Interests; (II) the Debtors to Enter into and Perform Their Obligations Under the Project Crush Acquisition Corp LLC Asset Purchase Agreement and Related Documents; (III) the Debtors to Assume and Assign Certain Contracts and Unexpired leases; (IV) Waiver of the Stay Periods Under Bankruptcy Rules 6004(h) and 6006(d); and (V) Granting Related Relief* [D.I. 203].

**1.128** "Schedules" shall mean the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors pursuant to Bankruptcy Code section 521 and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

**1.129** "Supplemental Administrative Claim Bar Date" shall mean the date that is forty-five (45) days following the Effective Date, which shall be the deadline for filing requests for payment of Administrative Claims that accrue after the Initial Administrative Claim Bar Date through and including the Effective Date.

**1.130** "Secured" shall  mean when referring to a Claim, a Claim secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by a Final Order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the applicable creditor's interest in such Estate's property or to the extent of the amount subject to setoff, as applicable, in each case, as determined pursuant to Bankruptcy Code section 506(a).

**1.131** "Settlement Term Sheet" shall mean that certain *Settlement Term Sheet and Addendum to Sale Order* included as Exhibit C to the Sale Order.

**1.132** "Solicitation Procedures Order" shall mean that certain *Order (I) Approving the Combined Disclosure Statement and Plan on an Interim Basis for Solicitation Purposes Only; (II) Establishing Solicitation and Tabulation Procedures; (III) Approving the Form of Ballots and Solicitation Materials; (IV) Establishing the Voting Record Date; (V) Fixing the Date, Time, and Place for the Combined Hearing and the Deadline for Filing Objections Thereto; and (VI) Granting Related Relief* [D.I. 402].

**1.133**    "Successful Bidder" shall mean the prevailing bidder acquiring the Debtors' assets.

**1.134**    "Termination Date" shall mean the earlier of (i) such time that the applicable Buyer Parties (as defined in the TSA) obtain all licenses and permits required by Alcohol Beverage Laws (as defined in the TSA) to allow Buyer Parties to conduct the Business (as defined in the TSA) and (ii) January 31, 2024.

**1.135**    "Transferred Assets" shall have the meaning given to such term in the APA.

**1.136**    "Transferred Causes of Action" shall mean the Causes of Action transferred to Project Crush pursuant to the APA.

**1.137**    "Treasury Regulations" shall mean the regulations (including temporary regulations) promulgated or proposed by the United States Department of the Treasury pursuant to and in respect of provisions of the Internal Revenue Code.  All references herein to sections of the Treasury Regulations shall include any corresponding provision or provisions of succeeding, similar or substitute, temporary or final Treasury Regulations.

**1.138**    "TSA" shall mean that certain *Transition Services Agreement* by and among Project Crush, Project Crush Wholesale Sub, LLC, Project Crush DTC Sub, LLC, and BWSC, effective as of January 23, 2023.

**1.139**    "Unclassified Claims" shall mean any Administrative Claims, Professional Fee Claims, and Priority Tax Claims.

**1.140**    "Unimpaired" shall mean, when used in reference to a Claim or Interest, any Claim or Interest that is not impaired within the meaning of Bankruptcy Code section 1124.

**1.141**    "U.S. Holder" shall have the meaning set forth in Section 5.7 of this Disclosure Statement and Plan.

**1.142**    "U.S. Trustee" shall mean the Office of the United States Trustee for the District of Delaware.

**1.143**    "U.S. Trustee Fees" shall mean fees payable pursuant to 28 U.S.C. § 1930 and any interest accruing thereon pursuant to 31 U.S.C. § 3717.

**1.144**    "Voting Deadline" shall mean July 27, 2023 at 4:00 p.m. (prevailing Eastern Time), the date and time by which ballots to accept or reject the Plan must be received to be counted, as established by the Solicitation Procedures Order.

**1.145**    "Winc" shall mean Winc, Inc.

**1.146**    "Winc Lost Poet" shall mean Winc Lost Poet, LLC.

**Rules of Interpretation**.

For purposes of the Disclosure Statement and Plan, except as expressly provided or unless the context otherwise requires, (a) any capitalized term used in the Disclosure Statement and Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable, (b) whenever the context requires, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter shall include the masculine, feminine and the neuter, (c) any reference in the Disclosure Statement and Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (d) any reference in the Disclosure Statement and Plan to an existing document or exhibit means such document or exhibit as it may be amended, modified, or supplemented from time to time, (e) unless otherwise specified, all references in the Disclosure Statement and Plan to sections, articles, schedules, and exhibits are references to sections, articles, schedules, and exhibits of or to the Disclosure Statement and Plan, (f) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan in its entirety rather than to any particular paragraph, subparagraph, or clause contained in the Disclosure Statement and Plan, (g) captions and headings to articles and sections are inserted for convenience of reference only and shall not limit or otherwise affect the provisions hereof or the interpretation of the Disclosure Statement and Plan, and (h) the rules of construction set forth in Bankruptcy Code section 102 and in the Bankruptcy Rules shall apply.

## ARTICLE II
## CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES

**2.1    Classification**.

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the claims reconciliation process. Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual Distributions received by creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only. In addition to the cautionary notes contained elsewhere in the combined Disclosure Statement and Plan, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates. The Plan Proponents expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

All Claims and Interests, except Administrative Claims, Professional Fee Claims, and Priority Tax Claims, are placed in the Classes set forth below. In accordance with Bankruptcy Code section 1123(a)(1), the Unclassified Claims, as described herein, have not been classified, and the respective treatment of such Unclassified Claims is set forth below in Article VI of the Plan. The categories of Claims and Interests listed below classify Claims and Interests for purposes of voting, confirmation and distribution pursuant to the Plan and pursuant to Bankruptcy Code sections 1122 and 1123(a)(1).

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

| Class/ Designation | Plan Treatment | Estimated Amount of Claims[3] | Status | Projected Recovery[4] |
|---|---|---|---|---|
| **Class 1**: Priority Non-Tax Claims | Each Holder of an Allowed Class 1 Priority Non-Tax Claim shall receive in full and final satisfaction and settlement of and in exchange for such Allowed Class 1 Claim: (A) Cash equal to the amount of such Allowed Priority Non-Tax Claim; or (B) such other treatment which the Debtors, Post-Effective Date Debtors, or the Creditor Trustee, as applicable, and the Holder of such Allowed Priority Non-Tax Claim have agreed upon in writing. | $240,000 | Unimpaired/ Presumed to accept the Plan | 100% |
| **Class 2**: Secured Claims | Each Holder of an Allowed Class 2 Secured Claim shall receive in full and final satisfaction and settlement of and in exchange for such Allowed Class 2 Secured Claim: (A) Cash equal to the amount of such Allowed Secured Claim; or (B) such other treatment which the Debtors, Post-Effective Date Debtors, or the Creditor Trustee, as applicable, and the Holder of such Allowed Secured Claim have agreed upon in writing. | $35 | Unimpaired/ Presumed to accept the Plan | 100% |

[3] The Allowed amount of Claims in any Class could be materially greater or less than projected, which, in turn, could cause the amount of Distributions to Holders of Allowed Claims in such Class to substantially change.

[4] Projected recoveries will be impacted by, among other things, the amount of Claims ultimately Allowed, the amount of Creditor Trust Expenses and the amount of Cash realized from the liquidation of the Creditor Trust Assets, including any proceeds realized from the pursuit of Retained Causes of Action, which could be less than anticipated. Consequently, the projected recoveries listed herein are estimates, provided solely for informational purposes, and are subject to material change.

| Class/ Designation | Plan Treatment | Estimated Amount of Claims[3] | Status | Projected Recovery[4] |
|---|---|---|---|---|
| **Class 3:** General Unsecured Claims | Unless the Holder of an Allowed Class 3 General Unsecured Claim agrees to a different treatment, as soon as practicable after the Effective Date, each Holder of an Allowed Class 3 General Unsecured Claim shall receive Cash equal to its pro rata share of the GUC Cash Distribution Amount. | $15,705,000 | Impaired/ Entitled to vote | 3–6% |
| **Class 4:** Intercompany Claims | Holders of Intercompany Claims shall receive no Distribution on account of their Intercompany Claims. | N/A | Impaired/ Deemed to reject the Plan | 0% |
| **Class 5(a):** Interests in Winc | On the Effective Date, all Interests in Winc shall be cancelled as of the Effective Date, and the Holders thereof shall receive no Distribution on account of such Interests. | N/A | Impaired/ Deemed to reject the Plan | 0% |
| **Class 5(b):** Interests in BWSC | On the Effective Date, all Interests in BWSC will be reinstated and vest in Reorganized Winc solely for corporate governance purposes, and the Holders thereof shall receive no Distribution on account of such Interests. | N/A | Impaired/ Deemed to reject the Plan | 0% |
| **Class 5(c):** Interests in Winc Lost Poet | On the Effective Date, all Interests in Winc Lost Poet shall be cancelled as of the Effective Date, and the Holders thereof shall receive no Distribution on account of such Interests. | N/A | Impaired/ Deemed to reject the Plan | 0% |

## ARTICLE III
## BACKGROUND AND DISCLOSURES

**3.1    General Background**.[5]

*(a)    The Debtors' History*.

        In 2011, Club W, Inc. was incorporated under the laws of Delaware.  In 2021, Club W, Inc. became Winc, Inc.  On February 13, 2012, BWSC was organized under the laws of California.  On April 19, 2021, Winc Lost Poet was organized under the laws of Delaware.  Winc was, and remains

---

[5]  Additional information regarding the Debtors' business, assets, capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in detail in the First Day Declaration, which is incorporated herein by reference.

as of the date of the Plan, the sole member of BWSC and the managing member of Winc Lost Poet.[6]

In November 2021, Winc completed an initial public offering ("IPO") through an underwritten sale of 1,692,308 shares of its common stock at a price of $13.00 per share. The aggregate net proceeds from the offering, after deducting underwriting discounts and commissions and other offering expenses, were approximately $17.7 million.

Following the IPO, Winc's common stock was publicly traded on the NYSE American LLC exchange under the ticker symbol "WBEV."[7]

     *(b)*     ***The Debtors' Business***.

As of the Petition Date, the Debtors were an emerging growth company that utilized a data-driven brand development strategy to sell proprietary wine products through a three-tier wine distribution network (distributor – retailer – consumer), referred to as the wholesale channel, and an online direct-to-consumer ("DTC") channel. As part of their business, the Debtors analyzed consumer data and real-time purchasing behaviors from their DTC sales to develop wine brands that aligned with shifting and emerging consumer preferences. The Debtors' business was structured to reduce time to market for potential breakout brands and reduce risk and cost of product launches, which was a key driver of the Debtors' growth strategy.

As part of the Debtors' wholesale operations, the Debtors distributed wine in all fifty (50) states through their relationships with various wine distributors. In 2021, the Debtors serviced 16,900 retail accounts in twelve (12) countries. The Debtors' primary retail partners in the United States included Whole Foods, H-E-B, Target, and Albertson's.

The Debtors' products were available at premium retailers and restaurants throughout the United States. The Debtors also offered their products for sale on their e-commerce platform, which comprised five (5) websites where products were available to customers (the "DTC Customers") that subscribed to the Debtors' online membership service. DTC Customers generally paid a monthly subscription fee of $59.99 per month in exchange for credits that they could then redeem to purchase products on the DTC platform. The DTC Customers also received access to special pricing, offers, and other services.

---

[6] Winc Lost Poet was formed after Winc acquired the rights, title, and interest in certain intellectual property in connection with the launch of a line of wine beverages promoted under the brand name, "Lost Poet." In connection with the acquisition of such rights, the Debtors established Winc Lost Poet and entered into that certain *Collaboration Agreement* with Atticus Publishing, LLC, which owns 10% of the Interests in Winc Lost Poet. Winc owns 90% of the Interests in Winc Lost Poet.

[7] On December 5, 2022, Winc received written notice from the NYSE Regulation that, as a result of the Chapter 11 Cases and in accordance with section 1003(c)(iii) of the NYSE American Company Guide, the NYSE Regulation had determined to commence proceedings to delist its common stock from the NYSE American LLC.

(c)     **The Debtors' Prepetition Capital Structure**.

As of the Petition Date, the Debtors' outstanding secured debt consisted of the Prepetition Credit Facility with an outstanding balance of approximately $3,500,000.  The Prepetition Credit Facility was secured by a security interest in substantially all of the Debtors' assets.

The Debtors were also party to the Clearco Agreement, whereby the Debtors obtained an advance of approximately $2,088,000 against approximately $3,026,000 of future receivables. Prior to the Petition Date, the Debtors applied 9% of daily DTC receipts towards the balance owed on account of their obligations under the Clearco Agreement.  As of the Petition Date, the unsecured amount owed under the Clearco Agreement was approximately $1,188,772.  The Debtors also owed approximately $8,000,000 in trade payables and operating expenses as of the Petition Date.

## 3.2    Events Leading to the Chapter 11 Cases.

(a)     **The Debtors' Sale and Financing Efforts**.

After considering the upcoming maturity of the Prepetition Credit Facility and their outstanding debt, the Debtors determined to explore strategic alternatives, including a sale of their assets.  To further this goal, the Debtors engaged Canaccord in March 2022 as their investment banker.

As part of the consideration of potential strategic alternatives, Canaccord undertook a prepetition marketing effort and began soliciting indications of interest for the sale of the Debtors' assets, both on an integrated and piecemeal basis.  Ultimately, after an approximate eight-month marketing process, one party – Project Crush – submitted an actionable bid for the assets and eventually became the Debtors' stalking horse bidder in the Chapter 11 Cases.

Project Crush initially proposed to provide the Debtors with an all-Cash purchase price and extension of credit to fund the Debtors' operations until an out-of-court merger transaction could be consummated.  However, the day before the Thanksgiving holiday (and one week prior to the Prepetition Credit Facility's maturity date), Project Crush revised the structure of the contemplated transaction, and instead proposed to consummate the transaction through a sale process under Bankruptcy Code section 363, pursuant to which Project Crush would buy certain of the Debtors' assets for $8 million in Cash consideration.  Thereafter, the Debtors, with the assistance of their professional advisors and Canaccord, reached out to a number of previously interested parties to solicit better offers (on both an in-court and out-of-court basis).  After it became apparent that no better offers were immediately forthcoming, the Debtors engaged in arms'-length negotiations with Project Crush, which led to Project Crush increasing the terms of the stalking horse bid to $10 million.  Upon filing the Chapter 11 Cases, the Debtors entered into a stalking horse agreement with Project Crush.

The Debtors determined, after considering all circumstances and in consultation with their professional advisors, that the 363 Sale would provide the best opportunity to maximize the value of the Debtors' assets.  After extensive arms'-length negotiations, the Debtors and Project Crush entered into the APA.  Following the commencement of the Chapter 11 Cases and after engaging in further negotiations with the Debtors and their professionals, Project Crush agreed to provide

additional consideration in the amount of $1 million, bringing the total cash consideration to $11 million while continuing to assume material specified liabilities related to the business. Under the APA, the cash consideration paid to the Debtors by Project Crush was reduced by the aggregate amount of any unpaid and outstanding obligations under the DIP Term Sheet and DIP Order by virtue of a credit bid.

The Debtors, with the assistance of Canaccord and the Debtors' other professional advisors, engaged in good-faith, arms'-length negotiations with Project Crush regarding the APA. The Debtors' entry into the APA, together with the committed postpetition financing from Project Crush, allowed the Debtors to conduct a value-maximizing sale process.

(b)    *The Debtors' Prepetition Liquidity*.

Under the terms of the Prepetition Credit Agreement, the initial maturity date of the Prepetition Credit Facility was March 31, 2022. In February 2022, the Debtors approached the Prepetition Secured Party for additional financing, which the Prepetition Secured Party declined to provide. Instead, over the course of the next several months, through a series of three amendments, the Prepetition Secured Party extended the maturity date of the Prepetition Credit Facility to December 31, 2022, and incrementally reduced the Debtors' borrowing capacity each month leading to the maturity date.

After the Prepetition Secured Lender declined to provide additional financing, the Debtors solicited funding from various other lenders, all of which declined to provide funding. Eventually, the Debtors engaged in advanced discussions with a private lender that specializes in providing working capital for growing businesses and executed a term sheet for a working capital loan. However, after performing substantial diligence and obtaining an appraisal of the Debtors' assets, the lender declined to provide funding. Despite this setback, the Debtors eventually entered into negotiations with another lender and executed a term sheet for a line of credit; ultimately, due to the lender's insistence on certain out of market and punitive terms, the Debtors deemed the transaction unfeasible.

Given the Debtors' liquidity position and inability to secure financing, the Debtors were unable to make the payment due to the Prepetition Secured Party under the Prepetition Credit Facility on December 1, 2022.

**3.3    The Chapter 11 Cases**.

(a)    *Generally*.

On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The commencement of a chapter 11 case creates an estate that consists of all of the legal and equitable interests of a debtor as of that date. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession." The Debtors have continued to operate their businesses and manage their properties as debtors and debtors in possession. By order entered on December 6, 2022 [D.I. 33], the Chapter 11 Cases are being jointly administered for procedural purposes only. No trustee or examiner has been appointed in the Chapter 11 Cases. On December 12, 2022, the U.S. Trustee appointed the Committee. On January 1, 2023, January 25, 2023, and

March 16, 2023, the U.S. Trustee filed its first, second, and third amendments to the appointment of the Committee, respectively. *See* D.I. 201, 213, and 299.

The filing of the Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under Bankruptcy Code section 362, which, with limited exceptions, enjoins all collection efforts and actions by creditors, the enforcement of liens against property of the Debtors and both the commencement and the continuation of prepetition litigation against the Debtors. With certain limited exceptions and/or modifications as permitted by order of the Bankruptcy Court, the automatic stay will remain in effect from the Petition Date until the Effective Date of the Plan, at which point the automatic stay will be replaced by a post-confirmation injunction under the terms of the Plan pursuant to Section 14.2 herein.

      *(b)*      *"First Day" Motions and Related Applications*.

Commencing on the Petition Date, the Debtors filed certain operational motions and applications (collectively, the "First Day Pleadings"), including (as detailed below) a motion seeking approval to borrow up to $5 million dollars on a final basis, designed to ease the Debtors' transition into chapter 11, maximize the value of the Debtors' assets, and minimize the effects of the commencement of the Chapter 11 Cases.

On December 6 and 7, 2022, the Bankruptcy Court entered orders approving the relief requested in the First Day Pleadings, on an interim basis [D.I. 33, 34, 35, 36, 37, 38, 39, 40, 41, and 44]. Subsequently, on January 4 and 5, 2023, the Bankruptcy Court entered orders approving the relief requested in the First Day Pleadings on a final basis [D.I. 119, 120, 121, 122, 123, 124, 125, and 134].

Pursuant to the DIP Order, the Debtors were authorized to borrow up to $5 million from the DIP Lender under the terms of the DIP Order and DIP Term Sheet. Through the Chapter 11 Cases, the Debtors borrowed approximately $4,165,964 under the DIP Order and DIP Term Sheet. The DIP Obligations were satisfied pursuant to the credit bid by the Purchaser in connection with the 363 Sale.

      *(c)*      *Retention of Professional Advisors*.

Pursuant to orders entered on January 5, 2023, the Bankruptcy Court authorized the Debtors to retain and employ (i) Young Conaway Stargatt & Taylor, LLP as their bankruptcy counsel [D.I. 129], (ii) RPA Asset Management Services, LLC as their financial advisor [D.I. 130], and (iii) Epiq Corporate Restructuring, LLC as administrative advisor [D.I. 131]. The Bankruptcy Court also authorized procedures for the Debtors to retain and employ certain professionals utilized by the Debtors in the ordinary course of business prior to the Petition Date [D.I. 127]. On January 19, 2023, the Bankruptcy Court authorized the Debtors to retain and employ Canaccord as their investment banker [D.I. 204]. On February 8, 2023, the Bankruptcy Court authorized the Committee to retain and employ ArentFox Schiff LLP as bankruptcy counsel [D.I. 229]. On February 10, 2023, the Bankruptcy Court authorized the Committee to retain (i) A.M. Saccullo Legal, LLC as bankruptcy co-counsel [D.I. 234] and (ii) CohnReznick LLP and CohnResnick Capital Markets Securities, LLC as its financial advisor and investment banker, respectively [D.I. 233].

On January 11, 2023, the Committee filed its *Omnibus Objection to (A) Debtors' Motion for Entry of an Order (I) Approving Stalking Horse Purchase Agreement and (II) Authorizing a Sale Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (B) Application to Retain Canaccord Genuity, LLC as Investment Banker; and (C) Certain Inventory Payments* [D.I. 159] (the "Committee Omnibus Objection"), which, among other things, objected to the Debtors' application to retain and employ Canaccord as their investment banker on the terms described therein. The Committee specifically objected to the transaction fee that the Debtors proposed to pay Canaccord Genuity, LLC through their application. The U.S. Trustee and Project Crush were also among the Entities that filed objections to the Debtors' application to retain Canaccord Genuity LLC. The Committee Omnibus Objection was resolved through the Settlement Term Sheet, as described below, which also resolved the other objections.

   (d)   *Sale of the Debtors' Assets*.

          i.    The Bidding Procedures.

On December 7, 2022, the Debtors filed a motion (the "Bidding Procedures and Sale Motion") seeking entry of an order (a)(i) approving bidding procedures relating to the sale of substantially all of their assets, (ii) approving notice of the auction and hearing, (iii) scheduling an auction for, and a hearing to approve, the sale, (iv) approving procedures for the assumption and assignment of executory contracts and unexpired leases, (v) granting related relief; and (b) approving (i) an asset purchase agreement, and (ii) the sale of the substantially all of their assets free and clear of liens, claims, interests and encumbrances.

On December 22, 2022, the Bankruptcy Court entered the Bidding Procedures Order [D.I. 85] establishing, among other things, January 9, 2023 at 12:00 p.m. (ET) as the bid deadline, January 11, 2023 at 10:00 a.m. (ET) as the auction date, and January 17, 2023 at 2:00 p.m. (ET), as the date and time of the hearing to approve the sale.

On January 11, 2023, the Committee filed the Committee Omnibus Objection, which, among other things, objected to the Debtors' proposed sale of their assets to Project Crush on the terms described therein. The Committee specifically objected to the lack of clarity of certain key items of the proposed asset purchase agreement, including but not limited to the responsibility for certain liabilities, the sale and marketing efforts leading up to the proposed sale, whether the assets' liquidation value exceeded the consideration that would be realized from the proposed sale, and the concern that the sale as contemplated would leave the Debtors' estates administratively insolvent and without any means to pay Holders of General Unsecured Claims anything. The Committee Omnibus Objection was resolved through the Settlement Term Sheet, as described below.

          ii.   The Sale Process.

The Debtors and their professionals marketed the Debtors' assets to potential purchasers both before and after the Petition Date. As described above, prior to the Petition Date, in March 2022, the Debtors engaged Canaccord as their investment banker for the purpose of assisting the Debtors with an analysis of strategic alternatives, including the sale of their assets. Canaccord spent considerable time investigating market receptivity to a potential out-of-court sale, contacting fifty-five (55) prospective buyers. Of these entities, approximately twenty-five (25) executed

confidentiality agreements and received a confidential information presentation, with those parties who expressed continued interest in receiving access to a virtual data room and the opportunity to meet with the Debtors' management to conduct additional due diligence.  After the Petition Date, Canaccord continued the marketing and sale process, including by continuing to reach out to potential strategic and financial buyers and having advanced discussions with numerous potential buyers.  *See* D.I. 184.

On January 10, 2023, after receiving no Qualified Bids (as defined in the Bidding Procedures Order), the Debtors filed a Notice of Successful Bidder [D.I. 149] deeming Project Crush the Successful Bidder, and cancelled the auction scheduled for January 11, 2023.

On January 11, 2023, the Committee filed the Committee Omnibus Objection.

On January 18, 2023, following agreement between (among others) the Committee and the Debtors on the Settlement Term Sheet, the Bankruptcy Court entered the Sale Order, thereby approving a sale of the Debtors' assets to Project Crush free and clear of all liens, claims, and encumbrances (other than those permitted therein), pursuant to the APA, TSA, and MSA  [D.I. 203].  The sale closed on January 23, 2023.

Following closing of the 363 Sale, Debtors terminated their employees, many of whom were offered employment by Project Crush, and began to wind down the operations of Winc and Winc Lost Poet.  BWSC continues to operate its business under the terms of the TSA and MSA.  Under the TSA and MSA, Project Crush funds BWSC's ongoing operations and related obligations.  BWSC will continue its operations going forward until termination of the TSA, which shall occur no later than the Termination Date.

(e)      ***Settlement Term Sheet***.

Prior to entry of the Sale Order, the Debtors, Committee, DIP Lender, and Prepetition Secured Party entered into the Settlement Term Sheet to resolve certain objections to the Sale Order and Canaccord's retention in the Chapter 11 Cases, including but not limited to the Committee Omnibus Objection.

Pursuant to the Settlement Term Sheet, among other things, the (i) Committee, Debtors, and Project Crush designated certain Executory Contracts and/or purchase orders for assumption and assignment by the Debtors to Project Crush, and Project Crush agreed to satisfy the cure costs associated with assumption of such Executory Contracts and/or purchase orders, (ii) Committee consented to allowing the Debtors to make a proposed vendor payment on account of a prepetition critical vendor claim, and (iii) Debtors and the Committee agreed to work in good faith to negotiate and draft this joint Disclosure Statement and Plan.  The parties to the Settlement Term Sheet also agreed to an allocation of sale proceeds, pursuant to which the Debtors and Project Crush split "Net Sale Proceeds" (as defined in the Settlement Term Sheet), and Project Crush credit bid its share of Net Sale Proceeds against the purchase price under the terms of the APA.

In connection with the approval of the 363 Sale and through the Sale Order, the Bankruptcy Court approved the Settlement Term Sheet.

(f)      *Payoff of the Prepetition Secured Facility and DIP Obligations*.

The DIP Obligations were satisfied through Project Crush's credit bidding of the purchase price under the 363 Sale and, in accordance with the terms of the DIP Order, the obligations owed under the Prepetition Credit Facility were paid at closing by the Debtors from the 363 Sale Proceeds.

(g)      *Schedules and Bar Dates*.

On December 28, 2022, the Debtors filed the Schedules.  Among other things, the Schedules set forth the Claims of known or putative creditors against the Debtors as of the Petition Date, based upon the Debtors' books and records.

On March 6, 2023, the Bankruptcy Court entered the Bar Date Order establishing the General Bar Date as April 5, 2023 at 5:00 p.m. (prevailing Eastern Time).  The Bar Date Order also established a deadline for filing proofs of claim by Governmental Units, of May 30, 2023 at 5:00 p.m. (prevailing Eastern Time), and the Initial Administrative Claim Bar Date, which is the deadline to assert claims pursuant to sections 503(b) and 507(a)(2) that arose after the Petition Date through and including January 31, 2023.  The Bar Date Order also established a deadline for filing proofs of claim asserting claims arising from the rejection of an executory contract or unexpired lease, of the later of (i) the General Bar Date, and (ii) the date that is thirty (30) days from entry of an order approving the rejection of the executory contract or unexpired lease.  As described in detail below, the Plan contemplates the establishment of the Supplemental Administrative Claim Bar Date and Professional Fee Claims Bar Date pursuant to the Confirmation Order.

The projected recoveries set forth in the Plan are based on certain assumptions, including the Debtors' estimates of the Claims that will eventually be Allowed in various Classes.  There is no guarantee that the ultimate amount of each of such categories of Claims will correspond to the Debtors' estimates.  The Debtors, the Committee, the Post-Effective Date Debtors, or the Creditor Trustee, as applicable, and their respective professionals will investigate Claims filed against the Debtors to determine the validity of such Claims.  The Debtors, Committee, Post-Effective Date Debtors, or Creditor Trustee, as applicable, may file objections to Claims that are filed in improper amounts or classifications, or are otherwise subject to objection under the Bankruptcy Code or other applicable law.

(h)      *The Wind-Down of the Estates*.

The Plan provides for the Creditor Trust Assets to vest in the Creditor Trust.  The Creditor Trust Assets will be liquidated over time and the proceeds thereof will be used to fund the Creditor Trust Operating Expenses and to make distributions to Holders of Allowed Claims in accordance with the terms of the Plan.

Pursuant to the Plan, and to comply with BWSC's obligations under the TSA and MSA, Interests in BWSC will vest in Reorganized Winc.  The Creditor Trust shall be the sole stockholder of Reorganized Winc.  Reorganized BWSC will continue to operate to satisfy the obligations of BWSC under the Sale Documents.  Upon the termination of the TSA and MSA, which shall occur

30605632.1

28

no later than the Termination Date, the Post-Effective Date Debtor Representative of BWSC will, in consultation with the Creditor Trustee, (i) liquidate, wind down, and dissolve Reorganized BWSC under applicable law; (ii) request that BWSC's Chapter 11 Case be closed; and (iii) file BWSC's final tax returns.

After the termination of the TSA and MSA, the Post-Effective Date Debtor Representative of Winc will, in consultation with the Creditor Trustee, (i) liquidate, wind down, and dissolve Reorganized Winc under applicable law; and (ii) file Winc's final tax returns.

Upon the Effective Date, the Post-Effective Date Debtor Representative of Post-Effective Date Winc Lost Poet will, in consultation with the Creditor Trustee and without the need for any further order or action of the Bankruptcy Court, dissolve and wind up the affairs of Post-Effective Date Winc Lost Poet in accordance with applicable law. The Post-Effective Date Debtor Representative of Post-Effective Date Winc Lost Poet is authorized to take all actions reasonably necessary to dissolve Post-Effective Date Winc Lost Poet, and neither the Post-Effective Date Debtor Representative nor the Post-Effective Date Debtors shall be required to pay any taxes or fees in order to cause such dissolution and termination of Post-Effective Date Winc Lost Poet's existence.

### ARTICLE IV
### CONFIRMATION AND VOTING PROCEDURES

**4.1    Confirmation Procedure**.

The Solicitation Procedures Order, among other things, conditionally approves the combined Disclosure Statement and Plan for solicitation purposes only and authorizes the Debtors to solicit votes to accept or reject the Plan. The Confirmation Hearing has been scheduled for **August 3, 2023 at 10:00 a.m. (prevailing Eastern Time)** at the Bankruptcy Court, 824 North Market Street, 6th Floor, Courtroom 2, Wilmington, Delaware 19801 to consider (a) final approval of the Disclosure Statement as providing adequate information pursuant to Bankruptcy Code section 1125, and (b) confirmation of the Plan pursuant to Bankruptcy Code section 1129. The Confirmation Hearing may be adjourned from time to time by the Plan Proponents without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

**4.2    Procedure for Objections**.

Any objection to final approval of the combined Disclosure Statement and Plan as providing adequate information pursuant to Bankruptcy Code section 1125 or confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on (i) counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: Michael R. Nestor, Esq. (mnestor@ycst.com); Matthew B. Lunn, Esq. (mlunn@ycst.com); and Allison S. Mielke, Esq. (amielke@ycst.com); and (ii) counsel to the Committee, ArentFox Schiff LLP, 1301 Avenue of the Americas, 42nd Floor, New York, NY 10019, Attn: George Angelich, Esq. (george.angelich@afslaw.com); 800 Boylston Street, 32nd Floor, Boston, MA 02199, Attn: Justin Kesselman, Esq. (justin.kesselman@afslaw.com) and James Britton, Esq. (james.britton@afslaw.com); A.M. Saccullo Legal LLC, 27 Crimson King

Dr., Bear, DE 19701, Attn:  Anthony M. Saccullo, Esq. (ams@saccullolegal.com) and Mark Hurford (mark@saccullolegal.com) in each case, by no later than **July 27, 2023 at 4:00 p.m. (prevailing Eastern Time)**.  Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

**4.3     Requirements for Confirmation**.

        The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of Bankruptcy Code section 1129.  Among other requirements, the Plan (i) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class, and (ii) must be feasible.  The Bankruptcy Court must also find that the Plan: (i) classifies Claims and Interests in a permissible manner, (ii) complies with the technical requirements of chapter 11 of the Bankruptcy Code, and (iii) is proposed in good faith.

**4.4     Classification of Claims and Interests**.

        Bankruptcy Code section 1123 provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with Bankruptcy Code section 1123, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to Bankruptcy Code section 1123(a)(1) need not be and have not been classified).  The Debtors also are required, under Bankruptcy Code section 1122, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

        The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest.  The Debtors believe that the Plan complies with such standard.  If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

        A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

        The Plan Proponents believe that the Plan has classified all Claims and Interests in compliance with the provisions of Bankruptcy Code section 1122 and applicable case law.  It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  If such a situation develops, the Plan Proponents intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its confirmation.  Any such reclassification could adversely affect Holders of Claims or

Interests by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

**EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized herein. The Plan Proponents believe that the consideration, if any, provided under the Plan to Holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

## 4.5    Impaired Claims or Interests.

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in Bankruptcy Code section 1124) under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under Bankruptcy Code section 1126(g) and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, Holders of Claims in Class 3 are Impaired and are entitled to vote on the Plan. Under the Plan, Holders of Claims or Interests in Classes 4, 5(a), 5(b), and 5(c) are Impaired and will not receive or retain any property under the Plan on account of such Claims or Interests and, therefore, are not entitled to vote on the Plan and are deemed to reject the Plan. Under the

Plan, Holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, not entitled to vote on the Plan and are presumed to accept the Plan.

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 3.**

**4.6     Feasibility**.

Bankruptcy Code section 1129(a)(11) requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). Inasmuch as the Debtors' assets have been, or eventually will be, liquidated and the Plan provides for the Distribution of all of the Cash proceeds of the assets to Holders of Claims that are Allowed in accordance with the Plan, for purposes of this test, the Debtors have analyzed the ability of the Creditor Trustee to meet its respective obligations under the Plan.  Based on the Debtors' analysis, the Creditor Trustee will have sufficient assets to accomplish its tasks under the Plan.  Therefore, the Plan Proponents believe that the liquidation pursuant to the Plan meets the feasibility requirements of the Bankruptcy Code.

**4.7     Best Interests Test and Liquidation Analysis**.

Even if a plan is accepted by the Holders of each class of Claims and Interests, the Bankruptcy Code requires the Bankruptcy Court to determine that such plan is in the best interests of all Holders of Claims or Interests that are impaired by that plan and that have not accepted the plan.  The "best interests" test, as set forth in Bankruptcy Code section 1129(a)(7), requires a court to find either that all members of an impaired class of Claims or Interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if a debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan.  If the hypothetical liquidation distribution to holders of Claims or Interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

Because the Plan contemplates the liquidation and distribution of all Creditor Trust Assets the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan.  However, the Plan Proponents believe that in a chapter 7 liquidation,

there would be additional costs and expenses that the Estates would incur as a result of liquidating the Estates in a chapter 7 case.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee. The Plan Proponents believe such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors. Conversion also would likely delay the liquidation process and ultimate distribution of the Debtors' assets. The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for professionals) that are allowed in the chapter 7 cases.

Accordingly, the Plan Proponents believe that Holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Cases were converted to chapter 7 cases, and therefore, the classification and treatment of Claims and Interests in the Plan complies with Bankruptcy Code section 1129(a)(7).

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Cases will not be converted to chapter 7 liquidation cases. While a liquidation under chapter 7 would have the same goal, the Plan Proponents believe the Plan provides the best source of recovery for several reasons. First, liquidation under chapter 7 of the Bankruptcy Code would not provide for a timely distribution. Second, the settlements embodied in the Plan provide protections to assist in maximizing value to creditors. Third, distributions would likely be smaller because of the fees and expenses incurred in a liquidation under chapter 7 of the Bankruptcy Code. In that event, the Debtors would incur additional administrative costs including those of a chapter 7 trustee and its professionals, which costs would be senior to General Unsecured Claims. Accordingly, if the Plan is not confirmed, it is likely that creditors will realize lower recoveries on account of their Allowed Claims.

**ACCORDINGLY, THE PLAN PROPONENTS BELIEVE THAT THE TREATMENT OF HOLDERS OF CLAIMS IN THE IMPAIRED CLASS ELIGIBLE TO VOTE WILL RECEIVE A GREATER RECOVERY FOR SUCH HOLDERS THAN WOULD BE AVAILABLE IN A CHAPTER 7 LIQUIDATION. ACCORDINGLY, THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF HOLDERS OF CLAIMS.**

A further liquidation analysis is attached hereto as **Exhibit B**.

**4.8    Acceptance of the Plan**.

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of ballots are set forth in the Solicitation Procedures Order.

For the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one voting Class, excluding the votes of insiders, must actually vote to accept the Plan.

**IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY SUBMIT THE BALLOT YOU RECEIVE. PLEASE BE SURE TO COMPLETE ALL BALLOT ITEMS PROPERLY AND LEGIBLY. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE SOLICITATION AND CLAIMS AGENT AT WINC'S BALLOT PROCESSING CENTER, C/O EPIQ CORPORATE RESTRUCTURING, LLC, 777 THIRD AVENUE, 12TH FLOOR, NEW YORK, NY 10017, OR AT WINCBALLOTS@EPIQ.COM.  THE SOLICITATION AND CLAIMS AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

### ARTICLE V
### CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

**5.1    The Plan May Not Be Accepted**.

The Plan Proponents can make no assurances that the requisite acceptances to the Plan will be received, and the Plan Proponents may need to obtain acceptances to an alternative plan for the Debtors, or otherwise, that may not have the support of the creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to creditors as those proposed in the Plan.

**5.2    The Plan May Not Be Confirmed**.

Even if the Plan Proponents receive the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan.  Even if the Bankruptcy Court determined that the combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation had not been met.  Moreover, there can be no assurance that modifications to the combined Disclosure Statement and Plan will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes.  If the Plan is not confirmed, it is unclear what distributions

Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of liquidation.

If the Plan is not confirmed, the Plan will need to be revised and it is unclear whether a chapter 11 reorganization or liquidation of the Debtors' remaining assets could be implemented and what distribution the Holders of Allowed Claims would receive. If an alternative could not be agreed to, it is possible that the Debtors would have to liquidate their remaining assets in chapter 7, in which case it is likely that the Holders of Allowed Claims would receive substantially less favorable treatment than they would receive under the Plan. There can be no assurance that the terms of any such alternative would be similar, or as favorable, to the Debtors' creditors as those proposed in the Plan.

### 5.3    Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections.

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution. There can be no assurance that the estimated Claim amounts set forth in the Plan are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates. If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for distribution to such Class are lower than the Debtors' estimates due to higher than expected Creditor Trust Expenses, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

### 5.4    Objections to Classification of Claims.

Bankruptcy Code section 1122 requires that the Plan classify Claims and Interests. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Plan Proponents believe that all Claims and Interests have been appropriately classified in the Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Plan Proponents would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation, and (ii) use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires re-solicitation, the Plan Proponents will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member. The Plan Proponents believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against

the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Plan Proponents believe that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and Consummation of the Plan and could increase the risk that the Plan will not be consummated.

**5.5    Failure to Consummate the Plan**.

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Confirmation Date and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court. Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

**5.6    Reductions to Estimated Creditor Recoveries**.

The Allowed amount of Claims in any Class could be greater than projected, which, in turn, could cause the amount of Distributions to creditors in such Class to be substantially reduced. The amount of Cash realized from the sale or liquidation of the Creditor Trust Assets could be less than anticipated, which could cause the amount of Distributions to Holders of Allowed Claims to be substantially reduced.

**5.7    Certain Tax Considerations**.

The following discussion summarizes certain U.S. federal income tax considerations regarding the implementation of the Plan relevant to the Debtors and to certain U.S. Holders (as defined below) of certain Claims. As used in this Section, the term U.S. Holder means a beneficial owner of a Claim entitled to vote on the Plan, which beneficial owner for U.S. federal income tax purposes is (a) an individual who is a citizen or resident of the United States, (b) treated as a corporation created or organized in or under the laws of the United States, any state thereof or the District of Columbia, (c) an estate, the income of which is subject to U.S. federal income tax regardless of its source, or (d) a trust (x) with respect to which a court within the United States is able to exercise primary supervision over its administration and one or more United States persons have the authority to control all of its substantial decisions, or (y) that has in effect a valid election under applicable Treasury Regulations to be treated as a United States person. This discussion does not address the U.S. federal income tax consequences to (i) creditors whose Claims are Unimpaired or otherwise entitled to Payment in Full in Cash under the Plan, or (ii) U.S. Holders who are deemed to reject the Plan, such as U.S. Holders of Interests.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code, Treasury Regulations, judicial or administrative authorities and interpretations

thereof and published positions of the IRS, all as in effect on the date of the combined Disclosure Statement and Plan and all of which are subject to change or differing interpretations, possibly with retroactive effect. The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties. The Plan Proponents have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan. No assurance can be given that the IRS will not take a position contrary to the description of the U.S. federal income tax consequences of the Plan described below or that any such contrary position would not be sustained by a court.

This discussion is not a complete analysis of all potential U.S. federal income tax consequences arising from the implementation of the Plan and does not address any non-U.S., state, or local tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (e.g., public entities and Governmental Units (including the U.S. Government, states, municipalities, and Native American Tribes), Holders that are not "United States persons" (as such term is defined in the Internal Revenue Code), small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, Holders that are, or hold Claims through, S corporations, partnerships, or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction). If an entity treated as a partnership for U.S. federal income tax purposes holds a Claim, the U.S. federal income tax consequences arising from the Consummation of the Plan will depend in part upon the status and activities of such entity and the particular partner. Any such entity should consult its own tax advisor regarding the U.S. federal income tax consequences arising from the Consummation of the Plan applicable to it and its partners.

The following discussion does not address the tax consequences of the receipt by a U.S. Holder or any other Person of any consideration other than as described in Article VII of the Plan or any transaction undertaken by a U.S. Holder other than in its capacity as such a U.S. Holder. In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it address the Foreign Account Tax Compliance Act.

The following discussion generally assumes that the Plan implements the liquidation of the Debtors for U.S. federal income tax purposes (including by way of distributions to the Creditor Trust), and that all Distributions by the Debtors and the Creditor Trust will be taxed accordingly. Additionally, this discussion assumes that (i) the various arrangements to which any of the Debtors is a party will be respected for U.S. federal income tax purposes in accordance with their form and (ii) except as otherwise indicated, the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Internal Revenue Code.

The following discussion of certain U.S. federal income tax consequences is for general informational purposes only and is not a substitute for careful tax planning and advice based upon

your individual tax circumstances.  Each Holder of a Claim or Interest is urged to consult its own tax advisor for the U.S. federal, state, local, and other tax consequences applicable under the Plan.

      *(a)     **Consequences to the Debtors***.

BWSC and Winc Lost Poet file a consolidated U.S. federal income tax return with Winc as the common parent or an entity disregarded as separate from its owner for U.S. federal income tax purposes whose business activities and operations are reflected on the consolidated U.S. federal income tax returns of Winc.  The Debtors estimate that, as of the Petition Date, Winc may have had some consolidated net operating losses ("NOLs") for U.S. federal income tax purposes. However, the amount of any NOLs and other tax attributes, as well as the application of any limitations on their use, remains subject to review and adjustment by the IRS.  Moreover, the Debtors believe that they will have recognized additional losses on the sales of their assets in 2023.

      i.     Limitations on NOL Carryforwards and Other Tax Attributes.  Winc's ability to utilize any NOLs and certain other tax attributes could be subject to limitation if Winc previously underwent or undergoes an ownership change for U.S. federal income tax purposes within the meaning of section 382 of the Internal Revenue Code after the Petition Date and prior to its liquidation and transfer of its remaining assets to the Creditor Trust.  The Debtors believe that no ownership change of Winc for section 382 purposes has occurred to date and expect that no such ownership change will occur prior to the liquidation of the Debtors pursuant to the Plan. If, however, Winc were to undergo an ownership change for purposes of section 382 of the Internal Revenue Code prior to its liquidation and the distribution of all of its remaining assets to the Creditor Trust, Winc's utilization of its NOLs or other tax attributes could be meaningfully and substantially impaired.  In addition, NOLs incurred in tax years beginning after December 31, 2020, may only be carried over and offset up to 80 percent of Winc's current-year taxable income. Subject to the foregoing discussion, if the Debtors were to recognize net taxable income in 2023, whether on the transfer of assets to the Creditor Trust or otherwise, they may be able to fully offset such net taxable income with NOL carryforwards.

      ii.     Vesting in and Assignment of Assets to the Creditor Trust; Dissolution of the Post-Effective Date Debtors.  Pursuant to the Plan, the Creditor Trust will be established.  On the Effective Date, Creditor Trust Assets will be vested in, and assigned to, the Creditor Trust. Creditor Trust Assets will include all of the assets of Winc (other than Winc's Interest in BWSC) and Winc Lost Poet as of the Effective Date after giving effect to payments and Distributions under the Plan.  Following the winding down of Post-Effective Date Winc Lost Poet's affairs, without the need for any further order or action of the Bankruptcy Court, Post-Effective Date Winc Lost Poet will be dissolved and its affairs will be wound up in accordance with applicable law.  On the Effective Date, the New Common Stock in Reorganized Winc will be issued to and vest in the Creditor Trust; Interests in BWSC will vest in, and be assigned to, Reorganized Winc; and BWSC Assets will vest in Reorganized BWSC. Upon termination of the TSA pursuant to the Sale Documents, the Post-Effective Date Debtor Representative will wind up and dissolve BWSC and Winc, in consultation with the Creditor Trustee.  Accordingly, following such transfers and transactions, the Debtors should be treated as having completely liquidated for U.S. federal income tax purposes.  The transfer of the Creditor Trust Assets to the Creditor Trust is expected to be treated as a transfer of such assets at their then fair market value (net of any applicable liabilities)

to the Beneficiaries for U.S. federal income tax purposes. *See* Section 9.10 of the Plan—"U.S. Federal Income Tax Treatment of the Creditor Trust."

Although the Debtors may recognize taxable income in connection with the transfer of the Creditor Trust Assets to the Creditor Trust and their liquidation in the taxable year of such transfer, the Debtors expect to have sufficient current deductions for such year, losses, available NOL carryforwards and/or other tax attributes for such year to offset most, if not all, of the resulting U.S. federal income tax liability for such year. Depending on the availability of and limitations on the Debtors' NOLs (including NOL carryforwards) and tax credits for state and local income tax purposes, the Debtors may be subject to certain state or local income tax liabilities relating to such transfers.

iii.    Cancellation of Debt Income.  In general, the Internal Revenue Code provides that a debtor must recognize cancellation of debt ("COD") income upon the elimination or reduction of outstanding debt for consideration that is less than the amount of such debt.

The Internal Revenue Code provides an exception to such income recognition treatment for any COD arising by reason of a discharge of the debtor's indebtedness granted by a court in a case under the Bankruptcy Code or occurring pursuant to a plan approved by such court (the "Bankruptcy Exception") or to the extent of the debtor's insolvency when the COD income arises. In such case, the Internal Revenue Code generally requires the debtor to reduce certain of its tax attributes by the amount of any such excluded COD income. In general, tax attributes will be reduced in the following order: (A) NOLs and NOL carryforwards, (B) most tax credit carryforwards, (C) capital losses and capital loss carryforwards, (D) tax basis in the debtor's assets, (E) passive activity losses and credit carryovers, and (F) foreign tax credit carryforwards. COD income generally is the amount by which the adjusted issue price of the debt satisfied exceeds the sum of the amount of Cash and the fair market value of any other property transferred in exchange therefor. In general, any reduction in tax attributes under the COD rules does not occur until immediately after the close of the tax year in which the debt discharge occurs, after any such attributes have been applied to determine the tax for the year in which the debt is discharged. In the case of asset basis reduction, the basis reduction applies to assets owned by a debtor on the first day of the taxable year following the tax year in which the COD occurs.

The Debtors expect to realize COD income in connection with the implementation of the Plan and the Distribution by the Debtors of all of their assets. The Plan, if approved, would enable the Debtors to qualify for the Bankruptcy Exception with respect to any such COD income triggered by the Plan. In such case, for U.S. federal income tax purposes, the reduction of tax attributes resulting from such COD income (which, as indicated above, only occurs after the tax for the year of the debt discharge has been determined) generally should not have a material impact on the Debtors.

**(b)    Consequences to U.S. Holders of Allowed Class 3 Claims**.  Pursuant to the Plan, each U.S. Holder of General Unsecured Claim (Class 3) will receive, in full and final satisfaction of its Claim, its pro rata share of the GUC Cash Distribution Amount.

i.    Consequences to U.S. Holders in Class 3.  In general, a U.S. Holder of an Allowed General Unsecured Claim will be treated as exchanging such Claim for Cash in a taxable exchange under Section 1001 of the Internal Revenue Code. Accordingly, a U.S. Holder of an

Allowed General Unsecured Claim will recognize gain or loss with respect to its Allowed Claim in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value as of the Effective Date of its undivided interest in the Creditor Trust Assets (net of any applicable liabilities) received or treated as received in respect of its Claim (other than any consideration attributable to a Claim for accrued but unpaid interest, as described in more detail below), and (ii) such U.S. Holder's adjusted tax basis of the Claim exchanged therefor (other than any tax basis attributable to accrued but unpaid interest previously included in the U.S. Holder's taxable income, as described in more detail below).

Pursuant to the Plan, the Creditor Trust will, in good faith, value the Creditor Trust Assets transferred thereto, and all parties to the Creditor Trust (including U.S. Holders of Allowed Claims receiving interests therein) must consistently use such valuation for all U.S. federal income tax purposes.  As discussed below, the amount of Cash or other property received in respect of an Allowed Claim for accrued but unpaid interest will be taxed as ordinary income, except to the extent previously included in income by a U.S. Holder under its method of accounting.  *See* Section 5.7(b)(ii) —"Distributions in Respect of Accrued But Unpaid Interest."

After the date of the transfer of the Creditor Trust Assets to the Creditor Trust, a U.S. Holder's share of any collections received on the Creditor Trust Assets (other than as a result of the subsequent disallowance of Disputed Claims or the reallocation of undeliverable Distributions) should not be included, for U.S. federal income tax purposes, in the U.S. Holder's amount realized in respect of its Allowed Claim but should be separately treated as amounts realized in respect of such U.S. Holder's ownership interest in the underlying Creditor Trust Assets.

In the event of the subsequent disallowance of any Disputed Claim, it is possible that a U.S. Holder of a previously Allowed Claim may receive additional Distributions in respect of its Claim.  Accordingly, it is possible that the recognition of any loss realized by a U.S. Holder with respect to an Allowed Claim may be deferred until all Claims are Allowed or Disallowed.  Alternatively, it is possible that a U.S. Holder will have additional gain in respect of any additional Distributions received and that a portion of such subsequent Distributions may be treated as interest.  Additionally, to the extent that a U.S. Holder of an Allowed Claim receives Distributions in a taxable year or years, following the year of initial Distribution, a portion of any gain realized by such Holder may be deferred.  All U.S. Holders of Claims are urged to consult their tax advisors regarding the possible application of (or the ability to elect out of) the "installment method" of reporting with respect to their Claim.

If gain or loss is recognized, such gain or loss may be long-term capital gain or loss if the Allowed Claim disposed of is a capital asset in the hands of the U.S. Holder and the debt obligation underlying such Allowed Claim has been held for more than one year (subject to the "market discount" rules discussed below).  Each U.S. Holder of an Allowed Claim should consult its own tax advisor to determine whether gain or loss recognized by such U.S. Holder will be long-term capital gain or loss and the specific tax effect thereof on such U.S. Holder.  The character of any gain or loss depends on a variety of factors, including, among other things, the origin of the U.S. Holder's Allowed Claim, when the U.S. Holder receives payment (or is deemed to receive payment) in respect of such Allowed Claim, whether the U.S. Holder reports income using the accrual or Cash method of tax accounting, whether the U.S. Holder acquired its Allowed Claim at a discount, whether the U.S. Holder has taken a bad debt deduction with respect to such Allowed

Claim, and/or whether (as is intended and herein assumed) the Plan implements the liquidation of the Debtors for U.S. federal income tax purposes.

A U.S. Holder's aggregate tax basis in its undivided interest in the Creditor Trust Assets (subject to any portion(s) of the Creditor Trust being treated as a "disputed ownership fund" (pursuant to Section 3.7 of the Creditor Trust Agreement) for U.S. federal income tax purposes) will equal the fair market value of such interest increased by its share of the Debtors' liabilities to which such assets remain subject upon transfer to the Creditor Trust, and a U.S. Holder's holding period generally will begin on the day following the date of transfer of such assets to the Creditor Trust.

        ii.    <u>Distributions in Respect of Accrued but Unpaid Interest</u>.  In general, to the extent any amount received (whether Cash or other property) by a U.S. Holder of an Allowed Claim is received in satisfaction of interest that accrued but was not paid during its holding period, such amount will be taxable to the U.S. Holder as ordinary interest income (if not previously included in the U.S. Holder's gross income under the U.S. Holder's normal method of accounting). Conversely, a U.S. Holder should recognize a deductible loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

If the fair market value of the beneficial interests in the Creditor Trust and/or Cash received (or deemed received) by a U.S. Holder is not sufficient to fully satisfy all principal and interest on its Allowed Claims, the extent to which such beneficial interests in the Creditor Trust and/or Cash will be attributable to accrued but unpaid interest for U.S. federal income tax purposes is unclear. Pursuant to Section 14.3 of the Plan below, except as otherwise required by law (as reasonably determined by the Creditor Trustee), distributions in respect of any Allowed Claim shall be allocated first to the principal amount of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes.  All U.S. Holders are urged to consult their own tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest and the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income for U.S. federal income tax purposes.

        *(c)*    *Market Discount*.  U.S. Holders who exchange (or are deemed to exchange) Allowed Claims for beneficial interests in the Creditor Trust or Cash may be affected by the "market discount" provisions of sections 1276 through 1278 of the Internal Revenue Code.  Under these rules, some or all of the gain realized by a U.S. Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Allowed Claims.  Generally, a U.S. Holder has market discount on an Allowed Claim to the extent that the "stated redemption price at maturity" of such Allowed Claim exceeds such U.S. Holder's initial tax basis in such Allowed Claim by more than a *de minimis* amount.  Under the market discount rules, such U.S. Holder generally will be required to treat as ordinary income any principal payment on, or any gain on the sale, exchange, retirement or other disposition of, such Allowed Claim to the extent of any accrued market discount on such Allowed Claim.  For this purpose, market discount generally will accrue ratably during the period from the date of acquisition of such Allowed Claim to the maturity date of such Allowed Claim, unless such U.S. Holder elects to accrue the market discount on such Allowed Claim under the constant yield method, which

election, once made, is irrevocable.  In addition, such U.S. Holder may be required to defer, until the sale, exchange, retirement or other disposition of such Allowed Claim, the deduction of all or a portion of the interest expense on any indebtedness incurred or continued to purchase or carry such Allowed Claim.

*(d)*    *Limitation on Use of Capital Losses*.  A U.S. Holder of an Allowed Claim who recognizes a capital loss as a result of the treatment of its Allowed Claim under the Plan will be subject to limits on use of such capital loss.  For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (i) $3,000 ($1,500 for married individuals filing separate returns) and (ii) the excess of capital losses over capital gains.  U.S. Holders other than corporations may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  Corporate U.S. Holders may only carry over unused capital losses to the five taxable years following the year in which the capital loss is recognized, but are allowed to carry back unused capital losses to the three taxable years preceding the year in which the capital loss is recognized.

*(e)*    *Medicare Tax*.  In addition to regular U.S. federal income tax, certain U.S. Holders that are individuals, estates or trusts are subject to a 3.8% tax on all or a portion of their "net investment income," which may include all or a portion of their income arising as a result of an exchange of their Allowed Claim for Cash or other property.  U.S. Holders that are individuals, estates or trusts should consult their own tax advisors as to the effect, if any, of this tax on their receipt, ownership or disposition of any consideration received pursuant to the Plan.

*(f)*    *Withholding Tax Requirements*.  All distributions to U.S. Holders of Allowed Claims under the Plan are subject to any applicable tax withholding.  Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%).  Backup withholding generally applies if the U.S. Holder (i) fails to furnish its social security number or other taxpayer identification number, (ii) furnishes an incorrect taxpayer identification number, (iii) fails properly to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.  U.S. Holders of Allowed Claims are urged to consult their own tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  U.S. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the

Plan would be subject to these Treasury Regulations and require disclosure on the U.S. Holder's tax returns.

**THE FOREGOING TAX SUMMARY HAS BEEN PROVIDED FOR GENERAL INFORMATIONAL PURPOSES ONLY. THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. <u>NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE.</u> THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, U.S. HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**ARTICLE VI**
**<u>TREATMENT OF UNCLASSIFIED CLAIMS</u>**

**6.1    Administrative Claims**.

Except as otherwise set forth in this Article VI, or as soon as practicable after the Supplemental Administrative Claim Bar Date, to the extent not already paid, each Holder of an Allowed Administrative Claim shall receive in exchange for such Allowed Administrative Claim: (i) Cash equal to the amount of such Allowed Administrative Claim, or (ii) such other treatment as to which the Debtors, Post-Effective Date Debtors, or the Creditor Trust, as applicable, and the Holder of such Allowed Administrative Claim shall have agreed upon in writing.

*(a)* **Supplemental Administrative Claim Bar Date**. Holders of Administrative Claims arising during the period following the Initial Administrative Claim Bar Date through and including the Effective Date, other than Professional Fee Claims, shall file with the Claims Agent and serve on the Creditor Trust requests for payment, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, so as to actually be received on or before the Supplemental Administrative Claim Bar Date. The Effective Date Notice shall set forth the Supplemental Administrative Claim Bar Date and shall constitute notice of such Bar Date. Absent further Bankruptcy Court order, any Administrative Claim arising after the Initial Administrative Claim Bar Date not filed by the Supplemental Administrative Claim Bar Date shall be deemed waived and the Holder of such Administrative Claim shall be forever barred from receiving payment on account thereof.

*(b)* **Objections by the Creditor Trustee**. Objections to requests for payment of Administrative Claims, other than requests for payment of Professional Fee Claims, must be Filed and served on the requesting party by the Claims Objection Deadline.

*(c)* **Professional Fee Claims**. All applications for allowance and payment of Professional Fee Claims shall be Filed on or before the Professional Fee Claims Bar Date. If an application for a Professional Fee Claim is not Filed by the Professional Fee Claims Bar Date, such Professional Fee Claim shall be deemed waived and the Holder of such Claim shall be forever barred from receiving payment on account thereof. The Effective

Date Notice shall set forth the Professional Fee Claims Bar Date and shall constitute notice of such Bar Date. Objections to any Professional Fee Claims must be Filed and served on the Creditor Trust and the requesting party by no later than twenty-one (21) days after service of the applicable final application for allowance and payment of Professional Fee Claims. Allowed Professional Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court upon the earlier of (i) the Effective Date, or (ii) the date upon which a Final Order relating to any such Allowed Professional Fee Claim is entered, and in each case, as soon as reasonably practicable. Unless otherwise required by the OCP Order, Professionals retained pursuant to the OCP Order shall not be required to file an application for payment of Professional Fee Claims.

*(d)* **U.S. Trustee Fees**. All fees payable on or before the Effective Date, pursuant to United States Code title 28 section 1930, shall be paid in full in Cash by the Debtors on or before the Effective Date. To the fullest extent possible, all U.S. Trustee fees payable after the Effective Date shall be paid in full in Cash by the Creditor Trust from the Creditor Trust Assets until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first; *provided* that Project Crush shall promptly deliver to the Creditor Trust or Debtors, as applicable, upon request the portion of any such U.S. Trustee Fees payable by Project Crush under the Sale Documents. Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file a request for Administrative Claims.

*(e)* **Source of Payment**.

All Allowed Administrative Claims and U.S. Trustee fees shall be paid from the Debtors' Cash or Creditor Trust Assets; *provided*, *however*, that the Post-Effective Date Debtors or Creditor Trust, as applicable, shall be timely reimbursed, within ten (10) Business Days of informing Project Crush in writing of such payment obligations, by Project Crush for any Claims and fees that are reimbursable under the Sale Documents in accordance with the terms of such Sale Documents.

With respect to Professional Fee Claims, on the Effective Date, the Debtors shall establish the Professional Fee Escrow Account and fund such account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account shall be maintained in trust for the Professionals (other than professionals retained pursuant to the OCP Order). Each Holder of an Allowed Professional Fee Claim will be paid by the Debtors in Cash from the Professional Fee Escrow Account. All amounts remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid in full shall be deemed a Creditor Trust Asset. If the Professional Fee Escrow Account is insufficient to pay the full amount of all Allowed Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims shall be promptly paid by the Creditor Trust from the Creditor Trust Assets.

**6.2    Priority Tax Claims**.

Within the time period provided in Article X of the Plan, each Holder of an Allowed Priority Tax Claim shall receive in exchange for such Allowed Priority Tax Claim: (i) Cash equal to the amount of such Allowed Priority Tax Claim, from the Debtors' Cash or Creditor Trust

Assets; or (ii) such other treatment as to which the Debtors or the Creditor Trust, as applicable, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing.

## ARTICLE VII
## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

Unless the Holder of an Allowed Claim and the Debtors, Post-Effective Date Debtors, or the Creditor Trust, as applicable, agree to a different treatment, each Holder of an Allowed Claim shall receive the following Distributions in accordance with Article X of the Plan:

**7.1    Class 1:  Priority Non-Tax Claims**.

Each Holder of an Allowed Priority Non-Tax Claim shall receive in exchange for such Allowed Class 1 Priority Non-Tax Claim: (A) Cash equal to the amount of such Allowed Priority Non-Tax Claim, from the Debtors' Cash or Creditor Trust Assets, or (B) such other treatment which the Debtors or the Creditor Trust, as applicable, and the Holder of such Allowed Priority Non-Tax Claim have agreed upon in writing.

**7.2    Class 2:  Secured Claims.**

Each Holder of an Allowed Secured Claim shall receive in exchange for such Allowed Class 2 Secured Claim: (A) Cash equal to the amount of such Allowed Secured Claim, from the Debtors' Cash or Creditor Trust Assets, or (B) such other treatment which the Debtors or the Creditor Trust, as applicable, and the Holder of such Allowed Secured Claim have agreed upon in writing.

**7.3    Class 3:  General Unsecured Claims.**

Each Holder of an Allowed General Unsecured Claim shall receive in exchange for such Allowed Class 3 General Unsecured Claim: (A) Cash equal to the amount of such Holder's pro rata share of the GUC Cash Distribution Amount, or (B) such other treatment which the Debtors or the Creditor Trust, as applicable, and the Holder of such Allowed General Unsecured Claim have agreed upon in writing.

**7.4    Class 4:  Intercompany Claims**.

Holders of Intercompany Claims shall receive no Distribution on account of their Intercompany Claims.

**7.5    Classes 5(a), 5(b) and 5(c): Interests**.

(a)    Class 5(a).  On the Effective Date, all Interests in Winc shall be cancelled as of the Effective Date, and the Holders thereof shall receive no Distribution on account of such Interests.

(b)    Class 5(b).  On the Effective Date, all Interests in BWSC shall vest in, and be assigned to, Reorganized Winc, solely for corporate governance purposes, and the Holders thereof shall receive no Distribution on account of such Interests.

(c)     Class 5(c).  On the Effective Date, all Interests in Winc Lost Poet shall be cancelled as of the Effective Date, and the Holders thereof shall receive no Distribution on account of such Interests.

**7.6     Reservation of Rights Regarding Claims and Interests**.

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' and/or the Creditor Trust's (in its own capacity or as successor, assignee, or otherwise) rights and defenses, both legal and equitable, with respect to any Claims or Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

**ARTICLE VIII**
**ACCEPTANCE OR REJECTION OF THE PLAN**

**8.1     Class Entitled to Vote**.

Because Claims in Class 3 are Impaired and Holders thereof will receive or retain property or an interest in property under the Plan, only a Holder of Claims in Class 3 shall be entitled to vote to accept or reject the Plan.

**8.2     Acceptance by Impaired Classes of Claims**.

In accordance with Bankruptcy Code section 1126(c), and except as provided in Bankruptcy Code section 1126(e), an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Plan.

**8.3     Presumed Acceptance by Unimpaired Classes**.

Because Claims in Classes 1 and 2 are Unimpaired pursuant to Bankruptcy Code section 1126(f), Holders of Claims in Classes 1 and 2 are presumed to have accepted the Plan and, therefore, such Holders of Claims are not entitled to vote to accept or reject the Plan.

**8.4     Presumed Rejections by Impaired Classes**.

Because Holders of Claims or Interests in Classes 4, 5(a), 5(b), and 5(c) are not entitled to receive or retain any property under the Plan, pursuant to Bankruptcy Code section 1126(g), such Holders of Claims or Interests are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

**8.5     Controversy Concerning Impairment**.

If a controversy arises as to whether any Claim or Interest is Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**8.6     Elimination of Vacant Classes**.

Any Class of Claims or Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for all purposes, including for purposes of determining acceptance of the Plan by such Class under Bankruptcy Code section 1129(a)(8).

**8.7     Elimination of Intercompany Claims.**

On the Effective Date, all Intercompany Claims of any kind shall be deemed cancelled, and Holders of Intercompany Claims shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan on account of such Intercompany Claims.

**ARTICLE IX**
**IMPLEMENTATION OF THE PLAN AND ESTABLISHMENT OF THE CREDITOR TRUST**

**9.1     Implementation of the Plan**.

The Plan will be implemented by, among other things, the continued existence of certain of the Debtors solely for purposes of satisfying the Debtors' obligations under the Sale Documents, the establishment of the Creditor Trust, the transfer to the Creditor Trust of the Creditor Trust Assets and Retained Causes of Action, and the making of Distributions by the Creditor Trust in accordance with the Plan and the Creditor Trust Agreement.

On the Effective Date, BWSC Assets will vest in, and be assigned to, Reorganized BWSC. Reorganized BWSC will continue to exist for purposes of satisfying the Debtors' obligations under the Sale Documents until termination of the TSA, which shall occur no later than the Termination Date. The operations of Reorganized BWSC will be overseen by the Post-Effective Date Debtor Representative and will be funded by Project Crush pursuant to the terms of the TSA and any other Sale Documents. Any other costs and expenses incurred by the Post-Effective Date Debtors shall be funded from the Creditor Trust Assets solely to the extent such costs and expenses are not required to be paid by Project Crush pursuant to the TSA or other Sale Documents.

**9.2     Substantive Consolidation**.

Except as otherwise provided in the Plan, each Debtor shall continue to maintain their separate corporate existences after the Effective Date for all purposes, other than the treatment of Claims and Distributions under the Plan. Except as expressly provided in the Plan (or as otherwise ordered by the Bankruptcy Court), on the Effective Date for purposes of voting to accept or reject the Plan and Distributions: (i) the assets and liabilities of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of Debtor Winc, (ii) all guaranties of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any Claim against any Debtor, and any guarantee thereof executed by any Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of Debtor Winc, (iii) each and every Claim filed or to be filed in the Chapter 11 Cases shall be treated as filed against the consolidated Debtors and shall be treated as one Claim against and

obligation of Winc, (iv) all Intercompany Claims shall be eliminated and extinguished, and Holders of Intercompany Claims shall not receive any Distribution or retain any property pursuant to the Plan on account of such Intercompany Claims, and (v) for purposes of determining the availability of the right of setoff under section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity, Winc, so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set off against the debts or any of the other Debtors. Such substantive consolidation shall not (other than for purposes relating to the Plan) affect the legal and corporate structures of the Post-Effective Date Debtors to seek to have any Claim or Interest subordinated in accordance with any contractual rights or equitable principles. Notwithstanding anything in this section to the contrary, all post-Effective Date U.S. Trustee Fees, if any, shall be calculated on a separate legal entity basis for each Post-Effective Date Debtor.

**9.3    Debtors' Members, Managers, Directors, and Officers**.

On the Effective Date, the Debtors' officers, directors, and managers shall be terminated without the need for any corporate action or approval and without the need for any company filings, and shall have no continuing obligations to the Debtors following the occurrence of the Effective Date.

From and after the Effective Date:  (a) Reorganized Winc shall be deemed to be the sole member and manager of Reorganized BWSC; (b) the Post-Effective Date Debtor Representative of Winc shall be the sole officer and director of Reorganized Winc; (c) the Creditor Trust shall be the sole stockholder of Reorganized Winc; (d) the Post-Effective Date Debtor Representative of BWSC shall be the sole officer of BWSC; and (e) the Post-Effective Date Debtor Representative shall perform the functions of a Liquidating Trustee to wind up the affairs of Post-Effective Date Winc Lost Poet as provided for in sections 18-101(11), 18-801, and 18-803(b) of the LLC Act. The Corporate Organizational Documents of each of the Debtors shall remain in full force and effect following the Effective Date, but are deemed amended by the Plan to permit and authorize the admission and appointment of the persons identified in (a)–(e) of this paragraph and to authorize the Creditor Trust, in its capacity as sole stockholder of Reorganized Winc, to appoint a successor Post-Effective Date Debtor Representative for each of the Post-Effective Date Debtors, if necessary.  The Post-Effective Date Debtor Representative shall serve in such capacities as set forth herein through the earlier of the date the applicable Debtor is dissolved in accordance with the Plan or the date that the Post-Effective Date Debtor Representative resigns, is terminated by the Creditor Trustee, or is otherwise unable to serve, *provided that* any successor Post-Effective Date Debtor Representative shall serve in such capacities.

**9.4    Appointment of Creditor Trustee and Wind-Down of the Post-Effective Date Debtors**.

The Creditor Trustee shall be appointed as of the Effective Date.  The Creditor Trustee shall be a disinterested Person selected by the Committee, in consultation with the Debtors, and identified in the Plan Supplement.  On and after the Effective Date, the initial Creditor Trustee shall become and serve as Creditor Trustee.  From and after the Effective Date, the Creditor Trust shall be the sole stockholder of Reorganized Winc.  On the Effective Date, the Creditor Trust Assets and the Retained Causes of Action will automatically vest in, and be assigned to, the Creditor Trust.  The Creditor Trustee is authorized and empowered to administer and liquidate the Creditor Trust Assets as soon as practicable after the Effective Date pursuant to the terms of the

Plan and the Creditor Trust Agreement without the need for any company action or approval by any of the Debtors or Post-Effective Date Debtors or further Bankruptcy Court approval, and none of the Post-Effective Date Debtors, the Creditor Trust, the Creditor Trustee, or any Beneficiary, shall be required to pay any taxes or fees to cause such dissolution.  The Creditor Trustee shall be authorized and empowered to take or cause to be taken all company actions necessary or appropriate to implement and consummate the Plan.  The Creditor Trust shall bear the cost and expense of the wind-down of the affairs of the Post-Effective Debtors, except for any costs and expenses of Reorganized BWSC that are satisfied or required to be satisfied by Project Crush under the terms of the Sale Documents.

**9.5    Appointment of Post-Effective Date Debtor Representative to Oversee the Reorganization and Eventual Wind-Down and Dissolution of the Post-Effective Date Debtors, as Applicable**.

The Post-Effective Date Debtor Representative shall be appointed to oversee the operations, and the ultimate wind down and dissolution, of the Post-Effective Date Debtors, *provided that*, the Creditor Trustee shall have the power to terminate and replace the Post-Effective Date Debtor Representative in accordance with the terms of the Creditor Trust Agreement.

On the Effective Date, all Interests in Reorganized BWSC will vest in, and be assigned to, Reorganized Winc, whose sole stockholder shall be the Creditor Trust.  On the Effective Date, BWSC Assets will vest in Reorganized BWSC for the purpose of operating the business in accordance with the Sale Documents. Reorganized BWSC will continue ordinary course business operations until the TSA and MSA are terminated.  Thereafter, the Post-Effective Date Debtor Representative is authorized and empowered to effect the dissolution of Reorganized BWSC and Reorganized Winc as soon as practicable without the need for any company action or approval in accordance with Section 9.4, above.

After the termination of the TSA and MSA, the Post-Effective Date Debtor Representative of Reorganized Winc will, in consultation with the Creditor Trustee, (i) liquidate, wind down, and dissolve Reorganized Winc under applicable law; and (ii) file Reorganized Winc's final tax returns.

Upon the Effective Date, the Post-Effective Date Debtor Representative shall, in consultation with the Creditor Trustee and without the need for any further order or action of the Bankruptcy Court, dissolve and wind up the affairs of Post-Effective Date Winc Lost Poet in accordance with applicable law.  The Post-Effective Date Debtor Representative is authorized to take all actions reasonably necessary to dissolve Post-Effective Date Winc Lost Poet, and neither the Post-Effective Date Debtor Representative nor the Post-Effective Date Debtors shall be required to pay any taxes or fees in order to cause such dissolution and termination of Post-Effective Date Winc Lost Poet's existence.

The Post-Effective Date Debtor Representative shall be indemnified by the Creditor Trust and receive reimbursement out of the Creditor Trust Assets against and from any and all loss, liability, expense (including reasonable attorneys' fees), or damage which the Post-Effective Date Debtor Representative incurs or sustains, in good faith and without willful misconduct, gross

negligence, or fraud, acting as Post-Effective Date Debtor Representative under or in connection with the Plan.

The Post-Effective Date Debtor Representative may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out the Post-Effective Date Debtor Representative's duties under the Plan and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court out of Creditor Trust Assets in accordance with the Plan.

The Post-Effective Date Debtor Representative shall be entitled to reasonable compensation, consistent with that of similar functionaries in similar types of bankruptcy cases. The Post-Effective Date Debtor Representative shall also be reimbursed for all documented, actual, reasonable, and necessary out-of-pocket expenses incurred in the performance of its duties under the Plan. The Post-Effective Date Debtor Representative shall not be required to file a fee application with the Bankruptcy Court in order to receive compensation.

**9.6     Creation and Governance of the Creditor Trust**.

On the Effective Date, the Debtors and the Creditor Trustee shall execute the Creditor Trust Agreement and shall take all steps necessary to establish the Creditor Trust in accordance with the Plan.   The Committee shall appoint the Creditor Trustee in consultation with the Debtors. Additionally, on the Effective Date, the Debtors or Post-Effective Date Debtors, as applicable, shall irrevocably transfer and assign and shall be deemed to have irrevocably transferred and assigned to the Creditor Trust all of their respective rights, title, and interest in and to all of the Creditor Trust Assets in accordance with Bankruptcy Code section 1141, except as specifically provided in the Plan or the Confirmation Order.  The Creditor Trust Assets shall automatically vest in the Creditor Trust free and clear of all Claims, Liens, encumbrances, or interests, as provided for in the Plan and the Creditor Trust Agreement, and subject to payment of any Claims required to be paid by the Creditor Trust pursuant to the Plan with priority over General Unsecured Claims, including, without limitation, First Tier Claims and Creditor Trust Operating Expenses. Transfer of the Creditor Trust Assets to the Creditor Trust shall be exempt from any stamp, real estate transfer, other transfer, mortgage reporting, sales, use, or other similar tax.

The Creditor Trustee may elect for the Creditor Trust to be treated as a partnership, a corporation, other entity, or Disputed Ownership Fund (as defined in the Creditor Trust Agreement) for tax purposes only, if the Creditor Trustee determines, in its reasonable discretion, that such election is permitted under applicable law and would be in the best interests of the Beneficiaries of the Creditor Trust.

The Creditor Trust will terminate no later than the fifth (5th) anniversary of the Effective Date, provided, however, that, on or prior to such termination, the Bankruptcy Court, upon motion by the Creditor Trustee or a party in interest, may within six (6) months of the beginning of such extended term, extend the term of the Creditor Trust for a fixed period if it is necessary to facilitate or complete the liquidation and distribution of the Creditor Trust Assets,  provided, however, that the aggregate of all such extensions shall not exceed three (3) years (i.e. for a maximum total of eight (8) years from the Effective Date), unless the Creditor Trustee receives a favorable ruling

from the Internal Revenue Service that any further extension would not adversely affect the status of the Creditor Trust as a liquidating trust for federal income tax purposes

The Creditor Trustee shall be the exclusive trustee of the Creditor Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to Bankruptcy Code section 1123(b)(3)(B).  The Creditor Trust shall be governed by the Creditor Trust Agreement and administered by the Creditor Trustee.  The powers, rights, and responsibilities of the Creditor Trustee shall be specified in the Creditor Trust Agreement and shall include the authority and responsibility to, among other things, take all of the actions set forth in Section 9 of the Plan.  The Creditor Trust shall hold and distribute the Creditor Trust Assets in accordance with the provisions of the Plan and the Creditor Trust Agreement. Other rights and duties of the Creditor Trustee and the Beneficiaries shall be as set forth in the Creditor Trust Agreement.  For the avoidance of doubt, (i) after the Effective Date, the Debtors and the Estates shall have no interest in the Creditor Trust Assets, and (ii) the Creditor Trust Assets shall not include the BWSC Assets.  The transfer of the Creditor Trust Assets to the Creditor Trust is absolute, and the Creditor Trust Assets shall not be held or deemed to be held in trust by the Creditor Trust or the Creditor Trustee on behalf of any of the Debtors or the Estates.  Likewise, upon completion of such transfer and subject to the exceptions as may be set forth in the Plan or Confirmation Order, the Creditor Trust shall have no rights, title, or interest in or to any property of the Debtors or the Estates other than the Creditor Trust Assets.

The Creditor Trust shall be administered in a manner consistent with the U.S. Securities and Exchange Commission's published guidance on liquidating trusts.

**9.7    Purpose of the Creditor Trust**.

The Creditor Trust shall be established for the purpose of pursuing or liquidating the Creditor Trust Assets;  winding down, liquidating and dissolving the Post-Effective Date Debtors; reconciling and objecting to Claims as provided for in the Plan; prosecuting any Retained Causes of Action to maximize recoveries for the benefit of the Beneficiaries; and making Distributions to the Beneficiaries, all in accordance with the provisions of Treasury Regulation section 301.7701-4(d) and Revenue Procedure 94-45, with no objective to continue or engage in the conduct of a trade or business.

**9.8    The Creditor Trust Agreement**.

(a) Generally.  The Creditor Trustee shall have the power and authority to perform the acts described in the Creditor Trust Agreement (subject to approval by the Bankruptcy Court where applicable), in addition to any powers granted by law or conferred to it by any other provision of the Plan.  The powers of the Creditor Trustee shall include, without limitation, any powers set forth herein, provided however, that enumeration of any powers herein shall not be considered in any way to limit or control the power and authority of the Creditor Trustee to act as specifically authorized by any other provision of the Plan, the Creditor Trust Agreement, or any applicable law, and to act in such manner as the Creditor Trustee may deem necessary or appropriate to take any act deemed appropriate by the Creditor Trustee, including, without limitation, to discharge all obligations assumed by the Creditor Trustee or provided herein and to conserve and protect the Creditor Trust Assets or to confer on the creditors the benefits intended

to be conferred upon them by the Plan.  The Creditor Trustee shall have the power and authority without further approval by the Bankruptcy Court to liquidate the Creditor Trust Assets, to hire and pay professional fees and expenses of counsel and other advisors (including but not limited to professionals who are members of the Creditor Trustee's own firm), to prosecute and settle objections to Disputed Claims, to prosecute and settle any Claims of the Estates, including but not limited to Retained Causes of Action, and otherwise take any action as shall be necessary to administer the cases and effect the closing of the cases.  The Creditor Trust Agreement shall provide that Creditor Trustee's powers shall include, without limitation, the following: (i) the power (but not the express obligation) to invest funds, in accordance with section 345 of the Bankruptcy Code, and withdraw, make Distributions and pay taxes and other obligations owed by the Creditor Trust from funds held by the Creditor Trust in accordance with the Plan as set forth below and Creditor Trust Agreement as set forth therein; (ii) the power to engage and compensate, without prior Bankruptcy Court order or approval, employees and professionals (including but not limited to professionals who are members of the Creditor Trustee's own firm) to assist the Creditor Trustee with respect to the Creditor Trustee's responsibilities; (iii)  the power to pursue, prosecute, resolve and compromise and settle any Retained Causes of Action on behalf of the Creditor Trust without prior Bankruptcy Court approval but in accordance with the Creditor Trust Agreement; (iv) the power to object to Claims, including, without limitation, the power to subordinate and recharacterize Claims by objection, motion, or adversary proceeding; and (v) such other powers as may be vested in or assumed by the Creditor Trustee pursuant to the Plan, Bankruptcy Court order, or as may be necessary and proper to carry out the provisions of the Plan.  Except as expressly set forth in the Plan and in the Creditor Trust Agreement, the Creditor Trustee, on behalf of the Creditor Trust, shall have absolute discretion to pursue or not to pursue any Retained Causes of Action as it determines is in the best interests of the Beneficiaries and consistent with the purposes of the Creditor Trust, and shall have no liability for the outcome of such determination, other than those determinations constituting gross negligence or willful misconduct.  The Creditor Trustee may incur any reasonable and necessary expenses in liquidating and converting the Creditor Trust Assets to Cash.  Subject to the other terms and provisions of the Plan, the Creditor Trustee shall be granted standing, authority, power and right to assert, prosecute or settle the Retained Causes of Action based upon its powers as a bankruptcy appointed representative of the Debtors' Estates with the same or similar abilities possessed by insolvency trustees, receivers, examiners, conservators, liquidators, rehabilitators or similar officials. The salient terms of the Creditor Trustee's employment, including the Creditor Trustee's duties and compensation, shall be set forth in the Creditor Trust Agreement and shall be consistent with the terms of the Plan.

(b) <u>Investment of Cash</u>.  Cash in the Trust Accounts and any other amounts contemplated by the Plan and the Creditor Trust Agreement shall be maintained in United States dollars or shall be invested by the Creditor Trustee in (i) direct obligations of, or obligations guaranteed by, the United States of America, including Government Money Market Funds, (ii) obligations of any agency or corporation that is or may hereafter be created by or pursuant to an act of Congress of the United States of America as an agency or instrumentality thereof, or (iii) such other obligations or instruments as may from time to time be permitted under section 345 of the Bankruptcy Code; provided that the Creditor Trustee may, to the extent necessary to implement the provisions of the Plan and the Creditor Trust Agreement, deposit moneys in demand deposits, time accounts or checking accounts at any banking institution or trust company having combined capital stock and surplus in excess of $100,000,000 based upon its most recently available audited financial statements, regardless of whether such investments and deposits are insured.  Such investments

shall mature in such amounts and at such times as the Creditor Trustee, in the Creditor Trustee's business judgment, shall deem appropriate to provide funds when needed to transfer funds in accordance with the Plan and Confirmation Order, make payments to the Trust Accounts or make Distributions in accordance with the Plan, Confirmation Order and Creditor Trust Agreement. The Creditor Trust may not retain cash or cash equivalents in excess of a reasonable amount as determined by the Creditor Trustee in its sole discretion needed to meet claims and contingent liabilities or to maintain the value of the Creditor Trust Assets in liquidation or maintain or fund an adequate and sufficient reserve. Notwithstanding anything to the contrary herein, the scope of any such investment shall be limited to include only those investments that a liquidating trust, within the meaning of Treasury Regulations Section 301.7701-4(d), may be permitted to hold, pursuant to Section 3.09 of Internal Revenue Service Revenue Procedure 94-45 or the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise. For the avoidance of doubt, notwithstanding any permission or obligations (in either case, whether express or implied) under section 345 of the Bankruptcy Code, the Creditor Trustee shall have no duty or obligation to invest any of the Creditor Trust Assets, and failure to invest any such assets shall not constitute a breach of duty on behalf of the Creditor Trust or the Creditor Trustee.

**9.9    Compensation and Duties of Creditor Trustee**.

On and after the Effective Date, the Creditor Trustee shall have the power and responsibility to do all acts contemplated by the Plan and the Creditor Trust Agreement to be done by the Creditor Trustee and all other acts that may be necessary or appropriate in connection with the disposition of the Creditor Trust Assets and the distribution of the proceeds thereof, as contemplated by the Plan and in accordance with the Creditor Trust Agreement.

In all circumstances, the Creditor Trustee shall act in its reasonable discretion in the best interests of the Beneficiaries pursuant to the terms of the Plan and the Creditor Trust Agreement.

The Creditor Trustee shall be indemnified by and receive reimbursement from the Creditor Trust Assets against and from any and all loss, liability, expense (including reasonable attorneys' fees), or damage which the Creditor Trustee incurs or sustains, in good faith and without willful misconduct, gross negligence, or fraud, acting as Creditor Trustee under or in connection with the Plan.

The Creditor Trustee may employ, without further order of the Bankruptcy Court, professionals (including those previously retained by the Committee or who are members of the Creditor Trustee's own firm) to assist in carrying out the Creditor Trustee's duties under the Plan and Creditor Trust Agreement and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Debtors' Cash in accordance with the Plan.

The Creditor Trustee shall be entitled to reasonable compensation, consistent with that of similar functionaries in similar types of bankruptcy cases. The Creditor Trustee shall also be reimbursed for all documented, actual, reasonable, and necessary out-of-pocket expenses incurred in the performance of its duties under the Creditor Trust Agreement. The Creditor Trustee shall

not be required to file a fee application with the Bankruptcy Court in order to receive compensation.

**9.10    U.S. Federal Income Tax Treatment of the Creditor Trust**.

*(a)*    **Grantor Trust**.  It is intended that the Creditor Trust will qualify as a "liquidating trust" under Treasury Regulation section 301.7701-4(d).  Accordingly, it is intended that the Creditor Trust will be treated as a grantor trust for U.S. federal income tax purposes, and that the Beneficiaries will be treated as grantors of such trust.

In general, a grantor trust is not a separate taxable entity.  The IRS, in Revenue Procedure 94-45, sets forth the general criteria for obtaining an advance ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  Consistent with the requirements of Revenue Procedure 94-45, the Creditor Trust Agreement will require all relevant parties to treat the transfer of the Creditor Trust Assets for U.S. federal income tax purposes as (i) a transfer by Winc, BWSC and Winc Lost Poet of the Creditor Trust Assets directly to the Beneficiaries in satisfaction of the Claims against the Debtors (to the extent of the value of the Beneficiaries' respective interests in the applicable Creditor Trust Assets) followed by (ii) the transfer by such Beneficiaries to the Creditor Trust of the Creditor Trust Assets in exchange for beneficial interests in the Creditor Trust (to the extent of the value of the Beneficiaries' respective interests in the applicable Creditor Trust Assets), provided, however, that the Creditor Trust Assets will be subject to any post-Effective Date liabilities or obligations incurred by the Creditor Trust relating to the pursuit of Creditor Trust Assets.

Accordingly, the Beneficiaries should be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Creditor Trust Assets.  The foregoing treatment should also apply, to the extent permitted by applicable law, for state and local income tax purposes.

As a grantor trust, the Creditor Trust Agreement will require all items of income, gain, loss, deduction and credit to be included in the income of the Beneficiaries, and reported on such Beneficiaries' U.S. federal income tax returns as if such items had been recognized directly by the Beneficiaries in the proportions in which they own beneficial interests in the Creditor Trust.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an IRS private letter ruling if the Creditor Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Creditor Trustee), the Creditor Trustee may (i) timely elect to treat any portion or all of the Creditor Trust and/or any Creditor Trust Assets (in either case, in whole or in part) as a "disputed ownership fund" within the meaning of Treasury Regulation Section 1.468B-9 for federal income tax purposes (the "Disputed Ownership Fund") and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, any Disputed Ownership Fund will be subject to tax annually on a separate entity basis on any net income earned with respect to any Creditor Trust Assets held in any such Disputed Ownership Fund, and all distributions from such reserves will be treated as received by holders in respect of their Claims as if distributed by the Debtors.

No ruling is currently being requested from the IRS concerning the tax status of the Creditor Trust as a liquidating trust. As such, there can be no assurance that the IRS would not take a contrary position to the classification of the Creditor Trust as a liquidating trust. If the IRS were to successfully challenge the liquidating trust classification, the U.S. federal income tax consequences to the Creditor Trust and the Holders of Claims could vary from those discussed herein (including the potential for an entity level tax to be imposed on all income of the Creditor Trust). Certain U.S. federal income tax consequences of the Creditor Trust or portions thereof relating to Disputed Claims and being treated as a Disputed Ownership Fund are also discussed below.

*(b)*     **Reporting**. The Creditor Trust shall comply with all tax reporting requirements, including, without limitation, filing returns for the Creditor Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and, in connection therewith, the Creditor Trustee may require the Beneficiaries to provide certain tax information as a condition to receipt of Distributions. The Creditor Trustee shall also send to each Beneficiary a separate statement setting forth such Beneficiary's share of items of Creditor Trust income, gain, loss, deduction, or credit. Each such Beneficiary will be required to report such items on its U.S. federal income tax return; *provided*, *however*, that any reporting under this Section is subject to the Creditor Trustee's discretion to elect to treat the Creditor Trust or any Creditor Trust Assets (in whole or in part) as a Disputed Ownership Fund, which election may alter the requirement in accordance with federal tax laws and regulations.

All taxable income and loss of the Creditor Trust will be allocated among, and treated as directly earned and incurred by, the Beneficiaries with respect to such Beneficiary's interest in the assets of the Creditor Trust (and not as income or loss with respect to its prior Claims), with the possible exception of any taxable income and loss allocable to any assets allocable to, or retained on account of, Disputed Claims. The character of any income or gain and the character and ability to use any loss or loss will depend on the particular situation of the Beneficiary.

The U.S. federal income tax obligations of a Beneficiary with respect to its beneficial interest in the Creditor Trust are not dependent on the Creditor Trust distributing any Cash or other proceeds, subject to any portion(s) of the Creditor Trust allocable to Disputed Claims. Thus, a Beneficiary may incur U.S. federal income tax liability with respect to its allocable share of the Creditor Trust's income even if the Creditor Trust does not make a concurrent distribution to the U.S. Holder.

In general, other than in respect of amounts retained on account of Disputed Claims, a distribution of Cash by the Creditor Trust will not be separately taxable to a Beneficiary of the Creditor Trust, since the Beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and will be taxed at the time the Cash was earned or received by the Creditor Trust). Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of Cash originally retained by the Creditor Trust on account of Disputed Claims.

*(c)*     **Valuation**. After the Effective Date, but in no event later than four months after the initial (i.e., not extended) due date for timely filing of the Creditor Trust's first federal income tax return, the Creditor Trustee shall (i) determine the fair market value of the Creditor Trust Assets

as of the Effective Date, based on the Creditor Trustee's good faith determination (in conjunction with guidance provided by Trust Professionals (as defined in the Credit Trust Agreement), if any); and (ii) establish appropriate means to apprise the Beneficiaries of such valuation; provided, however, that no such valuation will be required if the Creditor Trustee elects to treat the Creditor Trust or the Creditor Trust Assets (in whole or in part) as a Disputed Ownership Fund. The valuation, if established pursuant to the terms of the Creditor Trust Agreement, shall be used consistently by all Parties (including, without limitation, the Debtors, the Creditor Trust, the Creditor Trustee, and the Beneficiaries) for all U.S. federal income tax purposes.

(d)    **Tax Returns**.  In accordance with the provisions of section 6012(b)(3) of the Internal Revenue Code (and any comparable provision of state or local tax law), the Creditor Trustee shall cause to be prepared, at the cost and expense of the Creditor Trust, the income tax returns (federal, state and local) that the Debtors are required to file (to the extent such returns have not already been filed by the Effective Date).  The Creditor Trustee shall also cause to be prepared, at the cost and expense of the Creditor Trust, the income tax returns (federal, and if applicable, state and local) required to be filed on behalf of the Creditor Trust, and such returns filed on behalf of the Creditor Trust shall be consistent with the treatment of the Creditor Trust as a liquidating trust within the meaning of Treasury Regulations Section 301.7701-4(d) that is a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) (other than with respect to any election by the Creditor Trustee to treat the Creditor Trust or any of the Creditor Trust Assets (in either case, in whole or in part) as a Disputed Ownership Fund), and to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  The Creditor Trustee shall timely file each such tax return with the appropriate taxing authority and shall pay out of the assets of the Creditor Trust all taxes due with respect to the period covered by each such tax return.

(e)    **Attribution of Income**.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Creditor Trustee of a private letter ruling if the Creditor Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Creditor Trustee), taxable income, gain, loss or deduction in respect of the Creditor Trust Assets shall be attributed to the Beneficiaries in proportion to their beneficial interests in the Creditor Trust Assets.  Notwithstanding anything in the Plan or Disclosure Statement, the timing of distributions shall comply with the requirements of Revenue Procedure 94-45, as determined by the Creditor Trustee in its reasonable discretion.

(f)    **Tax Identification Numbers**.  The Creditor Trustee may require any Beneficiary to furnish to the Creditor Trustee its employer or taxpayer identification number as assigned by the IRS (e.g., via signed W-9 or for any non-U.S. Beneficiary a W-8) or otherwise certify in writing to the Creditor Trustee's satisfaction that distributions from the Creditor Trust to the Beneficiary are exempt from backup withholding.  The Creditor Trustee may condition any distribution to any Beneficiary upon receipt of such identification number or exemption certification.   If after reasonable inquiry and reasonable time constraints for responding (in each case, as determined by the Creditor Trustee in its sole discretion), any Beneficiary fails to provide such identification number, then distributions to such Beneficiary shall become undeliverable property to be made

available for distribution to the remaining Beneficiaries, in accordance with the terms of the Plan and the Creditor Trust Agreement.

(g)    **Annual Statements**.  The Creditor Trustee shall annually (for tax years in which distributions from the Creditor Trust are made) send to each Beneficiary a separate statement setting forth the Beneficiary's share of items of income, gain, loss, deduction or credit, and all such Beneficiaries shall report such items on their federal income tax returns; *provided*, *however*, that any such reporting obligation under this subsection is subject to the Creditor Trustee's discretion to elect to treat the Creditor Trust or any of the Creditor Trust Assets (in either case, in whole or in part) as a Disputed Ownership Fund, which may impact the requirement of such annual statements pursuant to federal tax regulations and applicable laws.

(h)    **Notices**.  The Creditor Trustee shall distribute such notices to the Beneficiaries as the Creditor Trustee determines are necessary or desirable.

(i)    **Expedited Determination**.  The Creditor Trustee may request an expedited determination of taxes of the Debtors or of the Creditor Trust under Bankruptcy Code section 505(b) for all tax returns filed for, or on behalf of, the Debtors and the Creditor Trust for all taxable periods through the dissolution of the Creditor Trust.

(j)    **Withholding**.  The Creditor Trustee will comply with all applicable governmental withholding requirements (*see* Section 10.9 of the Plan—"Withholding, Payment and Reporting Requirements with Respect to Distributions"—below).

**9.11    Abandonment, Disposal, and Destruction of Records**.

To the extent not transferred pursuant to the 363 Sale, the Creditor Trustee shall be authorized pursuant to Bankruptcy Code section 554, in its sole discretion, without any further notice to any party or action, order or approval of the Bankruptcy Court, to abandon, dispose of, or destroy in any commercially reasonable manner all originals and/or copies of any documents, books and records, including any electronic records, of the Debtors (including those that are transferred to the Creditor Trust) and which they reasonably conclude are burdensome or of inconsequential value and benefit to the Debtors, Post-Effective Date Debtors, or the Creditor Trust.

**9.12    Distributions by Creditor Trustee**.

Following the vesting of the Creditor Trust Assets in the Creditor Trust, the Creditor Trustee shall make continuing efforts to liquidate all Creditor Trust Assets in accordance with the Plan and the Creditor Trust Agreement, *provided* that the timing of all Distributions made by the Creditor Trustee shall be made as follows:

(a) The Creditor Trust, through or as the Disbursing Agent, as applicable, will make Distributions to Holders of Claims entitling such Holder to Creditor Trust Interests that are Allowed on and after the Effective Date, to the extent that the foregoing Claims have not been paid in full on or prior to the Effective Date or otherwise in accordance with the Plan. Except as otherwise provided by the Plan, Confirmation Order, or the Creditor Trust Agreement, the Creditor Trust shall be required to distribute at least annually (or more

frequently as the Creditor Trustee may determine, in his or her sole discretion) to the Beneficiaries its net income plus all net proceeds from the sale or other disposition of Creditor Trust Assets, except that the Creditor Trust may retain an amount of net proceeds or net income reasonably necessary to maintain the value of its assets or to meet claims and contingent liabilities (including disputed claims), within the meaning of Internal Revenue Service Revenue Procedure 94-45.

(b) The Creditor Trust will make the Distributions described in Section 9.12(a) either from such accounts or reserves as the Creditor Trustee, in his or her business judgment, may determine to establish in accordance with the provisions of the Plan and the Creditor Trust Agreement.

(c) The Creditor Trust will make Distributions from the Creditor Trust Assets to each Beneficiary holding an Allowed Claim in accordance with each Beneficiary's Pro Rata share of net Cash derived from the Creditor Trust Assets being made available for such Distribution, and in accordance with the terms of the Plan and the Creditor Trust Agreement.

(d) Distributions to be made by the Creditor Trust may be made by any Person(s) designated or retained to serve as the Disbursing Agent(s) without the need for any further order of the Bankruptcy Court, in accordance with the terms of the Plan and the Creditor Trust Agreement.

(e) The Creditor Trustee shall be authorized, in his or her business judgment, to delay Distributions to holders of Beneficial Interests or otherwise determine reasonable distribution dates for such holders, including, without limitation, based upon the status and progress of the liquidation of Creditor Trust Assets, the total number of and/or asserted claim amounts of Disputed Claims, and any other relevant factors.

**9.13    Dissolution of the Creditor Trust**.

The Creditor Trustee shall be discharged and the Creditor Trust shall be terminated, at such time as: (a) (i) all Disputed Claims have been resolved, (ii) all of the Creditor Trust Assets have been liquidated, (iii) Winc has been wound down and dissolved, (iv) all duties and obligations of the Creditor Trustee under the Creditor Trust Agreement have been fulfilled, and (v) all Distributions required under the Plan and the Creditor Trust Agreement have been made; or (b) as otherwise provided in the Creditor Trust Agreement.  Upon dissolution of the Creditor Trust, any remaining assets of the Creditor Trust may be transferred by the Creditor Trustee to one or more charitable organizations if the Creditor Trustee determines, in the reasonable exercise of the Creditor Trustee's judgment, that a further distribution would be uneconomical.

**9.14    Control Provisions**.

Except to the extent required, as determined by the Creditor Trustee in its reasonable discretion, for the Creditor Trust to qualify as a liquidating trust within the meaning of Revenue Procedure 94-45, to the extent there is any inconsistency between the Plan as it relates to the

Creditor Trust and/or the Creditor Trust Agreement, the terms of the Plan shall control unless otherwise indicated herein.

**9.15    Limitation of Liability; Indemnification**.

To the maximum extent permitted by law, the Creditor Trustee, its employees, officers, directors, agents, members or representatives, or professionals employed or retained by the Creditor Trustee (including without limitation, any professionals who are members of the Creditor Trustee's own firm) (collectively, the "Creditor Trustee Agents"), will not have or incur liability to any Person or Entity for any act taken, or omission made, in good faith in connection with or related to Distributions made under the Plan or the Creditor Trust Agreement, the administration of the Creditor Trust and the implementation of the Plan.  The Creditor Trustee and the Creditor Trustee Agents will in all respects be entitled to reasonably rely on the advice of counsel and tax accounting professionals with respect to their duties and responsibilities under the Plan and the Creditor Trust Agreement.  Notwithstanding the foregoing, nothing herein will alter any provision of the Creditor Trust Agreement that provides for the potential liability of the Creditor Trustee to any Person or Entity. The Creditor Trust shall indemnify and hold harmless the Creditor Trustee and its designees and professionals, and all duly designated agents and representatives thereof (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to such actions or omissions, or consequences of their actions or omissions with respect or related to the performance of their duties or the implementation or administration of the Plan; provided, however, that no such indemnification will be made to such persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

**9.16    Company Action**.

All matters expressly provided for under the Plan that would otherwise require approval of the stockholders, members or managers of one or more of the Debtors, including but not limited to, the dissolution or merger of any of the Debtors, shall be deemed to be in effect from and after the Effective Date pursuant to the applicable law of the states in which the Debtors are organized without any requirement of action by the stockholders, members or managers of the Debtors.

**9.17    Standing to Pursue Debtors' Rights, Including Retained Causes of Action**.

Except as otherwise provided in the Plan, as of the Effective Date, the Debtors, together with any successor or successors in interest and assigns, including, without limitation, the Creditor Trustee, and any other person or entity that claims or might claim through, on behalf of, or for the benefit of any of the foregoing, shall be deemed to have preserved all Retained Causes of Action, and shall have standing to pursue such Retained Causes of Action.

**ARTICLE X**
**PROVISIONS GOVERNING DISTRIBUTIONS**

**10.1    Distributions for Allowed Claims**.

Except as otherwise provided herein or as ordered by the Bankruptcy Court, all Distributions as of the applicable Distribution Date shall be made on or as soon as practicable after

30605632.1

the applicable Distribution Date.  Distributions on account of Claims that first become Allowed Claims after the applicable Distribution Date shall be made pursuant to the terms of the Plan and on the day selected by the Creditor Trustee.

The Creditor Trustee may accelerate any Distribution Date with respect to Distributions other than the initial Distribution Date if the facts and circumstances so warrant and to the extent not inconsistent with the Plan.

Distributions made as soon as reasonably practicable after the Effective Date or such other date set forth herein shall be deemed to have been made on such date.

**10.2    Interest of Claims**.

Postpetition interest shall not accrue or be paid on Claims, and no Holder of an Allowed Claim shall be entitled to interest accruing on any Claim from and after the Petition Date.

**10.3    Distributions by Creditor Trustee as Disbursing Agent**.

From and after the Effective Date, the Creditor Trustee shall serve as the Disbursing Agent under the Plan with respect to Distributions to Holders of Allowed Claims or Creditor Trust Interests (provided that the Creditor Trustee may hire professionals or consultants to assist with making disbursements or to act as the Disbursing Agent).  Any Entity other than the Creditor Trustee that acts as the Disbursing Agent will be an agent of the Creditor Trustee and not a separate taxable Entity with respect to, among other things, the assets held, income received or disbursements or Distributions made for the Creditor Trustee.  The Disbursing Agent shall make all Distributions required under the Plan.  The Disbursing Agent shall cause to be made all Distributions required to be made to such Holders of Allowed Claims or Creditor Trust Interests pursuant to the Plan and the Creditor Trust Agreement.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of the Disbursing Agent's duties as Disbursing Agent unless otherwise ordered by the Bankruptcy Court.  If required to obtain such bond, the Disbursing Agent shall notify the Bankruptcy Court and the U.S. Trustee in writing before terminating any such bond that is obtained.  The Disbursing Agent, if not the Creditor Trustee, shall be authorized, after consultation with the Creditor Trustee, to implement such procedures as it deems necessary to make Distributions pursuant to and in accordance with the Plan so as to efficiently and economically assure prompt and proportionate Distributions.

**10.4    Means of Cash Payment**.

Cash payments under the Plan shall be made, net of any applicable withholding taxes at the option, and in the sole discretion, of the Creditor Trustee, by wire, check, or such other method as the Creditor Trustee deems appropriate under the circumstances.  Cash payments to foreign creditors may be made, at the option, and in the sole discretion, of the Creditor Trustee, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction (with any currency exchange or other expenses related to such payments being valid expenses of the Creditor Trust and paid from Creditor Trust Assets).

For purposes of effectuating Distributions under the Plan, any Claim denominated in foreign currency shall be converted to U.S. Dollars pursuant to the applicable published exchange rate in effect on the Petition Date.

**10.5    Fractional Distributions**.

Notwithstanding anything in the Plan to the contrary, no payment of fractional cents shall be made pursuant to the Plan.  Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

**10.6    De Minimis Distributions**.

Notwithstanding anything to the contrary contained in the Plan, the Creditor Trustee shall not be required to distribute, and shall not distribute, Cash or other property to the Holder of any Allowed Claim or Creditor Trust Interest if the amount of Cash or other property to be distributed on account of such Claim is less than $50.  Any Holder of an Allowed Claim or Creditor Trust Interest on account of which the amount of Cash or other property to be distributed is less than $50 shall be forever barred from asserting such Claim or Creditor Trust Interest against the Creditor Trust.

**10.7    Delivery of Distributions; Unclaimed Distributions**.

All Distributions to Holders of Allowed Claims or Creditor Trust Interests not made by wire transfer shall be made at the address of such Holder as set forth in the claims register maintained in the Chapter 11 Cases (subject to any transfer effectuated pursuant to Bankruptcy Rule 3001(e) or a change of address notification provided by a Holder in a manner reasonably acceptable to the Creditor Trustee) or, in the absence of a Filed proof of Claim, the Schedules.  The responsibility to provide the Creditor Trustee a current address of a Holder of Claims or Creditor Trust Interests shall always be the responsibility of such Holder and at no time shall the Creditor Trustee have any obligation to determine a Holder's current address.  Nothing contained in the Plan shall require the Creditor Trustee to attempt to locate any Holder of an Allowed Claim or Creditor Trust Interest.  Amounts in respect of undeliverable Distributions made by the Creditor Trustee shall be held in trust on behalf of the Holder of the Claim or Creditor Trust Interest to which they are payable until the earlier of the date that such undeliverable Distributions are claimed by such Holder and the date that is ninety (90) days after the date the undeliverable Distributions were made.  Following the expiration of ninety (90) days after the date the undeliverable Distributions were made, the amounts in respect of undeliverable Distributions shall be become unrestricted assets of the Creditor Trust, and shall be redistributed after reserving as necessary in accordance with the Plan and the Creditor Trust Agreement.  Such Holder shall be deemed to have forfeited its right to any reserved and future Distributions from the Creditor Trust and any Creditor Trust Interests held by such Holder shall be deemed cancelled, and the Claims of such Holder shall be forever barred.  All funds or other property that vest or revest in the Creditor Trust pursuant to this Section 10.7 shall be (a) used to pay the fees and expenses of the Creditor Trust as and to the extent set forth in the Plan and the Creditor Trust Agreement, and (b) thereafter distributed to Holders of Allowed Claims as otherwise provided herein.  In the event any Creditor

Trust Assets remain after all economically feasible Distributions are made, such remaining property shall be liquidated to Cash and distributed to a registered 501(c)(3) organization of the Creditor Trustee's choice, in accordance with Section 9.13 above.  Neither unclaimed property nor any remaining portion of the Creditor Trust shall escheat to any federal, state, or local government or entity.

**10.8    Application of Distribution Record Date**.

At the close of business on the Distribution Record Date, the Debtors' claims registers shall be closed, and there shall be no further required changes in the record Holders of Claims or Interests.  Except upon death of the interest holder or by operation of law, or in other instances as may be expressly provided in the Creditor Trust Agreement, the Creditor Trustee and its agents, successors, and assigns shall have no obligation to recognize any transfer of any Claim or Interest occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record Holders stated on the claims registers as of the close of business on the Distribution Record Date irrespective of the number of Distributions to be made under the Plan to such Entities or the date of such Distributions.  The Distribution Record Date shall be the Effective Date, provided, however, that the Creditor Trustee may in its discretion seek to establish an alternative Distribution Record Date.

**10.9    Withholding, Payment and Reporting Requirements With Respect to Distributions**.

All Distributions under the Plan shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions shall be subject to any such withholding, payment, and reporting requirements.  The Creditor Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements.  The Creditor Trustee may require, in its sole and absolute discretion and as a condition to the receipt of any Distribution, that the Holder of an Allowed Claim or Creditor Trust Interest complete and return to the Creditor Trust the appropriate copy of IRS Form W-8 or IRS Form W-9, as applicable, to each Holder.  Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim or Creditor Trust Interest that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution, and including, in the case of any Holder of a Disputed Claim that has become an Allowed Claim, any tax obligation that would be imposed upon the Creditor Trust in connection with such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements reasonably satisfactory to the Creditor Trustee for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Creditor Trust in connection with such Distribution.  Under the backup withholding rules of the IRS, a Holder may be subject to backup withholding, with respect to Distributions or payments made pursuant to the Plan, unless the Holder (a) comes within certain exempt categories (which includes corporations) and, when required, demonstrates this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding. Any determination regarding such backup withholding described in the preceding sentence is the sole responsibility of the

Holder in consultation with the Holder's own tax professionals and not an obligation of the Creditor Trust or Creditor Trustee.

**10.10   Setoffs**.

The Creditor Trust may, but shall not be required to, set off against any Claim or Creditor Trust Interest, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim or Creditor Trust Interest, claims of any nature whatsoever that the Debtors or the Creditor Trust may have against the Holder of such Claim or Creditor Trust Interest; *provided, however,* that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Creditor Trust of any such claim that it may have against such Holder. *provided*, *further* that the Debtors give the Holder of such Claim no less than 10 days' written notice of the proposed setoff and the Holder does not object to the proposed setoff within 30 days thereof; *provided*, *further* that if the Holder of such Claim timely objects to the proposed setoff, such setoff may not be effectuated absent a consensual agreement by the Holder of such Claim and the Debtors or, in the absence of agreement, without prior approval of the Bankruptcy Court.

**10.11   No Distribution in Excess of Allowed Amounts**.

Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall receive in respect of such Claim any Distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim.

**10.12   Allocation of Distributions**.

The Creditor Trustee may, in its sole discretion, make Distributions jointly to any Holder of an Allowed Claim and any other Entity who has asserted, or whom the Creditor Trustee has determined to have, an interest in such Allowed Claim; *provided, however*, that the Creditor Trust shall provide notice of such Distribution to any Holder of an Allowed Claim or other Entity that has asserted an interest in such Allowed Claim.

**10.13   Forfeiture of Distributions**.

If the Holder of a Claim or Creditor Trust Interest fails to Cash a check payable to it within the time period set forth in Section 10.7, fails to claim an undeliverable Distribution within the time limit set forth in Section 10.7, or fails to complete and return to the Creditor Trust, the appropriate signed Form W-8 or Form W-9 , as applicable, within one hundred twenty (120) days of the request by the Creditor Trust for the completion and return to it of the appropriate form pursuant to Section 10.9, then such Holder shall be deemed to have forfeited its right to any reserved and future Distributions from the Creditor Trust and any Creditor Trust Interests held by such Holder shall be deemed cancelled, and the Claims of such Holder shall be forever barred. The forfeited Distributions shall become unrestricted assets of the Creditor Trust, and shall be redistributed in compliance with the Plan and the Creditor Trust Agreement.  In the event the Creditor Trustee determines that any such amounts are too small in total to redistribute cost-effectively, the Creditor Trustee may instead donate them to a charitable organization(s) free of any restrictions thereon, notwithstanding any federal or state escheat laws to the contrary.

## ARTICLE XI
## PROVISIONS FOR CLAIMS OBJECTIONS AND ESTIMATION OF CLAIMS

**11.1    Claims Administration Responsibility**.

Except as otherwise specifically provided in the Plan and Creditor Trust Agreement, after the Effective Date, the Post-Effective Date Debtors and Creditor Trust, as applicable, shall have the authority (a) to file, withdraw, or litigate to judgment objections to Claims, (b) to settle, compromise, or Allow any Claim or Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, (c) to amend the Schedules in accordance with the Bankruptcy Code, and (d) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  Any agreement entered into by the Creditor Trust (acting in accordance with the terms of the Creditor Trust Agreement) with respect to the Allowance of any Claim shall be conclusive evidence and a final determination of the Allowance of such Claim, *provided, however*, that the U.S. Trustee's rights to object to Administrative Claims and Professional Fee Claims are reserved.

**11.2    Claims Objections**.

All Objections to Claims shall be Filed on or before the Claim Objection Deadline, which date may be extended one or more times by the Bankruptcy Court upon a motion filed by the Creditor Trust on or before the Claim Objection Deadline with notice only to those parties entitled to notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 as of the filing of such motion. If a timely Objection has not been Filed to a proof of Claim or the Schedules have not been amended with respect to a Claim that was scheduled by the Debtors but was not set forth in the Schedules by the Debtors as contingent, unliquidated, or disputed, then the Claim to which the proof of Claim or the Claim set forth in the Schedules relates will be treated as an Allowed Claim. Nothing contained herein shall limit the right of the Creditor Trust to object to Claims, if any, filed or amended after the Claim Objection Deadline.

**11.3    Estimation of Contingent or Unliquidated Claims**.

The Creditor Trust may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Bankruptcy Code section 502(c), regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount shall constitute the Allowed amount of such Claim.  All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.

**11.4    Distributions on Account of Disputed Claims**.

If a Claim is Disputed, no payment or Distribution otherwise provided for under the Plan shall be made on account of such Claim unless and until it becomes an Allowed Claim. Notwithstanding the foregoing, Distributions may be made on account of an undisputed portion of

a Disputed Claim in the Creditor Trustee's sole discretion.  The Creditor Trust shall, on the applicable Distribution Date, make Distributions on account of any Disputed Claim (or portion thereof) that has become an Allowed Claim.  Such Distributions shall be based upon the Distributions that would have been made to the Holder of such Claim under the Plan if such Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

**11.5    Amendments to Claims**.

On or after the Effective Date, a Claim may not be filed or amended to increase liability or to assert new liabilities without the prior authorization of the Bankruptcy Court or the Creditor Trust, and any such new or amended Claim filed without such prior authorization shall be deemed Disallowed in full without any further action.  Nothing in this paragraph shall preclude any claimant from seeking leave from the Bankruptcy Court to amend a Claim.

**11.6    Claims Paid and Payable by Third Parties**.

A Claim shall be Disallowed without an Objection thereto having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives Payment in Full on account of such Claim from a party that is not the Debtors, the Creditor Trust, or the Creditor Trustee.  Distributions under the Plan shall be made on account of any Allowed Claim that is payable pursuant to one of the Insurance Contract(s) solely up to the amount of the portion of such Allowed Claim that is (i) within the self-insured retention under such Insurance Contract(s), and/or (ii) in excess of any aggregate limits under such Insurance Contract(s).  No Entity shall have any other recourse against the Debtors, the Estates, the Creditor Trust, the Creditor Trustee, Post-Effective Date Debtor Representative, the Disbursing Agent, or any of their respective properties or assets on account of a self-insured retention under an Insurance Contract; *provided, however*, that, except as otherwise required under the applicable Insurance Contracts and applicable non-bankruptcy law, an Insurer shall not be obligated to pay amounts within any self-insured retention or other self-insured layer.

**11.7    Adjustment to Claims Without Objection**.

Any Claim that has been paid or otherwise satisfied may be designated on the Claims Register as such at the direction of the Creditor Trustee without any further action, order, or approval of the Bankruptcy Court, so long as a notice of satisfaction of claim is filed and served on affected parties.

**11.8    No Recourse**

THE ESTIMATION OF CLAIMS AND THE ESTABLISHMENT OF RESERVES UNDER THE PLAN MAY LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIM.  Notwithstanding that a particular Disputed Claim may be Allowed in an amount for which, after application of the payment priorities established by this Plan, there is insufficient value to provide a recovery equal to that received by other Holders of Allowed Claims in the respective Class, no Claim Holder shall have recourse with respect thereto against the Disbursing Agent, the Debtors, the Creditor Trustee, the Creditor Trust, Post-Effective Date Debtor Representative, or any of their respective professionals, consultants,

officers, directors, employees or members or their successors or assigns, or any of their respective property.

# ARTICLE XII
## EXECUTORY CONTRACTS

**12.1    Executory Contracts Deemed Rejected**.

On the Effective Date, all Executory Contracts shall be deemed rejected as of the Effective Date in accordance with, and subject to, the provisions and requirements of Bankruptcy Code sections 365 and 1123, except to the extent: (a) an Executory Contract is assumed pursuant to the Plan, (b) the Debtors previously have assumed, assumed and assigned or rejected such Executory Contract, (c) prior to the Effective Date, the Debtors have Filed a motion to assume, assume and assign, or reject an Executory Contract on which the Bankruptcy Court has not ruled, or (d) an Executory Contract has been assumed by Project Crush in connection with the 363 Sale, *provided, however*, that any Executory Contract that has been designated a Delayed Assumption Contract in connection with the 363 Sale and in accordance with the terms of the Sale Documents, which is not assumed as of the Delayed Assumption Date shall be deemed rejected as of the Delayed Assumption Date.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all rejections of Executory Contracts pursuant to this Article 12 and Bankruptcy Code sections 365(a) and 1123.

Pursuant to the Bar Date Order, the deadline for filing proofs of claim asserting claims arising from the rejection of an executory contract or unexpired lease under this Section 12.1 of Plan will be the date that is thirty (30) days from entry of the Confirmation Order; *provided, however*, that as set forth in the Bar Date Order, proofs of claim for any amounts allegedly owed in connection with a rejected executory contract or unexpired lease that do not arise from the rejection of such executory contract or unexpired lease must be filed on or before the General Bar Date (or such other Bar Date as may be applicable).

**12.2    Asset Purchase Agreements and Related Agreements**.

To the extent executory, the APA, TSA, and MSA, or other ancillary documents that are related to the 363 Sale, shall be assumed by the Debtors or Post-Effective Date Debtors.

**12.3    Insurance Contracts**.

*(a)    Assumption of Insurance Policies*.  On the Effective Date, the Insurance Contracts shall be assumed by the Post-Effective Date Debtors or Creditor Trust, as applicable, pursuant to sections 105 and 365 of the Bankruptcy Code.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Post-Effective Date Debtors' assumption of each of such Insurance Contracts.

*(b)    Reservation of Rights*.  Notwithstanding anything to the contrary in the Plan, the Plan Supplement, Confirmation Order, the Solicitation Procedures Order, the Bar Date Order and any related notices, any claim objection, or any document related to the foregoing: (a) except as set forth in this Section 12.3, nothing (i) alters the rights and obligations of the Debtors, their Estates, the Post-Effective Date Debtors, the Creditors Trust, and the insurers under any Insurance

Contracts, (ii) modifies the coverage provided under any Insurance Contract or the terms and conditions thereof, except that, on and after the Effective Date, the Creditor Trust shall become and remain liable in full for all of the obligations of the Debtors and their Estates under the Insurance Contracts, regardless of whether such obligations arise before or after the Effective Date and without the need of any insurer to file a proof of Claim or an Administrative Claim, or (iii) affects the insurers' rights and interests in any collateral or security they hold.  For the avoidance of doubt, all rights and obligations under the Insurance Contracts shall be governed by the applicable Insurance Contracts and applicable non-bankruptcy law;

*(c)*      **Relief from Stay/Injunction for Limited Purposes**.  The automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article 14.1 of the Plan, if and to the extent applicable, shall be deemed modified without further order of the Bankruptcy Court, solely to permit:  (i) claimants with valid workers' compensation claims or with valid direct action claims against an insurer under applicable non-bankruptcy law to proceed with their claims; (ii) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or where an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in Article XIV of the Plan to proceed with its claim, and (C) all costs in relation to each of the foregoing; and (iii) any insurer to draw against any or all of the collateral or security provided by or on behalf of the Debtors, Post-Effective Date Debtors, and/or the Creditor Trust, as applicable, or apply such proceeds to the obligations of the Debtors, Post-Effective Date Debtors, or the Creditor Trust, as applicable, under the Insurance Contracts, provided that such insurer shall use commercially reasonable practices in doing so.  For the avoidance of doubt, to the extent that a workers' compensation claim (i) is not (A) payable pursuant to one of the Insurance Contract(s) or (B) paid by a party that is not the Debtors, Post-Effective Date Debtors, the Creditor Trust, or the Creditor Trustee, and (ii) is an Allowed Claim, such workers' compensation claim shall be treated in a manner consistent with the terms of the Plan;

*(d)*      **Prohibition on Certain Acts**.  Each Insurer is prohibited from, and the Confirmation Order shall include an injunction against, denying, refusing, altering, or delaying coverage solely on any basis regarding or related to the Chapter 11 Cases, the Plan or any provision within the Plan; *provided*, *however*, that nothing herein grants or should be deemed to grant any claimant relief from the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article 14.1 of the Plan, if applicable, to proceed with their claims (other than workers' compensation and direct action claims, as provided for herein) without first seeking and receiving relief from the Bankruptcy Court from the automatic stay and/or such injunctions, to the extent applicable; *provided further*, *however*, Insurers may draw against any or all of the collateral or security provided by or on behalf of the Debtors, Post-Effective Date Debtors, and Creditor Trust, as applicable, at any time and to hold the proceeds thereof as security for the obligations of the Debtors, Post-Effective Date Debtors, and Creditor Trust, as applicable, and/or apply such proceeds to the obligations of the Debtors, Post-Effective Date Debtors, and Creditor Trust, as applicable, under the applicable Insurance Contracts, in such order as the applicable Insurer may determine, and may also take any other actions relating to the Insurance Contracts (including effectuating a setoff or recoupment), to the extent permissible in accordance with applicable non-bankruptcy law or the terms of the Insurance Contracts, *provided*, *however*, that the Insurers shall

return any remaining collateral or security to the Creditor Trust in accordance with the terms of the Insurance Contracts.

*(e)* **Insurance Neutrality**.  Nothing in the Plan or the Confirmation Order, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the rights or obligations of any insurer, or (b) any rights or obligations of the Debtors, Post-Effective Date Debtors, or Creditors Trust arising out of or under any Insurance Contract.  The Insurers, Debtors, Post-Effective Date Debtors, and Creditors Trust, as applicable, shall retain all rights and defenses under such Insurance Contracts, and such Insurance Contracts shall apply to, and be enforceable by and against, the insureds and the Debtors, Post-Effective Date Debtors, and Creditors Trust in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.  Further, for all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Insurance Contracts shall control.  For the avoidance of doubt, nothing contained in the Plan or the Confirmation Order shall operate to require any insurer to indemnify or pay the liability for any claim that it would not have been required to pay in the absence of the Plan and Confirmation Order.

## ARTICLE XIII
## CONFIRMATION AND CONSUMMATION OF THE PLAN

**13.1    Conditions Precedent to the Effective Date**.

Each of the following is a condition precedent to the occurrence of the Effective Date:

*(a)* the Confirmation Order shall have become a Final Order in full force and effect with no stay thereof then in effect, and shall be in form and substance satisfactory to the Plan Proponents;

*(b)* all actions, documents, and agreements necessary to implement the Plan, including, without limitation, all actions, documents, and agreements necessary to implement any transactions contemplated under the combined Disclosure Statement and Plan, including the Creditor Trust Agreement, shall be in form and substance satisfactory to the Plan Proponents and shall have been effectuated or executed;

*(c)* the absence of any pending or threatened government action or any law that has the effect of or actually does prevent Consummation of any transaction contemplated under the combined Disclosure Statement and Plan;

*(d)* the Creditor Trust shall have been established;

*(e)* the Professional Fee Escrow Account shall have been established and funded in accordance with the terms of the Plan; and

*(f)* solely with respect to the Plan of BWSC, the occurrence of the Effective Date shall not result in a termination, revocation or impairment of BWSC's use of its alcohol licenses during the term of the TSA, unless otherwise agreed to in writing by the Debtors, Committee, and Project Crush.

**13.2    Notice of Effective Date**.

On or before seven (7) days after the Effective Date, the Creditor Trust shall File a notice of (a) the occurrence of the Effective Date, (b) notice of the Supplemental Administrative Claim Bar Date and Professional Fee Claims Bar Date, and (c) such other matters as the Creditor Trustee deems appropriate or as may be ordered by the Bankruptcy Court.

**13.3    Waiver of Conditions Precedent to the Effective Date**.

The Plan Proponents may at any time, without notice or authorization of the Bankruptcy Court, waive in writing any or all of the conditions precedent to the Effective Date set forth in this Article 13, whereupon if all of the conditions precedent in Section 13.1 of the Plan are either met or waived, the Effective Date shall occur without further action by any Entity; *provided*, *however*, that the Plan Proponents shall not waive Section 13.1(f) of the Plan absent written agreement from Project Crush.  The Plan Proponents reserve all rights, including but not limited to the right to assert that any appeal from the Confirmation Order shall be moot after the Effective Date of the Plan.

**13.4    Effect of Non-Occurrence of Effective Date**.

If each of the conditions specified in this Article 13 have not been satisfied or waived in the manner provided herein within ninety (90) calendar days after the Confirmation Date (or such later date as may be agreed to by the Debtors and the Committee), then: (i) the Confirmation Order and the Creditor Trust Agreement shall be vacated and of no further force or effect, (ii) no Distributions under the Plan shall be made, (iii) the Debtors and all Holders of Claims against or Interests in the Debtors shall be restored to the status quo as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (iv) all of the Debtors' obligations with respect to Claims and Interests shall remain unaffected by the Plan and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors, and the Plan shall be deemed withdrawn.  Upon such occurrence, the Debtors shall File a written notification with the Bankruptcy Court and serve it upon such parties as the Bankruptcy Court may direct.

**ARTICLE XIV**
**EFFECTS OF CONFIRMATION**

**14.1    Exculpation and Injunctions.**

**Nothing contained in this Section 14.1 of the Plan shall prohibit the Holder of a Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the Distribution provisions of the Plan, or enjoin or prohibit the enforcement by the Holder of such Claim of any of the obligations of the Creditor Trust under the Plan.  The exculpations and injunctions provided for in Section 14.1 of the Plan shall be effective upon the Effective Date.**

   **(a)    Exculpation and Limitation of Liability.    Notwithstanding any other provision of the Plan, consistent with the Debtors' organizational documents and to the fullest**

extent permitted by applicable law, the Exculpated Parties shall not have or incur any liability to, or be subject to any right of action by, any Person, Entity, Holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or Affiliates, or any of their successors or assigns, for any act or omission occurring on or after the Petition Date and on or before the Effective Date relating to, in any way, or arising from (i) the Chapter 11 Cases, (ii) formulating, negotiating or implementing the Plan or any contract, instrument, or other agreement or document created or entered into in connection with the Plan, (iii) the sale of the Debtors' assets pursuant to the 363 Sale, (iv) any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring, sale or liquidation of the Debtors, (v) the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, Confirmation of the Plan, Consummation of the Plan, or (vi) the administration of the Plan or the property to be distributed under the Plan, except for any action taken by the Exculpated Parties that is determined by Final Order to constitute gross negligence or willful misconduct (including, but not limited to, fraud). The Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting the Exculpated Parties from liability. Notwithstanding any other provision in the Plan, Disclosure Statement, or Confirmation Order to the contrary, including Section 14.1(c) of the Plan, the Confirmation Order and Plan shall serve as a permanent injunction against any Entity seeking to enforce any claim or cause of action against the Exculpated Parties that has been exculpated pursuant to this Section 14.1(a) of the Plan.

*(b)*     <u>Indemnification of Officers and Directors</u>.  Nothing in the Plan, Disclosure Statement, or Confirmation Order shall (i) modify or impair any rights or interests of any current and former officers and directors of the Debtors (the "<u>Officers and Directors</u>") to indemnification under the Corporate Organizational Documents or other applicable law; (ii) modify any limitation of liability that exists pursuant to the Corporate Organizational Documents or other applicable law in a way that would adversely affect the Officers and Directors; or (iii) reduce or impair any of the Officers' and Directors' rights to, interest in, or coverage under the D&O Liability Insurance Policies.

*(c)*     <u>Non-Discharge of the Debtors; Injunction</u>.  In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors.  Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors (except for the Claims and Interests of Project Crush in connection with the BWSC Assets).  Consistent with the preceding sentence, no Entity holding a Claim against the Debtors may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Entity under the Plan.  All parties are precluded from asserting against any property to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, or Interests based upon any act, omission, transaction, or other activity that

**occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.**

**Except as otherwise expressly provided for in the Plan or with respect to obligations imposed pursuant to the Plan, all Entities are permanently enjoined, on and after the Effective Date, through and until the date upon which all remaining property of the Debtors' Estates has been liquidated and distributed to creditors or otherwise in accordance with the terms of the Plan and the Plan has been fully administered, subject to further extension by motion on notice, with all parties' rights with respect to such extension reserved, on account of any Claim or Interest, from:**

> (1) **commencing or continuing in any manner any action or other proceeding of any kind against any of the Estates, Post-Effective Date Debtors, the Creditor Trust, and each of their successors and assigns, assets, and properties;**

> (2) **enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Estate, Post-Effective Date Debtor, the Creditor Trust, their successors and assigns, and any of their assets and properties;**

> (3) **creating, perfecting or enforcing any encumbrance of any kind against any Estate, Post-Effective Date Debtor, Creditor Trust, their successors and assigns, and any of their assets and properties;**

> (4) **asserting any right of setoff or subrogation of any kind against any obligation due from any Estate, Post-Effective Date Debtor, Creditor Trust, their successors and assigns, or against any of their assets and properties, except to the extent a right to setoff or subrogation is asserted with respect to a timely filed proof of Claim.**

**Any Entity that incurs damages as a result of any willful violation of such injunction may seek actual damages and, in appropriate circumstances, may seek punitive damages from the willful violator.**

## 14.2    Term of Bankruptcy Injunction or Stays.

All injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code sections 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of the Chapter 11 Cases.

## 14.3    Allocation Between Principal and Interest.

For U.S. federal income tax purposes, Distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount (as determined for U.S. federal income tax purposes) of Allowed Claims, until paid in full, with any excess allocated to unpaid interest that has accrued on such Claims and remains unpaid.

**ARTICLE XV**
**RETENTION OF JURISDICTION**

**15.1    Exclusive Jurisdiction of Bankruptcy Court**.

Pursuant to Bankruptcy Code sections 105(a) and 1142, and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

*(a)*    allow, disallow, determine, subordinate, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest (whether filed before or after the Effective Date and whether or not Contingent, Disputed or unliquidated or for contribution, indemnification or reimbursement), including the compromise, settlement and resolution of any request for payment of any Claims or Interests, the resolution of any Objections to the allowance or priority of Claims or Interests and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any Objection to such Claim or Interest to the extent permitted under applicable law;

*(b)*    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

*(c)*    hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters, including, but not limited to, all Causes of Action, and consider and act upon the compromise and settlement of any Claim or Interest, or Cause of Action;

*(d)*    determine and resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

*(e)*    ensure that all Distributions to Holders of Allowed Claims under the Plan and the performance of the provisions of the Plan are accomplished as provided herein and resolve any issues relating to Distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

*(f)*    construe, take any action and issue such orders, prior to and following the Confirmation Date and consistent with Bankruptcy Code section 1142, as may be necessary for the enforcement, implementation, execution and Consummation of the Plan and all contracts, instruments, releases, other agreements or documents created in connection with the Plan, including, without limitation, the Disclosure Statement and the Confirmation Order, for the maintenance of the integrity of the Plan in accordance with Bankruptcy Code sections 524 and 1141 following the occurrence of the Effective Date;

(g)    determine and resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation, implementation or enforcement of the Plan (and all exhibits and schedules to the Plan) or the Confirmation Order, including the releases and injunction provisions set forth in and contemplated by the Plan or the Confirmation Order, or any entity's rights arising under or obligations incurred in connection therewith;

(h)    modify the combined Disclosure Statement and Plan or the Confirmation Order before or after the Effective Date, pursuant to Bankruptcy Code section 1127, as well as any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the combined Disclosure Statement and Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code and the Plan;

(i)    issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with Consummation, implementation or enforcement of the Plan or the Confirmation Order;

(j)    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(k)    determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the combined Disclosure Statement and Plan or the Confirmation Order;

(l)    determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)    hear and determine matters concerning state, local and federal taxes in accordance with Bankruptcy Code sections 346, 505 and 1146;

(n)    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

(o)    determine and resolve controversies related to the Estates, the Debtors, or the Creditor Trust from and after the Effective Date;

(p)    hear and determine any other matter relating to the combined Disclosure Statement and Plan; and

(q)    enter a final decree closing any or all the Chapter 11 Cases.

## ARTICLE XVI
## MISCELLANEOUS PROVISIONS

**16.1    Modification of the Plan**.

The Plan Proponents may alter, amend, or modify the Plan or any exhibits or schedules hereto under Bankruptcy Code section 1127(a) at any time prior to or after the Confirmation Date but prior to the substantial Consummation of the Plan, provided, however, that any such alteration, amendment or modification does not materially and adversely affect the treatment of Holders of Claims or Interests under the Plan.  Any Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such Holder.

**16.2    Revocation, Withdrawal, or Non-Confirmation of the Plan**.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Hearing.  If the Plan is revoked or withdrawn prior to the Confirmation Hearing, or if the Plan is not confirmed by the Bankruptcy Court, then:

*(a)*    the Plan shall be null and void in all respects, and

*(b)*    nothing contained in the combined Disclosure Statement and Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Entity, (ii) prejudice in any manner the rights of the Debtors or any other Entity, or (iii) constitute an admission of any sort by the Debtors or any other Entity.

**16.3    Binding Effect**.

Except as otherwise provided in Bankruptcy Code section 1141(d)(3) and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, the Debtors and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.

**16.4    Subordination Rights**.

The classification and manner of satisfying all Claims and the respective Distributions and treatments hereunder take into account and/or conform to the relative priority and rights of the Claims in each Class in connection with the contractual, legal and equitable subordination rights relating thereto, whether arising under contract, general principles of equitable subordination, Bankruptcy Code section 510(b) Code or otherwise.  All subordination rights that a Holder of a Claim may have with respect to any Distribution to be made under the Plan shall be implemented through the Plan, and all actions by such Holder of a Claim related to the enforcement of such subordination rights shall be enjoined permanently.  The provisions of any contractual or structural subordination of Claims shall remain enforceable by the Creditor Trust on behalf of the Estates after the occurrence of the Effective Date.  Without limitation hereunder, the Creditor

Trust, on behalf of the Estates, may likewise enforce any right of the Debtors or the Estates to equitably or otherwise subordinate Claims under Bankruptcy Code section 510, which rights are deemed transferred to, remain and are preserved in the Creditor Trust, except as otherwise expressly set forth herein or as expressly provided in a Final Order of the Bankruptcy Court in the Chapter 11 Cases.

**16.5    Severability of Plan Provisions**.

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Plan Proponents, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**16.6    Payment of Statutory Fees; Filing of Quarterly Reports**.

All U.S. Trustee Fees due and payable prior to the Effective Date shall be paid by the Debtors on or before, as applicable, the Effective Date. After the Effective Date, the Debtors, Post-Effective Date Debtors, and Creditor Trust shall be jointly and severally liable to pay any and all U.S. Trustee Fees when due and payable. To the greatest degree possible, the payment of U.S. Trustee Fees shall be made from the Creditor Trustee Assets; *provided* that Project Crush shall promptly deliver to the Creditor Trust upon request its portion of any such U.S. Trustee Fees payable by Project Crush under the Sale Documents. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Creditor Trust and Post-Effective date Debtors shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. Notwithstanding the substantive consolidation of the Consolidated Debtors called for in the Plan, each and every one of the Debtors, the Post-Effective Date Debtors, and the Creditor Trust shall remain obligated to pay U.S. Trustee Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Administrative Claim in the Chapter 11 Cases, and shall not be treated as providing any release under the Plan.

**16.7    Dissolution of the Committee**.

On the Effective Date, the Committee shall be dissolved and the members of the Committee, and professionals retained by the Committee in accordance with section 1103 of the Bankruptcy Code, shall be deemed released from their respective fiduciary obligations, duties, and responsibilities arising from or related to the Chapter 11 Cases, except with respect to: (i) prosecuting applications for professionals' compensation and reimbursement of expenses incurred as a member of the Committee, (ii) asserting, disputing, and participating in the resolution

of Professional Fee Claims, and (iii) defending participating in any appeal of the Confirmation Order or any request for reconsideration thereof, in either case prior to entry of a Final Order or Final Orders approving all Professional final fee applications in accordance with the other provisions of this Plan.  Upon the conclusion of (i) through (iii) above, the Committee shall be immediately dissolved and released.

## 16.8   Securities Registration Exemption

The securities to be issued pursuant to the Plan are to be issued without registration under the Securities Act or any similar federal, state or local law in reliance upon the exemptions set forth in section 1145 of the Bankruptcy Code to the extent applicable.  To the extent section 1145 of the Bankruptcy Code is inapplicable, these issuances are exempt from registration under the Securities Act or any similar federal, state or local law in reliance on the exemption set forth in section 4(2) of the Securities Act or Regulation D promulgated thereunder.

## 16.9   Exemption from Section 1146.

Pursuant to Bankruptcy Code section 1146(a), under the Plan, (i) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtors; or (ii) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be taxed under any law imposing a stamp tax or similar tax.  To the maximum extent permitted pursuant to Bankruptcy Code section 1146(a), any transfers of property pursuant hereto (including to the Creditor Trust and by the Creditor Trustee pursuant to the Creditor Trust Agreement) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sales or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment. All subsequent issuances, transfers or exchanges of securities, or the making or delivery of any instrument of transfer by the Debtors in the Chapter 11 Cases or by the Creditor Trustee on behalf of the Creditor Trust shall be deemed to be or have been done in furtherance of the Plan.

## 16.10   Closing of Chapter 11 Cases; Caption Change.

As of the Effective Date, the Post-Effective Date Debtors or Creditor Trust, as applicable, may file a motion to close the Chapter 11 Cases of all of the Debtors at the appropriate time; *provided*, *however*, that the Post-Effective Date Debtor Representative or Creditor Trust, as applicable, may close one or more Chapter 11 Case of any non-lead Debtor as the Creditor Trustee (or the Post-Effective Date Debtor Representative, in consultation with the Creditor Trustee) may determine in its sole judgment.  Nothing in the Plan shall authorize the closing of any case *nunc pro tunc* to a date that precedes the date any such order is entered.  Any request for *nunc pro tunc* relief shall be made on motion served on the U.S. Trustee, and the Bankruptcy Court shall rule on such request after notice and a hearing.  Upon the closing of the Chapter 11 Cases, the Creditor

Trust shall File a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

**16.11   Filing of Additional Documents**.

On or before the Effective Date of the Plan, the Plan Proponents may issue, execute, deliver, and File with the Bankruptcy Court or record any agreements and other documents, and take any action as may be necessary or appropriate to effectuate, consummate and further evidence the terms and conditions of the Plan.

**16.12   Cancellation of Existing Securities and Agreements**

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, shares, bonds, indentures, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, and other documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in the Debtors giving rise to any rights or obligations relating to Claims or Interests, shall be deemed cancelled and surrendered without any need for a Holder to take further action with respect thereto.  Except as otherwise provided herein, the terms and provisions of the Plan shall modify any existing contract or agreement that would in any way be inconsistent with Distributions under the Plan.

Upon the Effective Date, Interests in Reorganized Winc will automatically vest in, and be assigned to, Reorganized Winc; and the New Common Stock in Reorganized Winc will automatically vest in, and be issued to, the Creditor Trust.

**16.13   Successors and Assigns**.

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Entity.

**16.14   Governing Law**.

Except to the extent that the Bankruptcy Code or Bankruptcy Rules or other federal laws is applicable, and subject to the provisions of any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the construction, implementation and enforcement of the Plan and all rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to conflicts of law principles which would apply the law of a jurisdiction other than the State of Delaware or the United States of America.

**16.15   Exhibits and Schedules**.

All exhibits and schedules annexed hereto, and all documents submitted in support hereof, are incorporated into and are a part of the Plan as if set forth in full herein.  Holders of Claims and Interests may obtain copies of the Filed exhibits and schedules upon written request to the Debtors. Upon their Filing, the exhibits and schedules may be inspected in the Office of the Clerk of the

Bankruptcy Court or its designee during normal business hours.  The documents contained in the exhibits and schedules shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.  To the extent any exhibit or schedule annexed hereto is inconsistent with the Plan, the contents of the Plan shall control.

**16.16  Computation of Time**.

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**16.17  Reservation of Rights**.

The Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan shall not be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims and Interests.

Dated: August 1, 2023

**Winc, Inc.,** *et al.*

*/s/ Carol Brault*
Name:  Carol Brault
Title:  Authorized Person

## **EXHIBIT A**

**Delayed Assumption Contracts**

Delayed Assumed Contracts

:

| Counterparty Name | Description of Contract |
|---|---|
| ALTA LOMA WINEYARD LLC | GRAPE PURCHASE AGREEMENT DTD 4/10/2022 |
| ARTISAN BRANDS LLLP | DISTRIBUTION AGREEMENT DTD 4/5/2022 |
| AVALARA INC | SALES ORDER DTD 4/19/2021 |
| AVALARA INC | SALES ORDER DTD 3/4/2021 |
| AVALARA INC | ORDER FORM DTD 4/28/2020 |
| AVALARA INC | ORDER FORM DTD 3/31/2020 |
| BACCHUS GROUP INC, THE | AGENCY AGREEMENT DTD 3/16/2020 |
| BEVERAGE MARKETING & MORE INC | BROKER AGREEMENT DTD 10/1/2021 |
| BIOWEINGUT LORENZGBR | LETTER OF APPOINTMENT DTD 4/27/2021 |
| BODEGA MATARROMERA S.L. | LETTER OF APPOINTMENT DTD 4/27/2021 |
| BODEGAS IRANZO, S.L. | SOLE SOURCE LETTER DTD 4/26/2021 |
| CANTINA SOCIALE DI PUIANELLO E COVIOLO S.C.A. | LETTER OF APPOINTMENT DTD 4/30/2021 |
| CHURCHKEY INC | BROKER AGREEMENT DTD 2/18/2022 |
| COLUMBIA BUSINESS CENTER PARTNERS LP | SECOND AMENDMENT TO STANDARD INDUSTRIAL/COMERCIAL MULTI-TENANT LEASE-GROSS DTD 3/20/2021 |
| COLUMBIA BUSINESS CENTER PARTNERS LP | FIRST AMENDMENT TO STANDARD INDUSTRIAL/COMERCIAL MULTI-TENANT LEASE-GROSS DTD 9/10/2020 |
| COMMONS COLLABS LLC | CO-MANUFACTURING AND SUPPLY AGREEMENT DTD 11/1/2022 |
| DOMAINE GIOULIS SA | LETTER OF APPOINTMENT DTD 4/27/2021 |
| EAGLES STADIUM OPERATOR LLC | SPONSORSHIP AGREEMENT DTD 12/30/2019 |
| FAVORITE BRANDS LLC | DISTRIBUTION AGREEMENT |
| FEDEX CORPORATE SERVICES INC | ALCOHOL SHIPPING AGREEMENT DTD 10/24/2019 |
| GEORGE'S DISTRIBUTING INC | AGREEMENT OF DISTRIBUTORSHIP WINE DTD 5/9/2019 |
| HARV 81 USA INC | SALES AGREEMENT DTD 7/23/2021 |
| INTERNATIONAL WINES INC | DISTRIBUTION AGREEMENT (MISSISSIPPI) |
| INTERNATIONAL WINES INC | DISTRIBUTION AGREEMENT (ALABAMA) |
| IRANZO FIELDS, S.L. | LETTER OF APPOINTMENT DTD 4/27/2021 |
| KYLIX VINEYARDS CALIFORNIA LP | GRAPE PURCHASE AGREEMENT DTD 7/25/2022 |
| LA CANTINA PIZZOLATO SRL | LETTER OF APPOINTMENT DTD 4/27/2021 |
| LA CANTINA PIZZOLATO SRL | LETTER OF APPOINTMENT DTD 10/4/2019 |
| LA CANTINA PIZZOLATO SRL | LETTER CONFIRMING THE RIGHTS TO DISTRIBUTE WINE DTD 4/27/2021 |
| LANGETWINS WINE COMPANY INC | BULK WINE STORAGE AGREEMENT DTD 4/10/2022 |

| | |
|---|---|
| LANGETWINS WINE COMPANY INC | ALTERNATING PROPRIETOR & BOTTLING SERVICES AGREEMENT DTD 6/20/2016 |
| LANGETWINS WINE COMPANY, INC. | FIRST AMENDMENT TO ALTERNATING PROPRIETOR AND BOTTLING SERVICES AGREEMENT DTD 5/1/2020 |
| LANGETWINS WINERY & VINEYARDS | WINE PURCHASE AGREEMENT DTD 3/12/2022 |
| LANGETWINS WINERY & VINEYARDS | WINE PURCHASE AGREEMENT DTD 3/12/2022 |
| LANGETWINS WINERY & VINEYARDS | WINE PURCHASE AGREEMENT DTD 2/3/2022 |
| LANTERNA DISTRIBUTORS INC | DISTRIBUTION AGREEMENT DTD 1/24/2020 |
| LODI WINEGRAPE COMMISSION | CERTIFICATION MARK LICENSE AGREEMENT DTD 11/9/2022 |
| LOMA DEL RIO VINEYARDS LLC | GRAPE PURCHASE AGREEMENT DTD 4/10/2022 |
| MAISON RAYMOND | LETTER OF APPOINTMENT DTD 4/27/2021 |
| MARKETPLACE SELECTIONS INC | EXCLUSIVE DISTRIBUTION AGREEMENT DTD 4/11/2022 |
| MED WINES | LETTER OF APPOINTMENT DTD 4/26/2021 |
| MENDOCINO WINE GROUP LLC | WINERY FACILITIES ALTERNATE PROPRIETOR AGREEMENT DTD 1/27/2021 |
| MICHLITS WERNER GMBH | SOLE SOURCE LETTER DTD 3/31/2022 |
| MICHLITS WERNER GMBH | LETTER OF APPOINTMENT DTD 5/5/2021 |
| MY WINES & SPIRITS PRIVATE LTD | APPOINTMENT LETTER |
| NAPPI DISTRIBUTORS | DISTRIBUTION AGREEMENT DTD 10/9/2020 |
| NATIONAL DISTRIBUTING COMPANY INC | DISTRIBUTION AGREEMENT DTD 4/1/2020 |
| PHASE 2 CELLARS LLC | CUSTOM CRUSH AGREEMENT DTD 4/19/2022 |
| PHILADELPHIA EAGLES LLC | SPONSORSHIP AGREEMENT DTD 12/30/2019 |
| PILOT RESEARCH AND DEVELOPMENT INC | SERVICES AGREEMENT DTD 8/11/2021 |
| PROVIVA SRL | LETTER OF APPOINTMENT DTD 4/27/2021 |
| QUINTA DA PLANSEL | LETTER OF APPOINTMENT DTD 4/27/2021 |
| RB WINE ASSOCIATES LLC | ALTERNATING PREMISIS AGREEMENT DTD 8/31/2021 |
| REPUBLIC NATIONAL DISTRIBUTING CO LLC | DISTRIBUTION AGREEMENT DTD 3/16/2020 |
| REPUBLIC NAT'L DISTRIBUTING CO LLC | DISTRIBUTION AGREEMENT DTD 1/28/2020 |
| SANTA BARBARA HIGHLANDS VINEYARD | WINE GRAPE PURCHASE AGREEMENT VINEYARD DTD 7/17/2020 |
| SARL CHATEAU BEAUBOIS | LETTER OF APPOINTMENT DTD 4/27/2021 |
| SHELBY DISTRIBUTORS LLC | WINE DISTRIBUTION AGREEMENT DTD 5/20/2021 |
| SIN ALCOHOL S.L. | LETTER OF APPOINTMENT DTD 4/27/2021 |
| SOUTHERN GLAZER'S WINE AND SPIRITS OF TN | DISTRIBUTION AGREEMENT DTD 2/28/2021 |
| SP COMINO LLC | GRAPE PURCHASE AGREEMENT DTD 7/25/2022 |
| SUMMERLAND WINE BRANDS | MEMORANDUM OF UNDERSTANDING DTD 5/16/2022 |
| SWG PASO VINEYARDS LLC | GRAPE PURCHASE AGREEMENT DTD 4/5/2018 |
| T ELENTENY HOLDINGS LLC | IMPORTING & DISTRIBUTION LOGISTICS SUPPORT AGREEMENT DTD 2/1/2016 |
| TAVERN CRAFT LLC | EXCLUSIVE FRANCHISE DISTRIBUTION AGREEMENT DTD 3/10/2020 |
| TESTANEY INC | PURCHASE ORDER #PO10888 DTD 11/9/2022 |
| TESTANEY INC | BULK WINE AGREEMENT DTD 8/29/2022 |
| TESTANEY INC | BULK WINE AGREEMENT #101 DTD 4/19/2022 |
| TOP IT OFF BOTTLING LLC | PROJECT INFORMATION DTD 10/18/2022 |
| TOP IT OFF BOTTLING LLC | GENERAL TERMS AND CONDITIONS DTD 10/18/2022 |

| | |
|---|---|
| VINA KOYLE S.A. | LETTER OF APPOINTMENT DTD 4/27/2021 |
| VINTEGRITY LLC | DISTRIBUTION AGREEMENT DTD 8/17/2021 |
| WEIBEL VINEYARDS AND WINERY | WINERY FACILITIES AGREEMENT DTD 3/16/2021 |
| WEIBEL VINEYARDS AND WINERY | CUSTOM SPARKLING WINE PRODUCTION AND BOTTLING AGREEMENT DTD 3/1/2018 |
| YOUNG'S MARKET COMPANY LLC | DISTRIBUTION AGREEMENT DTD 2/8/2021 |
| JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A) BY MANUALIFE INVESTMENT MANAGEMENT AGRICULTURAL SERVICES AS MANAGER | SUNSET VINEYARD GRAPE PURCHASE AGREEMENT DTD 7/21/2022 |
| JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A) BY MANUALIFE INVESTMENT MANAGEMENT AGRICULTURAL SERVICES AS MANAGER | SAN MIGUEL WEST VINEYARD GRAPE PURCHASE AGREEMENT DTD 8/31/2022 |
| AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC. | AMERICAN EXPRESS CARD ACCEPTANCE AGREEMENT DTD 10/2022 |
| AGRICULTURA Y BODEGA RENACIMIENTO DE OLIVARES S.L. | TRADEMARK AGREEMENT - GRANZA DTD 12/8/2015 |
| GORDON LOGISTICS | WAREHOUSING AGREEMENT DTD 1/1/2017 |
| LA CANTINA PIZZOLATO | EXCLUSIVE SALES IMPORTER & DISTRIBUTION AGREEMENT DTD 9/19/2007 |
| MICHLITS WERNER GMBH | EXCLUSIVE SALES IMPORTER & DISTRIBUTION AGREEMENT DTD 3/4/2008 |
| PROVIVA S.R.L. | TRADEMARK AGREEMENT - INKARRI DTD 4/27/2017 |
| SARL CHATEAU BEAUBOIS | EXCLUSIVE SALES IMPORTER & DISTRIBUTION AGREEMENT DTD 11/22/2020 |
| SARL RAYMOND VFI | TRADEMARK AGREEMENT - LES HAUTS DE LAGARDE DTD 4/30/2012 |
| SARL RAYMOND VFI | EXCLUSIVE SALES IMPORTER & DISTRIBUTION AGREEMENT DTD 9/18/2008 |
| SP BODEGAS MATARRAOMERA | TRADEMARK AGREEMENT - WIN DTD 10/29/2020 |
| VINA KOYLE S.A. | TRADEMARK AGREEMENT - KOYLE GRAN RESERVA DTD 4/16/2018 |

30059390.2

# **EXHIBIT B**

## **Liquidation Analysis**

**Winc, Inc., et al**
Liquidation Analysis

### Winc, Inc. Assets and Estimated Proceeds

| Assets: | | Balance 4/30/23 | Assumed Recovery | Proceeds | | | | Memo | Notes |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Ch. 7 (low) | Ch. 7 (high) | Ch. 11 (low) | Ch. 11 (high) | | |
| Cash and cash equivalents | $ | 2,168,272 | 100% | $ 2,168,272 | $ 2,168,272 | $ 2,168,272 | $ 2,168,272 | | 1) |
| Accounts receivable | | - | 0% | - | - | - | - | | |
| Other receivables | | - | 0% | - | - | - | - | | |
| Inventory | | - | 0% | - | - | - | - | | |
| Prepaids and other current assets | | - | 0% | - | - | - | - | | |
| Fixed assets | | - | 0% | - | - | - | - | | |
| Intangible assets | | - | 0% | - | - | - | - | | |
| Other assets | | - | 0% | - | - | - | - | | |
| **Winc Estimated Proceeds** | | | | $ 2,168,272 | $ 2,168,272 | $ 2,168,272 | $ 2,168,272 | **A** | |

### BWSC LLC Assets and Estimated Proceeds

| Assets: | | Balance 4/30/23 | Assumed Recovery | Proceeds | | | | Memo | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Ch. 7 (low) | Ch. 7 (high) | Ch. 11 (low) | Ch. 11 (high) | | |
| Cash and cash equivalents | $ | - | 100% | $ - | $ - | $ - | $ - | | |
| Accounts receivable | | - | 0% | - | - | - | - | | |
| Other receivables | | - | 0% | - | - | - | - | | |
| Inventory | | - | 0% | - | - | - | - | | |
| Prepaids and other current assets | | - | 0% | - | - | - | - | | |
| Fixed assets | | - | 0% | - | - | - | - | | |
| Intangible assets | | - | 0% | - | - | - | - | | |
| Other assets | | - | 0% | - | - | - | - | | |
| **BWSC Estimated Proceeds** | | | | $ - | $ - | $ - | $ - | **B** | |

### Lost Poet Assets and Estimated Proceeds

| Assets: | | Balance 4/30/23 | Assumed Recovery | Proceeds | | | | Memo | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Ch. 7 (low) | Ch. 7 (high) | Ch. 11 (low) | Ch. 11 (high) | | |
| Cash and cash equivalents | $ | - | 100% | $ - | $ - | $ - | $ - | | |
| Accounts receivable | | - | 0% | - | - | - | - | | |
| Other receivables | | - | 0% | - | - | - | - | | |
| Inventory | | - | 0% | - | - | - | - | | |
| Prepaids and other current assets | | - | 0% | - | - | - | - | | |
| Fixed assets | | - | 0% | - | - | - | - | | |
| Intangible assets | | - | 0% | - | - | - | - | | |
| Other assets | | - | 0% | - | - | - | - | | |
| **BWSC Estimated Proceeds** | | | | $ - | $ - | $ - | $ - | **C** | |
| **Total Estimated Proceeds (all Debtors)** | | | | $ 2,168,272 | $ 2,168,272 | $ 2,168,272 | $ 2,168,272 | $\sum_{A, B, C} = D$ | |

1) $ 1.8 million ending cash balance (per MOR) plus $340k for escrow account

**Winc, Inc., et al**
Liquidation Analysis

| Winc, Inc., et al Projected Class Recoveries | Ch. 7 (low) | Ch. 7 (high) | Ch. 11 (low) | Ch. 11 (high) | Memo | Notes |
|---|---|---|---|---|---|---|
| Total Estimated Proceeds (all Debtors) | $ 2,168,272 | $ 2,168,272 | $ 2,168,272 | $ 2,168,272 | D | |
| **Less:** | | | | | | |
| Case Expenses through July 2023 | $ (403,084) | $ (403,084) | $ (403,084) | $ (403,084) | | |
| Ch 7 Trustee Fees | (65,048) | (65,048) | - | - | | |
| Ch 7 Trustee Professional Fees | (800,000) | (800,000) | - | - | | |
| Ch 11 Post Confirmation Professional Fees | - | - | (500,000) | (500,000) | | |
| Other Fees & Expenses | - | - | - | - | | |
| **Total Deductions** | $ (1,268,132) | $ (1,268,132) | $ (903,084) | $ (903,084) | E | |
| **Estimated Proceeds to Creditors** | $ 900,140 | $ 900,140 | $ 1,265,188 | $ 1,265,188 | $\Sigma_{D,E}$ | |
| **Claims** | | | | | | |
| Administrative Claims | $ 426,251 | $ 426,251 | $ 426,251 | $ 426,251 | | 2) |
| Class 1: Priority Claims | 239,418 | 57,394 | 239,418 | 57,394 | | 3) |
| Class 2: Secured Claims | 35 | 35 | 35 | 35 | | |
| Class 3: General Unsecured Claims | 15,704,336 | 12,086,464 | 15,704,336 | 12,086,464 | | 4) |
| **Total Claims** | $ 16,370,040 | $ 12,570,144 | $ 16,370,040 | $ 12,570,144 | | |

| Recoveries | Ch. 7 (low) | Ch. 7 (high) | Ch. 11 (low) | Ch. 11 (high) |
|---|---|---|---|---|
| Administrative Claims | 100.00% | 100.00% | 100.00% | 100.00% |
| Class 1: Priority Claims | 100.00% | 100.00% | 100.00% | 100.00% |
| Class 2: Secured Claims | 100.00% | 100.00% | 100.00% | 100.00% |
| Class 3: General Unsecured Claims | 1.49% | 3.45% | 3.82% | 6.47% |

2) Includes $400K placeholder for additional Administrative Claims
3) Low includes disputed priority taxes
4) Low includes $1.2M placeholder for additional disputed claims